**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **WARREN F. JONES** | § | **CIVIL ACTION NO. 1:24-cv-00350** |
| *Plaintiff* | § | |
| | § | **JUDGE MARCIA A. CRONE** |
| **v.** | § | |
| | § | |
| **CHEVRON PHILLIPS CHEMICAL** | § | |
| **COMPANY LP** | § | |
| *Defendant* | § | |
| | § | **JURY DEMANDED** |

---

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**SUDDUTH & ASSOCIATES, LLC**

1109 Pithon Street
Lake Charles, Louisiana 70601
Tel: (337) 480-0101
Fax: (337) 419-0507
Email: james@saa.legal
kourtney@saa.legal

*/s/ James E. Sudduth, III*
**JAMES E. SUDDUTH, III (#24093227)**
**KOURTNEY L. KECH (#24107826)**
*Counsel for Plaintiff*

## TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS ........2

ADDITIONAL STATEMENTS OF UNDISPUTED MATERIAL FACTS ..............................12

A. Jones' Disabling Condition and Resultant Limitations ..............................12

B. Dr. Hart's Communications With and About Jones ..............................12

C. The Console Room Lighting ..............................13

D. Jones' Use of a Portable Lamp ..............................13

E. Dr. Stanton's Qualifications, Communications, and Actions/Inactions With Respect To Jones ..............................13

RESPONSE TO DEFENDANT'S STATEMENT OF ISSUES ..............................13

LAW AND ARGUMENT ..............................14

I. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Failed to Reasonably Accommodate Jones in Violation of the ADA/TCHRA ..............................14

A. CPChem's Motion Improperly Omits the Full Spectrum of Reasonable Accommodations Posed ..............................14

1. October 3, 2022: Discussions of Adaptive Devices, Reversion to the Outside Operator Position, and/or Reassignment to a Safety or Maintenance Position ..............................16

2. October 20, 2022: Repair the Lights Over the Heater Board ..............................18

3. Requests Between November 17, 2022—December 6, 2022 ..............................19

4. December 12, 2022: Request for Transfer/Reassignment to Vacant Instrument Mechanic Position ..............................20

B. CPChem Has Produced No Evidence that it Implemented Any of the Foregoing Accommodations ..............................21

C. Record Evidence Confirms that CPChem Did Not Accommodate Jones' Lighting-Based Accommodation Request(s) ..............................22

1. Resolving Fact Disputes and Inferences in Jones' Favor, Jones' Use of a Portable Lamp Did **Not** Sufficiently Accommodate His Disability ................22

2. CPChem Did **Not** Complete the Work Order or Otherwise Satisfy Jones' Repair Request Prior to Terminating His Employment ........................25

3. Jones Continued Raising Vision Concerns Pertaining to the Heater Board After October 20, 2022; CPChem Misstates the Record and Material Fact ....27

4. CPChem's Response to Jones' Continued Vision Concerns was Woefully Insufficient ........................................................................................28

D. Record Evidence Confirms that CPChem Did Not Accommodate Jones' Request To Perform Work as an Outside Operator ..........................................................30

1. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Failed to Or Otherwise Refused to Even consider the Accommodation Posed .............31

2. Resolving Fact Disputes and Inferences in Jones' Favor, Permitting Jones to Work as an "Outside" Operator Was a Reasonable Accommodation ..............................................................................31

II. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Suspended and Terminated Jones on Account of His Disability in Violation of the ADA/TCHRA ..........35

A. CPChem's Motion Relies Upon an Inappropriate Analytical Framework..................35

B. Alternatively, Resolving Fact Disputes and Inferences in Jones' Favor, Jones Establishes a *Prima Facie* Case of Disability Discrimination....................................38

III. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Terminated Jones In Retaliation for His Requests for Reasonable Accommodation(s) in Violation of the ADA/TCHRA ..........................................................................................40

A. Resolving Fact Disputes and Inferences in Jones' Favor, Jones Establishes a *Prima Facie* Case of Retaliation....................................................................40

B. Resolving Fact Disputes and Inferences in Jones' Favor, Jones Has Established a Clear, Causal Link Between His Protected Activity and CPChem's Suspension/Termination Decision(s) ..............................................................42

CONCLUSION........................................................................................................43

CERTIFICATE OF SERVICE ........................................................................................................44

# TABLE OF AUTHORITIES

## Case Law

*Burch v. Coca-Cola Co.*,
119 F.3d 305 (5th Cir. 1997) ........................................................................................34

*Carrizal v. Quality Edge*,
2019 WL 1077350 (N.D. Tex. Mar. 7, 2019)..................................................................39

*Credeur v. La. Through Office of Atty. Gen.*,
860 F.3d 785 (5th Cir. 2017) ........................................................................................14

*Delaval v. PTech Drilling Tubulars, L.L.C.*,
824 F.3d 476 (5th Cir. 2016) ..........................................................................15, 38, 39

*Dillard v. City of Austin*,
837 F.3d 557 (5th Cir. 2016) ........................................................................................21

*E.E.O.C. v. LHC Grp., Inc.*,
773 F.3d 688 (5th Cir. 2014) ...................................................................................38, 39

*Foreman v. Babcock & Wilcox Co.*,
117 F.3d 800 (5th Cir. 1997) ........................................................................................32

*Goldman v. Sol Goldman Investments LLC*,
2022 WL 6564021 (S.D.N.Y. Aug. 5, 2022).................................................................36

*Gover v. Frankel Family Tr.*,
537 Fed. Appx. 518 (5th Cir. 2013) ...............................................................................35

*Gross v. Carlisle Construction Materials, L.L.C.*,
2025 WL 2427194 (5th Cir. 2025)..................................................................................20

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009).......................................................................................................38

*Harmon v. Collier*,
58 F.4th 595 (5th Cir. 2025)...........................................................................................39

*Hildebrand, III v. Dollar General Corporation*,
2013 WL 3761291, * 9 (M.D. Tenn. Jul. 16, 2013).....................................21, 36, 37

*Mathis v. BDO USA, LLP*, 2014 WL 975706 (S.D. Tex. Mar. 12, 2014) ...........................39

*McMillan v. City of New York*,
711 F.3d 120 (2d Cir. 2013) ..........................................................................................36

*Molina v. DSI Renal, Inc.*,
840 F.Supp.2d 984 (W.D. Tex. Jan. 4, 2012) ....................15

*Neely v. PSEG Tex., Ltd. P'ship*,
735 F.3d 242 (5th Cir. 2013) ....................14, 35

*Parker v. Sony Pictures Entm't, Inc.*,
260 F.3d 100 (2d Cir. 2001) ....................36

*Piligian v. Icahn School of Medicine at Mount Sinai*,
490 F.Supp.3d 707 (S.D.N.Y. Sept. 28, 2020) ....................35, 36

*Quantum Chem. Corp. v. Toennies*,
47 S.W.3d 473 (Tex. 2001) ....................39

*Strife v. Aldine Independent School District*,
138 F.4th 237 (5th Cir. 2025) ....................21, 22

*Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155 (5th Cir.),
*cert. denied*, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996) ....................15

*Thompson v. Microsoft Corporation*,
2 F.4th 460 (5th Cir. 2021) ....................38, 39

*Way v. City of Missouri City*,
133 F.4th 509 (5th Cir. 2025) ....................40

*Williams v. Tarrant Cnty. Coll. Dist.*,
717 F. App'x 440 (5th Cir. 2018) ....................14

**Statutes**

29 C.F.R. § 1630.9 ....................14

42 U.S.C. § 12111(8) ....................20

42 U.S.C. § 12111(9)(B) ....................20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **WARREN F. JONES** | § | **CIVIL ACTION NO. 1:24-cv-00350** |
| *Plaintiff* | § | |
| | § | **JUDGE MARCIA A. CRONE** |
| **v.** | § | |
| | § | |
| **CHEVRON PHILLIPS CHEMICAL** | § | |
| **COMPANY LP** | § | |
| *Defendant* | § | |
| | § | **JURY DEMANDED** |

---

**APPENDIX**

---

**EXHIBIT A:** Deposition of Warren Jones (APPX 001)

**EXHIBIT B:** Deposition of William Hart, MD (APPX 220)

**EXHIBIT C:** Deposition of James Stanton, MD (APPX 250)

**EXHIBIT D:** Deposition of Judson Wooters (APPX 271)

**EXHIBIT E:** Deposition of Clay Ryan (APPX 326)

**EXHIBIT F:** Deposition of Chelse Cisneros Morris (APPX 359)

**EXHIBIT G:** Deposition of Aprile Danford (APPX 392)

**EXHIBIT H:** Deposition of Bryan Kubsch (APPX 421)

**EXHIBIT I:** Deposition of Nicholas Graham (APPX 448)

**EXHIBIT J:** Deposition of Jimmie Hayes, Jr. (APPX466)

**EXHIBIT K:** Deposition of Joshua Montalvo (APPX 488)

**EXHIBIT L:** Warren Jones Employee History Detail Report (APPX 516)

**EXHIBIT M:** Performance Improvement Plan dated October 13, 2022, PIP Update and Action Plan dated November 17, 2022, including email from Judson Wooters to Warren Jones recapping November 17, 2022 discussion, and Wooters forwarding the correspondence to Chelse Cisneros on November 28, 2022 (APPX 519)

**EXHIBIT N:** Unspecified Policy/Training Guideline Regarding Unsuccessful Unit Review Attempts (APPX 529)

**EXHIBIT O:** CPChem Compliance Policy No. 2150: Employment of Individuals with Disabilities (APPX 531)

**EXHIBIT P:** Chelse Cisneros Meeting Minutes for October 3, 2022 meeting (APPX535)

**EXHIBIT Q:** Termination Recommendation Memo prepared December 22, 2022 and Seven-Factor Test (APPX 538)

**EXHIBIT R:** Terminating Talking Points (APPX 542)

**EXHIBIT S:** Review 1 Sheets (APPX 545)

**EXHIBIT T:** Review 2 Sheets (APPX 577)

**EXHIBIT U:** Review 3 Sheets (APPX 635)

**EXHIBIT V:** Review 4 Sheets (APPX 693)

**EXHIBIT W:** Email Exchange Between Chelsea Cisneros and Jeannie Johnson dated September 19, 2022 (APPX 740)

**EXHIBIT X:** Email Exchange Between Jeannie Johnson and James Stanton dated October 12, 2022 (APPX 745)

**EXHIBIT Y:** Email from Jeannie Johnson to Chelsea Cisneros dated December 12, 2022 and Clinical Visit Progress note dated December 12, 2022 (APPX 748)

**EXHIBIT Z:** Warren Jones Equifax CaseBuilder Report (APPX 751)

**EXHIBIT AA:** Port Arthur Plant Process Operation Functional Job Description and email exchange between Chelsea Cisneros and Jeannie Johnson dated September 22, 2022 (APPX 755)

**EXHIBIT AB:** Excerpts from Articles of Agreement United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union AFL-CIO, CLC and Its Affiliated Local 13-423 and Chevron Phillips Chemical Company LP Port Arthur Plant and Stipulations (APPX 760)

**EXHIBIT AC:** CPChem EEOC Position Statement dated June 16, 2023 (APPX 770)

**EXHIBIT AD:** Email Exchange Between Warren Jones, Aprile Danford, Chelse Cisneros, Bryan Kubsch and Judson Wooters dated September 13, 2022 (APPX 778)

**EXHIBIT AE:** Email from Aprile Danford to Chelse Cisneros and Kelsey Bounds dated September 19, 2022 (APPX 780)

**EXHIBIT AF:** Email from Chelsea Cisneros to Warren Jones dated September 26, 2022 (APPX 785)

**EXHIBIT AG:** Email from Judson Wooters to Aprile Danford and Chelse Cisneros containing PIP Draft dated October 10, 2022 (APPX 787)

**EXHIBIT AH:** Emails from Chelsea Cisneros to Bryan Kubsch, April Danford, and Jeannie Johnson dated October 11-12, 2022 containing proposed Summary of Meet and Confer with Warren Jones (APPX 789)

**EXHIBIT AI:** Email exchange between Chelsea Cisneros and Warren Jones dated October 19-20, 2022, including Cisneros forward to Bryan Kubsch and Judson Wooters (APPX 795)

**EXHIBIT AJ:** Email exchange between Chelse Cisneros and James Stanton dated December 12, 2022 (APPX 806)

**EXHIBIT AK:** Email exchange between CPChem HR and Leadership re: Warren Jones Termination dated December 28, 2022 through January 2, 2023 (APPX 808)

**EXHIBIT AL:** Warren Jones Application for Job Vacancy and related emails dated December 12, 2022 (APPX 813)

**EXHIBIT AM:** Email exchange between Chelsea Cisneros and Judson Wooters re: accommodation meeting for Warren Jones (APPX 817)

**EXHIBIT AN:** Email exchange between Chelsea Cisneros and James Stanton, MD dated December 5-6, 2022 (APPX 821)

**EXHIBIT AO:** Email exchange between Chelsea Cisneros and Judson Wooters dated December 12, 2022 (APPX 824)

**EXHIBIT AP:** Email from Chelsea Cisneros to Greg Parsley dated October 24, 2022 providing accommodation letter provided to Warren Jones on October 19, 2022 (APPX 827)

**EXHIBIT AQ:** Email exchange between Warren Jones and Greg Parsley dated November 2, 2022 (APPX 830)

**EXHIBIT AR:** Email exchange between Greg Parsley and Jacob McAlister dated December 21, 2022 (APPX 833)

**EXHIBIT AS:** Email from Aprile Danford to Lauren Rudolff dated December 28, 2022 with termination recommendation and attachments (APPX 837)

**EXHIBIT AT:** Email exchange between Jimmie Hayes and Judson Wooters dated April 19, 2022 (APPX 861)

**EXHIBIT AU:** Work Order submitted 10/25/2022 and updated 10/01/2023 (APPX 863)

**EXHIBIT AV:** Photograph of heater board console taken by Warren Jones (APPX 866)

**MAY IT PLEASE THE COURT:**

## INTRODUCTION

A theme consistent amongst all of Warren Jones' ("Jones") claims is the complete and utter failure of CPChem to actually *implemen*t any one or more of the proposed accommodations posed to it starting September 19, 2022.[1] In response to what CPChem admits was a proper accommodation request by Jones, CPChem tasked a brand-new Human Resources (HR) employee—HR grad,[2] Chelse Cisneros ("Cisneros")[3]—with spearheading an interactive process arising under a legal regime of which she had bare minimum knowledge, and of which she had no personal or practical experience.[4] Whether it is due to Cisneros' inexperience or the overt lack of oversight and/or negligence by CPChem management and supervision, the record in this case highlights CPChem's ultimate inaction, which under the facts amounts to a woeful disregard for Jones' protected rights as a disabled employee.

There is no dispute that CPChem suspended,[5] and thereafter terminated, Jones for the sole reason that he was unable to pass the practical portion of the subject heater board examination after four attempts.[6] What CPChem's Motion ignores, however, is the fact that, despite the admission of its own witnesses that Jones' disability could easily have impacted his performance on the heater board examination, CPChem did not, at any point in time, actually *provide* Jones with any type of accommodation to assist him in actually seeing, reading, and/or navigating the heater board. While CPChem may have "engaged" in the interactive process to the

---

[1] Jones *formally* notified CPChem ***HR*** of his eyesight problems as of September 19, 2022 (Ex. F, p. 78-79). CPChem interpreted the email as an accommodation request because of his eyes (Ex. G, p. 46-47).

[2] An HR Grad position is an entry level HR position (Ex. F, p. 19). Human Resources Manager, Aprile Danford, claimed that Cisneros was an HR business partner at the relevant time; however, this is contradicted by Cisneros' testimony (Ex. F, p. 19; Ex. G, p. 31).

[3] Cisneros obtained her Bachelor's Degree in May 2022, and she started working for CP Chem in July 2022, approximately two (2) months before Jones' initial accommodation request (Ex. F, p. 12, 17).

[4] Jones was the first—and only—reasonable accommodation process Cisneros has handled during her employment with CPChem (Ex. F, p. 27-28).

[5] Ex. R, p. 1-2.

[6] Ex. F, p. 71-72; Ex. G, p. 61; Ex. Q; Ex. R; Ex. Z, p. 1; Ex. AR; Ex. AS.

extent it *discussed* potential accommodations with/for Jones, it altogether failed to actually *implement* a single one of them. The ADA's requirement that an employer engage in a good faith interactive process necessarily requires it to actually implement reasonable accommodations, and CPChem can point to no record evidence establishing that it did so.

Out of respect for the summary judgment procedure and its bar against a court's weighing of evidence and/or resolution of fact and/or credibility disputes, Jones did not file his own motion for summary judgment. That being said, this case represents a paradigm of a sophisticated employer failing to practically enforce the black letter of the written anti-discrimination policies it purports to follow. Jones properly initiated the ADA process, and, despite CPChem being offered a plethora of potential, reasonable accommodations, CPChem either failed to actually implement them, or it refused or otherwise failed to consider them altogether. Instead, it suspended and terminated Jones for failing a test due to his continued inability to see the board upon which he was tested. CPChem has not established that it is entitled to judgment as a matter of law, and its Motion must be denied in its entirety.

## RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Jones' Employment with CPChem.

1. Jones does not dispute Statement of Fact No. 1.

2. **Disputed.** While Jones does not dispute that there are six (6) areas of CPChem's ethylene unit as described by CPChem in Statement of Fact No. 2, Jones firmly disputes that operators "***must*** be qualified" in all of these areas, and he further disputes that qualifications in all six of the areas constitutes an "***essential job function***" of the Pool Operator role he held. There are at least two (2) former CPChem operators, Palmer Lee and Gerald Devlanc, who, for one reason or another, were permitted to work either solely inside jobs or solely outside jobs without obtaining qualifications in all six areas of the unit (Ex. A, p. 130, 185-186; Ex. E, p. 32-33). Palmer Lee, an operator who failed to qualify on the outside distillation job, was permitted to stop training on that job and to continue working outside only on heaters and compressors (Ex. A, p. 130-131; Ex. E, p. 52-53; Ex. J, p. 67-68). Devlanc only obtained one of the three board (inside) job qualifications—distillation—and after he had a couple of incidents on that board,

CPChem took Devlanc out of inside jobs and permitted Devlanc to work in the boiler unit (i.e., in outside jobs) until he retired (Ex. A, p. 130-134; Ex. E, p. 53; Ex. J, p. 69-70). Furthermore, for "good reason," CPChem can request that an employee bypass training/qualification per the terms of the collective bargaining agreement (Ex. H p. 50-52).

3. **Disputed.** Jones disputes that qualification in all six areas is an "essential job function" of the Pool operator role. *See* Response to Statement of Fact No. 2.

4. Jones does not dispute Statement of Fact No. 4.

5. Jones does not dispute Statement of Fact No. 5.

6. **Disputed.** Jones disputes the footnote to Statement of Fact No. 6 to the extent it asserts that qualification in all six areas is an "essential job function" of the Pool operator role. *See* Response to Statement of Fact No. 2. Furthermore, Statement No. 6 is factually incomplete: while Jones became an Operator on Crew 3 on May 28, 2019, he transitioned to an "Operator" on August 16, 2021, and he transitioned back to a Pool Operator on September 13, 2022 (Ex. L, p. 1).

7. Jones does not dispute Statement of Fact No. 7, subject to clarification. As described by Jones in his deposition, the job duties associated with the three outside job functions—outside heaters, outside compressors, and outside distillation—did **<u>not</u>** require Jones to work in a dark room staring a several brightly lit screens for extended periods of time (Ex. A, p. 49-53). Rather, these jobs required Jones to perform manual work, physically maintenance, service, or otherwise handling equipment, while outdoors (Ex. A, p. 49-53). Moreover, Jones' vision issues did not impact his ability to perform outside roles; he could see big words and had no problem seeing how the heaters were numbered outside (Ex. A, p. 74). In contrast, the heater board console is more complex, and more mentally taxing, than the outdoor roles because "it's a busy board" (Ex. A, p. 41; Ex. AV).

8. Jones does not dispute Statement of Fact No. 8.

9. Jones does not dispute Statement of Fact No. 9, subject to clarification. *See* Response to Statement of Fact No. 7. Additionally, Jones testified that, at the time he was presented with the heater board training opportunity, he did not anticipate any medical issues performing the job, given that he had not had any medical issues in any of the three previous jobs for which he had qualified (Ex. A, p. 50-51, 53, 55).

10. **Disputed.** First, CPChem's Statement of Fact No. 10 mischaracterizes Stipulation 35. While employees may not have had the unqualified "right" to disqualify themselves, Bryan Kubsch testified in his deposition that ***the company*** could request or otherwise permit an employee to bypass training (Ex. H, p. 30-31, 50-52). According to Kubsch, CPChem just has to have "good reason" to let an employee bypass (Ex. H, p. 50-51). Second, nowhere in pages 26-27 of Jones' deposition does he indicate that he was "fully aware" that, if he failed a training would "not result in a reassignment to his prior work

but instead would lead to termination because of his failure to qualify to perform one or more essential functions of the Operator role." Given that employees had bypass opportunities and that CPChem had permitted other operators to forego or otherwise bypass training in one or more areas, he had no reason to believe that his failure to qualify in any area would result in his termination. *See* Jones' Response to Statement of Fact No. 2. Even further, email correspondence exchanged between CPChem management employees suggests that the company had discussed or otherwise contemplated the idea of discontinuing Jones' training due to his noted vision concerns, (Ex. AT). Jones first began heater board training on March 18, 2022,[7] and on April 19, 2022—a full month later—Jimmie Hayes noted, "At Warren's request ***he would like to continue training***. He has some new described glasses coming in two weeks…." (Ex. AT). The fact that Jones "requested" to continue training suggests that CPChem had either posed or recommended that he stop heater board training in light of his vision concerns (Ex. AT). This cuts against any notion that the CBA prevented Jones from "changing his mind" after initially deciding to proceed with training on the heater board.

11. Jones does not dispute Statement of Fact No. 11.

12. Jones does not dispute Statement of Fact No. 12.

13. **Disputed.** Statement of Fact No. 13 mischaracterizes the text of CPChem's training guidelines, which state only that, if a trainee does not successfully pass the Unit Review Committee # 3, "Unit Leadership will consult with Human Resources to determine appropriate action." (Ex. N). Nothing in the training guidelines state that an employee is terminated after three (3) failed attempts. Jones does not dispute CPChem's summarization of the purpose of the online test.

14. Jones does not dispute Statement of Fact No. 14.

15. Jones does not dispute Statement of Fact No. 15, subject to clarification. Jones scored an 82.4 on his first assessment, and an 85 was required to pass (Ex. K, p. 49-50).

16. Jones does not dispute Statement of Fact No. 16.

17. Jones does not dispute Statement of Fact No. 17.

18. **Disputed as written/factually incomplete.** The questions posed to examinees during the practical portion of the heater board exam typically gauge two things: ) the ability of the person to navigate the console; and 2) after they navigate it, to explain the process (Ex. I, p. 45). Nicholas Graham, who was present for Jones' first and second exam attempts, specifically made a comment regarding Jones' navigation of the board (Ex. I, p. 46-47). Jimmie Hayes Jr., who was also present for Jones' first and second exam attempts, noted that Jones evidenced "navigation issues" because he would trace a line on the screen when asked a question (Ex. J, p. 46). Joshua Montalvo noted on his panel review notes for Jones' first exam "navigating console pages," which indicated Jones as deficient in

[7] Ex. M, p. 1.

being able to physically navigate the console pages (Ex. K, p. 51-52). Joshua Montalvo also noted on his panel review notes "navigate heater feed, steam, fuel pages and control," because Jones was not able to navigate from the heater feed page to the steam page to the fuel pages and the feed controls," nor could Jones "navigate the luminous or slice heater feeds" (Ex. K, p. 56-57). Jimmie Hayes Jr. testified that myopia problems that are ten times the average problem "definitely" could affect how Jones would navigate the console panel "because it's smaller writing" (Ex. J, p. 46). Joshua Montalvo likewise testified that, if someone had a problem seeing the board, it would impact his ability to navigate the board (Ex. K, p. 54).

19. **Disputed.** Jones testified: "everybody – everybody on my crew knew that I was having issues. And I've talked it over with a few of the union reps." (Ex. A, p. 69-70). Jones further explained that, while working the outside jobs, he would come into the console room and input temperature readings into the heater board on occasion (Ex. A, p. 70-71). When Jones did so, Jones' co-workers personally observed Jones "up close on the board" and would ask him, "you can't see that?" to which he responded he really had to focus on it (Ex. A, p. 73-74). Additionally, email correspondence dated April 19, 2022 confirms that, as of that date, Jimmie Hayes, Judson Wooters, Bryan Lohr, and Justin Ridgaway: 1) were each aware of Jones' vision concerns to some extent; 2) learned that Jones had new eyeglasses coming "in two weeks"; and 3) with the hope that Jones' glasses would correct the vision concerns, Jones requested to continue his training (Ex. AT). Jones testified that he had discussed his vision problems with Jimmie Hayes and his co-workers, and that, from general conversation, "they all knew [he] had, you know, vision problems and stuff like that" (Ex. A, p. 80).

20. **Disputed.** Jones disputes that Pool Operators are not relieved of the responsibility to train for and qualify in jobs assigned in the unit. *See* Jones' Response to Statements of Fact No. 2 and No. 10. Jones does not dispute the remainder of Statement of Fact No. 20.

21. **Disputed**. *See* Jones' Response to Statements of Fact No. 2 and No. 10.

22. **Disputed.** Immediately after Jones testified that he did not mention his eyesight issues to the panel *during* the first exam, Jones testified: "But everybody – everybody on my crew knew that I was having issues. And I've talked it over with a few of the union reps." (Ex. A, p. 69-70). Jones further explained that, while working the outside jobs, he would come into the console room and input temperature readings into the heater board on occasion (Ex. A, p. 70-71). When Jones did so, Jones' co-workers personally observed Jones "up close on the board" and would ask him, "you can't see that?" to which he responded he really had to focus on it (Ex. A, p. 73-74). Additionally, email correspondence dated April 19, 2022 confirms that, as of that date, Jimmie Hayes, Judson Wooters, Bryan Lohr, and Justin Ridgaway: 1) were each aware of Jones' vision concerns to some extent; 2) learned that Jones had new eyeglasses coming "in two weeks"; and 3) with the hope that Jones' glasses would correct the vision concerns, Jones requested to continue his training (Ex. AT). Jones testified that he had discussed his vision problems with Jimmie Hayes and his co-workers, and that, from general conversation, "they all knew [he] had, you know, vision problems and stuff like that" (Ex. A, p. 80). Jones does not dispute that he was

scheduled to re-take the panel evaluation before the Unit Review Committee on September 22, 2022.

**B. "After Failing His First Heater Board Exams, Jones Notifies CP Chem for the First Time of His Vision Difficulties and CPChem Initiates the Interactive Process" –** ***Disputed as Mischaracterization of Fact. Various CPChem management officials, including Wooters, had been made readily aware of Jones' vision concerns well before August 24, 2022, when Jones failed his first heater board exam (Ex. S; Ex. AT)***

23. **Disputed as written/factually incomplete.** Jones submits that the face of the letter he submitted on September 19, 2022 is the best evidence of its contents and that Statement of Fact No. 23 does not accurately represent the entire contents of the letter. *See* Def's Ex. Q; Ex. AE, p. 3. Jones does not dispute the remainder of Statement of Fact No. 23.

24. **Disputed**. First, Jones submits that the face of the letter he submitted on September 19, 2022 is the best evidence of its contents and that Statement of Fact No. 24 does not accurately represent the entire contents of the letter. *See* Def's Ex. Q; Ex. AE, p. 3. Furthermore, at 8:48 a.m. on September 19, 2022, Aprile Danford, CPChem's HR Manager, explicitly stated in response to Jones' email: "In Warren's email below from his doctor, ***I don't see a recommendation, a restriction, or an accommodation request***; therefore, we'll need to work with Warren to figure out what he is requesting and have him produce such request from his doctor. Let me know if we need to discuss." (Ex. AE). To the extent that CPChem asserts that the email represented an unequivocal request for a day shift role, and because Jones was currently on day shift so that they felt that they could retest Jones without accommodating him, record evidence confirms the opposite. Danford did not identify anything in Jones' email or Dr. Hart's letter as an accommodation request or recommendation.

25. **Disputed** to the extent CPChem characterizes its response to Jones' September 19, 2022 as "prompt." Before CPChem initiated the interactive process with Jones, CPChem subjected Jones to a second heater board exam on September 22, 2022, three days after his email (Ex. F, p. 48). Cisneros did not contact Jones to set up an accommodation meeting until September 26, 2022, four (4) days after Jones failed the second exam (Ex. AF; Ex. AM).

26. **Disputed.** At 8:48 a.m. on September 19, 2022, Aprile Danford, CPChem's HR Manager, explicitly stated in response to Jones' email: "In Warren's email below from his doctor, ***I don't see a recommendation, a restriction, or an accommodation request***; therefore, we'll need to work with Warren to figure out what he is requesting and have him produce such request from his doctor. Let me know if we need to discuss." (Ex. AE). Jones does not dispute that, despite having received Jones' letter on September 19, 2022, and before it actually met with him and commenced the interactive process on October 3, 2022, CPChem proceeded with Jones' second exam on September 22, 2022. To the extent that CPChem asserts that the email represented an unequivocal request for a day shift role, and because Jones was currently on day shift so that they felt that they could retest Jones

without accommodating him, record evidence confirms the opposite. Danford did not identify anything in Jones' email or Dr. Hart's letter as an accommodation request or recommendation.

27. **Disputed as written/factually incomplete.** Jones testified that he experienced vison issues during his second exam, and interview panelists made notations on their interview sheets that suggest that Jones "looked around too much" and experienced difficulty locating the graphics on the heater board screen (Ex. A, p. 100; Ex. T, p. 15, 26, 32, 49). Wooters also confirmed that, for the second exam, Jones had trouble with "what we call navigating the screens to find the answers to the exam (Ex. D, p. 158-159). Wooters then confirmed that, if an individual is struggling with vision issues or struggling to see the heater board, it would cause difficulty in finding the right graph (Ex. D, p. 169).

28. **Disputed as written/ factually incomplete**. Jones testified that he experienced vison issues during his second exam, and interview panelists made notations on their interview sheets that suggest that Jones "looked around too much" and experienced difficulty locating the graphics on the heater board screen (Ex. A, p. 100; Ex. T, p. 15, 26, 32, 49). Wooters also confirmed that, for the second exam, Jones had trouble with "what we call navigating the screens to find the answers to the exam" (Ex. D, p. 158-159). Wooters them confirmed that, if an individual is struggling with vision issues and/or struggling to see the heater board, it would cause difficulty in finding the right graph (Ex. D, p. 169).

29. **Disputed.** Jones explicitly testified that he felt like his vision difficulties prevented him from doing well on the second attempt (Ex. A, p. 145, 147-48). Jones testified that he felt that third test went "pretty much the same" as the second one (Ex. A, p. 126). Moreover, when asked if he felt that he could successfully test on the fourth attempt, Jones testified that he felt like he was a "marked man" and that he felt he did the "best [he] could with what [he] had" (Ex. A, p. 159-40).

30. Jones does not dispute Statement of Fact No. 30.

31. **Disputed as written/factually incomplete.** The face of the Performance Improvement Plan (PIP) is the best evidence of its contents, and Statement of Fact No. 31 does not accurately reflect the contents of the PIP. *See* Def's Ex. Q; Ex. M. Additionally, Jones had no practical choice but to sign the PIP if he wanted to keep working (Ex. E, p. 97).

32. Jones does not dispute Statement of Fact No. 32.

33. **Disputed as written/factually incomplete.** Jones does not dispute that, during the meeting, he clarified to CPChem that he was not requesting to be moved from the night shift, and that he requested to be permitted to continue performing any one of the outside jobs for which he already qualified. Wooters overtly rejected Jones' request to be permitted to continue performing the outside jobs for which he was already qualified, despite the fact that CPChem was actively hiring for outdoor jobs (Ex. A, p. 85-86, 129-30). In rejecting Jones' request to work outside jobs, Wooters noted that CPChem "has a bottomless pocket" and had the means to accommodate Jones' current inability to see the

console (Ex. A, p. 88-89). Jones responded to Wooters' statement, indicating that it was not just about him being able to see the console, but it was the length of time, the 12-hour shift, of being on the console at night that affected his vision (Ex. A, p. 88-89). Despite this fact, CPChem never escalated Jones' request perform solely outside operator functions beyond the October 3, 2022 meeting (Ex. E, p. 56, 63, 66-67; Ex. F, p. 66, 107; Ex. G, p. 62-66).Outside job request aside, Wooters offered a series of potential aids including, but not limited to console specific lighting, moving lights over, temporary lighting, magnifying screen filters, and potentially changing the display screen size (Ex. P, p. 2). The record confirms that CPChem did not purchase or otherwise make any of the aforementioned adjustments to the heater board console to improve its visibility to Jones during his employment (Ex. D, p. 186; Ex. K, p. 93). Additionally, in response to questions regarding what other areas Jones would consider working if CPChem was unable to accommodate the lighting-based requests, he indicated his extensive safety and maintenance experience, as well as his willingness to "do anything" (Ex. A, p. 85-86; Ex. P, p. 2). According to Ryan, CPChem did not meaningfully consider Jones' reassignment request(s) at any time during 2022, because "everyone agreed it was too late at that point because [Jones had] already taken his [heater board] test and failed it" (Ex. E, p. 92-93). Wooters likewise confirmed that CPChem did not discuss or try to find additional or alternative employment for him, nor did it look into the intranet to see other open positions within CPChem to which Jones could have been moved (Ex. D, p. 116-117).

34. **Disputed.** *See* Jones' Response to Statements of Fact No. 2 and No. 10. Additionally, Ryan never testified that permitting Jones to perform the three outside jobs as a form of ADA accommodation would ***violate*** the CBA. When asked if allowing someone to work outside as an ADA accommodation would *violate* the CBA, Ryan testified that it would "go against" the CBA but that he did not know how the disability would impact the analysis because he does not know enough about the ADA (Ex. E, p. 67-68). Ryan also specifically recalled Palmer Lee, who Ryan acknowledged "never worked the boards" (Ex. E, p. 52). The union never even discussed the idea of allowing Jones to work outside full-time as an outside pool operator due to his disability (Ex. E, p. 63).

35. **Disputed.** There are at least two (2) former CPChem operators, Palmer Lee and Gerald Devlanc, who, for one reason or another, were permitted to work either solely inside jobs or solely outside jobs without obtaining qualifications in all six areas of the unit (Ex. A, p. 130, 185-186; Ex. E, p. 32-33). Palmer Lee, an operator who failed to qualify on the outside distillation job, was permitted to stop training on that job and to continue working outside only on heaters and compressors (Ex. A, p. 130-131; Ex. E, p. 52-53; Ex. J, p. 67-68). Devlanc only obtained one of the three board (inside) job qualifications—distillation—and after he had a couple of incidents on that board, CPChem took Devlanc out of inside jobs and permitted Devlanc to work in the boiler unit (i.e., in outside jobs) until he retired (Ex. A, p. 130-134; Ex. E, p. 53; Ex. J, p. 69-70). Furthermore, for "good reason," CPChem can request that an employee bypass training/qualification per the terms of the collective bargaining agreement (Ex. H p. 50-52). CPChem's treatment of these individuals indicates that the CBA does not technically prohibit permitting an employee to forego training in one or more of six (6) areas. Jones does not dispute that these individuals may not have specifically failed to qualify on the heater board console

area; however, these individuals failed to qualify in one or more of the other five (5) areas and were permitted to continue their employment without said qualification.

36. **Disputed as written/factually incomplete**. Jones submits that the face of the October 19, 2022 email and its summary attachment represent the best evidence of their respective contents and that Statement of Fact No. 31 does not accurately represent the entire contents of either Cisneros' email or summary (Ex. AI).

37. **Disputed as written/factually incomplete**. Jones testified that he purposefully limited his response on October 20, 2022 because "at that point, my mind is stuck on what Jud told me" (Ex. A, p. 153-154). According to Jones, "regardless of what Chelse said . . . it was pretty much to be Jud way… So I was just trying to focus on passing and dealing with the… with the lighting situation" (Ex. A, p. 154-55).

38. **Disputed**. Jones testified that he purposefully limited his response on October 20, 2022 because "at that point, my mind is stuck on what Jud told me" (Ex. A, p. 153-154). According to Jones, "regardless of what Chelse said . . . it was pretty much to be Jud way… So I was just trying to focus on passing and dealing with the… with the lighting situation" (Ex. A, p. 154-55). Additionally, Jones testified that using the lamp while he was on the heater board "was more of an issue for other people than it was to help [him] out because how the short the cord was (Ex. A, p. 117-18). In other words, the lamp could not reach close enough to the heater board to truly assist Jones in seeing the heater board screen. The portable lamp was not the light that Jones requested to be fixed in the accommodation request, and the repair had not been completed before any of Jones' four heater board exams (Ex. D, p. 91, 95-96). Wooters admitted that "in hindsight," Jones continued to struggle with vision concerns during the period he had the portable lamp (Ex. D, p. 100). Jones does not dispute that, on October 20, 2022 Wooters responded and instructed Jones to submit a work order to get the lighting repaired.

39. **Disputed**. CPChem records confirm that: 1) a work order was placed on October 25, 2022; 2) that, as of December 12, 2022, that specific work order had not been completed; and 3) that, as of October 1, 2023, CPChem still had not requisitioned the necessary part for the specific repair that Jones had requested on October 25, 2022 (Ex. AU). The LED light over the console remained out during all four of Jones' exams (Ex. D, p. 96).

40. **Disputed.** Jones testified that using the lamp while he was on the heater board "was more of an issue for other people than it was to help [him] out because how the short the cord was (Ex. A, p. 117-18). In other words, the lamp could not reach close enough to the heater board to truly assist Jones in seeing the heater board screen. The portable lamp was not the light that Jones requested to be fixed in the accommodation request, and the repair had not been completed before any of Jones' four heater board exams (Ex. D, p. 91, 95-96). Wooters admitted that "in hindsight," Jones continued to struggle with vision concerns during the period he had the portable lamp (Ex. D, p. 100).

41. **Disputed.** In addition to the request that the lighting above the heater board be repaired, CPChem was made aware of the following as possible accommodations: a series of potential aids including, but not limited to console specific lighting, moving lights over, temporary lighting, magnifying screen filters, and potentially changing the display screen size (Ex. P, p. 2), many of which were raised again by Dr. Stanton following his conversation with Jones on December 6, 2022 (Ex. C, p. 36, 44-45). Despite the fact that CPChem never indicated that implementation of any of these adaptive devices would pose an undue burden, CPChem did not implement any of the proposed adaptive devices (Ex. C, p.37-38). Wooters confirmed that CPChem did not make any changes to the lighting in or around the heater board at any time during any of Jones' four tests (Ex. D, p. 186). CPChem did not make any material changes, "from a vision perspective," to the heater board console while Jones remained employed (Ex. D, p. 186)

42. **Disputed.** *See* Jones' Response to Statement of Fact Nos. 39 and 40. Jones does not dispute that CPChem proceeded with administering a third exam; however, Wooters confirmed, "in hindsight," Jones continued to struggle with vision concerns despite having the portable light (Ex. D, p. 100). Wooters admitted that CPChem simply assumed that, because Jones had brought a lamp, that was satisfactory to the lighting concern. In other words, it was the "judgment" of non-ophthalmologist/non-medically trained individuals that the portable lamp provided sufficient light for Jones (Ex. D, p. 102-03). CPChem never had medical personnel review the portable lamp to determine whether it was actually medically adequate to provide the required lighting for Jones (Ex. D, p. 101-02).

### C. CPChem Terminates Jones When He Fails to Pass Before the Unit Review Committee After Four Attempts

43. **Disputed as written/factually incomplete.** Jones does not dispute that Jones was deemed to have failed the heater board exam for a third time on November 17, 2022; however, Jones expressly commented during the exam that he had trouble seeing the text on the screen (Ex. D, p. 104). Wooters confirmed that difficulty seeing the writing on the screen is "different" than Jones not having adequate lighting to see the console such that, as of November 17, 2022, Jones was actually struggling to see two different things (Ex. D, p. 105). Jones testified that he experienced vison issues during his second exam and that the third test went "pretty much the same" as the second one (Ex. A, p. 100, 126).

44. **Disputed as written/factually incomplete.** Jones submits that the face of the November 17, 2022 email is the best evidence of its contents and that Statement of Fact No. 44 does not accurately represent the entire contents of the November 17, 2022 meeting. Moreover, Jones made comments during the actual exam that he was having trouble seeing the text on the screen due to the screen being backlit (Ex. D, p. 101).

45. **Disputed as written/factually incomplete.** CPChem's training guidelines state only that, if a trainee does not successfully pass the Unit Review Committee # 3, "Unit Leadership will consult with Human Resources to determine appropriate action." (Ex. N). Nothing in the training guidelines state that an employee is *per se* terminated after

three (3) failed attempts. Additionally, the fourth test functioned very similar to the first three: no changes were made to the overhead lighting, displays, or brightness levels as compared to any of the three earlier tests (Ex. D, p. 186).

46. **Disputed.** While Jones does not dispute that he presented for an on-site visual acuity exam on December 12, 2022, he disputes the exam results as characterized by CPChem (Ex. Y). For the visual acuity exam, Jeannie Johnson had Jones "stand back, however many paces, and read the E chart." Jones covered one eye and indicated the furthest line down he could read, and he repeated the process with the other eye. At that point, Johnson asked Jones to identified three colors—red, yellow, and green—"and that was it" (Ex. A, p. 196). Dr. Hart, a licensed ophthalmologist, explained that the acuity test simply tests vision of black letters on a white background, considering refraction and best optical correction (glasses prescription) (Ex. B, p. 91). The trouble with the macula is a different question as it pertains to bright light and darkness (Ex. D, p. 91). The visual acuity test, which is used as a basic measure of a person's ability to see, is administered in an optimal lighting conditions and does not test whether someone can see a brightly lit LED screen against the contrast of a dark room (Ex. B, p. 92-93; Ex. C, p. 54-55). Dr. Stanton confirmed that acuity is what is tested when an individual is asked to read the letter on an eye chart, but that acuity is ***not*** the only consideration to consider when determining whether Jones' myopia could have impacted his ability to see the heater board while sitting in a dark room (Ex. C, p. 33-34). For example, other factors, such as peripheral vision that is depth perception, and color perception must also be considered (Ex. C, p. 33-34). CPChem did not ask Dr. Stanton whether Jones had the medical ability to see the heater board screen, and Dr. Stanton never opined on it (Ex. C, p. 41-42, 50). That being said, Dr. Stanton testified that the acuity test is not determinative of whether Jones could see the heater board (Ex. C, p. 58). No one from CPChem contacted Dr. Hart to discuss Jones or his limitations in any capacity (Ex. B, p. 23-24, 85). Dr. Hart confirmed that, despite reading 20/40 in an optimal environment, because of Jones' birth defect conditions, Jones will still struggle beyond the normal population in a dark room with lit lights because his macula is not as efficient as a normal person's (Ex. B, p. 92-93; Ex. Y).

47. **Disputed as written/factually incomplete.** While Jones does not dispute that the panel determined that he failed a fourth exam on December 15, 2022, Wooters confirmed that CPChem did not change any part of the testing environment between the four tests it administered to Jones (Ex. D, p. 186). While Jones was afforded additional time to train, he went through the entirety of the training with the same vision problems (Ex. D, p. 177-178). Moreover, CPChem did not provide any of the discussed adaptive devices to Jones to assist with his vision concerns between the four exams (Ex. K, p. 93).

48. **Disputed**. Stipulation No. 35 states that employees hired after February 1, 1988 "***may*** be dropped from the payroll should they fail to meet the requirements of the Training Program" (Ex. AB, p. 10). Additionally, while employees may not have had the unqualified "right" to disqualify themselves from operator training, Bryan Kubsch testified in his deposition that ***the company*** could request or otherwise permit an

employee to bypass training (Ex. H, p. 30-31, 50-52). According to Kubsch, CPChem just has to have "good reason" to let an employee bypass (Ex. H, p. 50-51).

49. Jones does not dispute Statement of Fact No. 49.

## ADDITIONAL STATEMENTS OF UNDISPUTED MATERIAL FACTS

### A. Jones' Disabling Condition and Resultant Limitations

50. Because Jones has a very elongated eye—which Dr. Hart explained was "essentially a birth defect"—Jones suffers from myopic degeneration of the macula, which is a small zone in the back of the eye (Ex. B, p. 11). As a result of this condition, Jones has difficulty seeing in low light (Ex. B, p. 16-17). If a macula is slightly inefficient, it causes trouble focusing in areas where there is not enough light (Ex. B, p. 49).

### B. Dr. Hart's Communications With and About Jones

51. The intent of Dr. Hart's letter was to indicate that Jones wanted to change to a more well-lit environment (Ex. B, p. 76). Jones indicated to Dr. Hart that he (Jones) felt that he'd perform in a better lit environment, and Dr. Hart, who did not have a true understanding of Jones' work environment, "assumed" that Jones' request "equated to night shift versus day shift") (Ex. B, p. 76-77, 84, 87). Dr. Hart testified that he wrote the letter "to support [Jones'] desire to be moved to the light", i.e., "Jones' desire to be moved into the light situation, a better lit situation" (Ex. B, p. 59-60).

52. At the time he wrote his letter, Dr. Hart was under the impression that there was a "dark" part of the room and a "light" part of the room where Jones worked, and he understood Jones' request as a desire to be transferred to the lighter part of the place he worked (Ex. B, p. 85). Dr. Hart admitted that he erred in assuming that Jones' concerns about lighting equated to a request to transition from night shift to day shift (Ex. B, p. 95).

53. Dr. Hart testified that, because there were bright LED lights on the control panel and the surrounding room was dark, "the contrast was the problem" for Jones (Ex. B, p. 64). With more light in the room, Jones' pupil would be smaller, his retina would be adapted to the light conditions, and there would not be as much of a contrast between the dark and the bright lights (Ex. B, p. 65).

54. Dr. Hart, Jones' longtime treating ophthalmologist and an individual who has testified as an expert in ophthalmology on several previous occasions, explained that an "acuity test" tests vision of black letters on a white background with refraction and best optical correction (Ex. B, p. 91). Dr. Hart then explained that the acuity test would not detect a problem with an individual's macula, which is impacted by responses to contrast between bright light and darkness (Ex. B, p. 91).

**C. The Console Room Lighting**

55. Even before Jones' request, work orders had been placed to get lighting in the console room fixed (Ex. A, p. 113). While the control room was in a new building, the consoles themselves were old and outdated (Ex. A, p. 114-115).

**D. Jones' Use of a Portable Lamp**

56. Jones had been bringing a portable lamp from home "everywhere" before he ever began training on the heater board (Ex. A, p. 116-117). While working outside jobs, Jones would have to occasionally sit in front of a computer in a room next to the control room, which was also dark (Ex. A, p. 116-117). Jones had a day lamp in there so that he could see his computer keys without interrupting other employees (Ex. A, p. 116-117).

57. Jones brought a portable lamp from home "throughout [his] whole career" and "always had that lamp with [his] name on it (Ex. A, p. 116-18).

**E. Dr. Stanton's Qualifications, Communications, and Actions/Inactions With Respect to Jones**

58. Dr. James Stanton, CPChem's medical director, has no particular expertise in optometry and is not an ophthalmologist (Ex. C, p. 24-25).

59. Dr. Stanton confirmed that there was a question of whether Jones' failure(s) on the heater board exam "was a matter of visual acuity or the extreme high myopia that he suffered from or something else." (Ex. C, p. 32).

60. Dr. Stanton confirmed that his job was "not only to determine whether [Jones] met the minimum qualifications for the job but to try and determine or take into consideration globally what visual deficits or problems [Jones] might be having" that would have impacted his ability to pass the certification (Ex. C, p. 56).

61. During the conversation, Dr. Stanton asked Jones "is it your eyesight, or you can't pass the test," to which Jones responded, "it is my eyesight." (Ex. A, p. 197-199).

**RESPONSE TO DEFENDANT'S STATEMENT OF ISSUES**

Jones does not dispute CPChem's presentation of the first or third Issues; however, he submits that the second Issue should read: "Whether a genuine issue of material fact exists as to whether CPChem discriminated against Jones on the basis of his disability in ***suspending and thereafter terminating*** his employment" [D.E. 17, p. 19].

## LAW AND ARGUMENT

### I. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Failed to Reasonably Accommodate Jones in Violation of the ADA/TCHRA

To prevail on an ADA/TCHRA failure-to-accommodate claim,[8] Jones must establish that: (1) he is a "qualified individual with a disability"; (2) "the disability and its consequential limitations were 'known' by [CPChem]"; and (3) "[CPChem] failed to make 'reasonable accommodations' for such known limitations." *Credeur v. La. Through Office of Atty. Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013)). CPChem concedes Jones' ability to satisfy the first two prongs for purposes of its Motion [D.E. 17, p. 22]. Thus, the sole question before the Court with is whether, upon resolving fact disputes and inferences in Jones' favor, a reasonable juror could determine that CPChem failed to "make" reasonable accommodations for Jones' known disabling condition. For the reasons that follow, CPChem's Motion must be denied.

#### A. CPChem's Motion Improperly Omits the Full Spectrum of Reasonable Accommodations Posed

As a preliminary matter, CPChem's Motion addresses only two (2) accommodations: 1) Jones' request that CPChem repair the lighting over the heater board, and 2) Jones' request to be permitted to resume work on the three outside jobs, just as he had from 2018 through early 2022 [D.E. 17, p. 22-26]. Notwithstanding the fact that Jones disputes CPChem's characterization of the "actions" it took with respect to each of these requests, as further explained below, CPChem's Motion omits discussion a host of other, potential accommodations of which it had been made aware during the course and scope of what it purports to be the "good faith interactive

---

[8] TCHRA claims based on disability discrimination are interpreted in the same manner as ADA disability discrimination claims. *See Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 444-45 (5th Cir. 2018).

process" prompted by Jones' September 19, 2022 email,[9] which CPChem unequivocally interpreted Jones' as an accommodation request tied to his eyes/vision (Ex. G, p. 46-47).

Jones acknowledges that "'it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed.'" *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. denied*, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996) (quoting 29 C.F.R. § 1630.9, App.). That being said, both the EEOC Guidance and CPChem's own policy confirm that, while an employee may request an accommodation on his own accord, ***third parties may also request a reasonable accommodation on an employee's behalf***. *See, e.g., Molina v. DSI Renal, Inc.*, 840 F.Supp.2d 984, 1001 (W.D. Tex. Jan. 4, 2012)(citation omitted)(Ex. O, p. 2)

As the Fifth Circuit explained in *Taylor*:

> Once such a request has been made, "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." In other words, once an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer. Thus, it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one.

93 F.3d at 165 (quoting 29 C.F.R. § 1630.9, App.); *see also Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016). That being said, in addition to the lighting repair request and the "outdoor operator" request explicitly discussed in CPChem's Motion, record evidence reflects that CPChem was presented with, and refused or otherwise failed to implement, any one of the following accommodations post-September 19, 2022:[10]

[9] When Cisneros received the September 19, 2022 email, she brought it to Danford, who instructed her (Cisneros) to initiate the reasonable accommodation process (Ex. F, p. 42). Danford first instructed Cisneros to "read through the accommodation process to make sure she understood it" (Ex. F, p. 42).

[10] Jones does not submit that CPChem failed to accommodate any request to transition him from night shift to day shift, as he later clarified that he did not want to transition.

**1. October 3, 2022: Discussions of Adaptive Devices, Reversion to the Outside Operator Position, and/or Reassignment to a Safety or Maintenance Position**

In response to Jones' email, HR Manager, Aprile Danford ("Danford") instructed Cisneros to work with Kelsey Bounds, another HR grad, "on the process for an employee that reports a medical issue." (Ex. AE, p. 1). Imperatively, Danford "[did] not see a recommendation, a restriction, or an accommodation request" and indicated that HR would need to "work with [Jones] to figure out what he is requesting and have him produce such a request from a doctor" (Ex. AE, p. 1). That being said, before Cisneros reached out to Jones to set up the accommodation meeting, and without providing Jones any type of accommodation to address the vision condition(s) clearly articulated in Dr. Hart's letter,[11] CPChem subjected Jones to a second heater board test on September 22, 2022, on which he struggled due to his continued inability to see and navigate the heater board (Ex. A, p. 100, 147-48).

Cisneros, who spearheaded the interactive process, met and conferred with Jones, Judson Wooters ("Wooters"), and Clay Ryan ("Ryan") on October 3, 2022 to gather information regarding Jones' request to determine "what exactly he [was] wanting [CPChem] to accommodate and the duration of the request" (Ex. F, p. 45; AM, p. 2). Cisneros drafted a document summarizing[12] the meeting, which Cisneros circulated amongst numerous CPChem managers for approval prior to sending.[13] The document establishes that, as of October 3, 2022, CPChem had been made aware that Jones: 1) was having difficulty viewing small numbers and

[11] Ex. AE.
[12] Cisneros began drafting the document on or about October 5, 2022 (Ex. E, p. 44-45).
[13] Cisneros sent the summary draft to Kubsch, Danford, and Jonhson between October 11-12, 2022 (Ex. AH). Cisneros also forwarded the email/document she sent to Jones to Wooters and Kubsch on October 20, 2022 (Ex. AI, p. 1-2). She sent it to Greg Parsley on October 24, 2022 (Ex. AP).

letters on the heater board[14]; and 2) was feeling overwhelmed by the brightness of the lights on the heater board console (Ex. F, p. 46-47, 55; Ex. Ex. P, p. 1).

During the meeting, Jones "brought up outside operator accommodation that was made in the past Clay said that never made it 'up here' assuming he meant HR and that was all that was said on this." (Ex. P, p. 1). Wooters overtly rejected Jones' request to be permitted to continue performing the outside jobs for which he was already qualified, despite the fact that CPChem was actively hiring for outdoor jobs at that time (Ex. A, p. 85-86, 129-30). In rejecting Jones' request to work outside jobs, Wooters noted that CPChem "has a bottomless pocket" and had the means to accommodate Jones' current inability to see the console (Ex. A, p. 88-89). Jones responded to Wooters' statement, indicating that it was not just about him being able to see the console, but it was the length of time, the 12-hour shift, of being on the console at night that affected his vision (Ex. A, p. 88-89). Despite this fact, CPChem never escalated Jones' request perform solely outside operator functions beyond the October 3, 2022 meeting (Ex. E, p. 56, 63, 66-68l; Ex. F, p. 58, 107; Ex. G, p. 64-65; Ex. H, p. 46-47). CPChem's failure to accommodate this particular request is discussed at-length *infra*.

Outside job request aside, Jones clarified during the accommodation meeting that he was not requesting to be taken off of nights, as had been miscommunicated by Dr. Hart, after which Wooters *offered* a series of potential aids including, but not limited to console specific lighting, moving lights over, temporary lighting, magnifying screen filters, and potentially changing the display screen size (Ex. P, p. 2). Despite no indication by CPChem that the purchase, installation, or implementation of any one of more of these adaptive devices would pose an undue burden on it, CPChem did not purchase or otherwise make any of the aforementioned adjustments to the heater board console to improve its visibility to Jones during his employment (Ex. D, p. 91, 95,

[14] Ex. AV.

96-97, 100, 186; Ex. F, p. 74). Given Wooters' statement that CPChem "has a bottomless pocket" by which it could easily obtain adaptive devices, the implementation of any one or more of these devices would have constituted a reasonable accommodation; however, CPChem refused or failed to otherwise *make* an accommodation in this fashion.

In addition to the various adaptive devices mentioned *supra*, in response to questions regarding what other areas Jones would consider working if CPChem was unable to accommodate the lighting-based requests, he indicated his extensive safety and maintenance experience, as well as his willingness to "do anything" (Ex. A, p. 85-86; Ex. P, p. 2). According to Ryan, CPChem did not meaningfully consider Jones' reassignment request(s) at any time during 2022, because "everyone agreed it was too late at that point because [Jones had] already taken his [heater board] test and failed it" (Ex. E, p. 92-93). CPChem has not pointed to a policy, nor has it produced one, that prohibits the reassignment of an employee upon an employee's failure of a test—the portions produced to Jones do not (Ex. AB). That being said, Wooters confirmed that CPChem did not discuss alternative employment for Jones, nor did it look into the intranet to see other open positions within CPChem to which Jones could have moved (Ex. D, p. 116-117).

**2. October 20, 2022: Repair the Lights Over the Heater Board**

On October 19, 2022, after obtaining Danford's approval, Cisneros circulated a document to Jones via email summarizing the October 3, 2022 meeting and requesting that Jones meet with his physician and/or otherwise identify adaptive devices that CPChem could implement to accommodate Jones' vision concerns no later than November 11, 2022 (Ex. E, p. 47; Ex. AI, p. 5-6). The summary document indicates, "***Upon return to normal shift assignment and***

***implementation of any accommodation, the company will schedule a follow-up meeting within 30 days to review and evaluate***" (Ex. F, p. 49; Ex. AI, p. 2-3).[15]

The next day, on October 20, 2022, Jones responded to Cisneros and specifically requested that CPChem repair the lighting over the heater board console (Ex. AI, p. 7). Wooters, who Jones copied on the email, requested clarification of the light Jones wanted repaired,[16] and he instructed Jones to submit a G3 work order to have it repaired (Ex. F, p. 51; Ex. AI, p. 7-8). Jones testified that he purposefully limited the accommodation request in this email because "at this point, my mind [was] stuck on what [Wooters] told [him]" about not being able to stay working the outside jobs (Ex. A, p. 153-54). CPChem employees, including Wooters, confirmed that this request for repaired lighting over the heater board console was reasonable (Ex. D, p. 79-80). CPChem's failure to make this particular accommodation is addressed at-length *infra.*

**3. Requests Between November 17, 2022 – December 6, 2022**

Dr. Stanton recalled having a conversation with Jones on the afternoon of December 6, 2022,[17] wherein he submits they discussed various possible accommodations, including, but not limited to a monitor that could change contrast/brightness, switching between a black background/light background, changing font sizes, and other lighting changes, if doable (Ex. C, p. 36, 59-60). Dr. Stanton is "pretty sure" he had one or more conversations with CPChem to discuss the accommodations he recommended (Ex. C, p. 36). CPChem email correspondence confirms that Cisneros conversed with Dr. Stanton following his call with Jones and that they discussed other devices that Jones could use, "including a magnifier and other apparatuses that would help Jones see" (Ex. F, p. 95-96). Again, despite being advised that such adaptive devices

---

[15] Cisneros forwarded her email to Kubsch, Wooters, and Danford at 3:02 p.m. on October 19, 2022 (Ex. AI, p. 4).
[16] Jones verbally confirmed to Wooters that he was requesting replacement of the "long, narrow LED lights" (Ex. D, p. 78-79).
[17] Ex. C, p. 47-48; Ex. AN.

could assist in improving the visibility of the heater board for Jones, and despite no assertion that provision of any such adaptive device would pose an undue burden on CPChem, CPChem has produced ***no*** evidence that CPChem implemented any of the proposed assistive devices.

**4. December 12, 2022: Request for Transfer/Reassignment to Vacant Instrument Mechanic Position**

On December 12, 2022—prior to Jones' final heater board exam—Jones submitted an application for Job Vacancy No. 2022-1, and instrument technician position within CP Chem's maintenance department (Ex. AL, p. 3). Email correspondence confirms that, as of December 12, 2022, Cisneros, Ryan, Kubsch, and Danford all had actual knowledge of Jones' instrument mechanic bid (Ex. AL, p. 1-2).

Under the ADA, reasonable accommodations may include "reassignment to a vacant position." 42 U.S.C. § 12111(9). There is no doubt that, if other positions were vacant, including those which may be performed without having to sit in a dark room, in front of a brightly lit screen, trying to read and interpret small numbers and letters for 12-hours at a time, a transfer would have allowed Jones to "perform the essential functions of [that] employment position." *Id.* § 12111(8). After all, § 12111(8) does not narrow the ADA's applicability only to the position that the individual currently holds. To be qualified, the individual merely must be able to "perform the essential functions of the employment position that such individual holds *or desires*." *Gross v. Carlisle Construction Materials, L.L.C.*, 2025 WL 2427194 (5th Cir. 2025) (citing 42 U.S.C. § 12111(8) (emphasis added).

There is no dispute that, at the time of Jones' suspension and discharge, there was at least one position that existed, which was vacant, and which would have altogether eradicated the need and/or desire for Jones to qualify on the heater board console. To the extent Jones submitted a bid for this reassignment/transfer, Jones made an accommodation request that is reasonable on

its face. CPChem has not come forth with any evidence that permitting Jones to transfer to a non-console job would have posed an undue burden and, consequently, CPChem failed to accommodate Jones by suspending and terminating him instead of simply assigning him to a vacant job position for which he was qualified.

### B. CPChem Has Produced No Evidence that it Implemented Any of the Foregoing Accommodations

A jury rationally could infer that, if CPChem had truly engaged Jones in the interactive process, as it should have, Jones and CPChem might have identified appropriate assistive technologies, whether or not they were the ones that Jones originally requested. *See Hildebrand, III v. Dollar General Corporation*, 2013 WL 3761291, * 9 (M.D. Tenn. Jul. 16, 2013). Of course, that is the ultimate nature and intent of the interactive process requirement, which, if the jury credits Jones' version of events, CPChem ultimately ignored in bad faith. Thus, there is, at the very least, at least a genuine dispute of material fact as to whether a reasonable accommodation was available, whether it be assistive device or reassignment, that would have assisted Jones. Irrespective of whether CPChem had legal grounds for rejecting the lighting-based accommodation request and/or outside operator request—which Jones firmly disputes for the reasons below—CPChem has not come forth with any evidence to justify its rejection of, or failure to implement, any one of the additional accommodations, articulated above, discussed during the subject "interactive process." The interactive process "should be an ongoing, reciprocal process, not one that ends with 'the first attempt at accommodation,' but one that 'continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and future accommodation is needed.'" *Dillard v. City of Austin*, 837 F.3d 557, 562-63 (5th Cir. 2016). Moreover, the third factor of a failure-to-accommodate claim requires that an employer "***make*** reasonable accommodations" for a known

disability. *Strife v. Aldine Independent School District*, 138 F.4th 237, 246 (5th Cir. 2025) (citation omitted)(emphasis added). Jones does not dispute that CPChem engaged in conversation and discussion about the hypothetical implementation of various accommodations to assist Jones; however, CPChem failed, to a remarkable degree, to implement or "make" a single accommodation in this case. To the extent CPChem's Motion ignores its failure to accommodate Jones in any one of the ways discussed beyond the two (2) accommodations it discusses, its argument is without merit, and summary judgment must be denied.

### C. Record Evidence Confirms that CPChem Did Not Accommodate Jones' Lighting-Based Accommodation Request(s)

CPChem hinges its defense on the assertion that Jones bringing a portable desk lamp from home sufficiently and reasonably accommodated the myriad of vision concerns he formally raised to HR on September 19, 2022 [D.E. 17, p. 22-23]. Based on the apparent assumptions CPChem drew—which are egregiously incorrect—it appears to have foregone any material discussion or consideration of any other potential accommodation for Jones [D.E. 17, p. 22-23]. For the reasons that follow, CPChem's reliance on Jones' portable lamp is as remarkable as it is fatal to CPChem's defense, and a reasonable factfinder could readily determine that CPChem failed to accommodate Jones in deliberate violation of the ADA.

#### 1. Resolving Fact Disputes and Inferences in Jones' Favor, Jones' Use of a Portable Lamp Did <u>Not</u> Sufficiently Accommodate His Disability

Record evidence establishes that Jones started bringing a portable desk lamp from home long before he ever started training on the heater board. Jones testified that he had been binging the portable lamp everywhere with him, "when he wasn't even on a heater board," because, when he had to use computers as an outside operator, which were located in another dark room right next to the control room, he used the lamp "so [he] could see [his] computer keys without interrupting" other employees working in the room (Ex. A, p. 116-17). According to Jones, he

had used this lamp "[his] whole career" and "always had that lamp with [his] name on it." (Ex. A, p. 116-117).

Despite the fact that Jones had been utilizing his portable desk lamp in an attempt to mitigate lighting concerns for "his entire career," including the time before he started training on the heater board, Cisneros testified that Jones "told her" that the portable lamp he brought from home was adequate to remedy his lighting/vision concerns during the October 3, 2022 meeting (Ex. F, p. 53-54). She then, in turn, claims that she relied on Jones' October 3, 2022 assertion to effectively forego any additional accommodation considerations (Ex. F, p. 52).

First and foremost, CPChem's counsel specifically asked Jones whether the lamp helped with lighting in the console room. In response, Jones testified that, when he got on the heater board, the lamp "was more of an issue for other people than it was to help [him] out because of how short the cord was" (Ex. A, p. 117-118). In other words, the short cord prevented Jones from being able to effectively move the lamp close enough to the console for it to be of any real assistance to him (Ex. A, p. 117-118).

Jones' testimony notwithstanding, Cisneros' testimony cannot be reconciled with subsequent record evidence to the contrary. If it were true that, as of October 3, 2022, Jones had effectively accommodated himself by way of the portable lamp—which, per his testimony, he did not (Ex. A, p. 117-118)—there would have been no need for 1) Cisneros to, following the October 3, 2022 meeting, specifically request that Jones identify ***additional*** accommodations, and/or 2) Jones to specifically request repairs to the lighting over the heater board console so that he could see it. Drawing reasonable inferences in Jones' favor, the fact that Jones specifically requested that CPChem repair the lighting over the heater board ***after*** he had been bringing his portal lamp to the jobsite for some time necessarily indicates that the portable lamp did <u>**not**</u>

sufficiently accommodate his vision concerns.[18] Quite frankly, had the portable lamp been sufficient, there would have been no reason for Jones to even initiate the interactive process with CPChem in September 2022 in the first place.[19]

Cisneros ultimately confirmed that Jones had been using the portable lamp leading up to time he indicated to CPChem that he could not see the heater board (Ex. F, p. 55). Moreover, Cisneros conceded that, as of October 20, 2022, Jones was still writing to CPChem that he could not see, even though he had been using his portable lamp for some time (Ex. F, p. 57-58). Even further, Cisneros herself indicated, in light of Jones' October 20, 2022 request, that CPChem would "need to have a follow up meeting to review and evaluate if fixing the lighting over the heater board console has helped [Jones'] vision." (Ex. AI). From this evidence, a reasonable factfinder could easily find that 1) Jones' use of a portable lamp did not eradicate the vision challenges he faced on the heater board due to inadequate lighting and 2) Cisneros' apparent "reliance" on Jones' portable lamp to argue that CPChem implemented a "reasonable accommodation" completely inappropriate, unreasonable, and without credence. Wooters confirmed that CPChem undertook no medical determination of whether that portable light provided sufficient lighting to reasonably accommodate Jones' particularized vision limitations (Ex. D, p. 101-02). Rather, CPChem simply "assumed"—albeit wrongfully—that, because Jones brought a light from home, that light was necessarily sufficient (Ex. D, p. 101-02). At an absolute minimum, a materially disputed fact exists as to whether Jones ever conveyed that his use of the portable lamp fully "accommodated" his inability to see the heater board, especially given Jones' later complaint on November 17, 2022 that he was having difficulties seeing the text on the

[18] Cisneros admits that Jones' October 20, 2022 email says nothing about his portable lamp effectively addressing his vision concerns (Ex. F, p. 57-58).

[19] Though Cisneros engaged in a series of linguistic gymnastics in an effort to avoid answering the question, she finally admitted that Jones had been using the lamp at the time he indicated to CPChem that he felt he could not see (Ex. F, p. 56-57).

backlit LED screens (Ex. D, p. 104). Given that CPChem hinges its defense on Jones' use of this portable lamp to excuse its inaction throughout the remaining "interactive process," summary judgment is improper as to this claim.

### 2. CPChem Did Not Complete the Work Order or Otherwise Satisfy Jones' Repair Request Prior to Terminating His Employment

CPChem also relies upon its submission of a work order to support its position that properly accommodated Jones' explicit request that the light above the heater board be fixed [D.E. 17, p. 22-23]. CPChem's reliance on the submission of this work order, given record evidence of its status, is as remarkable as it is problematic for CPChem.

There is no dispute that, by way of an email dated October 20, 2022, and in direct response to Cisneros' request that Jones identify reasonable accommodations, Jones explicitly requested that the lighting above the heater board be repaired and/or replaced, as two of the three lights in the area did not work (Ex. F, p. 49-40; Ex. AI, p. 7-8). In response to Jones' request, Wooters asked for clarification as to the light needing repair, and he instructed Jones to submit a work order for the same (Ex. AI, p. 9-10). There is no dispute that the requested work order was placed to Chevron on October 25, 2022 (Ex. AO; Ex. AU). Moreover, there is no material dispute that replacement of this particular light was "perfectly reasonable and easy" for CPChem to effectuate (Ex. E, p. 62).

At no point did any agent of CPChem ever indicate to Jones that it would not fulfill this request; to the contrary, the fact that Wooters simply requested Jones submit a work order establishes the routine, reasonable, feasible nature of Jones' repair request.[20] Thus, a reasonable factfinder could determine that Jones, upon confirming that the work order had been submitted,

[20]Ryan admitted that it was perfectly reasonable and easy for CPChem to change the requested lightbulb. Indeed, when asked if the requested repair was too expensive or unreasonable, Ryan responded, "No. To me, it was the complete opposite" (Ex. E, p. 62).

was reasonable in his continued reliance on Chevron to make the necessary repair (Ex. G, p. 96). CPChem knew that Jones was operating under the assumption that his request for the lighting to be fixed was actually going to happen (Ex. H, p. 76).

Notably, record evidence confirms that, as of ***December 12, 2022***—nearly three (3) months ***after*** the work order had been placed—CPChem had still **<u>not</u>** replaced the light Jones requested (Ex. AO). Despite having knowledge of Jones' explicit request, and despite being tasked with overseeing the interactive accommodation process, Cisneros admits that she never bothered to track the progress of the work order. In fact, she testified that she did not she think she even should have to (Ex. F, p. 51). For the Court's edification, CPChem's discovery responses reveal that, as of October 1, **<u>2023</u>**—nearly one (1) year ***after*** the original work order had been placed—CPChem had not even bothered to order or purchase the requisite replacement parts (Ex. AU, p. 2). CPChem cannot dispute the fact that, at the time it retested, suspended, and terminated in Jones in December 2022, the October 25, 2022 work order still had not been satisfied. Whatever light Chevron may or may not have fixed in November 2022—of which there is no record—it was not the one Jones requested back in October 2022 as an accommodation.

Moreover, despite Cisneros and Wooters both having actual knowledge that, as of December 12, 2022, CPChem had ***not*** fulfilled the single accommodation Jones had explicitly requested back on October 20, 2022, CPChem nevertheless compelled Jones to sit for yet *another* heater board examination on December 15, 2022—under the exact same, deficient lighting conditions that had pervaded Jones' three (3) previous exams. It should come as no surprise to CPChem—given the fact that it had not taken a single, affirmative action to actually accommodate Jones' vision concerns—that Jones continued to fail a test on a heater board that he could not properly see. The record confirms that CPChem did change any part of the testing

environment, from a vision standpoint, between any of the four exams (Ex. D, p. 1986). Wooters acknowledged that, if Jones could not see the board, not only would he fail the exam the first time; he would fail it 20 times (Ex. D, p. 112).

### 3. Jones Continued Raising Vision Concerns Pertaining to the Heater Board After October 20, 2022; CPChem Misstates the Record and Material Fact

While CPChem, in one breath, argues that "after the work order was submitted, and Jones continued using his portable lamp in the interim, he did not raise any further concerns about the lighting," it admits in the very next sentence that, "after failing his third attempt," Jones informed Wooters that he was having difficult seeing the text on the screen" [D.E. 17, p. 23]. Ryan confirms the latter statement: following Jones' third exam, Jones raised an issue about the backlighting from the LED coming through the screen, which rendered it exceptionally difficult for Jones to see the numbers and digits on the flows within the screen itself (Ex. E, p. 88-89). As Ryan confirmed, at this time—November 17, 2022—Jones raised an issue "***in addition to***" the lighting over the board and/or keyboard (Ex. E, p. 88). This is even further reflected in Wooters' November 17, 2022 PIP Update, wherein he explicitly notes that, during a discussion with Wooters, Graham, Ryan, and Hayes, Jones indicated that he continued to have vision concerns that periodically interfere with his ability to view text and the screens (Ex. AV; Ex. M, p. 6). Accordingly, to the extent CPChem asserts that Jones "never" raised concerns about seeing the heater board after submission of the work order, it does so to the detriment of its own credibility. This is even moreso true, given that Wooters and HR interpreted Jones' November 2022 concerns as indicative of a ***new*** issue: Wooters confirmed that difficulty seeing the writing on the screen is "different" than that Jones not having adequate lighting to see the console such that, as of November 17, 2022, Jones was actually struggling to see two different things (Ex. D, p. 105).

### 4. CPChem's Response to Jones' Continued Vision Concerns Was Woefully Insufficient

In response to Jones' complaint to Wooters regarding his ability to see the text on the screen of the heater board in November 2022, Wooters apprised Jones that CPChem would be reaching out "to the company doctor following the Thanksgiving holiday." (Ex. M, p. 6). At the end of the November 17, 2022 meeting, Wooters and Jones "agreed" that Jones would return to his normal shift and be allowed to continue his training (Ex. M, p. 6). Imperatively, Wooters noted, "***If a suitable resolution to your vision concerns is found prior to 15-Dec-2022***, you will be given one final opportunity to take the full heater board unit review test to qualify on the heater board" (Ex. M, p. 6)(emphasis added). From this correspondence, a reasonable factfinder could determine that, as of November 17, 2022, it was known to CPChem, including Wooters, that Jones was still having vision concerns with respect to the heater board.

CPChem then argues that, as an accommodation, it arranged a visual-acuity test assessment, the results of which it argues unequivocally demonstrated that Jones' "vision was sufficient" for him to proceed with a fourth heater board examination [D.E. 17, p. 23]. This summarization of the "visual acuity" assessment to suggest that Jones could "see" the heater board sufficiently to "navigate" it represents an egregious misstatement of material fact (Ex. Y)

Dr. William Hart, Jones' longtime treating ophthalmologist, explicitly explained how the results of a "visual acuity" test—which gauges an individual's ability to see black letters against a white screen under optimal lighting conditions, refraction, and optical correction[21]—does **<u>not</u>** indicate an individual's ability to read and interpret small figures and/or colors when there is a significant brightness/darkness contrast (Ex. B, p. 91).[22] As made abundantly clear by Dr. Hart,

[21] Ex. B, p. 90-91.

[22] As further described by Dr. James Stanton, the visual acuity test represents a basic measure of a person's ability to see, read, and comprehend words, letters, and numbers (Ex. C, p. 54-55).

Jones' problem lies with his elongated eye, a problem with which [Jones] was born, and the deterioration that comes because of the high myopia, the elongation of the eye." (Ex. B, p. 91). Jones' macula is not able to change between dark and light, as compared to that of a normal person, because he has an insufficient number of photoreceptors (Ex. B, p. 94-96). Thus, despite Jones being able to "read" in an *optimal* lighting environment—which is the environment under which an acuity test is administered[23]—Jones still struggles beyond the normal population in a dark room with lights because his macula is not as efficient as a normal person's (Ex. B, p. 92-93). There is **no** evidence in the record suggesting that CPChem did anything to ascertain Jones' ability to read/interpret in areas with a high dark/brightness contrast, which is the problem of which he complained throughout 2022.

The individual who recommended the visual acuity test, Dr. James Stanton,[24] admits that he had no particular expertise in optometry and is not an ophthalmologist (Ex. C, p. 24-25). That being said, Dr. Stanton nevertheless confirms that "there was a question of whether failing was a matter of visual acuity or the extreme high myopia that [Jones] suffered from or something else," and that "acuity" which is "what is tested when you are asked to read letters on an eye chart," is not the only consideration: "there are other factors like peripheral vision, field of vision that is depth perceptions, [and] color perception" to consider when determining whether Jones' high myopia could have played a part (Ex. C, p. 33-34, 58).

CPChem's own medical director confirmed that acuity was **not** the sole factor to consider when determining whether Jones' condition impacted his ability to see the heater board (Ex. C, p. 33-34, 58). That being said, and despite Dr. Stanton's assertion that CPChem was "certainly

[23] Hart confirms that Jones had "visual acuity" of 20/40, which is the standard for obtaining a driver's license, Jones can perform daily chores and tasks, he can drive, and he can watch tv (Ex. B, p. 12, 15, 27). This, however, is different than Jones' ability to see in low light, something that CPChem ***never*** tested.

[24] Stanton had actually reviewed Jones' previous acuity test as of October 12, 2022 and had confirmed at that point that Jones had acceptable "visual acuity" (Ex. X, p. 1).

open" to the possibility that Jones' myopia played a part in his certification "struggles,"[25] CPChem did **nothing** whatsoever to evaluate any of the other factors—peripheral vision, depth perception, or color perception, among others—that Dr. Stanton indicates could have been an issue and not otherwise detectable or evaluated through a basic acuity test (Ex. C, p. 33-34, 58). Dr. Stanton confirmed that the acuity test was **not** determinative of whether Jones could actually see the heater board (Ex. C, p. 58). Thus, to the extent CPChem relied solely on Jones' visual acuity test—which, again, represents a basic measure of a person's ability to see—to determine whether Jones could actually "see the heater board" highlights its blatant disregard for the individualized assessment required of it when engaging in the required interactive process.

Even further, Dr. Stanton confirmed that, even after it received Jones' acuity test results, CPChem never asked Dr. Stanton whether Jones had the medical ability to see the heater board screen (Ex. C, p. 50). Contrary to CPChem's assertion that it relied on Stanton's statements to suggest that Jones was ready for another heater board exam, Dr. Stanton admits that he never opined on it, either (Ex, C, p. 50). Based on the foregoing, a reasonable factfinder could determine that CPChem derogated from its duty to meaningfully work with Jones to *make* reasonable accommodations for him. Rather than actually implement anything, Chevron subjected him to a test—one not designed to actually evaluate Jones' ability to visualize the heater board under the conditions of the heater board room—and subjected him to another test, under identically, non-accommodating conditions, for a fourth time on December 22, 2022.

**D. Record Evidence Confirms that CPChem Did Not Accommodate Jones' Request to Perform Work as an Outside Operator**

CPChem does not materially dispute that Jones requested the ability to continue working solely outside operator jobs as an accommodation for his disability (Ex. A, p. Ex. F, p. 58, 61-62;

[25] Ex. C, p. 33-34.

Ex. J, p. 26-27, 35-36). From the record evidence, a reasonable factfinder could determine that, during the October 3, 2022 meeting, and later again in November/December 2022, permitting Jones to work exclusively on the three (3) outside operator jobs was actively posed to both CPChem and the union, through Ryan, as a proposed accommodation.

**1. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Failed or Otherwise Refused to Even Consider the Accommodation Posed**

Cisneros confirmed that, despite her notation that someone[26] in the October 3, 2022 meeting "brought up outside operator accommodation that was made in the past," the request was never discussed as an option, not did the request go any further than October 3, 2022 (Ex. F, p. 63, 107). CPChem never materially discussed the idea of allowing Jones to perform solely outside functions as an accommodation, and it undertook **no** analysis whatsoever to determine whether accommodating Jones in this way would pose an undue burden on the company (Ex. F, p. 66, 107; Ex. G, p. 62-66). Clay Ryan confirmed that CPChem never approached the union with an accommodation request to allow Jones to work outside because of his disability (Ex. E, p. 56). He further confirmed that the union never discussed the idea of allowing Jones to work full-time outside as an operator as a means of accommodation (Ex. E, p. 63). In fact, Ryan went so far as to say that the union "never considered actually discussing it" (Ex. E, p. 66-67). Given that CPChem never even discussed the option as a legitimate one, it has not established that providing such an accommodation would have, in actuality, posed any undue burden.

**2. Resolving Fact Disputes and Inferences in Jones' Favor, Permitting Jones to Work as an "Outside" Operator Was a Reasonable Accommodation**

To the extent CPChem attempts to rely upon its CBA to justify its non-consideration of permitting Jones to work outside jobs as an accommodation, it does so to the detriment of its own credibility. The same is true with respect with its argument that permitting Jones to continue

[26] Jones, Wooters, Ryan, and Cisneros were present for the October 3, 2022 meeting (Ex. F, p. 61).

working the three outside jobs and letting him bypass training for the inside jobs would somehow "create" a jew job [D.E. 17, p. 25].

While the ADA does not require an employer to take action ***inconsistent*** with contractual rights of other workers under a collective bargaining agreement,[27] there is nothing in the present record to suggest that CPChem permitting Jones to continue working the three (3) outside functions actually violated any CBA. The record, construed in Jones' favor, reveals the opposite.

First, on at least two occasions, CPChem permitted other ethylene operators to forego training/qualification in one or more of the inside and/or outside areas, negating any contention that the CBA actually required operators to affirmatively train and qualify in all six (6) areas to maintain employment. Palmer Lee was only qualified on two outside jobs, and he could not pass the exam to qualify for the distillation job (Ex. A, p. 131). That being said, CPChem permitted Lee to worked solely in the compressor and heater areas until he left on disability (Ex. A, p. 131). Lee had a successful career with CPChem with qualifications on only two outside jobs (Ex. A, p. 134). Similarly, Gerald Devlanc, after qualifying on all three outside jobs and on the distillation board, had a couple of incidents indicating that he was not equipped to work said board (Ex. A, p. 130-31; Ex. J, p. 69). CPChem simply stopped assigning Devlanc to work that board and scheduled him to work solely outside jobs until he retired (Ex. A, p. 131-32; Ex. E, p. 53; Ex. J, p. 69-70). Which particular area Jones, or any other operator, failed to qualify does not change the analysis: the fact that other operators failed exams and were simply permitted by CPChem to avoid/bypass additional training and/or having to work in those areas, when construed in the light most favorable to Jones, that it was neither a violation of any CBA, nor did it pose any undue burden on CPChem, to permit Jones to continue working on any of the three outside jobs for which he had already qualified. CPChem's treatment of other operators, to the extent it

[27] *Foreman v. Babcock & Wilcox Co*., 117 F.3d 800, 810 (5th Cir. 1997).

permitted them to forego training and/or qualification on at least one (1) of the six areas, negates any contention that training and working in all six (6) areas is, in actuality, an "essential job function" of the position, as CPChem asserts [D.E. 17, p. 25]. According to Jones, at the time he made the request, there were openings for the outside areas, and CPChem was hiring for the same (Ex. A, p. 86). Construing facts and inferences in Jones' favor, permitting Jones to continue rotating between the outside jobs, just as it had over the last several years, does not actually "create" a position at all.

Second, CPChem's then-Operations Manager,[28] Bryan Kubsch, indicated that, while the CBA requires employees to train in seniority order, the agreement specifically permits the company and employee to request that the employee be bypassed for training (Ex. H, p. 30-31). According to Kubsch, CPChem has the discretion to let employees bypass training, and it will do so long as there is a "good reason" therefore (Ex. H, p. 50-52). To the extent the CBA permits employees to bypass training in a given area, it cuts against any contention that requiring employees to train on all six (6) areas is an essential function.

Next, despite CPChem's assertion to the contrary, it does not appear that the CBA actually prevents an employee from bypassing training, even if he or she initially commences the training and later wishes to bypass the same. On April 19, 2022—approximately one (1) month into Jones' heater board training—Hayes sent an email to Wooters, copying Jones, which stated:

> ***At Warren's request he would like to continue training***. He has some new described glasses coming in two weeks. My crew and I will give him as much assistance as necessary to make him successful. . . . (Ex. AT)(emphasis added)

While CPChem did not produce any additional correspondence on this matter, a reasonable factfinder could infer from Hayes' email several key items: 1) Jones had, as of April

[28] Kubsch served as the Operations Manager over CPChem's Port Arthur facility from April 2019 through July 1, 2025 (Ex. H, p. 14).

2019, indicated a concern with reading the heater board, for which he sought medical assistance; 2) someone at CPChem had recommended or inquired about Jones stopping heater board training, despite the fact that he had been participating in it for over one (1) month.

The ability of employees to bypass training notwithstanding, when asked if allowing someone to work outside as an ADA accommodation would violate the collective bargaining agreement, Ryan, who had served as the union worker's committee chairman for over six (6) years at the relevant time, stated only that it would "go against" the CBA but that he had no idea how the disability would impact the analysis because he does not know enough about the ADA (Ex. E, p. 67-68). Even further, when asked to identify the type of "burden" posed by permitting Jones to work as an "outside" operator, Ryan responded, "Yeah, I mean, I guess I'm not understanding what the burden would be" (Ex. E, p. 98-99). Ryan then effectively conceded that the choice to have operators work both inside and outside jobs was a merely a preference, and that he "d[id]n't think it would be a burden" but, rather, would "open [them] up for other people wanting to try to do the same thing, which [they] d[id]n't want to allow" (Ex. E, p. 98-100). Of course, Ryan confirmed that he has no idea how many of the union employees have ADA-qualifying disabilities (Ex. E, p. 100-01).

At the end of the day,

> The ADA, its implementing regulations, and the EEOC's interpretive guidance make clear that an employer's obligation to provide a 'reasonable accommodation' ... contemplates changes to an employer's procedures, facilities, or performance requirements that will permit a qualified individual with a disability to perform the essential functions of his or her job.

*Burch v. Coca-Cola Co.*, 119 F.3d 305, 314 (5th Cir. 1997). "In all cases a reasonable accommodation will involve a change in the status quo, for it is the status quo that presents the very obstacle that the ADA's reasonable accommodation provision attempts to address." *Id.*

Resolving fact disputes and inferences in Jones' favor, permitting Jones to continue rotating amongst the three outside jobs and bypass training/qualification for inside jobs 1) did **not** amount to CPChem "creating" a new job and 2) did **not** violate any CBA. CPChem cannot meaningfully argue otherwise, given admissions by numerous CPChem officials that it undertook no analysis whatsoever at the relevant timeframe to determine whether permitting Jones to perform outside jobs would actually pose any undue burden on CPChem at all (Ex. F, p. 66, 107; Ex. G, p. 62-66). To this end, CPChem is not entitled to judgment as a matter of law.

Ultimately, the final element of a failure-to-accommodate claim requires a showing that the employer "failed to ***make*** 'reasonable accommodations'" for an employee's known disability and consequential limitations. *Neely,* 735 F.3d at 247 (emphasis added). CPChem has not pointed to a shred of evidence suggesting that, beyond "discussing," in the hypothetical, a series of potential accommodations, it actually attempted to implement (or make) a single one of them before suspending and terminating Jones in December 2022. In fact, the record unequivocally indicates otherwise. For this reason, a reasonable fact finder could determine that CPChem failed to reasonably accommodate his known disabling conditions in violation of the ADA/TCHRA, and CPChem's Motion must be denied accordingly.

## II. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Suspended and Terminated Jones' On Account of His Disability in Violation of the ADA/TCHRA[29]

### A. CPChem's Motion Relies Upon an Inappropriate Analytical Framework

CPChem inappropriately relies upon the *McDonnell-Douglas* framework to address the specific facts of this case. Where an employee alleges that an employer failed to accommodate a disability, and that the failure to accommodate caused the conduct upon which the termination is based, there is no need to determine whether the proffered reason for discharge was pretext.

[29] Substantially the same law applies to ADA and TCHRA disability claims. *See, e.g., Gover v. Frankel Family Tr.,* 537 Fed. Appx. 518, 520 (5th Cir. 2013) (per curiam).

*Piligian v. Icahn School of Medicine at Mount Sinai*, 490 F.Supp.3d 707, 717 (S.D.N.Y. Sept. 28, 2020). In other words, where an employee alleges that an employer failed to accommodate a disability, and that failure to accommodate caused the conduct upon which termination was based, there is no need to determine whether the proffered reason for discharge was pretext. *Id.*

Because Jones alleges that CPChem's failure to grant him an accommodation resulted in his termination, the Court should not apply the *McDonnell Douglas* burden-shifting analysis to this claim. *See, e.g., Goldman v. Sol Goldman Investments LLC,* 2022 WL 6564021 (S.D.N.Y. Aug. 5, 2022); *Piligian*, 490 F.Supp.3d at 717. Instead, in actions where both an adverse action and failure to accommodate are alleged, "'the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment.'" *Id.* (citing *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)). Additionally, "Jones [also] must show 'the *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action.'" *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 108 (2d Cir. 2001)(emphasis in original).

Because Jones submits that CPChem's failure to accommodate his disability caused the performance "deficiencies" for which he was terminated (i.e., his inability to pass the heater board exam), it is not enough for CPChem to simply establish that it terminated Jones for those deficiencies. *See Hildebrand*, 2013 WL 3761291. Instead, the relevant inquiry is whether CPChem's failure to accommodate Jones' disability was the "but for" cause of the performance deficiencies for which he was terminated. *Id.* Stated another way, the question at this stage is whether Jones has produced evidence from which a rational trier of fact could conclude that, if CPChem had granted Jones a reasonable accommodation, Jones would not have been fired for

his failure to qualify on the heater board console. *Id.* As noted by the *Hildebrand* Court, this approach makes sense: it would frustrate the ADA's purposes if CPChem could be insulated from liability for causing Jones to fail by refusing to accommodate his disability.

Drawing all reasonable inferences in Jones' favor, CPChem did not actually "work[] with him to ensure he had what he needed to succeed,"[30] given that it did not actually make a single requested/discussed accommodation to address Jones' concerns with his visibility of, and resultant ability to navigate, the heater board console. It may have afforded Jones an "extra opportunity" to take the heater board exam; however, that extra opportunity was futile, given that CPChem did not change the testing environment to actually accommodate Jones' ongoing vision concerns at any time (Ex. D, p. 186). Put simply, Jones could not see the heater board during the fourth exam any better than he could during the first, despite his clear efforts to engage CPChem for assistance with seeing the console screens over the course of several months.

Many if not all of Jones' performance deficiencies (within the context of the heater board exam) were attributable to CPChem's failure to countenance his requests for a reasonable accommodation. A substantial portion of the practical exam required employees to demonstrate an ability to navigate the board and locate various items, a duty directly impacted by an individual' ability to see the board and its components. Several of CPChem's deponents acknowledged that a person's inability to see the heater board would likely impact the person's ability to successfully navigate it (Ex. E, p. 70; Ex. J, p. 46; Ex. K, p.54); however, CPChem ultimately confirmed that it did not actively change anything in the testing environment, between any of Jones' exams, in an effort to help Jones see the board better (Ex. D, p. 186).

As of December 12, 2022, CPChem was readily aware that Jones' explicit request that the overhead lighting be repaired had not occurred. Inexplicably, neither Cisneros nor Wooters ever

[30] [D.E. 17, p. 27].

told anyone to stop the retest until the light was replaced (Ex. F, p. 75, 89-90). Cisneros never notified anyone in higher management that they should reconsider terminating at the time, give that CPChem had not made the requested heater board light repair (Ex. F, p. 76-77). In fact, Cisneros claims that she did not think it was relevant that the decisionmakers knew whether Jones' requested accommodations had (or here, had not) been satisfied (Ex. F, p. 79-80). Jones' bad eyesight negatively impacted his ability perform the inside jobs, all of which required him to interact in dimly lit rooms with bright LED screens containing a series of small numbers. Compared to the outside jobs, the inside jobs required multiple computer screens, and required far more reading that the outside jobs. Thus, although Jones had been able to perform satisfactory work for all of the three outside positions, the lack of accommodation caused him to struggle to meet the elevated vision requirements of the inside jobs. A jury could find that, had CP Chem had granted him any accommodation tailored to improve the lighting and/or visibility of the heater board, Jones would have been able to more easily and efficiently navigate the board and pass the exam. At this stage, the failure to accommodate Jones' vision directly resulted in him experiencing continued difficulty in navigating the heater board. This, in turn, lead to him failing the exam on four occasions—albeit all under the same, non-accommodating conditions—which CPChem used to justify his suspension and termination. Construing facts and inferences in Jones' favor, a reasonable juror could readily see a direct, causal link existing between CPChem's failure to accommodate Jones, the resultant difficulty Jones experienced reading the heater board, and his ultimate termination. Summary judgment must be denied as to this claim.

### B. Alternatively, Resolving Fact Disputes and Inferences in Jones' Favor, Jones Establishes a *Prima Facie* Case of Disability Discrimination

Should the Court disagree with Jones and find that the *McDonnell-Douglas* analysis is appropriate, summary judgment remains unwarranted. "To establish a *prima facie* discrimination

claim under the ADA and TCHRA,[31] [Jones] must prove: 1) that he has a disability; 2) that he was qualified for the job; and 3) that he was subject to an adverse employment decision on account of his disability." *Thompson v. Microsoft Corporation*, 2 F.4th 460, 470 (5th Cir. 2021) (citing *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)). Here, CPChem concedes Jones' ability to satisfy the first two prongs for purposes of its Motion [D.E. 17, p. 22].

With respect to the third prong, the Fifth Circuit in *Delaval v. PTech Drilling Tubulars, LLC*, a post-*Gross* case, readily articulated the mixed-motives framework when explaining the law applicable to the employee's ADA discrimination claim. 824 F.3d at 480 (*citing LCH Grp*., 773 F.3d at 702). Additionally, as of October 14, 2025, the Fifth Circuit indicated that the ADA only requires an individual's disability be a motivating factor. *Harmon v. Collier,* 58 F.4th 595, 608 (5th Cir. 2025). For this reason, *Delaval* and *Harmon* governs the analysis of his ADA claim, such that, to survive summary judgment, he need only satisfy the "motivating factor" test," which provides that "the discrimination need not be the sole reason for the adverse employment decision … [so long as it] actually play[s] a role in the employer's decision-making process and ha[s] a determinative influence on the outcome." *Id.* The same "motivating factor" standard unequivocally applies to Jones' contemporaneous TCHRA claim. *See Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 480 (Tex. 2001) ("The plain meaning of the statute establishes 'a motivating factor' as the plaintiff's standard of causation in a TCHRA unlawful employment practice claim, regardless of how many factors influenced the employment decision."). CPChem employs an inappropriate standard in its Motion by suggesting a heightened causation standard [D.E. 17, p. 29].

---

[31] The inquires under the ADA and TCHRA are identical under the first and second stages of the modified *McDonnell Douglas* framework. *Carrizal v. Quality Edge,* 2019 WL 1077350 (N.D. Tex. Mar. 7, 2019) (citing *Mathis v. BDO USA, LLP,* 2014 WL 975706, at * 3 (S.D. Tex. Mar. 12, 2014)).

As noted above, it is undisputed that the sole reason proffered by CPChem for suspending and terminating Jones is based upon his inability to pass the heater board exam after four attempts (Ex. G, p. 61). And, again, several of the panel members, as well as CPChem's medical director, acknowledged that Jones' inability to see the heater board easily could have impacted his ability to successfully navigate it, which, in turn, easily could have impacted a large portion of the practical examination Jones failed four times (Ex. E, p. 70; Ex. J, p. 46; Ex. K, p.54; Ex. T). The fact that Jones specifically requested accommodations to assist him with seeing the board, combined with the fact that CPChem did not implement any accommodation discussed during the interactive process, establishes that Jones' disabling condition, and CPChem's failure to accommodate it, caused—or, at the very least, motivated—the very heater board exam "navigation" failures that CPChem admits precipitated Jones' suspension and discharge. A reasonable factfinder could easily find that CPChem's failure to accommodate Jones, which lead Jones to experience considerable difficulty seeing and navigating the heater board in all four of the exams he failed, unequivocally motivated CPChem's decision to suspend and discharge Jones. CPChem's Motion must be denied accordingly.

## III. Resolving Fact Disputes and Inferences in Jones' Favor, CPChem Terminated Jones in Retaliation for His Requests for Reasonable Accommodation(s) in Violation of the ADA/TCHRA

### A. Resolving Fact Disputes and Inferences in Jones' Favor, Jones Establishes a *Prima Facie* Case of Retaliation

"To establish a *prima facie* case of retaliation under the ADA/TCHRA ... [Jones] must show that (1) []he participated in an activity protected under the statute; (2) h[is] employer took an adverse employment action against h[im]; and (3) a causal connection exists between the protected activity and the adverse action." *Way v. City of Missouri City*, 133 F.4th 509, 521-22 (5th Cir. 2025) (citation omitted).

As to the first prong, making a request for reasonable accommodation under the ADA constitutes "participat[ing] in an activity protected under the statute." *Id.* at 522. Here, there is no dispute that, on September 19, 2022, Jones sent an email readily identifying his vision disability and resulting limitations, which was interpreted by CPChem as a request for an accommodation (Ex. F, p. 45-47). With respect to the second prong, there is no material dispute that Jones was suspended on December 20, 2022, and thereafter terminated on January 2, 2023, such that he was subjected to two adverse actions. *See Way,* 133 F.4th at 522 (citation omitted).

As to the third prong, CPChem's argument—i.e., that the timing between Jones' initial accommodation request on September 19, 2022 and his discharge on January 2, 2023 is too attenuated to establish causation—ignores a summary judgment record that supports a reasonable inference of causation even without relying on temporal proximity.

First, with respect to temporal proximity, the timeline is much less attenuated that CPChem suggests. Here, Jones engaged in protected activity on September 19, 2022, and three (3) days later, was subjected to his second exam—under the same, suboptimal conditions—on September 22, 2022. This led Jones to engage in a thorough discussion of his disability, resultant limitations, and proposed accommodations on October 3, 2022, which took CP Chem over three (3) weeks to process. Then, on October 20, 2022—in almost immediate response to Chevron's inquiry relating to assistive devices—Jones requests what CPChem admits is a reasonable accommodation, and instead of working to repair a simple light fixture, CPChem completely ignores Jones' requests and, instead, requires him to retest less than one (1) month later—again, under the same, suboptimal conditions—on November 17, 2022. Both during and following his third exam, Jones clearly articulated that he continued experiencing difficulty on reading the heater board--which both he and the panel interviewers confirm negatively impacted his ability

to navigate the board and, consequently, his overall exam performance. Despite assertions that it would "address" Jones' concerns, CPChem subjected him to an absolutely useless "visual acuity test"—one that both an ophthalmologist and general practitioner confirm did ***nothing*** by way of testing whether Jones' myopia impacted his ability to see a bright screen in a dimly lit room—and hid behind that useless test to, once again, subject Jones to an exam in suboptimal conditions, on December 15, 2022. Rather than acknowledging the simple reality that the portable lamp Jones had brought from home did absolutely nothing to alleviate Jones' vision concerns and actually making a reasonable accommodation for Jones in any respect, CPChem chose to altogether disregard Jones' disabling condition and terminate him for failing a test it had, quite literally, set him up to fail. The temporal proximity is far "closer" than three months and the suspicious timing, combined with the unequivocal interplay between Plaintiff's requests for accommodation, CPChem's failure to accommodate, and CPChem's reliance on performance deficiencies driven by its failure to accommodate to suspend and terminate him, satisfy the minimal causation burden applicable at the *prima facie* stage.

### B. Resolving Fact Disputes and Inferences in Jones' Favor, Jones Has Established a Clear, Causal Link Between His Protected Activity and CPChem's Suspension/Termination Decisions

For the reasons set forth in the analysis for Jones' other claims, while CPChem "identified" a host of reasonable accommodations that would have permitted Jones to perform the essential functions of the job(s) in question, it did not actually make or implement a single one of them. The fact that CPChem asserts that it effectively "granted" Jones the "accommodation" of a fourth exam[32] is a red herring, given that it made no real effort to alter or improve the lighting of the heater board console, or to otherwise accommodate Jones' known

[32] Danford testified that CPChem accommodated Jones by 1) letting him use his personal lamp and 2) giving him an extra attempt to test that they did not give to other employees (Ex. F, p. 95).

vision disability, in order to ensure even a semblance of a likelihood of success for Jones. Jones firmly disputes, and record evidence establishes, that Jones' portable lamp fell woefully short of "resolving" the lighting issue, and record evidence further confirms that the generalized "visual acuity" test CPChem undertook did not indicate, in any form, whether Jones' specific myopia prevented him from being able to see and read the heater board screen as issue here. While an employee's failure to qualify on a piece of an equipment may appear to be a "legitimate, nondiscriminatory" basis for terminating an employee, Jones has shown that his particular failure was driven exclusively by CPChem's repeated failures and/or refusals to accommodate the known vision conditions rendering Jones unable to see the heater board, much less navigate it.

## CONCLUSION

CPChem's own policy indicates that, "[i]f the requested accommodation is reasonable and will not impose an undue hardship . . . the Company will ***make*** the accommodation in an accordance with applicable law." (Ex. O, p. 2). Moreover, CPChem's Policy affords it the ability to "propose an alternative to the requested accommodation or substitute one reasonable accommodation for another," with CPChem retaining the "ultimate discretion to choose between reasonable accommodations" (Ex. O, p. 2). Resolving fact disputes and inferences in Jones' favor, CPChem altogether failed to abide by its own policy and established law to effectively accommodate the known limitation of a disabled employee, instead terminating the employee for "performance deficiencies" driven exclusively by the employee's unaccommodated condition. CPChem has not established that it is entitled to judgment as a matter law on any of Jones' claims, and its Motion must be denied in its entirety accordingly.

*{Signature Page to Follow}*

**SUDDUTH & ASSOCIATES, LLC**

1109 Pithon Street
Lake Charles, Louisiana 70601
Tel: (337) 480-0101
Fax: (337) 419-0507
Email: james@saa.legal
kourtney@saa.legal

*/s/ James E. Sudduth, III*
**JAMES E. SUDDUTH, III (#24093227)**
**KOURTNEY L. KECH (#24107826)**
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I served a true and correct copy of the foregoing via CM/ECF on counsel for Defendant on this 5th day of January 2026 in Lake Charles, Louisiana.

*/s/ James E. Sudduth, III*
JAMES E. SUDDUTH, III

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| WARREN F. JONES<br>Plaintiff, | ) |
| VS. | ) CIVIL ACTION NO.<br>) 1:24-CV-00350 |
| CHEVRON PHILLIPS CHEMICAL COMPANY LP<br>Defendant. | ) |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF

WARREN FITZGERALD JONES

AUGUST 14, 2025

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF WARREN FITZGERALD JONES, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on AUGUST 14, 2025, from 9:42 a.m. to 3:27 p.m., before Deborah Garney Viator, RPR, CSR No. 2394, Louisiana CCR No. 99011, in and for the State of Texas, reported by machine shorthand, at the offices of Sudduth & Associates, 1109 Pithon Street, Lake Charles, Louisiana 70601, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFF:

Mr. James E. Sudduth, III
SUDDUTH & ASSOCIATES
1109 Pithon Street
Lake Charles, Louisiana 70601
james@saa.legal

FOR THE DEFENDANT:

Ms. Brooke Jones
SBOT NO. 24107537
Ms. Marlene C. Williams
SBOT NO. 24001872
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
500 Dallas Street, Suite 2100
Houston, Texas 77002
brooke.jones@ogletree.com
marlene.williams@ogletree.com

ALSO PRESENT:

Ms. Stephanie John

VIDEOGRAPHER:

Mr. C. J. Moorer
LEGAL MEDIA, INC.

I N D E X

PAGE

Appearances......................................2

Stipulations.....................................5

WARREN FITZGERALD JONES

Examination by Ms. Jones........................5

Examination by Mr. Sudduth....................215

Signature and Changes..........................219

Reporter's Certificate.........................221

E X H I B I T S

NUMBER DESCRIPTION PAGE

1 Email Dated March 17, 2022................53

2 Quiz Information CP CHEM 000899...........63

3 Quiz Information CP CHEM 000900...........65

4 Unit Review Committee for Job Qualification Dated 8/24/22.............................66

5 Email Chain and Letter from Hart Eye Center.........................79

6 Unit Review Committee for Job Qualification Dated 9/22/22............................100

7 Performance Improvement Plan.............107

8 Email Dated October 19, 2022.............110

9 Email Chain..............................112
10 Unit Review Committee for Job Qualification Dated 11/17/2022.........................214
11 Unit Review Committee for Job Qualification Dated 12/15/22...........................215

C E R T I F I E D  Q U E S T I O N S

NUMBER PAGE/LINE

(NONE)

THE VIDEOGRAPHER: Good morning. Today's date is August 14th, 2025. The time is 9:41 a.m., and we are officially on the record.

(WITNESS SWORN)

THE REPORTER: Are there any stipulations?

MS. JONES: No, ma'am.

WARREN FITZGERALD JONES,

having been first duly sworn, testified as follows:

EXAMINATION

(9:42 A.M.)

BY MS. JONES:

Q. Good morning, Mr. Jones. Can you please state your full name for the record?

A. Warren Fitzgerald Jones.

Q. Have you ever gone by any other names?

A. "Pooley Ray."

Q. Did you say "Pooley"?

A. P-O-O-L-E-Y --

Q. Uh-huh.

A. -- R-A-Y.

Q. Did you go by that name at -- when you were employed at CP Chem?

A. No. Maybe a few colleagues, out of work, maybe asked, after seeing somebody that was at -- that was -- that I knew; and they may have been hey, "Pooley Ray."

And they say, "Pooley Ray"?
And I have to go through the whole spiel of explaining it to them.
Q. Have you gone by that name at any other jobs?
A. No. No, ma'am.
Q. The defendant in this case is Chevron Phillips Chemical Company. I may refer to them as CP Chem.
A. Right.
Q. I probably will refer to them as CP Chem.
A. Right.
Q. You understand that Chevron Phillips --
A. Correct.
Q. -- Chemical is CP Chem?
A. I do.
Q. Okay. Today, I'm going to be asking several questions. You'll be answering.
A. Uh-huh.
Q. The court reporter, who is a very important person here today, she's going to be writing down everything that you and I say.
A. Okay.
Q. So that we have a clear record, it's important that when I ask a question, you wait to speak before I finish asking the question; and I'll do the same for you. I'll allow you to answer before I ask another

question. In essence, let's just do our best not to interrupt each other.

A. Gotcha.

Q. Is that okay?

A. Gotcha.

Q. Okay. If you need to take break at any time, just let me know.

A. Okay.

Q. I'll just ask that you finish answering whatever answer you're in the middle of --

A. Uh-huh.

Q. -- and then we can go ahead and take a break at any time.

A. Okay.

Q. Is that fair?

A. That's fair.

Q. Okay. You just took an oath. You are sworn to tell the truth just like as if you were in front of a judge or a jury.

A. Uh-huh.

Q. You understand that?

A. Yes, I do.

Q. Okay. Have you ever testified in a deposition before?

A. Insurance deposition.

Q. When was that?
A. During Hurricane Laura, for my content, on my insurance.
Q. Hurricane Laura?
A. Yes.
Q. Okay. What -- do you remember when that was, approximately?
A. 2000, I believe -- 2020, I meant to say. I'm sorry. I think I'm correct. Somewhere up in that area.
Q. Who -- did Mr. Sudduth represent you in that lawsuit or a different attorney?
A. No. No.
Q. Okay.
A. It was a different attorney.
Q. Did y'all go to trial, or did that case settle?
A. No, we just -- it settled. It was just a mediator.
Q. Okay. Any other depositions?
A. No, ma'am.
Q. Okay. Did you review any documents before this deposition today?
A. Concerning?
Q. The lawsuit.
A. No, just my -- giving my lawyers what -- the events that took place --

Q. Uh-huh.
A. -- pretty much.
Q. Other than your attorney, did you speak with anyone else about this deposition?
A. My wife. That's pretty much it.
Q. Anyone else other than your wife?
A. No, ma'am.
Q. Are you under the influence of any alcohol, drugs, medications that would prevent you from testifying truthfully here today?
A. No, ma'am.
Q. Okay. What's your date of birth?
A. October 27th, 1973.
Q. And that would make you how old?
A. 51.
Q. Okay. Where do you currently live?
A. 6920 Silver Lane, here in Lake Charles, Louisiana 70607.
Q. How long have you lived there?
A. Right at 15 -- no. 10 -- yeah, right at 15 years.
Q. Okay. Do you own or rent that house?
A. We own.
Q. Who lives in that house with you?
A. Myself, my wife, and my three kids.

Q. What are the ages of your children?
A. "Doodie" is 28, Hannah is 24, and Jada is 22.
Q. Do your three children still rely on you financially?
A. No, they all work.
Q. Okay. Okay. Have you ever posted on any social media network, which I'll say Instagram, Snapchat, TikTok, anything about your employment at CP Chem or your termination?
A. No.
Q. Okay.
A. No, ma'am.
Q. What's your wife's name?
A. Wendy Jones.
Q. How long have y'all been married?
A. 17 years.
Q. Were you married to anyone else before that?
A. No, ma'am.
Q. Who -- who -- are your children all -- do they all have the same mother?
A. No.
Q. Okay. Do you have any grand -- grandchildren?
A. Yes.
Q. How many grandchildren do you have?
A. Two.

Q. Do either of your grandchildren rely on you financially?
A. Yes.
Q. Okay. How so?
A. From time to time, I pay -- pick up the arrears on the day care and --
Q. Okay.
A. -- feedings when we're out and things of that nature.
Q. Uh-huh.
What's your highest level of education?
A. I have an Associate's Degree from Lamar Institute in Orange -- or Lamar State College in Orange.
Q. Where did you go to high school?
A. I graduated from Parkview Baptist, but the majority of my time was spent at Washington-Marion.
Q. Are you from Lake Charles or --
A. From Lake Charles.
Q. Okay. Have you lived anywhere else other than Lake Charles?
A. I've done contract work that may have took me out of the state for a month -- 13, 14 months at a time.
Q. Okay. Have you -- other than the insurance matter that we -- that you mentioned, have you ever been involved in any other lawsuit?

A. No.
Q. Other than CP Chem, have you ever filed a lawsuit against any other employer?
A. No, ma'am.
Q. Have you ever personally been sued?
A. No, ma'am.
Q. Other than the insurance matter, have you ever testified in a lawsuit before --
A. No, ma'am.
Q. -- as a witness?
A. No, ma'am.
Q. Did you file for Workers' -- have you ever filed for Workers' Compensation?
A. No, ma'am.
Q. And you -- you filed for unemployment after leaving CP Chem -- benefits -- did you?
A. Let's see. I did. I took a little time off, and then I went back to work for a contractor. And then after that contractor, I went to unemployment.
Q. Okay. How -- how long -- about how long did you take off work after CP Chem?
A. December, then January. So December, I was suspended. January, they let me go. So I was -- January, February, March -- like, four months --
Q. Okay.

A. -- before I went back to work.
Q. Okay. So maybe March, April?
A. Yes.
Q. Okay. Have you ever filed any -- any charge with the Equal Employment Opportunity Commission against any employer other than CP Chem?
A. No, ma'am.
Q. Okay. Have you ever been arrested?
A. No, ma'am.
Q. Before CP Chem, who did you work for?
A. Oh, wow. A bunch of contractors. So there's Brock. There's Chevron offshore division. Southern Insulation.
Q. Hold on. Let's take these in turn.
So Brock before CP Chem --
A. Well, it was --
Q. Yeah.
A. Before CP Chem, there was Chevron offshore division.
Q. Okay. And about how long -- you were a contractor?
A. No, I was an operator.
Q. Operator.
For how many years?
A. Five years.

Q. Okay. Were you an operator for that entire time?
A. Yes.
Q. Okay. How long -- okay. Five years.
Why did you leave Chevron offshore?
A. They was -- the field I was in was working seven on and seven off.
Q. Uh-huh.
A. Chevron -- Chevron decided to sell that field, which was going to take me deep water --
Q. Uh-huh.
A. -- which was going to be two weeks on and two weeks off, and my wife didn't want that so I found a job with CP Chem.
Q. Okay. Before Chevron offshore -- so you -- when did you get the job at CP Chem? Year is fine if -- best guess.
A. 2012, I want to say, or 20- -- it's rough. Let's see. I was there, roughly, ten years. So prior to ten years -- yeah, like, 2012.
Q. Okay. And then before 2012, approximately, you worked for Chevron offshore for five years?
A. Right.
Q. Okay. Who did you work for before Chevron offshore?

A. Okay. So before Chevron, I was at Lamar Institute. So I was working for -- I was at Total Refinery, and I was at the big expansion that Motiva had as a safety guy. The name of those companies were Brock.
Q. Uh-huh.
A. And the name of the other company at Total was -- I want to say it was Brock both -- both times. Brock pretty much put me through college.
Q. When you say you were at Lamar Institute, was that the type of arrangement where they would place you with a contractor or --
A. No. No. What I was doing was I was leaving here.
Q. Uh-huh.
A. I would drive to my job in Port Arthur or -- or in Groves, Texas.
Q. Uh-huh.
A. Then I would stop in Orange --
Q. Uh-huh.
A. -- and take a couple of classes before coming home.
Q. Okay.
A. Yes.
Q. Okay.

A. So I would work days and then take a -- get off at 5:00, drive to Orange -- which was great because it gave me 30 minutes to rest and go to school --

Q. Uh-huh.

A. -- and then I would drive another 30 minutes home.

Q. Okay. With your job at Brock, did you voluntarily leave to go work at Chevron offshore; or why did your employment end?

A. Oh, I wound up getting on with Chevron.

Q. Right.

A. Yeah.

Q. Are you currently working?

A. No, ma'am.

(KNOCK AT THE DOOR)

THE REPORTER: Do you want to go off the record?

MS. JONES: Oh, can we please go off the record?

THE VIDEOGRAPHER: We're off the record at 9:54 a.m.

(RECESS FROM 9:54 A.M. TO 9:55 A.M.)

REPORTER'S NOTE: MS. WILLIAMS ENTERED THE DEPOSITION ROOM.

THE VIDEOGRAPHER: We're back on the

record at 9:55 a.m.

Q. (BY MS. JONES) Okay, Mr. Jones, I was just asking you where you currently work, I believe. So where is that?

A. I was laid off from Turner Industries at Westlake South. Westlake South had a big layoff, and I was told that I was overqualified for the position I was in. So I was part of the layoff.

Q. So you're not currently working?

A. No, ma'am.

Q. Okay. And you're working at Turner -- you were working at Turner Industries?

A. Correct.

Q. They -- Turner Industries laid you off?

A. Yes.

Q. When did they lay you off?

A. This is August. July 4th, I was there. So, like, the middle part of July.

Q. And how long have you been employed with Turner Industries?

A. I was employed with Turner -- I was just getting my benefits. So right at six months.

Q. Okay. So at the beginning of this year, around there?

A. Yes, like, February --

Q. Okay.
A. -- somewhere up in there, yes, ma'am.
Q. And what job were you -- what was your job?
A. I was -- I was an inspector, a QC.
Q. And "QC" is quality control, yes?
A. Right.
Q. Okay. Were you a full-time employee?
A. Correct.
Q. What did you do in your -- what -- what -- what were some of your job duties as a quality control --
A. I was a --
Q. -- inspector?
A. I was a vessel or a tank -- I'm sorry.
Q. It's okay.
A. I didn't let you finish.
I was a tank or vessel inspector, checking for leaks, corrosion; be sure that things worked properly, like the PSV on top of the tank, make sure it was venting; just overall just put our eyes on all the vessels that we were assigned to that day.
Q. How -- were you an hourly or a salary employee?
A. Hourly. Hourly.
Q. How much were you getting paid?
A. 35.70.
Q. Okay. So where did you work before Turner

Industries?

A. Before Turner, I was at -- the name of the company -- I was a subcontractor for a company, Allied Reliability; and I was a process operator in the West Banks of New Orleans for Roehm Chemical.

Q. And when did you get that job?

A. So Roehm Chemical was -- I stayed there, like, maybe 15 months -- 14 months before the job ended. What is this? 2025? So I was -- 2023. I was there, roughly, 14 months before the plant closed.

Q. Do you remember, roughly, when you started there?

A. So let's see. So Chevron, 2022 to 2023. I was let go. Then there was Brock for a few months, Worley for a few months, and then I got the job with Roehm Chemical -- or with Allied, as a contract operator, I want to say maybe around April.

Q. Of?

A. Of 2023.

Q. Okay. And with Allied, you left because you got laid -- did you get laid off because the job was over or --

A. Yeah, the job was complete.

Q. Okay.

A. It was a plant that was closing and they let

their employees know and the employees start leaving at a -- at a mass amount.

Q. Uh-huh.

A. So they had to man the plant with qualified operators, and I was hired in as a third-party operator.

Q. Okay. Okay. So before Allied, you said you worked for Wor- -- Worley?

A. Worley.

Q. What was your job there?

A. As -- I was a safety tech.

Q. And how long did you work for Worley?

A. Maybe three months.

Q. In early 2023, would that have been?

A. Yes.

Q. Okay. Were you full time or part time?

A. I was full time.

Q. Do you remember how much you got paid there?

A. Worley was paying me, like, $34 an hour.

Q. Backtracking a bit.

Do you remember how much you got paid with Allied?

A. Allied was -- it was -- I started off at 35; and after I qualified at my area, I got a 5-dollar raise. So it was, like, 40.

Q. Okay. Okay. So with Worley, you were employed

for about three months, early 20- -- were you a full-time employee or a contractor for Worley?

A. I was a contractor.

Q. Okay. And why -- why did your employment at Worley end?

A. I took the job in New Orleans.

Q. The Allied job?

A. Yes.

Q. And then before Worley?

A. It was Brock. Brock.

Q. Was Brock your first job after CP Chem?

A. Correct.

Q. What did you do for Brock?

A. I was a safety guy.

Q. Were you a full-time employee?

A. Yes.

Q. Were you an employee or a contractor?

A. Contractor.

Q. And how -- do you remember how much you were getting paid at Brock?

A. I left Brock because Worley was paying more. So I think I was right at 30 bucks an hour with Brock.

Q. Okay. Why -- and you -- you left Brock voluntarily --

A. Correct.

Q. -- to get the job at Worley?
A. Correct.
Q. Okay. Okay. How did you hear -- what was your first job for CP Chem?
A. I was hired in as a process operator, a trainee.
Q. How did you hear about that position?
A. While working offshore with Chevron, I had applied with them several times. I tested, passed the test, and never interviewed; and the third time was a charm, I guess.
Q. Uh-huh.
And you said you first started working for them in, like, 2012?
A. Yeah, roughly, somewhere up in there.
Q. If I represent to you that you started working there in 2015, based on the documents, does that sound correct; or do you think it was earlier than that?
A. I know I put, roughly, ten years in with them so I'm just --
Q. Okay.
A. -- roughly, putting it together for you guys.
Q. Okay. When you were -- when you started with CP Chem, did you have any medical issues?
A. None that I knew of, other than hypertension;

but none that I knew of.

Q. Did you -- do you recall if you had disclosed any medical issues to the company when you were hired?

A. Yes. I let them know that I -- the medicines that I took. It was required for me to let them know that I was taking a pill for high blood pressure.

Q. Okay. Have you always -- how long have you struggled with high blood pressure?

A. Since I was 18.

Q. Has it ever presented a problem for you in any of your work?

A. No. I took a physical in high school for football, and that's where it was first told to me. And then after the doctors talked to me about my family and its history, they realized that it was hereditarily some sort -- in my genes. It was on both sides of my family, my mom and my dad's side.

So the athletic association saw that -- you know, they seemed to just start taking a better look at high school athletes; and I fell under that criteria, went into physicals and stuff like that. I believe all this came because of a couple of high school players had passed away because of whatever the case may be.

Q. Uh-huh.

A. So ever since I was 18, I was taking a pill and

physicals regularly.

Q. Do you still take medicine for high blood pressure?

A. Yes.

Q. Okay. Tell me a bit about the hiring process at CP Chem. You said you applied several times and took a test, and then there was an interview. Is that how it went?

A. I applied. It was two tests. It was mechanical multitude test, and then you took a test called the COBRA 3000.

The first two times I tested -- well, the first time I tested. The second time I didn't have to test because my first test was still current.

Q. Uh-huh.

A. I was offshore. My wife called and said, CP Chem is hiring again.

And I said, if you want to apply for me, please do; and she did.

I took the test again. Passed it again. This time got an interview and got hired on.

Q. Describe for me the test, mechanical multitude. What type of test is that?

A. It's a test where it tests your knowledge on basic tools and quick thinking on a time schedule,

troubleshooting issues, things of that nature.
Q. And then what about the COBRA 3000?
A. COBRA 3000 is a simulated unit, distillation unit, where you're bringing in oils and you're separating in a distillation column. Your lights go overhead; your bottoms go to the bottom. And the computer presents you problems, and you have to correct it.
Q. So you passed both of these tests and then got an interview with CP Chem?
A. Correct.
Q. Do you remember who you interviewed with?
A. It was a guy named "Bear." He's retired now. "Junior" was just his nickname. It was a panel of about eight people. And so people from HR, I believe, and --
Q. Was it just the one interview, or did you have multiple interviews?
A. No, it was just -- it was just one interview.
Q. Okay. About how long between the interview were you offered the job?
A. About two weeks.
Q. Okay. And why did you decide to leave the offshore -- Chevron offshore to come work at CP Chem?
A. They -- Chevron frame of mind was on deep water drilling.

Q. Uh-huh.
A. And my left field, which was on the shelf, produced at -- right at 55 to 6,000 barrels of crude oil a day, which is considered small in the oil field --
Q. Uh-huh.
A. -- when you're thinking of giants.
So they sold that to a smaller company, and they was going to move all their employees deep water --
Q. Uh-huh.
A. -- or elsewhere.
So I bought a dump truck, started working the dump truck with the Sasol project; and in between that, I was searching for a job and got on with CP Chem.
Q. Okay. Were you a union member throughout your entire time at CP Chem?
A. Yes.
Q. Okay. And what union were you a member of?
A. United Steelworkers. SW -- what is it? USW, I believe it's called.
Q. And you were a member of USW the whole time you were employed at CP Chem?
A. I believe so.
Q. Okay. Did you understand that as a union member, you were -- your employment was subject to the

union's collective bargaining agreement?
A. I'm not sure I'm understanding.
Q. Did you -- did you know that the union had an agreement with the company --
A. Yes.
Q. -- that governed --
A. Yes.
Q. -- how your training --
A. Right. Right.
Q. -- your pay would go?
A. Correct.
Q. Okay. Were you also aware that CP Chem had a Code of Conduct?
A. Yes.
Q. Did you receive periodic training on the Code of Conduct and other CP Chem policies and procedures?
A. I did receive training, but it was -- I would like to say it was botched, if you will, at times.
Q. What do you mean?
A. My training process was interrupted because of employees that were trained were swapping positions because of labor issues with they wives.
So I had, maybe, one trainer; and then I got swapped out with another trainer. And then, also, during my training process, I'm actually took off the

schedule. But within the rules of Chevron Phillips, if I come to work and I'm qualified in a job that needs to be manned, I had to work that job.

So during illnesses and things of that nature, a lot of times I was working the outside job instead of training on the board.

Q. Okay. I think we may be getting a bit ahead of ourselves, and we'll get to that.

A. Okay.

Q. We'll talk more about that.

But I'm talking about CP Chem -- you're aware they had policies that prohibited discrimination, retaliation --

A. Oh, right.

Q. -- that type --

A. Correct. I'm sorry. I'm sorry.

Q. And you were aware that you could -- if you felt that you were being discriminated against, you could report that to the union or to the company?

A. Right.

Q. Okay. So you weren't an operations -- a trainee for your entire time with the company?

A. No, ma'am. No.

Q. Eventually, you became --

A. I was qualified on all jobs outside.

Q. Okay. How long were you in a trainee -- operations trainee role?

A. In the beginning of, like, each job, you become a trainee of that job. So I was, maybe, three months before I qualified in my first job.

Q. What was the first job you qualified in?

A. Outside heater board -- I mean -- heater board -- outside heater operator -- outside operator for the heaters or the furnaces.

Q. Is it similar, that each time you qualify for a job you have to take, you know, a test and then you do --

A. Right.

Q. -- an area walk-through --

A. Right.

Q. -- before a unit com- -- unit review committee? Yes?

A. Outside, you just take a test; and then you'll go outside with -- yes, pretty much.

Q. Yeah.

A. You go outside with the -- with -- with the guys, and they ask you questions --

Q. Right.

A. -- and you answer the questions.

Q. Okay. So there's, like, a test portion; and

then there's an on-the-job portion --
A. Right.
Q. -- where you're asked questions to kind of gauge that you have sufficient knowledge --
A. Right.
Q. -- to perform that job?
A. Correct.
Q. Okay. So you were an operations trainee; and then the first job you qualified on, you said, was -- remind me.
A. Heaters.
Q. Heaters. Outside heaters?
A. Out, right.
Q. And what was your -- how long were you on the job for outside heaters?
A. A couple of years, maybe.
Q. Okay.
A. Roughly.
Q. And then after that, what was the next --
A. Compressors.
Q. How long -- did you qualify -- successfully qualify --
A. Yes.
Q. -- for compressors?
Same -- same system --

A. Roughly.
Q. -- tests?
A. Roughly, right.
Q. Yeah.
A. Right.
Q. And how long were you on compressors?
A. About the same amount of time, roughly.
Q. Okay. For the outside operator -- for the outside heater role, what shift were you working?
A. I was on 3 crew.
Q. Okay. Was that a night shift or a day shift?
A. Both.
Q. Okay.
A. You worked what's called the Canadian or duPont schedule.
Q. Uh-huh.
What is that -- what is the duPont schedule?
A. For instance, I would come in -- I would work -- so if I came in off my seven days off, I would start that Friday night.
Q. Uh-huh.
A. Work Friday night, Saturday night, Sunday night, and Monday night; then I'm off Tuesday, Wednesday, Thursday. Come back Friday days, where I

would work Friday, Saturday, Sunday, days, off Monday, then come back that Tuesday.

Q. Uh-huh.

A. And work Tuesday, Wednesday, Thursday, off Friday, Saturday, and Sunday; and then I worked -- wait. I might be saying that wrong.

But you worked pretty much 14 days out of the week.

Q. Okay.

A. I mean, out of the month.

Q. Okay.

A. So it's -- let's see. Friday -- so I come back Friday night. So that's Friday night, Saturday night, Sunday night, Monday night; off Monday, Tuesday, Wednesday -- wait. Friday, Saturday, Sunday, Monday. Off Tuesday, Wednesday, Thursday, come back Friday days.

Q. Uh-huh.

A. Then work Friday, Saturday, Sunday days; off Monday; and then come back Tuesday night and work Tuesday, Wednesday, Thursday; off Friday, Saturday, Sunday; then come back Monday. That's what they call your hell week.

Q. Okay.

A. And then after that Monday, Tuesday, Wednesday, Thursday of your hell week, you go on your seven days

off.

Q. Okay. Who did you report to in that outside heater role?

A. You have -- my -- my supervisor was -- was Jimmie Hayes, which was my -- he's called the -- the head operator. The head operator.

Now, my supervisor was -- the head operator was Jimmie Hayes; and then you have a supervisor, or what they would call your shift foreman, would be -- at the time I was released, his name was -- he was a new guy from -- I can't remember his name.

Q. That's okay.

So in the outside heater role -- heater job, you reported to Jimmie Hayes?

A. Yes.

Q. Okay. And he was the head operator?

A. Yeah, he was the head -- head operator.

Q. Okay. And your next role -- your next job in outside compressors, did you report to a different person?

A. No.

Q. Did you work the same shift?

A. Yes, 3 crew.

Q. Okay.

A. I was 3 crew the whole time I was there --

Q. Okay.
A. -- at Chevron Phillips.
Q. So you had a -- a similar type of work schedule that you described the whole time you were --
A. Same thing.
Q. After the compressor job, what was your next job outdoor?
A. Distillation.
Q. And how long were you in the distillation job?
A. Roughly, three, four years, somewhere up in there.
Q. Did you report to someone different than Jimmie Hayes, in that role?
A. No, ma'am.
Q. Is it common to go through this type of -- like, it's common -- is it common to -- once you -- once you're done with operations training, is it common to go through the outdoor roles? Like, you start with heaters, then you go to compressors, and then distillation; or was that --
A. That was just for me.
Q. Okay. Everyone -- do other people have different --
A. Right.
Q. -- trajectories?

A. Other people -- other people didn't follow it like that. Other people may have had two outside jobs and then went to a board job. Some people may have had one outside job and then went to the board on that particular outside job, things of that nature. So it was -- it was just different for everybody.
Q. Is it common to start in an outside job?
A. Yes. Yes --
Q. Okay.
A. -- I believe so.
Q. Is going to an indoor -- or I think it's -- I think I've seen it referred to as a DCS job.
A. Yeah, a console job.
Q. A console job?
Is that considered, like, a promotion, a next step up from an outdoor job?
A. Your pay doesn't go up or anything. I was pretty much topped out in pay --
Q. Uh-huh.
A. -- by the time I went inside.
Q. Okay. Are -- are there other outdoor roles or is heater compressors and distillation, are those the outdoor operator jobs?
A. That's pretty much.
Q. Okay.

A. If you're an ethylene operator, that's -- that's what I was, an ethylene operator -- that's the only three outside jobs.

Q. So you qualified on all of the outside jobs --

A. Correct.

Q. -- as an ethylene operator?

A. Correct.

Q. So after distillation, you became -- you went to the heater board?

A. Yes.

Q. Okay. How did that opportunity present itself?

A. I believe it's a seniority thing --

Q. Uh-huh.

A. -- and it was my turn to be called in, which I was looking forward to. And I think you could give it up if you don't want it, and then it will make itself -- then the next person with seniority after you could get it; but if everybody, after your seniority, make its way around and if they don't want it and it gets back to you, then you have to --

Q. I see.

A. -- assume that position, yeah.

But I wanted it from the word "go."

Q. You didn't -- you didn't give it -- give it up?

A. No.

Q. Okay.
A. No, ma'am. No.
Q. Did you report to Jimmie Hayes in the heater board role, or did that switch?
A. Jimmie Hayes was always the head operator over my crew. During -- it's a little different -- well, no, it's not different. You just have the -- there's a training program through -- Chevron Phillips has with -- what is his name? He's the trainer on...
Q. I could give you a couple of names that may ring a bell.
A. Okay.
Q. Josh Montalvo?
A. That's his name.
Q. Yeah.
A. That's his name.
Q. He's the training coordinator?
A. Correct.
Q. Okay. So what did -- did Josh Montalvo work -- like, work with you? Was he trained for each of these jobs?
A. No --
Q. Or what --
A. -- he's not trained in any of those jobs.
Q. Okay. Well --

A. He's not trained in the heater board.
Q. Right.
I'm sorry. How did Josh Montalvo -- you --
A. He's the trainer that presents you with the paperwork and the documentation for training for the heater board --
Q. Okay.
A. -- and all the console jobs. He ran the training program.
Q. Okay. So you worked with him to try to become qualified?
A. No. To become qualified is based on you getting with a qualified operator. He's training you while you're on shift.
Q. Who is training you while you're on shift?
A. I had several trainings on shift.
Q. So once you got the opportunity for the heater board, you accepted it; you didn't give it up.
What was your understanding of what the training process, to become qualified? Was it similar to the outdoor --
A. I --
Q. -- roles? Were you --
A. No -- well, during the training process,

Montalvo gives you a packet. Within that packet, you're to get areas that you go through with your coworker; and the qualified coworker signs off on different things that you go over the board with.

Q. So you're training on the job?

A. Yes. While you're at work, you're training.

Q. Okay. How did that process -- how did -- how did that go?

A. Not well.

Q. Why?

A. Several people were out due to illness. Several people were out due to maternity leave. So a lot of times, when it was on me to come to work and train, I had to man a job. If I'm qualified in a job that is not filled on the outside role, I didn't train on the board. I went and manned that job that was outside. That was -- from what I can remember, that was in the contract.

Q. So if I'm understanding you, these -- tell me if I'm understanding you correct.

So while you're training for the heater board, there were people in outdoor jobs that were out for illnesses or on maternity leave. So because you were qualified in those roles, jobs, you would go cover for them?

A. Yes. Yes.
Q. Yeah.
A. I would have to man those jobs.
Q. Okay. Were you still required to complete your -- your kind of training shifts for the heater board --
A. Yes.
Q. -- during this time?
A. Yes. You still have to, yes.
Q. You were -- you're just saying that was interrupted at times because you had to go man --
A. Yeah.
Q. -- outdoor operator jobs?
A. Yeah, well, it was -- yes --
Q. Okay.
A. -- pretty much.
Q. At some point, did you complete the shifts that you needed to, to test for the heater board?
A. I was always reminded by Montalvo that my time was coming up for me to train on the -- to take my test on the board. So I was rushed, if you will, to complete my packet.
Q. Okay. So there's a time that you're supposed to complete the training shifts before you test?
A. Right.

Q. And what's the regular amount of time that you have to complete those shifts?

A. I can't remember, but it was -- I'm not sure, man. I can't answer that.

Q. Okay.

A. Maybe three to five months, something like that, before you take your test.

Q. Was that -- is that normal, that amount of time?

A. For me, I'm guessing --

Q. I'll say, I guess, in your other roles, is that about the amount of time that you were training?

A. Well, I think you get more time on the console than you do on the outside portion of the job.

Q. Are console roles more complex than the outdoor roles, in your -- in your view?

A. The heater board is because it's a busy board.

Q. So the heater board job was a more complex job than your outdoor jobs that you had qualified on?

A. Mentally.

Q. Yeah.

And I just want to make sure we have our timeline right. So you -- after you became a train -- after your operations training, your first job that you qualified for was in outside heaters. You worked that

job for a couple of years. After that, you were in outside compressors. You did that job for a couple of years. Then you were in the outdoor distillation job for three to four years.

For purposes of a clear record, about when did you start training for the heater board role?

A. At the end of my career with Chevron Phillips.

Q. I guess, maybe it would be helpful, about how long before you were let go from the company?

A. Maybe a year.

Q. Okay. So early 2022, maybe?

A. Yeah, roughly, I would think.

Q. Okay. Okay. Describe for me kind of who was involved in your training. Josh Montalvo was the training coordinator. Were there other people that were training you on the heater board?

A. Justin Ridgaway.

Q. What was his title?

A. Justin was an operator.

Q. And he worked on the heater board, or he had already --

A. Yeah, he worked on the heater board and he worked outside.

Q. Okay. Who else?

A. And Joseph Angelle.

Q. Was he -- what was his -- what --
A. He was a operator, also.
Q. Okay. Who else?
A. And Jimmie Hayes would help out from time to time.
Q. Okay. And was he an -- he was the head operator?
A. Right.
Q. Okay. So after you completed your shift training -- do you recall how many shifts you had to complete training before you were able to test?
A. I don't.
Q. Okay.
A. I don't.
Q. How did the testing process go? Or how -- what did -- what did that look like?
A. You had a -- you had a written part, which was, like, 150 questions of multiple choice.
Q. Was that online or paper?
A. It was online.
Q. Okay.
A. I went to Josh office, I believe, and took it; and I scored an 89 on it, which was passing.
Q. Was that on -- was that on -- so the first time you tested, took this online test, that was about three

to five months after you began training for the heater board?

A. Maybe a little longer than that but --

Q. Okay.

A. -- up in that area, I want to say, maybe, roughly.

Q. Okay. And so the first time you took the test, you remember getting an 89?

A. I think the first test I made an 80, and you have to make over an 85.

Q. Okay. So --

A. The second time I took it, which was, like, a week later, I made an 89.

Q. Okay. And the 80 -- the 80 is a not passing score --

A. Right.

Q. -- but the 89 is a passing score.

A. Right. I think you have to make over 85 percent.

Q. Okay. So the second time you passed the written test, did you have to take the written test again after that; or did that kind of check the box on the written portion?

A. That was over with after that.

Q. Okay. Is there another component to become

qualified, other than a written test?
A. You have a panel of people on the console. Josh Montalvo asked you questions, and the panel can rebuttal that particular question that Josh asked. I think there were two questions.
Q. When was the first time you went before the panel?
A. What you mean, like a date --
Q. If you can give me --
A. -- or roughly?
Q. -- roughly.
A. The beginning of -- let's see. The beginning of -- that's hard to say, ma'am. Like, maybe February or something. I'm not sure. I'm not sure at all.
Q. Yeah, maybe it'll help --
A. I'm not sure.
Q. -- because we said -- I think we said earlier that you started training on the heater board in early 2022 --
A. Right.
Q. -- or thereabouts?
A. Right.
Q. And maybe you were training on shift --
A. Right.
Q. -- for about three to five months?

A. I mean, it was --
Q. So, then, you would have --
A. I -- I know --
Q. If you're tracking with me, taking the --
A. Yeah, it's -- it's actually -- it's weird because there was a lot going on in my life at that time.
Q. Uh-huh.
A. So -- but sticking to the question, I was training. From what I can remember, it was -- it was -- and excuse me, because I'm --
Q. No.
A. -- I'm trying to replay all this in my head, and I really believe my defense mechanism is to -- you know, because my little sister passed away of filomybrosis [sic] at that time, also.
Q. In 2022?
A. And it was -- it was just a lot going on in my life at that time. My house was destroyed by Laura, and just all kind of stuff was going on. So I'm trying to put all that together.
Q. Yeah.
A. I'm trying to give you the answers that -- that --
Q. No, and it's okay. And I have some documents

that may help us clarify, that we can pull out later, like, you know, help us with the timeline.

So when did your sister pass away?

A. The early part -- I was in there -- I was in Baytown, living in a Airbnb, after Laura. So shortly after Laura, she passed away. And Laura was, what, 2020, 2021, somewhere up in there?

Q. Uh-huh.

How long did it take your house to get repaired?

A. I had to get completely gutted. My roof sustained a lot of damage; and it rained, like, two days after Laura. So I had to get completely gutted to the frame. It was just bricks and the frame and a new roof on my house for at least nine months, before I actually started -- found the right contractor without getting snaked by fly-by storm chasers.

Q. Uh-huh.

A. So I lived in Baytown -- my family and I lived in Baytown for maybe eight months before we started building. So I just had the roof put on, and I had it gutted and dried real well. And I would work, drive home, assess the property, drive back to Baytown, and then have to be to work that next morning. I did that for a long time.

Q. Uh-huh.
A. And the whole time my little sister is in New Orleans, dying of filomybrosis [sic]. So if you can understand -- I'm scarred --
Q. Uh-huh.
A. -- you know.
So my defense mechanism is to put it, as a man, in the rear and continue to keep going for my family. I'm the only man --
Q. Uh-huh.
A. -- between my momma -- I need some time.
MS. JONES: You want to take a break?
THE VIDEOGRAPHER: Go off the record at 10:35 a.m.
(RECESS FROM 10:35 A.M. TO 10:45 A.M.)
THE VIDEOGRAPHER: We are back on the record at 10:45 a.m.
I'm sorry. Hold on a second. We're back on the record at 10:45 a.m.
Q. (BY MS. JONES) Mr. Jones, we just took a break. Is there anything about your previous testimony that you want to change?
A. No. No, no, no, no.
Q. Okay. Before we move forward and talk more about the heater board job, I want to ask a couple of

additional follow-up questions about your prior outdoor jobs.

A. Prior?

Q. Outdoor jobs.

A. Okay. Gotcha.

Q. Okay. So we talked about how you were qualified on the outdoor roles, which included the heater outdoor job, the compressor outdoor job, and the distillation outdoor job?

A. Uh-huh. Yes, ma'am.

Q. Can you describe some of your duties in the heater outdoor job, what that entailed --

A. Heaters --

Q. -- what that job entailed?

A. Heaters, it was routine maintenance -- well, routine operations, if nothing was going on; just making sure that things was running currently; walking the heaters, making sure any burners wasn't burning outside of the box.

Q. Uh-huh.

A. You have routine rounds, which are isom machine, where you would -- the machine -- or the computer would ask you certain questions, and you would walk and make sure that those particular questions was answered correctly. You had heater swaps, where you

would bring a heater down simultaneously as you're bringing one up after it was decoked. Things of that nature pretty much.

Q. Uh-huh.

From a medical standpoint, did you have any issues performing that job?

A. From a medical standpoint?

Q. Yeah.

A. No, ma'am.

Q. Did you request any accommodation with the company for any medical issue?

A. No, ma'am.

Q. Okay. How long were you training for the heater job before you became qualified in that role?

A. Maybe two months -- two, three months.

Q. Okay. And after that, you got the opportunity to move into the compressor job?

A. Well, you work -- you have to work that outside heater job for a extended time before you go move -- before you move on.

Q. Okay.

A. So it might have been a couple of years, I would think, before you moved on to the next job.

Q. Describe for me the compressor job. How did -- the duties, responsibilities.

A. Pretty much the same thing. You had rounds that you had to meet. Compressors consisted of samples you would take, where you would test the -- you would grab samples and go to the lab and run them, run your pHs and things of that nature. On your caustic -- caustic tower and heat -- compressors -- them compressors pretty much ran theirself. It was kind of a laid-back job where you just -- basically, just looked for leaks and things of that nature and made adjustments as the outside -- as the inside compressor board guy asked you to do something. You would maybe swap a pump or something like that and -- but for the most part, it wasn't that bad of a job.
Q. How long did it take you to get qualified on that job once you began --
A. About the same --
Q. -- training for it?
A. About the same amount of time.
Q. So two to three months?
A. Two to three months.
Q. Okay. And, then, that job, any -- did you have any medical issues performing that role?
A. No, ma'am.
Q. Did you request any accommodation from the company during your time in that role?

A. No, ma'am.
Q. Okay. Then after compressors, we got to distillation.
A. Yes.
Q. Can you describe that role for me?
A. Compressors was a good job, also. You had --
Q. You mean distillation?
A. I mean -- I mean, yeah, distillation. Distillation was a great job, also. You had dryers -- also, compressors had dryers --
Q. Uh-huh.
A. -- that you had to regenerate.
So you would take one out of service, put one back in service, and then generate -- or clean the one that was wet up. It went through a process of drying it, if you will, getting it -- and then you would put it on stand-by. And then while those other two dryers are running, when the board saw that those two were wet, then you would take the one that was the wetter of the two, you would take that one out, put the dry one in service, and then regenerate the one that was damp, if you will.
Q. Okay.
A. Distillation was the same thing. It had hydrogen dryers and stuff like that you had to take in

and out of service and stuff like that.
Q. Did you have any medical issues performing the distillation job?
A. No, ma'am.
Q. How long did it take you to become qualified in that job?
A. Maybe a little longer. So maybe about three to -- about -- about three to four to five -- maybe even five months, something like that.
Q. In that role, did you ever request or discuss an accommodation for any medical issue with the company?
A. No, ma'am.
Q. Okay. Before I move into the next, I'll show you some documents that may help on the timeline.
(EXHIBIT NO. 1 MARKED)
Q. (BY MS. JONES) There you go (tendering).
A. Okay.
MS. JONES: (Tendering)
MR. SUDDUTH: Thank you.
MS. JONES: Oh, sorry, James.
THE REPORTER: James, do you want to switch that one out? That one has the sticker on it.
MR. SUDDUTH: This one has a sticker? Okay. There you go (tendering).
Q. (BY MS. JONES) Okay. So this is an email from

Josh Montalvo. We said earlier he was the training coordinator --

A. Correct.

Q. -- correct?

It's to you, Jimmie Hayes, and Justin Ridgaway; and the subject is "Heater Board Training."

A. Uh-huh.

Q. It's dated March, 2022.

You can take a chance to review this, and then I'll just ask a couple of questions.

A. (Reviewing document) Okay.

Q. Okay. So was this -- it's dated March, 2022. Does that help refresh -- refresh your recollection about when -- is this about when your training started on the heater board?

A. Yes. Yes.

Q. And you said earlier you were excited to get the heater board job and start training.

A. Uh-huh.

Q. What -- what -- can you explain that to me a bit more? What made you excited about moving into the heater board role from an outdoor role?

A. Well, as I was getting older, I was really ready to come inside from being in the -- in the humid

environment and being in a controlled environment and just get a little inside time, you know, from being outside all the time.

I liked outside; but, you know, most outside operators look forward -- and I was one -- I was looking forward to being inside and moving up in my career. I knew the more I had, the more valuable I was with the company.

Q. You would have more opportunities to be promoted?

A. Right. Right.

Q. Did you anticipate, when you took -- when you agreed to take the job and not -- you said you had -- you could pass it up, I think is what you said. Did you anticipate that you would have any medical issues performing the job?

A. No, ma'am.

Q. All right. So Exhibit 1 -- you read through it. Does this kind of out- -- is Josh -- is Josh, is he outlining for you kind of how the training process --

A. Well, he --

Q. -- would go?

A. He -- this is his --

Q. Or describe this email for me a bit.

A. This is his outline to where he gives the PSC.

Q. What is PSC?

A. Process -- which is the -- so PSC is the -- he's not an operator, so say. He's like a company guy, if you will --

Q. Uh-huh.

A. -- that overlooks the crew as scheduling and stuff like that.

And he's not union, also. He's more of a company overseer --

Q. Okay.

A. -- if you will.

If upsets or anything would happen, he would be the one to notify the company, hey, we in the flare; we're out in the pipeline --

Q. Uh-huh.

A. -- things of that nature; make sure that the crew is doing what they're doing. He's like the company eyes, if you will, from what I could get from him.

Q. The first bullet point -- point, he says you're expected 35 shifts to train before your final exam.

Is that how it works in every job? Like, in your prior outdoor roles, is it -- you have to -- 35 shifts of training before you test?

A. That's going to get -- that's going to get -- at that particular time, that -- those 35 shifts pretty

much got thrown out of the window because of -- like I said, numerous times I would come to work and have to work a outside job instead of training.

Q. Yeah.

A. So it got mixed up to how many days were worked on the board compared to, okay, this day, he was on the board training; but this day here he was outside.

Q. Describe for me the shifts where you were on the board training. What did that look like?

A. Me with my manual, studying, surfacing; like, going over the stuff on the console, flipping pages on the console, and looking at various items and studying them and stuff like that, asking questions.

And sometimes things would happen outside where I would go assist the guys outside when they needed my help, like, for heater swaps and stuff like that.

Q. Uh-huh.

For your training, were you, like -- did you have someone that was assigned to you that you were shadowing on the heater board?

A. Yes.

Q. Yes?

A. My coworker. It was either -- it was either Joseph Angelle or it was Justin Ridgaway.

Q. Okay.
A. Those two guys actually swapped because during that time, they were both -- it was almost, like, right at the beginning of my training, at least three people were leaving for maternity leave.
Q. That were training you on the heater board?
A. Yes. It's one left and -- one left and one came back from maternity leave.
So my first trainer was Joseph Angelle.
Q. Uh-huh.
A. And then when Justin Ridgaway came back from maternity leave, Joseph Angelle left to go to maternity leave. So I had two different trainers with two different mentalities on how to train.
Q. So you started with Joseph or Justin?
A. Joseph.
Q. Joseph.
A. And I ended with Justin.
Q. About how long were you training under Joseph, on the heater board, before -- you said Justin came back from paternity leave?
A. Right.
That's rough to say. I would think they both split the training equally --
Q. Okay.

A. -- if you will.
Q. So about half your training was --
A. With --
Q. -- you were shadowing Joseph?
A. Joseph.
Q. And then half your training you were shadowing Justin?
A. Justin, right.
Q. Joseph Angelle and Justin Ridgaway --
A. Ridgaway.
Q. -- right?
Okay. And you've talked about the interruptions. How long were you training on the heater board before the first inter- -- before you --
A. The very first day.
Q. Okay. And what -- what led to, you know, you being --
A. They didn't have someone to -- I was actually -- most of the time I would go to my locker, grab all my material, my manual and everything, and place it on the board.
And then Jimmie would come and tell me, hey, I need for you to go relieve such-and-such. We don't have someone here to work the outside, whatever, job.

Q. Uh-huh.
A. So now I'm getting relief from my guy that worked days or nights to go man the job outside; and I'll be going, put my book back in my locker and everything, because I'm working outside job.
Q. When you had to go from training on the heater board to the outside, did that affect your pay at all or --
A. No.
Q. No. Okay.
And would that kind of last -- let's talk -- this first inter- -- interruption, you said that lasted -- it happened on your first day. Did that -- was it a couple of hours, then you went back to the heater board; or would it be an entire shift?
A. No, it would be the whole shift.
Q. Okay.
A. I have to man that position the whole shift.
Q. How frequently did this occur where you worked -- in your training -- where you worked --
A. In the beginning, a lot.
Q. Was that -- was there a reason for that or --
A. No, people were out --
Q. -- that you were aware of?
A. People were either out sick, they called in.

We had a lot of people that was dealing with illness due to the situations of the pandemic and all kind of stuff like that. So --

Q. Uh-huh.

A. Lot of times I didn't know. I just knew I had to man a job --

Q. Yeah.

A. -- and get a guy out of here because he needed a relief; he's waiting on a relief.

Q. Did -- when you started training on the heater board, had Hurricane Laurel already happened? Laura? Laurel?

MR. SUDDUTH: Laura.

Q. (BY MS. JONES) Laura.

A. Yes.

Q. My memory is --

A. I believe so, yes.

Q. Okay. So when you started the training on the heater board, you were dealing with all the issues you described earlier with your house?

A. Yes. My -- I was displaced. I was living in Baytown, also.

Q. Yeah.

A. See, and that -- well, no.

Q. No, it's okay. Do you want to say something?

A. No.
Q. Okay. Did you eventually complete the 35 shifts that Josh mentions in this email?
A. I was being pressured by Josh. We needed to get this done. So a lot of it was rushed through because I believe he was being asked from his higher-ups, hey, where is Warren at on his training?
So a lot of times I would -- on days, I would see him. Hey, man, how you doing? When do you think you're going to be ready? That type of stuff.
Q. Is that what you mean by "pressured"? He was following up with you? Or what do you mean --
A. No, not pressured.
Q. -- by "pressured"?
A. Maybe that was the wrong word. He would just -- I would see him more than I would --
Q. Yeah, he would follow up with you?
A. -- to where he would follow up with me.
Q. Yeah.
A. And...
Q. Okay. I have another document I'll show you.
But you did eventually complete the 35 shifts?
A. Yeah.
Q. Yes. Okay.

MS. JONES: We're going to mark this. Oh, I think -- I'm sorry. That's not the right document. I apologize.

MS. WILLIAMS: Sorry about that.

MS. JONES: Here we go.

(EXHIBIT NO. 2 MARKED)

Q. (BY MS. JONES) During this time that you were training with -- once you began training on the heater board, did you ever have to personally go out for any illness due to COVID or otherwise?

A. I did catch COVID, but I can't remember if it was while I was on the board or not. I don't think I was.

Q. Okay.

A. I don't think I was.

Q. You don't remember being -- once you started heater board training, you don't -- do you -- do you remember being out for any illness, for any extended period of time, during your training --

A. No.

Q. -- on the heater board?

A. No, I don't believe. Not that I can remember.

Q. Okay. So this document I just gave you, it's marked as Exhibit 2. Take a chance to look over it --

A. Uh-huh.

Q. -- and then I'll ask you about it.
A. (Reviewing document) Okay.
Q. Okay. So you'll see about midway through, it says Initial Access: August 22nd, 2022. It shows, in the red box, Score: 81; Evaluation: Fail.
A. Uh-huh.
Q. Is this the first time you tested on the heater board, the --
A. The written part --
Q. -- the written portion?
A. -- yes.
Q. And this reflects that -- that was -- that first time you failed; and that was in August, 2022.
A. Right.
Q. This is just for purposes to help us --
A. Right.
Q. -- with that timeline a bit.
A. Thank you.
Q. Did that help reflect -- refresh your recollection?
A. Yes.
Q. Okay. So next -- I'll show you another document here in a second.
And once you failed this, was the -- the unit review, where you described that they would ask you

questions on the job to gauge your knowledge, did that happen about the same time you took this test?
A. Well, you have to get this portion out the way first before you take the unit evaluation -- before you take the panel test.
Q. Okay. Let me -- do you remember how long it was before you tested again, from August 22nd?
A. Like, the following week, if I'm not mistaken.
Q. Okay.
(EXHIBIT NO. 3 MARKED)
Q. (BY MS. JONES) I'm going to hand you another document that's Exhibit 3 (tendering). Take a chance to review -- or if you've already reviewed it --
A. Yes, ma'am.
Q. So you'll see in the middle, this is dated December 20th, 2022. And this is your score of the 89 --
A. Uh-huh.
Q. -- that you described earlier. And it's a passing score?
A. Yes, ma'am.
Q. So does this help reflect -- refresh your recollection about when you tested for the second time?
A. Yes, ma'am.
Q. So that was September 20th, 2022; and you

passed.

After you passed, did you have to take the written portion again or --

A. No. No, ma'am.

Q. Okay. Okay. I have another one.

(EXHIBIT NO. 4 MARKED)

Q. (BY MS. JONES) Exhibit 4 (tendering). Take a chance to look through that.

A. (Reviewing document) Okay.

Q. Okay. So this is a document. It's Exhibit 4, titled Unit Review Committee for Job Qualification. It's dated August 24th, 2022.

This would have been -- we looked at Exhibit 2 earlier, which was your first attempt at testing -- the written portion where you failed.

A. Uh-huh.

Q. So this would have been a few days later.

Did that help reflect your recollection about -- refresh your recollection, excuse me, about the first time that you, you know, did the walk-through portion of the --

A. Yes.

Q. -- qualification process?

A. Yes.

Q. And this shows that you weren't successful; is

that correct?
A. Correct.
Q. Okay. And let's talk about these people below.
So we have Jimmie Hayes. We talked about him earlier.
A. Okay.
Q. Nick Graham. He was the PSC.
A. Right.
Q. Do you remember that?
A. Yes, I remember --
Q. Okay.
A. -- now that I see his name.
Q. Okay. Training Coordinator, we talked about Josh Montalvo. And then we have Jud Wooters. We haven't talked about him yet.
Who is Jud Wooters?
A. Jud is the -- Jud is the operations manager.
Q. And where does he fall --
A. He's my boss.
Q. Okay. Prior to this, had you had any issues with Mr. Wooters?
A. I -- I didn't know him at all. I just knew we had a new operations manager; but I didn't really engage with Jud, other than a good morning or something like that.

Q. Okay. In your first -- in your first time that you went before the unit review committee, can you describe what that -- what that -- like, describe how that went.

A. So I knew I was coming in to work to test on the board, and it was these guys on the panel.

Q. Uh-huh.

A. And so it's the panel over the CDS board, and Montalvo is to my left -- on my right, and everyone else is behind us.

And as Montalvo would ask me a question, I would answer it; and then the panel behind me would rebuttal if they had a issue with my answer.

Q. Uh-huh.

A. And seem like every time I would answer a question that Josh would ask me, I was being rebuttaled; somebody was asking me an in-depth question, so much so that Jimmie Hayes stopped the training -- or stopped the test and they all walked out and did whatever they did, then walked back in, and we considered -- we went on and testing more.

So they -- the next day after I signed this and everything -- or one of these tests, after I signed it, I asked Jimmie, you know, what was that all about. And he thought that some of the stuff that they

were asking for as rebuttals should have been something they should have been asking a five- to six-year senior board operator.

So after that, I felt like I was -- I don't know.

Q. How did you feel about the -- the unit review? Did you feel compet- -- did you feel like you had passed and did a good job?

A. Not the first one --

Q. Not the first one?

A. -- no, I didn't, no.

Q. You -- so were you surprised when you found out that, you know, you hadn't passed the unit review committee portion?

A. No.

Q. No?

A. No.

Q. Okay. When you were going through that -- when they were asking you questions to gauge your knowledge on the heater board, did you mention that you were having issues with your eyesight or any -- anything like that?

A. To the committee?

Q. To the committee, the first time.

A. No, but everybody -- everybody on my crew knew

that I was having issues. And I've talked it over with a few of the union reps, Ricky -- well, we call him "Ricky Bobby"; but his name is Clay, Clay --

Q. Clay Ryan.

A. Clay Ryan.

Q. Yeah.

A. So...

Q. What do you mean when you say everyone on your crew knew you were having issues?

A. Well, there was a portion of being an outside heater guy where you're going -- you get -- so you put the heater at a -- you put the heater where it's at a -- a control state within -- so you could go out and get these readings with your gun.

Q. Uh-huh.

A. So you open the peepholes and you put your gun in there and you get temps.

Well, after I get those temps, instead of going in and bothering the heater guy, I would just go to the board next to him and enter the numbers in.

Q. Uh-huh.

A. Well, as I'm looking at the board at these small numbers --

Q. On the -- in your outside role? Is this in your outside role?

A. It's in my outside role.
Q. Okay.
A. But I would come in to enter the numbers.
Q. Okay.
A. I knew how to enter the numbers.
So I would enter those numbers; and while I was entering those numbers, I would ask, you know, is this a 6 or an 8 on the board and stuff like that.
And everybody, you can't see that?
And I'm, like, yeah, I can see it; but I have to focus in on it and everything.
But that was -- that was minor compared to my training, once I started training on a frequent basis.
Q. Uh-huh.
A. You know, 6s started looking like 5s to me. A 8 would look like a B. Just -- like I say, the board -- the heater board is a busy board. So you're always on it, looking at it for an extended period of time to make sure -- and, then, any increment of a move could change anything. So you had to be precise on the changes you would make.
Q. Uh-huh.
A. Like, if you went from 1988 to 1989, that one move could up- -- that one decimal could upset something

dealing with the back end or the compressor area or something like this.

Q. Uh-huh.

A. So you always got to be -- and then these moves have to be made quickly once they -- once you have to make these moves.

So, for instance, I actually got on the wrong pump one time during training and -- what is his name -- Washburn, Brandon Wash- -- Washburn is his name. He was over my shoulder, looking at me; and before I actually hit "Enter," he was, like, you need to look at that again.

And I looked at it again; and I said, oh. So instead of me being -- because the pump I was on was the actual pump that was -- that was not affiliated. And what was messing me up was the numbering.

Q. Uh-huh.

A. Like, if it was 105B and 105C, or whatever, I was actually thinking I was on 106B, when I was really on 105.

Q. Uh-huh.

A. So the numbers were -- were messing with me a little bit, you know.

Q. Yeah.

A. So they -- they knew about it, but I brought it

to my optometrist about -- while I was in the middle of my training, and he started tinting and messing with my prescriptions -- I don't know if I'm getting ahead of myself or what.

Q. Yeah, let me just pause --

A. Okay.

Q. -- to clarify really quick.

A. Okay.

Q. So when you said they knew about it, is that what we were talking about earlier, where you described, in these outdoor roles, at certain times you would go inside to input numbers --

A. Right. Right. You go outside --

Q. -- and you would have --

A. -- collect data, and you come in and you enter it --

Q. Uh-huh.

A. -- for the heater board guy.

Q. Right.

A. And entering those numbers, I would just -- instead of me being like this (indicating); I'm actually like this (indicating) --

Q. Uh-huh.

A. -- you know, entering the numbers.

And they would see me up close on the

board and would ask me, you can't see that?

And I'm, like, huh-uh. You know, I have to focus in on it.

Q. Right.

What we talked about earlier, that wasn't enough in your -- in your outside jobs that you had qualified for, that didn't present -- that didn't affect your ability to do a good job in those roles?

A. No. I could see --

Q. Yeah.

A. -- like "Sudduth & Associates" and big words like that. Like, our heaters are -- what were they numbered? They were numbered, like, FA105 and things of that nature. And I could see that without a problem.

Q. Uh-huh.

A. You know, it's just the -- the constant staring at stuff that would affect me from time to time, you know.

Q. And on the heater board, it -- did it start to affect you more or --

A. Well, it -- it started driving me into headaches on my ride home.

Q. Uh-huh.

A. And my -- from what I was told by my doctor, it was from the constant -- me being severely nearsighted

and the constant watching the -- the console.
Q. Yeah.
A. And, then, when on my ride home on I-10, I would -- it would always happen on my ride home, where I would get drove into these headaches. And I was thinking that it was from the oncoming traffic and the lights that would, you know, mess with me a little bit on my way home. At least that's what I thought.
But from what my optometrist say, it was just me being almost 50 and getting older and always being severely nearsighted my whole life.
Q. Uh-huh.
A. So...
Q. Have you -- so after you -- I want to get back on track a bit.
A. Okay.
Q. So after you were not successful this first time, what happened after that? You tested again on the written portion?
A. No, the written portion was done. I didn't have to do the written portion. It was all console and the panel.
Q. The written portion was done because you passed it?
A. Huh?

Q. The written portion, when you say it was done, that's because you passed it; right?
A. I passed, right.
Q. Okay.
A. Correct.
Q. So the only portion you had left to qualify was to pass the panel portion?
A. Right.
Q. Okay. So after you were unsuccessful this first time, did anything not- -- did you go see your doctor before you tested the next time, or when did you --
A. Well --
Q. -- when did you go --
A. -- in between the first time and the second time was when I went -- because I was having headaches, and I thought it was my blood pressure. Checked my blood pressure. My blood pressure fine.
So my wife indicated, she say, well, maybe it's your eyesight.
So I went, got with Dr. -- Dr. Hart and told him how I was having problems, not necessarily seeing, but just my head and my headaches and my new role at work and stuff like that. And we discussed it a little bit and tweaked my prescription, got new glasses,

and moved forward with that and continued training. Because in between the tests, you continued to train before they test you again and --

Q. So pause.

After you were unsuccessful on this first attempt, you continued training --

A. Well, yeah, he told me to continue to train --

Q. Okay.

A. -- yeah.

Train, and we'll try it again on a later date.

Q. Did they tell you what -- when the next time you'd be tested?

A. Yeah, I had, like -- yeah, they gave me another -- you know, like, a timeline or whatever it was, yeah.

Q. Uh-huh.

And was that -- when was the next time you tested?

A. Maybe a month later or something like that.

Q. Okay. So maybe a month after this August 22nd?

A. Yes, roughly.

Q. Yeah.

A. Yeah.

Q. So before you tested the second time, had you

gone to your doctor?
A. Yes.
Q. Okay. And what did your doctor -- you -- your doctor -- you told him what you were going through --
A. Right.
Q. -- in terms of your new role.
A. Right.
Q. What was his response?
A. His response was to tweak my prescription. We went through my -- the power of my lenses, getting -- getting stronger.
Q. Uh-huh.
A. And then the second time I went, which is a couple of months later, he actually tinted my glasses to see if that would help.
And then the third time, I don't know if he tweaked my prescription again or did something; but -- I'm not sure -- exactly sure what he did.
Q. Okay.
A. But I know I saw, in the process of me training on the board and seeing my optometrist, was three times.
Q. Did you notify anyone at CP Chem about your discussions with your eye doctor?
A. Well, our PSC wasn't -- we was actually -- the PSC that we had, Nick --

Q. Uh-huh.
A. -- I think he had just came over. So I didn't tell him anything -- or we didn't have a PSC.
Q. Uh-huh.
A. We was in the process of hiring Nick, I believe, during this time.
Well, no. No, no, no. No, no, no, no. I take that back. Nick was there. Nick was there; but I don't think he was there at the beginning, if I remember right.
Q. Uh-huh.
A. I know Nick was fairly new.
And I discussed it with, you know, coworkers and Jimmie Hayes and -- I mean, but my coworkers, just from us talking in general conversation, they all knew I had, you know, vision problems and stuff like that just from them looking through my glasses and stuff like that.
You know, oh, man, and things of that nature. So...
Q. Uh-huh. Okay.
MS. JONES: This is going to be Exhibit 5.
(EXHIBIT NO. 5 MARKED)
Q. (BY MS. JONES) Take a chance to review and flip through this, and then let me know once you've done

that.

A. (Reviewing document) Okay. Yes, ma'am, I'm familiar with it.

Q. Okay. So this is -- the bottom of it is an email from Hart Eye Center to you and Clay Ryan.

Who's Clay Ryan?

A. Clay Ryan was -- is the -- the time I was there, Clay was the -- he was the coordinator and my union rep.

Q. Okay. And why did -- did you request Dr. Hart to write this letter?

A. No. As far as requesting to write it?

Q. Right.

A. No. I requested, not for him to write it, but just to -- to let the company know what I was dealing with --

Q. Okay.

A. -- you know, as far as my -- my -- my vision and stuff --

Q. Uh-huh.

A. -- yeah.

Q. So you asked Dr. Hart to kind of let the company -- let CP Chem know the issues about what you --

A. Well --

Q. -- were dealing with, with your vision?
A. Well, my -- my discussion with Dr. Hart was that he didn't think that -- with my elongated retina -- that it was safe for me to continue to be on the board for extended periods of time, watching the heater board and things of that nature, because it wasn't going to do nothing but just ruin me in the long-run.
Q. Uh-huh.
A. So he told me that he was going to look out and see if it was something that he could do to help me not be on the board, so say, because it was eventually going to just continue to ruin my eyesight.
Q. Uh-huh.
Did you want to stay on the board at this point and keep training?
A. Well, I was -- I'm groomed to never give up. I'm sorry. I just had to put that in there.
Yes, I wanted to stay on the board and continue to -- to do my job --
Q. Uh-huh.
A. -- to the best of my ability.
I always knew I had bad eyesight. I was born this way. If my mom and dad wasn't great providers as a kid, I probably could have got it checked from the State for my eye -- for my vision or something. I'm

just -- all my sisters, myself, we're severely nearsighted.

Q. Uh-huh.

A. Has it ever affected me coming up? Other than jokes and having thick Coke bottle glasses, no.

You know, you talked about my glasses one day; I'll see you on the football field and handle it another way.

It's just the way it was. Just the way I was raised and brought up to -- my dad never let that be a handicap --

Q. Uh-huh.

A. -- if you will. I always did the best I could with my vision and stuff. It never hindered me like it has through this process. And...

Q. So you forwarded -- Dr. Hart sent this -- emailed you this letter. You forwarded the letter to --

A. Well, the letter, I gave --

Q. Yeah.

A. I gave the letter to "Ricky Bobby." He -- he --

Q. Who is "Ricky Bobby"?

A. Clay Ryan. I'm sorry.

Q. Does he go by "Ricky Bobby"?

A. Yes. I was -- I didn't know Ricky -- I didn't

know Clay Ryan real name for several years.

Q. Does he drive a car or something, that --

A. Well, his name is Clay -- from what I was told, his name is Clay Ryan, which is two first words. So they started calling him "Ricky Bobby." And that's the name he goes by at work. So...

Q. So you gave the note to Clay first?

A. I gave the note to Clay; then Clay gave it to Sabas.

Q. Who is -- who did he give it to? Repeat that, please.

A. Sabas, which is a -- that's -- we call everybody by their last name.

Q. Okay.

A. Sabas' first name -- Sabas is a guy that has a lot of experience. He's a seasoned operator on the board. A lot of times if we're in troubleshooting mode and trying to get the unit back stable, he would be one of the guys that we would call in if needed be.

Q. Uh-huh.

A. And he was a union rep.

So I first gave the letter to "Ricky Bobby" -- I mean, Clay Ryan; and then Clay gave it to Sabas. And Sabas read it and gave it to back to "Ricky Bobby." And him and "Ricky Bobby" talked about

it -- I mean, him and Clay Ryan talked about it; and then Clay said he would present it to HR on my behalf.

Q. Okay. And so do you know if Clay presented it to HR before this next email, which is September 19th, and you're emailing it to --

A. I think I did. I just remember the -- the Hart letter --

Q. Yeah.

A. -- but I believe I did email --

Q. Yeah.

A. -- HR the letter, also.

Q. Yeah. So that's, maybe, what we see here.

A. Right.

Q. In the middle of this, you'll see an email, September 19th, 2022 --

A. Right.

Q. -- from you to Jud -- Judson Wooters -- Wooters.

A. Right.

Q. Who is Aprile Danford?

A. She's a HR --

Q. Okay.

A. -- individual, also.

Q. And we talked about Clay.

And, then, Chelse Cisneros?

A. Yes.
Q. She's in -- is she in --
A. She's --
Q. -- HR, also?
A. She's in HR, yes.
Q. Okay. So you email the letter to Aprile, Clay, and Chelse, notifying them that -- you say (reading): Ever since I've been training on the heater board, I've been in and out of the eye clinic, trying to get my vision where I can see the controls and reading clearly.
After you sent this letter, what was the response?
A. So they responded to where they wanted to have a meeting in the HR -- in the -- up front, in the human resource office, after work.
So myself; my representative, Clay Ryan; Jud; and Chelse had about a -- excuse me -- had about a 45-minute meeting. During that meeting, Chelse, who represented HR, asked various questions; Jud asked a few questions. And Jud asked if the lighting in the room was sufficient? Is there something that can be done to where you can see the console better, and things of that nature.
And I explained to Jud that it's just the way my eyes are and things of that nature and my doctors

and -- you know, we trying to fix it or was in the process of trying to fix it and things of that nature.

And then Chelse asked me a series of questions; and Chelse asked me, she say, well, Mr. Jones, if you can't work the console, what is it that you could do?

I say, well, Chelse, I'm qualified in everything outside. You know, I could work outside. I have safety certifications. I could go over their safety or if -- something like that or, you know -- and in the middle of me talking, Jud stopped and said, we can't -- we can't have that. We pretty much need you inside, you know. He said --

Q. Do you know if there were any available, like, outdoor jobs available at that point?

A. Yeah. We were -- we were hiring. We was always hiring.

Q. Okay. About how long was this meeting, after you sent this letter?

A. How long was the meeting?

Q. Like --

A. The HR meeting?

Q. No. So you sent this letter -- you forwarded this letter, on Exhibit 5 --

A. Oh, like, the -- like, the following -- like,

the following week.

Q. Okay.

A. Because I went on -- because, mind you, I go on -- you know, I'm on days one week; then I'm on nights next week.

Q. Uh-huh.

A. So it might have been, maybe, the next time I was on days. So maybe two weeks.

Q. Okay. You mentioned the lighting. Was -- what was going on with the lighting?

A. So most control rooms are -- are under a low or dim setting just because the way that most console operators want it to be, being that they're looking at a board all day, which is actually not good for me. It's best for me to watch television in a lit environment, where I'm not just focused in on the TV and it's dark. That's where the wear and tear, from what I was told, comes in at. It's best for me to watch television, like, with -- with -- with a light surface or whatever.

Or, I've come to realize afterwards, that a lot of consoles and companies are going to the console being black, white, and gray, instead of in color. Would that have helped? I don't know. But I'm just saying that it's being noticed that for seasoned, long-term console operators, that they have found that

it's best for the console to not just be in color and, like, brightly lit like a television, with colors and stuff.

Q. Uh-huh.

A. It's best for it to be in white, gray, and black, like a book reading or something, you know.

Would that have helped me in my situation? I don't know. This is just stuff I seen after my career with CP Chem.

Q. So the questions that Chelse was asking you at the meeting, was that geared towards how they could best help you in the heater board?

A. Well, Jud pretty much shut that down because he said that -- he pretty much let me know that if it wasn't going to be the heater board, then it wasn't going to be pretty much anything.

Q. Did you -- did he say that, or did you take --

A. That's what I took from --

Q. From --

A. Because when I told Chelse that I continued to work my three outside jobs, Jud said -- his reply was that Chevron Phillips has a bottomless pocket to where -- and I'm paraphrasing -- that Chevron Phillips has the means to get it to where I could see the console.

What it is that we have to do to get it to where you can comfortably see the console?

My reply was it's not -- it's me seeing the console; but it's also the length of time, the 12-hour shift, of me being on the console, at night, that's affecting my vision.

Q. Uh-huh.

A. Because it -- from what I could remember, it didn't affect me during the daytime. It was -- the nighttime is when it was affecting me.

And from what my doctor was saying, that that's mostly the time when your eyes are replenishing theirself, when you're asleep and you're behind your lids of your eyesight. Your eyes are actually being in its own little eye solution, if you will, behind your eyelids. And he was, like, when you're up with terrible eyes, watching the console at -- for 12 hours in the middle of the night, you know, he said, that's what's driving you mostly into your -- your situation of headaches and things of that nature.

So -- and this is just what me and my doctor conversation was. I don't think this is in the documentation.

Q. So if I'm understanding you right, the priority was to make it to where you could do the heater board

role --

A. I don't think --

Q. -- with the lighting?

A. -- Jud understood what my doctor was trying to portray to him at all, what he was trying to tell him. He was trying to do his best to explain to Jud that I was -- you can't fix my situation --

Q. Uh-huh.

A. -- is what I think he was trying to tell Jud -- and through my -- through my letter --

Q. Uh-huh.

A. -- you know.

From the years of -- I mean, I was -- I didn't realize this till I got older, but I'm negative 14 in one eye and negative 16 in the other.

When TSO first got to Lake Charles, when I was a kid, I was here, one of they -- I could never understand while they always wanted to see me or they looked forward to seeing me or whatever. And I didn't know how well off my vision was as a kid, until I became an adult. So -- I always knew I had two pair of glasses. One was to play in, and one was to go to school in. And my glasses was just so thick to where when they would fall and hit the concrete, they didn't break; they would just bubble in the corners, right?

That's how thick my glasses was. But...

Q. When you were working -- training -- training on the heater board, is -- are there windows in that room?

A. No.

Q. No.

So it's a closed-in room with --

A. It's bomb -- it's bombproof. It's bomb -- it's like a shelter. It's -- it had to be made that way so that if any explosion or anything was to hit, the people inside that building would be safe. So there's no windows or anything.

Q. When you were working day shift, did you have the same issues with the heater board?

A. Rarely. My memory tells me most of the time it was me getting home, taking a shower, and not being able to sleep because I was in these headache situations.

Q. Uh-huh.

So after -- at the meeting, other than saying, you know, I can work the outdoor jobs, did you discuss any other possible alternatives or solutions with Jud or Chelse?

A. No, not with -- not with Chelse. That was my last time seeing Chelse. And just kind of did the -- the -- the level of command thing and just was relying

on Jud to -- the last thing I remember Jud telling me is, just continue to train on the board; and we'll solve it.

So after talking with Ricky -- I mean, with Clay --

Q. After talking with him at this meeting?

A. No, after the meeting.

Q. No?

So after the meeting --

A. I talked with Clay.

Q. -- you had another conversation with Clay?

A. Yeah, I had a conversation with Clay, which is my union rep; and I -- from what I was told from him, that this was supposed to go higher than Jud, like, maybe to The Woodlands or something. I didn't -- I don't know.

But that was the last I heard of it, and I just continued to train on the board.

Q. Okay. Okay. So your next time -- you said it was about a month later after you were first unsuccessful that you did the unit review committee, you know, question and answer, where they're testing your knowledge a second time. How did that go?

A. One more time.

Q. How -- the second time you were before the unit

review committee, how did your second --

A. I think I did better. I think I did a lot better. I was -- my anxiety was a little better. I was used to -- I knew what I was facing.

In between me training, I've sat in on -- I had the opportunity -- I worked over. That's what it was. I worked a overtime job, off site; and it was a guy on that crew that was actually about to take his testing on the board. And I remember going in and -- well, first, I asked if it was all right; and everybody was, like, yeah, man, you should -- yeah, watch.

You know, so I pulled up a seat and was just going to watch behind the -- the panel of people. Well, Montalvo walks in; and a couple of other people walk in. And I'm, like, well, let me go to bathroom before they get started. Well, right when I went to the bathroom, they got started. And when I walked back in, I noticed that it wasn't nowhere near the amount of people that was on my panel that was on they panel. It was no operations manager. It was no supervisor. It was pretty much just Montalvo and the guy that was taking the test.

Q. Do you remember who the guy who was taking the test -- what his name was?

A. He was a newer guy than I was. I don't -- I

don't.

But it was just shocking to me how brief his test was compared to what I had to go through, the amount of questioning and rebuttal of questions. He probably went through the same questioning I did, but it wasn't nowhere near follow-up questions that I had to go through that he went through.

Q. That you went through on your first time?

A. Yes.

Q. Okay.

A. Now, mind you, Jimmie did -- my supervisor did interrupt my interview. And from what he told me, that was pretty much -- it was, like, it was more intense for me than it was for the actual guy I watched test during his board testing or whatever. It was just strange to me. I -- I felt I knew what I was doing on that board the whole time. I just felt that the troubleshooting questions was just a little in depth than -- than normal, than what my training manual would provide me with, you know.

Q. Did you feel like that was more -- you felt like that in your first attempt, when you didn't pass; or you felt like that --

A. I felt like that both -- both -- during all the attempts.

Q. The second one?
A. Yeah.
Q. So the second attempt, you said you left feeling better about it?
A. I thought I passed it.
Q. You thought you passed.
So it was surprising to you when you found out you didn't pass?
A. Well, I didn't find out at work. I found out at home.
So I was supposed to test that morning, but we had a hiccup. We had -- the unit was unstable. We had a -- we had a problem that took most of the morning to get back ironed out where the unit was at a safe state. So we fought that off, and it was up -- and it was the last day on my -- before I go on my seven days off.
Q. Uh-huh.
A. So after lunch -- no, before -- we take lunch about 10:30. So maybe about 12:30 we went on to test. Everybody was, you ready?
I'm, like, yeah, let's do it.
So we sat down --
Q. This was 12:30 p.m. or a.m.?
A. p.m.

Q. Okay.
A. Like, noon.
Q. Okay.
A. So we took the test. The test lasted up until crew change, which is, like, 4:00 o'clock, when you start seeing people come in for the night shift.
Q. Uh-huh.
A. So the panel gets up, goes outside. I mean, they go meet in the -- in the PSC's office. So people start coming in, and we're talking.
Oh, how you think you did?
I think I did good.
And sure enough, it's time for me to clock out.
Q. Uh-huh.
A. So people in the panel start walking out one by one, and then --
Q. Pause.
For the panel, is it the same panel as the first test; or were there different people?
A. I want to say it was mainly the same people, I want to say.
Q. Okay.
A. So -- so I clock out, and I'm waiting on Jud. And Jud walks out; and I'm, like, well -- he didn't tell

me anything. So I had to get his attention. So I'm like, hey. Hey, what's -- you know, what's the -- what's the verdict?

He say, well, Warren, I have some things to think of -- well, no. He said -- yeah, he said, I have some things to think of. Go home and enjoy -- enjoy your time off, and I'll get in touch with you.

And I'm, like, what this mean? Friday? Saturday? Monday?

He said, look, man, go home. Enjoy your family. And I'll give you a call on your seven days off.

I said, okay. So now I'm like, what that mean?

So I'm on my bike and I'm riding to the front gate and Jud is walking back to the front offices and me and Joseph Angelle is next to me and I'm, like -- so Joseph rides up next to me; and he's, like, how do you think you did?

I'm, like, I think I did good; but he didn't tell me anything. So I said, okay.

So I get to the turnstile, and I -- I never forget this -- I get in the turnstile; and when I hit that turnstile key, I heard "click," to let the gate let you go through the turnstile. And when I went

through the turnstile, I said to myself, I don't think he going to pass you, you know. I'm thinking he want to get you outside this gate and call you and tell you from a phone distance, instead of telling you to your face. He want to do it -- I honest to God thought that. Then I just blew it off, oh, no, that ain't it. Bro, you did good.

So I drove home. I took my four tickets to go see the Texans and Kansas City Chiefs, on the company. They gave us tickets to go. So me and my wife and the kids went, watched the Texans and -- great game. Went into overtime, all that good stuff.

Monday rolls around. I don't hear anything. Tuesday rolls around, and I get a phone call. And it's -- it's Jud; my union rep, Clay Ryan; and somebody else in the room; and they're on speaker. And everybody introduce theirself to me and everything; and he says, man, we're going to suspend you until further notice.

I was, okay. So that was the 17th of December, I want to say.

Q. Yeah, I think we're getting maybe --
A. Okay.
Q. -- ahead of ourselves.
A. Okay.

Q. So we're on the second -- we're just on the second attempt.
A. Okay.
Q. I think there were four attempts in total.
A. Okay. Right. Right.
Q. So we're on the second attempt.
A. Okay.
Q. And that -- you weren't -- you weren't successful on that attempt.
Was all of this that you're talking about precipitate -- or did that come before the last attempt? Are we moving ahead of ourselves, or are we --
A. Yeah. Yeah.
Q. Okay.
A. Yeah.
Q. Okay. So after the second attempt, what was the -- how did you find out you weren't successful on the second time, if you remember?
A. He -- he told me. He pulled me in the office and told me -- I think I had some -- he said they think that I had some -- some work to do and just continue to study.
Q. Who told you that?
A. Wooters.
Q. Okay. He --

A. Jud. Yeah, Jud.
Q. Did you feel like you did a good job? You thought you passed on the second attempt?
A. I thought I did.
Q. Okay. Were there still similar -- did you have any issues on the second attempt, vision issues?
A. Yes. I mean, it -- it actually got to a point to where it was just so repetitious to where I was just going over the same material to where I would work the board for four or five hours and then my trainer would work the board for four or five hours. It got to the point to where if it wasn't a heater swap, which is a crucial part of training on the board, I was just sitting there, not looking at the board --
Q. Uh-huh.
A. -- because it was -- it was -- it was irritating, you know, stuff like that. I didn't want to have any situations to where I was driving myself into a headache or anything like that, you know.
Q. So let me show you another document to help with the time.
MS. JONES: Exhibit 6.
(EXHIBIT NO. 6 MARKED)
Q. (BY MS. JONES) Exhibit 6 (tendering).
MS. JONES: That was our two copies there.

MR. SUDDUTH: Oh, actually, no, yeah, I think you gave me two there (tendering).

MS. JONES: Yeah.

Q. (BY MS. JONES) Okay. So this is -- we're marking this as Exhibit 6. It's dated September 22nd, 2022.

Can you describe for me what this is? I see your signature at the bottom.

A. Yeah, this is the -- another attempt at trying to pass the test, and they said that I didn't pass. And I think they referred me to go over the -- I don't know if that was the last time where I -- so they referred me to go back outside and go over the unit in detail outside.

Q. Pause real quick. I just want to make sure that we're clear.

A. Okay.

Q. So this is the second attempt --

A. Okay.

Q. -- to pass. It shows you weren't successful.

So after you --

A. Right. Right. Right.

Q. After you weren't successful on this attempt, you're describing that they told you to go back -- go on.

A. It was either the second or third attempt where he tried to make the training more intensified --
Q. Uh-huh.
A. -- by actually going outside and comparing things outside to the inside.
Q. Who was doing that?
A. That was -- that was Jud's suggestion.
Q. Jud suggested you -- describe that a bit more for me. What did -- so he wanted you to go outside?
A. He came up with a program to go outside with -- with the coordinator, which was Clay Ryan, the heater board coordinator -- or the heater outside coordinator, or specialist, if you will.
Q. Uh-huh.
A. Go outside with him and just explain things as Clay Ryan pointed them out to him.
Q. Uh-huh.
A. And that was successful. I also thought it was a waste of time, also, because I was already outside heater qualified.
At this point, it was kind of confusing. I didn't -- I didn't understand what was the purpose of it --
Q. Uh-huh.
A. -- or whatever, but --

Q. Did they tell you what the purpose of it was?
A. Well, yeah, they -- they --
Q. What did they say?
A. They said that it was to get outside recognition to what was going on on the -- on the board on the inside, which I already knew that. I already knew the outside components compared to the inside components. I mean, I was a -- pretty much a leader when it came to heater swaps and things of that nature. I was a seasoned outside guy. So I didn't think it needed to be that way, but I was just following the instructions of my -- of my boss, you know.
Q. Uh-huh.
A. So that's what we did.
Q. Yeah.
So you're describing, after you were unsuccessful the second time, that you continued still training?
A. (Moving head up and down)
Q. Yes.
And how long was it before --
A. Now, mind you, I'm also training and I'm also working as need be outside, too.
Q. Okay.
A. So I'm working outside, and I'm working inside.

So as I'm -- I'm just doing what I need to do as I'm needed.

Q. Yeah.

Are you still shadowing the person on the heater board --

A. Yes.

Q. -- inside?

A. Yes.

Q. Yes.

And at that point, you'd completed all of the written portion of the test. So you were really still --

A. I was --

Q. In laymen's terms, you were training on the job --

A. Right.

Q. -- but continuing to train on the job?

A. Yes.

Q. Did you have an understanding of when your next time would be that you would have an opportunity to test?

A. Roughly, yes. Yes.

Q. How long did they tell you?

A. About the same length of time as the other times.

Q. So about a month?
A. About a month.
Q. Okay.
A. Somewhere up in there.
Q. Okay. I'm losing my train of thought a bit.
After you -- as you continued to train on the job, were you working with Josh Montalvo primarily; or who -- or was it different people?
A. No, I'm not -- I've never -- Josh Montalvo never participated in any of my training. He wasn't even qualified to -- to train anybody.
Q. Okay.
A. He wasn't heater board qualified.
Q. Did you -- at some point -- after you were unsuccessful the second time, did they place you on, like, a formal plan?
A. I was always with -- if I was on the board, I was being trained by a coworker.
Q. Uh-huh.
A. If I was outside, going over things they wanted me to go over with them to explain things, I was with Clay Ryan.
Q. Okay.
A. And Clay Ryan would come in -- oh, Clay Ryan and Jimmie -- Jimmie Hayes, they would come out

sometimes as a team.
Q. Uh-huh.
A. And we would just walk the SWECs and the Lummus heaters and they would just point at stuff and ask me things and I would let them know what's going on and things of that nature.
Q. Okay.
A. That was deemed successful.
And then we moved on to continue to train on the board.
Q. Okay. Were you placed on a Performance Improvement Plan after you were --
A. That's what the Performance Improvement Plan was, the outside.
Q. Okay. So that's the -- when you're describing that they wanted you to go outside, that was the additional kind of training program under --
A. Right.
Q. -- the Performance Improvement Plan?
A. Right.
Q. Okay. Were you immediately placed on the Performance Improvement Plan after you were unsuccessful on the second attempt?
A. I think after the second test, I think that's what it --

Q. They put you on a Performance Improvement Plan?
A. Performance improvement.
Q. Okay.
A. Yeah, I think that's what's on --
Q. Was the Performance Improvement Plan, like, a series -- what did -- what did that consist of?
A. The outside work, and I had to sit in -- which was -- which was what I thought was humiliating -- not humiliating -- but it was just confusing to me. I had to sit in with the new hires that was on the heater -- outside heater. So the people that was just hired in, I had to retake the outside training with them. So I was inside the conference room, going over stuff that I already knew; and then I would go outside with them and go through the outside -- go through the outside stuff with them, also.
Q. Yeah.
MS. JONES: I'll pull it up.
(EXHIBIT NO. 7 MARKED)
MS. JONES: This is a document -- we're marking it as Exhibit 7 (tendering). Did I give you two copies again, James?
MR. SUDDUTH: No.
Q. (BY MS. JONES) This is a document we're marking as Exhibit 7. It's titled Performance

Improvement Plan.

I want to just direct your attention for -- to Page 2 of 6. It's the second page.

A. Uh-huh.

Q. And in the second column, it says, you know, Performance -- the first column says "Performance Issue," "Not Meeting Training Expectations." And then it has "Required Actions To Bring Performance To Fully Successful Level." And it says "Attend heater outside classroom to refresh on heater area flows."

Is that what you were describing when you say --

A. Yeah.

Q. -- you were to attend outside -- heater outside classroom, you know --

A. Yes, ma'am.

Q. Okay. And you're saying you thought that was kind of a -- not very productive because you already knew --

A. Well, it was pretty -- it was -- it was -- I mean, I knew everything. It was a refresher. I knew everything that was going on outside. But I had to go and spend time with Nick Graham and Jimmie Hayes and Clay Ryan; and as they asked me questions, just have to answer it.

Q. Uh-huh.
A. You know, from time to time Jud would come out and see where we were at with everything and -- but for the most part, we was just walking the unit. They would point at stuff. I would tell them what that piece of piping was, what the psi in the piping was, and what was flowing through it.
Q. And what the -- and, I guess, their goal was that this would help you to --
A. That's what they --
Q. -- to --
A. For some reason or another, he was deeming that I didn't know what the flow or what was going on in the heater unit.
Q. Uh-huh.
A. But I had already passed and qualified in all of that.
Q. Uh-huh.
A. So it felt humiliating --
Q. Yeah.
A. -- so to say.
I was, like, why am I not still on the board, or something like that. I mean, I -- I know all this. But for some reason, he thought he was helping me. I mean, it was -- it was -- it was a great

refresher, don't get me wrong.

Q. Uh-huh.

A. I mean, I know every -- I don't want to say I -- you never know everything. But it was -- it was great to go through all the nicks and crannies [sic] --

Q. Uh-huh.

A. -- of the Lummus heaters and the SWEC heaters all over again.

Q. Okay. I have another exhibit.

(EXHIBIT NO. 8 MARKED)

Q. (BY MS. JONES) This is Exhibit 8 (tendering). Okay. Take a chance to look over this and then let me know.

A. (Reviewing document) Okay.

Q. Okay. This is an -- we're marking this as Exhibit 7. This is an email from Chelse Cisneros, and you mentioned she was in HR, to you. It says -- it's attaching Summary of Meet and Confer.

Do you remember getting this email?

A. Yes, I do. I do.

Q. Okay. And -- and it -- it says -- you know, we're on Page 2, at the bottom. It says CP Chem 736. And it says Summary of Meet and Confer Held on October 3rd, 2022.

Did you review -- read this once she sent

it to you?

A. To a certain extent, I believe I did.

Q. Yeah.

And did you think that anything in this email was incorrect or false?

A. Not be removed from nights. Oh, okay. I'm reading it now. Yes. I wasn't being asked to be removed from nights. I was just letting the company know about my situation with my --

Q. With your eyes?

A. With my eyes, right.

Q. Okay. So going back to the first page. She says you agreed you would consult with your ophthalmologist, which I believe that's your eye doctor?

A. Uh-huh.

Q. Yes?

And to identify adaptive devices that the company could potentially provide to increase the visibility of the console?

A. Uh-huh.

Q. And I'll pull up another document. This is going to be Exhibit 8.

A. Yeah, this is 8.

THE REPORTER: I think this would be 9.

MS. JONES: 9?

THE REPORTER: Yes, uh-huh.

MS. JONES: Okay. Thank you. This happens to me every time.

(EXHIBIT NO. 9 MARKED)

Q. (BY MS. JONES) So Chelse -- and the last document we looked at, she sends you the letter. Well, take a chance to look over this, then.

A. Uh-huh. This is my reply. I say (reading): Good morning. Really, all I need was you guys -- is a lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine.

Q. Did you think that if the lighting was improved, that that would, you know, help you to get successfully qualified on the heater board?

A. I thought that the lighting was -- would -- would help if it would be brighter in there, you know. It was other things that were -- that was just making things awkward, also. But I thought the lighting had a lot to do with it, from what, you know, my doctors and stuff like that was telling me about. It was a couple of lamps over the console that wasn't working properly. We put work orders in on them. They took their sweet time getting them fixed, and they eventually did fix them but --

Q. How long did it take --
A. It --
Q. Well, really, before we get to that.
So Jud replied to you; and he said (reading): Thanks, Warren. Are you referring to the long narrow lights on the arms that can be moved around?
A. Right.
Q. (Reading): Can you enter a G3 to get them fixed?
A. Yes.
Q. What is a G3?
A. It's a work order.
Q. Okay. And did you submit a work order after Jud suggested that?
A. I think -- I think -- I think me and a couple of guys submitted a work order. Even before my situation occurred, work orders were sent in to get the lighting fixed; but -- so you have a criteria of work orders. You have level -- I believe it was Level 1, 2, or 3. Most normal work orders are at, like, a 2 or a 1 level or something like that.
Q. Uh-huh.
A. But the more severes are the 3. At 3, they need to get --
Q. Fixed ASAP?

A. ASAP, right.
Q. Uh-huh.
A. So...
Q. So he's talking about a G3, would be a --
A. A work order.
Q. -- a third-level work order? Is that --
A. No, a G -- it's just a -- a G3 is just a work order.
Q. Okay.
A. Yeah.
Q. Did you get to decide, when you submitted a work order, whether to designate it as a Level 1, 2, or 3?
A. Yes. Yes. You're -- you're the -- but you're always told to put it as a No. 1 or Level 2. If it's something that's not -- if it isn't a crucial piece of equipment that is going to keep us from running, then you put it as a Level 2; and they'll just work it in as they get to it.
Q. Do you remember what you desig- -- when you submitted the work order for the lighting, do you remember --
A. A Level 2.
Q. Okay. Do you know what -- you said other people submitted work orders. Do you know --

A. Well, I -- before I became -- before I started training on the heater board, it was always talked about the lighting and the consoles and things of that nature how old they was and stuff. It was a new control room, but the consoles -- like, we would have turnarounds and you have other people from other CP Chem facilities that will come over and help us with the turnaround and them guys would come over and they would all harp on how old and out- -- outdated our console was.

Q. Uh-huh.

A. Brand-new building; but the consoles were from the Seventies or something, you know.

Q. Uh-huh.

A. Being that this was my first operations job where I was looking at a console, I didn't know how old or outdated the consoles were, you know.

Q. Uh-huh.

A. That's just what I was told.

Q. Yeah.

A. Different conversations with people I've worked with.

Q. So you submitted the work order.

What -- what happened after you submitted the work order? Did the lighting -- you said the lighting eventually got repaired.

A. Well, they --
Q. How long did that take after you --
A. A month.
Q. -- submitted a work order?
A month?
A. About a month. They didn't -- they didn't deem that as being something that --
Q. It wasn't a Level 3?
A. It wasn't a Level 3.
Q. Yeah. So -- yeah.
So in the meantime, after you submitted the work order, were you -- I've seen reference in this case to a portable lamp. Were you using a lamp to help you with the lighting?
A. Yeah. I brought -- I brought my lamp everywhere I went.
Q. Did you bring that -- did you have that lamp with you from the start of your training on the heater board?
A. Yeah, I had that lamp just, period, on -- on -- when I wasn't even on a heater board.
Q. Uh-huh.
A. Because every -- even in the -- the day area or the -- it's where the outside operators sit in front of they computers at --

Q. Uh-huh.
A. -- which is next to the control room. I had a day lamp in there, too, because that room is dark, also.
Q. Uh-huh.
A. So I had always had a lamp so I could see my computer keys without interrupting anybody else that was on -- that was in that particular room. So it wasn't just in the control room. It was throughout my whole career, I always had that lamp with my name on it.
Q. Uh-huh.
Did the lamp help with the lighting in the heater board -- the lighting in the console room -- console room?
A. From the where -- from where I had it at and from where I could -- as long as my plug was stretched or stuff like that. So if I'm in on the console right here, my light would be kind of over there, facing them.
Somebody over here would look. Oh, man, your light. And it was -- it was -- when I got on the board, it was more of a issue for other people than it was to help me out because how short the cord was.
Q. So other people would ask you to turn off the lamp?
A. Or just reposition it.
Q. Okay. Do you remember who any of those people

were?

A. My trainer, Justin, Joseph, people that was right there in that area.

Q. Did you continue to use the lamp throughout the rest of your training or --

A. I always had that lamp. I always used it.

Q. Was it on when you would be on the heater board?

A. I mean -- I mean, not on -- well, when I was doing my relief notes and things of that nature, I would have it on most of the time so I could get all my verbiage right for my relief. When I was training and on my manual, I would use it in my manual to read and things of that nature. I would have it on. But then I could take my manual and go next to the light and read with the lamp down --

Q. Uh-huh.

A. -- you know.

But when I had to be to the console on this side, I would have to adjust the lamp; and it would, you know, bother people that was to my left --

Q. Uh-huh.

A. -- and stuff like that. So, yeah.

Q. Did you, at any point, like, request that your training be paused to allow the lighting to be fixed?

A. I had no idea I could pause the training.
Q. Yeah.
A. I was never aware of that or anything.
Q. At this point, did you have any complaints with respect to how Jud Wooters had handled the situation? Did you make any complaints to the company about how Jud Wooters was handling it?
A. I didn't make any complaints to him or to the company. I mean, who was over him? The plant manager, I think, is next; and I didn't meet him until, like, the very end.
I would talk to Clay about it, you know, how I really felt about some things. I thought -- I just -- at that point, I just thought I was out being -- I just thought, especially during the PIP follow-up training, where I had to go outside and do some things, at that point, I just -- I felt like I was being -- I felt like I was being -- being hunted, maybe, if you will. I didn't feel like...
Q. Did you feel like there was a particular person was -- I'll use your word -- hunting?
A. I feel like I just was -- I feel like I was being possibly outcast and was --
Q. By who?
A. By -- by Jud.

Q. Why? Did that -- well, first of off, did that -- did you feel that way throughout the whole time; or at a certain point, did you start feeling it?

A. I didn't -- I never had any encounters with Jud until -- I've been through three plant managers, operations managers, and PSCs, because them guys move on with their careers and stuff.

Q. Uh-huh.

A. I haven't had any issues with the other two before they moved on with they career until Jud got there.

Q. Do you remember the names of --

A. I don't know right off; but, normally, you don't see your operations manager except for on days, because they work days.

And when Jud first came over, it was just a good morning, how you doing thing, just a meet and greet, which is standard Chevron for the -- you know, you -- hey, how are you doing, man? Okay --

Q. How often did you interact with Jud?

A. Not at all.

Q. Not -- not often?

A. I wasn't one of those guys. I wasn't -- I went to work, punched in, get my relief. Talk to my guys who I knew, who knew me, come to my house and eat barbecue,

things of that nature.

But as far as company people, I didn't really -- I just -- I just didn't really conversate with those. Now, I'm not -- now, we -- you know, somebody may say something about a football game or something, I give them my opinion. That will be most of that. But just to go out the way and go to his office and sit down and drink a cup of coffee and that kind of stuff, I didn't -- I didn't -- I didn't do that --

Q. Yeah.

A. -- you know.

Q. Would you see him every shift?

A. No.

Q. No?

A. No.

Q. Okay. So it sounds like y'all's interactions, for the most part, were just, hi; how are you; good morning?

A. That's it.

Q. That's it.

So what -- what did he -- you say that at some -- it sounds like, from what you're saying, at some point you felt like he -- like, you used the word "hunted." So what -- what changed, just from...

A. I believe it was the PIP thing.

Q. Did Jud -- Jud -- did he give you the PIP?
A. Yeah, I believe it was his idea to -- to actually do the PIP training.
Q. Do you know that or --
A. I don't know that.
Q. Okay. That's a guess?
A. That's a guess.
Q. Okay.
A. But -- well, from what Clay, who is the heater -- okay. Okay. No. I think -- I want to say maybe him and Clay may have came up with that. I'm not -- I'm not sure. I'm not sure.
Q. That's okay.
So I guess I just -- I'm trying to understand a bit more clearly.
A. Okay.
Q. You know, when you say, I felt like I was being hunted -- that's pretty strong language -- you said, by Jud Wooters. So what was he doing that made you feel like that, other than being put on a PIP?
A. So, you know, everybody has a way of doing things that were -- you know, some guys have, you know, Toledo Bend camps and things of that nature and stuff like that, the way they spend the money they make. So I bought a used work car, very clean used work car.

And -- and this is just me. I don't know.

Q. When did you buy a work car?

A. I bought a car -- a used car in 2017, I believe it was. No, no, no. That's my Maxima. I'm sorry. Well, I -- I -- you know -- you know, when you work at Chevron Phillips, you park in a certain spot. Everybody park where they park at. And operators are the first ones to get there. So if there's a new vehicle there, you see a new vehicle and things of that nature.

And so when I say I feel like I was being hunted -- I don't want to -- that's a -- that's a -- maybe that's a bad word or bad terminology. I feel like -- I feel like I was -- I don't know, maybe because I was to myself a lot and just did my job and went home. You know, a lot of guys didn't know I lived in Louisiana and traveled back and forth the hour and ten minutes. So I didn't have time for after-work activities and stuff for a lot of times.

Q. Uh-huh.

A. So I was invited to a lot of stuff I never went to.

Q. Uh-huh.

A. And I just feel like I was just -- just started becoming the outcast. You know, I didn't -- like, I wasn't gelling as the years went on or something like

that, if you will. You know...

Q. Is there something specific that Mr. Wooters did that led to that or --

A. Well, a lot of times when I --

Q. -- is that -- excuse me really quick.

A. I'm sorry.

Q. Was that something specific that Mr. Wooters did that kind of starts -- led to that feeling, or was that --

A. That's just --

Q. -- how things progressed?

A. That's just me thinking to myself.

Q. Yeah.

A. You know, I don't want -- I don't want to put it on record as that's what took place. It's just that as things are starting to unfold and as things are being revealed to me, like, after I sit in this one testing and see how brief and easy it was for one coworker on a different crew, one has to start wondering, well, why, when it comes to me, it's a full-fledged panel? Why wasn't Jud, who was actually on premises, not at this particular testing, but he's at all of mines?

Q. Uh-huh.

A. I got a six-panel people. This dude only has three or four people, and Jud isn't one of them.

Q. Uh-huh.
A. Could just be coincidence. I don't know. But this is just what's in my head, what I'm thinking about to myself. I'm not saying that...
Q. I understand.
A. It's just -- that's just the way I felt.
Q. Yeah.
A. I'm not saying it -- it's -- it's that way. It's just the way I felt, you know.
Q. When -- I want to go back to the PIP.
So when you got issued this PIP, was it in a -- like a formal sit-down meeting, where they presented you with this is -- you know, you're being placed on a Performance Improvement Plan?
A. Yeah. We was in the --
Q. Meeting?
A. -- PSC office.
Q. Do you remember who was there?
A. No.
Q. After the Performance Improvement Plan, you said it was -- do you remember how long it took for the lighting to be fixed after you were placed on that -- or placed on the performance --
A. It was awhile. It wasn't -- it didn't -- it wasn't -- it wasn't nothing that happened quickly.

Q. Uh-huh.
So about a month after you had your second attempt, you took -- you tested again before the unit review committee. Did you test again?
A. After what, now?
Q. So after your second --
A. After the second attempt? Yeah.
Q. Yeah, yeah. I'm sorry. I wasn't very clear on my part.
And that was about a month after your second attempt, you had a --
A. Somewhere, yes.
Q. -- third attempt?
How did -- how did that attempt go?
A. Like the second one. Pretty much the same questions and everything, and Jud rebuttalling questions and -- I remember the third time, Jimmie was -- you know, a few times, he already answered that, you know, and things of that nature.
And that's another reason why I felt like -- because it was -- it was -- it started to become repetitious and then it started feeling like people that was on my side and on my union side, like Jimmie, was, like, you already asked that and he answered that. Why are you asking him that again?

Q. Uh-huh.
A. So it was like he was coming to my rescue, if you will. You know, why are you continuously asking this if he already answered that, you know.
Now, mind you, I'm -- I'm here. Montalvo is here. They're behind me. So if they're not saying nothing, I can't really hear it.
Q. Uh-huh.
A. But I can tell it's tension behind me between Jimmie and -- and Wooter --
Q. Uh-huh.
A. -- you know.
Q. Just based on what?
A. Just based on the -- the repetition of the questions that I've already answered --
Q. Uh-huh.
A. -- you know.
And mind you, I was -- I sat in on another meeting. I sat in on another console.
Q. When was -- when did you sit in on that --
A. Now you're stepping on me, baby.
Q. Yeah.
A. I'm sorry.
Q. You're right.
A. I sat in on a test; and I saw how smoothly that

test went, on when I worked over one time. Got clearance from -- from the head operator.

Can I sit in on this test?

Oh, yeah, sit in on it.

And it went smooth. No Wooter, no -- no Josh. I mean, Wooter -- Montalvo was there but -- but no head -- no -- no -- nobody from up front was on that meeting. Everything was signed off, and the guy passed.

Q. Uh-huh.

A. But when it comes to be my turn, it's almost like the act of Congress. Everybody from up front behind me, asking me the same questions I felt I already had answered.

Q. Do you know if the person that -- who you're describing that you sat in on their meeting, do you know if that was their first attempt at passing? Their second or third attempt?

A. I'm not -- I'm not sure.

Q. Okay. And do you remember when, in this timeline, that that took place, that you -- was that after your first attempt?

A. I think it was after my -- I think it was after my second attempt.

Q. After your second attempt? Okay.

So after the third attempt, did you -- did

you feel like you did a good job and passed?
A. I did.
Q. How did you find out that you didn't?
A. They called me in the office; and it was my union rep, Clay Ryan; Montalvo -- I mean, not -- yeah, Clay Ryan, Montalvo, and Jud.
Q. Uh-huh.
A. Jud.
Q. And they told you in person?
A. Yeah.
Q. You didn't pass. You'll have to test again?
A. Yes. And I'm sitting there, you know, just ready to go home. They presented me with the paperwork. I signed it and...
Q. Other than the first -- we -- you had talked about at the meeting with Chelse in April to discuss the doctor's note, and you mentioned that you -- after that meeting --
A. Uh-huh.
Q. -- did you -- was there another -- did you ever request to be put on -- in an outdoor role throughout the rest of your training?
A. Well, I told Chelse, after she asked me, you know, if it's not the heater board, what can you work? And I told her I was qualified on everything outside.

Jud stepped in and made it clear that he wasn't going to allow that to happen.

Q. At the meeting?

A. At the meeting.

Q. Uh-huh.

A. He said, we need you inside. So I didn't pursue to go any further with asking anybody about staying outside.

Q. Okay.

A. Also, it was guys that was there prior to me, for whatever they situations was, they remained outside after not successfully moving forward as the company wanted them to.

Q. Do you remember any of their names?

A. Yes.

Q. What are their names?

A. Palmer Lee.

Q. Sorry. Palmer Lee, I think?

A. Palmer --

Q. Palmer.

A. -- Lee.

Q. Okay.

A. And this other guy, he was qualified on all outside jobs, also; and his first inside job on the console was on the distillation board. He could never

keep us in the pipeline. They retrained him, but they never let him work the heater board -- I mean, the compressor -- I mean, the distillation board again. And he just remained outside until he retired.

Q. Uh-huh.

A. His name is Dwayne or Dwight -- what's his name? I could find out his name, but I know -- I know Palmer --

Q. Uh-huh.

A. -- offhand -- I mean, firsthand, because an altercation happened at work with Palmer. Palmer was only qualified in compressors and heaters outside. He could never pass distillation outside. So he just -- after numerous times of trying to pass it. So they just kept him working outside heaters, outside compressors.

Q. Did he -- Palmer, did he ever try to qualify on the heater board?

A. Not to my knowledge.

Q. Okay. What about -- well, the sec- -- the second person that you're --

A. The second person I'm talking about is -- I can see him in my head and everything. He's a vegan, don't eat any meat. But the second guy went through distillation training, after not being able to keep us in the pipeline. And we was in the flare on his shift a

lot of times. So the company took it upon themself to send him through a program like they sent me.

Q. Uh-huh. A PIP?

A. A PIP.

Q. Okay.

A. But he never went back to work on the distillation board. They just always scheduled him in the schedule to stay outside.

Q. Do you --

A. Now, he qualified as a distillation guy; but after working the distillation board by himself, it was always reviewed after the incident that it was operation -- that it was the board guy's error. It was error on his behalf of why we had to hit the flare and get out of the pipeline.

Q. Uh-huh.

A. So he went through the extensive training, but they never scheduled him in the schedule to work the console anymore. And then, like, five years later, he retired with a successful career with Chevron Phillips.

Q. Uh-huh.

A. LeBlanc. Last name is LeBlanc.

Q. Okay. Okay. Do you know when that -- when that -- when that was? Was that around the same time that --

A. I was outside working, and I was -- I wasn't even thought of being a heater board operator.

Q. How did you learn of these two people, Palmer and LeBlanc?

A. I worked with them.

Q. Okay.

A. I came into work one day. Palmer Lee is only qualified on heaters and compressors, but he's working overtime on my shift. It's a lot of work going on in distillation. The guy that was on my crew is signed up for heaters, which has a easy night. But Palmer Lee's working overtime, not qualified in distillation where all the work is.

But the guy that's on my shift that's scheduled for heaters, thinking he coming to work to work heaters. So when he get to work, they tell him to take a distillation relief. So he's, like, why do I have to take a distillation relief?

Well, we got Palmer Lee working over; and all he's qualified in is heaters.

Well, he need to get qualified in distillation. Why isn't he qualified in distillation yet?

So the guy was upset, and I'm hearing all this. And I'm, like, well, what's going on?

Well, Palmer Lee can't pass distillation.
Q. Uh-huh.
A. Palmer Lee had a successful career with Chevron Phillips with two outside jobs.
Q. Uh-huh.
A. I'm qualified in three outside jobs and tried to qualify on the inside for distillation -- I mean, for heaters --
Q. Uh-huh.
A. -- until I came into my situation with Wooter and my eyesight.
So that's whys, when you add all that together, start to make you think, well, why are they -- why are they trying to exile me --
Q. Uh-huh.
A. -- when these two guys was able to work 30 years and retire with a successful career?
Q. Yeah.
MS. JONES: I'm going to show another document.
MR. SUDDUTH: While you gather that document, can we take a bathroom break?
MS. JONES: Yeah. Let's take one right now.
THE VIDEOGRAPHER: We're off the record at

12:40 p.m.

(RECESS FROM 12:40 P.M. TO 12:58 P.M.)

THE VIDEOGRAPHER: We are back on the record at 12:58 p.m.

Q. (BY MS. JONES) Mr. Jones, we went on a break. Do you have anything you want to change about your prior testimony?

A. No.

Q. Okay. One thing I realized, as we are going through these questions, is I don't think I've asked you to describe the heater board and, like, how the room is set up.

So you're -- just, I guess, describe for me the setting of the heater board. Were you sitting at a desk and then there's a --

A. Yes.

Q. Okay.

A. So there's a desk. There's multiple computer screens with one big 32-inch screen at the top. Your 32-inch screen at the top displays your Lummus heaters and your SWEC heaters. We got 12 Lummus heaters, and you have four SWEC heaters. In between, you have one, two, three, four, five -- six panels. So I have six regular-size computer screens with one big screen up top.

So it's me here. Behind me, maybe 10 feet behind me, it's like a circle. So behind me is the compressor board -- yeah, behind me is the compressor board -- okay. If I'm -- so behind me is the -- if I'm sitting here, behind me is the compressor board. My supervisor, who is the specialist that can help me with anything if something goes wrong, he's over here. And the distillation board is over here.

Q. Okay.

A. And there is a big space in the middle.

Q. Where the heater board is?

A. Well, no. The heater board -- so if we in this -- if we in this room, I'm facing that way. Distillation board is over here. The specialist who has access to all the boards is here. And you have the other board right here. And this table would be out the way.

So if I had to go ask distillation about something, then I could just walk straight over to him and ask him or I could talk to him --

Q. Uh-huh.

A. -- you know, and everything. So it was -- everybody had they own little...

Q. When you're sitting at the heater board, you're sitting at a desk and there's monitors in front of you?

A. Yeah. There is a desk that I can raise or sit down or whatever, yeah.

Q. How far away from where you're sitting is the -- are the monitors?

A. Like, a regular computer, like -- like, maybe right here.

Q. So, like, a couple of feet?

A. Yeah.

Q. Okay.

A. A couple of feet right here.

Q. Okay. And there's multiple monitors?

A. Yeah, there's six.

Q. Six monitors.

Is it three and three?

A. Three and three.

Q. Okay.

A. And one big one up top.

Q. Okay. Okay. I want to understand a bit more.

So your first attempt on the heater board, when you were going -- when I say "first attempt," I mean your first unit review committee test on the heater board that took place in August, 2022.

A. Okay.

Q. When you were going through being asked questions by the unit review committee, were you having

issues seeing the board during that attempt, the first attempt?

A. Yes.

Q. Okay. Did you tell the people that were testing you?

A. I didn't -- I didn't have to say anything. He told me.

Q. Who told you?

A. "Junior," which is --

Q. Who is "Junior"?

A. "Junior" name is Brian Lohr.

Q. Was Brian on your unit review committee?

A. I was -- I was -- Brian -- after my first testing, Brian, who was actually on the hiring committee, was who voted for me to be hired on, he was -- when I hired in, Brian Lohr was a board guy that the company thought really high of.

So when -- by the time my career took off, Brian had been moved up to where he was, in between the control room and the HR office. And he was going to take DuBose's place once he retired, which would have been the ethylene specialist over all the units, pretty much.

So I'm entering something into the computer one day and Brian Lohr walks in behind me and I

can't see him. So as I'm typing it, Brian Lohr goes, you're really having problems with it.

And I say, yeah, I -- I -- I told you, you know.

And he said, okay. And that was just a brief conversation of him seeing me have to -- you know, when I had to go in and really type, I was here with everything (indicating). It wasn't as easy as being like this (indicating) and you got your ergonomics thing going and all that stuff.

When I was really into something -- now, most your moves on the board is just (indicating) and you're done; right? But when you're really -- you know, I'm -- yeah, that's just the way -- that just was my natural routine of doing it, I mean.

Q. This interaction that you're describing with Mr. Lohr, that was in -- that took place in -- in one of your outside jobs, when you were still working outside?

A. This is when I was on the board, training.

Q. On the heater board?

A. Yes.

Q. When was that -- when did -- when did that --

A. In between the first and second time when we tested.

Q. So Mr. Lohr saw you working on the heater board

and --

A. He saw me punching in numbers. So somebody went out and got the numbers for me, got the numbers for the heater coils.

Q. Uh-huh.

A. So you got tubes in the heater that go up and down. You get hot spots. Once you get hot spots on those coils, it will drive the temperature up. That could actually cause a catastrophic situation inside the confinements of the heater.

So when you go in and -- so they would call, hey, Jones. Hey, go ahead. Could you stabilize the heater? I'm about to shoot the -- I'm about to shoot the piping or the coils or whatever.

Okay. So I would punch it in. And I let him know, hey, go ahead. We can run the numbers, or you can shoot the tubes. So he'll shoot the tubes.

You got A, B, C, D, E, and F. Each one of those alphabets is going to give you -- you might get A, there's 2,010 degrees. B and C might be -- and then you have a range. So a range -- I forget what the range is, but you don't want to go over a range. If the range is over a hundred degrees, then you got to make a call and let them know, hey, maybe we need to decoke earlier than normal.

So we shoot the -- he will shoot the range, get the numbers; and it's on him, the outside guy to either give me the numbers and I will punch them in or he could do it hisself on the adjacent board.

Well, that particular day, he gave me the numbers to do. So I put the -- put the little piece of paper there, and I'm looking at the paper. And as I'm pulling it up on the screen, I got to go in and put the numbers in. And while I'm putting the numbers in, Brian Lohr walks up and see me doing it. And he just coming to see how I'm doing on my training because he's heard that, previously, I've not done so well on the board --

Q. Uh-huh.

A. -- test.

So as I'm punching the numbers in, I hear him say, man, you really can't see that shit, huh?

And I look; and I say, oh, what's up, man? Yeah, you know. And I just went back to working.

So between him and Washburn, before everything got farther along with my training, them two knew.

Q. Who is Washburn?

A. Brian -- the compressor guy that sits behind me.

Q. Okay.
A. So if I'm here on the heater board, he's behind me. Brandon Washburn.
Q. Brandon Washburn.
Okay. So but were either Brandon Washburn or -- or Brian Lohr on your first -- on the unit review committee for your first attempt?
A. No, no, no.
Q. Okay. Were they --
A. But Brandon -- Brandon -- I believe Brandon was on the board, working across -- he was -- he was -- you know, he was in the room while the testing was going on.
Q. Right. But neither -- were -- were either Brandon or Brian --
A. On the committee, no.
Q. They weren't on the committee?
A. No.
Q. So neither one of them would have determined if you passed or failed?
A. No.
Q. Okay. So going back to your first attempt before the unit review committee, did you express to any -- when you -- when they were asking you questions, did you express to anyone on that committee that you were having difficulties -- any vision difficulties?

A. No. It was just about trying to take the test and --

Q. Yeah.

A. -- get out of there, pretty much.

Q. I want to go back to -- I forget which exhibit it was, but it was the note from your doctor.

Can you go back to that document where we have the email with the doctor's note? There it is. What exhibit is that, just for the record?

A. 5.

Q. 5. It's Exhibit 5.

Okay. So you -- we talked about how you sent this letter from your doctor after you were unsuccessful on your first attempt.

A. Uh-huh.

Q. Was this the first time that you notified anyone in HR, or Mr. Wooters, about the vision difficulties you were having on the heater board?

A. Yes.

Q. Okay. And after that, you put in the work order. You said it was a Level 2 work order. Could you have put in a Level 3 work order or --

A. Well, you're always advised not to go as high as Level 3 unless it's --

Q. Who advises that?

A. The maintenance department and supervision.
Q. Okay.
A. But even if it would have been at a Level 2 -- well, it was a Level 2. But it wasn't nothing that was -- rule of thumb is never put a Level 3 in unless it's detrimental to keep the unit running.
Q. Okay. Okay. So let's move -- after this -- you sent this letter, you -- you, obviously, tested for the second time before the unit review committee.
On that -- I think you mentioned -- and correct me if I'm wrong -- but you thought that that -- that attempt went well, that you --
A. Which attempt?
Q. The second.
A. Yes, because it was pretty much the same -- the only attempt I felt that was shaky grounds were -- was the first attempt.
Q. Uh-huh. Okay.
So you felt like it -- the second attempt went well. Were the same people on your unit review committee that second time?
A. I believe so.
Q. Okay. Did you have issues that second attempt, any -- did you have vision issues?
A. No. Let me refer to that. The only two -- the

only two people that may have changed out on the committee was the two people I work with that trained me. I think -- I think one time, Angelle, Joseph Angelle was there; and the other time Brandon -- Ridgaway was there.

Q. Because he came back from paternity leave?

A. I believe something like -- yes, ma'am, that I can remember.

Q. Okay. Did you have trouble seeing or any vision difficulties with the heater board on that second time?

A. I mean, I've always had vision discrepancies. I have floaters. One of the reasons why my glasses aren't as thick as they are today is because of corrective lenses.

Q. Uh-huh.

A. And I've also had LASIK. So what LASIK surgery has done is it has intensified the floaters in my eyes. You know, I could -- I could look now and see, like, you know, what you would probably look at as being, like, spiders --

Q. Uh-huh.

A. -- or little lightning bolts or something like that.

So if I could go back, I wouldn't even

have had LASIK surgery. LASIK surgery might have been good for maybe nine months, to where I could see, you know, something on that wall crawling.

Q. Uh-huh.

A. And then eventually it just started declining to where -- I was without glasses to where I started having to get glasses -- wear glasses again.

Now I can't go back to contacts, which was great, because LASIK flattens your eye. So that curvage that the contact suction cups to is no longer there because the LASIK surgery has flattened it.

So through different optometrists and specialists, I've tried to find a contact to where it would fit without being harsh on my eye; and I just was never been able to like it was in the past. I mean, I played college ball with contacts; and it was great, except for when -- maybe one would pop out or go up in my brain or something and I have to flush it out -- fish it out.

But other than that, if I would have known LASIK surgery would have flattened my eye so much to where I couldn't have gotten that -- that suction to where the -- the lens could fit, I'd have never -- I'd have never -- I'd never done it. I'd never had it. But back then, LASIK surgery was the hot new thing going on;

and it was supposed to take glasses away from me. And it did that for a little bit, but then it -- it -- my eyesight started declining back to where I am now. And it also -- it has the floaters in my eyes.

Q. Uh-huh.

So on your second attempt at the heater board, did you have -- did you feel like your vision difficulties prevented you from doing well on that second attempt?

A. I do.

Q. How so?

A. Because it was times where I felt myself getting -- it's a feeling you get when you about to, headache --

Q. Uh-huh.

A. -- but you're not there yet, you know. You -- you start feeling it here and under my cheek lines.

So a lot of times I would just -- now, this is when the unit is fine. So a lot of times I'd -- hey, Joseph, you got it?

Yeah, I got it, bro.

And I'd just sit back here, and I'd just close my eyes and just be like this for a little while (indicating). You know, it...

Q. Did you --

A. And I also have -- also have drops, the artificial tears.
Q. Uh-huh.
A. So a lot of times I would just step back and I'd go in my books and I'd grab my artificial tears and I'd pop them in. And I'll just sit there and just -- you know, and then take maybe 30 minutes; and then I, okay, bro, I got it. And we'll -- I'll go back to studying or working or whatever the case may be.
Q. Did you communicate with any -- to anyone on the unit review committee that you were having any vision issues --
A. My super- --
Q. -- the second time?
A. -- supervisor Joseph -- I mean, not Joseph -- Jimmie. Jimmie Hayes.
Q. Was that during the test or after?
A. It was throughout the process of me...
Q. Yeah.
I'm talking about that actual -- the second attempt, when you --
A. No.
Q. -- sitting --
A. No.
Q. -- before the unit review committee.

A. No.
Q. You didn't tell Jimmie, like, hey, I -- I'm having -- I'm struggling because of my vision difficulties?
A. No.
Q. Did you tell anyone else on the unit review committee about that?
A. It was just mostly during the shift of me training on the board and stuff like that. During the actual committee and taking the test, I don't recall telling anybody about that.
Q. Okay. What about on the -- is that -- is that answer true for both the third and fourth attempts? Did you ever tell anyone on the committee that you were having vision -- vision issues?
A. No, because I was always -- not always -- but within my training process, it was at least three different times I've went, saw my optometrist, where he was working on my situation.
Q. Uh-huh.
A. Either it was tinting my glasses, empowering them, or something. So I always thought that he was -- it was in the best interest to just let him try and fix it.
Q. Did anything that he was doing help -- help the

situation, your doctor?
A. I don't think so. About the closest, maybe, he have came probably was when he strengthened them; and I think he put a light tint, like a light blue tint, on my glasses at one time.
Q. When was that?
A. Like, the second time I went to him.
Q. Which would have been around?
A. Like, in September or something like that.
Q. So to clear -- just so we're clear for the record, on the first, second, third, or fourth attempts before the unit review committee, during those -- during those attempts -- testing attempts, I'll call them -- you never flagged for any of the people on the panel, like, I'm having trouble seeing the heater board or --
A. No, ma'am.
Q. Okay.
A. I was -- with -- within the time frame of me going to my optometrist and testing, it was -- they all co-exist within the time frame of me testing --
Q. Uh-huh.
A. -- and going to my optometrist the three times I went.
Q. Okay. I think you mentioned earlier, when we were talking about something, you said that there were

other things -- there were other things going on when you were -- before the unit review committee that were making things awkward. Do you remember saying that?

A. Say it again.

Q. I have a quote where you said other -- other things were making -- were making it awkward when you were before the unit review committee.

A. Well, it was brought to my attention that -- and it's just me and coworkers -- so if my board is here -- it's a cuticle [sic]; right? So you have maybe 5 feet, 4 feet of cuticle [sic] space, and then was the wall, the half wall is, it's your monitors, then the desk, then me sitting here.

Behind the cuticles [sic] is a walkway --

Q. Uh-huh.

A. -- that leads you from the kitchen/bathroom area, that people could walk and go to the other side of the control room where cyclo unit is --

Q. Uh-huh.

A. -- another part of the control room, another unit.

Well, some of those guys that were in cyclo were trained in heaters before they moved to another unit. So this they walkway to go back and forth. So I'm sitting there, being trained. I'm

sitting there being tested.

And as one of the guys walk in -- he's cooking -- and he's walk in; and he, like, damn. He keeps walking. So after the testing, he was, like, man, I never seen nobody test as long as you for that particular board.

I say, really?

He said, yeah, they got you in there -- the test don't last no longer than three hours. It's four and a half hours they got you in there.

So I say, okay. And that was that. So it was just a lot of little nuggets that was dropped on me from people that have been there longer than me that just put me in that frame of mind that I was -- that's where I get the exile stuff from, just little nuggets like that, you know.

Q. Who told you that they had never seen anyone tested that long?

A. Mel Williams.

Q. Do you know what his role -- what his job was?

A. Shoot, Mel was pretty much a specialist in ethylene before he moved to cyclo. Mel knew it all.

Q. Okay.

A. Very highly skilled individual.

Q. Did he make that comment after your first test,

first test before the --

A. I think it was --

Q. -- unit review committee?

A. I can't remember.

Q. Yeah.

It was sometime during the process?

A. (Moving head up and down)

Q. Okay. I want to go back to one of the exhibits. Let me pull it up. Okay. Okay. It's -- I'm probably not doing the best job at keeping track of which exhibit is which. It's -- I'll show you a picture of it (indicating). It's this exhibit. It's the email from Chelse Cisneros to you on October 19th, 2022.

A. Okay.

Q. What -- can you -- for the record, what exhibit number is that in the bottom corner?

A. Is it 8?

Q. Yes, that's right. Exhibit 8.

Okay. So in this email, we talked about how Chelse was attaching a summary of the meeting on October 3rd that y'all had to discuss the doctor's note.

In the last sentence, she says (reading): The company would appreciate you providing this list as soon as possible, but no later than November 11th, 2022.

And then we looked at another exhibit

where you said -- responded to her and said (reading): Really, all I need from you guys is to fix the lighting.

Do you remember that?

A. Being honest. At this point, my mind is stuck on what Jud told me.

Q. Hold on. Really quick, before we get there.

A. Okay.

Q. So you responded to Chelse --

A. The light --

Q. Hold on.

So after you -- after Chelse sent this email, Exhibit 9, if you want to look back at it; but you responded and said, really, all I need is for the lighting to be fixed.

Did you ever follow up with Chelse again, after that email, or anyone in HR, and say, you know, the lighting still hasn't been fixed; or, I'm continuing to struggle; or did you ever approach HR again?

A. I felt it was useless because when I was talking to Jud, Jud interrupted me and Chelse and said that, pretty much, you're needed on the inside, you know. So regardless to what Chelse said or whatever question she was trying to imply to help me, it was pretty much going to be Jud way.

Q. Okay.

A. So I was just trying to focus on passing and dealing with the circumstances --
Q. Okay.
A. -- with the lighting situation.
I did put a work in for the lighting; but as far as Chelse helping out in any way, I was just really replying to her email because I knew it was Jud's ballpark. It was his ball, it was his goal, and it was being played behind his yard -- in his yard.
Q. So you never followed up with Chelse or April or anyone else in HR?
A. The only time I remember talking to April was after -- was during the death of my sister.
Q. Which was before the heater board training began?
A. It was right after the -- before the heater board training.
Q. Okay. So you -- after -- I want to make sure we're clear for the record.
So after you emailed Chelse back and said, really, all I need from you guys is for the lighting to be fixed, there was no follow-up conversations with HR after that?
A. None that I could recall.
Q. Okay. And you said that you never followed up

with Chelse or HR because you felt like Jud was kind of the decision-maker over all of this. Is that how you felt?

A. Well, after he interrupted -- again, Chelse asked the question, what can you do other than the heater board?

Q. Uh-huh.

A. And my reply was, outside work.

He answered and said, you being outside is -- ain't going to cut it. Chevron Phillips has a -- a bottomless pocket of whatever money, a big wallet; and we need to get you on the board. We need to get the board where you can see it.

But for some reason, Jud couldn't understand that it was more than just seeing a board. It was my ability to constantly stare at the board as it changes and to make the right moves. Because not only my physical situation or it was driving me in the headaches but it was sometimes a 6 looks like a 8 to me.

Q. Uh-huh.

A. Sometimes a 5 look like a 6.

Q. Did you --

A. He couldn't -- he couldn't understand that for some reason.

Q. Did you follow up with him and you're, like, I

put in a work order for the lighting; the lighting still hasn't been fixed; I'm still having issues? Were there other conversations with Jud outside of this -- the October 3rd meeting?

A. No.

Q. Okay.

A. No, not to my knowledge.

Q. Okay. So we've talked about your first attempt, your second attempt, your third attempt.

And you had a fourth attempt that was in December of 2022; do you remember that?

A. Yes.

Q. And it was after that attempt -- is that what you were describing earlier, where, after that attempt, you were riding the bike out --

A. Yes.

Q. -- and you thought that you'd been successful?

A. Yes.

So we -- like I say, that day, we had a hiccup in the unit. I forget what happened. Something happened within the unit where I had to -- where I went outside and assisted the crew outside into getting the unit stabilized, which took a few hours.

So instead of testing in the morning, we tested afternoon -- afternoon time. So Jud walks in;

and he's, like, you ready?

And I'm, like, yeah, I guess so. You know, it's late in the evening; but, you know, let's just get it done.

So people start showing up and everything, and we go on to test. And after testing, it was right around shift change, because people started walking in for the night crew and they were done. They went to the PSC office to -- to elaborate on everything. And I'm sitting there. People asking me, man, how you think you done?

And I'm pretty much, at this point, you know, I done like I did the last couple of times. I think I did well, you know.

One person comes walk out at the same time; but, you know, you really can't talk with them like you would want to because they trying to go home. They been there 12 hours.

Q. Uh-huh.

A. So Jud walks out, and he goes opposite of me and makes a right down the hallway. I'm, like, he's not looking for -- well, I say, maybe he's looking for me in the control room. So I go meet him in the control room. And so I'm, like, hey, what's up? What y'all think?

And he guides me back into the PSC office,

and that's when he told me to go on home and enjoy my time off and stuff like that. It's the holiday season, you know. I get with you next week.

I say, okay. Next week? Saturday? Say, you know, Monday? Tuesday, whatever you think?

He say, man, just go home; and I'll get with you. You know, I'll call you.

I say, okay. So I get on my bike and ride to the gate, and I'm looking at his back as he walks back to the front of the -- the plant -- or the -- back to HR and -- I think we might even -- I think we might even waved at each other bye, and I went home for my seven days off.

And that Tuesday, that's when he called with the panel of people saying that I was suspended till further notice, you know, and that my -- my gate log -- or my gate -- my badge was disabled from the gate.

Q. Uh-huh.

One thing that is -- is coming up in my mind is after Chelse sent -- sends you the summary of the meeting that we talked about and you responded that, really, all I need from you guys is to fix the lighting and you said that the lighting was fixed, was there -- was there -- did you have any feeling that -- did you

think that you could test successfully when you went for your fourth time?

A. I'm just doing the best I can at this point.

Q. So you felt like, I could -- I had an opportunity to successfully qualify on the heater board that fourth attempt?

A. Yeah, I felt like I did the best I could. I felt like I was doing the best I could with what I had, you know.

Q. So you felt like you were -- did you feel like it was a fair opportunity to test before the unit review committee that fourth time?

A. The fourth time, I felt like I was a marked man, is what I felt. Mind you, we've went through this several times. Mind you, people are in my ear about stuff. Mind you, I've sat in on a -- on a testing that was nowhere near intensified as mine was.

So in my mind, as an individual, I kind of came up with my own conclusion. It's just another thing I have to muscle my way through like I've been doing my whole life.

Q. Uh-huh.

A. I just got to find a way to get through it and pass and get on over to the other side.

Q. Okay. So is it -- when you say -- well, first

of all, you said, I had people in my ear.
Are you -- who are we talking about there?
A. Well, like, Mel told me about the testing.
Q. Uh-huh.
Mel told you about the testing about --
A. About how long --
Q. Yeah.
A. -- the testing was.
Jimmie Hayes interrupting the meeting, saying that they're asking me questions that only seasoned board operators would know. Why are y'all asking this to me? Because it just -- it just -- it just -- I was -- I was wondering, because he broke the meeting up --
Q. Uh-huh.
A. -- and say, y'all, let's go. We going to pause right here. The committee got up and just left me at the board. And they may have stayed gone maybe 20 minutes, and they came back and sat down.
And a few days -- the next day, I think I was off, so the next day at work, I asked him. I say, what that was all about?
He said, oh, he's just asking you more seasoned questions than I've ever asked -- heard them ask other people that I've sat in on a panel testing

before.

So that's something else in my head, you know.

Q. You said you felt like you were a marked man. Was it Jud that was making you feel that way, Jud Wooters?

A. Yes. He had a part to play in it. Yeah, I just felt that way. And then after -- it just seemed like I didn't have -- it's like the -- my limited -- you know, you got coworkers who you become almost like family. You hear about the birth of their family, somebody is sick, they lose a loved one. You even pray with these people. And it just felt like at times, when the -- when the end -- when the near came, it just seemed like I was just -- I was just separating from the crew. Like I wasn't -- you know, just come and do your time and go home, you know.

Now, was that everybody? No. But it just felt like the tension between myself and my coworkers just didn't feel the same because they knew I was facing, you know, possibly termination, if you will.

Because, you know, the word was out. Oh, we getting this guy from overseas; and he's a no-nonsense kind of guy. You know, you hear stuff before the guy -- before your new boss rolls in; right?

People may have worked with him before. And the last operations manager, people hated to see go because he was a people's person. Jud wasn't a people's person.

Q. When did Jud -- when did Jud get hired?

A. I don't know.

Q. Do you remember?

A. I know he's my third --

Q. Was it before you started on the heater board?

A. I want to say so, yes.

Q. Okay. Okay. So after you -- after you were unsuccessful on your fourth attempt, you talked about how they called you and placed you on a suspension. At that -- how did -- how did you respond?

A. I know they had to say a few times, hello? You still there? You know, because I was just -- I was just sitting there, listening. And, you know, Jud mostly said what he had to say. He said, good evening or good morning, one. I'm here with Sabas. I want to say Clay was there. And they all on speaker in somebody's office. And he goes through his little spiel of telling me, after several attempts, you know, you wasn't successful at passing the panel testing on the heater board and we're going to move forward to suspend you until further notice.

And I think he asked me if I had any final

words or anything; and I pretty much told him, man, I guess there ain't much I can say, you know. "Ricky Bobby" or Clay said, you know, Warren, we're going to be filing a grievance and some other stuff and -- that's another thing. Our union -- union -- the union weak over there, too. The union just -- you know, the way they do things, if they find out you got a strong union back -- like, when I first hired on at Chevron Phillips, the union was strong. 30-, 28-year guys. And then they start retiring, and these younger guys started taking they place. And a lot of them asked me why I didn't join, why I didn't take those roles; and I'm, like, bro, I live in Lake Charles. I got an hour and 15-minute drive to get to work, back and forth. And I knew how intense these meetings could get; and, you know, that's 15-hour days, doing union -- working -- going to work and doing union meetings. So it was younger guys that was voted in.

Any strong union worker get the -- the company realize they a union man, has a backbone. The first position that opens up in the front office, for some reason -- now, I could be wrong -- but for some reason, he -- that guy that was our union rep that would stand up to the company was getting that 9/80 job, which means he's not union no more.

Q. Uh-huh.

A. So it made the union that represented Chevron Phillips at Port Arthur extremely weak, in my opinion.

Q. Was Clay Ryan the union rep on -- on the unit review committee each time that you tested?

A. Yes.

Q. Okay. Other than telling Chelse that you needed the lighting to be fixed, after these attempts, would you ever complain to her or -- Chelse or anyone in HR about how these unit review committee -- how -- how -- for example, how you're being asked more serious questions, how yours are longer? Did you escalate these complaints to anyone?

A. No. Again, Chelse was fairly new to the company when I was going through my ordeal; and it's just the way the meeting that we had in the HR building was orchestrated. It seemed as though she was not the one that was going to -- it seemed like Jud was in complete control of everything.

I mean, even though she did ask me what she asked me and I answered it, immediately after my reply, Jud pretty much said it was going to be what it was.

Q. So your feeling was that Jud was in control of how things were being handled?

A. Yes.
Q. Okay. And you base that on the comment that Jud made about we're going to try to -- I'm paraphrasing -- we're going to try to fix things with the heater board?
A. Right.
Q. Okay.
A. And I believe that meeting was recorded, also. I think there's meeting -- minutes on that particular meeting that could be pulled about how it went and all that good stuff. And it just -- I don't even know why Clay was there. I guess it's because it was his role to represent me as a union rep but...
Q. I think I may have seen somewhere -- don't quote me -- I think you may have requested him, but I -- I --
A. Well, he was on my -- I didn't -- I knew it was him and I knew it was Sabas and I knew who I didn't want. So it was slim pickings.
Q. Uh-huh.
Okay. So after -- when you were placed on a suspension, did you understand that you were going to be terminated at that time?
A. I didn't know I was going to be terminated until they called me the early part of the new year --

Q. Who called you?
A. -- and terminated me.
Pretty much the same people.
Q. Uh-huh.
A. The same -- Wooters and everybody else.
Q. So Wooters, Clay Ryan. Anyone else that you remember on the call?
A. I think maybe Sabas was on the call.
Q. And -- well, describe how that call went, for me.
A. They just pretty much called and said that they was going to move forward and terminate me, and they wished me my -- wished me the best.
And I think Clay said that, you know, we're going to be -- this -- this is not over with, Warren. You know, hold your head up; and we'll be in touch. I ain't heard from Clay since, unless I contacted him.
They asked me if I had any final words or if I had anything to say; and I pretty much said, respectfully, that I enjoyed my time with you guys and I'll be in touch.
Q. Uh-huh.
A. And we left it at that.
And I think I might have jumped on my road

bike afterwards and went for a ride.
Q. Uh-huh.
A. Not motorcycle, that is.
Q. Yeah.
A. It's just cycling.
Q. Have you applied for any positions with the company -- with CP Chem since you were -- since you were terminated?
A. No, ma'am.
Q. Okay.
A. And let me just add something, if I -- if I can.
It was a time in my career where there was a job that opened up at the docks. I had the seniority. I had the know-how. I had the time in to apply for that job. I was actually told that the job was going to probably be mine.
During that time I applied for that job, another position opened up at the docks. There was two people apply for that job, myself and a guy named Casey. The rumor has it -- me and Casey worked on the same crew, 3 crew. I been there maybe five years before Casey. Got interviewed for the job, knocked every question out of the ballpark. It was like playing home run derby. I thought the job was mine.

Well, of course, they couldn't pull two people from the same crew for them jobs so they just pulled one; and they decided to pull Casey, the guy that was less seniority than me and everything. Casey wound up getting that job because the manager of the dock's son and Casey are hunting and fishing buddies. The other job was given to a guy that left ExxonMobil.

So I always tell myself if I'd have got that dock position, which I was qualified for, which I had the seniority of possibly getting because I had more time than the younger fellow, I wouldn't be here today. I'd be on the docks, loading propane on barges, cutting grass, minding my own business, and watching my grandkids get old. But as fate has it...

Q. When was it -- when did you apply for this job?

A. About three years before all this stuff even came to head.

Q. Uh-huh.

A. Maybe two years before I was even considered to go to the heater board.

Q. Okay. Okay.

MS. JONES: Maybe let's take a five-minute break.

THE VIDEOGRAPHER: We're off the record at 1:46 p.m.

(RECESS FROM 1:46 P.M. TO 2:03 P.M.)

THE VIDEOGRAPHER: We are back on the record at 2:03 p.m.

Q. (BY MS. JONES) Mr. Jones, we just took a break. Do you have anything about your testimony that you'd like to change?

A. Nothing I can think of, no, ma'am.

Q. One point of clarification, before we went on a break, you were talking about the dock job. I just -- was that a job within CP Chem, or was that a job outside of the company?

A. No, it was with CP Chem.

Q. Okay. I also had a clarification question. You've talked about that there was a new guy coming in. He was a no-nonsense person. Was the person -- was that Jud Wooters, who you were referring to?

A. Correct. That was the --

Q. Okay.

A. That was the rumor circulating around the control room, like, where he was from, where he was -- you know, he was from the Southeast Texas area and he was from there and what religious he practices. Like, somebody knew about him, which they have done that with previous --

Q. Yeah.

A. -- operational managers and stuff like that.
Somebody that knows him or worked with him before, they'll normally start the little rumor and stuff like that. So...
Q. Yeah.
A. What kind of guy is he, is he a no-nonsense guy, or stuff like that.
Q. Okay. So -- okay. And he started before your training on the heater board started? Do you remember --
A. Yes. Yes.
Q. Okay. Yes, he did.
One thing I was also curious about is you talked about how that after your second, third, and fourth attempts, you felt like you had done a good enough job to pass each attempt -- you know, pass the unit review; is that fair --
A. Correct.
Q. -- to say?
That's fair to say?
A. Yes.
Q. Okay. Did you feel like, in those attempts, that you needed anything from the company to, like, help you pass or you -- I'm just trying to understand, was there something that you felt like the company could do

to assist you in passing the heater board?

A. No. Maybe -- maybe the first time, you know, after thinking about it, was the most rockiest time --

Q. Uh-huh.

A. -- you know, with working, you know, outside and coming in and the next day I'm on the board and then I go off for several days and then I'm back, thinking I'm going to train on the board, and then I'm outside again; but other than that, you know, people started coming back -- like the situation of people being sick with stuff was starting to float on over; and, you know, I could really get into the nit and grit of training and stuff like that. But after the first time, second time of me training, I think everything was --

Q. Would it be fair to say that after -- with -- with respect to your second, third, and fourth attempts, you felt like you answered the unit review committee's questions enough to -- that they should have passed you?

A. I thought I did.

Q. Yeah.

If you were sitting here today, you feel like you could do the heater board job?

A. Yes.

Q. Okay. Just so we -- I understand -- just so I understand correctly how these unit review tests went,

so it would be the unit -- the committee, the panel, asking you questions; and you'd be answering?

A. It'd be Josh Montalvo with a list of questions.

Q. Were these pre- -- were these --

A. Pre-written down questions.

Q. -- pre-written down questions?

A. He would ask me the question, and then I would answer it. Each question, from what I understand, could be rebuttaled; or it could be followed up by the panel.

Q. Ah.

A. Right.

Q. So someone else on the panel could have an opportunity to have --

A. Right.

Q. -- a follow-up question?

A. And guess who -- guess who was always following up with the question?

Q. Uh-huh.

A. Wooters. Nobody else on the panel. It was always Wooters. He always had -- which is his right, because he's the operational manager -- but he always was the one to find something to -- to harp on. It was -- he was the reason why Jimmie stopped the testing --

Q. Uh-huh.

A. -- and was pulled into the office the time it was stopped, you know.
Q. Okay.
A. That's about the only one that kind of -- but he was on the panel. He was a supervisor. But Jimmie was the -- was kind of my little knight in shining armor, if you would, without -- if something was not handled right.
Now, did he feel like I felt? I don't know that. And this is just a feeling that -- did Jimmie sense I was being sought after or whatever like I felt? I don't know. But he defended me.
Q. Did you get any impression like -- with respect to your unsuccessful attempts, was it -- you talk about Wooters was the one who would ask -- but it's a panel decision whether or not you pass or not --
A. Right.
Q. -- is that right?
A. Right.
Q. So it wouldn't be just Jud Wooters making the decision; it would be the panel making the decision on whether you passed?
A. Yes, I believe so.
Q. Okay. Do you understand, like -- do you know whether it's, like, a vote of the panel and then if more

people on the panel say you passed, you passed; and if more people say you failed, you failed? Is that how it plays out?

A. Well, I asked people on the panel if they thought I passed; and they told me they thought I did well enough to pass.

Q. Who did?

A. Well, Jimmie did. From what I understand, it was just Wooters and the engineer, I believe, that said that I was -- I needed more time to train. I don't know how they grade it or whatever, but I believe the majority of the panel have to, you know --

Q. Say you passed?

A. -- say that you pass.

Q. Yeah.

A. But I think at least one of the attempts, I had the majority on my side; but it's Wooters who has to sign off on it, being the operations manager.

Q. What do you base that thought on?

A. From what I was told.

Q. By who?

A. Different people. Different people that was tested.

Q. Do you happen to have any specific people who told you that?

A. Jimmie, Mel --

Q. So Jimmie --

A. -- different -- different -- Jimmie Hayes, Mel Williams. You know, people that have tested before me kind of told me, this is what the rules of the -- the nature of the rules for passing a panel test.

But I was always told the pen floats through the supervisor or the operations managers. I think it's the operations manager and the engineer that has to sign off on it.

Q. Who was the engineer on your panel?

A. I'm not sure what his name was.

Q. Okay. So just so I'm understanding you correct, so Jimmie Hayes and Mel Williams, they told you that you -- you --

A. With other people. Other people told me different things. Brandon Washburn. I forget the female that works with us that told me some things.

Q. Hold on. I want to make sure I'm clear.

So I'm talking about people who told you that the unit review committee -- it's a panel and they determine if you pass or fail -- I'm talking about who told you that you passed -- should have passed instead of should have failed, not just general kind of --

A. Oh. Well, my trainer, Justin Ridgaway.

Q. He told you I -- you -- he should have -- you should have passed?
A. I should have passed.
Q. Okay. And Jimmie, you said he told you that, too?
A. Yeah.
Q. Okay. Is there anyone else that was on your unit review committee panel that told you I should have -- you should have passed?
A. No.
Q. Okay. Okay. Okay. I want -- I just want to make sure this is -- it's clear for me and for the record. So you -- we've talked about these second, third, and fourth attempts where you felt like you passed.
With that thought in mind, was there -- what were you wanting the company to do at that point for you, to help you? Like, what could the company have done better?
A. How could it have done anything better if I thought I passed? I mean, I was doing --
Q. So they could have, obviously, passed you; but outside of passing you, was there anything that they were doing or that -- were there any other issues you were having in your test attempts or...

A. I mean, I feel like they could have just -- if -- if you feel I'm not qualified to run this piece of equipment, but I'm qualified in every -- in other areas and it's known that you have let people in my situation go back to those areas that they have performed their job duties well, well, why not just place me there -- back there? Why just get rid of me?

Q. I think I understand. So why not move you back to an outdoor role?

A. I mean, they've done it before.

Q. Am I -- am I correct in saying that?

A. Right. Right.

Q. You're saying why didn't they just -- why did they terminate me? Why --

A. Right. Why just -- why just terminate me? I come to work like I should. I do all the overtime y'all want me to do or any call-out. I thought I was just as valuable to the company as vice versa. I was meeting all the requirements. I was trying to retire from there. I was providing for my family from there. Just threw me to the wolves, the way I feel.

Q. I understand.

Did you express that to anyone at the time you were terminated?

A. I kept it professional. I didn't -- I kept all

that to myself, for the most part.
Q. So you didn't -- you didn't make that request -- or, at least, during the termination meeting, did you ask -- ask, let's not terminate me; let me go to an outside -- back to an outdoor role?
A. What you mean, beg for my job back?
Q. No. I just mean did you ask: Could I go back to an outdoor job?
A. I was terminated.
Q. So the answer is "no"?
A. The answer is no, ma'am.
Q. Okay.
A. I mean, at some --
Q. After your second, third, and fourth -- oh, I'm sorry. Go ahead.
MR. SUDDUTH: If you -- go ahead.
A. I mean, it comes to a point where there's dignity involved.
Q. (BY MS. JONES) Uh-huh.
A. I'm a man. I stand on my -- I put my pants leg on one at a time just like him.
Q. Uh-huh.
A. To me, it was obvious what your decision was. So I'm not going to give you the benefit of me poor-mouthing, if you will. You understand what I'm

saying?

Q. I think so.

A. I'm not going to belittle myself when it's already determined that you want to terminate me.

Now, is Chevron Phillips a career-moving job and was paying me well and helping me keep my family afloat, my moms, who is 83 years old, family afloat, her household afloat? Yes. But, again, I'm a man, ma'am. I'm not going to let you -- I'm not going to crawl to you, if you will.

I thought I did everything I could do to pass the test. I thought I passed the test. Even in my current state -- you know, it was even suggested, just pass the test, man. We're going to keep you outside.

Q. Who --

A. That was even said before.

Q. Who said that?

A. Several people said that. Just pass the test, man. You ain't got to work the board. We'll keep you outside, you know. I can't put names on it; but, you know, just get it out the way and pass the test.

And that was my objective, to pass the test. I thought I passed the test, you know. Because everybody knew my -- my situation with my vision. Everybody -- I mean, people was walking up on me -- not

people -- but, you know, one of the higher-ups -- I mentioned his name earlier -- "Junior," Brian Lohr.

You know, he caught me in the act of trying to look at the board and determine some things of what I was typing in and he's just sitting there observing and he made the comment, without me even knowing he was behind me, you having trouble seeing that, huh?

I was, like, yeah, I am.

Q. Uh-huh.

A. You know, so...

Q. I guess -- maybe this is a better way to ask: So if you're having -- if there's issues going on, obviously, the company cannot do what it can't do if you don't bring things to their attention.

So we talked -- you sent them the doctor's note, which you talked about. You said, I need you to fix the lighting. The lighting got fixed.

Was there any other thing that you raised to the company of, I need more help; I'm not being successful; I need --

A. I thought the doctor note and my union rep was sufficient enough, if you will.

Q. So other than your union rep being involved and you sending the doctor's note and the lighting being

fixed, there wasn't anything that you brought to the company's attention that this is what I need to do to succeed on the heater board?

A. Like, for instance, going up there, sitting down and talking with somebody or anything?

Q. Yeah.

A. No, everything was email-driven and stuff like that. I didn't -- we didn't go up there. They came down to us. The only time I went up there was to see the nurse. Maintenance office was adjacent to that building. But as far as anybody in the human resource building, the closest I ever came to the human resource building most of the times was going to the lab, you know. I was blue collar. I stayed in my blue collar lane and did what I had to do to work, and that was pretty much it.

But, again, I thought I was successful at doing what I was doing. I thought I did enough to pass the -- the test. So it wasn't -- I didn't think it was any need. I thought I was conquering --

Q. Yeah.

A. -- this stuff that I was faced with and what I was dealing with.

Q. Uh-huh.

A. So I didn't feel no need to go up there and

discuss stuff with people --
Q. I understand.
A. -- you know.
Q. Okay. Other than -- and I may circle back to Jud Wooters -- but other than Jud Wooters, is there anyone else at CP Chem that you're complaining about in this lawsuit?
A. No.
Q. No?
A. No. No.
Q. Okay. And we've talked about -- we've talked about Jud Wooters in the sense of, you know, him asking you, I think the word was, strenuous questions during these heater board attempts we've talked about; the meeting with HR where Jud Wooters says, no, that's not an option; we're going to focus on the heater board.
Other than those -- is there anything else that Jud Wooters did that you can point to that -- you know, that -- that wasn't a -- fair or that was inappropriate?
A. Huh-uh. No.
Q. Okay.
A. No.
Q. Okay. Do you know the legal claims you're bringing in this lawsuit, Mr. Jones?

A. The legal claims?
Q. Yeah, like what your claims are in this lawsuit. Do you understand what those are?
A. Wrongful termination or -- I felt like I was wrongfully terminated.
Q. Are you claiming that anyone at CP Chem discriminated against you based on a disability?
A. Yes.
Q. And what disability are we referencing there?
A. My eyesight.
Q. Okay. And how do you feel the company discriminated against you because of your eyesight?
A. They didn't take my doctor's letter into the -- into consideration. As far as I understand -- I don't know how true it is -- but as far as I understand, this was all kept in-house. It never left the confinements of CP Chem, Port Arthur. It never made it to The Woodlands and the higher-ups to be determined if they should keep me or not.
Q. Do you know that to be true for a fact?
A. No, I don't.
Q. Okay. When you say they didn't take your doctor's letter into consideration, who are we talking about there?
A. Jud. He just told me to keep training. We're

going to get to the end of --
Q. Yes.
A. We're going to get to the bottom of -- or not the bottom -- he said, we're going to get to the -- as of right now, we're going to take this into consideration; but just keep training.
Q. Uh-huh.
A. That's what was told to me after the meeting, the HR meeting.
Q. Jud told you that?
A. Yes.
Q. Okay. So when you say he -- Jud didn't take your doctor's letter into consideration --
A. I don't know if he did or not, ma'am.
Q. Okay.
A. I'm just saying it's -- it just seems that way.
Q. Yeah.
A. When it was -- you know -- again, I've seen other people unsuccessful at passing on or furthering their career; and they just stay where they was. They wasn't terminated, to my -- from what I could understand.
Q. Are you talking about the Palmer and -- Palmer Lee and --
A. Palmer.

Q. -- LeBlanc?
A. Yeah, LeBlanc.
Q. Okay.
A. And it's others. There are others. But those two, I know for myself because I've worked with them and seen it unfold.
So there was -- I never thought I was going to be terminated. I just thought maybe I would -- I thought I was valuable. I thought I could just go outside and continue to help outside and work the three jobs that I was qualified for. There was nothing outside I couldn't do.
Q. Did you make the request to go back outside?
A. Yeah, but it was cut short. Chelse made the request during the HR meeting, and Jud cut it short.
Q. And when you say "cut it short," you're talking about his --
A. He said it wasn't going to happen. He said, it's not going to happen. We need him inside.
Q. Okay. So Jud said the company needed you on the heater board?
A. Yes.
Q. Okay. Okay. So I have Jud telling you that the company needed -- at that meeting -- the company needed you on the heater board; it wasn't going to

happen, you going back outside; that he didn't take your doctor's letter into consideration; the more strenuous testing. Is there -- or strenuous questioning -- is there anything else Jud did during this process that you feel was improper or inappropriate?

A. No.

Q. Okay.

A. I mean, Chelse was asking the question.

Q. Yeah.

A. Well, Mr. Jones, if you can't work the heater board, what it is you can do? What else is it you can do?

I say, well, Chelse, I can just remain outside. I'm qualified in all positions outside.

And then Jud replied, that ain't -- we can't have that. We need you inside.

Word for word or -- I believe, like I say, the recorder was in the middle. You know, I believe they have that documented and all that good stuff, from what I could remember. They took minutes of it. So...

Q. Would going back outside have been, like, a step back in your career?

A. I'm topped out in pay already. There's no stepping back. I was already topped out in -- only -- only other -- the only other increase there was, was if

a contract between the union and the company made an increase to top pay or the 3 percent increase annually you got for living.

Q. Uh-huh.

A. I was topped out in pay.

Q. Okay. Are you claiming in this lawsuit that CP Chem retaliated against you?

MR. SUDDUTH: Object to the form, to the extent it calls for a legal conclusion.

I don't know if you understand what retaliation means in the context of Title VII, Mr. Jones; but if you do, you're more than welcome to answer the question to the best of your ability.

A. I do feel that way. I do feel like I was discriminated against.

Q. (BY MS. JONES) I'm sorry. The question was about retaliation. Do you --

A. Oh, do I feel like they retaliated?

Q. That's right.

A. In what form? I mean, like, retaliate -- so if you retaliating, it's something I did for you to retaliate; right? To retaliate?

I don't know if I understand the movement of that question, was I retaliated.

Q. Did you ever complain about Mr. Wooters to

anyone at CP Chem?
A. Not on the record. To coworkers.
Q. You never complained -- did you ever complain to anyone in HR about Mr. Wooters?
A. No.
Q. Did you ever complain to any supervisor about Mr. Wooters?
A. Jimmie Hayes.
Q. And what -- was Jimmie Hayes -- he was the head operator; is that --
A. Yes.
Q. -- right?
What I -- what I think -- what did you tell Mr. Hayes about Mr. Wooters?
A. I felt like he was after me. Just felt like he was out to see me not move forward within the company, as far as maybe moving on to another unit, because I was up to move out of ethylene and get into cyclo. My seniority had me, two months before I was fired, to actually transfer over to cyclo and get out of ethylene.
Everybody knew that because everybody was talking about it. I don't think that he liked it that much, that he was use -- that he was losing a seasoned ethylene operator. And it was nothing that the company could do to stop me from moving to cyclo, also, because

of the way that he -- the seniority and the rules are set up.

So that's another thing. If I wouldn't have been fired, I'd have been over to -- I would have been over at cyclo, working a whole nother unit. So...

Q. What was Jimmie's response when you complained about Mr. Wooters?

A. You know, just -- I never really complained. I just maybe held -- used his -- him to vent to, maybe. You know, he would listen. So I wouldn't necessarily call it complaining. It may be venting. Maybe get a little feedback from him on what I should do or whatever. But I just used him as a quick Dr. Phil, if you will, to just to vent some things off to him instead of keeping it stored in, you know. Just talked to him.

Q. Did you ever complain -- did you ever make any complaint about Mr. Wooters, if you can call it that, to anyone else besides Jimmie?

A. I complained to David Levine.

Q. Who is that?

A. Head operator -- head outside operator.

So at the time, David Levine was a head outside operator. The head outside operator does the permits for the outside contractors. So a lot of times, on days, when we get our day started, Levine and the

contractors would get permits; and he will call us, in the field, saying, hey, X, Y, Z come into FA105. They going to be removing some insulation.

And we would meet the contractor at FA105, discuss the job that they had, and we would close the permit -- or finish off the permit. So David Levine, being the head outside operator, would give them permission to do it; and we would finish off the permit out in the field.

Well, maybe around 10:00 o'clock, 10:30, Levine office is clear of all contractors pretty much for the day; and I would go in there and sit on a bucket and just talk with him from time to time. And he was another ear that I would -- that would listen to some things; and I would, you know, talk to him about, you know, maybe they should do this or do that or -- you know, the job would run better if they did X, Y, Z.

And he would reply, yeah, man, you know, we need to probably do this because you have people up front that run up front; but they're not working the job as a blue collar in the unit. So a lot of times we know what's best for us, working the unit. But being that they're over us, they want to come down and tell you, you know, X, Y, Z need to be done; and sometime we heard and sometime we not.

And then, for the most part, when we not heard is until something happens to where we're, us as operators, are, like -- kind of, like, well, we told you so and -- you know...

Q. Did you tell David or Jimmie that Mr. Wooters, like, had it out for you for a specific reason; or was it just -- were these conversations --

A. I told --

Q. -- mostly where you were just generally venting to them?

A. I told Levine that I think he got it out for me, maybe, you know. Because one thing about those panel tests is once you're in the spotlight of not passing it, rumor has it that they intensify; like, they go into more depth; like, they want to pick your brain more than what they did the first time just to make sure you know what you're doing.

So I could kind of understand why, after the first time, things went into more of an in-depth setting.

Now, with that being said, the testing that I sat in on, on 2 crew, was nothing like my first test. It was a breeze. And, not to mention, it wasn't many people that I had on my panel review.

Q. Uh-huh.

A. You know, it was like a walk-through. It was like a pregame warm-up or something.

And I'm, like, so this is over? He -- he qualified? Oh, okay.

So, now, the second time I get there, it's like a choir behind me, you know; and it's way more in depth than the guy that was there --

Q. Do you mean, when you say it was way more in depth, that they were asking you more questions?

A. It was more intensified. It was more people. It was more questions.

Q. What -- what -- I -- I think I'm a bit confused because you said that the questions they would ask --

A. Wooters wasn't there.

Q. -- were from --

A. Okay.

Q. The questions were from -- they were, like, preset questions before, you know --

A. It was preset questions by Montalvo.

Q. So the questions were kind of preset and they would ask you questions and people had the opportunity to ask follow-up questions?

A. Well, now that I remember, it's a -- it's a sheet he has like this (indicating).

Q. Uh-huh.

A. In those different pages is maybe 150 questions. Out of those 150 questions, he have 50 circled; and he's going to ask you the questions that are circled. I was being asked questions that wasn't circled.
Q. How do you know that?
A. Because I sat in on the guy -- I sat in on 2 crew, the guy that was being qualified -- that was testing, and I could relate to the questions.
I'm, like, well, he didn't ask him X, Y, and Z that he asked me.
Q. Is it possible that a different 50 questions are asked of that guy?
A. That's possible. That's possible. But it just seems like my arrangement was -- of questions was just more in depth than his was.
Now, mind you, my shift supervisor stopped the meeting and pulled the panel out.
Q. I thought Jimmie stopped the meeting.
A. I mean Jimmie. That's what I mean. Well, he's my supervisor. He's my -- he's my head operator. He's a supervisor --
Q. Uh-huh.
A. -- unit operator -- unit supervisor.
And he pulled them out and had their

meeting and came back. So it just made sense to me that, you know -- it's just the way I felt. You know, I could be wrong; but it's just the way I -- it's just the way I felt.

Q. Uh-huh.

A. I mean...

Q. Okay. So I want to go back to you talking to David and Jimmie about Wooters.

Did you complain to David or Jimmie that Mr. Wooters was doing anything -- handling anything inappropriately with respect to your eye issues?

A. I never heard -- after the letter was presented to HR and Wooters and we had our meeting, that was the last thing -- oh, so after the letter with the meeting, after the meeting -- after the meeting with the letter in HR --

Q. Yes.

A. -- that next week, I get a phone call in the control room to go meet the nurse up front. So I'm thinking I'm going to be drug screened or whatever. So I go.

So she has -- she pulls me -- she say, I need to get your -- I need to get a vision from you -- a vision exam.

Q. So really quick, so I'm clear, so a week after

the meeting, you went to the nurse --

A. I wasn't sure --

Q. -- and they had a --

A. Maybe a week or two or later.

Q. Okay.

A. The nurse summons me on days. So I go up front to the nurse. And she had me stand back, however many paces, and read the E chart. I cover one eye, tell her which farthest line I could read. Cover the other line [sic], tell her the farthest line I could read. She points and tells me to ask her what these colors [sic]. I tell her red, yellow, and green. And that was it. That's the last --

Q. That was the last --

A. After the meeting. That was after the -- the -- the letter and the meeting.

Q. Uh-huh.

A. And that was the last I heard of anything dealing with my eyesight or anything like that.

Q. Okay. Do you know if you -- like, what the results of the vision test were?

A. (Moving head from side to side)

Q. Okay.

A. I also was notified by a doctor on my way to work one evening. He told me who he was. I can't

remember what his name, but he said he was -- hey, I'm Dr. Such-and-such. I'm with Chevron Phillips and I'm here in The Woodlands and I got some questions I want to ask you. I say -- he say, you have time?

I say, well, I'm on my commute to work; but I got you on my Bluetooth.

He say, okay, man, it's not going to ask you -- it's not going to take too long. He say, I just want to ask you a few questions.

So I say -- I say, man, I think I need my union rep to be available.

Oh, man, this is going to be quick, just some -- just -- I got about maybe four or five questions to ask you.

I said, okay. Go ahead. Shoot.

And it was nothing pertaining to my eyesight. It was all about the testing.

Q. The panel testing?

A. The panel testing.

He say, man, it -- so pretty much what he was asking me was: Is it your eyesight, or you can't pass the test?

Q. And what did you tell him?

A. I told him I felt offended.

Q. Why -- I guess, describe that conversation for

me a bit more. Why did you tell him you felt offended?

A. Because he wasn't asking me anything about the exam or my letter with my doctor. He was asking me more questions about the panel test. He was elaborating on that. Why did you -- you know, so you called -- he said, man, is it that your eyesight; or you can't pass the test?

Q. What did you tell him?

A. I -- to be honest with you, I can't even remember what I -- because I felt out of line with what he was asking me. And I believe I told him that's why I think I needed my union rep to be available before I even answered these questions. I think -- I know I paused for a minute before I replied.

Q. Uh-huh.

A. So I'm driving, and I said -- I want to think I said, excuse me? Or something like that. But I do know I paused because it was -- it was just -- first, I'm not expecting him to call me. Secondly, the line of questions he asked me didn't have anything to do -- the ten minutes, eight minutes I stayed on the phone with him, wasn't nothing about my eyesight; it was about passing the test.

Q. Well, I thought you said you asked -- he asked you about was it with your eyesight or --

A. Well, he asked me -- he asked his -- the question I remember him asking me is: Is it your eyesight, or you can't pass the test?

Q. And you -- did you respond -- do you remember what your response was?

A. I told him it was my eyesight.

Q. Okay. And when was that conversation?

A. I don't know. After the letter and the HR sit-down and all that good stuff.

Q. Do you remember about how long after that?

A. I can't remember if it was the eyesight/vision test with the nurse, before or after that. So it was the panel meeting, then it was the eyesight/vision test, and then I was working nights -- because I saw the nurse on days; and then it was nights, on my commute to work.

So I would normally leave my house -- we had to be to work at -- I normally get to work about 4:15. So I would leave my house about 3:15, 3:00 o'clock. So it was late in the evening. I'm guessing he worked straight days. So it was the following week after the nurse called me in for the -- for the eyesight test.

Q. So you told him that you -- he asked -- he's asking questions: Is it your eyesight, or you can't pass the test? You said eyesight.

Did you ask him, like -- do you remember anything else about that conversation?

A. I was just stunned. I was stunned that he asked me that. I didn't feel that was appropriate.

Q. Okay.

A. I don't remember his name or anything like that. I do remember telling him I don't think I need -- I need a union rep present.

Oh, man, it's just going to be a couple of questions. I just got to ask you, man, you know.

And he asked and I answered him and -- I believe it was a couple of other things he may have asked me, but I can't remember. It's just stuck in my head about him asking me, is it the test; or is it that you can't pass the -- I mean, is it your vision; or you can't pass the test?

Q. Uh-huh.

A. And I remember saying, excuse me?

He said, well, I just want to know because I know you didn't -- you know, you're not doing well. I've heard that you're having -- you know, you're having difficulties passing the test or whatever.

And I was just -- I was baffled. I'm, like -- I'm drawing a blank on how that conversation even ended. But I do know I got to work, and I told

Clay about it.

Q. What was Clay's response?

A. Pretty much nothing, just -- just making him aware of it. He didn't say anything or -- he didn't -- he wasn't, like, yeah, I knew -- he didn't tell me he knew the guy was going to call or, I had no idea this guy was going to call, or anything.

All I know is he was the doctor representing Chevron Phillips, and he was out of The Woodlands. That's what I remember.

Q. When you say "out of the woods," like, he called you by surprise?

A. Out of The Woodlands.

Q. Oh, out of The Woodlands. Okay.

Okay. I think I asked this; but just to be clear, after you took the vision test with the doctor, did you -- did they follow up with you to tell you if you passed or failed or what the results of the vision test were?

A. I was maybe there five, ten minutes. She said, read the -- read the lowest line you could read.

I read the lowest line I could read. Did it with the right and left eye.

And then she asked me to -- she checked to see if I could tell what the colors of those three

things that's on the wall. She said, tell me those colors.

I told her it was red, yellow, and green; and that was it. I went back to -- I rode my bike back to the unit.

Q. Yeah. Okay.

A. That was the last I heard of anything with the vision.

Q. Jimmie Hayes, he's the head operator -- was he a union member? Was he with the union?

A. Yes.

Q. So he was with the union.

Clay Ryan was with the union?

A. Yes.

Q. You said he's a head operator.

A. He's the --

Q. Did he have any -- I guess I'm confused -- a little bit confused of whether he was, like, a supervisor who could discipline you or issue, you know --

A. Yeah, he could discipline you. He's the -- he's the head -- he's the head inside operator.

So you have com- -- you have heaters, compressors, and distillation. Jimmie is like the specialist.

Q. Uh-huh.
A. So if I'm over here fighting something, he can come over --
Q. And help you?
A. -- and assist me with it.
So he's qualified in everything outside and inside.
Q. So he has more knowledge than you, but is he -- like, do you report to Jimmie?
A. Yeah. Yeah. He's -- he has authority.
Q. Just give me a second.
Going back to -- you were talking about conversations that you had with Jimmie and David about Jud Wooters.
I think, if I'm understanding you correctly, you would go to these folks and you would, you know -- you know, vent to them, generally; but would you ever make any -- like, Jud Wooters is doing this to me?
A. No.
Q. Anything more specific than that?
A. I mean, it's not I'm going to seek these guys just to talk about Jud. We're talking about whatever is happening under the sun. And he -- Jud would come up. Hey, man, how you -- how your training going, you know.

And then I would just tell them about, you know, how I felt.

Q. Yeah. Did you consider Jimmie and David, like, your friends in the workplace?

A. I considered all -- all my guys that I worked with -- mind you, I'm there 12 hours out of the day with them so they was extended family.

Q. Okay.

A. Everybody was.

Q. So you never went to David or Jimmie and made -- said -- you know, made a complaint about how specifically Wooters was treating you as a part of your testing for the heater board?

A. Not just going to them and that's what the topic of subject is.

Q. What do you mean?

A. I mean, I would go to them and we would be talking about something and -- like I said before, they'll ask or I'll say something; and now the topic of discussion is my training and Jud. Or we'll relive the situation with Jimmie, when he stopped the meeting, stuff like that. It was just never where I'm just seeking people out to just talk about Jud.

Q. Uh-huh.

A. You know, I felt the man was just doing his

job; but I also felt it wasn't the same for everybody that was going through that particular console evaluation or testing. It felt like some people -- or the individual that I saw take his test, I felt if I'd have had that my first go-around, I'd have been qualified. I'd have been qualified in working the heater board.

Now, mind you, once you qualify, you're still training. You still have a specialist there to help you. You have somebody overseeing you. Of course, I'm not going to know every -- nobody knows everything once they qualify. It's the whole reason why Chevron Phillips have a specialist that's qualified and got years under his belt to oversee everything while you're there, which was Jimmie. And Jimmie felt, from what I could tell, he felt I had the knowledge to be qualified on the board.

Q. With respect to -- so I just want to make sure I'm understanding right.

So with respect to David -- what was David's last name?

A. Levine.

Q. Levine.

-- and Jimmie Hayes, you would -- y'all -- you would go to them and talk to them, and Wooters --

Jud Wooters would come up, but you never sought them out to specifically complain about Jud Wooters?

A. No.

Q. Okay.

A. No, it wasn't -- you know, I'm -- I'm just trying to make the day --

Q. Right.

A. -- you know.

Q. And when Jud Wooters would come up, what was the context of that?

A. I mean, it was nothing that they were -- they never had anything bad to say about Jud or anything. I think I had more -- I had more time with Jud, probably, than anybody.

Now, mind you, Jud is up front. Jud only comes down for 5:30 meetings before we go out and go on about our day. Jud may pop up during upsets and stuff like that; but for the most part, Jud was nowhere around or unless it was him stretching his legs, coming out after lunch, or something like that.

Q. I guess I'm just trying to specifically understand. When Jud Wooters would come up in your conversations with David and Jimmie, like, what were you specifically complaining to David and Jimmie about Jud?

A. About my situations of seeing the other

testing; and, you know, Jud is at all my tests. I thought he had to be at everybody testing.

I know he was on site when the test that I stood in on. I knew he was there for that guy's testing. Now, maybe he had something to do where he couldn't participate in that test. I don't know. But for each of my tests, he was there, you know --

Q. Uh-huh.

A. -- which I didn't have a problem with.

I didn't run from him or anything, but it just -- I just know he was there for all of my evaluations and stuff. It was a whole panel. Everybody was there. This other guy, it wasn't -- it wasn't like that. I thought it was --

Q. Do you have a sense or feeling that Jud was after you for any specific reason?

A. Do I feel that way? Yes. Can I explain it? No. I don't -- I can't put a finger on it, you know.

Q. When you say that, do you mean just, I felt like Jud was after me; but I don't know what to attribute that to?

A. Yeah, I don't -- I don't know what to contribute it to, other than Jimmie stopping the meeting because of the arrangement of the questions he was asking. It's like his questions was more intensified;

and in other situations, he's not even at people's testing. He's not even in the building for people testing, the one I observed.

Q. Other than the one you observed, do you have any knowledge of him just not being present at --

A. I thought he had to be present at all of them.

Q. Other than --

A. Or -- or somebody of his caliber had to be there.

Q. Jud Wooters, did you -- do you know his official title?

A. Operations manager.

Q. Operations manager.

Do you know what damages are you seeking to recover in this lawsuit? When I say "damages," I mean money.

A. Back pay. I mean, my 401k, thank God I hadn't had to go into that; but that was doing pretty good. Suffering, the pain and stuff, the mental distress I've been going through, and just trying to keep stuff afloat on my behalf. I had plans and things that I was trying to do while I was with Chevron Phillips. I was looking to retire with them.

Since leaving Chevron Phillips, the only thing I ever came close to working that was doing me

right was the job that actually closed down as a -- when I was in New Orleans, working for Roehm Chemical. I was praying that that job -- somebody would buy the company and keep that plant open, but they wind up closing.

Q. Do you remember your final pay -- pay rate was at the time you were terminated?

A. I think I was at, like, 52 bucks an hour.

Q. Okay. Okay. Do you know how much you're seeking in back pay in this lawsuit?

A. I hadn't -- I hadn't put paper to pen or anything like that. I mean, it's not many companies out there looking for a 51-year-old operator. You know, I was locked in with you guys; and I had plans on retiring with Chevron Phillips. Am I out there looking for work? In my craft, I am.

But, again -- I would like to think -- I've seen cases where people my age get picked up by new companies and able to keep going in they life and they life-style remains the same and stuff, but I hadn't had that luck yet.

I find a lower role, I take that role, and then when the layoff happens because of the economy and the way things are, I'm the first one to go because I'm overqualified. Got a lot of LNG projects going on I'm applying for, but a lot of them works want new guys

fresh out of school. 51-year-old, washed up, They ain't been putting eyes on me. I can outlift, outrun, outjump, outread all these younger cats, and I'm experienced; but my resume say I'm 51.

So I keep my faith up, and I just keep pushing. Right now I'm not working. I'm looking for work. I passed the test with Golden Pass. I'm looking for them to possibly interview me, but I hadn't got that call yet.

So I cycle. I try to lose weight and keep myself busy. I cut my mom yard, my yard, my neighbor yard; and I -- I -- to answer your question, ma'am, I hadn't -- I guess I'm leaving that up to my lawyers and stuff. I don't -- I hadn't put paper to pen and actually tried to come up with a number and stuff like that. I don't -- I've never been through this before, nor did I ever want to go through this.

Q. Understood.

Since you left -- since your employment at CP Chem ended, have you seen a counselor for any of this, you said, mental pain and suffering? Have you seen any type of counselor or doctor?

A. No, other than myself and my wife going to church and Wednesday night bible study and stuff like that. As far as physically seeing a counselor --

Q. Uh-huh.

A. -- me and my wife, through this ordeal and everything else, we did seek marriage counseling.

Q. When was that?

A. I think right before -- or the beginning of my training, in between my sister passing and the hurricane and all that good stuff.

Q. Was that before you started training on the heater board?

A. I think it was just during -- yeah, I think it was right before, because we were displaced in Baytown and the house and stuff wasn't working well with my sister in New Orleans. We couldn't get to New Orleans because of the pandemic and all that crap and the rules with the hospital. And my mom in Dallas. We in Baytown. My little sister way in New Orleans. So it was just rough.

And my wife was -- she was, like, I think we fine; I think we just need to talk to somebody. My youngest was in high school. Her life came to an abrupt stop. She was losing weight. She wasn't in school. Cheerleader and all that stuff was over with, track and volleyball. And so she had a few ZOOM calls with a counselor, and me and my wife went to marriage counseling.

And after one of those talks I had with Levine, I was sharing with him, on a bucket, in his office, about what me and my wife was talking about; and he said, man, you know Chevron Phillips will give you seven free hourly visits with a -- with your therapist of choice, seven free a year.

So I was, like, really? So I pursued that. Chevron Phillips presented me with a list of therapists. I let my wife pick, and we started going.

And walking into that woman's office, as I opened the door for my wife, I can remember telling myself, this is -- this is a waste of time. Got in there, sat down, and she introduced herself and said, who want to go first?

I looked at my wife. My wife looked at me. And I said, I'll go first. Needless to say, 35 minutes of that hour was spunt on me. I never experienced -- I've been proven wrong twice in my life. I never knew what a deep tissue massage could do for you, and I never knew what a therapist could do for you. I always thought all I needed was church.

Q. Did the therapist help the marriage issues that you were going through?

A. I don't think we had issues; it was just what life was presenting us at the time.

Q. Uh-huh.
A. I love my wife, and she loves me. But the ways and woes of what life can present -- can present an individual, well, can take you down a road you don't want to go through.
And I went through it. I held my head up high. I continued to provide by any means, the right way. And I find my strength in my grandfather and my daddy because I seen them do it. So I refuse to break; and lo and behold, situations come and they go. Just got to keep walking through it. So...
MS. JONES: Let's take a quick five-minute break.
THE VIDEOGRAPHER: We're off the record at 3:07 p.m.
(RECESS FROM 3:07 P.M. TO 3:21 P.M.)
THE VIDEOGRAPHER: We are back on the record at 3:21 p.m.
Q. (BY MS. JONES) Mr. Jones, we just took a break. Is there anything about your previous testimony that you'd like to change?
A. No, ma'am.
Q. Okay. Just one point of clarification.
Since you were -- since you were let go from CP Chem, have you seen any type of therapist or

counselor?

A. No, ma'am.

Q. Okay. Now I just have a couple of final exhibits to introduce in the record for our timeline purposes.

MS. JONES: This will be Exhibit 11.

THE REPORTER: I'm sorry. No, we will be on No. 10.

MS. JONES: We'll be on 10. Okay.

(EXHIBIT NO. 10 MARKED)

Q. (BY MS. JONES) Let me know when you have a chance --

A. Uh-huh.

Q. Okay. So this says Unit Review Committee for Job Qualification; and it's dated November 17th, 2022. And it has a No. 3 over there written in.

To the best of your recollection, is this when your third attempt at the heater board --

A. Yeah.

Q. -- to qualify?

A. Yes.

Q. I'm going to ask a more clear question so we have a clean record.

To the best of your recollection, was November 17th, 2022, or thereabouts, when you tested to

qualify for the third time on the heater board?
A. Yes.
(EXHIBIT NO. 11 MARKED)
Q. (BY MS. JONES) Okay. And this is going to be Exhibit 11 (tendering).
And this is just for purposes of the record. This is Exhibit 11. It's titled Unit Review Committee for Job Qualification. It has a No. 4 in the margin. And it's dated December 15th, 2022.
To the best of your recollection, is this about when your fourth and final attempt to qualify on the heater board was?
A. Yes.
MS. JONES: Okay. No further questions.
MR. SUDDUTH: Okay. I have some -- some questions, Mr. Jones.

EXAMINATION
(3:24 P.M.)

BY MR. SUDDUTH:
Q. Do you recall when counsel asked you earlier in your deposition whether or not you had ever gone to the company, in some way, about, you know, what you felt you needed to be successful to help to pass the test? She was asking some questions along that line. Do you recall those questions?

A. Yes.
Q. Okay. Now, I have some questions based upon that. Let me go on the back side of that.
Did anybody from the panel ever tell you what you were doing wrong to lead to you failing?
A. No. No, I -- nothing was never highlighted, as far as what I needed to focus in on. I -- I kind of knew what I may have stumbled on; but as far as somebody pulling me to the side and going, hey, focus on X, Y, and Z, no.
Q. Right, because -- I mean, I'm looking at these Unit Review Committee for Job Qualifications; and I just wanted to -- they all say refer back to the PIP. So I just wanted to see, did anybody on your panel committee ever come to you and say, here was the question you struggled on, or the series of questions you struggled on?
A. Not that I can recall.
Q. Did anybody ever come to you and say, it was in this way that you struggled on these questions, meaning, you got the right answer; but we wanted you to be faster or quicker in getting the right answer? Any advice or guidance ever given to you by the company in any form or fashion as to where or how you were deficient in the testing?

A. No. No. The only thing I could refer to was the outside, of going back over things; but as far as on the board, you need to concentrate this, that, and the third, no, sir. No.

Q. Okay. Because the actual written exam -- we went through that in your earlier deposition -- and the written exam, you failed the first time?

A. Right.

Q. You knew the exact percentage that you made and the percentage you needed to make?

A. Uh-huh.

Q. And then you passed the second time?

A. Correct.

Q. Okay. That's kind of what I'm looking for here, in this unit review committee thing.

Was there any kind of feedback at all as to where you were failing and where you were passing?

A. No.

MR. SUDDUTH: Okay. I have no further questions for you, sir. Thank you.

MS. JONES: No further questions.

THE VIDEOGRAPHER: All right. Before we go off the record, Ms. Jones, how would you like your copy of the video? MP4 or synchronize the transcript?

MS. WILLIAMS: I think she prefers

synchronized.

MS. JONES: Okay.

MS. WILLIAMS: Can we -- can we confirm that with our -- after we talk to our assistant? I think she prefers synchronized.

THE VIDEOGRAPHER: And -- Mr. Sudduth?

MR. SUDDUTH: You got it.

THE VIDEOGRAPHER: Would you like a copy of the video?

MR. SUDDUTH: Yes, please.

THE VIDEOGRAPHER: MP4 or synchronize the transcript?

MR. SUDDUTH: I don't need it synchronized.

THE VIDEOGRAPHER: MP4 it is.

The time is 3:27 p.m., and we are officially off the record.

THE REPORTER: James, do you need a copy of the transcript?

MR. SUDDUTH: I will need a copy of the transcript, yes, E-tran. And we will read and sign.

(VIDEOTAPED DEPOSITION CONCLUDED AT 3:27 P.M.)

# Exhibit B

# Deposition Transcript

**Case Number: 1:24-cv-00350**
**Date: November 7, 2025**

**In the matter of:**

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

# WILLIAM B. HART, M.D.

**CERTIFIED COPY**

Reported by:
Margaret Lowe

**Steno**
**Agency, Inc.**

**315 West 9th Street**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(888) 707-8366**
**NV: Firm #108F**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| WARREN F. JONES, Plaintiff, vs. CHEVRON PHILLIPS CHEMICAL COMPANY LP, Defendant. | ) CIVIL ACTION NO.: 1:24-cv-00350 |

---------------------------------

VIDEOTAPED DEPOSITION OF

WILLIAM B. HART, M.D.

VIA VIDEO CONFERENCE

FRIDAY, NOVEMBER 7, 2025

---------------------------------

VIDEOTAPED DEPOSITION OF WILLIAM B. HART, M.D., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on Friday, November 7, 2025, from 9:14 a.m. CST to 11:16 a.m. CST, before Margaret Lowe, Registered Professional Reporter and Notary Public, in and for the State of Florida, reported remotely by machine shorthand pursuant to the Federal Rules of Civil Procedure.

REMOTE APPEARANCES

On behalf of the Plaintiff:
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, LA 70601
337-480-0101
James@saa.legal
BY: JAMES E. SUDDUTH, III, ESQ.

On behalf of the Defendant:
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
500 Dallas Street, Suite 2100
Houston, TX 77002
713-655-0855
Marlene.williams@ogletree.com
BY: MARLENE C. WILLIAMS, ESQ.
BROOKE JONES, ESQ.

Also Present:
Stephanie John, Esq.
Chevron Phillips Chemical Company

Collier Victorian, Legal Videographer



INDEX


| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulation | 6 |
| WILLIAM B. HART, M.D. | |
| Direct Examination by Mr. Sudduth | 6 |
| Cross-examination by Ms. Williams | 29 |
| Redirect Examination by Mr. Sudduth | 83 |
| Recross Examination by Ms. Williams | 97 |
| Errata Sheet | 104 |
| Verification of Deponent | 105 |
| Reporter's Certificate | 106 |


EXHIBITS


| Number | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 10 |
| Exhibit 2 | E-mails re Warren Jones' Most Recent Eye Visit - Bates 706-707 | 18 |
| Exhibit 3 | Letter from the Hart Eye Center Bates 708-709 | 20 |
| Exhibit 4 | Eye Exam - Hart Eye Center 4-6-22 Bates 918-919 | 69 |
| Exhibit 5 | Eye Exam - Hart Eye Center 9-14-22 Bates 916-917 | 69 |
| Exhibit 6 | Eye Exam - Hart Eye Center 11-18-22 Bates 914-919 | 73 |




EXHIBITS (Continuing)


| Number | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | E-mails re Confidential: Letter to Employee Warren Jones - Bates 741 | 86 |
| Exhibit 8 | E-mails re Lighting Above the Heater Board - Bates 811 | 102 |
| Exhibit 9 | Letter from the Hart Eye Center Bates 764 | 102 |




REPORTED REMOTELY FROM ORANGE COUNTY, FLORIDA
FRIDAY, NOVEMBER 7, 2025, 9:14 A.M. CST
\- - - - - -

THE VIDEOGRAPHER: Good morning. We are on the record at 9:14 a.m. Central Time on November 7, 2025, to begin the deposition of William B. Hart, Medical Doctor, in the matter of Warren F. Jones vs. Chevron Phillips Chemical Company LP. The venue of this case is the United States District Court for the Eastern District of Texas, Beaumont Division. The case number is 1:24-cv-00350.

This deposition is taking place via Zoom. The lead videographer is Collier Victorian, here on behalf of Steno, whose business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent.

MR. SUDDUTH: Yes. James Sudduth on behalf of the Plaintiff, Mr. Warren Jones.

MS. WILLIAMS: Marlene Williams on behalf of Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, Counsel. Will the reporter please identify yourself and swear in the witness.

THE COURT REPORTER: Margaret Lowe, Registered

Professional Reporter.

The parties and their counsel agree that while I am a licensed notary and court reporter, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me. If any party has an objection to this manner of reporting, please state so now.

Hearing none, we will proceed.

Dr. Hart, raise your right hand, please.

Do you swear or affirm that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

THEREUPON,

WILLIAM B. HART, M.D.,

having been first duly sworn, was examined and testified as follows:

**THE WITNESS: I do.**

DIRECT EXAMINATION

BY MR. SUDDUTH:

Q. Dr. Hart, good morning, sir. My name is James Sudduth, and I represent Mr. Warren Jones. Nice to meet you. Let me start by asking you, Dr. Hart, have you ever been in a deposition before, meaning being deposed like this?

**A. Yes, many times.**



Q. Many times. Okay. So you know the rules of the road?

**A. Yes.**

Q. Have you ever in any of those depositions, have you ever been in a deposition like this by Zoom?

**A. No.**

Q. Okay. All right. Since you've never been in a deposition by Zoom, then, I know you've been through a lot of depositions, but let me give you a few rules for the road on Zoom depos. Two things --

**A. Okay.**

Q. Yeah. Two things in particular, one, please do not say uh-huh or uh-uh when you're answering a question. Make sure you actually verbalize those answers out loud whatever they are.

**A. Sure.**

Q. Second, talking over each other, that's really troubling by Zoom or problematic by Zoom. Here's why. If there's a situation where I'm asking you a question and you're answering that question and we're talking at the same time, Zoom will actually cut off one of the speakers entirely so we hear nothing that person had to say.

**A. Okay.**

Q. So it gets a little bit tedious at times to



kind of let the person finish out that question and answer all the way to the end. Let that happen, please, sir, if you don't mind so we can hear --

**A. Sure.**

Q. -- what you have to say.

**A. Got it.**

Q. Thank you, sir. Breaks, if you need a break today, I don't think we'll take too long today, but if you need a break at any time, maybe there's an issue with the patient, something like that, just ask me and I'm going to try to accommodate that as best as I can. My only --

**A. Okay.**

Q. -- request of you, sir, is if I have a question that's pending on the table for you to answer, please answer that question before you go take any break you want, okay?

**A. Okay. Got it.**

Q. Do you have any logistical questions for me before I press further?

**A. I don't.**

Q. Okay. Then your full legal name, please, sir, and your address for the record. If you wish to use a business address, you certainly can.

**A. William Beroen, B-E-R-O-E-N, Hart, M.D., 1920**



**West Sale Road, Suite F as in Frank, No. 3, Lake Charles, Louisiana 70605.**

Q. Dr. Hart, just so we can build a record here, I understand that you are an ophthalmologist, but can you give us your educational background, please?

**A. Yes. I went to McNeese State University. I graduated, attended Tulane Medical School, and did my ophthalmology training at Tulane Ophthalmology Department. I started practicing in Lake Charles in 1983, and I've had a very busy practice all those years. I have seen and done everything an ophthalmologist could possibly do for eyes, so I consider myself an expert.**

Q. Okay. You mentioned you have been through many depositions before. Have you had to testify in court as an expert?

**A. I have.**

Q. Okay. And have you ever been proffered by either side, okay, whatever side was in the case, did they proffer you or offer you to the court as an expert?

**A. Yes.**

Q. Okay. And did the court accept your testimony as --

**A. They did; they did.**

Q. All right. And were you accepted in any particular field? I assume it was optometry, but was it

in that field?
A. Ophthalmology. Optometry is a -- they're just eyeglass fitters. An ophthalmologist is an M.D.
Q. Thank you. Okay. Good to know. All right. Ophthalmology. Okay.
A. Yeah.
Q. So you said when you came to Lake Charles in 1983, you opened up your practice, and have you been doing that ever since?
A. To this very day, yes.
MR. SUDDUTH: Okay. All right. So Dr. Hart, the first thing I'm going to do is I'm going to mark as Exhibit 1 your notice of deposition and attach it hereto to your deposition.
(Exhibit No. 1 was marked for identification.)
BY MR. SUDDUTH:
Q. Do you recall receiving from my office, or it may have been delivered by a processor, I'm not sure, but did you receive a notice of deposition setting your deposition for today?
A. Yes.
Q. That notice of deposition, at the top of it says Warren F. Jones, Plaintiff, vs. Chevron Phillips Chemical Company. When you saw that name, you saw the name Warren F. Jones, did you recognize that name?



A. Yes. I know the gentleman very well.
Q. Describe that for me. How do you know Mr. Jones?
A. So I was -- he was referred to me about probably a dozen years ago by a local optometrist because he had some high myopia. His near-sightedness was very great, like a negative 12, something like that. So at that time, I was doing LASIK, and so he was referred to me for LASIK which I performed and from which he recovered very well and could see pretty well.
As time went on, he developed his -- when someone has a very elongated eye as Mr. Jones does, which is essentially a birth defect, sometimes we have to go back and do some other procedure to allow his eyes to focus. So I did lens implant surgeries on both eyes of Mr. Jones with good result. His vision has been fine ever since. He's deteriorated a little bit in the present area.
Because of the elongation of his eye, he has some -- a bit of what we call myopic degeneration of the macula which is the small zone in the back of the eye that actually we -- our -- our optics where our eye focus upon. It's that part of the eye that because of his elongated eye has deteriorated a little bit because of that elongation. So something he was born with, the



elongation of his eye meant that he -- actually, his skull formed differently in birth than most people so his orbit or socket was very elongated.
So the eyes as we grow up, our eye follows the elongation of the orbit or the -- or the socket if you will. And so in that, the deterioration of the retina which is designed around about a 23-millimeter eye, his is several millimeters longer than that, so that stretching is what caused some problems with his macula. However, his vision currently, I just -- because of this case, I re-refracted him on November 11th of 2024.
The last -- I see him every year, but I had him come in just for the purpose of this deposition. I redid his refraction and his vision that I got at that time. And the past few times I've done his refraction, his visual acuity was 20/40, and that's the standard for obtaining a driver's license. He could actually see somewhat better than the other a bit on the 20/30 line, but the line he could see comprehensively was the 20/40 line.
He doesn't have any objection about his vision. He can do all of his daily chores and tasks. He can drive, he watches TV, and so forth. I questioned him about those things specifically so it seems like his vision is okay to me.



Q. Whenever -- so there's a lot to unpack there, but let me go back and start with when you mentioned myopia. Can you just explain for all of us who are not ophthalmologists what exactly in layman's terms is myopia?
A. Okay. So we divide eyes into hyperopia or myopia. Hyperopia means the eye is short. You need a plus powered lens, contact or eyeglass lens, to focus on the retina because the eye can't focus as sharply as it needs to. Myopia is the opposite. It's an elongated eye, longer than usual so it takes a negative optic for the -- to the image to focus properly on the macula which is that part of the eye we see with.
Q. Okay. And was it that particular condition, the myopia condition, that he was born with?
A. Yes, yes. So his -- the elongation of the eye to the extent that -- first of all, he's about 9 feet tall, but the elongation of his eye, it means that his skull when it was being formed, the orbit or socket elongated, the eye grows to fill that space so, then, the eye elongates.
Q. Okay.
A. And a long eye requires a negative powered lens.
Q. Okay. For lack of a better word, so forgive me

if I -- if this is the wrong word, but is this condition or is this myopia that you described, is this a deformity, meaning is this outside of the norm?

A. Yes, absolutely. An eye that long, as long as his eye was, you know, it's extremely unusual, and we know that the -- we always are on watch with the problems that occur because of that. So he was wearing glasses, I think, when he was two years old.

Q. Okay. Gotcha. So he was referred to you, I think you said, about 12 years ago?

A. Right.

Q. Okay. And so have you been consistently seeing him ever since he was referred to you?

A. Yes. He keeps his annual visit pretty routinely. He also sees his optometrist too but ...

Q. Okay. You mentioned the annual visit, but it also sounds like in addition to kind of checkups or annual visits, there were two surgeries or procedures that you conducted. One was LASIK, if I remember correctly, and one was --

A. Correct.

Q. Is that right?

A. Yeah. So the LASIK was performed about a dozen years ago. He had a good result from the LASIK, that is, he didn't need any correction after the LASIK;



however, as time goes by, his eye was still elongating a bit so he regained some myopia. So then later I put in some lens implants that would mitigate his -- his nearsighted vision. That's been pretty stable.

Q. So the lens implants still are, as you put it, they're still stable; they're functioning?

A. Yes. So that's why he has such good vision, uncorrected really. Because he regained a little bit of myopia again but, you know, he wears glasses, I think, to counter that.

Q. You were --

A. This high -- excuse me, but this high myopia is definitely a handicap. It's something you were born with, and it's -- actually, most -- before our modern era, kids just went blind from it.

Q. Oh, wow, okay.

A. Because there wasn't any way to correct it.

Q. So when you say that the 20/40, when you recently refracted him, which let me also get a layman's term on that. When you're talking about refracting someone, what does that mean?

A. So we have an instrument called a phoropter that has lenses in it and we put it up to the patient's face and we ask a series of questions. The patient is looking at a wall chart that has a series of sizes of



letters down to 20/20. And so we work on the optic in that Phoroptor until we find the best vision, and that best vision was 20/40. And I refracted him 11/13 of '24, 9/15 of '23, 11/18 of '22, and his refraction has been stable and his vision has been stable at 20/40 and, actually, a bit better.

Q. Okay. So the last refraction that you have record of is 11/13 of '24?

A. Correct. But I did also do one -- I don't have it in the record because of this deposition. Maybe a week ago I saw him in preparation for this, and his refraction had not changed, that is, eyeglass power.

Q. Okay. So that was about a week ago and --

A. Correct.

Q. -- he was still 20/40 reading on the 20/30 line slightly?

A. Yes, correct.

Q. Can you explain to me what is the significance of someone who is at 20/40?

A. So 20/40, the way the chart system works, a person is 20/20, sees the 20/20 line -- our lens are designed to be 20 feet long, so at the 20-foot range, the person who's 20/20 sees the 20/20 line without correction. So then you go down from there to somebody with 20/40 vision would have -- a 20/20 person can move



20 feet farther back and still see the 20/20 line -- well, see the 20/40 line, sorry. So he -- that's -- that's the range of vision he had. It could be corrected at 20/40 because he still had some myopia because this is a condition that, really, we have to kind of keep track of.

Q. At 20/40, in your professional opinion, at 20/40, can he function and do basic tasks and see the world around him?

A. The driver's license standard is 20/40 so he could drive a car, watch television, knit.

Q. Okay. I want to show you -- at some point in time, do you recall that Mr. Jones began to come to see you because of struggles that he was having at work?

A. He has mentioned that the last couple of times I've seen him, and the only difficulty he seems to have is low light. And that's understandable because the eyes elongate, and so it's harder for it to -- for the focusing to occur in it. The eye has some ability to focus itself but he -- because of the myopic degeneration, he was having some trouble in the dark seeing well.

He mentioned that to me. He felt like he could still function in the work in which he is pursuing. But he did admit to me he was having trouble, and he needed

**-- he needed more light than he had in his, I guess, control room you could call it. I'm not sure the place where he works, but he mentioned that to me. And so I worked on it, make sure his eyeglasses were best possible. And he can see; it's just the low light because of the elongation of his eye and the myopic degeneration that's sort of difficult for him to see.**

Q. Okay. I want to -- what I'm going to do is I'm going to share my screen with you, Doctor, and I'm going to show you some different documents on my screen so bear with me here while I set this up. But if you just keep staring ahead at your iPad, you should eventually begin to see my screen in front of you. Do you see that?

**A. Yes.**

Q. I'm going to zoom in. Can you see the text okay?

**A. I can.**

MR. SUDDUTH: All right. I'm going to mark this as Exhibit 2, Madam Court Reporter, to the deposition, and this is going to be an in globo exhibit because it'll be 706 to 707.

(Exhibit No. 2 was marked for identification.)

BY MR. SUDDUTH:

Q. What I'm referencing there, Doctor, when I say



706, what I'm highlighting here, that's a Bates label. It's just how we as lawyers mark voluminous documents, so that's that 706 I'm referencing but -- so you'll see here at the bottom, 707 is the carryover where it says please find attached notes and concerns. Thank you, Dr. William Hart, Hart Eye Center.

I'm going to scroll up, and this is a letter that -- or e-mail that Warren Jones sent to his team on September 19th of 2022. I want to read this to you and ask you some questions.

**A. Okay.**

Q. Here's what Warren says. Quote, Good morning, this letter is from my optometrist and my recent eye exam. Ever since I've been training on the heater board, I've been in and out of the eye clinic trying to get my vision where I can see the controls and reading clearly. During this time, my doctor found some concerns he wanted to share with you guys. Attached is a letter wrote by him on my behalf. Please look at the letter and get back with me, please. Thanks.

My first question is this: What he's kind of outlining here for his employer, is this substantially similar to what he outlined to you when he came to visit you?

**A. Yeah. He's quite frank about it.**



Q. Okay.

**A. And the -- the optometrist would've been the other doctor that he sees for his glasses.**

Q. Gotcha. He also referenced that "attached is a letter wrote by him on my behalf." Did you write a letter on behalf of Mr. Jones?

**A. I have not yet.**

Q. You don't recall writing a letter on his behalf?

**A. His optometrist. Now, he sees another eye doctor, an optometrist. I think that's who wrote the letter. I don't remember writing a letter for him.**

Q. Well, let's take a look.

**A. Wait a minute. I'm sorry.**

Q. I'm going to scroll down here. If you keep looking at the screen --

**A. That is -- that is right. I did write one.**

MR. SUDDUTH: Okay. This will be Exhibit 3, by the way, Madam Court Reporter. It'll also be in globo so it'll be a two-page exhibit at 708 and 709.

(Exhibit No. 3 was marked for identification.)

BY MR. SUDDUTH:

Q. So that logo there at the top, Hart Eye Center, is that you?

**A. Yes, it is.**



Q. Okay. There's a two-page letter. If we scroll down to 709, is that your signature?

**A. It is.**

Q. Okay. So you wrote this letter, but it seems like from our earlier questions, you may not have recalled writing a letter. Do you want to take some time to read over this letter before I ask you some questions?

**A. Can I scroll it up?**

Q. Sure. You want me to scroll this way or down?

**A. Yeah. Okay. Keep scrolling. Yeah, so that's -- that's what I had to say. Yeah, the same thing I just told you.**

Q. And then I'll just finish the second page for you down here.

**A. Okay. That's the -- that's the letter I wrote; it is.**

Q. Okay. So let me ask: What was the purpose of writing this letter for Warren?

**A. I think he asked me to write the letter to give my opinion about his problem and that centers around the fact that this isn't a normal eye problem that he had. This is something he was born with, and we've done a lot of work to keep his vision going which has -- does work pretty well. If he sees 20/40, we consider that normal**

**vision.**

Q. Right. But if he's in a situation where he's looking at, let's say, LED screens from across a room, and those LED screens have certain levels of brightness or darkness, how does that impact someone like Mr. Jones, if at all?

**A. Well, it would -- if they were very bright, he should be able to see them. If they're darker -- and he said there was some problem. I couldn't -- because I'm not familiar what his work zone is. There was some problem with the amount of light he was able to see in his -- in his workplace.**

Q. Okay. So I'll just represent to you that where he was, was in a sort of like a control room, what they call the heater board console where you're looking --

**A. Okay.**

Q. -- at screens and that sort of thing, and you're looking at different flows and diagrams of how the plant is functioning, okay? So that's the space that he's in.

**A. Sure.**

Q. What else do you recall, if anything, about what he relayed about the problems in that particular space? I know he relayed the darkness. What else?

**A. That was the main thing. He said just a little**



**-- he could -- out in the -- and bright light and outside of the room or if -- there was something about some control they could have over the brightness of the board, what they didn't have for him to do to accommodate him. But his -- you know, he could do his -- function in his duties easily, but it was just too dark when you see the board at some time. Apparently, it was intermittent.**

Q. Did he provide any specificity on the intermittent nature of it --

**A. No, it just -- the conversation went something like there are some days I could see better than others but, in general, it's hard for me to because of the darkness.**

Q. Did you ever -- I know you made some recommendations inside of this letter, but let me ask you: Did anybody from Chevron Phillips -- and I -- so I'm referring now broadly. This could be the HR department; this could be the company doctor; this could be the company nurses.

Did anybody from Chevron Phillips ever call you and ask you for any clarification about your letter?

**A. No.**

Q. Okay. Did anybody from Chevron Phillips ever call you in any regard to ask you any questions about



Warren Jones?

**A. No.**

Q. What about your medical records? Anybody from Chevron Phillips ever call and ask you for your medical records?

**A. No.**

Q. So fair to say there were never any discussions, directly at least, between yourself and anybody with Chevron Phillips about what specific accommodations maybe they could make to work on Warren Jones's particular issue?

**A. That is correct.**

Q. Okay. In your professional opinion, are there accommodations that could have been made that would have allowed him to see the heater board adequately?

**A. I think if they could --**

MS. WILLIAMS: Calls -- I'm sorry. I'm sorry, Dr. Hart. I'm just going to lodge an objection, but then you can proceed to answer.

Objection; calls for speculation. You can go ahead and answer.

**THE WITNESS: Okay. So this would be a conversation that he and I had because he was concerned about losing his job. He said that he knows what he's doing when the light is better in the**



**room -- I don't know exactly what his work environment is but, like he said, if the light is better in the room and he can -- and the LED lights are turned up on his board, he can see okay; but when it's very dark in there, he has trouble. And if the LED lights, as I understand, whatever the board consists of, if it's up not bright enough, he can't -- he does admit that he has trouble seeing it.**

BY MR. SUDDUTH:

Q. Right. Okay.

**A. So this is not something I'm dreaming up. This is -- I'm feeding back what he said to me.**

Q. Understood. That was a direct conversation you had with him. Speaking of that, were there other conversations that he had with you such as was there ever a time where he relayed to you, hey, Doctor, this is the accommodation they provided me, but it's not working or they're not providing me one? Was there anything along those lines that he ever brought up?

**A. When he -- when he came in for this 11/13 exam, he said that he showed up for work, and all of his equipment or whatever he had was in his locker. And his locker had been emptied out. He was told to leave the premises.**

Q. Oh, all right.

Page 26

**A. So, apparently, nobody tried -- contacted me or tried to accommodate to his problem. He was upset.**

Q. Understood.

**A. So, apparently, there's a parallel to his job, a daylight parallel to his job that he could perform at the plant and still have a function there at the plant. So I would consider that a reasonable accommodation to allow him to work in a place where he can work.**

Q. But, again, there was never a discussion like that with you where you could have offered such a suggestion?

**A. I didn't offer that for him because that's not my place. He just -- he -- that's what he told me and I understood, told him I understood.**

Q. Are there -- can you, I guess, get a little more specific for me on -- I understand the difficulty in seeing, but when I was discussing with Dr. Stanton, who I'll just represent to you, you may not know who he is, but he was a doctor for Chevron Phillips. When I was discussing with him earlier this week, he mentioned that there are other things such as, like, color and depth perception, things of -- peripheral vision, things of this nature.

Aside from just how are you doing in the refraction, there are other things that you have to

Page 27

consider. How does Warren Jones's genetic condition or his birth condition, how does that affect other issues such as color and depth perception and that sort of thing, peripheral vision?

**A. Well, because he has some -- some myopic degeneration in his macula, it's within the macula that all the color photoreceptors reside. The macula is made up entirely of almost color photoreceptors. The peripheral photoreceptors are just black and white for motion detection. They don't really have that much to do with actual vision but motion detection, nighttime vision. But the color photoreceptors are in the macula, and he does have some myopic macular degeneration. I have his vision is okay, and if his vision is okay, his macula is functioning, it means that the photoreceptors, which are the color photoreceptors, are functional.**

Q. Okay. So as it stands now after both visiting with him beforehand and even you've met with him as of last week, is it fair to say or accurate to say that his vision is an acceptable level to where he can function, drive, and do basic tasks?

**A. Absolutely, and he so says.**

Q. Okay.

**A. He doesn't admit to any problem with his vision.**

Page 28

Q. Well, beyond just his subjective reports of whether he admits or he doesn't admit, the objective test, the refractions also confirm what Warren is saying to you?

**A. Correct. And, like I said, I've got the last three or four refractions I've done on him. The vision has been stable. He's not degenerating. That's not degenerating.**

Q. Okay.

**A. I think I even did -- I have an instrument called an OCT that gives me a picture of the macula itself and I -- you know, it shows that it's fairly intact. There is some degeneration that shows on this instrument. I don't have that -- that readout on my file here, but I could send it to you if you would like.**

Q. No, certainly, I think anything that you have would be helpful so that we can get a full picture.

**A. So any other eye doctor seeing that OCT image would see that his macula is basically intact but has some degeneration showing.**

MR. SUDDUTH: Okay. Well, Doctor, I told you we'd be quick this morning. I don't have any further questions for you, okay, but other counsel for Chevron may have some questions, okay?

**THE WITNESS: Okay. But -- okay. I have an editorial comment but okay.**

MR. SUDDUTH: Okay. We can -- I'll get the chance to ask you some questions after Ms. Williams so we can talk about that then.

**THE WITNESS: Okay.**

MS. WILLIAMS: Thank you, James.

Page 29

CROSS-EXAMINATION

BY MS. WILLIAMS:

Q. Good morning, Dr. Hart.

**A. Morning.**

Q. As I mentioned earlier at the start of the deposition, my name is Marlene Williams, and I'm counsel for Chevron Phillips Chemical in the lawsuit that Mr. Jones has filed.

You and I have never met or talked before today; is that right?

**A. That's correct.**

Q. I wanted to just kind of go back and do -- just get a little bit of additional background. When we started or we were starting the deposition, I think I saw you looking at some papers. Were those papers related to Mr. Jones's medical file that you have?

**A. Yes. This is the printout from my electronic medical records, and these are the last three refractions that I printed out for the purpose of this**

**meeting.**
Q. And I know that in connection with this case, we've exchanged information and with Mr. Jones. He has exchanged information with us, and I think that we've also requested records directly from you. I just wanted to make sure, and we probably will do a follow-up here, but can you tell me the latest date of medical records that you have on Mr. Jones?
**A. I refracted him about two weeks ago.**
Q. And what is the date specifically if you --
**A. She's --**
Q. -- have that --
**A. -- my -- my officer manager is gonna pull that up.**
Q. Okay. The records that you're looking at and, I'm sorry, this may be a little bit tedious, can you share with me the dates that are on the records that you have in your hand?
**A. Sure.**
OFFICE MANAGER: This one is 11/3 of '25.
**THE WITNESS: The last time I saw him was 11/3 of '25, an OCT.**
BY MS. WILLIAMS:
Q. Okay.
**A. And this is a -- this is a picture of the exam**



**from 11/13/24, and then this is an exam printout from -- and then 9 -- 9/15 of '23 was the annual exam. And I've got it, no, I've got it, and also 11/18 of '22 and also the -- we have -- I don't have it with me the printout from that recent exam, but I do have the -- I can print out a printout from the OC -- the ocular coherence tomography that I have that gives us a picture of the macula.**
Q. When was that taken and done?
**A. That was 11/3 you said? 11/3 of this year, just a few weeks ago.**
Q. Okay.
**A. I asked him to come in, having seen the request for the deposition. I asked him to come in so I could get an up-to-date refraction on him so I could give you good information.**
Q. Okay. And I was actually going to follow up on that. In terms of the most recent exam that you conducted on November 3rd, that was -- you initiated that visit with him after receiving notification that you were going to be deposed in this case?
**A. I did; I did. I felt that an up-to-date refraction would be helpful to this conversation.**
Q. Okay. And then prior to that, the last time that you saw Mr. Jones would have been November 13,



2024; is that correct?
**A. That's correct.**
Q. Okay. Other than talking to Mr. Jones or meeting with Mr. Jones and examining him on November 3rd, what else did you do to prepare for today's deposition?
**A. Just printing out the previous exams. I asked him to come in. I just did a cold exam on him and did the OCT and, you know, he read the 20/40 line actually a little bit better. And I didn't query him or have a conversation with him about it. I just thought I needed that information for this deposition, and then I told him the 20/40 is normal vision. And then he left.**
Q. Okay. Did you speak to anyone from Mr. Sudduth's office in preparation for your deposition today?
**A. His secretary.**
Q. Just administratively to try to schedule this deposition?
**A. Correct.**
Q. Okay. Did you speak to anyone about your anticipated testimony in today's deposition?
**A. No, I did not. I've learned about that --**
Q. You've got some experience --
**A. -- the hard way.**



Q. -- about that, right?
**A. Zip, yeah. I get put in the zip file.**
Q. Okay. Do you recall the first time that Mr. Jones shared with you that he was having some difficulty related to his work duties at Chevron Phillips Chemical?
**A. Let's see if he -- at least the test. I talked to him about it and -- I think I even sent him to the retina specialist that comes here on a weekly basis. They agreed it was macular degeneration, myopic degeneration, but his visual acuity has been very consistent at 20/40.**
Q. What date -- I guess what I'm trying to clarify is what is the earliest record that you recall or you have where you communicated with Mr. Jones about difficulties that he claimed that he was having at work?
**A. I would say probably last year's deposition the first time he really talked about it. Before that, he never mentioned that to me. He also has an optometrist you see, you know, for eyeglass fitting, but he didn't -- he just took the last -- last year's exam I remember. But he said he was having some difficulty in the darkness, and he was trying to figure out a way.**
**Asked me my opinion about how he could make it better and, of course, I'd have to be in the control**

**room to answer that question. So I said I -- you know, I don't understand why they couldn't have -- you can't have better light for your eyes because I don't understand what a heater board is or what his work environment is.**

Q. Okay. And that's like -- I'm going to circle back on the date and the last exam but, in fact, in -- in -- since Mr. Sudduth showed you a letter that you sent to -- I think it's addressed to whom it may concern, but you sent it to Chevron Phillips Chemical. When you sent that letter over to Chevron Phillips Chemical, you did not have any information at all about the specific work environment in which Mr. Jones had been working; is that a fair assessment?

**A. Yeah, absolutely correct. Only what he tells me, but he could -- he could get in a lunar lander; I wouldn't know the difference.**

Q. Right. Okay. Did he ever specifically describe for you what that work environment was to give you a better sense -- I'm sorry --

**A. The only --**

Q. -- I'm sorry, Dr. Hart --

**A. -- the only complaint --**

Q. -- Dr. Hart --

**A. -- he sort of --**



Q. -- Dr. Hart --

**A. Ma'am.**

Q. -- I'm sorry. Just let me finish the question just --

**A. Okay.**

Q. -- so the record is clear. I apologize.

**A. I apologize.**

Q. That's okay; that's okay. You're doing great. It happens.

Did he ever specifically describe for you what the control room looked like or what the work environment looked like in connection with you preparing the letter that you sent to Chevron Phillips Chemical?

**A. Not -- not -- not in any very detailed way. I understand that there's a control board they work at, and I understand the room is generally dark so they could see the control board better.**

Q. Okay.

**A. And beyond that, he said he was just having difficulty with how -- with the poor lighting. That's as much as he told me.**

Q. Okay. And I want to go back, I think, before that question. You -- I had asked you the first time that he raised issues as having difficulty at work, and you said it was last year's exam was your best



recollection; is that -- is that accurate?

**A. That he first started complaining about the darkness in the room, yes.**

Q. Okay. And is it true last year's exam would've been November 13, '24?

**A. That's correct.**

Q. Okay. And I -- I just want to make sure we pin down the terminology. Mr. Jones worked for Chevron Phillips Chemical, and his employment ended late 2023. And so kind of with that understanding, is it your best recollection that the first time he talked to you about difficulties at work were in 2024?

**A. I think the way that it worked that he -- he didn't -- if he had been fired or let go, whatever, he was angry because he knows he could do his job, but it was the thing we discussed sometime in the past that it was the lighting situation which, of course, I don't really understand. I could just repeat what he says.**

Q. Right. And I guess what I'm trying to understand -- so we went through, and we talked about records that you have for him in November, a visit that you had with him November 18, 2022, and then another visit September 15, 2023 --

**A. Yes, ma'am.**

Q. -- and then November 13, 2024, and then most



recently November 3, 2025. With those dates in mind, do you recall when he first talked to you about having difficulties at work?

**A. I just think it was the last exam.**

Q. Okay. So at the time that you wrote the --

**A. It may have been the one before that. It -- that's unclear to me because I didn't record that conversation. I just remember him because I know him well after taking care of his eyes for 20 years, so I just have memory of him telling me about the situation he was in.**

MS. WILLIAMS: Okay. Maybe let's -- let's go about it this way. I'm going to -- I'm going to show you a document, and then we'll kind of maybe walk through some dates this way.

**THE WITNESS: Okay.**

MS. WILLIAMS: Give me one second. I'm trying to just use the same exhibits that we already have so that we're not reinventing anything.

**THE WITNESS: Okay.**

MS. WILLIAMS: Just give me one second. I'm going to share my screen just the way that Mr. Sudduth did as soon as I can figure out where.

THE VIDEOGRAPHER: Would you like to go off record, Ms. Williams, and I can help you with it?

MS. WILLIAMS: Yeah. I normally -- I think I'm just on a different platform. I'm normally fine with it, but I -- yes. Let's -- well, hold on one second. I see it now. I'm sorry.
BY MS. WILLIAMS:
Q. Okay. Okay. Dr. Hart, can you see my screen here?
**A. Yes.**
Q. Okay. So this was referenced earlier as Exhibit 3 to your deposition, and this is the letter Mr. Sudduth talked to you about that you wrote regarding Mr. Jones's issues.
**A. Yes.**
Q. This letter is not dated, but I'll represent to you that it was sent to Chevron Phillips Chemical in September of 2022. Does that sound about right to you?
**A. You know, I don't have a memory of when this was done. I just remember writing the letter for him.**
Q. When you wrote this letter, did you have any information from Mr. Jones at this time that he was having difficulty performing his job at Chevron Phillips Chemical?
**A. So in 2022, I don't think he mentioned that. He was still working full time and -- there's even a part of his job where he had to climb things, and he was a little more concerned about that. That's why I would check his eyeglass and his vision.**



Q. Okay. In this letter, you indicate that he was suffering from extremely high myopia.
**A. Correct.**
Q. Is there a scale on which you would kind of diagnose someone with myopia -- you know, I'm assuming extremely high is on one end. What -- what generally are the ranges when you're diagnosing someone with myopia that you would kind of designate their -- their condition?
**A. Well, the only -- we have an instrument, of course, that can show us the length of the eye, but the real way we go about evaluating his vision is how much eyeglass power it takes for him to see and then the acuity he receives at the best refraction. So the determination of eyeglass power is refraction, refract to the best of my ability, and then we can kind of decide from the amount of power that he needs. At one time, it was 20 diopters which is extreme. An average myopic person may be as high as negative 6. The average is minus 250 and, of course, a normal person has zero refractive error.**
Q. Okay.
**A. We only could -- it's an indirect determination, but an elongation of the eye is the only thing that can cause that high a myopia.**



Q. Sure. So what I'm -- what I guess I'm trying to understand is you've described it here as extremely high myopia as opposed to -- are there situations where someone, for example, might have mild myopia?
**A. Sure.**
Q. And then --
**A. Probably 60 percent of the population, yes.**
Q. I think maybe I have that only because some days I feel like it's extreme but --
**A. It's annoying for sure. Someone with myopia always has trouble with nighttime vision, even mild.**
Q. And in addition to mild, someone might have moderate myopia, right?
**A. Sure. Right, because the range is up to negative 20 is about as high as they go with our refraction.**
Q. Okay. And in your note here, you identify that Mr. Jones has suffered from extremely high myopia?
**A. Correct.**
Q. Were you indicating in this letter that at the time you wrote this letter, he had extremely high myopia or that was a part of his previous history?
**A. That's part of his previous history. Dr. Rick McGuirt who no longer practice in Lake Charles had been his optometrist, had been fitting him for glasses, and so he finally -- you know, was having trouble. He was wearing contacts, I think, at the time, and he was having trouble with the contact lenses.**



**So he sent him to me to do LASIK which I did and his -- you know, did as much LASIK as the instrument would allow. I think he still needed glasses over that amount of myopia. In other words, the laser that we use could literally eat a hole in the cornea if we set it up too high, so we always measure the thickness, and we move as much as we can according to our -- our scale.**
**So then afterwards, he went back to McGuirt. He was still having to wear contacts and glasses to see -- to see well. So then later, he came back and, like I said, put lens implants in so that he could reduce the amount of myopia that he had again, and it was more stable with lens implant.**
Q. When -- okay. And so to be clear, when you're describing here that he has suffered from extremely high myopia, you are not indicating that that was his current condition in 2022, correct?
**A. So his eye is still -- is still long; however, the change in his cornea, which is the front part of his eye, we were able to obtain with a laser and, of course,**

Page 42

**glasses.**
Q. Right. So as --
**A. So the --**
Q. -- of this -- I'm sorry. As of the date of this letter, he was not -- because of the, I guess, the corrective procedures that you had performed on him, he was not suffering from extremely high myopia at the time of this letter. That was a past --
**A. Correct.**
Q. -- condition that had been corrected with the procedures that you had performed on him, correct?
**A. So let's be careful. The elongation of his eye was still there and the macula was still affected, but his vision was better with just glasses.**
Q. Right. I guess what I'm -- I'm not questioning the -- the myopia. I understand that he still was dealing with that, but the characterization that it was extremely high, that was not the case at the time that you wrote the letter in 2022; is that right?
**A. The elongation of his eye will always be there.**
Q. Right.
**A. That's not -- that's not changed by anything we do. It's merely --**
Q. Right.
**A. -- the refraction or the -- or the lens power**

Page 43

**it takes to shoot the image back that far.**
Q. No, I understand that. What I'm -- what I'm trying to understand is we just talked a few minutes ago about there are some people who have mild myopia, there are some people who have moderate myopia, and there are some people that have extremely high or even something beyond that.
**A. Right.**
Q. At the time that you wrote this letter, you were not indicating that he actually had extremely high myopia at the time even though he still had myopia, correct?
MR. SUDDUTH: Let me -- let me interject right there and just put my objection as to asked and answered on the record, but subject to that, Doctor, you can go ahead.
**A. Okay. So I -- in that letter, I said I've been taking care of him for 20 years. His natural refraction in my office was negative 20 diopters so that we did some various things to alter his refraction, but his elongated eye he was born with and will have until he dies. So that's -- you're mixing up two terms. High myopia indicates both a power that it takes for him to see and also the -- we infer from that the elongation of the eye.**

Page 44

BY MS. WILLIAMS:
Q. Now, I think I'm understanding it as best as a layperson, frankly, can understand it. What I'm -- what I'm -- earlier, you testified that when you indicated in this letter that he has suffered from extremely high myopia, you were describing that as a part of his history but not indicating that presently in 2022 when you wrote this letter that it would be described as extremely high myopia because there had been --
**A. Okay. So -- so --**
Q. -- corrective procedures that had been -- been done, correct?
**A. Okay. So let's be careful. High myopia has an effect on the macula, and that's the -- that's a high myopic comment is to remember to refer to somebody the problem that he has because of the elongation of his eye. The deterioration of his macula is due to the elongation, and his high myopia is a term that has to do with the refraction it takes for us to allow him to see.**
Q. Okay. In 2022, then, how would you have described the state of Mr. Jones's myopia? Was it mild, moderate, high, extremely high, or something else?
**A. So after all the procedures that we had done, it was moderate.**
Q. Okay. And so if those procedures predate

Page 45

2022 --
**A. Yes.**
Q. -- as of 2022, he would've had moderate myopia as opposed to high or extremely high myopia?
**A. Correct.**
Q. Okay.
**A. That's the definition of the refraction.**
Q. I understand that. I'm just trying to make sure kind of we understand the terms and as you've written them in the letter. Okay.
**A. Right. And, of course, eyeglasses would give him good vision so ...**
Q. Okay. And the eyeglasses would have assist -- basically helped to moderate the myopia?
**A. Well, it focuses the light. It elongates the light, the light cone so that it focuses upon the macula to the best of our abilities.**
Q. The eyeglass prescription, was Mr. Jones required to wear those consistently or only as needed?
**A. He'd have to wear them all the time or contacts which I think he's wearing contacts now.**
Q. At the time in 2022, do you know if he had contacts or glasses?
**A. Both, I think. I refracted him, and then he was also seeing an optometrist so I gave him the**

Page 46

**eyeglass prescription. And he would go back to the optometrist, and the optometrist would give him a pair of glasses and fit him with contacts. You're fitting someone with contacts; you have to have eyeglass backup. You can't always wear contacts.**

Q. And for, again, a layperson, what were the eyeglasses and contacts -- basically, how did they help Mr. Jones? What specifically did they do?

**A. So they're optical devices, and so they change the light cone. His focus is upon the back of the eye so more nearsighted than the greater than negative power of the lens. Say you're a negative 2 if you're moderately myopic. The best -- an average -- a person has no trouble with their -- with -- their shape of the eye would be planar, would have no correction needed. A farsighted person needs a plus power lens so hyperopia, plus power lens; normal person, no lens; nearsighted person, a negative powered lens, and they can range from a minus point 5 to minus 20.**

Q. And I don't know that we've said this specifically. I think you may have, but just to be clear, myopia is basically what we in lay terms might refer to nearsightedness; is that right?

**A. Correct, right. So without correction, you would -- the person has to get very close to what**

Page 47

**they're looking at.**

Q. And so the glasses or the contacts would be intended to basically help them see -- correct that nearsightedness to some degree?

**A. Right. So in our refraction line, we have the person sitting at -- looking at a 20/20 target, and then we have a series of lines of vision up to 20/100. And we get the best vision, the best line we can get using an optical device, glasses or contacts, and these are peripheral things. The problem is the -- is the fact that he was born with elongated eye that affected his macula so the vision wouldn't be affected by the glasses he's wearing but whether how well the glasses focus on his macula and was the macula capable of resolving the small line of vision.**

Q. Sure. But generally speaking, I guess as of 2022, around the time that you wrote this letter, you had already performed at least two procedures, corrective procedures on Mr. Jones --

**A. That's correct.**

Q. -- he was also given glasses and contacts, all of which basically improved his vision and improved -- it didn't fix his myopia because I understand that he's still -- you know, that's, you know, a condition that he would have that can't be corrected. But it would

Page 48

basically assist him with some of the issues he experienced with his myopia, right?

**A. Correct.**

Q. Okay.

**A. But put into there the fact that the macula upon which the glasses focus is the problem, not the glasses.**

Q. Right. The glasses are intended to help him, though, correct?

**A. Correct. They just focus the light as best as possible on his macula.**

Q. To basically help him see better, right?

**A. Correct. Just like you have glasses.**

Q. That's right. These are readers by the way.

**A. Okay.**

Q. Okay. And then you indicate that Mr. Jones came in for a normal annual eye exam --

**A. Well, I guess that -- it's a little confusing I guess. What I mean is the usual annual exam, the exam that we normally give, you know, a total eye exam and has many components.**

Q. Okay. And he told you that his vision on night shift was beginning to bother him. What do you specifically recall Mr. Jones telling you about issues that he was having with his vision on night shift?

Page 49

**A. He just -- he merely said that in the room where he worked, it's just too dark for him to see the board that he works at very well, although he feels like he can see if the light is better. So since I don't know if he's really talking about that environment, I just would understand that he did need a little bit more light. And some of that has to do with the fact that his macula is slightly deteriorated. That was something he was born with.**

Q. What specifically about him working on night shift did you understand was causing him the issue?

**A. Well, if his -- if his macula is slightly inefficient, then he has trouble focusing, I guess, in the -- where there's not enough light. The light has two effects. One of the effects it has, it constricts the pupil which gives the person a little bit better vision, but a constricted pupil also, of course, reduces the -- the light coming into the eye. But he was having trouble with the glasses and all that seeing his control board or heater board or whatever it's called. I have no idea what that is.**

Q. And it was your understanding that that was only -- he was only having that trouble on the night shift as you indicated in --

**A. Yeah, so -- right. He said seeing the small**

Page 50

**numbers and letters and was overwhelmed by the brightness of the lights on the operator floor which I'm using words I don't understand. So take that with a grain of salt.**
Q. Okay. And then --
**A. I just understood that he -- the light was the problem, not the -- with good light, he could see. With pure light, it was difficult to see.**
Q. Did he specifically tell you that this was impacting him on night shift only?
**A. Yes. He said that out in the light as well.**
Q. And so in the control room during the day shift, he was not having any issues as far as he reported to you?
**A. So he -- we just --**
MR. SUDDUTH: Objection; calls for speculation --
**THE WITNESS: -- we didn't discuss that.**
MS. WILLIAMS: I'm sorry --
MR. SUDDUTH: Yes.
MS. WILLIAMS: -- I don't know if we got your objection in. I'm sorry.
MR. SUDDUTH: Right. Let me get that. Objection; calls for speculation. The witness has testified that he wasn't in the room and so -- but

Page 51

subject to that, Doctor, you can go ahead and answer.
MS. WILLIAMS: Okay. But -- I'm sorry, Doctor, for clarification, because I think my question was not asking you about what you knew about the room. I was asking about what Mr. Jones told you.
Madam Court Reporter, can you read back my question, please?
(The following question was read: And so in the control room during the day shift, he was not having any issues as far as he reported to you?)
BY MS. WILLIAMS:
Q. Did he report to you that he was having any issues in the control room during the day shift?
**A. So the conversation was in the -- when he's in the dark, he has difficulty; but when he's in the control room, it's light; he can see well. That is what he told to me.**
Q. Okay. And did you interpret that to mean that in the control room during the day that he did not have any issues?
**A. Yes, as he so said. So I'm not -- I can't see with his eyes nor can I be there, but that was -- that was what he told me.**
Q. And that is the reason that you focused in this letter on requesting that he be moved from the night

Page 52

shift; is that right?
**A. Correct. That is correct.**
Q. And to be clear, do you recall Mr. Jones telling you that he had any issues in the control room when he was on the day shift?
**A. So, no, that -- we never had that conversation.**
Q. Did you ask him about that?
**A. No. I just let that -- I just let that be part of my understanding that the -- in the light he could see better which makes sense because there's more light falling on the macula. And in the darkroom, his macula being insufficient, he had more trouble seeing things, but he didn't say he couldn't see. He just -- he just related to me that it was more difficult.**
Q. Okay. Did he specifically ever describe for you what lighting existed in the control room?
**A. No.**
Q. Did you ask him?
**A. Whether -- no, I don't think he could've described it in a way I would've understood. I don't know what a heater board is. I don't know if it's 2 feet across or 20 feet across. But he did complain in the darkened room he was having trouble, but in the lighter room he could see well. So that's as much as I know.**

Page 53

Q. Did you ask him, for example, whether or not there were lights within the control room that he could adjust or manipulate to help him with any lighting issues that he had?
**A. No, because at the time we were discussing this in any depth, I didn't get the impression he was having that much trouble in the darkened room. He just said he couldn't -- couldn't see as well. He didn't feel like it was a game changer, you know, so we didn't have that discussion in a very deep way. I just understood what he was saying, and it made sense to me versus his -- his disability.**
Q. So if -- if it was your understanding that he wasn't having that much trouble and it wasn't a game changer, what is the reason that you sent the letter asking that he be moved from the night shift?
**A. Because he said he was having difficulty in the night and he -- but he could see well in the bright -- in the brighter control room, and so I just simply asked on his behalf if he could be moved.**
Q. Did he ask you to make that request on his behalf?
**A. I told him -- he did ask because he was concerned, and I said, well, I'll write a letter and tell them with our -- you know, with my experience with**

**your vision what I can. And that's as much as I know is his description to me that he saw well enough in the light and poorly in the dark.**

Q. Okay. And so just so the record is clear, you wrote the letter because Mr. Jones asked you to write the letter asking for him to be moved from the night shift; is that correct?

**A. Yes. I think he was concerned and wanted to be -- wanted to pursue his job that if I could do a better job where it was apprised, that was my -- my sense.**

Q. It was your sense that he thought he could do better in the day than he could at night; is that right?

**A. Correct, correct.**

Q. Did he ask you to make any other requests on his behalf other than be moved from night shift to day shift?

**A. No.**

Q. Did you and Mr. Jones discuss any other possible adjustments that might help him with whatever difficulties he was having?

**A. No, because I don't know that he could have described to me exactly what that would be because I've never seen his environment so we just kept it at that basic level of dark versus light.**

Q. Okay.



**A. I'm admitting to my ignorance of his workplace, you know.**

Q. That is okay, and I appreciate your candor.

Did Mr. Jones ever describe for you -- because there's a line here where you indicate that I think he informed you that he was overwhelmed by the brightness of the lights on the board?

**A. Right, right. That's a -- that's a difficult thing to untangle. I'm just repeating what he said. I can't --**

Q. What was the --

**A. -- I can't --**

Q. I'm sorry. Go ahead.

**A. So I don't know what exactly why that would be except that in the dark when his pupil is more dilated, it could be very well -- then the fact that his macula is insufficient, then he can -- all macula suffer from fatigue, light fatigue if it's -- if things are too bright in an environment. So you know when you go out in the sunlight and you walk back into your house and it takes a while for your -- for your eye to recover? That's the kind of fatigue that happens in the macula when the light is too bright.**

Q. Okay. There was no way, obviously, and I just want to make sure that I'm clear, for you to test what



Mr. Jones meant by the brightness of the lights on the board overwhelming him; is that right?

**A. No. I just could understand -- again, think about you walking in from a bright day into a dark room. It's that -- that sort of a thing, that the light was bright enough that he was having a little trouble with the -- with his environment.**

Q. And that, again, is during his night shift?

**A. I would assume that's so.**

Q. Okay. And you also indicate here that there, I guess, was an additional issue related to tear duct production which decreases at night which was another factor that warranted him not working at night, but it would have been okay for him to work day shift, right?

**A. Well, our tear production, you know, starts off in the morning at the highest level of tear production. Then by the evening, our -- that's one of the reasons we sleep with our eyes closed is because the tear -- the tear layer in all of us decreases at night. You know, the -- it sort of -- the production of tear kind of decreases throughout the day, but using artificial tears usually will mitigate that.**

Q. But generally speaking, this is not something that would necessarily impact during the day because the tear duct production is normal during the day?



MR. SUDDUTH: Let me go ahead and I didn't lodge my objection here. I should have done it earlier. I think I did do it before, but this is going to be a running objection to a mischaracterization of evidence as to all this day shift, night shift stuff. Just object to form and I think -- yeah, everybody knows what I'm talking about here. Object to form to all of that.

BY MS. WILLIAMS:

Q. Okay. So, Dr. Hart, just to be clear, your understanding was that Mr. Jones was having an issue on the night shift, correct?

**A. Correct. And he was very frank about that.**

Q. Okay. And -- and not on the day shift, correct?

**A. That's what he told me.**

Q. Okay. And so my question is: When you're referring to tear production decreasing at night, that is not necessarily an issue that would have impacted him working on the day shift?

**A. Okay. Now I'm going to bring something out of the misty past in my mind, and I may -- I may mischaracterize that that he was saying that he was having some trouble with dry eye at night. So in the letter I wrote on his behalf, I think he had some really**

**-- couldn't bring the artificial tears into the -- into the operating room, into the place where he operates. They can't have any medicines or extraneous devices or whatever. I think that was part of what he was telling me that if he could have -- bring artificial tears into the workplace, he could also see better. So, again, I'm voicing my ignorance, but I think that's what he was trying to tell me.**

Q. Okay. But, again, your understanding was that was something that also impacted him working at night as opposed to during the day?

**A. As it would do also, yes.**

Q. Okay.

**A. So all of us would have poor light. You know, when you drive down the street at night and you've been working hard all day looking at a computer, your vision will not be good because of staring at the computer. The surface of the eye dries out, so lubrication of the eye is a very important factor in vision.**

Q. Okay. I'm going to stop sharing here, and I'm going to pull up a couple of other -- well, let me ask you this first: Were you aware at any point that Mr. Jones told Chevron Phillips Chemical that he did not want to be moved from the night shift?

**A. I do not know that.**



Q. How would that -- knowing that --

**A. Our discussion -- our discussion --**

Q. I'm sorry.

**A. -- our discussion was always about he did say in the night shift his vision was worse and so, again, I think it was partly because of the dry eye and partly because of the light problem. So I don't -- I don't know -- he didn't ever tell me that he was offered daytime only so ...**

Q. Well, let me -- I'm going to share a document with you so that we're kind of on the same page about what we're talking about here.

**A. He did ask me to write the letter so that he could be changed to day, but I don't think he ever told me he was offered that.**

Q. Okay.

**A. So my letter was to -- to support his desire to be moved to the light.**

Q. Okay. So just to be clear, you did not know that Mr. Jones told Chevron Phillips Chemical that he did not need to be moved from the night shift; is that right?

**A. I did not -- I do not know that because I always assumed he was having trouble, and I was supporting his desire to move to light.**



Q. Okay. Assume -- knowing that and assuming with me that that is the case that he told Chevron Phillips Chemical he did not need to be moved from the night shift, how does that impact your analysis of the letter request that you made to Chevron Phillips Chemical and the need for him to -- to not work at night?

**A. Well, I'm surprised because I felt like moving to the daytime would be what he would desire. You know, in other words, if he was complaining to me about night, can he move -- and I helped him move to day and that he said, no, I don't want to be moved to day, then -- I just didn't know that because I was --**

Q. Right. I mean, if he had told -- I'm sorry. Go ahead.

**A. I was supporting his desire to be moved into the light situation, a better lit situation.**

Q. If he had told you that he did not want to be moved from night, is it fair to say that you would not have written the letter the way that you wrote the letter?

**A. Correct. If he had been offered that, I would assume the case closed. I don't know why he would have gone through all the trouble of describing the situation to me and asking that I write in support of his desire to be in a better lit environment. So I didn't know**



**that he had been offered that and rejected it.**

Q. And I want to make sure that I'm clear. When Mr. Jones was describing his issue to you, I understand that he was describing this in the context of the lighting, but did he -- is it also true that he described it in the context of working on the night shift versus the day shift?

**A. Right. Because he said the night shift is always more difficult for him because, you know, the decline of the tear film during the day and his vision being poor in that dark room.**

Q. Okay. Did Mr. Jones -- I'm sorry. Yeah, did Mr. Jones ever come back to you and tell you that Chevron Phillips Chemical asked him to consult with you to determine whether there were any other adaptive devices that he might be able to use to help him?

**A. Not that I recall because, again, I don't understand the environment he works, and so I don't know having back lights or whatever could help. So I just don't know that because I don't know the environment.**

Q. Are you aware that Chevron Phillips Chemical met with Mr. Jones and specifically asked him to discuss with you whether or not there were any other adaptive devices that might help him with the issue he was having?

A. There could have been. I don't remember that. My only addition was the tear film thing I think -- because I think he told me they couldn't bring artificial tears into the work space, any outside, whatever. So I don't remember that discussion. If we had it, it would've been sometime ago.

Q. If you-all had had that discussion, would you have made a recommendation to Mr. Jones to have him bring that back to Chevron Phillips Chemical to address the situation?

A. Well, he asked me for the letter so stating those things, and I did.

Q. Right. And that's what I'm trying -- I think you're saying you don't recall it, but I guess what I'm asking is: If it had occurred, can we assume you would have complied and provided some guidance on other potential adaptive devices that may have helped him?

A. Yes. But, of course, that's -- I would not be able to say things -- I'm ignorant about his workplace so I don't know exactly what I would say other than the usual things, glasses, artificial tears, and more light.

Q. Okay.

A. I'm not an expert in that -- in his -- in his field.

Q. And sitting here today, you don't have a



specific recollection of him ever coming back to you and asking what other options might be available to him to help him in his work at Chevron Phillips Chemical?

A. No, because his basic complaint was the light. Of course, I assumed it was the nighttime environment so also including dry eye.

Q. And I want to talk, I guess, a little bit more specifically. We're talking about the light. What specific adjust -- lighting adjustment, if any, did you understand might help Mr. Jones with the issue he was having?

A. Okay. So my understanding is he works in a dark room; is that correct?

Q. That's correct.

A. And so, then, the boards, the environment, then, is a dark room so his pupils are dilated. Then when he has to look at the board, sometimes the light, which are LED lights which can be quite bright, were difficult for him to see. And I would assume that has to do with the fact that he's in a dark room and isn't light at the -- his light adaptation drops because of looking at the bright light.

Q. And so the issue as far as the lighting was concerned, the issue as you understood it, would have been to decrease the lighting as opposed to increase



lighting?

A. Okay. You're asking me something I don't know the answer to, but that -- that sounds reasonable.

Q. Okay. Did Mr. Jones tell you that -- did he ever indicate to you that he was working with a portable light at Chevron Phillips Chemical in the control room?

A. Not that I recollect. It's possible.

Q. Did Mr. Jones ever come to you and tell you that he had trouble because any of the lights in the control room were out and, therefore, he had less light than he needed?

A. He merely stated they didn't have enough light. He didn't give me the reason why that I remember.

Q. So I guess -- and, again, this is my ignorance as a layperson -- on the one hand, Mr. Jones needed decreased lighting, and on the other hand, he needed more lighting; is that correct?

A. Okay. So, again, you're asking me to -- to know something about an environment I don't understand. Apparently, there are bright LED lights on the control panel and he worked in a dark room, so I think the contrast was the problem in my opinion.

Q. Right. And so as far as you understood it and in your letter, what you're suggesting ultimately is that, I mean, that he needed decreased lighting because



of the impact of the LED lighting on the board was having on his vision. Is that your understanding?

A. So that might be one mitigation but I -- if he's in a lighter room, then his light adaptation wouldn't be so critical.

Q. Right. How -- and that's what I'm trying to understand. How would additional light -- how might additional lighting have helped him with understanding what his condition was?

A. Okay. Well, his pupil would be smaller; his retina would be adapted to the light conditions that he was working in. There wouldn't be so much of a contrast between the dark and the bright lights. Just as if you were driving, you know, through a bright sunny day; you drive into a tunnel; you can't see.

Q. Okay.

A. It's the nature of our retina, the light -- the photoreceptor's fatigue in the light.

Q. I'm sorry, I'm just going through some notes. I noticed -- I guess let me pull up these documents here because I think it'll be easier if we're looking at them in order. Let me make sure I have the correct ones pulled up first. Okay. I'll share my screen here.

Dr. Hart, can you see my screen here?

A. I can.

Q. Okay. So there is -- okay. You say -- we didn't mention this earlier as one of the dates that you had seen him but, according to my records, yeah, you obviously saw him on April 6, 2022?
**A. Correct.**
Q. Okay. Do you recall if this was -- and I don't know if there's any way to tell us from your notes specifically. It says follow up, but was this sort of a normal kind of annual routine exam or was there some other purpose for this exam --
**A. Just a --**
Q. -- in April 2022?
**A. -- routine exam, a follow-up exam, you know, seeing if there had been any more deterioration of his macula which would have been evidenced by his vision loss.**
Q. Okay. When you -- HPI, would you share with the jury what HPI stands for?
**A. Let me think.**
Q. I think it's a history, but I didn't know if there was some other specific --
**A. No. It's a history of present -- I can't remember what HPI is.**
Q. Okay. So in terms of --
**A. This is -- this is out of the EMR so we just**



**fill in slots.**
Q. No, that's okay. I just didn't know -- I just -- it's a history, basically, right?
**A. Right.**
Q. And it's what -- is this based on what the patient presents to you when they come in for the appointment?
**A. So the way it works, I have a scribe and they go in, they take the basic data down, the reason for the visit, the history of the present illness, the HPI, the history of present illness. And then so they populate the front field, give me the medicines they're taking, the complaint they have, they check the eye pressure, and then I come into the refraction to see if it's changed any so that we change to glasses or contacts if necessary, dilate him. And I take a look at the inside of his eye and then, you know, write down what I find in that case and that's the eye exam.**
Q. Okay. And generally speaking, and I'm just trying to kind of understand the process here, this -- this HPI would record whatever information the patient is explaining about whatever issues, symptoms, or whatever they might be having at the present time; is that right?
**A. Right. So in that history of present illness,**



**he says he's having blurry -- reporting to my scribe -- blurry vision both eyes, moderate severity, he has dry eye and, of course, the duration of his problem has been active since birth.**
Q. And I think, basically, OU here just means both eyes; is that right?
**A. That's correct.**
Q. Okay. Is it fair to say that if a -- if a patient shares his symptom with you that it's gonna -- it -- it would be recorded here in HPI?
**A. Correct.**
Q. Okay. And under secondary here, again, it says moderate myopia. I think it's the right eye is greater than the left eye; is that right?
**A. Correct, right. In this case, it's referring to his refraction.**
Q. Okay. So I'm going to stop sharing this. I just wanted to make sure, kind of understand, you know, the chronology here. And then --
**A. And this -- this is just -- this is just standard things filling in the form. It's more for insurance than for really any great information.**
Q. Okay. All right. I'm going to go to another document. Just bear with me. I'm sorry.
THE VIDEOGRAPHER: Counsel, the videographer



here. Ms. Williams, did you want to mark that as an exhibit?
MS. WILLIAMS: Oh, yes. I'm so sorry. That'll be marked I think -- are we on Exhibit 4?
THE VIDEOGRAPHER: Yes, ma'am.
(Exhibit No. 4 was marked for identification.)
MS. WILLIAMS: Okay. And I'm sorry, I think that the -- James, look at me. After all the trouble I gave you about marking exhibits.
MR. SUDDUTH: I know. I've been suffering for weeks but, you know.
MS. WILLIAMS: Sorry, it's contagious. I think that was CP Chem 918 to 919 so we'll mark that as Exhibit 4, I believe; is that right?
THE VIDEOGRAPHER: Yes.
MS. WILLIAMS: Okay. And the next document I'm going to show, and I'm going to mark this as Exhibit 5 just so that I don't forget. It will be CP Chem 916 to 917. Let me make sure I've got the right one pulled up. Apologies.
(Exhibit No. 5 was marked for identification.)
BY MS. WILLIAMS:
Q. Okay. And so I'm showing you what's been marked as CP Chem 916 to 917. This is, I think, an office record reflecting a visit that Mr. Jones had with

Page 70

you on September 14, 2022?
A. Okay.
Q. And I think -- I just want to understand for the record you had seen him in April, right, 2022?
A. Possible, yes.
Q. Generally, you see him on an annual basis; is that right?
A. That's correct.
Q. Okay. And you had seen him in April, and now you're seeing him again in September which is just a few months later. And it's also --
A. So the --
Q. -- I'm sorry, let me just get -- it's also marked as a follow-up so I just want to understand because it's sort of outside of the usual pattern of an annual visit, but it's still described as a follow-up. If you can explain why you would have been seeing Mr. Jones just a few months later as an additional follow-up visit.
A. If he's wearing contacts, he had early stage -- that he had dry eye syndrome so he probably came in and was treated for that problem, and then it was time for his annual exam.
Q. In September?
A. Which would be the complete exam, yeah. So

Page 71

he's also seeing an optometrist at the same time. So my exam has -- so his -- his optical difficulties, the glasses or the contacts he has to wear, I have to deal with the medical aspect, and I would have done a dilated exam. It's a full exam.
Q. In September?
A. Yes.
Q. Which would not have been done in April?
A. It's possible, but it worked either way. So we are -- we are -- if it's -- we have to populate all these fields for the case of -- for the cause of insurance. So sometimes it's just, you know, filling stuff mindlessly on here. It doesn't really have any meaning other than I'm looking at the surface of his eye, checking his vision, and I -- and I'd look into his eye to see how the retina looks.
We have an instrument called an OCT -- occasionally order an OCT that gives me a better objective evaluation of his macula, but he had two problems that we're dealing with. He needed to wear contacts. He had dry eye coming from the fact that he had LASIK some years ago. So someone who's had LASIK generally has dry eye problems for the rest of their life to some extent. So this is a long time ago but ...
Q. And all -- I guess what I'm just trying to

Page 72

understand is that he had a visit in April of 2022 and then -- and that's described as a follow-up, and then he has another visit in September of 2022 which is described as a follow-up. I'm trying to understand whether or not there was some special reason for the September visit compared to the April visit based on how you --
A. But --
Q. -- I'm sorry -- based on how you've documented kind of what his condition and his issue is here.
A. Okay. So you have to understand there's a scribe that's filling these things in, the woman that goes in and takes his history and just gives the reason for the -- for the visit, and some of the definitions have to do with insurance. So certain terms they use so if this is a follow-up for his dry eye, that could be the reason I was following him up, but it was also convenient to do a dilated exam, say.
Q. Okay. Okay.
A. So it's not -- it wasn't like there was a problem, a vision problem. It doesn't seem to be indicated here. Moderate myopia, dry eye syndrome. You know, he had started -- he was taking a drop called Refresh Relieva three times a day so I would be checking on how he was doing with the new lubrication.

Page 73

MS. WILLIAMS: Okay. And then -- I'm going to stop sharing here. I'm going to show you another document -- I'm sorry -- which will be marked as Exhibit 6, I believe.
(Exhibit No. 6 was marked for identification.)
BY MS. WILLIAMS:
Q. Okay. And I'm showing you what's marked as CP Chem 914 to 19. We have a -- this one is dated November 18, 2022. Again, so you had just seen him in September. That was indicated as a follow-up. We have this also noted as a follow-up.
Can you explain from the notes that you have here why you were seeing him just, like, two months later from the most recent visit which was five months from the visit before that?
A. Well, that had a lot to do with dry eye. Dry eye is a very difficult problem to resolve, and the fact that he had so much LASIK in the past, his dry eye -- his eyes were drying rapidly, more rapidly than usual. So I would probably have him use different types of drops to see which one was most effective for his dry eye.
Q. Okay. And so based on what I've seen here, I guess at least in 2022, you saw Mr. Jones approximately three times, correct?

Page 74

A. Again, probably for his dry eye, yes. That's not -- that's not uncommon at all.
Q. Okay. And do you recall during these -- any of these three visits in April, September, or November -- and I understand if you don't, but I'm just trying to under -- you know, kind of get an understanding here.
In April 2022, September 2022, or November 2022, do you have a specific recollection of speaking to Mr. Jones about his work at Chevron Phillips Chemical during any of those visits?
A. Only as regards nighttime drying, not so much his vision. His vision was 20/30 on that visit which is a line better than average.
Q. Okay. And along those lines, the conversation that you had with Mr. Jones about vision issues, whatever they may have been at work, that only occurred on one occasion in 2022; is that correct?
A. I can't really say yes or no because I wouldn't -- I don't remember that far back. I know we had several discussions about his dry eye and we're trying to solve that problem. He would -- I don't think he mentioned to me that he was having trouble with his work environment, so I can't really answer your questions properly. This information we put in the EMR. It's just purely for the sake of insurance so it's not a

Page 75

total and complete exam where I sit there and ask him 20 things to -- that are -- have to do with all his problems. I probably was dealing just with the dry eye which is a big deal.
Q. Okay. If -- and I know you mentioned it earlier, and I know you said that you don't have a specific understanding of exactly what his work environment is, that you described that you at least understand that it's a dark room?
A. Correct.
Q. If I share with you that it is a dark room that has no windows --
A. I think I knew that.
Q. Okay. -- and that is -- you know, has the computer boards, a desk and table, some lighting in various locations, can you please explain what difference would it make if Mr. Jones was working at night in that environment versus in the day in that environment?
A. Okay. We've gone over this before, but the dry eye is a major factor in the evening; and if he's in a room where it's lit and he doesn't have to adapt so much to a dark room and bright lights, you know, his retina is adapted to dark and then there's very bright light, that's a problem. In the daytime where his retina is

Page 76

more light adapted, then the difference between their lighting on the board and the environment are less.
Q. Okay. And so when Mr. Jones came to you and said he didn't want to make -- work in that environment at night, does it make sense to you that he would work better in that environment in the daytime?
A. That's what he told me. So that letter that we referenced earlier was his request of me to say that he would like to change to a better -- a more well lit environment.
Q. And I guess that's what I'm trying to understand. More well lit in what respect because it's a dark room without windows with computer board so well lit in what respect?
A. I would assume that the daytime environment is brighter somehow.
Q. So it was your understanding that the daytime environment in his control room without windows was brighter than it was at night?
A. Well, I don't know about the source of the light. He seemed to indicate that there was more light in the daytime environment.
Q. Okay.
A. You know, he didn't get technical about it. He just gave that to me, and I just assumed there were --

Page 77

there was more light for some reason. Maybe --
Q. But if it has the same light in the daytime that it has at the night -- in the nighttime, do you have an explanation as to why him working in the daytime versus working at night would have made a difference?
A. I assumed there was more light so, no, I don't know why he would have -- you know, just -- if there was more light which I assumed that's what he was telling me in the daytime environment there was more light. So, again, I don't know the technical details of his workplace. So he -- that's what he -- he told me that, that was what I wrote the letter about because he felt like he'd perform better in a better lit environment, and I assumed that was because it was daylight.
Q. If there isn't more light in that room in the daytime, do you have an explanation as to how moving him -- your recommendation moving him to night to day would have helped him?
A. The only other thing would be the dry eye. I don't know if they're not allowed to wear contact lenses in the workspace. It's possible, and our eyes naturally set. Our eyes have, you know, vision that changes according to the room or the day controlled by some things in the brain so that our brains expect for us to go to bed and night and to renew some -- you know, some

chemicals in the retina and so forth. And that would -- that could have been a physiological difference so you know --

Q. You addressed -- I'm sorry.

A. -- you understand that we have circadian rhythms so that our brains are set to understand daytime, nighttime. So there are -- so physiologic elements that change in the nighttime hours.

Q. With respect to his dry eye, how was -- how was his dry eye being treated?

A. Lubricating drops.

Q. In 2002? I'm sorry.

A. Lubricating drops, frequent use of lubricating drops.

Q. How -- how often would he have had to use the drops?

A. So my mandate is morning, noon, night, and then as much you feel the need in between those. He also was wearing contacts so that has an effect. So I would have ordered him to use the lubricating drops frequently if wearing contacts.

Q. Okay. And so --

A. Contacts are like -- contacts are like sponges. They pull water off the cornea and evaporates it faster.

Q. Okay. And so as far as addressing the dry eye,



he had a prescription from you where he was basically supposed to use that morning, noon, and night and as needed to address the dry eye?

A. Right. It's the over-counter drop, but that's instruction I give all the people that I see with dry eye so ...

Q. Did he ever indicate to you in this time frame that the eye drops were not helping him?

A. No. The contrary. He said when I remember to use the drops, I see better so -- but I got the impression that -- it's in the back of my -- tingling in the back of my brain that there was some reason he couldn't bring the drops into the workspace.

Q. You think that's what he may have told you?

A. Yeah. I think that's possible he said something like that.

Q. Okay. And by workspace, what do you mean?

A. Where he has the board, the heater board or whatever it's called, the situation in which he works.

Q. But not that he couldn't bring them to work generally?

A. The impression that I got is he couldn't bring them into that -- that place where he's the operator. And that's a -- this is a foggy recollection, but I kind of think that was the gist of what I got.



MS. WILLIAMS: Okay. I know we've been going for a bit. If -- if -- would it be okay if we take a break? I'm gonna check my notes and see if I have any follow-up and then maybe just five minutes or so? Is that okay?

THE WITNESS: Sure.

MR. SUDDUTH: That's fine.

THE VIDEOGRAPHER: We are now off the record. The time is 10:46 a.m. Central.

(Break was taken.)

THE VIDEOGRAPHER: We are now on the record. The time is 10:51 a.m. Central Time.

BY MS. WILLIAMS:

Q. Dr. Hart, I just have one -- I think one follow-up question that I wanted to address or ask you. Do you recall Mr. Jones ever explaining or sharing with you that he was having migraines in connection with his work at Chevron Phillips Chemical?

A. I don't have that recorded in my chart. He may have mentioned it to me. I don't know that the word migraine is especially proper. He can certainly have headaches from trying to focus. You know, there are -- there are squint -- what are called squinter's headaches, and so I'm just trying --

Q. Did he ever -- I'm sorry.



A. So we didn't go down that path very far. That didn't seem to be a very relevant symptom to me. Our conversations all rotated around the vision at night and the vision in the day. And he was an athlete, you know, and he wanted the -- the original reason I fixed his eyes, he was still, you know, active in athletic endeavors. And so he didn't want to wear glasses to where he'd have -- with my trial to get him out of glasses.

And the main points we should be looking at here is whether his vision is -- the macula in the back of his eye, the physiologic state of his eye is the problem, and the answer is yes. All the other stuff, you know, his myopia and his glasses and all that don't have as much to bear on this as the fact that there's just a limit of how well his eyes accommodate to the bright -- changes in brightness because the macula which is the active center of our eyes is sensitive to light very much so.

And, also, if there are no photoreceptors to recover quickly, if the receptors are fewer, you accommodate, you react or rebuild to a much slower degree because there's not enough photoreceptors to take up the difference.

Q. And to be clear, if Mr. Jones had indicated to

Page 82

you that he was having migraines or headaches in connection with performing his work at Chevron Phillips Chemical, is that something that generally you would have noted in your records?

**A. Well, I don't think it would've been an eye problem so I would've attributed it to probably stress, and, then, that's not my place to comment on the stress state.**

Q. Okay. And you don't recall him ever bringing that up in connection with any of the issues he said he was having at Chevron Phillips Chemical; is that right?

**A. That doesn't mean he didn't say it, but I don't remember it. It doesn't seem to have been a major factor or I would have, you know, gone down that road with him. Migraines can be a migraine -- you know, a headache or it can be the sign of a greater disease, and if it had been something that was ongoing and I thought it was dangerous, I would've referred him to a neurologist.**

Q. But that never happened, correct?

**A. No. So people complain -- headaches are the commonest symptom. Don't forget that issue. Every human being has headaches so his headaches could have been from trying to focus with the so-called squinter's headaches, and a resolution to that would, I guess, be the resolution to his whole problem, the light.**

Page 83

MS. WILLIAMS: Okay. No further questions at this time.

REDIRECT EXAMINATION

BY MR. SUDDUTH:

Q. Okay. Doctor, there's lots to unpack there, and so I want to start because I think a lot of confusion has been created. Let's start going with his night shift issue, okay?

**A. Okay.**

Q. First of all, since you've been asked to speculate about his working environment, let's -- let me ask you. I'm going to tell you some things.

First of all, do you have any reason or did you know that the working environment he was training on in the heater board was an inside job, meaning it was indoors with these heater board consoles? Did you know that?

**A. I knew that.**

Q. All right. Furthermore, did you know that in that inside room, the room was dark, by all accounts, dark?

**A. Yes. He so stated.**

Q. Okay. In fact, in your letter which I've gone over with you, and Counsel has gone over with you, in

Page 84

your letter, that seems to be the crux of the concerns was just that he needed more light?

**A. Correct. And for the reasons we discussed, the physiology of his eye.**

Q. Right. Further understanding -- I don't know if you knew this or not -- in the room that he's in, there is no natural light; there's no windows. If it's 2 p.m. versus 2 a.m., it looks and feels the same in that room. Did you know that?

**A. Okay. I didn't know there were no windows. I didn't really think about it because he -- he kept mentioning it was dark at the time that he worked which was night shift.**

Q. Right. So what I'm trying to figure out is I think that there was some kind of miscommunication because what he relayed to you was a desire for more light, and somehow that got equated to night shift versus day shift.

**A. Correct.**

Q. Okay. His request for more light, no matter where he was working in that plant remained consistent; is that right?

**A. As far as I know, yes. That was his main complaint was he needed more light. Now, it's very possible I assumed that out of the darkness into the light.**

Page 85

Q. Yeah, right. And, in fact, you know, this whole miscommunication we've had today about night shift and day shift and light and dark and trying to equate those two, Chevron Phillips could have picked up the phone and called and told you, you know, Doctor, he works in a room where whether it's day shift or night shift, it doesn't change the lightness, why are you asking us, Dr. Hart, to move him from night shift? They could have called you and told you that and had that conversation with you to clear up the miscommunication, but they never did that, did they?

**A. No, they didn't, and I'm surprised because definitely the opinion I was working under was that there was a dark room part of his work, and there was a light room part of his work that he wanted to be transferred to the lighter part of the place where he worked.**

Q. Okay. So, then, would it surprise you, then, if I told you there was no lighter room; it was just a dark room?

**A. Yes, that would surprise me because my -- what I had in mind was there's a room that was better lit that he could work at -- I assume -- because there would be windows, but that was my error.**

Q. And so further to that point, if you have a room that's not affected by natural light, I can only assume this but, you know, you're the expert so you tell me. The way in which you would brighten that space if you can't brighten it by natural light would be to brighten it by artificial light; is that true?

**A. Correct, correct. As I've explained before, what you want is not so much contrast between total dark and then the bright lights that he has to work with. If it's moderately well lit, then his retina is somewhat light adapted.**

Q. And so, in fact, I want to show you what the actual accommodation is. After the letter was sent by you and they engaged in discussions back and forth, I want you to see what Mr. Jones actually requested because it would suggest that this whole request of him was about night shift.

I want you to see an e-mail which I'm going to attach as an exhibit to this deposition. Bates labeled 741 will be the next exhibit to this deposition, and let's take a look at it together.

**A. Okay.**

(Exhibit No. 7 was marked for identification.)

BY MR. SUDDUTH:

Q. You send the letter. That initiates the



interactive process, and here's the e-mail that Mr. Jones through joneswf@cpchem.com, writes, quote, Good morning. Really, all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine. The only light that works properly is the one over the computer. The other two seem to be broken. Thanks. End quote.

**A. Okay.**

Q. So is this the first you're hearing of what his specific request was to CP Chem?

**A. Yes. And, of course, there were a lot of assumptions on my part.**

Q. Right. So what he seems to be doing here is he's requested that the artificial lighting in the room that he's in be enhanced so that the light is greater.

**A. Which makes sense, yes.**

Q. Yes. Which based upon everything you testified to today, if we reduce those contrasts, if we increase that lighting, that should help?

**A. Yes. And I think what he's asking for in his e-mail. He understands that if there's enough light, then his light adaptation stays more stable.**

Q. In fact, did you know that during the time period that he was training on this heater board, in the



heater board, one of the things that was done was he was put on straight days during this time period. So, actually, while he was training, he was on days. Did you know that?

**A. Okay. I did -- I sort of knew that now that you mention it.**

Q. Okay. It might be one of the reasons why he told Chevron Phillips that he didn't need the night shift accommodation anymore because he was on day shift, correct?

**A. Right. So that's -- that's where I got the daylight, night -- poor night light notion.**

Q. Yeah, yeah. Okay. I want you to clear up that confusion because I think that it's important. I want you to know or I want you to see from this letter that did you ever know -- you see the accommodation on here that was requested.

Do you know whether or not in the course of all the tests and all the time that he was ever working on the heater board, do you know if that accommodation was ever fulfilled by CP Chem?

**A. He -- no, no --**

MS. WILLIAMS: Objection; calls for speculation. You can answer.

**A. Okay. No, because, again, my assumption was**



**the dark room was bad and the light room was good. That's -- it's as simple as that. I don't think he ever told me that they tried to improve the lighting or didn't, although I have a sense that he did say that they hadn't improved the lighting.**

BY MR. SUDDUTH:

Q. I don't want you to speculate so I'm going to show to you -- I'll go to 811. This is in the discovery so let's take a look at it together. This is the human resources associate at 811 who's reaching out to somebody who's working over Warren Jones saying, Jud, do you know if the lighting above the heater board has been fixed? If you can, could you also provide the date the work order was put in for this? Jud then reaches out to someone else, Bubba Vandevender, at CP Chem and says is this something you can check on?

You'll see as we continue in this path, Bubba Vandevender, this is in December by the way now, December 2022 --

**A. Okay.**

Q. -- can we get these lights repaired on the heater board area? Limited lights in the area make it hard to see in the area. Bubba Van, okay?

Finally, December 12, 2022, here's Judson who goes back to HR, Chelse Cisneros, quote, Chelse, this

Page 90

has not gotten repaired yet, end quote.
So as of December in 2022, the lighting that was requested by Mr. Jones to be enhanced in the area had not been fixed with limited lighting in the area. How does that impact Mr. Jones's vision or ability to see?
MS. WILLIAMS: Objection; calls for speculation. You can see.
**A. No, it's quite clear. If there's a great contrast of darkness and the bright LED lights, he's not -- he's dark adapted, and so the bright light would be as if you were coming from the sunlight into the darkness. So a consistent lighting over what he's doing, it would be much less contrast between the environmental light and the light on the boards that he's using.**
BY MR. SUDDUTH:
Q. Understood. I want to go now to the next area that was covered with you by Counsel which was this idea of moderate myopia. They were asking you a lot of questions about you mentioning him having extremely high myopia and trying to confirm with you that in 2022, his myopia was moderate.
What I want to ask about that is: At a moderate myopia level in 2022, how is Mr. Jones affected

Page 91

by a dark space versus, say, someone who doesn't suffer with his disability?
**A. Okay. So moderate myopia now has been defined by the amount of power it takes for him to see his best. He still has the elongated eye, he still has macular deterioration because of the elongated eye, so that was his birth defect if you want to look at it that way. So the moderate thing, that has no bearing on the -- on the issue. The issue is the functioning of his macula inside of his eye.**
Q. And was the functioning of his macula inside of his eye as of 2022, was that still less than the normal population or in any way considered to be disabled?
**A. No. In fact, in 2022, he's seeing 20/30 in both eyes which is essentially normal.**
Q. Okay. So --
**A. Now, that -- that -- that's -- you know, using black letters on a white background with me doing his refraction and obtaining the best optical correction. The trouble with the macula is a different question as regards bright light and darkness.**
Q. I see. Okay. I think -- I think I'm understanding. Okay.
**A. But you can't really put those together. Defining the myopia has nothing to do with his problem.**

Page 92

**His problem is an eye that was elongated, a problem with which he was born, and the deterioration that comes because of the high myopia, the elongation of the eye. That literally is stretched out like a piece of Saran Wrap.**
Q. Gotcha. So let me then try to explain it this way, and then you can correct me if I'm wrong. First, I want to start with the refraction because I go to the eye doctor too, and so when I'm at the eye doctor, you're right, it's optimal conditions. I'm looking at a -- inside of a light room or a dark room, whatever they prefer.
**A. Yeah.**
Q. Now I'm looking at the screen, I'm looking at the letters, and I'm trying to tell what the letters are. Is it an accurate statement to say that during the refraction, during whenever you're reading 20/30, that the conditions are optimal for Mr. Jones? Is that a fair --
**A. Yeah. We -- we have a darkened room and a high contrast target. We want to maximize the environment for the vision so that if it's poor under those conditions, we know there's something physiologically wrong.**
Q. Okay. Despite his reading 20/30 in an optimal

Page 93

environment, it sounds like because of his birth defect conditions, he's still going to struggle beyond the normal population in that dark room with the lit lights. Is that a fair summary?
**A. That is fair because his macula is not as efficient as yours or my maculas. They're -- they're deteriorated or stretched out because of the elongation of his eye. So there is a term "myopic macular degeneration."**
Q. Okay. Now, the other thing I want to cover with you was I think just some confusion created about a timeline, and I don't want just the mistake about dates to create some kind of problem here.
Your letter -- and I'll go back, and I'll pull this up just so we can all be on the same page, but I want to show you Bates label 764. I believe it's already in evidence, but we'll take a look at it.
Here's your letter just for reference, point, and I'll scroll back up to 763 and 762. And, here, you'll see your letter is being e-mailed to Mr. Jones, and Mr. Jones is forwarding your letter on to his team, his people, over at CP Chem, Chevron Phillips Chemical. He's doing that September 19th of 2022.
So would you agree with me or can we agree that your letter must have been written sometime prior to

September 19th of 2022 in order for him to send it on September 19th of 2022?

A. That'll be correct.

Q. Okay. You were asked -- and here's where the confusion came from. You were asked by Counsel, you know, when was the first time Warren Jones brought up these light concerns and light issues over at the workplace, and you said, well, it was our last visit which was in '24.

Here's what I want to know, clarify: How in the heck could you have written a letter about concerns in the workplace in 2022 if he didn't tell you about it until 2024, or are our dates wrong here?

**A. So if this letter is from 2022, I think it would've been a recurring problem with him, you know, so that I was used to him saying that he's having trouble, light, dark. It made sense because of his physiology. This wasn't something new so -- so, then, he said he was having a little more trouble at some point. 2022 may be it, and he had asked me to write a letter, he, himself. No one else did, and I did to my best ability to describe the problem.**

Q. Okay. So, then, would it be fair to say that it's very possible that he could have come to you prior to you writing that letter to describe those problems in a working environment?

**A. Correct. It could very well be that he wasn't quite as vociferous about it, he wasn't causing as much trouble earlier in the state of things, but as he aged, it became a little bit more of a problem. That's an assumption we can make.**



Q. Understood. Doctor, the final thing I had for you was, because I did make a note of it after we wrapped up, you said you have an editorial comment. I want to give you the opportunity to say that. What is your comment, sir?

**A. Well, that you're focus -- everybody is focusing on the idea of moderate myopia and so forth. The whole problem is the fact that his macula is not as able to change between dark and light as yours or mine is because he has an insufficient number of photoreceptors.**

**Every time light hits the photoreceptor, that photoreceptor goes dark. It has to be -- it goes down in what's called a pigment epithelium where the chemicals by which we see are renewed, so there's always a turnover of photoreceptors. If we have enough photoreceptors, we don't notice it. If we have few photoreceptors, there's a little more prolonged recovery from light.**



Q. And I just have one follow-up question based upon that clarification of what the focus should be.

If that is the focus, and the focus is on the macula and the ability to change between the dark and the light because of the photoreceptors, how does that struggle -- or how does that struggle with the macula that you just defined in layman's terms, please, sir? How specifically does that affect someone like Warren Jones?

**A. So his ability to recover from bright light, again, when you walk in from the sunlight into a dark room, it takes a while for any human being's eyes to adapt to the dark.**

**So his dark adaptation may have been good for a dark room, but then a bright light would be difficult for him to respond to. Like the -- I understand the LED is on the heater board. Maybe that -- they're so bright that that -- his dark accommodation or dark adjustment would have been throwing him off.**

MR. SUDDUTH: Makes sense. Okay. Well, Doctor, thank you for your time. That's all I have for you.

**THE WITNESS: Okay.**

MS. WILLIAMS: I have just a few follow-up questions.



RECROSS EXAMINATION

BY MS. WILLIAMS:

Q. Mr. Sudduth asked you whether or not Chevron Phillips Chemical called you after you sent the letter in September of 2022, and I think you indicated that you were surprised that you didn't hear from them asking for --

**A. Well, it's -- it's the first I've heard of it. If somebody called me, I don't remember it.**

Q. Right. And the question that I have for you is: Mr. Jones specifically asked you to write that letter, correct?

**A. He did.**

Q. And he knew that you were asking for him to be moved from night shift to day shift when you sent that letter, correct?

**A. Correct. And my understanding was that in the day shift, there was more light. It's as simple as that.**

Q. And, in fact, after you sent that letter which you initially sent it directly to Mr. Jones, right?

**A. Correct.**

Q. After you sent that letter, did Mr. Jones ever come back to you and say, Dr. Hart, I'm sorry, this isn't right; I'm not really asking to move from night

shift to day shift; I'm asking for something else with respect to light. Did he ever come back to you and say that this isn't what he wanted?

**A. Not that I remember.**

Q. Okay. The other question that I have is that I think you indicated that there was some point where you think that you were aware that Mr. Jones was on straight days when he was explaining his issues to you; is that right?

**A. As well as I remember, yes.**

Q. Okay. Was that your understanding at the time -- at what point do you think that you learned that Mr. Jones was on straight days?

**A. I think that's what he described to me because I've been taking care of him for a long time, you know, so there were probably discussions about it -- about that. I don't think he was having that much trouble when he was on days. When he started going on nights is when he started complaining.**

Q. When you wrote the letter, were you aware that he had been working on days?

**A. No. I mean, I didn't really know what his work schedule was. I know he was still just complaining about light always, just light.**

Q. At what point in time do you think that you



learned that he was working what you described as straight days?

**A. So early in his career.**

Q. Okay. When you wrote the letter early in his career, meaning prior to your letter in September 2022?

**A. I would think so. Again, I've been taking care for him a long time.**

Q. Okay. So it was your understanding that he had been working straight days?

**A. That's what I assumed and assumed that he'd been shifted to having some night work, having to do with night shifts. That's an assumption I made. I don't know that he told me that but he -- because he was complaining about working in a dark room.**

Q. Right. But if you had that understanding that he was working in a dark room, that he was working on straight days, why did you also not include in your letter to the company that there should be some adjustments made to the lighting for Mr. Jones?

**A. I think that's what I was asking for because I was assume --**

Q. By moving him from night to day?

**A. Right. I was assuming and I could -- it could've been a wrong assumption. I was assuming that working in a better lit room, which would be daylight,**



**would be easier for him.**

MS. WILLIAMS: Okay. No further questions.

MR. SUDDUTH: Okay. And I have no follow-ups. So, Doctor, the ping-pong is finally done and you are finally now done. The only thing I have to go over with you, sir, is pursuant to Louisiana law, as you probably well know, you've been through this rigamarole many times, you have the right to read and sign your deposition under Louisiana law. You can waive that right, or you can exercise that right. The choice is totally yours.

The reading and signing just as a refresh to you, all that means is you're not really changing your testimony for substance. You're going through to make sure that what you said got properly transcribed down so, you know, grammar, spelling, that kind of thing. I don't want to suggest to you that you can't change substance because you can.

For example, if you read your deposition and you see a yes and you say, wait a minute, what the heck was I thinking, the answer is no, well, if you make a change like that, it's a big change. And it gives us the right to reopen the deposition and ask you questions about that change. So you can make a change in substance. It just has some caveats that



come with it but, generally, most people are reviewing their depo for just spellings and grammar and that kind of thing. But, again, the choice is totally yours. Now that I've --

**THE WITNESS: I always ask to receive the deposition to sign it because there can be things that were misstated.**

MR. SUDDUTH: Very good. So we will do the read and sign. Where would you like your deposition sent to you, sir?

**THE WITNESS: To my office address.**

MR. SUDDUTH: And is that the address that you gave us at the beginning of your deposition?

**THE WITNESS: Yeah. 1920 West Sale Road.**

MR. SUDDUTH: Perfect, perfect. Okay. Well, Doctor, that's all I think we have.

Madam Court Reporter, do you have any spellings or things that you need? Or we can probably do this off the record. So, Mr. Videographer, if you want to read us off the record.

THE VIDEOGRAPHER: Before we go off the record, we do need to confirm transcript and video orders on the record.

We'll start with you, Mr. Sudduth. You'll receive a transcript and a standard video edit as

part of your videographer service today. Would you like to purchase anything in addition such as the synced video?

MR. SUDDUTH: No. The standard is perfectly fine. Thank you.

THE VIDEOGRAPHER: Very good. And, Ms. Williams, will you be purchasing a transcript and/or video from us too? You're muted, Ms. Williams.

MS. WILLIAMS: Sorry about that. Yes to both transcript and video, and standard is fine.

THE VIDEOGRAPHER: Very good. And before we do our read-off, Mr. Sudduth, Exhibit CP Chem 811 and CP Chem 764, were you marking those as exhibits?

MR. SUDDUTH: Yes. I just forgot where we were so I didn't mark them while I was doing my examination, but they will be the next two in line, whatever they were.

THE VIDEOGRAPHER: Very good. So Exhibit 8 will be CP Chem 811 and Exhibit 9 will be CP Chem 764.

MR. SUDDUTH: Fair enough.

(Exhibits Nos. 8 and 9 were marked for identification.)

THE VIDEOGRAPHER: Stand by for our official



read-off.

This concludes the deposition of William B. Hart, Medical Doctor, for Warren F. Jones versus Chevron Phillips Chemical Company LP. We are now off the record. The time is 11:16 a.m. Central Time.

(The deposition concluded at 11:16 a.m. CST.)

\- - - - -



ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Jones vs. Chevron Phillips Chemical Co. LP
Date: November 7, 2025
Deponent: William B. Hart, M.D.

| Page Line | Now Reads | Should Read | Reason |
|---|---|---|---|
| | | | |



VERIFICATION OF DEPONENT

STATE OF LOUISIANA )
PARISH OF CALCASIEU )

I, WILLIAM B. HART, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

SIGNED this ______ day of ___________, 2025.

___________________________
WILLIAM B. HART, M.D.

REPORTER'S CERTIFICATION

I, Margaret Lowe, Registered Professional Reporter and Notary Public in and for the State of Florida, hereby certify to the following:

That the witness, WILLIAM B. HART, M.D., was duly sworn by the officer and that the transcript of the videotaped deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached errata sheet contains any changes and the reasons therefor;

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

IN WITNESS WHEREOF, I have this date subscribed my name this 23rd day of November, 2025.

Margaret Lowe
Margaret Lowe, RPR
Registered Professional Reporter

# Exhibit C

# Deposition Transcript

Case Number: 1:24-cv-00350
Date: November 3, 2025

In the matter of:

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL CO LP

# JAMES M. STANTON, M.D.

CERTIFIED COPY

Reported by:
Margaret Lowe

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| WARREN F. JONES, Plaintiff, | ) CIVIL ACTION NO.: 1:24-cv-00350 |
| vs. | ) |
| CHEVRON PHILLIPS CHEMICAL COMPANY LP, Defendant. | ) |

-----------------------------------

VIDEOTAPED DEPOSITION OF

JAMES M. STANTON, M.D.

VIA VIDEO CONFERENCE

MONDAY, NOVEMBER 3, 2025

-----------------------------------

VIDEOTAPED DEPOSITION OF JAMES M. STANTON, M.D., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on Monday, November 3, 2025, from 9:02 a.m. CST to 11:02 a.m. CST, before Margaret Lowe, Registered Professional Reporter and Notary Public, in and for the State of Florida, reported remotely by machine shorthand pursuant to the Federal Rules of Civil Procedure.

REMOTE APPEARANCES

On behalf of the Plaintiff:
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, LA 70601
337-480-0101
James@saa.legal
BY: JAMES E. SUDDUTH, III, ESQ.

On behalf of the Defendant:
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
500 Dallas Street, Suite 2100
Houston, TX 77002
713-655-0855
Marlene.williams@ogletree.com
BY: MARLENE C. WILLIAMS, ESQ.
BROOKE JONES, ESQ.

Also Present:
Stephanie John, Esq.
Chevron Phillips Chemical Co.

Austin Matthews
Milton Washington, Legal Videographer



INDEX


| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulations | 4 |
| JAMES M. STANTON, M.D. | |
| Direct Examination by Mr. Sudduth | 5 |
| Cross-examination by Ms. Williams | 52 |
| Redirect Examination by Mr. Sudduth | 66 |
| Errata Sheet | 71 |
| Verification of Deponent | 72 |
| Reporter's Certificate | 73 |

EXHIBITS

| Number | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 9 |
| Exhibit 2 | E-mails re Visual Acuity for Employee Bates 743-744 | 27 |
| Exhibit 3 | Letter from the Hart Eye Center Bates 764-765 | 31 |
| Exhibit 4 | E-mails re Warren Jones Bates 809-810 | 45 |


Reporter's Note: Exhibit 1 including cover letter, subpoena, service return, affidavit of service and Exhibit 2 retained by Attorney Sudduth.



REPORTED REMOTELY FROM ORANGE COUNTY, FLORIDA
MONDAY, NOVEMBER 3, 2025, 9:02 A.M. CST
\- - - - - -

THE VIDEOGRAPHER: Good morning. We are on the record at 9:02 a.m. Central Time on November 3, 2025, to begin the deposition of James M. Stanton, Medical Doctor, in the matter of Warren F. Jones vs. Chevron Phillips Chemical Company LP. The venue of this case is in the United States District Court for the Eastern District of Texas, Beaumont Division. The case number is 1:24-cv-00350.

This deposition is taking place via Zoom. The lead videographer is Milton Washington, here on behalf of Steno, whose business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent.

MR. SUDDUTH: Yes. James Sudduth on behalf of the Plaintiff, Mr. Warren Jones.

MS. WILLIAMS: Marlene Williams on behalf of Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, Counsel. Will the reporter please identify yourself and swear in the witness.

THE COURT REPORTER: Margaret Lowe, Registered



Professional Reporter.

The parties and their counsel agree that while I am a licensed notary and court reporter, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me. If any party has an objection to this manner of reporting, please state so now.

Hearing none, we will proceed.

Dr. Stanton, raise your right hand, please.

Do you swear or affirm that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

THEREUPON,

JAMES STANTON, M.D.,

having been first duly sworn, was examined and testified as follows:

**THE WITNESS: I do.**

DIRECT EXAMINATION

BY MR. SUDDUTH:

Q. Dr. Stanton, I know we met previously this morning before we got on the record but, once again, good morning, sir. Nice to meet you.

Let me ask you, Doctor: Have you ever been deposed before, meaning in a deposition like this?

**A. I have. I believe it's three or four times**

**over the space of quite a few years.**
Q. Okay, yeah. So you're fairly familiar with the process. Have you ever done a deposition like this, though, by Zoom?
**A. No, I have not.**
Q. Okay. The other ones have been in person. All right. So let me go over just a couple ground rules for you. I'll try to be brief about it because you've probably heard the spiel before, but some of this is applicable for you since this is your first time by Zoom.
But the first ground rule I'd like to go over applies no matter how you've done your depositions which is the oath you just took. I realize this can seem somewhat informal, Doctor, because I'm in my conference room, you're located in your neighborhood, we're not in a courtroom, we don't have a judge or jury sitting with us, so it can all seem rather informal. But the oath that you just took is the same oath as if you were in a court of law, and so all the same obligations to tell the truth, all the same penalties of perjury if you do not, all those attach here just like they would in a courtroom.
Do you understand that, sir?
**A. I do.**



Q. Okay. And are you okay with that?
**A. I am fine with that.**
Q. Very good. The next thing, Doctor, is to ask you to please verbalize your answers. It's really common to say things like uh-huh or uh-uh when you're answering a question. That happens a lot in conversation. The problem here, as you know, Doctor, is this deposition is being transcribed into a written format, and so it's really hard to accurately get from Madam Court Reporter exactly what you said with those kind of nods or uh-huhs and uh-uhs.
So whatever your answer is, sir, if it's yes, no, or maybe, whatever the answer is, please verbalize that out loud for me, okay?
**A. That's fine.**
Q. Thank you, sir. This part is important by Zoom which is talking over each other. This happens a lot in conversation too. You'll find it's very common in the course of us discussing things today where I might assume your answer is done, so I'll start asking you a question. Or you may understand where my question is going, so you begin to answer it. Well, in that situation, in both situations, at least us talking over each other, that's especially more problematic by Zoom because when we're talking over each other, Zoom will



actually cut off one of the speakers entirely so we don't hear anything that that person has to say.
So if you would, please, sir, though it is kind of tedious and sometimes you may know exactly where my question is headed, please let me finish it all the way out to its end before you start to answer, okay?
**A. Okay.**
Q. Thank you, sir. I think the final thing I'll go over with you before we jump into things is breaks. If you need one, sir, this is not a marathon, okay? So if you need a bathroom break or water, whatever the case is, just ask me, and we'll try to accommodate that for you.
My only request of you is this: If I have a question that's pending on the table for you to answer, please answer that question before you take any break that you desire, all right?
**A. Right.**
Q. Okay. Very good. Then, Doctor, do you have any logistical questions from me before I go further?
**A. I don't think so. Thank you.**
Q. Okay. Of course. All right. Well, then, Doctor, your full legal name and address for the record, please.
**A. It's James M. Stanton, M.D., 1542 Massey --**



**that's M-A-S-S-E-Y -- Manor Lane, Memphis, Tennessee 38120.**
MR. SUDDUTH: Okay. And for the record, I have here your notice of deposition which was a cover letter from my office which then included the notice of the deposition and in the subpoena to appear today, and you are here pursuant to that subpoena, November 3, 2025, at 9 a.m.
So I'm going to attach that entire copy, the whole package you received as well as the service return, the affidavit of service, attach all that as Exhibit 1 in globo and make it an exhibit to your deposition.
(Exhibit No. 1 was marked for identification.)
BY MR. SUDDUTH:
Q. Dr. Stanton, these documents that were served on you, they were served on you by a process server I'm guessing?
**A. That's correct.**
Q. Okay. When you got these documents and you saw the caption of the case, Warren Jones vs. Chevron Phillips Chemical Company, when you saw the name Warren James, did you recognize the name Warren Jones?
**A. I didn't immediately, but as I thought about it, it began to come back to me and so, yes, I do**

**recognize the name.**
Q. Okay. All right. So that's obviously what I'm going to spend a lot of time talking to you about today. Before I do, though, once you got these documents and you saw the name, I'm sure it was sort of out of the blue because you're now out in Memphis. As I understand it, you might be retired; is that right?
**A. That's correct. Mostly retired.**
Q. Mostly retired. Okay. So once you kind of got these documents dredging up this matter from a few years ago, did you look at any documents in preparation for your deposition today? Did you gather up or try to find any e-mails or records or things like that?
**A. I did not. I, of course, no longer have access to my Chevron Phillips records and e-mails. Ms. Jones of Ogletree briefly described the case to me, but that's all I had to go on.**
Q. Okay. So that was going to be my next question was that after you got these documents setting your deposition for today, you didn't look at any documents, but what about discussions? Did you have discussions with anybody about your deposition today?
**A. Just with Ms. Jones and Ms. Williams.**
Q. Okay. And did they show you any documents or show you any e-mails from --



**A. No, they did not.**
Q. -- this time period?
**A. No, they did not.**
Q. Okay. Was there anybody else that you discussed your -- your testimony with today aside from Ms. Williams and Ms. Jones?
**A. I mentioned it to my wife.**
Q. Okay. I would've expected something like that, yeah, yeah. Anybody else?
**A. I have a stepson here who is an attorney, and I didn't discuss it with him. My wife brought it up in his presence, and that was it.**
Q. Understood. Did Ms. Williams or Ms. Jones, did they initiate contact with you, or did you initiate contact with them?
**A. They initiated contact with me.**
Q. Okay. So, Doctor, since this is my only chance to get to know you at all or understand anything about your background absent a trial, let me just ask you briefly about your educational background. I don't need your whole CV, okay? I don't want to make you have to regurgitate all that but just briefly about your educational background, please, sir.
**A. Sure. I attended the University of Texas at Austin, graduated in 1974. My degrees were in chemistry**



**and biology. I then went to Baylor College of Medicine in Houston, graduated with an M.D. degree from Baylor in 19 -- oh, gosh, I misstated that. I graduated from UT Austin in 1970, entered Baylor, graduated from Baylor College of Medicine in 1974.**
Q. Okay. After Baylor College of Medicine, I'm sure you had a period of residency?
**A. I did. I did a residency at -- it was actually a first-year OB-GYN residency but the equivalent of a -- of a rotating internship at St. Joseph Hospital in Houston, Texas.**
Q. Now, obviously, I see from these documents and different e-mails that you may be included on that, at least for the time period that you worked at Chevron, you were titled medical director. You had your own Chevron Phillips e-mail address, you had a title with Chevron Phillips, so the first thing I want to do is kind of get some clarification on what your role was with Chevron Phillips.
Were you an independent contractor, or were you somebody that was working there full time?
**A. I was actually an independent contractor. I was -- Chevron Phillips had an arrangement with one of the major hospital health care systems in Houston, Memorial Hermann. And at some point in 2010 or early**



**'11, I was contacted by Memorial Hermann, and they informed me that they had a client, a relationship that was looking for a new medical director. And so I -- I was actually contracted by Memorial Hermann health care to Chevron Phillips at that point.**
Q. Okay. So with Memorial Hermann, were you a full-time employee at Memorial Hermann?
**A. No, not at the time. I was acquainted with one or more officials at Memorial Hermann and, as I say, they let me know that they had a client who was looking for a new medical director. I had been working in various clinics and practices over the years, and so that's what I was doing at that time.**
Q. Okay. So when you started -- I guess let me pin down my date here. When did you start as medical director with Chevron Phillips?
**A. That would've been in February of 2011.**
Q. And February 2011, that relationship was one that was through Memorial Hermann contracted you to CP Chem to be their medical director?
**A. That's correct.**
Q. Okay. Were you paid directly by CP Chem, or did CP Chem pay Memorial Hermann and then Memorial Hermann paid you?
**A. I was paid through Memorial Hermann, and my**

**understanding is that I presume Memorial Hermann billed CP Chem and CP Chem paid Memorial Hermann.**

Q. Gotcha. Okay. This particular role as medical director for CP Chem, was it over one site, numerous sites? Can you kind of describe the scope for me of this role?

**A. Yes. It was actually kind of a, I guess, hybrid. I was plant physician for one of the CP Chem plants, which is the Pasadena plant, and split my time between Pasadena and CP Chem headquarters in The Woodlands. And from time to time, I would visit other CP Chem plants, locations.**

Q. Describe that for me in terms of your time commitment. I mean, how often were you in Pasadena versus at corporate in The Woodlands?

**A. That varied. It started out -- I believe it was two to three days a week at the Pasadena location and the other days at Woodlands headquarters.**

Q. How often would you make it out to other facilities, CP Chem facilities?

**A. I would say frequently but not on any set schedule. I would visit -- I would need from time to time to visit the Port Arthur plant or the Old Ocean plant south of Houston, occasionally, more distant plants like the performance site in -- in Nevada, Reno,**



**Nevada or the site in East Tennessee, Knoxville. And large -- large plant in -- near Baytown, Texas.**

Q. Right, yeah. So, I mean, were you the medical director for all of CP Chem at least for their North American facilities?

**A. That's -- that was my understanding, yes.**

Q. Did you have any sort of associate doctors or other doctors underneath you or nurses underneath you as part of this medical team?

**A. I did. There were a number of plant nurses, occupational health nurses, a few physician assistants, and at one time or another, there was a physician that was the physician at the Baytown plant that I was at least nominally over.**

Q. So is it fair to say -- I mean, these people, you would work with them, but did you have any direct sort of supervisory authority over them, meaning that you could fire them or discipline them, things like that?

**A. I never had authority to fire or hire but, you know, I certainly communicated with all of those people from time to time. And, again, I suppose I was considered nominally over -- overseeing the plant physicians and physician assistants, that sort of thing.**

Q. So I understand from what you've told me now,



they were -- they were paying Memorial Hermann, Memorial Hermann was paying you, you were their medical director, but what were the -- what were the -- and you described yourself as sort of an independent contractor. But in terms of the time commitments, it sounds like -- and forgive me for saying this, but it sounds like it was kind of a full-time job. I don't know that you -- but you tell me.

I mean, did you have any other private practice, other clinics that you ran in addition to your obligation to CP Chem, or once you took CP Chem, that was sort of your -- your full-time job?

**A. I would say it was -- it was pretty much a full-time job. It did -- the commitment did vary a little back prior to the COVID years. It was -- it was certainly a five-day-a-week job. It was understood that I had a few prior relationships that were minimal, took a little bit of time, so I did some work for what was at the time Sterling Chemical down in Texas City, although that ended fairly quickly.**

**I did a little work for, oh, gosh, Huntsman, just north of The Woodlands but, again, it was understood from the beginning that I would be allowed to do that. And as I say, that ended fairly -- fairly quickly.**



**When COVID occurred, I was asked to -- well, let me back up a little bit. Prior to COVID, at one point, I dropped down to three days a week; and then when COVID struck, I was asked to just be on full time in all of The Woodlands location.**

Q. So post-COVID, did any of your employment arrangement change, or did you remain an independent contractor at Memorial Hermann?

**A. The independent contractor status remained the same. I did drop back down to less than a full, you know, five days a week. I think it was three days a week at that point.**

Q. No, I'm sorry, I was asking post-COVID. Post-COVID, once COVID occurred, once it struck, it sounds like that's when they asked you to come on full time. So post-COVID, did your employment relationship with them change in any way, or did you remain an independent contractor?

**A. I remained an independent contractor.**

Q. Okay. But at that point in time, it sounds like it was no longer three days a week but five days a week?

**A. During COVID, I guess it would be 2020 through 2023 early, it was -- it was five days a week but, then, it reverted to approximately three days a week.**

Q. Okay. Do you remember --
**A. Post-COVID.**
Q. Gotcha. Understand. Do you remember when in '23 that was that it went back down from five days a week to three days a week?
**A. I don't recall the -- the exact date. It might even have been late '22, early '23.**
Q. During that time period of -- let's just say 2022 because a lot of what I'm going to talk about with you is in 2022, maybe barely stretching into the first part of '23 but largely '22.
In '22 with COVID, were there any restrictions on you in terms of travel into the plants just due to COVID? I don't know if you were restricted in any way or if you simply wore a mask; you were allowed to go wherever you wanted to go. I don't know. Tell me about that.
**A. It was the latter. I would say there were no specific restrictions, and I recall actually visiting one or another plant during COVID with just the usual precautions, you know, the social distancing, wearing a mask, that sort of thing.**
Q. Okay. Did the frequency of your visits to these different locations, Baytown, Port Arthur, those sorts of things, did the frequency of those visits



change at all during COVID?
**A. Visits to plants I don't believe changed. It was not a regular occurrence, but visits did occur.**
Q. So is it fair to say, then, these visits to the plants were, what, on an as-needed basis?
**A. Yes. I think that's fair to say.**
Q. Okay. On average, if you can just think back through your time with CP Chem, on an as-needed basis, how often would you have to go to Port Arthur? Is this as needed; is this once a month; is this once a quarter, once a week? What does that as needed look like?
**A. As best I recall, it was really just on an as-needed basis, and I was probably in the Port Arthur plant, gosh, maybe two or three times during this -- this time span.**
Q. Okay. When you say during this time span, what time span is that?
**A. Oh, I think that would be probably pre-COVID, then through COVID, so I guess maybe 2020 to 2023.**
Q. Okay. So when you took on this medical director role, what exactly was relayed to you as what your duties were going to be or what exactly the scope of your job was going to be?
**A. Well, as I said, it was partly to serve as the plant physician for the Pasadena plant but, then, also**



**to just basically, I suppose, provide whatever input, medical input, supervision for the company might be required at any of their locations.**
**I also was a certified physician director of the hearing conservation program so I dealt a lot with that. I actually made one trip overseas to their Saudi Arabia location and, as I mentioned, I had occasion to visit several of the domestic plants from time to time.**
Q. So it sounds like your primary role in which you were more directly involved in, I would say, would be in Pasadena as a plant physician, and then you served as the directorate role over every other facility; is that accurate?
**A. Well, I think so. In the earliest years, it was -- but that's hard for me to say. I think it was just basically a split between Pasadena and -- and headquarters, and then during the COVID years especially, it became predominantly headquarters.**
Q. Okay. So, then, as medical director, you've kind of given me a broader review, but let me push a bit on some specifics. I mean, let's say you have somebody out at the facility who is injured so we're going to have a workers' compensation claim.
Were you conducting for the company on behalf of the company any kind of analysis on the person's



injuries where they can get back to work, that kind of thing? Was workers' compensation something they asked you to do?
**A. Broadly speaking, I would say yes. It happened fairly frequently that I would converse with the human resources people at a particular plant or the safety people, and I -- it would be suggested or I would volunteer to make a visit to the plant, talk to the employee, examine the employee, that sort of thing.**
Q. Okay. So in a worker's context -- I'm sorry, in a workers' compensation context, is it fair to say that you had some review as an employee that might have been paper based, so medical record reviews and that sort of thing; but in other cases, you actually went physically to the employee and, you know, examine the employee yourself physically in person?
**A. Yes.**
Q. Okay. Did you ever give an opinion in any of those cases to CP Chem as to what kind of restrictions, whether light duty or not or whether the person could come back to work, and if they could, when they could come back to work, those kinds of opinions? Did you ever give those opinions to CP Chem?
**A. I'm sure that that occurred. You know, it would be common for me to discuss what restrictions**

**might be feasible, might be reasonable restrictions, but I was not the final decision-maker on that. That would be decided typically by those safety people, managers on the scene.**

Q. Same series of questions now but sort of a different area. We've talked about workers' compensation. If I said to you the Americans with Disabilities Act, otherwise known as the ADA or the Americans with Disabilities Act, are you familiar with that act or that piece of legislation?

**A. Yes, I am.**

Q. Okay. How did you become familiar with it?

**A. Well, it was a fairly frequent occurrence that situations would arise where the ADA had applicability, and so, again, we would certainly discuss, oh, whether we -- whether we might be looking at an ADA consideration and, again, what -- what measures or what accommodations might be reasonable, feasible for the company to take.**

Q. Right. So if I used the phrase such as the good faith interactive process, are you familiar with that process?

**A. I think so, yes, yes.**

Q. Okay. If I use the phrase such as a reasonable accommodation, are you familiar with that phrase?



**A. Oh, yes, absolutely.**

Q. Okay. If I use the phrase such as an undue burden, that's a phrase typically used. When you're looking at whether or not an accommodation is reasonable or not, a company will say, well, does this present an undue burden to us. So if I say undue burden, are you familiar with that phrase?

**A. Yes, I am.**

Q. How many times in the course of your career as a medical director of CP Chem do you think you engaged in that sort of ADA, good faith interactive process where you guys contemplated reasonable accommodations and that sort of thing? How many times did that occur?

**A. Well, I would say that was a quite frequent occurrence. Again, in discussions with safety directors or officials on the scene in plants or with HR persons, our plant nurses, that that sort of discussion would come up fairly frequently.**

Q. So help me even in broad strokes put a number on that. I mean, is this something that you did 10 times; you did it a hundred times through the course of your career? I mean, was it happening once a week, once a month? Any kind of parameters on that?

**A. I would say dozens and dozens of times, so fairly frequently.**



Q. Was there -- in those numerous or frequent times that you did the ADA process, describe for me the process of coming up with the accommodation. Would you proffer an accommodation to the company, or were you simply limited to giving medical advice and you left the accommodation up to -- to HR? Describe for me your role specifically in that process.

**A. Well, I'm sure it was a frequent occurrence that we would discuss accommodations and, you know, whether we were doing all that we could to identify feasible reasonable accommodations. And I'm rather sure I voiced opinions from time to time over what would be a reasonable accommodation or perhaps would not be, but the ultimate decision on that really was not part of my job.**

Q. Okay. Prior to your time becoming the medical director, you know, how would you have described your -- your career? I mean, were you a general practitioner kind of in private practice and you just saw patients with any number of things, or did you specialize in a particular area?

**A. Well, it varied over the years. For much of the time, I was doing general primary care or what might be referred to as family practice in one or another clinic or setting. Over time, I did get more involved**



**in the occupational medicine end and, actually, I became board-certified in occupational and environmental medicine. I believe it was back in 2007, and so I am board-certified in that -- that specialty or that area.**

Q. What about in the -- in the realm of optometry? Any specialization or practice area in that?

**A. No. I have no particular expertise in that and, of course, I'm not an ophthalmologist.**

Q. Is there a difference -- and this is more just general interest here. I don't know what the answer is to this, but with occupational medicine versus the dozens of ADA claims that you processed, I mean, is there a difference between processing, say, a broken knee which has a period of time that it's going to heal up versus, let's say, a genetic condition or somebody simply has a particular condition that there is no endgame here in sight, that you've had it since birth, you're not guaranteed to have it for the foreseeable future?

From a standpoint of occupational medicine or how you deal with that employee, is there any difference between those two kind of scenarios as you treat them and advise the company on those two kind of conditions?

**A. I don't think so. I mean, it's clearly there's a difference that you described. You know, one is**

**perhaps a lifelong, ongoing condition whereas others are going to be self-limited, but as far as simply considering whatever the -- the injury or the condition was, you know, I think it would be the same sequence of events. You know, one would discuss it and try to determine what accommodations might be made, might be reasonable, so on.**

Q. Okay. So with that in mind, let's just turn to Warren Jones. When was the first time that Warren Jones's issues or his case was brought to your attention for your opinion?

**A. I believe that would have been sometime in either late 2022 or at some point in 2023. Just in speaking with Brooke Jones, she refreshed my memory of the time frame. That's what I'm going on.**

Q. Gotcha. Because I have and, you know, for example, I can -- let me go ahead and just show it to you. Maybe it'll give us a barometer, it'll guide our discussions a little bit, so I'm going to go ahead and share my screen, Doctor.

If you'll go ahead and kind of stay focused on the screen in front of you and bear with me, but you should eventually be able to see my screen. Do you see it, sir?

**A. I do.**



Q. I'm going to scroll and don't worry, I'm going to zoom in. I know it's kind of small right now, but let me zoom in here. As I zoom in, does that help, sir? You're able to see it?

**A. Yes.**

MR. SUDDUTH: Okay. You let me know if you can't see it or if you need me to adjust this at all. I'll be happy to do so. But you'll hear me reference throughout the day a Bates label. What I'm highlighting down here, sir, that's a Bates label. That's just a label that lawyers place on documents. We have voluminous series of documents so we can track what documents are what.

So this is basically CP Chem 744, and I do believe that -- yeah, what I want to do is I want to include 743 and 744 in globo as Exhibit 2.

(Exhibit No. 2 was marked for identification.)

BY MR. SUDDUTH:

Q. So let's start, though, with 744, Doctor. So as you see with these e-mails, we have to sort of start at the bottom and work our way up. So let's start here, December 12, 2022, so the end of '22. Jeannie Johnson is sending an e-mail to Chelse Cisneros.

So let me stop and ask you: Jeannie Johnson, do you recognize that name?



**A. I do, yes.**

Q. Okay. Was Ms. Johnson one of your nurse practitioners that was part of your team?

**A. She was. As -- as it's indicated on the -- on her signature there, she was through another company called CareOnSite but -- but, yes, I remember her clearly.**

Q. Okay. What about Chelse Cisneros who is in HR? Any recollection of Ms. Cisneros?

**A. The name is familiar, but I don't really recall a specific interaction with her.**

Q. Okay.

**A. It might have occurred.**

Q. Sure. Okay. This is -- Jeannie Johnson is sending Chelse the results of a visual acuity for Warren Jones that she had requested with the results and in that -- those results are forwarded to you on the same day, December 12, 2022, at 1:04 p.m. to -- let's just make sure this e-mail address is right. It looks like S-T-A-N-Tjm@CPChem.com. Was that your e-mail address, sir?

**A. Yes, it was.**

Q. All right. And it says here, Dr. Stanton, below are the results for Warren Jones's visual acuity exam. Please let us know of your thoughts or



suggestions on how we should proceed.

The reason why I included, sir, Bates Label 743 is because I don't actually see a response from you anywhere in writing. The very next thing that I see is that there was some kind of Teams meeting set up between yourself, Chelse Cisneros, Aprile Danford, that kind of thing. Was that common that you guys would discuss on Teams rather than by e-mail?

**A. I certainly remember it as having happened. How common it was, I would say it was -- it was certainly not uncommon, and we might communicate just simply by exchange of e-mails or in an actual Teams meeting either, say, a conference call or possibly a Zoom call like this one.**

Q. Okay. Let me ask you. I'm showing you something here towards the end of 2022, December of 2022. Was this the first time that you ever remember getting involved with Warren Jones, or was there sometime earlier in the fall or '22 that you may have been consulted?

**A. As best I recall, I probably became aware of the situation at some point earlier, but that's my best recollection. I just couldn't be certain.**

Q. Okay. Do you recall how you first became aware, meaning the first person who called you or

e-mailed you or reached out to you? Who was the first person that reached out to you to tell you about Warren Jones or ask you about Warren Jones?

**A. I don't recall that. I don't recall who that first person would have been. I just -- I do remember the matter came to my attention and then -- but as to who contacted me first or made me aware, I just don't recall.**

Q. Okay. Well, let me ask you this way: You may not recall who brought it to your attention, but do you recall what they were seeking your advice on when they did bring it to your attention?

**A. Well, I think so. You know, it was -- it became apparent that this employee was having difficulty passing his recertification as a board operator and that the question of his vision had come up. Beyond that, let's see. I'm just not -- I'm not sure I recall the -- the exact sequence of events.**

Q. Well, let me show you. This will be --

MS. WILLIAMS: James, were you -- I'm sorry. Were you marking 743 and 744? Is that going to be Exhibit 2?

MR. SUDDUTH: It is, yes.

MS. WILLIAMS: Okay.

MR. SUDDUTH: I'm going to go now to what I'll



mark as Exhibit 3. This is 764 to 765.

(Exhibit No. 3 was marked for identification.)

BY MR. SUDDUTH:

Q. Do you recall receiving a -- well, not -- I don't know if it was -- if you received it. I don't think it was directed towards you, but it probably got forwarded to you at some point.

Do you ever recall receiving and reviewing a letter from Dr. William B. Hart, M.D., an ophthalmologist in the Lake Charles, Louisiana area regarding Warren Jones? I'll scroll down through the -- through the page. You'll see it's one and a half pages here. Do you ever recall receiving this letter?

**A. I don't think I ever received it directly, but I do recall the letter.**

Q. You do recall the letter. Okay.

**A. I do recall seeing it, yes.**

Q. Do you recall approximately when in the timeline of things you received that letter?

**A. I don't.**

Q. So I mean, was CP Chem asking you -- this is one of the things I'm trying to drill on is, is your involvement. I see that Jeannie Johnson is giving test for Warren Jones. There's a lot of back and forth between Warren and his direct supervision, his direct



team. But, then, every time -- this is why I bothered you, sir, with a -- with a deposition and a subpoena is because every time sort of information was ever sent to Dr. Stanton, very rarely do I get an e-mail back. It's usually a Teams meeting like I showed you at 7:43. So I'm trying to poke your brain a little bit on maybe what you recall, what you remember what you did, what you didn't do.

So when CP Chem brought the issue of Warren Jones to your attention, what were they seeking your advice on? You know, what were they seeking your guidance on, if you recall?

**A. Well, I think I do recall. I mean, it was -- you know, the problem or the issue seemed to be here was this employee who was having difficulty passing his recertification evaluation to be a board operator and that these potential issues regarding his vision had come up. Whether it was just a matter of visual acuity or the extreme high myopia that he suffered from or something else, all of that was, you know, to be considered --**

Q. Can you describe for me the different -- I'm sorry to interrupt you. Go ahead, sir, if you're -- if you're not done. Go ahead.

**A. No, I was just going to say, as you said, the**



**type of communication could vary. It might have been e-mail; it might have been phone conversations. I recall probably several phone conversations with one or another of these folks. I believe I recall a conversation with Jeannie Johnson probably with one of the safety people at Port Arthur, or maybe it was a direct supervisor, manager of -- of Mr. Jones. So that's what I recall.**

Q. Okay. You mentioned visual -- visual acuity versus extremely high myopia. Just because I'm not a medical doctor, when you say "visual acuity," what are you referencing there? What do you mean by that?

**A. Well, that refers to, you know, the acuity that is typically what's tested when you are asked to read the letters on an eye chart in a physician's office. Or when you go to get a driver's license and you, you know, look at their pattern, their test pattern, and they determine that you've got that minimal acceptable visual acuity of 20/40.**

**But visual acuity alone is not necessarily the only consideration. You know, there are other factors, like what is the peripheral vision, the field of vision, what is the depth perception, what is the color perception and, in this case, I think, you know, it was -- it was certainly reasonable to -- to consider whether**

**this high myopia could have played a part. And I think, you know, we were certainly open to the possibility that it -- it could be involved so --**

Q. You say play a part or could be involved. Play a part or could be involved with what? With his struggles on his recertification?

**A. Yes, yes.**

Q. Okay. I understand. You said there are other considerations beyond just -- and I -- thank you and now -- now I know what you mean when you say visual acuity, simply how effective you are or, as you put it, the eye chart. You know, you're at the driver's license bureau or you're at the eye doctor and you're looking at the letters across the board. It's not simply visual acuity. Those sorts of other struggles such as peripheral vision, color, depth perception, did -- do you ever recall, did you ever examine Warren Jones yourself in person?

**A. I did not.**

Q. Okay. Did you ever get any -- aside from this letter from William Hart, William B. Hart, M.D., did you ever get any medical records, actual records from Dr. Hart's clinic?

**A. I don't think so as best I recall.**

Q. Okay. Did you --



**A. Now, I --**

Q. -- I'm sorry, go ahead, sir.

**A. Sure. I was just going to say I do recall at least one, possibly two conversations directly with Mr. Jones --**

Q. Okay.

**A. -- which I recall as being cordial. And I believe I tried to explain to him, you know, the problem that he was facing, and I recall having discussed various possible accommodations and -- well, there were several. I can go into that if you like.**

Q. Sure, yeah. No, please, I'll happily ask the question that'll allow you to elaborate on that but, no, I was -- I was familiar from Mr. Jones -- Mr. Jones was deposed just as you're being deposed, and Mr. Jones mentioned that he had had a conversation with you. I don't think that my memory could be wrong on this. I don't think he mentioned two conversations. I thought he just mentioned one but, again, I think that's rather a minor issue. So whether it was one or two conversations, he did mention talking with you.

So why don't you tell me about that, and I'll circle back to my other questions later, but tell me about those conversations with Mr. Jones.

**A. Yeah. Again, I recall the conversation or**



**conversations as being friendly, cordial. I believe we discussed things like, well, what was he actually having trouble with. Was it the size of the font on the monitor that he had to -- had to read, was it the colors, was it the brightness, and I remember thinking or suggesting, well, there -- there might be a couple of things that could be done.**

**You know, there are screens which you can put over a monitor kind of to prevent shoulder surfing that might, you know, change the -- the contrast or the brightness. As -- as I'm sure everybody knows, you can choose the background you want to use, either a black background or a light background, and I think, you know, that might have been part of the solution here.**

**So, you know, I -- I can say I generally try to be pretty empathetic to an employee's position. And so I -- you know, I'm pretty sure that I suggested, you know, let's talk this over with your manager or your supervisor and let's see what might -- might be done. So I think that's it.**

Q. Okay. How did Mr. Jones, if you recall, how did he respond to your different suggestions?

**A. I don't specifically recall. I think he recognized, you know, the possible measures that might be taken, but beyond that, I just -- I really don't**



**know.**

Q. Okay. In terms of the different combinations that you suggested for Mr. Jones that he could do, I think you mentioned the screens over the monitor that change the contrast or the brightness, changing his background, you know, the background color, that might help.

Whatever accommodations you suggested to Mr. Jones, did you do anything to follow up with those accommodations? I mean, did you reach out to Mr. Wooters or Chelse Cisneros or Aprile Danford and relate to them in some way here are the accommodations I'm recommending for Mr. Jones?

**A. I am pretty sure that I had one or more conversations with -- with possibly Aprile Danford, Ms. -- the nurse practitioner or, again, with a manager or supervisor, you know, to that effect that -- that these possible accommodations have been discussed. But, again, beyond that, the -- the further consideration of possible accommodations, that would have been pretty much out of my hands.**

Q. Did -- was there any response from Aprile or Jeannie or anybody else that you spoke to, management, you know, his -- his superiors? Was there any response from any of those folks whenever you offered up just the

Page 38

few combinations that you offered like the monitor, the screen over the monitor, or the background change? Did any of them ever respond in any form or fashion or substance such as, you know, Doctor, that's just too burdensome, you know, we're not gonna do that?

**A. No, I don't recall that ever -- ever being said. Yeah.**

Q. Okay. Do you know whether or not, meaning do you have any personal knowledge, do you know whether or not any of your suggested accommodations were actually ever done, actually ever implemented prior to Mr. Jones being tested again on the heater board?

**A. I don't.**

Q. In terms of, you know, actual data, okay, so I know you didn't have the medical records from Hart. You have a letter from Hart, but you did have the exam that Jeannie did. We went over that. That was the 744. You had that exam.

Did you have any other data, any other, you know, metrics data results of tests? Did you have any other things like that aside from this visual acuity test performed today, 12/12 of '22, that -- that you recall having?

**A. Not that I recall.**

Q. Okay. Did you ever have any discussions

Page 39

with -- I know you remember at least a discussion or two with Aprile, Chelse, certainly with Jeannie. What about with some of his, like, management team, some of his direct superiors, people like Judson Wooters, Bryan Kubsch, people like that? Did you have any discussions with those folks?

**A. I can only say that to the best of my recall, I did have one or possibly more discussions with those individuals or -- or someone in their position, but I just -- I don't recall with certainty, you know, what -- what that -- whether that type discussion occurred.**

Q. Okay.

**A. I think it did.**

Q. Okay. Maybe a long shot to ask this because you're not too sure if you -- if the conversation happened or not, but do you recall any specifics? If those conversations did happen with somebody like Judson Wooters, do you recall anything specific about that conversation other than what he said to you or what you may have said to him?

**A. I really don't at least not with any certainty. I believe I recall it as just -- as being kind of a freewheeling, general discussion of, well, we might do this, we might do that, maybe there's something else that could be tried and -- but, again, I kind of**

Page 40

**probably lost the trail at that point as to exactly what -- what occurred following that discussion.**

Q. Okay. Well, let me -- let me phrase it this way, then, or ask it this way. And forgive the crudeness of the example, Doctor, but, you know, I've kind of equated it when I was talking to Mr. Wooters to if I took the exam, like I had to take a bar exam, you had to take an exam to become a doctor, if I took the bar exam and I was sick as a dog, while I'm taking the bar exam, it's probably not a very fair analysis of my intellectual capacity if I'm taking it sick as a dog.

So I think you can see where I'm going here. What I asked Mr. Wooters was: Was this situation where you were confident that -- that Warren Jones, he could see the board, he knew what the board had, he knew what was in front of him, and he just didn't get it versus there were some real questions and struggles as to whether or not he could even see the board so, in a sense, the integrity of the test, right? Does the test have integrity because the person can see it function and not sick as a dog, and now I'm going to go ahead and test them?

So now I've kind of given you that broad stroke, did you -- did you ever opine in that regard to Mr. Wooters? Was that question ever posed to you by

Page 41

Mr. Wooters of listen, Doctor, I just need to know is the integrity of my test with Warren good or not? Was such a question like that ever posed to you?

**A. Not that I recall, no.**

Q. Okay. Does my example make sense? Were you following my example there?

**A. Yeah. And by the way, the bar exam is really hard.**

Q. It is; it is.

**A. Okay. You know, I will say this. I think -- and I probably tried to convey this to Mr. Jones himself that the real sticking point was going to be could he or could he not after X number of tries pass his recertification and that one way or another for him to remain in his position as a board operator, at some point, he would have to be able to pass that -- that test or recertification.**

Q. Right. But did you ever -- understand, you know, and that's certainly been the position of CP Chem in this case; but just taking that as you just said, let me press it a little bit.

Okay. He's going to have to pass this exam. What I'm trying to figure out is did you ever make any kind of determination that based upon his visual data points, his visual metrics, his health records, he can

see the screen, he cannot see the screen? Did you ever make a medical determination like that?

**A. No, I did not.**

Q. And so you never -- if you didn't make that kind of determination, you certainly never communicated any -- any determination like that to anybody at CP Chem?

**A. I -- no, I don't think so.**

Q. Okay. So, then, let me go now, fast forward a little bit to the decision is being made to terminate Mr. Jones. Were you part of any of those discussions? And that may have been totally out of your wheelhouse. I just want to know that so I don't ask you questions that you don't know anything about.

So all the termination conversations that were had with HR and management, did they bring you or loop you into those conversations?

**A. No. In fact, I -- I don't think I ever knew or ever learned that Mr. Jones had been terminated. Basically, you know, beyond the point of discussing medical aspects, discussing possible accommodations, I was just -- I was not kept in the loop. As you say, it was kind of out of my wheelhouse the final decision on whether to terminate or not.**

Q. Right. Okay. I know you talked about your own



kind of suggested accommodations that came from your conversations with Mr. Jones and those kind of cordial one or two conversations the two of you had. Let me go back to kind of in the very beginning any accommodation request that Warren made himself or that Dr. Hart made on behalf of Warren.

Did you ever opine about those accommodations that were made kind of, you know, prior to your conversations with Warren as to whether those accommodations were reasonable or unreasonable, things like that?

**A. I don't recall that. I think it would have been unlikely that I would have offered an opinion on whether this or that possible accommodation was -- was doable or was reasonable or did not constitute an undue burden. I don't recall any -- I don't recall doing that.**

MR. SUDDUTH: Okay. What I'm going to do, Doctor, is that, typically, I try to watch the clock around an hour. I like to give folks a break just to stretch their legs, get a cup of coffee, something like that. I actually think I'm very close to being done, okay?

Doctor, I think I've asked all the questions I have for you so I'm going to kind of combine this



break into two different things: one, I'm going to look at my notes and make sure I have no further questions for you but also give you the chance to stretch your legs a little bit.

It's 10:05. I don't think I need long, maybe 10:10, five minutes, something like that if that's okay with you, Doctor, and then we'll come back and, hopefully, wrap things up, okay?

**THE WITNESS: Sure. That's -- that's fine.**

MR. SUDDUTH: All right.

THE VIDEOGRAPHER: We are now off the record. The time is 10:05 a.m. Central Time.

(Break was taken.)

THE VIDEOGRAPHER: We are now on the record. The time is 10:15 a.m. Central Time.

MR. SUDDUTH: Okay. Doctor, back on the record after a break brief. Thank you for your patience.

There was one additional document I want to go over with you which I think may bring to life kind of some conversations we've already had. So it may tread new ground, it may not, but -- I'm going to mark this as Exhibit 4, Madam Court Reporter. It is going to be an in globo exhibit. It's going to be two pages, and it's going to be Bates labeled 809 and 810.



(Exhibit No. 4 was marked for identification.)

BY MR. SUDDUTH:

Q. So, Doctor, I'm going to share my screen with you, and I'm going to scroll down here to 810. And you'll see the only reason why I'm including 810 is because it has a little carryover of the e-mail signature block. There's really not much to 810, so let's go now to 809. If we go to 809, this is December 5th of 2022, a few days prior to the e-mails I showed you before.

There's an e-mail from Chelse Cisneros to you with a cc to Beth Roberts, Aprile Danford, and it says, quote, Dr. Stanton, thank you for taking the time to join Beth and I in our meeting this afternoon. I've attached the letter from Warren's ophthalmologist and have provided his contact information as well. Please let me know if you have any questions or need further information, end quote.

So, Doctor, a few questions about this. This meeting that you had, did you meet with them in person, was this over the phone, or do you recall?

**A. This would be with Beth Roberts and Chelse.**

Q. Yeah.

**A. I don't recall if this was in person or over the phone.**

Page 46

Q. Okay. What happened in this meeting to lead to kind of at the end of the meeting this is sort of Chelse sending a follow-up saying here's Warren's contact information and the letter from the ophthalmologist?

Do you recall what you-all discussed to where those were the action items that Chelse was sending to you after the meeting?

**A. I don't believe I do recall. The discussion was probably along the lines of, okay, we've got this information from the ophthalmologist, you know, there are certain things which might be implemented in the way of accommodations but, ultimately, you know, the sticking point would be whether he was able to pass his certification.**

Q. Is that why the follow-up was to talk to Warren? I mean, I don't understand why if the issue is in passing the certification why you would need to talk to him. It seems like you would need to talk with him if you were trying to figure out more information about how to accommodate him.

**A. Well, I think that's correct. It would -- it would not be uncommon for me to say, well, let me -- let me talk to whoever the employee is.**

Q. Okay.

**A. And I -- as best I can recall the conversation**

Page 47

**or conversations that I had with him, we explored a little bit, well, could we do this, would this other accommodation help, maybe, maybe not, so that's -- that's basically what I can recall.**

Q. And that's why I said at the very beginning of this before I even showed you my screen that we may not be treading new ground here because you've already told me that you spoke with -- with Warren and had those cordial conversations and you-all explored possibilities. So I wanted to see if this was a new time that this happened, or if this was just a memorialization of a time you already told me about. And let me scroll up, and I'll show you what I mean.

Here's this e-mail between you-all where you get Warren's contact information, and here is what you say in response. You send an e-mail the next day at 3:47 p.m. and you say, quote, hi, Chelse, I had a long conversation with Mr. Jones this afternoon, and I think I have a better understanding on his overall situation and what solutions may or may not be feasible. If you want to give me a call, we can discuss, or if you prefer, we can do another Teams meeting with Beth. Just let me know. Regards.

So my first question, Doctor, is: Is this e-mail here kind of memorializing the conversations

Page 48

you've already told me about that you had with Mr. Jones, or is this describing some separate conversation?

**A. I think this would be just a matter of memorializing the conversation that took place.**

Q. Okay. All right. So this is providing a little more, you know, light, a little more insight into what you've told me about. You had a conversation with him that afternoon, so it looks like the afternoon of December the 6th, and you said that you have a better understanding of his overall situation and what solutions may or may not be feasible.

You told me earlier some solutions you thought were feasible. You described to me the monitor, the changing of the background. Let me ask you about this other line here, what solutions may not be feasible. Were there things that you and Warren discussed that the two of you decided or you decided was not feasible? Is there anything like that that you can recall?

**A. Not that I can recall, no.**

Q. You end your e-mail with if you want to give me a call, we can discuss, or if you prefer, we can do another Teams meeting with Beth.

Do you recall whether or not it was a phone call, or did you guys do another Teams meeting? Or how

Page 49

did the group of you debrief or recap your conversation with Warren?

**A. I don't think it was another Teams meeting, and I just don't recall if a further -- another telephone conversation occurred. I just don't recall.**

Q. So then, again, this question might be a bit superfluous, but I'll go ahead and ask it because if you don't recall the conversation or its existence, I doubt you recall what you said in it.

But I'll ask you: Do you recall what you relayed or what you stated in that phone conversation after your phone conversation with Warren?

**A. Well, I'm just kind of surmising here as to what I likely would have said. I don't really recall, but chances are I would have said, okay, we've discussed this, that, the other possible accommodation. And, you know, I may have said, as I mentioned earlier, that I think the ultimate sticking point here is the question whether or not he can ultimately pass his recertification. You know, that kind of gets to can this -- can the individual perform all the essential functions of his job. But beyond that, I just -- I really don't recall what exactly might have been said.**

Q. Do you recall -- I'm trying to see if this is something you're telling me now or something you said in

the phone call.
Did you say in the phone call to Beth and Aprile and Chelse, did you say to them that line, the ultimate sticking point may be whether or not he can pass the exam? Is that how you phrased it to them?
**A. I really don't recall. I would say it's possible that -- that or words to that effect might have been used.**
Q. Okay. So if that's -- again, that's -- whenever you told them, if that is what you told them, that the ultimate sticking point is whether or not he can pass the exam or not, I mean, that's all something they already knew. They already knew he was struggling to pass the exam.
Did you opine to them or did they even ask you whether or not Warren had the ability, did he have the medical ability, did his eyes have the physical capacity to see the screen? Did they ever ask you that?
**A. I don't recall that being asked.**
Q. Okay.
**A. I just don't.**
Q. Did you ever volunteer that information on whether or not you felt that Warren had the capacity to see the screen?
**A. I don't think so. I don't recall that.**



Q. Okay. So whenever you were mentioning to them the ultimate sticking point is whether or not he can pass the exam, what did you -- what did you mean by that? I'm trying to understand that comment in the context of a medical review.
**A. Well, I think what I would've been trying to say was that, you know, when all is said and done, what -- you know, I don't think any of us were denying that Mr. Jones had some significant visual, possibly impairment which might or might not explain the difficulty he was having. And I think we were all certainly open to that -- that possibility, whether it was his extreme myopia or some other similar consideration.**
**Yeah. I just -- I don't think I would have opined in any definite way, okay, this is -- this just is not going to work, you know, this person can't pass, you know, end of sentence, end of discussion. No, I would not have said anything like that.**
MR. SUDDUTH: Gotcha. Okay. Well, Doctor, I think that -- with the attachment of this Exhibit 4, I think those are all the questions that I have for you today so I appreciate your time unless -- unless Ms. Williams has some questions for you.
MS. WILLIAMS: I do. I do have a few follow-up



questions, Dr. Stanton.
**THE WITNESS: Um-hmm.**
CROSS-EXAMINATION
BY MS. WILLIAMS:
Q. Just to clarify a couple of things, is it fair to say that in -- in your position with Chevron Phillips Chemical, you were not involved in every accommodation issue that came up at the company; is that a fair statement?
**A. I think that would be fair, yes.**
Q. And is it also fair to say that there were some occasions where you might get involved early in an accommodation request and then other instances get involved later in an accommodation issue depending on what those circumstances presented?
**A. I think that's correct. I'm -- I'm rather sure it happened. There were times when I was asked early on and then other times where maybe the -- the whole discussion had been -- had gone on for a while and I was asked at a later date.**
Q. Okay. And in the case of Mr. Jones -- and I know that you described that there was some details about this that you don't specifically recall, but the fact that you may have gotten involved later in the process, if that were the case, that would not



necessarily be unusual in your experience at CP Chem and the other -- compared to the other times you might have engaged on accommodation questions; is that right?
MR. SUDDUTH: Object to form.
MS. WILLIAMS: You can still answer, Dr. Stanton.
**A. Yeah. I think that's probably correct. You know, I don't recall at what specific point in Mr. Jones' situation that I was made aware of it. I believe it was after he had not -- was -- had not been able to pass his recertification on at least, oh, maybe at least a couple -- one or two occasions at least.**
BY MS. WILLIAMS:
Q. Okay. And I was actually going to ask you about that. I know you testified earlier that you at least had some understanding that he had not passed the test.
Do you know specifically sitting here today how many times Mr. Jones had not passed his qualification test when you first were engaged and informed of his issue?
**A. I don't. I know just from previous discussions I think -- our brief discussion that I think he had been given three opportunities and -- and not been able to pass.**

Q. And you're -- sitting here today, do you recall when you first learned of it whether he had not passed one time or two times or three times? Do you have any specific recollection where in the process he was in those tests when you first became aware of his issue?
**A. I really didn't. I couldn't pin that down with certainty.**
Q. You were also asked earlier by Mr. Sudduth a question -- and I know there -- there were multiple parts to this, and so I'm just sort of summarizing. But it had to do with the integrity of the test.
Did you ever receive any information -- because I want to make sure that I'm clear on your testimony. Did you ever receive any information indicating that the integrity of the test that CP Chem provided to Mr. Jones was compromised in any way?
**A. I don't recall ever seeing or hearing anything to that effect.**
Q. You were also asked earlier about the visual acuity tests that were conducted on Mr. Jones. Can you describe for us -- you know, to have a layperson understand it, what is the purpose -- and I think you described this in -- in some terms, but can you describe what the purpose of the visual acuity test is?
**A. Well, I mean, it is pretty much, you know, a**



**basic measure of a person's ability to -- to see, read, comprehend words, letters, numbers. You know, I guess the closest example is if you don't have at least 20/40 acuity with using both eyes, well, there's real doubt as to whether you can see a stop sign versus a yield sign or something of that sort. So that's -- you know, that's an important measure.**
**I think we were all open to the possibility that there might be other -- other factors beyond just strict visual acuity that could be, as I say, factors in Mr. Jones' difficulty. Not sure that answers your question.**
Q. Is it -- is it sort of too simplistic to say that the purpose of a visual acuity test is to see how well you can see generally?
**A. Yes. I agree with that.**
Q. Okay. What is the reason that Chevron Phillips Chemical conducts visual acuity tests on employees?
**A. Well, you know, for some employees who are in primarily, you know, administrative positions, you know, it would not be that important perhaps; but for people who are in the field operating potentially hazardous equipment, for instance, it's pretty important. You know, just as an example, we've had employees who they had good central visual acuity, but because of fairly**



**severe glaucoma, they had a restricted field of vision. And so, you know, an employee, say, driving a forklift truck might turn a corner with that forklift and hit something that he just didn't see because he didn't have the peripheral vision or the field of vision that most of us have.**
**So, hopefully, I'm answering your question. You know, good vision generally, whether it's -- whether we're talking acuity or peripheral vision, is pretty important in a lot of -- a lot of employees who work.**
Q. Does visual acuity -- in your time at Chevron Phillips Chemical in terms of submitting employees to visual acuity exams, is that done generally to determine whether or not they are fit for duty?
**A. I would say yes. You know, if the listed requirements for a position are a visual -- a minimum visual acuity of X, which is typically 20/40, if that acuity is not possessed, then the employee may not meet the essential functions of the job requirement.**
Q. In Mr. Jones's case when he was submitted to the visual acuity test, was that to determine whether or not he was generally fit for duty to perform the functions of the position that he was qualifying for or attempting to qualify for?
MR. SUDDUTH: Object to form; speculation,



leading.
MS. WILLIAMS: You can answer.
**A. I would -- I would say yes but, in this case, it was -- it was -- it was, I guess, a little beyond that, in that, it was not necessary -- it was not only to determine whether he met the minimum qualifications for the job but to try and determine or take into consideration globally what visual deficits or problems he might be having that would -- it would really have impacted his ability to pass the recertification. As Mr. Sudduth said, you know, if you're sick as a dog on the day of an important exam, well, you know, that could sure have an effect.**
BY MS. WILLIAMS:
Q. And in Mr. Jones's case, do you recall what -- maybe not specifically what the results of the visual acuity example were, but if you recall specifically, obviously, share that with us; but do you recall what you learned from his visual acuity test results?
**A. Well, simply as the -- the written report said, he had -- I believe it was 20/50 in each eye independently but 20/40 with both eyes.**
Q. And for lay people, what does that indicate to you in terms of his visual acuity?
**A. Well, I would say for most job positions, that**

**would be the bare basic requirements of a person's ability to -- to be basically or qualified for the position. You know, as, again, in the case of, say, a forklift driver, you know, that would be kind of the bare minimum.**

Q. Okay. And so was there anything about the results of the visual acuity test that suggested to you that Mr. Jones could not see the board on which he was trying to qualify?

**A. No. I would say having a visual acuity minimum 20/40 both eyes, it would be expected that a person could read the lettering and the numbers on a computer screen. Once again, you know, there may have been other factors, you know, just having to do with depth perception, light perception which, you know, could play a part.**

Q. And I know that you testified earlier that you don't recall details of conversations that you had with either HR or management or safety people at CP Chem, but I want to ask you this generally:

At any point during the conversations that you had with either HR or management or safety, did anyone at Chevron Phillips Chemical ever indicate to you that they were not trying to determine a way to help Mr. Jones in the process of him taking these tests to



qualify on the operator board?

**A. No. I never had that impression. If anything, I had the impression that, oh, this or that human resources person or supervisor or manager were -- were trying to figure out a solution or accommodation or set of accommodations that would've -- would've worked in this case.**

Q. And I think you testified earlier as well that your role is -- was not to actually make the ultimate determination as to what accommodation could or could not be provided. Did I understand that correctly?

**A. Yes, that's correct.**

Q. In your discussions with Mr. Jones, I think you said that the two of you had conversations about -- I'm trying to recall specifically the phrase. I think you said accommodations or solutions. Maybe that was the terminology.

When you use the term accommodation -- or solutions, let's talk about that. When you say solutions, some of the solutions -- do you recall specifically what some of the solutions that you discussed with Mr. Jones, what those possible solutions were?

**A. I feel pretty confident that Mr. Jones and I discussed things like possibility of a monitor screen,**



**possibility of changing font sizes if that was doable, possible, possibility of, as we discussed, you know, black background versus white background. Beyond that, I am not sure that we addressed anything else. I think you -- you mentioned briefly in our conversation there was some mention of lighting changes. I don't specifically recall that, but it -- it could have come up.**

Q. And, specifically, do you recall ever having any discussions with Mr. Jones or anyone else about lighting changes for him?

**A. I don't. Again, I think it's possible that it came up.**

Q. And sitting here today, do you know whether or not any lighting adjustments were made for Mr. Jones or how they were made?

**A. I don't.**

Q. When you referred to possible solutions like changing the font size, the background, you're not saying -- are you saying that those were -- that you were making the determination that those were actual accommodations that Chevron Phillips Chemical should have made for Mr. Jones?

**A. No. In fact, I would not have known. I did not know if any of that was, in fact, doable. You know,**



**Chevron Phillips may have had certain requirements that needed to be in effect as far as font sizes or coloration, that sort of thing. I just -- I didn't know anything on that score.**

Q. Okay. And sitting here today, do you have any information as to whether or not, for example, on the font size issue, if that was something that Mr. Jones could have just done on his own without any specific involvement at CP Chem or permission from -- from CP Chem to administer? Do you know whether or not that was the case?

**A. I don't know if something like that would have been under his control or his -- within his abilities. I just don't.**

Q. And so I guess, ultimately, what I want to make sure I understand, when you're talking about solutions, you're not necessarily saying that those are accommodations that should have been made or that Mr. Jones was prevented from implementing them if he needed them. You were just describing that these are possible things that could happen that could help him potentially?

MR. SUDDUTH: Object to form.

**A. That's -- that's correct. In my view, this was just a kind of open-ended preliminary discussion of**

**things that conceivably might be -- might be possible.**
BY MS. WILLIAMS:
Q. Okay. In your conversation with Mr. Jones, did he describe for you any particular difficulty he was having taking the exams?
**A. I don't recall that. Other than perhaps his difficulty interpreting what he was seeing. That I think would have been the extent of it.**
Q. Did Mr. Jones share with you during your conversation with him any additional communications he had had with his physician about possible solutions that might help him in -- in the qualification process?
**A. I don't specifically recall that. It's possible that he might have ventured a guess to the effect of, well, if I just had this or that, that would help me or that would solve the problem. I just can't say --**
Q. You --
**A. -- with certainty.**
Q. I'm sorry. And I think you were asked earlier whether or not you had any discussions with Mr. Jones's doctor. Is that something ordinarily that you would need to do in order to have the kind of conversation you had with Mr. Jones and with people at CP Chem to examine possible solutions for him?



**A. I don't think I saw a need for that in this case. We had Dr. Hart's letter and -- that was pretty plain, I think, on the face of it. Now, from time to time, I have had discussion with a treating physician but, you know, again, in this particular case, I didn't see the need for it.**
Q. And why is that?
**A. Well, I guess it was the fact that no one -- no one -- no one was disputing the fact that he had these ophthalmological conditions or condition, the severe myopia, and we certainly, you know, were not rejecting that. That's -- that's pretty much a given. And so from there, you know, we were certainly willing to consider various possible, you know, remedial measures. So that's pretty much where it stood.**
Q. And I think you mentioned just now and then earlier that you recall at some point seeing a letter from Dr. Hart. Are you aware that CP Chem also had Mr. Jones's medical history records from Dr. Hart throughout this process as well? Do you recall that?
**A. I don't think I knew that at the time. I think I recall that you mentioned that you had his -- his medical records.**
Q. Do you recall having any conversations with Jeannie Johnson, for example, where she discussed



Mr. Jones's -- any information that she had obtained from Mr. Jones's medical records with his physician?
**A. That could have happened. I just don't recall. I certainly recall a conversation with Jeannie Johnson but, no, I just don't recall if that specifically came up.**
MS. WILLIAMS: I'm just looking at notes here. Give me one second, please.
**THE WITNESS: Um-hmm.**
Q. I think you were -- I think you also indicated or you were asked whether or not you participated in any conversations regarding Mr. Jones's termination.
Generally, in your role as medical director, would that be something that you would participate in?
**A. No, it just would not. I -- yeah, I'll just add. I think my -- my view at that point in time would have been that -- just how many chances it would be reasonable to give Mr. Jones to pass the certification was really more of a company decision based on their risk tolerance, you know, just how far can you go, how long do you go with an uncertified board operator, and that's just not a decision that I would have made or gotten into.**
Q. Okay. In the course of an employee's time at Chevron Phillips Chemical, does the company also



generally maintain medical records that would be kept within your department on that employee?
**A. Yes. Whether records would have been kept in our offices at headquarters or in a specific plant, Port Arthur in this case, that might have varied.**
Q. And within that framework if -- whatever medical records are kept on an employee, in your capacity as medical director, would you have had access to those medical records?
**A. Typically, yes.**
Q. And what about Ms. Johnson?
**A. I don't recall ever seeing any other medical records beyond what we have from the ophthalmologist, Dr. Hart, and the visual acuity test data that we performed or obtained.**
Q. Would Ms. Johnson have had access to any additional medical records that were kept on Mr. Jones in her capacity as a nurse for Port Arthur?
**A. Yeah. I would say it's certainly possible, but I just can't be -- I don't know for sure.**
MS. WILLIAMS: Okay. Can we take about a five-minute break, James, and let me just kind of go through my notes and see what I might have left.
MR. SUDDUTH: Okay.
THE VIDEOGRAPHER: We are now off the record.

Page 66

The time is 10:51 a.m. Central Time.
(Break was taken.)
THE VIDEOGRAPHER: We are now on the record. The time is 10:57 a.m. Central Time.
MS. WILLIAMS: We don't have any additional questions at this time, Dr. Stanton. Mr. Sudduth may have some more questions.
MR. SUDDUTH: Yes, I do. Thank you.

REDIRECT EXAMINATION

BY MR. SUDDUTH:
Q. Doctor, my apologies, but I have some follow-up based upon all of that.
First of all, these different things, the lighting changes, the changing of the font sizes, the background issues, the screen monitor issue, in your e-mail that I showed you with Chelse where you said I had a long conversation with Mr. Jones this afternoon, and I think I have a better understanding of his overall situation and what solutions may or may not be feasible, did you relay these solutions, these remediations, these accommodations, whatever word you want to use for it, did you relay these different things to Chelse, Beth, or Aprile in that conversation?
**A. I can't recall with -- with certainty whether they were discussed in that conversation. I do**

Page 67

**generally recall that at one point or another, we -- we did discuss these potential accommodations.**
Q. Okay. Because -- I mean, do you have any reason to disagree with me the company had opened what they called, this is what they termed it, CP Chem had opened up the good faith interactive process, the accommodation process? Did you know that process was open as it related to Mr. Jones?
**A. I think that would have been my presumption that that actual phrase was, I don't recall, being used, but my general impression was that we were all quite -- quite open to trying to find the accommodation that would work or accommodations.**
Q. Yeah. And, in fact, I think you testified earlier that you never got any sense of any pushback from Aprile or Chelse or anybody else for that matter when these proposed accommodations were proffered as part of the process. You never got any pushback from any of those folks whenever that was proffered; is that right?
**A. I think that's right. You know, again, and I think there was -- there was, I think, general acceptance of the fact that, ultimately, this employee would have to be able to recertify. But as far as there being any feeling of rejecting this or that possibility,**

Page 68

**no, I don't think that occurred.**
Q. Okay. And do you know whether or not any of these suggested changes, any of these suggested accommodations, any of these things that would have assisted Mr. Jones in the testing process in him seeing in the testing process, do you know if any of these things were ever implemented during any of his exams?
**A. I don't recall that. I don't think I ever actually knew.**
MR. SUDDUTH: Yeah. Okay. All right. I have nothing further for you, Doctor. Thank you for your time.
**THE WITNESS: Okay.**
MS. WILLIAMS: We have nothing further as well which I think, Dr. Stanton, means you may be done today.
**THE WITNESS: I'm sorry?**
MS. WILLIAMS: I think that means you may be done today but --
THE VIDEOGRAPHER: Don't disconnect just yet. We just want to get the orders on the record. Then we'll make sure everybody can get to the rest of their day.
So, Mr. Sudduth, I think we have a standard video for you. Did you want to add syncing to that?

Page 69

MR. SUDDUTH: No, that's okay. Standard is fine.
THE VIDEOGRAPHER: All right. And then I think you get an e-tran. Is that okay?
MR. SUDDUTH: That's fine as well, yes.
THE VIDEOGRAPHER: Ms. Williams, would you like to have a copy of the video?
MS. WILLIAMS: Yes, please.
THE VIDEOGRAPHER: Excellent. And would you like a copy of the transcript as well?
MS. WILLIAMS: Yes, please.
THE VIDEOGRAPHER: Thank you very much.
All right. This concludes the deposition of James M. Stanton, Medical Doctor, for Warren F. Jones vs. Chevron Phillips Chemical Company LP. We are now off the record.
**THE WITNESS: Let me just ask will I be able to have a transcript to review?**
MR. SUDDUTH: Absolutely. In fact, we were going to go over that with you. Thank you for saying that as we usually -- don't you want that down on the record, Madam Court Reporter?
THE COURT REPORTER: Yes. We're still on the record.
MR. SUDDUTH: We are. Okay, good, yeah. Sorry

about that, Doctor. I should have gone over that with you.

You have the right under Louisiana law to read and sign your deposition. It sounds like -- I already know what your answer is going to be. It sounds like you do want to read and sign. It's absolutely your right to do that. We just need to get that on the record. You can waive your right to read and sign, or you can exercise your right to read and sign your deposition.

Which would you like to do, sir?

**THE WITNESS: I think read and sign would be good.**

MR. SUDDUTH: Very well. Do you want it sent to the address that we -- that you mentioned earlier in your deposition? Is that okay?

**THE WITNESS: Yes, that's fine.**

THE VIDEOGRAPHER: Okay. In that case, we are now off the record. The time is 11:02 a.m. Central Time.

(The deposition concluded at 11:02 a.m. CST.)

- - - - -



ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Jones vs. Chevron Phillips Chemical Co. LP
Date: November 3, 2025
Deponent: James M. Stanton, M.D.

| Page Line | Now Reads | Should Read | Reason |
|---|---|---|---|
| | | | |



VERIFICATION OF DEPONENT

STATE OF TENNESSEE )
COUNTY OF SHELBY )

I, JAMES M. STANTON, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

SIGNED this ______ day of ___________, 2025.

_________________________
JAMES M. STANTON, M.D.



REPORTER'S CERTIFICATION

I, Margaret Lowe, Registered Professional Reporter and Notary Public in and for the State of Florida, hereby certify to the following:

That the witness, JAMES M. STANTON, M.D., was duly sworn by the officer and that the transcript of the videotaped deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached errata sheet contains any changes and the reasons therefor;

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

IN WITNESS WHEREOF, I have this date subscribed my name this 17th day of November, 2025.

Margaret Lowe

Margaret Lowe, RPR
Registered Professional Reporter

# Exhibit D

# Deposition Transcript

**Case Number: NO. 1:24-cv-00350**
**Date: October 1, 2025**

**In the matter of:**

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

# THOMAS J. WOOTERS

**CERTIFIED COPY**

Reported by:
SUSAN LOZZI

**Steno**
**Agency, Inc.**

**315 West 9th Street**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(888) 707-8366**
**NV: Firm #108F**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

WARREN F. JONES )
Plaintiff )
) CIVIL ACTION
v. ) NO. 1:24-cv-00350
)
CHEVRON PHILLIPS )
CHEMICAL COMPANY LP, )
Defendant )

VIDEOTAPED DEPOSITION OF THOMAS J. WOOTERS, a witness in the above-entitled cause, taken remotely from Doha, Qatar, before Susan Lozzi, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, pursuant to the Federal Rules of Civil Procedure, on Wednesday, October 1, 2025, commencing at 9:02 a.m. Central Time.

APPEARANCES:

SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana 70601
(337) 480-0101
For the Plaintiff.
BY: JAMES E. SUDDUTH, III, ESQ.
james@saa.legal
(via Zoom.)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
500 Dallas Street - Suite 2100
Houston, Texas 77002
(713) 655-0855
For the Defendant.
BY: MARLENE C. WILLIAMS, ESQ.
marlene.williams@ogletree.com
(via Zoom.)

ALSO PRESENT (via Zoom):
Nicholas Ketzel, Videographer.
Stephanie John, CP Chem Representative.
Austin Matthews, CP Chem Representative.



INDEX


| THOMAS J. WOOTERS | Page |
|---|---|
| Direct Examination by Mr. Sudduth | 6 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| Exhibit 1 | NOTICE OF DEPOSITION. | 25 |
| Exhibit 2 | E-mail correspondence, CP CHEM 000706 and CP CHEM 000707. | 47 |
| Exhibit 3 | Accommodation Meeting: Warren Jones 10/3/2022 4:00 pm, CP CHEM 000814. | 51 |
| Exhibit 4 | E-mail correspondence, CP CHEM 000705. | 68 |
| Exhibit 5 | Letter to Warren Jones from Chelse Cisneros, October 19, 2022, CP CHEM 000739 and CP CHEM 000740. | 73 |
| Exhibit 6 | E-mail correspondence, CP CHEM 000741 and CP CHEM 000742. | 75 |
| Exhibit 7 | E-mail correspondence, CP CHEM 000770. | 82 |
| Exhibit 8 | E-mail correspondence, CP CHEM 000811 and CP CHEM 000812. | 91 |
| Exhibit 9 | E-mail correspondence, CP CHEM 000745 through CP CHEM 000748. | 123 |
| Exhibit 10 | One-page typewritten document, CP CHEM 000817. | 128 |
| Exhibit 11 | E-mail correspondence, CP CHEM 000809 and CP CHEM 000810. | 129 |
| Exhibit 12 | E-mail correspondence, CP CHEM 000796 and CP CHEM 000797. | 131 |




EXHIBITS CONTINUED


| | | |
|---|---|---|
| Exhibit 13 | E-mail correspondence, CP CHEM 000792 and CP CHEM 000793. | 133 |
| Exhibit 14 | Unit Review Committee for Job Qualification, 8/24/22, #1, CP CHEM 001341 and CP CHEM 001342. | 154 |
| Exhibit 15 | Unit Review Committee for Job Qualification, 9/22/22, #2, CP CHEM 0001343 and CP CHEM 0001344. | 157 |
| Exhibit 16 | EU1544 Unit Review Committee EU1544 Heater DCS, CP CHEM 001360 through CP CHEM 0001370. | 161 |
| Exhibit 17 | EU1544 Unit Review Committee EU1544 Heater DCS, CP CHEM 001371 through CP CHEM 001381. | 166 |
| Exhibit 18 | Unit Review Committee for Job Qualification, 11/17/2022, CP CHEM 001345 and CP CHEM 001346. | 170 |
| Exhibit 19 | Unit Review Committee for Job Qualification, 12/15/22, CP CHEM 0001347 and CP CHEM 0001348. | 187 |
| Exhibit 20 | Application for Job Vacancy Notice Number 2022 -1, CP CHEM 000778. | 188 |
| Exhibit 21 | E-mail correspondence, CP CHEM 000756. | 190 |
| Exhibit 22 | Termination Recommendation Memo, CP CHEM 000121. | 197 |
| Exhibit 23 | Accommodation Meeting: Warren Jones 10/3/2022 4:00 pm, CP CHEM 000119 and CP CHEM 000120. | 199 |


*** Original exhibits retained by the court reporter and returned to Mr. Sudduth ***



P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER: So good morning. We are on the record at 9:02 a.m. Central Time, October 1st, 2025, to begin the deposition of Thomas Judson Wooters in the matter of Warren F. Jones vs. Chevron Phillips Chemical Company LP.

The venue of this case is in the United States District Court for the Eastern District of Texas, Belmont Division. The case number is 1:24-cv-00350.

This deposition is taking place via Zoom. The legal videographer is Nicholas Ketzel, here on behalf of Steno, whose business address is 315 West Ninth Street, Suite 807, Los Angeles, California 90015. Would counsel please identify yourselves and state whom you represent?

MR. SUDDUTH: Yes. James Sudduth on behalf of the Plaintiff, Mr. Warren Jones.

MS. WILLIAMS: Marlene Williams on behalf of Defendant Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, Counsel. Will the court reporter please identify yourself and swear in the witness?

COURT REPORTER: My name is Susan

Lozzi. I am a court reporter. The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.

The parties and their counsel further agree that while I am a notary public, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me.

If any party does have an objection to this manner of reporting or anything stated above, please state so now.

(Pause.)

COURT REPORTER: Hearing none, we can proceed. Would you please raise your hand and I will swear you in.

THOMAS J. WOOTERS, having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY MR. SUDDUTH:

Q. All right. Mr. Wooters, good morning, sir.

**A. Good morning.**

Q. I know we've never met before. My name is



James Sudduth and I'm representing Mr. Jones. Nice to meet you, sir. Let me ask you, Mr. Wooters, have you ever been deposed before? Meaning in a deposition like this.

**A. No. This is my first.**

Q. First time for everything, huh? Well, let's go over some ground rules. I'm sure counsel for CP Chem has been giving you some ground rules of what to expect, but I'm going to go over a couple things with you.

The first, sir, is I can realize that this seems somewhat informal. You know, you're -- it looks like may be at your location, whether it's an apartment or a house, wherever it is in Qatar. I'm in my conference room.

So we're not in a courtroom. We don't have a judge or a jury sitting right here with us, so it can seem a little bit informal.

But the oath that you just took is the same oath you'd take as if we were in a court of law and we did have a judge with us and so all the same obligations to tell the truth, all the same penalties of perjury if you do not, all those attached here just like they would in a court of law. Do you understand that?



**A. I do.**

Q. All right. And are you okay with that?

**A. Yes.**

Q. Very good. The next thing, sir, is to please ask you to verbalize your answers. What I mean by that is this: You'll find that it's really conversational, really common a lot of times to say things like mh-hmm or uh-uh when you're answering questions. That's really hard on madam court reporter to get that right because she's putting everything down into a transcript that we're saying.

So whatever your answer is today, sir, whether it's yes, no, maybe, whatever the answer is please verbalize that answer out loud. Okay?

**A. I can do that.**

Q. Thank you so much. The other thing, it's very important especially when we're doing these depos by Zoom because Zoom when people are talking over each other will actually cut off one of the speakers sometimes entirely. You don't hear anything that person has to say.

So this is especially important in this kind of a deposition. It's a remote deposition. I would ask you to please, sir, let me finish my question before you start to answer. You'll find



what tends to happen sometimes is I'm asking a question. You know where that question's headed and so you go ahead and you just start to answer it before I'm done asking it.

Well, the problem there is at least for the situation we're talking over each other, I'm asking, you're answering at the same time and now we're talking over each other and then we don't get any of your answers.

So I will try -- I'm sure I'm going to make the mistake. You'll make the mistake. I'm -- I'm sure I'm going to assume your answer is done at times when it's not done and so I'll starting asking my next question.

I'm sure we'll break that rule numerous times today. We'll try not to, but if you would, please, sir, even though it gets a little tedious, please let me finish that question all the way out to its end before you start to answer it. Okay?

**A. I can do that.**

Q. Thank you very much, sir. The final thing I'll go over with you is breaks. This is not a marathon. Okay? If you need a break, water, bathroom, whatever the case is, you're welcome to it.

My only request of you is this: If I have a question that I've asked you, meaning the question's pending on the table to be answered, answer that question first before you go take any break you desire. Okay?
**A. Okay.**
Q. Very good. Do you have any logistical questions of me, Mr. Wooters, before I press further?
**A. I don't think so.**
Q. All right. Very good. Then give me your full legal name and address for the record, please.
**A. Thomas Judson Wooters. I live in Doha, Qatar. I don't know how much more specific about Doha, Qatar, you need.**
Q. Well, I imagine since you've got your CP Chem uniform on that you're not in Doha, Qatar, because you were born there.
**A. Correct.**
Q. Okay. Probably because you work there. So let's do it this way: How long have you been stationed out in Qatar?
**A. Yeah, that's fair. And I -- I just got home from work so that's -- I would have changed into better -- better clothes but I just -- just**



**walked in the door. So I've been here for a year and four months.**
Q. Okay. And do you have any kind of estimated completion date maybe on when you might be returning home?
**A. I do. Approximately five years total.**
Q. Okay. So maybe another four years or so give or take?
**A. Yeah. Yes, sir.**
Q. Okay.
(Pause.)
Q. What is your position out at this Qatar facility?
**A. I am the operations superintendent for the Ras Laffan Petrochemical plant, ethylene unit.**
Q. And when I said earlier sort of returning home after the five years, that's more what I meant in terms of address.
What -- what is your home base when you're not stationed around the world? Where's home for you?
**A. So we do not have a -- a home address. We use the CP Chem PO box number. Houston is home for me.**
Q. Okay.



**A. But...**
Q. So if you had to -- to say a home address when it's not traveling for CP Chem, it would be Houston?
**A. Yes, sir.**
Q. Okay. All right. How long have you been with CP Chem?
**A. I have been with CP Chem since 2008, so over 16 years.**
Q. Since this is my only opportunity to kind of get to know you a little bit absent, you know, a trial and to ask you some questions so I can understand your background, you know, from an educational standpoint, I assume you graduated high school but after that -- let me just confirm. Did you?
**A. Yes, I did.**
Q. Okay. After that did you attend any sort of vocational or training school or community college or college?
**A. Yes, sir, I did.**
Q. Where at?
**A. I have a bachelor's in chemical engineering from Brigham Young University and a master's in chemical engineering from Oklahoma State**



**University.**
Q. When did you obtain that master's?
**A. That would have been 2008.**
Q. Okay. So did you sort of -- was your education straight through? And what I mean by that is you complete your bachelor's; then you go straight into your master's or did you work in-between the two?
**A. I worked for like eight months in-between.**
Q. Did you work in those eight months for CP Chem?
**A. No, I did not.**
Q. Okay. Who did you work for?
**A. I worked for Amerada Hess.**
(Pause.)
Q. Did your employment with them end because you were going back to school or did it end for some other reason?
**A. It ended because I was starting my master's program.**
Q. Okay. All right. So you got the master's in 2008 from Oklahoma State. In 2008 did you immediately -- then that's when you commenced your work for CP Chem?
**A. That's correct, yes.**

Page 14

Q. All right. Did you work for CP Chem in any capacity prior to 2008?
**A. I did. I interned for CP Chem the summer of 2007.**
Q. So aside from that brief stint for eight months with the other company, your professional career has largely been CP Chem?
**A. Yes.**
Q. Okay. When you started in 2008 with the company, what was your position then?
**A. I started as a process control engineer.**
(Pause.)
Q. And how long did you serve in that capacity?
**A. I did that for six years.**
Q. So about 2014? 2008 to 2014?
**A. Yes, sir.**
Q. Okay. So then 2014 what was your position?
**A. In 2014 I was moved to Saudi Arabia at one of our petrochemical plants there as a operations engineer.**
Q. Was that move from a process control engineer to an operations engineer, was that considered a promotion?

Page 15

**A. No. No. It was lateral.**
Q. Lateral. Okay. How did the opportunity for Saudi Arabia present itself? Did you want to go to Saudi Arabia? I mean, what happened there?
**A. Yes. We -- we wanted to go overseas and try something -- something a little different, but it lined up, so...**
Q. I'm sure it satisfied the "a little bit different" requirement. I'm sure it was different, but...
**A. Yes, sir.**
Q. All right. So how long were you in that role?
**A. We were there for five years, completing in 2019.**
Q. Okay.
**A. You said "that role." I did -- I did have one job change while I was there but stayed in Saudi for the five years.**
Q. Thank you. Okay. So Saudi Arabia was for five years, but what was the job change during those five years?
**A. So a little over three years into the role there as an operations engineer I was offered and took a role as an operations superintendent.**

Page 16

**They actually -- the title was called operations manager, but it's effectively the same job as our U.S. plants call a operations superintendent. That will become meaningful because my next job was operations superintendent after this in the U.S.**
Q. So then three years in approximately maybe 2017, if my math is right?
**A. Mh-hmm. Yeah.**
Q. That move to operations manager or as you -- as you've testified is sort of comparable to an operations superintendent, that move, that was a promotion?
**A. Yes, sir.**
Q. Okay. You served in that capacity until 2019 and then in 2019 what happened?
**A. 2019 I repatriated to Texas and went to our Port Arthur facility as operations superintendent.**
Q. Was that move to Texas, to the Port Arthur facility, was that a lateral or was there any kind of, you know, promotion as an operations superintendent at that facility?
**A. It was a lateral.**
Q. And you served as operations

Page 17

superintendent over Port Arthur for how long?
**A. I was there for five years.**
Q. So 2019 to 2024?
**A. That's correct.**
(Pause.)
Q. When you came into Port Arthur, was it always scheduled to be a five-year stint?
**A. It was always assumed it would be five years plus or minus, yeah.**
Q. Okay. So you had -- Saudi Arabia was about five years. Port Arthur was about five years and then now Qatar is the same, about five years?
**A. Yes.**
Q. Okay. How did the opportunity present itself for -- I guess I didn't clarify this. Let me clarify this. In 2024 when Port Arthur ended, is that when the Qatar position began?
**A. It did, yes.**
Q. Okay. All right. When you went to Qatar, what was your title there?
**A. Operations superintendent.**
Q. Got you. So lateral?
**A. Yes.**
Q. Lateral just with a change of scenery?
**A. That's right.**

Q. Okay.
(Pause.)
Q. Okay. Once you were in Qatar -- let me now ask how that opportunity presented itself. How did the opportunity to go to Qatar present itself to you?
**A. We -- we -- we post jobs internally and when the job was posted, I -- I wanted to go back overseas. We enjoyed our five years and so applied, interviewed internally and then was offered the job.**
Q. Okay. So you're saying "we." Your family is with you in Qatar?
**A. That's correct.**
Q. Okay. Do you have any kind of slate as to what's next after Qatar? Any idea?
**A. Don't know. Don't know.**
Q. All right.
**A. I'll stay here longer if they'll let me. We -- we enjoy it. We enjoy it here.**
Q. Fair enough. So obviously the crux of what I'm going to talk to you today about is going to be this time period here of 2019 to 2024 when you were in Port Arthur as the operations superintendent, so we're going to focus on that part of your career. But before I dive into that, let me



just ask you, at any point in time as we've gone through your time history with CP Chem, I see the promotion. There's been several lateral moves. I see the promotion. Has there been any disciplinary history? Meaning have you ever been disciplined in your time at CP Chem?
**A. No.**
Q. Okay. And that includes even things such as like a PIP. Have you ever been put on a PIP in your time at CP Chem?
**A. No, I have not.**
Q. In your -- in your role as an operations superintendent, is it fair to say you supervised individuals?
**A. That is correct.**
Q. Okay. So you had the capacity or the authority to discipline people in that role?
**A. I did.**
Q. You had the capacity and the authority to issue write-ups and PIP's and verbal coachings and verbal counselings? Things of that nature?
**A. That is correct, with consulting with our -- with the leadership team in Port Arthur, yes.**
Q. Okay. Did you have the authority to effectuate terminations?



**A. No.**
Q. Okay. Who did have the authority to effectuate a termination?
**A. I think that authority derives outside of the site. I can give, you know, my -- my -- my recommendation. Ultimately I believe it's outside of the site. So like a Bryan Canfield, that level.**
Q. In your time as the operations superintendent, did you ever make recommendations for termination? And I'm talking about your time in Port Arthur.
**A. Yes. Yes, I did.**
Q. Okay. Were any of your recommendations ever overturned? Because you're talking about the idea that somebody else, Bryan Canfield or someone else higher up beyond you is going to make the final decision. They're going to rely largely upon your recommendation, so what I want to know is, have your recommendations ever been over turned or rejected?
**A. No.**
Q. In terms of discipline, you mentioned it was sort of consultative with the leadership team. What I want to know is what sort of things were consultative versus not. I would assume if you needed to verbally just coach somebody or verbally



counsel someone, you could do that without consultation, but I don't want to make an assumption. I want to ask you. Is that true? Is that correct?
**A. Yes. Verbal coaching, yes.**
Q. Okay. What if you get to the level of say a -- write-ups? You're not going to do a PIP but you can do a write-up. If you're doing a write-up, does that need consultation or can you do that on your own authority?
**A. That requires consultation.**
Q. With whom?
**A. At least HR and my direct line supervisor.**
Q. I'm sorry. After you said HR, what was the position?
**A. Oh, the -- the operations manager. My direct line supervisor.**
Q. Who was your operations manager when you were at Port Arthur?
**A. Bryan Kubsch.**
Q. The entire time that you were at Port Arthur was Bryan Kubsch your operations manager?
**A. Yes.**
Q. Okay. So that chain of command, the -- the personnel in that chain of command stayed the

same for those five years?
A. **Yes, sir, that's correct.**
Q. Okay. During that time period -- you said if you're doing a write-up it would include HR and possibly even Bryan Kubsch.
During that time period if you wanted to issue a write-up, did HR or Mr. Kubsch ever overturn you?
A. **I would say that there are times when they wanted to change the wording. We worked together on making sure that it was right. I don't know that I would say that it ever overturned.**
Q. Now we'll go kind of one step further. We'll get into a -- into a PIP. If you wanted to issue a PIP, was that consultative with HR and the operations manager as well?
A. **Yes, sir.**
Q. Okay. Same thing there. Did they ever overturn, meaning you may want to issue a PIP. We're just -- we're not going to do a PIP.
They may have changed the wording on the PIP, but did they ever reject the idea of a PIP and say we're just not doing it?
A. **No. It was never rejected in the recommendation of a PIP.**



Q. Okay. What about were there ever situations where there was a suspension or a demotion? So not a termination but some kind of a suspension or a demotion. Did that situation ever crop up in your five years at Port Arthur?
(Pause.)
A. **The only sus -- true suspensions from work that -- that cropped up resulted in termination. There were a few times when somebody was put on leave without pay as part of discipline.**
Q. When you got to that level where it was leave without pay or -- or suspended, maybe pending a termination, those kind of decisions, was it consultative with anybody else aside from HR and the operations manager or it was still that -- those two people?
A. **At the level that you just described it's still just HR and my direct line supervisor, Bryan Kubsch.**
Q. Okay. Any situations where you recommended leave without pay or you recommended a suspension and Bryan Kubsch or HR overturned you or rejected it?
A. **No.**
Q. Okay.



(Pause.)
Q. Prior to being the operations superintendent at Port Arthur when you were an operations engineer in Saudi Arabia or a process control engineer prior to that, did you supervise people in those roles?
A. **No, I did not.**
Q. Okay. When you became the operations superintendent I think in Saudi Arabia midway through that job, did you pick up supervisory authority there in Saudi Arabia?
A. **Yes, I did.**
Q. Okay. So those two years there from about 2017 to 2019 was the first two years in your career where you were in a supervisory capacity?
A. **That is correct.**
Q. All right. About how many people do you think you supervised when you were in Saudi Arabia for those two years?
A. **It would have been 50 to 60 people.**
Q. The 50 to 60 people would have been all operators?
A. **Operators, some engineers and, yeah, a couple engineers and most -- but the rest operators. Shift supervisors.**



Q. And then your time in Port Arthur as operations superintendent, how many people under your supervision?
A. **Approximately the same number. About 60.**
Q. Same categories of people as well? Operators, engineers, shift supervisors?
A. **Yes, sir.**
(Pause.)
Q. Obviously you -- you know that you're in your deposition today because you probably got a Notice of Deposition before this.
I'm sure that, you know, the attorneys for CP Chem maybe forwarded you that notice that we sent them, but if you didn't see that, did you see that Notice of Deposition?
A. **I -- I know -- I know the -- the reason for the deposition.**
MR. SUDDUTH: Okay. What I'm going to do is I'm going to make the notice of deposition today which sets your deposition for today, we'll make that Exhibit 1 to your deposition attached it hereto.
(Exhibit 1; so marked.)
Q. When you got that Notice of Deposition, you saw it said Warren Jones vs. CP Chem. If I say

the name "Warren Jones," do you know who Warren Jones is?
**A. I do know Warren.**
Q. All right. Let me ask you, prior to your deposition, aside from maybe that Notice of Deposition that you looked at, I don't want to know of any conversations that you may have had with the attorneys for CP Chem, so I don't need to know about those, but I do want to know about documents that you may have looked at. Did you look at any documents in preparation for your deposition today?
**A. I looked at documents related to what I sent to our legal team.**
Q. Documents that you sent to the legal team?
**A. Correct.**
Q. Okay.
**A. From -- from -- from prior. From when I was asked to.**
Q. Okay.
**A. However long ago that was.**
Q. Okay. And I know the -- the case has been pending for some time because the case had an EEOC process that it was in; then the case formally got filed, so I'm sure you saw documents at some point in time in the history of the case. Let me try to



pinpoint a time period here. When you were sending these documents to the attorneys, were you still in Port Arthur when you were doing that?
**A. Yes. When I -- yes. When I first started, yes, I was.**
Q. Okay. So you were sending these documents sometime prior to 2024.
**A. Yeah, I believe that's right.**
Q. Okay. Do you recall any specifics of what these documents were? What were you sending them?
**A. They would have been e-mails, copies of the disciplinary files that I had on record. Yeah, any -- any history of any conversation which is -- which is basically all in the e-mails.**
Q. So prior to your deposition today, you pulled those e-mails when you sent that information to the attorneys and you -- did you review the actual documents in those e-mails prior to your deposition today?
**A. In -- during the consultation I had with -- with our CP Chem representative, legal representative, yes.**
Q. Okay. When was -- again, I don't want to know anything you said in that meeting, in that consultative meeting, but when was that meeting?



**A. That was last Friday night, which is...**
(Pause.)
**A. I'll tell you in a sec. 20... 26th. The night of the 26th. The night for me.**
Q. Got you.
**A. It was a late one.**
Q. Yes. Because currently you are in Qatar. It is 9:00 a.m. or 9:27 a.m. my time, but it is what time for you currently?
**A. It is 5:27 for me.**
Q. 5:27. Okay. 5:27 p.m.?
**A. P.m. P.m.**
Q. Okay.
(Pause.)
Q. So aside from those documents, the lawsuit that Mr. Jones has filed, have you ever seen the lawsuit that's been filed?
**A. I don't think so.**
Q. Okay. Do you -- do you know or do you have any understanding as to what the specific allegations are that Mr. Jones is making?
**A. No.**
Q. Okay.
**A. Other than what Mrs. Williams and I talked about Friday night, but I'm not sure that those were**



**all -- were all details.**
Q. Okay. Is the first time that you ever met Mr. Jones -- he had been working for CP Chem for sometime and so had you, but was the first time that you ever met Mr. Jones whenever you got assigned or you went over to the Port Arthur location?
**A. Yes. That is the first time I met Mr. Jones.**
Q. Okay.
**A. Do I need to say Mr. Jones? Is it okay if I say Warren or do --**
Q. No, it's okay.
**A. -- say Mr. Jones? Okay.**
Q. No. It's -- it's whatever you're comfortable with.
**A. Okay. I didn't know if there was an appropriate for the court proceedings.**
Q. No. No. I -- you know, I'm -- I'm calling you Mr. Wooters because, you know, just trying to be respectful and professional but obviously you and Warren worked with each other, so --
**A. Okay.**
Q. -- you -- you may know him and -- and remember him as -- as Warren and that's perfectly

fine. There's -- there's no hard, fast rule about that.
**A. Okay.**
Q. So you met Warren in 2019 first time?
**A. That's correct.**
Q. Did you know him in any way personally prior to meeting him professionally in the workplace?
**A. No, sir.**
Q. Okay. When you met him, any -- any problems? I mean, any issues when you met him? Did you guys dislike each other from the start? Did you like each other from the start? Tell me about that.
**A. Oh, no. No issues at all. Warren's a very pleasant person.**
Q. Okay. Good working relationship with him?
**A. Yeah, I think so. When we'd see each other we'd say hello, shake hands. Very -- very professional, but, you know, warm -- warm hellos.**
Q. Got you. In your role as operations superintendent and in Warren's particular role, how often would you interact with him?
I -- I don't know what it was like out there at the Port Arthur facility. Is it something where you would say hello to him once a week? Would



you see him numerous times a day? Tell me about that.
**A. Probably about once a month.**
Q. Once a month. Okay.
**A. Yeah.**
Q. So what was your -- at that time period, what was your particular schedule?
**A. So I -- I worked five -- four to five days a week. My schedule changed part way through working there, but I was a Monday through Friday or Monday through Thursday depending on the week and Warren was on shift work.**
Q. So you were Monday through Thursday, Monday through Friday. Were you days?
**A. That's correct.**
Q. Okay. What -- what are the hours for -- for day?
**A. About 7:00 to 5:00.**
Q. Okay.
**A. Give or take.**
Q. So you're -- you're on a more typical schedule when you're on that particular schedule of Monday through Friday 7:00 to 5:00; whereas, Warren is -- he's rotating. He's on shift work?
**A. That's correct.**



Q. Okay. So Warren's got to have one of his shifts -- he can't be on nights. He can't be off. He's -- he's got to be on a dayshift where the two of you can have the opportunity to pass each other?
**A. That's correct.**
Q. Okay. And that particular crossover would happen about once a month?
**A. Approximately. There's -- sometimes it would be more, but the -- the most consistent at times I'd see him is -- is when they would coincide. The four days they'd work on days they coincided with my dayshift.**
Q. Okay.
**A. Which is one once a month.**
Q. What about during the time period -- and we'll talk about this, but there was a time period I think, you know, whenever he's training on the heater board, whenever he had a run of, like, 35 days where he's just sort of dedicated to training.
As I understand it -- and I could be wrong so please correct me if I'm wrong. As I understand it, the 35 days was more of a dayshift kind of schedule when he was training. Is that right or wrong?



**A. When -- the initial training on the board is on shift.**
Q. It's on shift. Okay.
**A. That's correct.**
Q. What about any retraining?
**A. It depended -- it wasn't always the same for everybody. Usually the first retraining -- I'm -- I'm trying to remember for -- for Warren's case, but usually the first retraining would be on shift. It would be potentially later times that he would stay on straight days.**
(Pause.)
Q. Do you have any particular recollection on whether or not there was any training or retraining that Warren did that was on straight days versus on shift?
**A. I believe the initial retraining following his PIP, so when his PIP was issued I believe that that training was on days. Retraining was on days.**
Q. So in that particular time frame, that training after the PIP, every single day for him is on days, so is it fair to say that your interactions with him might have increased to once a day during that time frame?
**A. Probably not quite once a day but much**

**more frequent. Like a couple times a week I would see him.**
Q. Okay.
**A. My office is in a different building than the control room. It didn't mean I didn't have opportunities to, but it increased to probably a couple times a week.**
Q. When Warren -- when you first met him, when you first went out to the facility in Port Arthur, what was he assigned to? What was he working, if you remember?
**A. I think he had just recently qualified in the distillation outside area and so he was working in that area.**
Q. As I understand it from some of these depositions that I've taken, there is a -- a process whereby, you know, the CP Chem operators, they -- they rotate to train on different areas within the facility, is that correct?
**A. That is correct.**
Q. Okay. How many different areas are there that an operator at that facility in Port Arthur needs to train on?
**A. There are six total areas an operator is expected to train on.**



Q. At the time that Warren had just qualified on distillation, what -- do you recall at that time what areas he was qualified in and what areas still remained to be qualified in?
**A. I believe he had qualified in all of our outside areas. There are three outside areas: heaters, compressors and distillation.**
Q. Okay. So he is at this time qualified on heaters, compressors and distillation?
**A. Outside. Outside only.**
Q. Outside only. So he has three out of six areas at this time?
**A. That is correct.**
Q. Is there any particular time frame as to the operators need to be qualified on all six areas in six months? In six years? In one year? Is there any time frame on how long that qualification process is to take?
**A. There's not a -- a documented, that I'm aware of, maximum time required. We try to move them through though. As soon as we have availability for -- to support the training, we try to move people through as quickly as we're able.**
Q. The other three areas that had to be trained on were what?



**A. The other three areas are called console jobs. They're working at a -- in -- inside the control room at a -- in a room with -- with screens, monitors, and it mirrors the outside job so it's heaters, compressors and distillation. Just the console version of that job.**
Q. Okay.
(Pause.)
Q. Yeah, so you said that there's -- there's not a -- a dedicated or a specific time that these trainings need to be completed.
But as I understand it I think maybe it's based upon seniority, so the longer you've been there, okay, you might be up now for it's your turn to go train on this -- this particular area, is that right?
**A. Yes, sir. That's correct.**
Q. Warren was union, meaning he was within the union. He had a Collective Bargaining Agreement. Is that your understanding?
**A. That is correct.**
Q. Okay. Are you union?
**A. No, sir.**
Q. Okay. Do you -- is there a requirement that you know of where you have to work with the



union when it comes to training and whether or not the person is going to begin training or commence training? Does that require consultation with the union?
**A. As a -- as a matter of professionalism we work with the union to ensure we're following the expectations for most senior person training.**
Q. Does a -- and just in your experience, does an operator have the right to say I may be the most senior but I -- I don't want to -- I don't want to train. Pass me over. Take the next guy?
**A. They -- they don't have the right to not train. However, we do try to come to mutual agreements where it makes some sense to -- to -- to right -- right size that training, but if we ask the individual that they are to train, they're the most senior person, they will train.**
Q. Can an individual -- because I -- I've worked with a Collective Bargaining Agreement. Can an individual remove himself from the training and go back to the operator pool?
**A. So the operator pool does not remove them from the their requirement to train. The operator pool simply means that they do not have what's called a -- a set schedule. It actually removes --**

**it -- it adds flexibility for me to train them wherever I want to.**
Q. Okay. In fact, at some point in time in this case Warren had made the request to go to the pool, didn't he?
**A. That is correct.**
Q. So if they go to the pool, then you can train them anywhere you want to?
**A. I can train them anywhere on the plant.**
Q. Okay. Not just in ethylene.
**A. That is correct.**
Q. Okay. Because the six areas that we're talking about, these six areas deal with just ethylene?
**A. That is correct.**
Q. At the time that Warren was training on the heater board, were there any other operators that were training on the heater board?
**A. I do not recall.**
(Pause.)
**A. On that shift, on his shift, no. On other shifts possibly.**
Q. Okay. What about -- what about seniority? Aside from me just asking for the -- some documents from CP Chem that shows me the history of all 60



people, was Warren the most senior person to commence training on the heater board?
**A. He was the most senior available person to commence, to train.**
Q. Okay.
**A. Meaning he was the most senior person that didn't yet have that qualification.**
Q. Okay. Yeah, so I wanted to get clarification on what you -- when you just said "available" what that meant.
So "most senior available" meaning he was the most senior -- of the 50 or 60 people that -- that you supervise, he was the most senior that did not have the qualification on the heater board?
**A. That is correct.**
Q. Okay. How many other people did not -- at that time did not have qualification on the heater board?
**A. I -- I don't recall.**
Q. Would there be any kind of document? I guess aside from their -- their resumes perhaps or -- or some -- some documentation that CP Chem would keep, is there documentation out there that shows all -- a listing of the operators, when they started, what they're qualified on, what they're not



qualified on?
**A. Yes.**
Q. Okay. Did you have the capacity as the operations superintendent if -- if Warren was struggling in an area of training, did you have an opportunity to kind of put him to the side, train some other people and retrain him at a later date?
**A. We did not. Our policy did not allow for that.**
Q. Your policy did not allow for that. Okay. What policy are you referring to?
**A. We would -- a training policy. It's an HR policy that defines the training process.**
Q. And that's an HR policy, the training policy you're referring to?
**A. That's correct.**
Q. All right. I want ask you some more questions about that so let's just kind of put a star by this and we're going to circle back to this and come back to this and -- and talk more about that, but I should make a note of that for now.
I want to keep going through the -- the -- these console jobs. The heater inside job, what about -- did you have any authority as the operations superintendent to -- since he was the



most senior person stop the training on the heaters and move him to the compressors?
**A. No.**
Q. Train him on the compressors.
**A. No.**
Q. Did you have the authority to move him over to distillation, train him on distillation?
**A. No.**
Q. Why not?
**A. Our training policy as agreed to with the -- with the union, they're aware of our policy. We -- we always present any changes to the policy with them, stipulated the training timeline and the steps of the training.**
**And it did not have -- that I'm aware of did not have any flexibility for moving people between different jobs while they're training. Sorry. Different training positions while they're training.**
Q. Okay. And you're basing that upon the -- the training policy, the HR policy that you've just referenced to me earlier?
**A. Yes, sir.**
Q. Okay. So put another star by that. I want to ask you now about the pool. In terms of the

Page 42

operator pool, it allows you to train him or to send him anywhere to work anywhere inside the plant. When Warren put himself in the pool, did you have the authority to train him outside of ethylene?
**A. I could have when he completed his heater qualification, yes.**
Q. Why was it necessary to complete the heater qualification before moving him somewhere else in the plant?
**A. Because our policy dictated that once you start your training program you follow the training program to its completion.**
Q. So you did not even have the ability or the -- the authority to pull him out of the heater board training and just move him to a different part of the plant and start training over there?
**A. That's correct.**
Q. So once he starts the heater board he's got to either finish it successfully or fail it, but he's -- he's got to go all the way?
**A. That is correct.**
Q. Okay. So now I want to take that -- that -- all that stuff about the policy and I want to ask you now about an accommodation. Are you familiar with reasonable accommodations or the

Page 43

Americans with Disabilities Act? I mean, you're an engineer. You probably may not be familiar with it. I expect HR to be familiar with it. I don't know if you're familiar with it, but you tell me.
**A. Yeah. In -- in general from like a -- a -- in general, yes. I -- I -- we had some accommodations at times we had to -- short-term, very short-term accommodation had to be made, so familiar that sometimes we have to make some short-term accommodations.**
Q. When you had to make short-term accommodations, that happened in Saudi Arabia or that happened in Port Arthur?
**A. In Port Arthur.**
Q. Okay. When you say "short-term accommodations," what do you mean by that?
**A. Yeah, something where somebody got injured at home and needed a temporary short-term change of job where they already were qualified in something and so we might mutually agree with the union that we would assign them to one of their previously already qualified jobs until they had gotten past their -- their short-term disability requirement.**
Q. Okay. All right. So I -- I -- I think I understand what you're saying. I go home and I --

Page 44

and I have an accident. I break my hand and I need you to help me for a few weeks while my hand heals up?
**A. Yes, sir.**
Q. Okay. Well, what about -- had you ever dealt with an accommodation that is not temporary, an accommodation that is genetic, an accommodation that's -- or -- or an issue, disability that is going to be with this person and has been with this person for their lifetime? Was Warren Jones the first time you ever dealt with a situation like that?
**A. Yes, sir.**
Q. Okay. Have you dealt with a situation like that after Warren Jones?
**A. No, sir.**
(Pause.)
Q. I have -- and -- and I'll -- I'll show you so we can talk about it, but I have, you know, the accommodation meeting that -- that occurred and the minutes from it and we'll go over it together, but when was the first time that you became aware that you recall of the eyesight issues that Mr. Jones was having?
**A. It would have been close to the time when**

Page 45

**he was going to take his second test. So he took his -- he took his first test and then he did not pass it and then sometime just before he took his second test was my recollection.**
Q. Okay. Do you recall how you became aware of it?
**A. At first was -- the information was passed to me in a one-on-one conversation with Clay Ryan.**
Q. Oh.
**A. And then I -- I think -- I think that day or maybe the -- I think it would have been that day or maybe it was the day after that I received an e-mail.**
Q. You received an e-mail from whom?
**A. I think it -- I think Warren forwarded me an e-mail about it from his doctor I think.**
Q. Okay. So he forwarded -- Warren forwarded you an e-mail that would have included a letter from his ophthalmologist, Dr. Hart?
**A. Yes, that sounds right. I think I have that timing right.**
Q. Did you review the letter from Dr. Hart?
**A. Yes.**
Q. Okay. Did you discuss the letter from Dr. Hart with anyone?

**A. Yes.**
Q. Who did you discuss it with?
**A. It would have been HR, so Chelse Cisneros -- I'm sorry -- Chelse Morris. She got married around then. Aprile Danford, Bryan Kubsch.**
Q. Yeah, I -- I have deposed Aprile, Bryan and Chelse so far in this case and so if I refer to Chelse as Chelse Cisneros, are we on the same page that Chelse Morris or Chelse Cisneros is the -- we're talking about the same person?
**A. Yes.**
Q. Okay. All right. Because I -- I may also do what you did. I may say the wrong last name. It's just a lot of these e-mails have Chelse Cisneros on them, so...
**A. Understood.**
Q. What I'm going to do, Mr. Wooters, I'm going to share my screen and I want to show you a document and we'll talk about it and go over it together. Let's see.
(Pause.)
Q. Can you see my screen, sir?
**A. I can, yes.**
Q. I'm sure it's kind of small. Bear with me. I'm going to zoom in to try to help you out



here. Is that better to see?
**A. Yes, that's great.**
MR. SUDDUTH: Okay. Very good. This is CP Chem 706 to 707. So, madam court reporter, this will be an in-globo exhibit because it's two pages but it will be Exhibit 2, 707 to 706.
(Exhibit 2; so marked.)
Q. Mr. Wooters, as you know with e-mails, you have to sort of start from the bottom, work your way up so we'll start here at the bottom which says, "Please find attached notes and concerns. Thank you, Dr. William Hart."
And then up here we see where it looks like Warren forwards a message to Judson Wooters, Aprile Danford, Clay Ryan and Chelse Cisneros. Do you recall receiving this e-mail?
(Reviewing document.)
**A. Yes.**
Q. Okay. And let me verify. wootej@cpchem.com, that's your e-mail?
**A. That is correct.**
Q. All right. This e-mail purports to say that it was sent September 19th, 2022, at 8:12 a.m. Any reason to disagree with that date?
**A. No, I don't think so.**



Q. Okay. Good morning. This letter is from my Optometrist and my recent eye exam. Ever since I've been training on the heater board I've been in and out of the eye clinic trying to get my vision where I can see the controls and reading clearly. Doing this time my Dr. found some concerns he wanted to share with you guys. Attached is a letter wrote by him on my behalf. Please look at the letter and get back with me please. Thanks [as read]. Did I read that correctly?
**A. Yes.**
Q. All right. This particular e-mail, is this e-mail the e-mail we were talking about together earlier whenever you said this was the first time that you became aware of some eye concerns?
**A. It looks like it, yes.**
Q. Okay. And actually to be fair to you and I want to be accurate about this, you told me that you found out about it with Clay Ryan first; then you mentioned the e-mail, so let me ask about Clay Ryan.
You said you found out about it in an in-person conversation with Clay Ryan. Was that in-person conversation over the phone or was that --



that was verbal to each other in person?
**A. It was verbal. Face-to-face.**
Q. Got you. Okay. Clay Ryan, to be clear, is the union representative?
**A. That is correct. He is the union chairman.**
Q. Okay. Describe that conversation for me. What did Clay tell you when he came up to you? How did he bring it up? What did he say?
**A. He just -- he told me that Warren had expressed that -- to -- to Clay that he had been seeing a doctor for his eyes. It was -- it was a pretty short conversation.**
Q. Okay. So if I'm understanding this right, Warren had actually gone to Clay to express some concerns and Clay's relaying them to you?
**A. Yes. I think if you look at the e-mail, I think -- and it's possible that my timeline of knowing exactly the date when he talked to me and the date when he sent this may have been a little off, but it does look like Clay is in that first e-mail on the 16th.**
Q. Yes. Yes. The one from the Hart Eye Center sent to Warren and to Clay. So -- and -- and you're right. I see it down here, September 16th,

Page 50

2022, so -- and I realize this is three years ago, so it's kind of a blast from the past to ask you these, but I'm going to see, you know, what's your -- if you don't recall, you don't recall.
But best of your recollection, do you think that you had that in-person conversation with Clay between when he got that e-mail September 16th but before you got the e-mail September 19th?
**A. I believe so.**
Q. Okay. So you had that in-person conversation; then you actually get the letter from Hart. You discussed it with -- I think you said with Clay and also with HR, with Aprile and -- and Chelse?
**A. When I received the letter, I discussed it then with -- with company leadership, so Aprile Danford, Chelse Morris and Bryan Kubsch.**
Q. Okay. Tell me about those discussions.
**A. It -- it was mostly about making sure that I knew the right next steps to take, if there was something that I should do further regarding his testing, the training process that required testing and et cetera, so...**
Q. Well, I --
**A. I don't know if I recall the exact**

Page 51

**conversations, but it was around getting the advice for what's the next thing to do.**
Q. Okay. In terms of getting advice for the next thing to do, did -- what did HR tell you?
**A. So HR asked me to proceed. I believe that at some point after this we -- we held some -- held a discussion with -- with Warren to discuss the -- the letter from his doctor. I don't remember the day of that meeting.**
MR. SUDDUTH: Well, yeah, let me show you since you brought up that -- that meeting. I'm going to flip to that page and we'll talk about that.
(Pause.)
MR. SUDDUTH: Madam court reporter, this will be Exhibit 3, and it should be just a one-page document, so it will be Bates labeled at 814.
(Exhibit 3; so marked.)
Q. If you see my screen here, sir, it -- it -- this is titled -- and Chelse Cisneros confirmed for me that she wrote this. These were her minutes of the meeting. So I showed you September 19th, that e-mail we went through together. This is now saying October 3rd, 2022.

Page 52

There was an accommodation meeting. Any reason to dispute that date of October 3rd?
(Reviewing document.)
**A. I don't think so. That -- that looks right.**
Q. Do you recall having a meeting where Chelse, yourself, Warren and Clay were present are?
**A. Yes, I do.**
Q. Okay. Was anybody else present aside from who's listed here?
**A. I -- I do not think so.**
Q. Okay. Where was this meeting held?
**A. That would have been at -- at the Port Arthur plant.**
Q. Right. Okay. But, you know, where physically inside the plant?
**A. I think it was in the conference room that's in the administration building near the HR side of the building.**
Q. And list -- or here there's a listing of different topics that were brought up in -- in these -- in these minutes from the meeting. Jones asked for 5 minutes to tell us the background of his vision issues throughout his life [as read]. I mean, do you recall that? Do you recall Warren kind

Page 53

of telling you how this got started and how long he's been having it?
**A. I do. I remember the conversation.**
Q. Okay. He talked about he had had Lasik in the past and it wasn't (sic) successful for him. Do you recall that?
**A. I don't remember that detail. I can read it here, but I don't remember the detail.**
Q. Okay. This -- this comment here, he's having "to squint to view the console." Any recollection of him saying that?
**A. I don't remember him saying that at the time, but it -- it's noted here so he -- he probably did.**
Q. Okay. "Feels completely burnt after the board." If you don't remember that, do you have any reason to dispute that?
**A. No.**
Q. Okay. He "Has drops that he brings with him to work but they don't help." Any specific recollection?
**A. No, no specific recollection.**
Q. Any reason to dispute it?
**A. No.**
Q. Okay. Always fought through the

Page 54

difficulty, has dealt through this his whole life [as read]. Let me ask you this one: Jones says when he's on the heating board, he feels he knows the material but the anxiety that comes over him [as read]. Any recollection of that and any reason to dispute it?

**A. I think that was his perspective.**

Q. Okay. That was his perspective?

**A. Mh-hmm.**

Q. Is that a yes?

**A. Yes. Sorry. Yes. That is -- that was his perspective at the time.**

Q. That's okay. I told you it was going to happen so it's -- it's very normal. It happens. So when you say that -- that's his perspective, I -- I want to ask about that because it seems like maybe you disagree with it as if that's how Jones felt but you don't necessarily agree. Am I reading that right?

**A. That's correct.**

Q. Okay. Why do you disagree with that comment?

**A. Certainly anytime that you're tested there's some anxiety. I've felt it. We've all felt it when you are asked to share what you know with**

Page 55

**others that has some bearing, the outcome has some bearing on the consequences. We do our best to make the -- the assessments where we're assessing people's abilities as comfortable as we possibly can.**

**But he -- he -- he did not -- he did not know and was not able to demonstrate knowledge in the areas that he -- he has to be able to demonstrate knowledge in to successfully qualify for that position.**

Q. Right. And we're -- we're going to go through the testing and I'll go through, you know, the -- the notes from the testing and things like that and I want to ask you a lot more detailed questions about that, about his knowledge in the areas that you're saying he didn't have knowledge.

But when you say that we've all felt that anxiety, I mean, to be clear, this didn't have some consequence. This was "the" consequence. If he didn't pass this, he -- he was going to be fired.

**A. Absolutely true.**

Q. Okay. It states here, "He doesn't want to put anyone in harm's way because he cannot properly see." Do you have any recollection of that comment? Do you have any reason to dispute it?

Page 56

**A. I don't have any specific recollection of that comment.**

Q. Any reason to dispute it?

**A. No, sir.**

Q. Okay. "Doctor has stated that he doesn't think they will get better." Any specific recollection? Any reason to dispute it?

**A. No, sir, no recollection and no reason to dispute it.**

Q. Okay. This notation here, "Brought up outside operator accommodation that was made in the past Clay said that never made it 'up here' assuming he meant HR and that was all that was said on this."

I've deposed -- obviously Warren has been deposed. I did not depose him but CP Chem took his deposition.

Warren brought up that in this meeting he did request to just let me work outside. You know, I'll work outside and I'll just do that.

Do you recall in that meeting Warren bringing up that as a -- as a -- an accommodation, as an idea that just let me work outside? Do you recall Warren saying that?

**A. In this meeting I don't have a specific recollection. That idea and -- and coming from him**

Page 57

**at some point I think did happen.**

Q. Okay. Do you have any recollection of when that idea came to your attention from Warren?

**A. I don't remember the exact timing of when it -- when it came.**

Q. Did -- do you recall if that idea came from Warren in like an in-person meeting with you where he was just talking to you one on one or did he send it to you an e-mail or a phone call?

**A. I -- I don't have any e-mail with it that -- that I know of that I can recall, but I think it -- the first time I remember hearing about it -- and it may have been during this meeting. I -- I can't contend that it didn't come up during this meeting.**

**But Clay Ryan as -- as the union steward oftentimes messages would go through him and I recall it coming -- coming from him. He just relayed on.**

Q. Oh, your recollection is that actually this idea came from Clay?

**A. Not from Clay. That it -- it was -- the message from Warren was passed along through Clay to me.**

Q. Got you. Okay. From Warren --

A. **Sorry. That wasn't clear. Yeah.**
Q. No, that's okay. From Warren but through Clay.
A. **Yeah.**
Q. Okay. Was that idea of allowing Warren to just work outside as an accommodation, did you take that idea -- once you heard it from Clay, did you take that idea and run it by HR or run it by Kubsch?
A. **I might have mentioned it to them, but as it's fairly well understood from our policy, it's -- it's not -- it's not something we had the flexibility to do.**
**I'm sure I brought it up to Bryan and Aprile. I don't remember a specific conversation about it, but as we were talking about Warren quite a bit during this time, I'm certain I brought it up.**
Q. Okay.
(Pause.)
Q. Well, I -- I guess the reason why I'm asking that is because you've talked about this policy and I'm curious as to whether -- to what HR's response was about this policy as it related to an accommodation. So let me ask it this way: Did HR ever discuss with you different ways that they could perform an accommodation in light of the training



policy?
A. **Specific to Warren?**
Q. Yes.
A. **So just in -- in response to the request that he made.**
Q. Well, one of requests that he made which we'll talk about was the -- the lighting, fixing the lighting, right?
A. **Yes.**
Q. Okay. And I'm going to get to that and I want to ask about that accommodation and that request.
A. **Okay.**
Q. But this accommodation right now that I want to talk about is let me work outside. Who said no to that idea?
A. **I think we all said no. I wouldn't say that any one person said no. I think our policy does not allow us to -- with -- without, you know, a -- a medical justification saying otherwise, we don't have a policy that says you can just work an outside job.**
Q. Well, but you --
A. **It's not a --**
Q. You had --



A. **-- job that can work.**
Q. Okay. But, I mean, in -- in this case just to be clear, the other examples you gave me of a disability were what we described as temporary disabilities, meaning the disability would eventually pass. The -- the arm would heal or the hand would heal, right?
A. **Yeah.**
Q. This was the only accommodation or disability where we're dealing with that was "permanent" in nature.
A. **Yes, sir.**
Q. Okay. Did -- in those discussions, the policy that you're referencing you said absent a medical justification, why would was this --
A. **I didn't -- I didn't say that right. Sorry.**
Q. Okay.
A. **I -- I did say that but what I -- what I meant was we -- we don't have an outside-only position. That's not a position that exists.**
Q. Okay. Let me ask this: Was there ever a discussion, did HR even talk about creating a position, creating an outside position in order to meet their obligations under the Americans with



Disabilities Act? Did they ever even talk about maybe we should do this. Hey, Mr. Wooters, can we create a position? Did they ask you that?
MS. WILLIAMS: And I'm going to object just to the extent that the framing of the question calls for a legal conclusion, but, Jud, you can go ahead and answer.
**THE WITNESS: Sure.**
A. **I -- I don't think we have the right to do that under the Collective Bargaining Agreement. I don't think.**
Q. Did you ever talk to Clay about that to see if your assumption was correct?
A. **That as a general discussion often came up in conversations that an outside-only type position could be beneficial to union and company but it was never agreed upon.**
Q. Okay. That was discussed as a general proposition, but I want to ask in terms of a specific.
As an accommodation to Warren and Warren's medical issues, did you ever discuss with Clay or anybody with the union can we make this kind of a position as an accommodation?
A. **No.**

Page 62

Q. Okay. In addition to -- let's shift gears a little bit. Instead of whether or not the position violates the Collective Bargaining Agreement -- I'll have a chance to depose Mr. Ryan.

Let me ask this: Did you ever conduct any kind of analysis on whether or not it was going to be an undue burden on the company?

So what I mean by that is if you created this position, it was going to be too financially burdensome on the company to have a position like that? Was that analysis ever done? Any numbers run about that?

MS. WILLIAMS: And I'm going to object again to the extent the framing of the question calls for a legal conclusion, but you can go ahead and answer, Jud.

**A. I -- I don't know the answer to it.**

Q. Okay.

**A. I can tell you I did not do an analysis of that.**

Q. Understood. You've talked a lot about the policy. Let me ask now the -- the training policy. Was there ever any discussion with the HR team -- I guess it -- it can be anybody even beyond the HR team, anybody. HR, maybe even above that. Bryan

Page 63

Kubsch. Was there ever any discussion about modifying, making an exception or a change to the training policy when there is a medical reason or a medical accommodation necessary? Was that discussion ever even contemplated?

**A. No. And for Warren's case we -- we tried to make accommodations for what he asked for us to accommodate for.**

Q. Well, --

**A. Except in the case of getting an outside job which doesn't exist.**

Q. Right. Right. Right. So -- okay. You -- you picked up on why I was confused there because let -- let's just -- so that we're both clear, and if there were any other accommodations that he requested, please let me know, but I -- I'm aware of -- of two. One was the request to work outside. You know, just let me work outside. Is that one of the requests?

**A. Yes, sir.**

Q. Okay. Another request was about the light, fixing the light so that he could see better in the heating board console. Is that --

**A. Yes.**

Q. Do you remember that request?

Page 64

**A. Yes, sir.**

Q. Okay. We were talking right now though about the -- the outside job, but aside from those two requests, the outside job and the lighting issue, were there any other requests that Warren made to accommodate him that -- that you recall or that you're aware of?

**A. I -- I'm not -- I'm not aware of any others.**

Q. Okay.

(Pause.)

Q. I want to turn now to talk about --

MS. WILLIAMS: James, I'm sorry to interrupt. I just wanted to clarify, the -- Chelse's notes that you put up, is that -- did you mark that as an exhibit?

MR. SUDDUTH: I did.

MS. WILLIAMS: And did we get confirmation in the record of the total number -- I mean, the total kind of Bates pages? I'm sorry. I know this comes up every time, but I have a blank in my notes that I don't know fully what --

MR. SUDDUTH: Marlene, I -- I swear I -- I don't know if I can ever fully satisfy you. I -- I don't know if it's possible.

Page 65

MS. WILLIAMS: I'm sorry.

MR. SUDDUTH: I don't think it's humanly possible. I try --

MS. WILLIAMS: You actually did well on the first one and the second one.

MR. SUDDUTH: I -- I -- so, Jud, just so you know, Marlene and I are in a constant battle about me properly marking my exhibits and one of these days -- I was hoping yours was going to be the day. One of these days I'm going to properly mark my exhibits. I thought I did this.

But, no, we -- I did mark the accommodation meeting. It is Bates labeled as 814 and I did clarify, I thought, that it is a one-page document. It is not a two-page document, so it is not in globo. It is a single page.

MS. WILLIAMS: Just that one. Okay. Just making sure. Thank you. Sorry, James.

MR. SUDDUTH: No -- no worries. No worries. Actually, what I was going to say, Mr. Wooters, is that I was -- was going to change topics a little bit. I was going to move from the outside accommodation and move now to the lighting, so it's a good opportunity and a transition to take a little break, and I like to try to offer a break

Page 66

at about every hour. It's been -- we've been going an hour already. Good chance for you to maybe use the bathroom, stretch your legs a little bit.

So let's take a break for a few minutes. We're at -- I have 10:09 Central Standard Time, so five or so minutes? Is that okay or do you want more time, Mr. Wooters?

**THE WITNESS: Five minutes is probably okay. At some point it would be nice to have a little bit longer of a break to grab dinner but also understood that if -- long -- longer break meaning like 15 minutes would be plenty at some point.**

MR. SUDDUTH: Got you. Okay. Well, we can do -- let's -- let's do 10 minutes for this one. We're at 10:09.

**THE WITNESS: That's fine.**

MR. SUDDUTH: We're 10:10. We'll come back at 10:20. We'll come back at 10:20. We'll go for another hour and see where we are. Okay?

**THE WITNESS: That sounds great.**

MS. WILLIAMS: And, Jud, I usually just recommend to just go ahead and turn your camera off and mute while we're on break and then when you come back, you know, we can kind of pull those back up.

Page 67

**THE WITNESS: Okay. Will do. Turning my camera off.**

MS. WILLIAMS: Okay, thanks.

THE VIDEOGRAPHER: We are now off the record. The time is 10:10 a.m. Central Time.

(A break was taken from 10:10 a.m. to 10:20 a.m.)

THE VIDEOGRAPHER: We are now on the record. The time is 10:20 a.m. Central Time.

MR. SUDDUTH: Okay. Mr. Wooters, back on the record after a brief break. Thank your for your patience, sir.

**THE WITNESS: Sure.**

MR. SUDDUTH: So before I jump to the light issue, there was a -- there was another document I wanted to show you and ask you about.

So let me show you this and I'm going to -- I'm going to mark this as an exhibit, so say some prayers for me, Jud, that I do this right as we do this together.

This is going to be Bates labeled CP Chem 705. It is a one-page document and it's going to be the next exhibit which I believe, madam court reporter, is No. 4.

COURT REPORTER: Correct.

Page 68

MR. SUDDUTH: Thank you.

(Exhibit 4; so marked.)

Q. Bates label 705. Again, with the e-mail chains we'll go from the bottom to the top. If -- if you remember, Mr. Wooters, we were talking about that September 16th e-mail from Hart Eye Center that was sent to Warren and just to Clay and then September 19th it got forwarded to you, just to refresh your recollection on the timeline there, on the 16th and 19th.

This is three days before that letter from Hart on September 16th. This is September 13th just to get our timeline straight. Warren sends an e-mail to Aprile and to Chelse. Subject: "Operator Pool."

(Reviewing document.)

Q. And he says, "Good evening. I want to be removed from under the bar of having a permanent schedule as a 1544 Operator and be placed back into the pool please. Thank you both." Did I read that correctly?

**A. You did.**

Q. Is a 1544 Operator, is that synonymous with like an ethylene operator?

**A. It is.**

Page 69

Q. Okay. Then it goes up. Chelse forwards this to yourself and to Bryan and says, "FYI... We wanted to make you both aware of his request." Bryan responds September 14th, the next day, "10-4 I support the request." Do you see that?

(Reviewing document.)

**A. I do.**

Q. Okay. And then Chelse -- this e-mail chain sort of ends with Chelse on the 14th to Aprile saying this: "Both Bryan and Jud were made aware of Warren's request. Bryan responded with his support."

I wanted to ask you about this because I -- I do see Bryan's support. I do see you getting the e-mail about the request. Did you ever respond to his request to go to the pool?

**A. I don't know if I verbally or e-mail-wise responded to this e-mail. I knew about it but there's -- there's -- there's nothing for me to do at this -- at this juncture. It's -- it's a job -- job classification change.**

Q. Okay. So I want to understand what your role was with this. Did you need to support the request in order for him to be eligible to go back to the pool?

**A. All that I was allowed to do was -- was follow the Collective Bargaining Agreement requirements, which I believe this met. I'm not aware of any permission I had to give.**

Q. Okay. So I -- I don't see any e-mail permission that you gave. Did you ever give any verbal permission that you recall?

**A. I don't recall. Let me -- let me make one other clarification to that just to make it as exact as I can.**

**There -- there were times if something fell outside of the exact wording of the CBA where union and company could come to an agreement.**

**For example, there are stipulations around somebody going to the pool. I think around, like, number of times or other things. I don't recall exactly. You'll have to look in the Collective Bargaining Agreement.**

**I don't recall that this was one of those cases, so I just want to make sure that's -- that's clear. There may have been times in other cases where my agreement would have been necessary if it was -- it fell outside the CBA, but I think this one fell inside the CBA.**

Q. I -- I appreciate that so let me make sure



that I understand this. When you say it "fell inside the CBA," meaning -- this is the way I'm interpreting what you're saying.

When you say "it fell inside the CBA," meaning the CBA was not going to prevent this request?

**A. I believe that is correct.**

Q. Okay. Meaning that your permission or your approval wasn't necessary?

**A. I -- that is -- that is my understanding, yes.**

Q. Okay. * Do you know whether or not he had begun training on the heater board at the time that he --

COURT REPORTER: I'm sorry. I didn't hear the question. There was an interruption.

(* Question read back.)

MR. SUDDUTH: That he made the request on September 13th to go to the pool.

COURT REPORTER: Thank you.

**A. Yes. He was already training on the heater board.**

Q. So did you ever respond to anybody or say to anybody, nope, he can't go to the pool; we're training?



**A. No. They don't have any bearing on each other.**

Q. Okay. So -- yeah, so going to the pool does not affect the obligation to train?

**A. That's correct.**

Q. So do you know whether or not he was -- this request was ever officially approved to send him back to the pool?

**A. I -- I believe it was. Excuse me.**

Q. What -- what forms that belief? Did that come from a conversation or an e-mail?

**A. This e-mail chain just reminds me. I don't have -- I don't have anything else as -- as specific memory.**

Q. Would there have been anything necessary beyond this e-mail chain in order to effectuate the request to go to the pool?

Meaning on September 14th at 2022 at 8:00 a.m. when Bryan Kubsch says "10/4 I support the request," is Warren Jones in the pool as of 8:00 a.m. September 14th, 2022? That's it?

**A. I -- I believe that is correct.**

Q. Okay. Did you ever ask anybody in HR or Bryan, any of your higher-ups, did you ever ask anybody in HR or in your upper chain whether -- now



that he was in the pool whether you could make an accommodation for Warren and train him somewhere else?

**A. No, no conversation like that happened with relation to him asking to be put into the pool.**

MR. SUDDUTH: Okay. Now, let me turn you to -- we will go...

(Pause.)

MR. SUDDUTH: Yeah, I think it's probably best to break these up into numerous exhibits. So first I'm going to do is I'm going to take you to 739.

I'm going to mark this as Exhibit 5 to the deposition and this will be numerous pages so it will be in globo. Exhibit 5 will be 739 to 740.

(Exhibit 5; so marked.)

Q. This letter here which is a summary of a meet and confer and I've -- I've confirmed with Ms. Chelse Morris that she's the one -- or Chelse Cisneros is the one who wrote this.

So you can see 740 is what -- I scroll down 740 really just has her signature block on it, but 739 was the letter that she wrote to Warren as a summary of the meet and confer.

(Reviewing document.)

Q. Have you ever seen this letter before? I don't know if it was sent to you or not. It certainly was sent to Warren. I don't know if you've seen it before.
**A. Yes, I have seen it before.**
Q. Okay. It put on him the -- the obligation that -- if I can use that word, The Company would appreciate you providing this list as soon as possible, but no later than November 11th of 2022 [as read].
So the company wanted on November 11th of 2022 any sort of adaptive devices or accommodations. Now we're shifting from the outside job to -- to what can we do, you know, inside the heater board console. What can we do with the lighting to assist.
Is that your recollection that by no -- no later than November 11th, 2022, he needed to tell the company what particular adaptive devices he was looking for as an accommodation?
**A. I don't have any specific recollection of that item, but I don't have any reason to -- to disagree with your comment in this e-mail or in this document.**
MR. SUDDUTH: Okay. So now what we'll



do is make it the next exhibit which will be Exhibit 6, which is Bates labeled 7 -- it will be in globo, madam court reporter, as 741 to 742.
(Exhibit 6; so marked.)
Q. So I'll just scroll down and you'll see here again a line of e-mails beginning with 741 to 742. 742 really is just a signature block for Chelse Cisneros where she says, "Should you have any questions feel free to contact me."
So we'll scroll up, and I just showed you the letter that was Exhibit 5 and here's where she's sending out the letter and so I will read this e-mail to you.
"Hi Warren, Thank you for attending the meeting this afternoon. As stated in the letter, You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but no later than November 11, 2022." Did I read that correctly?
(Reviewing document.)
**A. Yes, sir.**
Q. Okay. So we looked at that letter that



she sent. She is sending out this e-mail to Warren and it's a cc to Aprile Danford. I don't see you included on this particular e-mail. Were you blind carbon-copied on this e-mail?
**A. I don't think so.**
Q. Okay. The same day -- or I'm sorry. Excuse me. The next day, October 20th, 2022, at 6:59 a.m. Warren responds and he says, quote, Good morning! Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the keyboard. Everything else will work out fine. The only light that works properly is the one over the computer. The other two seem to be broken. Thanks [as read]. Did I read that correctly?
**A. You added an extra keys before board but otherwise, yes.**
(Pause.)
**A. You said "keyboard."**
Q. Oh, okay. Okay. So "over the heater board console to work properly so I can see the keys on the board."
**A. Yes.**
Q. Okay. Do you recall seeing this e-mail from Warren?



**A. I do not remember seeing this e-mail. I have seen this before. I just don't remember seeing this e-mail at the time.**
Q. This e-mail that he sends October 20th is well before the November 11th timeline. So if I were to suggest to you that he did comply with the company's request, he sent the company what adaptive device he was looking for prior to November 11th, would you have any reason to disagree with my statement there?
**A. I do not, no, sir.**
Q. Okay. If we scroll up it -- it somehow got forwarded to you because you'll see that's your e-mail --
**A. There we go. I did have it. I didn't remember.**
Q. That's okay. From you to Warren with a cc to Chelse Cisneros and your response is, "Thanks Warren, are you referring to the long, narrow lights on arms that can be moved around? Can you enter a G3 to get them fixed?" Did I read that correctly?
**A. You did.**
Q. Okay. Couple questions on this. What is a "G3"?
**A. A "G3" is a simple system that makes it**

**possible for any -- it's an electronic system that it makes it possible for anybody to enter a -- a work notification for something to be -- to be fixed by maintenance.**

(Pause.)

Q. Do you have any reason to believe that Warren did not put in this request?

**A. No. I think he put it in.**

Q. Yeah, okay. So G3 is referring to kind of the -- the method, means or the system by which someone makes that formal maintenance request?

**A. Yes, sir.**

Q. Now, what he was saying in his e-mail where he's talking about the only light that works properly is the one over the computer. I need the lighting over the heater board console to work. The other two seem to be broken [as read]. As you read through all that, did you know the lights that he was referring to?

**A. He clarified for me. In my e-mail I asked him if that's what he -- what he meant and so he clarified for me. I don't think it was by e-mail. I think it may have been verbally. I knew that it was the -- these long, narrow LED lights from outside of this e-mail trail.**



Q. Okay. So you knew that through a verbal conversation with him?

**A. Yes.**

Q. And then it looks like the only thing that's done further on this chain is that Chelse forwards this chain to Aprile Danford with an FYI letting her know of that discussion.

Did you have any discussions yourself? I see that you -- you had the e-mail with Warren. You told me about a verbal discussion you had with Warren to clarify the lights. Did you have any discussions about the lighting issue with human resources?

**A. I -- I probably did outside of this e-mail, but this e-mail would have documented it. We were -- we were discussing it.**

Q. Were -- were there ever any discussions with HR where HR felt or did you ever feel that this requested accommodation was unreasonable?

**A. No. It's not unreasonable to have -- have that -- have a lighting source.**

Q. Okay. Any discussions with HR about whether or not, look, fixing the lights the way Warren wants them fixed is just going to be too expensive. It's too burdensome. We're not going to



do it. Anything like that?

**A. No, sir.**

Q. Okay. So is it fair to say at least from your standpoint, in your mind, did you believe that Warren had made this request and that the request was going to be fulfilled?

Meaning nobody from the company said we're not doing it. Did you believe this request was in line to be fulfilled?

**A. Yes, sir.**

Q. Okay. Now, during that time you told me he's -- he started training prior to when he made the request to go to the pool September 13th.

What I've just shown you here is in the October time frame. He is still training during all this time, is that right?

**A. That is correct.**

Q. Okay. Can you describe for me, please, sir, what that training consists of?

**A. So in general, I can give you the general overview of the training. There is a console manual, a binder with some documentation that provides information for the operator to -- to learn. They're expected to learn this material, and there are -- there's several sections in it.**



**Anyways, they -- they go through the training, through the binder, through the manual over those 35 days, and they are to sit at the console with a qualified operator so that he can be there to do several things. He may witness moves that are being made. When I say a move, I mean inputs being put into the computer that controls the plant; ask questions.**

**And under the guidance and -- and authorization of the qualified operator he may even make moves so long as he's being supervised in -- in those moves as a -- as a form of practice.**

Q. When you say "make moves," "he may even make moves," you're referring to what there?

**A. Yes. It would be on the computer screen, moving -- moving the mouse to different locations to be able to enter in what are called set points or changes to the process.**

Q. Okay. And that process takes 35 days?

**A. It -- we -- we allot 35 days for that training process.**

Q. The binder that you referred to that -- yeah, the binder you referred to that is a manual, I think is what you called it, that a person has to learn about the console, is that a manual that

Page 82

they -- they can take home with them?
A. **I -- I don't see any reason why they -- they couldn't. They could, yeah. I don't know that I've ever seen anybody do that, but...**
Q. Okay.
A. **But they could, I suppose.**
Q. So most people show up to work. They open up their manual that's there at the office or at -- at work and -- and they will study it during work time?
A. **That is the expectation.**
MR. SUDDUTH: Okay. Okay. So training is going on. I've got the evaluations and I've got the results of the test which I'm going to get to later.
But I kind of want to continue to work through my timeline here, and I see an e-mail from you in November. This is 770.
So I'm going to make this Exhibit 7 to your deposition, and it does appear to be solely a one-page document so it's going to be just 770. Or -- 770, I'm referring to the Bates label, so let me move to that document for you.
(Exhibit 7; so marked.)
Q. It says from Judson Wooters to Warren

Page 83

Jones with a cc to Nick Graham, Clay Ryan, Aprile Danford and Bryan Kubsch. I -- I know the other names on here except for Nick Graham. Who is Nick Graham?
A. **Nick Graham was Warren Jones's direct-line supervisor. He is the shift supervisor for a three crew.**
Q. As the shift supervisor, was he someone that was -- was he training Warren, like, directly on the heater board?
A. **He was not training him. He was providing oversight for the crew in general and ensuring that Warren had the needed materials to be able to proceed with his training.**
Q. Who -- who was the person that he was sitting with? And if there were numerous people, please tell me who the -- all the names of those people.
But as you've described it to me, he doesn't just have a manual. He's also kind of sitting right there at the console with a qualified person who is doing the job and he's watching them do the job. Please -- if -- if you recall, if it was one person, just that person's name, but if was it numerous people, please tell me those names of

Page 84

who Warren was actually sitting with doing that in-person training.
A. **The -- the only name that I can remember -- he would not have been the only person, but the only name I remember that -- of the individual that was there with him -- with him was Justin Ridgaway.**
Q. Justin Ridgaway. Okay. And just to be clear, --
A. **No -- no longer employed at CP Chem. Just -- I don't know that it matters, but...**
Q. No. Thank you. I was -- I was going to ask. Okay. So he's no longer employed. Do you know how his employment ended? Meaning was it voluntary or involuntary?
A. **It was voluntary.**
Q. Okay.
A. **Although we didn't want him to go.**
Q. Didn't want him to lose -- didn't want to lose him?
A. **No. He was -- he was extremely good.**
Q. Okay. Do you know where he's at now?
A. **I think he went to Golden Triangle was what I recall, which is a -- well, you're in Belmont. You probably know... I'm sorry. Golden**

Page 85

**Pass. Sorry. Golden Pass.**
Q. Golden Pass.
A. **It's one of the LNG plants that are being built there.**
Q. Okay. And to be clear, you -- you -- you told me that Justin Ridgaway is one you knew for sure, but you also feel pretty confident that Justin Ridgaway was not the only one; that there were other people.
A. **There would have been others. I -- but I would -- I'm most confident in giving the names of which ones that actually sat at the board with him. I just don't recall.**
**I know for sure Justin did for -- for quite a few of the days of those 35 days. I just don't recall exactly who else sat there with him.**
Q. Okay. Is there any kind of document or schedule or anything like that that we could look at that would tell us who was there?
I mean, obviously Mr. Jones, to the extent that he recalls, you know, Mr. Jones could tell me, you know, who he was sitting with and -- and that question may have already been asked. I just don't recall it as I sit here today. But aside from asking Warren who were you sitting with all day when

Page 86

you were training, is there any document from CP Chem's standpoint that you know of that I could look at?

**A. We -- we have a program called eSOMS, which is a -- it's -- essentially it's a -- a shift documentation, activity documentation electronic record.**

**I don't -- I can't make any claims about the retention period for those documents. I don't know if they would still exist from 2022. I suspect they probably do, but I -- I don't know.**

**One of the tasks required when you -- when you begin your shift is to do what's called a assume the position, the position meaning the job you're -- you're doing that day because we may do different jobs on different days that you're assigned to work.**

**So that record may include the individual who would have been assigned to the heater board on the days that he trained.**

Q. Okay.

**A. What may be a little fuzzier is we did not always in that same record have the person who was training do that activity, what -- what I'm calling assume the position, so they -- they would not have always, so lining those up from that record alone**

Page 87

**may -- may be a touch tricky.**

Q. And just so I'm -- I'm clear because I didn't hear what the exact word -- you called it E what?

**A. eSOMS. eSOMS, E-S-O-M-S.**

Q. E-S-O-N-S?

**A. M. Sorry. M as in Mary.**

Q. Okay. eSOMS. eSOMS. Okay. Got you. Thank you. So now back to Exhibit 7, Bates labeled at 770. This is -- it's a -- "PIP Update" is the Subject, November 17th of 2022.

So by this point in time you have placed Warren on a Performance Improvement Plan, or a PIP, is that right?

**A. Yes, sir, that is correct.**

Q. What -- what led you to place him on a PIP?

**A. So unfortunately Warren at this point had failed the first test of the heater board qualification process.**

**He had subsequently been given additional time to learn his -- his duties as a heater board console operator and then was given the opportunity for a second exam which he -- which he failed. Excuse me. I -- I -- I did grab a little bit of**

Page 88

**dinner on a break so that could be why I'm...**

Q. I was -- I was going to give you your 20-minute break. You should have asked for your 20-minute break.

**A. Well, it was hot -- it was hot and ready when I walked downstairs and reheated dinner is not as good as -- as fresh off the stove. Anyways...**

**So the -- so unfortunately he did not pass his second attempt and so the training process demands that at the failure of a second attempt, a -- a PIP is required.**

Q. Okay. And so when you say the -- "the training process," are you referring back to that training policy you told me about before?

**A. That is correct.**

Q. Okay. Can you tell me more about that training policy? Is that like -- is that an HR document? Is it within the code of conduct? Is it within the -- the employee handbook? Where is that policy at?

**A. It's -- it's a -- it's a policy in the -- on -- on the intranet. I -- I don't -- I don't remember the number of it.**

Q. Okay. So in accordance with the training policy, the training policy mandates that after two

Page 89

failed attempts you have to do a PIP?

**A. That is correct.**

Q. Okay. Did you ever discuss with HR or Bryan Kubsch whether or not you could forgo the PIP given the -- as an accommodation given the vision difficult?

(Pause.)

**A. No. I -- I don't recall there being an -- an accommodation request to forgo the PIP. Am I understanding your question right?**

Q. Slightly. I wasn't saying that Warren had made a request of that. What I was asking is, the way you phrased it to me was, look, your hands were kind of tied; that -- that you had to. The policy mandated that you have to give a PIP after two failed sessions.

And what I was asking you is, did you ever speak to anybody about whether or not you could forego giving the PIP because of the vision difficulties?

**A. No.**

Q. Okay. So in this e-mail here you reference, "In addition, during our discussion, you indicated that you continue to have vision concerns that periodically interfere with your ability to

Page 90

view text on the screens. To be sure we adequately address the continued vision concerns, we will be reaching out to the company doctor following the Thanksgiving holiday." Did I read that correctly?
(Reviewing document.)
**A. Yeah, I think though this -- this is -- this is a little further past the time when we actually issued his PIP to him.**
Q. Okay. And I have the PIP which I will -- I will show you, but do you recall off the top of your head when you issued that PIP?
**A. No. Sorry. Bring -- bring it up. That's -- that's where it's at. That's where the date's at.**
Q. Okay. But just from -- what I'm trying to establish here is that based upon this e-mail, I mean, as of November 17th, we've talked about September when he sends you the ophthalmologist's letter. We talked about October when he makes the request for the G3 or you tell him to put in the G3.
Now we're in November and he's still talking about vision concerns and you're acknowledging them. I mean, is that accurate?
**A. Yes. Yes, it is.**
Q. Okay. To your knowledge, in November had

Page 91

the lighting issue that Warren identified, had it been fixed?
**A. The light that was broken over the console was not repaired in November.**
Q. Okay. So as we go through -- and during this time, by the way, he's -- he's training. He's being tested. All of that's continuing as -- as scheduled; just the vision concerns were -- Warren was just kind of fighting through?
**A. He -- he may have been. I mean, I don't know that he would -- I don't know that I would have said he was fighting through them, but...**
MR. SUDDUTH: Well, let's take a look at 811, 812. This will be Exhibit 8, which will be an in-globo exhibit which is 811 and 812.
(Exhibit 8; so marked.)
Q. So I showed you a time period there of November. We'll start at the bottom, work our way up. 812, as you can see, is really nothing more than a little bit of the signature block that carries over.
So to the bottom of 811 there's an e-mail from Chelse to you with a cc of Aprile Danford, and the subject line is "Lighting above the heater board."

Page 92

Now, this is December 12th of 2022 so now we're in December. "Jud, Do you know if the lighting above the heater board has been fixed? If you can, could you also provide the date the work order was put in for this? Thanks." Did I read that correctly?
(Reviewing document.)
**A. You did.**
Q. Okay. By December 12th, do you know -- how many times has he tested by December 12th?
**A. I -- I think he would have tested by then three times.**
Q. Okay. You then send an e-mail it looks like the same day.
(Reviewing document.)
Q. Yeah, a few minutes later, same day, to Bubba Vandevender with -- is -- is that -- is that his actual first name is Bubba?
**A. It is Bubba, yes, it is.**
Q. I love that name. All right. So you --
**A. That is awesome.**
Q. -- send an e-mail to Bubba and you say --
**A. Sorry. Sorry. I -- I'm sorry. I have to -- I have to -- I have to correct what I just said. His first name's David.**

Page 93

Q. Oh, is it? Okay.
**A. Yeah.**
Q. Okay.
**A. There's -- I -- I'm shocked that I haven't slipped up to this point. They're allowed nicknames in the Port Arthur and I have thus far not slipped off one -- slipped up once. Bubba is not his official legal name.**
Q. You are -- you are absolutely right. In fact during Warren's deposition he struggled, I'll just tell you, the same way.
He continued to refer to everybody by how he knew them. I think -- I think Clay Ryan has a nickname, too, and he kept calling Clay by his nickname, so...
**A. Do you remember?**
Q. No. No. What was the name? What was the name?
**A. Ricky Bobby.**
COURT REPORTER: I didn't hear.
Q. That's right.
COURT REPORTER: I didn't hear.
Q. Yes.
COURT REPORTER: I didn't hear.
**THE WITNESS: Ricky -- Rick -- Ricky**

**Bobby.**
Q. Yes. He continued to refer to Clay as -- as Ricky Bobby, yes, so... So David. Okay. That's -- that's better for him his legal name's not Bubba, but you e-mail him, "Is this something you can check on?" Do you recall sending that e-mail?
**A. Yes.**
Q. All right.
**A. Well, let me say this differently. Sorry. I don't remember the specific e-mail. When I sent it, I don't have that recollection but, yes, I did send this e-mail.**
Q. Okay. And then he responds same day and he forwards kind of a -- in my opinion a bunch of code or -- or -- it's really -- it looks kind of gibberish to me, but -- but a lot of this up here where my cursor is and he highlights "Heater board lights (lamps)."
I wanted to ask you, though, a question about kind of these two lines at the top that appear to be, you know, code and a lot abbreviations.
Specifically I wanted to ask you about this: 10/25 of 2022. Is -- is that date the date the work order got put in or submitted? Is -- what's the significance of that date?



**A. I do not know.**
Q. Okay.
**A. I -- I do not know.**
Q. He says to Claude Richardson, Danny Gay, Greg Johnson, Warren Jones with a cc to you and Andy Coots, he says, "Can we get these lights- repaired on the Heater Board area? Limited lights in the area, make it hard to see in the area. Bubba Van." Did I read that correctly?
**A. You did.**
Q. So as of December 12th, 2022, it's -- it's not been repaired and in fact you in this e-mail of 5:39 p.m. back to Chelse tell her, "Chelse, this has not gotten repaired yet."
So fair to say December 12th, 2022, the request Warren made back in October has still not been completed?
**A. That is accurate.**
Q. Okay. So we are three out of four tests in where he's failed three and the repair, the requested repair has not been made for all those --
**A. That is --**
Q. -- tests?
**A. That is correct.**



Q. Okay. The fourth test occurred sometime in December and then he was terminated shortly after Christmas, I want to say around the 1st of the following year in January, something like that. Does that sound right to you?
**A. Yes, sir.**
Q. Okay. So the fourth test occurred sometime in December. Here's my question to you: For the fourth test, was the light repaired?
**A. No, sir.**
Q. Okay. So through all of the tests and all of the failures, the light remained out?
**A. The -- that's -- that -- that LED light over the console, yes.**
Q. Okay. Did anybody from HR or any other supervisors above you ever tell you or suggest to you let's hold off. Let's wait. Let's get this thing fixed, retest him and see where we are?
(Pause.)
Q. And when I say "wait" -- I'm sorry. I need to clarify. When I say "wait," I mean wait on the termination so let me say my question again.
Did any supervisors, anybody from HR ever say let's stop the train. Let's hang on on termination. Let's get this thing fixed, retest



him, see where we are? If he fails, we'll see what we've got to do. If he passes, you know, he passes. Any conversations like that?
**A. No. I -- I can tell you why, if you -- if you want to know why.**
Q. Sure.
**A. So -- so the reason that the specific repair of this lamp over the console was not seen as a -- as a required to prior to proceeding with further testing and -- or further training and testing was that in the meantime he was bringing his own personal lamp from the house.**
Q. Okay. So the -- I'm going to make sure I understand that because I've -- I've heard about this, about -- he -- he brought as a way to just kind of help himself as best he could. We're not talking about an industrial lamp or a medical lamp or something Dr. Hart gave him.
We're talking about a decorative lamp from the house that his wife was probably pissed that he took, right? We're talking about one of those lamps?
MS. WILLIAMS: I'm going to object to the extent that mischaracterizes the evidence, but you can go ahead and answer.

MR. SUDDUTH: Well, I'm -- I mean, I'm -- I'm not mischaracterizing the evidence.
MS. WILLIAMS: That it was decorative is what I'm saying. You're describing it as a, you know, living room lamp and I don't think that that's accurate.
MR. SUDDUTH: I described it as decorative because Wendy was here yesterday for a mediation that we had and Wendy talked about it to me, so I just want to make sure.
Q. This is not a medical lamp or an industrial lamp, is it?
MS. WILLIAMS: Objection. Calls for speculation. You can answer, Jud.
**THE WITNESS: Okay.**
**A. I -- I don't know what a medical or industrial lamp would look like. It did look like a lamp that provided light.**
Q. Okay. It looked like a lamp. It -- it -- it was not the light that he requested to be fixed in his accommodation, was it?
**A. It was not the light that he had asked in the original accommodation request, correct.**
Q. Okay. And I wrote down what you said here. You said it was not seen as required for



retesting because he brought his own lamp from the house. Let me ask a question about that.
Did anybody from CP Chem that you know of, did anybody from CP Chem ever go to Warren and say I know you requested this accommodation, but we don't deem it anymore as necessary. We don't deem it anymore as needing to be satisfied because you've come up with your own solution? Did anybody ever notify Warren that his request wasn't in -- in the hopper anymore?
MS. WILLIAMS: Objection to the extent that that mischaracterizes the evidence. You can -- can go ahead and answer, Jud.
**A. Yeah, I don't -- I don't think the repair was -- was not expected or planned to happen. We still planned to do it.**
**And we just had felt internally that there was not a reason for us to have to wait for the repair to be completed because in the interim the lighting issue was fixed, albeit by his own use, by his own bringing a lamp.**
Q. Yeah, so -- so you -- that's right. You made the determination or I guess the team, the supervision team made the determination that the lighting situation had been solved because of the



lamp that he brought from the house?
**A. During that window, temporarily, yes.**
Q. Okay. Here's what -- what I want to know: During this time period where the lighting had been assisted or helped or somewhat alleviated due to the lamp, Warren still continued to struggle with the vision concerns, didn't he?
**A. I -- I think he probably did in hindsight. There's a -- I think in that letter -- there's a letter you had just a minute ago that may have indicated that he had raised another concern.**
Q. Yeah, and the reason why -- that's the reason why I showed you other letter that was dated in November. I mean, by November -- let's go ahead and establish this: By November Warren had brought his lamp from the house, right? As of November?
**A. Yes. Correct.**
Q. He's -- he's got the lamp and, yet, despite the lamp in November, he's still expressing to you vision concerns, isn't he?
**A. So I think the letter's a little different than the lighting. I'm not sure that he was talking about the lighting during that letter.**
(Pause.)
Q. "In addition, during our discussion, you



indicated that you continue to have vision concerns that periodically interfere with your ability to view text on the screens." This is not dealing with lighting? This is dealing with something else?
**A. The screens are back -- backlit. Those are LED screens.**
Q. Okay. So this is -- this is not dealing with lighting. This is dealing with another vision concern?
**A. In -- in -- in my eyes during this time, yes. This was -- because in fact we intentionally keep the lights dim in the control room to allow for as much contrast as -- as we can because it's a back -- backlit screen.**
**So lighting had the potential of -- too much lighting could have done the opposite. Could have washed out the screen.**
Q. Yeah, so there's just -- there's so much here to unpack, but I'm going to try to keep myself narrow to stay focused. Right now -- because I want to talk about that backlighting concern.
But right now, on the lighting, did you or any supervision ever have any company doctor go look at the lamp, look at the lumens of the lamp to see if that lamp was adequate; not a -- just a temporary

Page 102

solution but was medically adequate to provide the lighting that his particular medical condition needed? Did a company doctor do that?
**A. I -- I don't believe so.**
Q. What about the nurse who was Jeannie? Did the nurse ever go look at the lamp, look at the heater board console -- she had done eye exams on him in the past.
Did Ms. Johnson ever go and look at the setup that Warren had sort of created for himself, a little temporary lamp, and do an analysis on whether or not that lamp was satisfactory or adequate for his particular medical issues?
**A. I don't believe so.**
Q. Okay. Is it fair to say or is it accurate to say that you and the leadership team are not ophthalmologists?
**A. That is accurate.**
Q. Okay. Is there any medical training with eyes or eyesight that any of the leadership team had?
**A. No, sir.**
Q. Okay. Is it further fair to say that you and the leadership team, meaning HR and Bryan Kubsch and others, made an assumption that because he

Page 103

brought the lamp, that was satisfactory to the lighting concern?
**A. I -- maybe assumption is the right word. I don't know if it is or not, but we -- in our judgment it was. It -- it provided sufficient light, yes.**
Q. Right. Okay. Now we've talked about that lighting issue and that's why you all felt that Warren's particular accommodation request, fixing the long, narrow lamps, that that wasn't necessary before effectuating the termination, is that correct?
**A. I think that's -- I think that's correct.**
Q. Okay. Now I -- I want to shift gears a little bit to what you clar -- what you classified for me as a little bit of a different concern.
You didn't view this letter here at 770 or this e-mail, you didn't view this as a lighting issue. You viewed it -- I think you called it as a backlighting issue, so describe for me what this particular issue was.
**A. So I -- I didn't say -- sorry. I can clarify what I meant.**
Q. Please.
**A. What I meant to say or meant by what I**

Page 104

**said is that these are -- they're -- they're LCD screens. They may be LED. I'm -- I'm being as truthful as I know how to be.**
**They're flat screens, right, and -- and so as such they provide their own light. So you -- you see them because they're backlit light just like the -- probably the monitor in front of you.**
**Being that they give off their own lights, you can see the text on them because of that. They -- they provide the light necessary to see the text or other needed graphics on the screen.**
**He commented during the third exam that he had trouble seeing the text on the screen. So when I said had trouble with backlighting, I meant he commented that he could not or was having trouble seeing. Make sure I say it the way he said it cause my memory is worse than what my writing there is.**
**But that he was having trouble seeing the writing, which is different than him not having adequate lighting to see at the console.**
**That lighting was providing light for things like being able to see his manual because his manual was just paper, reflected the light that was shined on it. Seeing the monitor as -- you don't need a separate light to see the text on the**

Page 105

**monitor.**
Q. I got you.
**A. That -- that's what I meant. Hopefully that was more clear.**
Q. No. Thank you. Yeah, no, it -- it was. So it -- it sounds like there was -- he was actually struggling to see two different things.
One, he was struggling to see the console, so he had the -- the lamp brought and then he was asking for the light to be fixed over the console, but based on this e-mail, he was also struggling to see the text on the screens?
**A. That is correct.**
Q. Okay. So with the text on the screens, do you ever recall Warren telling you about or did you ever even witness him having to do this, did you ever see him, like, squinting, you know, looking in and squinting and straining his eyes to try to see it? Did you ever notice that?
**A. I've thought about this several times and it -- it can be hard to tell the difference sometimes between somebody searching on a screen. You're looking, you're looking, you're trying to see like this and somebody squinting. I -- I would not feel confident in being able to say that I saw him**

Page 106

**squinting at the screen. That does not say that he was not squinting to see the screen better, but I -- I -- I definitely witnessed him doing like -- you know, looking at a screen and -- and doing this in a way that I might also say would be somebody searching for something. Does that make sense?**

Q. Yes. Yeah, I -- I think I'm following you. I appreciate that. But, I mean, you weren't able to kind of make that distinction in your -- in your mind as to was this guy squinting, was he searching, but is it also fair to say you never asked Warren directly whether or not that was him squinting or searching to clarify that for yourself?

**A. That's a good question. I -- I don't remember asking him that specific question.**

Q. Okay. In addition to that, with kind of struggling to see the screens from a distance or the text on the screens from a distance, do you know how all of that -- how these vision concerns, do you know how those vision concerns were affecting his overall health?

Meaning whether or not it was giving him headaches and migraines as he struggled through it. Did -- did you know about that?

**A. No, sir.**

Page 107

Q. Do you think that it's relevant to your analysis as to whether or not Warren was having migraines while he was being tested? Would that matter to you? If -- if that was a fact, if was that true, if that was happening, would that matter to you?

**A. I -- I don't -- I don't know. I mean, it might -- might have. It might have -- it might have caused us to have to seek additional medical advice.**

Q. Did you ever speak with Dr. Stanton, the company doctor, about Warren?

**A. I -- I believe that I was on a phone call where Dr. Stanton was speaking about Warren. I want to say that I remember a -- a phone call in either Aprile Danford's office or Bryan Kubsch's office. I do not remember which one.**

Q. Do you recall who else was present for the call?

**A. I don't.**

Q. Do you recall what he said?

**A. I remember him saying that the -- because I think it was around that time that we had Jeannie administer another eye test to him. I think we were concerned this was -- this would have been -- okay. I'm trying -- so I'm remembering from this letter.**

Page 108

**We told him come back after the holidays, meaning Thanksgiving, and we would assess. And as I recall, Dr. Stanton recommended that Jeannie gave -- give him a eye test because at that point now our concern was about eyesight, being able to see the text on the screen and so that was -- that was the context of that discussion.**

Q. Okay. You know, so I -- I appreciate that because we've kind of shifted away from, you know, the lighting and whether the light was bright enough to see versus just even seeing the heater board console, itself.

Did that -- or excuse me. The board. The LED screens and the board. Did that analysis get completed prior to his termination?

**A. I believe it did.**

Q. Okay.

**A. In fact, probably more than believe. I -- I know it did.**

Q. Who conducted that analysis? Jeannie or --

**A. I believe it was Jeannie.**

Q. Okay. When you say that analysis got completed, what are you referring to? Jeannie conducting the eye test?

Page 109

**A. I -- I believe it was Jeannie. I'm not 100 percent certain that it was Jeannie, but I believe it was Jeannie that conducted the eye test.**

Q. Okay. And do you recall what the results were of that eye test?

**A. I don't recall any specific, you know, eye test results from it other than I remember those results were sent to Dr. Stanton.**

Q. Okay. And did you have a phone call or e-mail or a Zoom call? Did you have any kind of discussion with Dr. Stanton after Jeannie's test was performed?

The results of the test were sent to Stanton, did you have any conversation with Stanton at that point about, okay, we have our results. What do we do?

**A. I don't recall if I had a phone call. I don't recall the exact context of the conversation, but I do recall that my concern was ensuring that we did not have a -- a medical reason that would prevent me from -- from performing another test. I think I said that in that -- that e-mail.**

**And as I recall, the response back from Dr. Stanton was that the results of the test did not prohibit him from being able to perform that**

**function required for his job. Something -- something along those lines, probably poorly quoted.**
Q. Okay. Well, I -- I mean, your question's very similar to mine, which is if all of the eye tests that Jeannie had performed prior to that, Mr. -- Mr. Jones was working outside. I mean, this was his first time ever working in doors, is that right? On the console.
**A. Yes, sir, that is correct.**
Q. Okay. So when Jeannie tested his eyesight, do you know whether or not she tested it for adequacy for the heater board console, to see -- for seeing the heater board console?
**A. I -- I wouldn't be able to answer that.**
Q. You asked Dr. Stanton, look, I mean is -- and this is a paraphrase so if my paraphrase is wrong, tell me, but it sounds like what your question to Dr. Stanton was, was basically, look, you looked at his testing. You looked at his eyesight.
Is his eyesight so bad that there's a medical sort of prohibition, a medical reason that I should not test this guy again? That was the question.
**A. That is -- that is the gist of the**



**question, yes, sir.**
Q. Okay. Because -- if I can phrase it this way, would you agree with me that because if he can't see or he's struggling so much to see, if he can't see the board, not only is he going to fail the first time; he's going to fail 20 times?
**A. Sure. That's not -- not an unreasonable statement.**
Q. Okay. So we're trying to figure out is the eyesight so bad that we might have a medical reason that we need to move on from the testing?
**A. Or something else. I -- we'd have to try to figure out what else to do.**
Q. Okay. Dr. Stanton when he -- when you're talking with him, you don't recall in what context, whether was it on the phone or in person or Zoom or whatever, but do you recall who else was present?
**A. I do not.**
Q. Okay. Do you recall if Dr. Stanton put his findings into a written format?
**A. I -- I want to say that there was a written e-mail about it. I just don't remember if he was on the e-mail. I want to say I remember there was an e-mail exchange that -- that -- and I just don't remember if it was between me and HR and**



**it was HR that communicated with Dr. Stanton. That's fuzzy in my memory. What I recall is the outcome of that written dis -- that written e-mail was essentially the outcome of the test did not prohibit him from being able to perform the function of that job.**
Q. Did you know whether or not Dr. Stanton spoke with Dr. Hart, who was actually his treating doctor?
**A. I do not. I do not know.**
Q. You never spoke with Dr. Hart?
**A. No, sir.**
Q. Do you know whether Dr. Stanton whenever he was discussing this with you -- and the end result of what you took away from it was that, you know, whatever the eyesight issues are it's not enough to stop us from testing.
My question is, was Dr. Stanton referring to that as Warren's eyes are or was he referring to that with some kind of an accommodation that with an accommodation of XYZ Warren should be able to see adequately to perform the essential functions?
**A. I -- I do not think it was in terms of an additional accommodation. That's -- that was not my -- my recollection.**



(Pause.)
Q. Was it after your conversation with Dr. Stanton and the fourth failed test, was it after that point in time that you decided that termination was the only alternative?
**A. Yes, sir. Yes, sir.**
Q. Was there any discussion with anybody in leadership about -- strike that question. I mean, aside from his troubles with the heater board, can we agree that, I mean, Warren was a good worker, conscientious, you know, showed up on time. He was a good worker?
**A. Warren was a -- was a good worker. He had some errors that he was disciplined before on his record. I would say in general he was a good worker.**
Q. Okay. Was there any discussion about trying to find another place for him within the CP Chem family given the eye struggles and the vision struggles that permeated throughout the testing?
**A. The only jobs that he was qualified to be able to perform were the outside jobs that he had qualified in doing. And at this point since he was in the training program, this was the --**

**unfortunately the path he was on. There weren't any discussions about trying to find additional or any alternative employment for him.**

Q. So discussions about alternative or -- or alternate employment within the CP Chem family, that just -- you don't know whether that was even available or not, whether or not it was out there or not, whether there were openings or not because it just wasn't even discussed?

(Pause.)

**A. Yeah, I -- I don't -- it -- it wasn't -- it -- I would say it was discussed from the standpoint that his -- his path remains as an operator at Port Arthur. There -- there wasn't anything outside of that.**

**I'm not sure I'm answering your question very well, but outside of the confines of the 1544 unit where he was qualified to work, there was -- there was nothing else that we're aware of that would meet his qualifications.**

Q. Yeah, if -- if you limit it to the ethylene unit, 1544, yes, he's in the training program and he's in that particular unit. What I'm asking is, was there ever any discussion, did HR ever even bring up, hey, as an accommodation for



Mr. Jones, since he's struggling on the heater board, can we move him to this facility or this location or this job or this place out of the ethylene unit? Can we put him in the pool of operators and move him over here?

**A. Yeah, we -- we -- I think we -- we did have a -- like a moment where we said is there anything else we can do with him.**

**The -- the problem becomes that he's -- as an operator, and unfortunately this is true of our operations progression process, you're qualified in a very specific job role and job function. That does not match very many jobs outside of the -- the -- that pool within CP Chem.**

**So, yeah, it was -- it was -- there -- there were some passing conversations about is there anything else we can find for him to be able to contribute but there -- there was not. It was not a long conversation.**

Q. Okay. So it -- it sounds like -- do you remember who brought that, who discussed that -- that idea?

**A. I don't. It -- it would have been -- and I'm -- I'm -- I'm, like, reaching back into, like, memories of, like, what -- what all did we talk**



**about because a lot of things were talked about with Warren around this same time and I just -- I don't remember any specifics other than we -- generally when we try to -- we don't like letting folks go.**

**Warren was a -- was a good person. We did not like letting him go, but there was nothing else that we could see given his qualifications with CP Chem that he could -- he could do.**

**And I'd say that as a -- as a general conversation that was kind of over the course of time. I -- I can't pick out a -- this happened on this date.**

Q. Yeah, I -- I guess that's kind of what I'm -- what I'm pushing at or what I'm asking about is that when you say we didn't see any other positions that we could put him in given his qualifications, that -- that's what I'm asking about was how detailed was that search if -- if that search occurred? Because it sounds like it was more in passing.

So I'm wondering, did you guys go look into the intranet to see what positions were open anywhere within CP Chem that he could be moved to make him a contributor? I just don't know how detailed that was.



**A. I -- I did not.**

Q. Okay. Because -- and -- and to your point about, you know, you didn't want to have to do this, I mean, I -- I see a note from Bryan Canfield on the idea of terminations being discussed December 31st of 2022.

Bryan Canfield says I support the recommendation. He's talking about termination. I know we need personnel but we need quality over quantity [as read].

So, you know, Bryan Canfield is talking about we need personnel which suggests to me that there's -- there's needs out there within the -- the CP Chem.

**A. That's accurate.**

Q. Okay.

**A. We wanted -- we wanted people who could meet our qualification standards.**

(Pause.)

Q. And the idea of training Warren in some other area, so let's just pass over the heater boards since we are -- we having difficulties.

The idea of passing that over and moving to a different area of training was something that you guys didn't consider because you viewed it as

Page 118

prohibited by your training policy?

**A. The training policy -- failure of the training policy led to the PIP. The terms of the PIP were to become qualified on the heater board. Failure of the PIP resulted in his termination.**

Q. Right. I -- I got you. One, two, three. What I'm asking is whether or not going around the training policy, making an exception to the training policy because of a medical issue, whether that was never contemplated by -- at least by HR?

**A. So, again, we -- we felt that the lighting issue was temporarily resolved by him bringing in a lamp. Wish we could have fixed the light over the console earlier, but in the -- in the short-term there was the lamp and his eyesight test from Dr. Stanton had indicated that he -- not from Dr. Stanton.**

**The eyesight test as interpreted by Dr. Stanton indicated that he had sufficient eyesight to be able to perform the function of his job.**

**At that point I'm left with the quality of the testing, the quality of his ability to be able to become certified in that job.**

Q. I -- I understand everything you just said, but that -- that wasn't my question. My question was whether or not making an exception to the training policy because as I understand your testimony, you viewed it as the training policy kind of mandated that you finish off the heater board training.

If he, you know, fails that, then you've got to issue the PIP after the second failure and then if he can't comply with the PIP, then you've got to terminate. I'm -- I'm following you on the one, two, three there. I -- I got you.

What I'm asking is whether or not as a -- an accommodation to a known medical issue, making an exception of the training policy that you just detailed for me, whether or not that was ever discussed or contemplated.

**A. What known medical issue at -- at this point is left?**

Q. The known medical issue that he's made you aware of from Dr. Hart, his eye issues.

**A. Which -- which we -- which -- which we addressed with the lighting and the eyesight test.**

Q. Okay. I understand you're -- you're -- you're quibbling with me about that and we'll go -- I'll get into the details with you about that, but what I'm asking is whether or not an exception to the training policy was ever contemplated or discussed as an accommodation.

Page 119 / Page 120

**A. No, because it was -- there was no further accommodation that we understood was required.**

Q. So the answer to that's no. Now let's go what you just told me about. We can talk about that. You wanted to -- to tell me that, hey, we accommodated the lighting issue.

To be clear, when you say you accommodated the lighting issue, you're referring to the fact that Warren brought a lamp from the house?

**A. Yeah, that's -- that's a good point. We -- we did not accommodate. In the meantime he -- he brought a lamp to -- to aid, right.**

Q. Right. The one accommodation that he asked for -- from a lighting standpoint, he also asked to be able to work outside, but the one accommodation he asked for from a lighting standpoint was that light be fixed. In the entire time he trained that was never fixed.

**A. That is correct. It was on the -- it was on a work order to fix.**

Q. Got you. All right. Now, the second thing you brought up to me was you said and based upon Dr. Stanton, it was our understanding that the eyesight -- that Warren's eyesight was adequate to be able to test.

Page 121

**A. That is correct.**

Q. Okay. The details of what Dr. Stanton did, what test he conducted, what analysis he performed, the details of all that, is it fair to say you don't know?

**A. All -- all I know about is -- is that there was an eye test performed, so, yeah.**

Q. Okay. You don't know the details of what the eye test revealed?

**A. It -- it may have been included in -- in the e-mail. I don't remember. Not -- not that it would have made a lot of difference to me as -- as -- as not an ophthalmologist, but I -- I don't know the details of it.**

Q. Okay. Because if -- if you knew about it, I want to ask you about it, but I don't want to waste your time asking you things you don't know.

So just trying to understand the universe of what your knowledge is. Is it fair to say that what medical records Dr. Stanton reviewed, who he consulted with, who he talked to, whether he -- he talked to Warren, whether he talked to Dr. Hart,

what he did or didn't do in coming to his conclusion, do you have any personal knowledge yourself about what Dr. Stanton did or didn't do in coming to his conclusion?

**A. I don't have any recollection. That doesn't mean that he didn't share it. I just don't have any recollection of -- of the -- the details.**

(Pause.)

Q. And I know you already answered this and I apologize for asking you again, but I -- I need to -- I forgot what your answer was.

Did you say that -- that Dr. Stanton put his findings into any kind of written format or was it solely in person or over --

**A. I --**

Q. -- the phone?

**A. I -- I think that there was some writing. I just don't remember if it was an e-mail or, like, an attachment on an e-mail. I think there was something written though.**

Q. Okay.

(Pause.)

Q. I will -- in one of our breaks I'm going to find some of these comments with -- with Dr. Stanton and we'll go over them together to see



what you know and what you don't know.

**A. Okay.**

Q. But before I do that, I wanted to ask you about -- we'll go to 747, 748. Let me share my screen.

(Pause.)

Q. I'm going to make this -- actually, for the purpose of completeness until this e-mail concludes, yeah.

For the purpose of completeness, I'm not going to talk about all of these pages, but the chain does run from 745 to 748 and so I think it probably makes the most sense to make Exhibit 9 an in-globo exhibit that will run from 745 to 748. We won't talk about 745, Mr. Wooters, but we'll -- we will include that with the exhibit.

(Exhibit 9; so marked.)

Q. What I -- what I want to ask you about is these particular comments here, this summary, the summary that sort of gets passed up the line.

So all of higher-ups are relying upon this summary that's getting passed up the line. Did you write this summary?

(Reviewing document.)

**A. I don't think I did.**



Q. Okay.

**A. I probably had a chance to review it, but I don't think I wrote it.**

Q. Okay. Do you ever recall seeing this summary?

**A. I -- I -- I probably did. I -- I can't say that I remember specifically receiving it, reviewing it but -- but it would -- I probably did.**

Q. Okay. I want to ask you about one part of this which is, "During the PIP, Jones received additional classroom and one-on-one training. Despite the additional training, Jones was again unsuccessful on his third attempt at qualifying on the heater board on November 17, 2022."

"Jones indicated at this time the existence of a medical condition that may have been relevant to his qualification attempts."

That right there, the idea that Jones indicated for the first time after November 17th of 2022 a medical condition, we've gone over the timeline together, that's not accurate, is it?

(Reviewing document.)

**A. Yeah, no. Sept -- September 19th was that e-mail we got, but I'm not sure that that's what this is saying.**



**It does say Jones indicated at this time the medical condition that may be relevant to his qualification attempts [as read], so maybe that's not exactly following the timeline.**

Q. I'll -- I'll -- I'll tell you how I -- how I read it and you can tell me I'm wrong or -- or what your position is or your thought is on it.

When I read this and I -- I read November 17th, 2022; then "Jones indicated at this time the existence of a medical condition," it's sort of suggesting to me that he's failing and failing and failing and then after his third attempt he throws up a hail mary and comes up with a medical condition to try to get out of it. That's how I read that. Do -- do you read it that way?

**A. So because I was involved in this activity, I -- I could see somebody reading it that way. I -- I don't -- I'd probably read between the gaps a whole lot more than you do.**

Q. Okay. Okay.

**A. To -- to me I read between the gaps saying that during the process, but I do -- I see -- I see the way that you're interpreting it.**

Q. Okay. So that the most accurate way that should have -- well, I don't want to say should

have, but a more accurate way that this summary could have been written as it went up to the higher-ups is that Jones indicated a medical -- existence of a medical condition on September 19th. That's actually when he told everybody and sent the letter from Dr. Hart, is that right?

**A. That is the date.**

Q. Okay.

(Pause.)

Q. You may not -- it's 818.

(Pause.)

Q. Yeah, 817. You may not know but I -- while I have you here, I need to ask you about this. This is Bates labeled 817. I'm not going to mark it as an exhibit unless you tell me you recognize it.

I will just tell you, sir, at 817 there's really no context on 818 or 816 to give me any -- because 816 is -- is the letter from Dr. Hart.

So 817 is just a couple of paragraphs here really with no signature block, no e-mail on the top or bottom of it suggesting who it was sent from or sent to with some comments in it, but I don't have any idea who wrote it or authored it or -- or the comments inside of it. Is this something that you wrote? Do you recognize it?



**A. And I'm -- I'm reading it. Just a sec.**

Q. And -- and please, yes, take your time to read it. I -- I don't mean to rush you on that. Take your time to read it.

(Reviewing document.)

**A. Scroll down a little bit.**

Q. Sure.

(Reviewing document.)

**A. Yeah, I didn't write this. I wouldn't have -- I wouldn't have asked that question at the end like that.**

Q. Okay. I have several questions about it, but the operations manager, that's referring to Bryan Kubsch?

**A. That's correct.**

Q. Okay. I mean, there is a comment in this that says, "The Operations Manager has asked to see if we can talk to Dr. Stanton in regard to this or request an Internal Medical Referral."

I want to stop there and go -- do you -- or ask you do you recall that request for an Internal Medical Referral and getting with Dr. Stanton? Is this accurate or not?

**A. Yeah, I think this is consistent with the -- the timeline.**



Q. What is an "Internal Medical Referral"?

**A. No idea. Sorry.**

Q. Okay. All right. "If we are able to determine" if -- excuse me. "If we are able to determine he is fit to perform his job by getting an IMR or any other suggested course of action operations has agreed to give Warren a final opportunity to take the test to qualify for the heater board."

Is that kind of what you were telling me about, that -- that Dr. Stanton was determining whether or not his eyesight was sufficient to even be tested?

**A. Yes, sir, that's correct.**

MR. SUDDUTH: Okay.

(Pause.)

MR. SUDDUTH: Now, let me show you 809. And you know what? We did talk about at least that paragraph of 817, so let's go ahead and mark as Exhibit 10 817, a one-page document. Exhibit 10, 817.

(Exhibit 10; so marked.)

MR. SUDDUTH: Let's go now to 809, and it does roll over to 810 so let's make Exhibit 11 an in-globo exhibit, two pages going from 809 to 810.



(Exhibit 11; so marked.)

THE VIDEOGRAPHER: I don't mean to interrupt. Does it matter if -- if Chem -- "CP Chem" dropped off?

MS. WILLIAMS: I think that that's fine, yeah. It -- we're okay. We can proceed.

THE VIDEOGRAPHER: Okay.

Q. So 810 you'll see really just has a signature block or at least a portion of a signature block and then 809 has -- has this on December 5th of 2022 from Chelse Cisneros to James Stanton, Beth Roberts and Aprile Danford. The Subject is -- is "Warren Jones."

"Dr. Stanton, Thank you for taking the time to join Beth and I in our meeting this afternoon. I have attached the letter from Warren's ophthalmologist and have provided his contact information as well. Please let me know if you have any questions or need further information."

Were you aware of any of these communications with Chelse and Dr. Stanton and Aprile?

**A. I was aware that they were taking place.**

Q. Okay. This letter or this e-mail back from Dr. Stanton to Chelse again with a cc to Beth

Page 130

and Aprile dated December 6th. "Hi Chelse, I had a long conversation with Mr. Jones this afternoon and I think I have a better understanding of his overall situation and what solutions may or may not be feasible. If you want to give me a call we can discuss, or if you prefer we can do another teams meeting with Beth. Just let me know." Regards, James Stanton [as read]. Did I read that correctly?
**A. Yes, sir.**
Q. Okay. So this tells me that he -- he had a conversation with Jones. I -- I have no idea if he actually spoke with the ophthalmologist, Dr. Hart. Do you know if he did or not?
**A. I do not know.**
Q. Do you know if he reviewed any medical records of Mr. Jones?
**A. I do not know.**
Q. Okay. Seeing here that these kinds of conversations are happening on December the 6th, December the 6th based on the timeline that we just went over together, this would be before his third test?
**A. This would have been after his third test. That is correct. Between his third and his fourth test.**

Page 131

Q. I'm sorry. So December 6th was after the third test?
**A. That is correct. Oh, I thought that's what you said. Sorry. Yes.**
Q. No. I thought -- sorry. I -- I thought that -- I thought that December 6th was before his third test so forgive me.
**A. Sure.**
MR. SUDDUTH: Now, I'm going to show you...
(Pause.)
MR. SUDDUTH: Let's go to 796. Technically this is another example of a -- of a two-page document. We'll make this Exhibit 12 to your deposition.
It's going to be an in-globo exhibit 12 running from 796 to 797 but, again, 797 is really just a signature block that carries over, so it would be 796 to 797.
(Exhibit 12; so marked.)
Q. Chelse is -- is e-mailing here Jeannie Johnson who's -- who's the nurse saying -- this is September 22nd. "Could you please email me a copy of the Functional Job Description for Warren Jones?" The Functional Job Description, do you know what

Page 132

that is?
**A. If it's what I think it is, it's -- it's -- it's the description of the operator job.**
Q. Okay. The reason why I was asking that, the reason why I'm confused, I'm trying to figure out if this was like a result of an eye test that Ms. Johnson had performed or whether or not this was just simply the job description as -- as operator.
**A. I believe the Functional Job Description is the description of the job, of the operator job. It's possible that she's asking Jeannie -- I actually don't know. I'm not sure why she's asking Jeannie that.**
**Maybe she held onto -- you know, we sometimes bring in, like, Moorman Associates to -- to come in and do function -- or function job description reviews for us and maybe they interacted with Jeannie. Maybe she held onto them. I'm not -- I'm not entirely sure. I'm speculating. Sorry.**
MR. SUDDUTH: That's okay. Because I know -- I wouldn't push on this if -- if you had told me that, you know, you didn't know what Dr. Stanton looked at, but you seem to recall maybe some things Dr. Stanton talked about; some things that he didn't talk about, so let me -- let's go to

Page 133

792. Take a look at that. I'm going to mark this as Exhibit 13. 792 I believe...
(Reviewing document.)
MR. SUDDUTH: No. No. It is two pages. So it's going to be Exhibit 13, and it will be in globo and it will be 792 to 793 and really 793 has the same issue. Just has a signature block.
(Exhibit 13; so marked.)
Q. So here's some communication in September where Chelse's communicating with Ms. Johnson, Nurse Johnson.
(Reviewing document.)
Q. It says, quote, Good Morning Jeannie, Warren Jones sent an email to us in regards to his vision. He stated that ever since he's been training on the heater board he's been in and out of the eye clinic. Do you do any annual eye tests on Warren. If so, what types of test results do you have on him? I have attached the letter from his optometrist, end quote [as read]. Did I read that correctly?
**A. Yes.**
Q. Any reason to dispute this, by the way, that he had been in and out of the eye clinic since he was on the heater board?

**A. I have no reason to dispute it.**
Q. Jeannie -- and there doesn't appear to be a cc here to Dr. Stanton. Ms. Johnson says, quote, Good morning Chelse- I did his annual eye exam on 5/3/2022 this year when he had his annual surveillance. His eye exam results were comparable to the results from 11/2021, and his vision did not worsen. I've compared the results from 2020 to this year's results, and the results are not any worse. He did pass his eye exam, end quote [as read]. Did I read all that correctly?
**A. Yes, sir.**
Q. Okay. A couple questions. Do you know what it means to, quote, "pass the eye exam"? Meaning, do you know what the metrics are that they use to determine that?
**A. No, sir, I do not.**
Q. Okay. Do you know whether or not the minimums that are considered for passing an exam are adequate in order to be able to see the heater board console?
**A. I -- I would assume so, but I could not speak with authority.**
Q. All right. And to be clear, when she compared his results to 2020, in 2020 he was working outside, is that right?



**A. Yes, that is correct.**
Q. Okay. When she compared the results from 2021 to 2020, he was also working outside in 2021?
**A. Yes, that is correct.**
Q. Okay. By May 3rd of 2022, that would have been right at the beginning of his training on the heater board, is that right?
**A. That sounds correct, yes.**
Q. Okay. So while his eyes are comparable in 2022, 2021 and 2020, two of those three exams were being conducted while the obligations on his eyes, what his eyes needed to be able to see would have been working outdoors, is that accurate?
**A. Working outdoors, yes.**
Q. All right. The -- this last test, the one done in 2022 would have been the first exam where the obligations on his eyes now included having to see things internally, meaning the heater board console.
**A. It would have been since he started training on the heater board console, correct.**
Q. Okay. Do you know what the obligations or the strains or any of the demands on his eyesight, do you know how that differed at all, if it did, between when he was working inside versus outside?



**A. No, sir.**
Q. Okay. Do you know whether or not -- we would certainly hope so and we would assume so but I don't know.
Do you know whether or not his annual eye exams from Ms. Johnson were provided to Dr. Stanton when he provided his -- his analysis to you guys?
**A. I do not know that.**
Q. Okay.
**A. Would also hope so, but I don't know.**
MR. SUDDUTH: I -- I would join you in saying that, yes, yes, but I -- I don't know. What I was going to do, sir, because I think at this point I'm going to shift gears to the testing and I want to talk about testing and -- and, you know, the results. So I want to talk about testing.
It's a good opportunity to take another break, but I don't need to give you 20 minutes because you -- you scarfed down dinner earlier, I think you said.
So it is currently 11:45. Do you -- do you want to do 15 minutes? We'll just go to noon our time or do you want a shorter break than that?
**THE WITNESS: I'm okay with noon or shorter is okay.**



MR. SUDDUTH: Okay. All right. We'll set it for noon and we'll just try to get back as soon as we can.
**THE WITNESS: Sounds great.**
THE VIDEOGRAPHER: We -- we are now off the record. The time is 11:45 a.m. Central Time.
(A break was taken from 11:45 a.m. to 12:01 p.m.)
THE VIDEOGRAPHER: We are now on the record. The time is 12:01 p.m. Central Time.
BY MR. SUDDUTH
Q. All right, Mr. Wooters. Back on the record. Took a brief break. Thanks again for your patience.
So I said when we took the break that I was going to turn to the testing and that's what I want to do now is just ask you about kind of the details of that.
This particular testing, can you describe for me, please, the different parts of the test that -- that comprise this heater board test?
**A. Sure. There's two portions of the test. There is a written portion. It's usually done,**

**like, on a computer. It doesn't have to be, but I think that's what we must have been doing.**
**And there is a -- we call it like a board review. They're two separate tests. The written test is almost always done first and then the board review -- the board review happens second.**
**The board review would be the first board review, meaning the first test in the qualification process would have been most likely supervisor. The -- I should probably start with the person being tested.**
**The person being tested, the supervisor, usually the operator that is there that has been mentoring him if not the entire time, then at least the day that the test is taken and then -- and then usually the head operator. There's usually three to four people in that first test. Board review. Sorry.**
Q. And in terms of the written portion, is the written portion -- I guess I'll -- I'll phrase it this way: Is it -- is it objective or is there a subjective component to it?
And what I mean by that is, an objective test would simply be I'm going to give you a multiple-choice question and the answer is A and if



you select A, it's right versus, you know, subjective might be I'm going to have you write an essay about something and I'm going to kind of grade the essay on some different subjective factors. So with that kind of understanding of what I mean by those two terms, is that --
**A. Yeah, it's objective. And that's the -- the nature of both tests, so the -- I'm sorry. That's the difference between -- that's one difference between the two tests.**
**The written portion or the one done on the computer is -- is objective. It is multiple choice. It's true/false. It's that type of -- those type of questions.**
Q. Okay.
**A. And the board review is a subjective -- is a subjective-style test.**
Q. Okay. At some point in time as I understand it Mr. Jones did pass the written portion, actually.
**A. That's correct.**
Q. Okay. Did he -- did he fail the written portion and then pass it eventually or did he pass it on the first go?
**A. I don't remember. There may be**



**something -- there may be something where he did have a -- a second attempt, but I do not know remember for sure. I do remember he passed it at -- at some point.**
Q. Okay. The written portion consists of how many questions?
**A. I do not remember.**
Q. Okay. What about the -- the pass rate? What is the pass percentage that you need to get correct to pass?
**A. I do not remember.**
Q. Is that graded or is that exam graded by hand or does the com -- does the computer automatically spit out a grade?
**A. It should be the computer that automatically spits out the grade. I'm pretty sure by 2022 we had everything in LMS which is -- sorry -- Learning Management System, which would be computer-based, so I'm pretty sure it's just a computer that spit it out right or wrong.**
Q. So if he's passing the written portion of the exam, the -- the portions where we're saying he's not successful, what he's continually not being successful at is his board review, meaning he's sitting there and he's being asked questions by



these three or four people. That's the board review.
**A. Yes, sir, that is correct.**
Q. Okay. Is there any kind of discussion among you and the board review or your fellow board members as to a rubric, what the -- what the guidelines or guideposts are going to be for how to grade somebody on the board review portion?
**A. So the -- the typical -- I do not recall exactly for him, but the typical what happens is that we -- I -- I should back up to say the very first test I'm not involved with, so I can't speak to the first test.**
**I can only speak to the second and third. If you're wanting me to answer for the first test, I actually can't answer that.**
Q. Okay. So you were not involved in the first test at all?
**A. That is correct.**
Q. So you were not part of his board review on that?
**A. That is accurate.**
Q. Okay. Okay. Well, then in the second and third -- let me ask it this way: Let's just start with, how does the board review get assigned? So

who determines who's going to be on the panel?
A. So it's usually between me and the training coordinator. We will try to get qualified in the area personnel to aid us in assessing the answers to the questions that are asked. There is a standardized list of questions. We don't ask every question.
The -- the test is typically -- it can run from two to three hours long and if we asked every question it would be of course much longer.
So we'll -- we'll pick a subset of questions that we feel give a good representative view on their understanding of the various areas and requirements.
I'm answering more than your question, I'm realizing, but we typically will -- it will be myself, the training coordinator and we'll decide on a couple of other people to engage in the -- the board review with us.
Q. Was the training coordinator the same person for all of his exams?
A. It was the same person. I believe he was at every single exam. I do not remember that a hundred percent if he was at every single exam, but it was the same training coordinator assigned to the



unit.
Q. Who was that?
A. In other words, he didn't change, get promoted. Josh Montalvo.
Q. So you and Josh Montalvo, the training coordinator, the two of you decide on who your other panel members are going to be?
A. That is correct.
Q. Okay. Once you select your panel members, how do you determine which subset of questions from the standardized list of questions you're going to choose?
A. We'll have a -- a pre-board review briefing and we will walk through the full list of questions. We don't go through each one individually.
What we do is we ask each of the members of the team to pick questions to go onto the -- the full list of questions to be asked so each person might pick five or six questions.
And what Josh will do -- I say it will do because I don't remember the exact meeting that we had to do this. I'm just saying we -- we did this quite a bit, so this is a very standard thing that we do, is that he'll take that list then of



questions that each of the panel members have selected and he'll circle it on his sheet as a master and then we'll convene that -- that pre -- pre-board review meet -- briefing to go give the test.
Q. Have you ever had a situation where a panel member has selected a series of questions and you've -- you've just looked at the questions and thought I think that's inappropriate. We're not going to ask that; we'll -- we'll ask this one?
A. Never inappropriate. More wanting to be sure that we're selecting questions that are representative.
Q. Okay. So inappropriate may have been too strong of a word, but you see a question and you think I don't think that's a good one. I think we need to ask this one over here.
So have you ever overrode a panel member's suggestion of a question because you didn't think it was representative enough?
A. I probably have. I don't recall that I did that in this situation.
Q. Okay. I -- i was going to ask you. So for any of the tests with Warren that you were on, which would be two, three and were you on four?



A. Yes, sir, I was.
Q. Okay. So on test two, three and four, in your pre-board review meeting where you're discussing the -- the questions, did you ever select different questions than what your panel members suggested to you?
A. Yes. And I maybe didn't do a good job of explaining that. I didn't -- I would select questions out of the pool; others would select other questions.
And between the whole board we would say, yeah, we agree. Yeah, we agree. Yeah -- no, maybe we won't do that one. Yes, we agree. Yes, we agree. No, maybe we won't do that one.
It was really the -- the -- the team coming together with the questions they wanted to ask and we'd compile them on a -- on a -- on a final sheet with all the questions on them. Did that do a better job of explaining what I was trying to --
Q. Yes. Yes. I appreciate that. So my -- now that you've kind of selected your questions, is every single board member giving their own individual grade as to how somebody did?
A. Yes.
Q. Okay. How is that grade determined? And

Page 146

I'll give you an example. I'm looking here at one of the unit review committee sheets where it says unit review committee needs to select 25 questions. So if you have 25 questions, is -- is each question worth four points to come to a hundred or how's that determined?

**A. We -- we actually did not have -- we did not have a standard. I think what we -- what we tended to do is come to the end and we say each question was weighted approximately the same.**

**I don't know that we selected a certain number of points or anything. We just said out of the number of questions that they got, each -- each question was weighted approximately the same.**

**And each member of the -- the board review as they're writing down their notes would -- would write down enough information so that later during the post-meeting we could say -- we could each ask as we go down the list of questions, how did he do on that question? How did he do on that question?**

**And using our notes -- because we don't want to do that during the test. If we're doing that during the test, you can cause somebody to get rattled, so we try to take good notes, right, during the test.**

Page 147

**And then -- and so then after we'll -- we'll be able to say like, yeah, he almost got there or he got there far enough. We'll give him credit for that answer. And so you'll go down and -- but -- but in the -- in the end there is a subjective field to it.**

**The -- the person got -- might have gotten, you know, a large number of them mostly correct, but the feeling in the end of they -- they were -- they didn't get any one of them or very few of them very right.**

**We would -- we'd go around and say, okay, they got this, they got this, they got this. They missed a lot these things. Are you comfortable with this person being able to be left on the board alone?**

**And so it was a little bit of a -- of a, yes, we would look at every single question and we'd say right or wrong, right or wrong, right or wrong, but there was always that -- at the end that subjective question asked.**

Q. Yes. So, I mean, if I can phrase it this way, it sort of sounds like the end -- the end analysis -- not in the objective portion but in the subjective portion, the end analysis is do I think

Page 148

based on how this person answered questions, would I feel comfortable with them being on the board alone. That's kind of your ultimate litmus test?

**A. Yes, sir, that is correct.**

Q. Because we're -- we're not really looking at a situation where -- the only thing I can tend to relate this to is that I'm an assistant examiner, for example, for the bar exam in Louisiana. Okay?

So when I give answers or credit, I'm giving them on a numerical basis out of ten points or 15 points, a certain number of points.

Is it fair to say you're not giving a number of points to a particular question or are you?

**A. There's not a standard.**

Q. Okay. And it's -- so it's not as though if -- in the subjective part of the test, it's not as though if somebody hits 75 out of a hundred points, that's passing. There's not a numerical value on passing, either.

**A. Correct.**

Q. It's a group kind of consensus, for example, I'm looking at Test No. 1 here and No. 3 is circled. So let's just talk about No. 3 it says "Locate the Deaerator," if I'm pronouncing that

Page 149

right.

**A. Great job.**

Q. Is -- is that right?

**A. Yeah, you did good.**

Q. Hey, all right. "level control on the DCS console and explain how this works." Okay. So listen to that answer and say do I -- do I think that -- that he gets it. That's what we're really doing here.

**A. Hundred -- hundred percent.**

Q. Okay.

**A. And when we ask him that question, and it is not just that question, and we tell the candidate beforehand this is not just us asking you a list of questions for you to be able to know -- answer the questions that we ask you.**

**If during the question and answer -- sorry. If during their answer to us they give an answer that feels not right or feels memorized because this happens at times, in the amount of time somebody has to be able to train for a test, you -- you probably wouldn't be surprised to hear that people find ways to get the answer to the question sheets and memorize answers despite our best efforts to try to keep them confidential, so that at least**

**it's a little bit of a -- of a -- of a actual test.**
**We have to do some cross-examining, some cross-questions to make sure that, okay, you gave the answer to this. Tell me a little more about this just so that we know that they're not giving a rote or memorized answer.**
Q. Is -- is there -- one of the questions I asked you earlier was -- was sort of a rubric and I'll go back to my own experience here.
They put us through a lot of training because they don't want a bar examinee to suffer because Sudduth might be really tough in how he grades but Smith might be kind of easy in how he grades. They want to systematize or try to be consistent with how we're grading.
Same kind of question though for you. It's subjective, but, I mean, do you have people on your panel that are just -- they're tougher? Just by nature of their personality they're tougher in what they deem to be an acceptable answer and some people are a little more laid back?
**A. Absolutely.**
Q. Okay. Did you -- what did you do to ensure that your panel had a good mix? Meaning that Warren wasn't going into a buzz saw where we had



four people who were all really hard graders but maybe he had two really tough guys but he had two kind of laid back guys.
**A. That's the job of the training coordinator.**
Q. Okay. That was a Montalvo thing?
**A. Yes, sir.**
Q. Okay. Was there ever a time -- it sounds like you weren't grading as you went. You were sort of grading after the fact, meaning the group convenes after the facts and goes through each question, looks at the notes and says, okay, how do we as a group feel like he did on No. 3, for example. Is that a fair summary?
**A. Yes, sir.**
Q. Okay. Take me into the room in the situation. We're -- we're now after the exam. It's done. We're talking about No. 3.
And let's say you got four people in there and then you got two people saying I don't really think that he understood three and you got two people saying I think he did. I -- I feel comfortable. I think he knows three.
How -- how do you resolve that when you've got disagreement with the committee between whether



or not the answer was sufficiently knowledgeable?
**A. That's a good question. In the absence of me in the room, the training coordinator has the responsibility to make the final call.**
**When I -- when I'm in the room as the person who is making the final qualification determination, if I disagree with the training coordinator's decision, then I override him.**
Q. Okay. You weren't in the first exam but in the second, third or fourth exam, were there ever moments where the panel members disagreed on how Warren did on a question and you had to make the final call?
**A. I -- probably, yeah. I'm sure that happened. I don't -- I don't -- I couldn't tell you an exact question when that happened, but I'm -- I'm sure it did happen.**
Q. Okay. Do you recall whether or not any of your what I'll call final calls, were any of your final calls that you had to make, were any of them favorable towards Warren?
Meaning the committee thought that he flunked the question but you disagreed. You thought he'd passed the question or was every one of your final calls where you went in the negative? Meaning



the panel thought he passed but you said, no, it wasn't good enough. I'm --
**A. I definitely -- I definitely -- I almost always went both ways. I don't remember the specifics of -- of the questions that -- either the second, third or fourth test, but I -- I usually had ones that went either way.**
Q. Okay.
**A. I can tell you the overall feel for each of the tests because that's the thing that stands -- stands with me.**
Q. Sure.
**A. But individual questions I -- I -- I would not be able to say that I overrode in -- in either direction more than the other.**
Q. Okay. In the -- in any of these exams when you're sitting after the fact and you're talking as a group, was there ever a -- and I'm just going to use 25 because I see here 25 questions.
Was there ever a time where you all were able to mark and say we felt comfortable as a group with 20 questions. We felt uncomfortable with five questions? Did it ever come down to that where you actually had a number of questions that you marked him as pass/fail?

**A. No. I -- I couldn't give you a specific example like that.**
Q. Okay.
(Pause.)
Q. Would it be fair to say that there were times where an examinee gets the right answer. They get the ultimate right answer but getting there just wasn't quite -- the analysis wasn't -- you just -- the examiner deemed that it just sort of felt like they didn't fully get it. They got the right answer but it didn't feel like they fully got it.
**A. That happens.**
(Pause.)
MR. SUDDUTH: Tell me in -- you weren't in Exam No. 1, but this is probably a good time to just go ahead and show this document. I'll share my screen. I'm just going to do one page at a time.
This will be Bates labeled 1341. Well, actually, you know what? Exhibit -- this will be Exhibit 14. Make it Exhibit 14. It will be an in-globo exhibit because it's two pages and we're going to make it 1341 to 1342.
(Exhibit 14; so marked.)



Q. So here this purports to be, Mr. Wooters, the first exam because it -- it has a red marked "# 1," Warren Jones on the heater board. Do you recognize this document, sir?
(Reviewing document.)
**A. Yes.**
Q. Okay. It's dated August 24th. You don't sign at the bottom here until September 22nd. So I -- I want to ask you, if you were not part of the first exam, what is your role when you're signing off on it?
**A. My role is acknowledging the team's -- the team's results. I rely on the team -- on the team in the first exam and their determination.**
Q. So let's take a look here. I see Warren Jones is the Trainee. I see Jimi Hayes as an Area Qualified Operator. Was he one of the board members?
**A. Jimi Hayes was the head operator for third -- three crew. His crew.**
Q. Okay. Next line appears to be N/A or not applicable. The PSC is Nick Graham. Who is the PSC?
**A. He is the plant shift coordinator and he is -- he's the shift supervisor. Same name; just**



**different title.**
Q. So Nick Graham is the one who's -- who's the direct supervisor of Warren Jones?
**A. That is correct.**
Q. Okay. And then Josh Montalvo. I see his name here as a Training Coordinator. So do you know -- is this -- is this telling me, like, who's on Warren's panel? Meaning was his panel Jimi, Nick and Josh?
**A. That is correct.**
Q. Okay. All right. Based upon what we're looking at here, is it fair in me saying that his examiners, he had three examiners? He had Jimi, Nick and Josh?
**A. Yes.**
Q. Okay. And you were not part of that exam?
**A. That is correct.**
Q. All right. It marks it as "Not Successful" and then these notes here on the second page, 1342, where the deficiencies where identified, do you recognize the handwriting here? Is this your handwriting?
(Reviewing document.)
**A. That looks like Josh's handwriting.**
MR. SUDDUTH: Looks like Josh. Okay.



Then I'll -- I'll wait because I have his deposition so I'll wait to ask him about these notations.
(Pause.)
MR. SUDDUTH: Now I'm going to mark as Exhibit 15 to your deposition, this will be 1343. It is in globo. It will be 1343 to 1344, two-page exhibit.
(Exhibit 15; so marked.)
Q. It marked it as "#2," Test No. 2. And you were on Test No. 2?
**A. That is correct.**
Q. It appears to have Warren Jones. Is that Clay Ryan underneath Warren Jones?
**A. That is -- that is -- that is Clay Ryan.**
Q. Okay. We've got Clay Ryan. We have Jimi Hayes, Nick Graham, Josh Montalvo and now we have a John Watkins, is that right?
**A. That is correct.**
Q. Okay. Did this particular -- who was on the panel? Who were the examiners of Warren in Exam No. 2?
**A. All that you see here.**
Q. Okay. All right. So he actually had Clay, Jimi, Nick, Josh, John and you examining --
**A. That is --**

Q. -- him?
**A. That is correct.**
Q. Okay.
(Pause.)
Q. So on Exam No. 2 he seems -- he had more than the typical. Where you mentioned three or four, he had six.
**A. Yes. Well, I don't know that the previous was necessarily typical. There's enough lines for more people. You might ask Josh that.**
Q. So you told me you couldn't really base it upon, you know, one particular question but it's -- it's more of a -- of a feel thing. What was the ultimate feeling or deficiency or problem with Exam No. 2?
**A. So Warren had trouble -- he had trouble with what we call navigating the screens to find the answers to the exam.**
**So we'll ask him a question. You -- you noted No. 3. Identify the deaerator and tell us its function [as read], and I can't tell you that it was this specific question that he had trouble finding.**
**But in general he had trouble navigating to the -- to the screen. It's -- it's like navigating a web page. If -- if I could use a crude**



**example, you click buttons on the screen, virtual buttons that will take you to different places. He had trouble navigating to the location of enough of the questions that that gave us some pause or concern.**
**And as he answered the questions, it felt very much like he answered the question based on what the book said but did not understand the answer.**
**I think in his notes -- did Josh have notes down below? He would have had notes on this one, too, or he might have had notes. He had notes on the first one.**
Q. No. In -- in -- in this one he just says refer to the PIP [as read].
**A. Oh, okay.**
Q. But -- okay. Answered the question but didn't seem to understand. All right. I'm going to use the only example that -- that I can relate to and Marlene will be able to relate to this pain.
In -- in law school they do something horrible to you, which is it -- it's not enough to get the right answer. You can get the right answer and be last in the class. You -- you've got to get the right answer and then explain how you got there.



So saying that, you know, this situation violates the First Amendment, it may be the right answer but, you know, how did you get there and what was your analysis?
So I -- I want to be clear. Warren, it sounds like he got the right answer. I mean, he -- he got the right answer. You all just felt like the analysis wasn't good enough as he got there.
**A. I would characterize it to say the answers that he did get right, we had concerns about how he got there. He did not give all the right answers.**
Q. Okay. But based upon the discussions we've had, it sounds like you can't tell me in Exam No. 2 which questions he got right and which -- which questions he got wrong because that's not how you guys scored it or -- or can you? Can you tell me in Exam No. 2 which ones he got right and which ones he got wrong?
**A. Yeah, I don't -- I don't remember which ones he had right and wrong.**
Q. Okay.
**A. There may be -- there -- I -- I don't know if -- you said you had a -- a list of questions in front of you. It's possible that -- that there was -- those tests were retained.**



**I just don't know. We didn't always retain them. I think we handed them to Josh and then the outcome was what we were -- what we recorded.**
MR. SUDDUTH: Well, let's see.
(Pause.)
MR. SUDDUTH: Just based upon what we're talking about, it's probably a good time to just at least go through one of these. This may be an example.
So I'll make this Exhibit 16 to your deposition and this is going to be 13 -- it's going to be in globo and it's going to start at 1360.
So this is 1360 and you can see there's a red marking there "#2" so this is why I'm pulling this one because it says "#2." It's going to run from 1360 to 1370, Exhibit 16.
(Exhibit 16; so marked.)
Q. All right. So I have a red circle at No. 3. Does that tell me that of all the questions that are out there to -- to examine somebody on, the committee chose No. 3 to ask him as one of the questions?
**A. That's correct.**
Q. Okay. Do you recognize the handwriting

here?
(Reviewing document.)
**A. No. But I would not have written "lil fuzzy."**
Q. Yeah, because little is -- is written as L-I-L; not L-I-T-T-L-E.
**A. I would not have written it that way.**
Q. Yeah. So No. 2 here says that -- okay. This is the way I read it. You know, it seems like he might have gotten there but he was a little fuzzy. I don't know what that means but a little fuzzy. It -- it was their note.
(Reviewing document.)
**A. Yes.**
Q. Okay. No. 4, "Comments: Basic." So as -- as you see here, I'm -- I'm showing you one of these things, but I don't know -- is there anything on these notes that's telling you -- was No. 3 deemed to be he got the right answer; he just was weak getting there or he got the wrong answer?
**A. It -- it would be hard for me to -- to say based on those comments.**
Q. What about this comment here on No. 9? "85." Does that mean anything to you?
(Reviewing document.)



**A. No. "What basic steps should be taken upon loss of instrument air."**
COURT REPORTER: I can't hear you. I'm sorry.
**A. I don't know what that means.**
MR. SUDDUTH: What's that, Susan?
**THE WITNESS: Oh, did I -- did I not speak up? I'm sorry.**
COURT REPORTER: Yeah, I didn't hear when you were reading.
**THE WITNESS: Apologies.**
**A. "What basic steps should be taken upon loss of instrument air." I do not know what "85" means.**
Q. Okay. It's not a numerical score that he got an 85 on that question?
**A. No. No. I'm trying to make sure that's an eight. It's -- like, it doesn't finish at the top, but I was trying to figure out if it was something else. It looks like an eight, though. I -- I don't know what that means.**
Q. Got you. What about here? "Explain what basic moves should be made if we were flaring fuel gas on 44PC 488." There's a checkmark. I don't know what that means, but does that indicate good,



he got it?
**A. Yeah, since I did not write this, I'm not sure what the -- what the person was indicating.**
Q. Okay. Again, there's a -- there's a notation here "Basic / Knows low press." "Partial found answer." "Missed some stuff." "Don't know." "Half understanding."
Is it fair to say, sir, that -- I mean, really in order for me to know which questions this person flat-out missed versus which ones they got right versus which ones were right but the analysis was weak, I'd have to talk to each individual examiner?
**A. You would. And then they'd have to remember exactly how they're -- how they would even interpret their own -- their own notes.**
Q. Right.
**A. Oh, hey, maybe that -- maybe that was a -- there's a 75 percent. That -- that 85 up there. I'm pretty sure I wouldn't be so exact as to put an 85.**
Q. Yeah.
**A. I don't know what that 85 -- I was trying to see if I could remember what that 85 could possibly mean.**



**No. To answer your question, yes, that would be -- it be would difficult for me to read this. I -- I can interpret it like you do, and I know the answers to these questions so I know what they should answer, but it's hard to -- I mean, you can read that. "Lead" -- "Lead Horse to Water."**
**So I -- I will tell you what that means because it's something we talked about a lot and it was something we were always trying to be careful not to do.**
**We tried our best not to ask questions that led them to the answer because we're always worried that we were going to get the intent or -- sorry -- get -- that we were going to have a misunderstanding about -- that they actually knew it.**
**So we tried to ask the question. If they didn't answer it right, we might rephrase it one time, but we try not to ask it so many times that eventually they go, oh, that's the right answer. Okay. You didn't -- you didn't know what it is the first time we asked -- the five times we asked it. Does that make sense?**
Q. Yes. And I appreciate you clarifying that because I didn't know what the -- the "Lead Horse to

Page 166

Water" thing meant at least in that -- that context.
**A. Yeah.**
MR. SUDDUTH: So we -- we've scrolled through to 1370 and so I just -- I wanted to go through one of the...
(Pause.)
MR. SUDDUTH: But, you know what -- well, actually I -- I do kind of want to show you. This -- I'll make this Exhibit 17 which will be 1371 to 1381. 1371 to 1381 in globo.
(Exhibit 17; so marked.)
Q. I'm not going to go through all ten pages, but there's enough here that -- that I want to ask you about.
At the top this -- this examiner makes a notation. We'll zoom in, but it says "Better on finding graphics but still needs work," right?
(Reviewing document.)
**A. That's correct.**
Q. "Better on finding graphics," is that referencing what you were telling me about before about, like, trouble navigating?
**A. Yes, sir, that is.**
Q. Okay. The reason why I wanted to also go over this one with you is because the other examiner

Page 167

had an 85 and we didn't know what it meant. This particular examiner's actually putting up a percentage mark next to it. He says "OK."
**A. Yeah.**
Q. And -- and he puts "80%," right? And then you've got down here -- he does it consistently, I'll just tell you. He puts here "50%." He puts here "60%."
So what you told me beforehand was, you know, look. We're not really doing it by a grade. Well, you know, would you agree with me this guy seems to be doing that? He seems to be actually, you know, giving percentages for questions.
**A. Yeah, I -- I don't -- I don't want to guess who this is because I'm afraid I'll guess wrong. I have in my mind who I think this probably is, but I'd rather not guess because I -- again, each person was left to build their notes the way that they felt like they could be able to defend during the post review.**
Q. Okay. So this person here on question No. 8, he says it's a "Good explanation on 7589 but got lost on other graphic." So he -- he in his head gives him "50%."
**A. Yeah.**

Page 168

Q. So we don't know because it would be speculation as to who this examiner is, but at 50 percent, is it fair to say he's -- this examiner is going to be failing Mr. Jones with a 50% at least for that question?
**A. Yes.**
Q. Okay. Here, you know, "trouble finding right graphic," but the answer was "Ok - 60%," right?
(Reviewing document.)
Q. Did I read that right?
**A. Yes, sir.**
Q. Okay. One thing that struck me when you were giving your answer and then I'm reading these notes here, you said he had trouble navigating the screens. Mr. Wooters, doesn't that go directly to vision?
We're not talking about intellect. We're not talking about his ability to understand the question. We're talking about literally navigating the screens. We're talking about vision here.
**A. I don't think -- in the way that we tested him, I don't think that that is true.**
Q. Okay. So for example here, "trouble finding the right graphic" but the answer was "OK."

Page 169

I read this -- tell me if I'm wrong. I read this as though his understanding and his answer was okay, but he had trouble finding the right graphic.
Do you think that if someone is struggling to see the heater board and is struggling with vision issues, do you think they're going to have trouble finding the right graphic?
**A. They could. I think you could interpret this answer as also meaning that they couldn't find their graphic because they didn't know where it was.**
Q. If I can't see the board, I don't know where it is, right?
**A. Sure.**
MR. SUDDUTH: Okay. I've showed you these specific like, you know, questions to get into the details on some of these exams, but I want to go back where we were to kind of finish my -- my thought process because we had all four exams in one location.
So I've already gone over one and two with you. I want to go now to -- to No. 3 and talk about it with you.
Exam No. 3 here, I have that as 1345 to 1346. I'll make that Exhibit 18. 1345 to 1346 in globo two-page exhibit.

Page 170

(Exhibit 18; so marked.)
Q. Okay. Exhibit -- I'm sorry. Exam No. 3 marked as "Not Successful," is that correct?
(Reviewing document.)
**A. That is correct.**
Q. Okay. And the dates on here are signed as of 12/13, 12/13. This person here I don't -- Bryan -- is that Bryan Lohr?
**A. That is Bryan Lohr.**
Q. Okay. Bryan Lohr seems to have signed it maybe on 12/15. You signed it 12/15. Do you have any recollection as to which day was the test? Was it the 13th or the 15th?
**A. It was neither day. It was in November.**
Q. Oh, it was in November. So the third test was in November?
**A. That is correct.**
(Reviewing document.)
Q. Up here, November 17th, 2022, that's the date of the test?
**A. Yes, sir.**
Q. Okay. Okay. What -- what was the reason it took so long to -- was it about a month later before things were signed. What was the reason for that?

Page 171

**A. I don't remember why we chose not to sign it at the time. I will tell you this test -- I remember very, very well the post meeting and I remember very well the meeting with -- with Warren.**
**And I -- I want to say not with the clearest of recollection exactly why I would not have signed it right then, but I want to say the reason why was -- was that I -- I was a little baffled after this test as to how to proceed, so I can elaborate if you want me to, but...**
Q. Yeah, no. I appreciate that. I mean, those things that you do have good -- you have recollection of, like me asking you about Dr. Stanton it's not going to go anywhere because, you know, you're not Dr. Stanton.
But those things that you do have good recollection of and clear recollection of like you just said, please tell me about it. So why did the third exam stick out to you so much?
**A. So he did not pass this exam. He was not successful in this exam. My recollection about the outcome of the exam was that he improved about his -- he improved a little bit over Exam No. 2. Not enough that we were comfortable with him on the board alone.**

Page 172

**And we brought him into the office to -- to give him the result, and the result -- and you haven't brought up the PIP yet, but the outcome of this was potentially determining whether he would have continued employment with CP Chem or not, this third test.**
**And so we told him the outcome and at this point he -- he then says that my -- I could -- I could not see the text on the screen, which was different than the issue that we had been -- thought we had been addressing up to this point which was sufficient light.**
**And so I -- I was worried that I was now dealing with a different issue. Similar, you know, eyes, right. Both are eyes related, but I was worried I was -- I'm deciding on somebody's future employment and so I said, Warren, I want to make sure we are making the right decision here. I'm going to need some help.**
**So we -- we stopped the feedback session and I went upfront to go talk to HR because I wanted to make sure that I was proceeding the right way because that was different information than what had been shared up to that point. That specific piece was different.**

Page 173

**So I think the reason we didn't sign was because I essentially said scuttle. I'm -- I'm not willing to proceed right now. I need to get a little bit of help.**
Q. No. I -- I appreciate that. I mean, that -- that makes sense to me. So you -- he now brings up that, you know, not only is it a lighting issue apparently over the board, but he -- he can't see the text on the screen which would -- would seem to me -- I don't know if you agree with me or not, but it would seem to me that if you can't see the text on the screen, that certainty could lead to trouble navigating the screen. Would you agree with that?
**A. That's -- that's not too unreasonable.**
Q. Okay. So he's telling you that. It raises -- you know, raises the hair on the back of your neck that maybe I've got to take a look at some things, so you go to HR. Do you remember who you went to HR with?
**A. I don't remember who was there. It might have been -- it could have been either Chelse or -- or Aprile. I just don't remember which one it was that I first spoke with.**
Q. Okay. Because, yes, the -- the PIP is in

place, so if he continues to fail, it's -- this is not just, well, he doesn't get to work on the heater board. It's going to be termination?
A. **Yes, sir.**
Q. Okay. What did -- what did HR say? Did HR -- did HR discuss with you -- well, what did HR say to you when you brought this up?
A. **HR said they agreed this is something a little different and we're going to have to reach out to company -- medical to -- to figure out what's -- if there's something else we need to do.**
**And I think probably in one of the versions of the PIP's you have is probably my -- a copy of my e-mail where I explain this to Warren.**
Q. You explain what to Warren?
A. **That we were going to have to take a step back, get a little bit of help and that we'd have to get back to him after the holidays.**
(Pause.)
Q. Because can we -- would you agree with me if I said that, I mean, ultimately what you're trying to do is you're trying to get Warren to a point where he can at least see the screen, see the heater board, see the numbers, see everything on



there because a test of his skill set or his knowledge when he can't see the screens would not be a fair test. Can we agree on that?
A. **I don't think I agree with the way you characterize it.**
Q. Okay. Are you -- when Warren mentioned to you that he couldn't see the text on the screen, that caused you enough concern to go to HR about it.
A. **Yeah.**
Q. Yeah.
A. **I -- maybe I can explain why I don't agree with your statement.**
Q. Sure.
A. **So -- and I may have misinterpreted your statement, but I don't agree that -- that my intent was to make sure he could see what's on the screen.**
**My intent at that point was to -- was to make sure that the tests up to that point represented an accurate reflection of his understanding.**
**In other words, that meeting to me if -- if eyesight was an issue could call into question whether -- whether his -- whether it was his ability to see the screen that led to him not being able to navigate or not or if it was his competency.**



**Up to this point we had -- we had felt very strongly it was his competency and so that's why I had take a step -- step back.**
Q. Okay. Now, I -- so let me see if I understand it better. I'm going to take it back to the only things that I know.
If I -- if I take a bar exam and I am perfectly healthy. I have my wits about me. Everything's fine, and I take it and I just don't know. I don't know the material. I flunk it based upon my competency. Meaning my knowledge. Can we agree with that?
A. **I guess. I'm not sure I -- sure.**
Q. Versus if I took a test and I had COVID while I was taking the test, there could be -- what I'm meaning by this is there could be other extenuating circumstances affecting my ability.
A. **Absolutely.**
Q. So that my really, really bad answer on that -- that question may not be because I'm stupid or I lack competency. It may be because I was fighting through COVID at the time.
A. **It's -- yeah, it's -- it's possible, which is why I wanted to get some assistance and figure out how to proceed forward.**



Q. Now I understand your answer because that's what I was trying to say in my previous question was --
A. **Oh, okay.**
Q. -- you're trying to figure out whether or not this test is a -- a fair representation of Warren's knowledge and his ability. Is that a better way to describe it?
A. **Yes.**
Q. Okay. And if he's unable to see the text on the screen, it would call into question whether or not the test is truly an accurate representation of his knowledge base?
A. **It -- it could call into question. I agree.**
Q. Okay.
A. **I will -- I will -- if I -- if I could elaborate just a touch more.**
Q. Sure.
A. **After the amount of time that he had been on the -- on the board training, and -- and this is just because of the amount of time.**
**So 35 days plus two different one-month stints in the -- which he was -- he got 14 days and -- approximately and then another 14 days, so 28**

**plus 35.**
**So you're talking almost 60 days of uninterrupted training on a console is -- is a lot of time to still struggle in navigating even if you're having trouble with some text. So just -- I'm just -- just giving a little context. That's a significant amount of time.**
Q. Yeah, no. I -- I hear your point there. My only pushback to you would be it's -- it's 60 days. 60 days, though, with the same exact vision problems. So if I was having --
**A. Sure.**
Q. -- vision problems --
**A. Sure. I'm with you.**
COURT REPORTER: Excuse me. Excuse me. One at a time, please.
MR. SUDDUTH: Sorry.
**THE WITNESS: Sorry.**
MR. SUDDUTH: Okay.
**THE WITNESS: That's me. That's me.**
MR. SUDDUTH: It's okay.
Q. So we're on the same page with that.
**A. It -- it calls into question which is why I took a step back.**
Q. Understood. Okay. I -- I hear where



you're coming from. All right. So then you go to HR and HR -- what was their suggested approach to deal with this?
**A. Their suggested approach was to -- to get with Dr. Stanton.**
Q. Okay. And that's where we find ourselves now looping back to Stanton. Ultimately your understanding from Stanton was that his vision was sufficient or adequate or whatever word I want to use, was -- was sufficient such that you could proceed with testing; that -- that the vision was not calling into question the accuracy of the testing. That -- is it fair to say that was the impression you got from Stanton?
**A. Yes. The -- the testing -- yes. That the -- that his eyesight was not the contributor to his poor testing, yes.**
Q. All right. That is based upon either -- because I -- if there was a writing you don't particularly recall it, so it's based upon the conversation that you had with him?
**A. There -- there was something in writing. I just don't remember where -- where that's at.**
Q. Yeah. Okay. Do -- do you specifically recall having a conversation with him where he gave



you this information?
**A. No. I don't think I had the conversation with him at the end. I remember being part of a conversation to start that discussion, meaning when I went to HR and then they had the first phone call with Dr. Stanton where we -- we discussed the issue, I remember that conversation.**
**But the outcome and the final response back from Dr. Stanton, I do not think I was in a phone or a face-to-face conversation there. I -- I recall there being something written, yeah. I remember there being something written.**
Q. Okay.
**A. Does that -- does that clarify that better?**
Q. Yes, thank you. So the actual final result, the final analysis from Dr. Stanton, it sounds like that was something relayed to someone else, maybe HR, and then HR told you --
**A. Yes --**
Q. -- what --
**A. That is correct.**
Q. All right.
**THE WITNESS: Sorry. I didn't mean to talk over him again. I apologize, Susan.**



COURT REPORTER: Okay.
MR. SUDDUTH: No. Look, we've been going a long time. You've done a really good job with that.
Q. The -- okay. That clarifies for me that you actually weren't on the call or present for his final analysis or what he considered, what he looked at, so, okay.
After that information was passed along to you from Stanton or from HR about what Stanton said, is it at that point in time that you decided, okay, now we can have a fourth test because according to Stanton, eyesight's not the problem so now we can test truly for competency?
**A. So I think if you go back to that letter, and -- and I remember wording it intentionally. I remember being a little still unsure on how we would proceed afterwards, but I remember writing in the letter -- excuse me. I'm sorry. That -- that I would depending on the outcome of the -- the assessment, and this I -- this I would have written in November, right, depending on the outcome, something to the effect of we will test you a fourth time.**
**And -- and I think at the time I was**

**thinking -- I'm not entirely sure why -- why I said that. I think I wanted to give him a -- like an olive branch, kind of a -- a -- a hey, man, there's some uncertainty here right now.**
**I want the last one to be free and clear of any questions. I -- I want to try to give you the benefit of the doubt and so because I said that in that letter, I -- I felt like I needed to honor that, so that's what I recall.**
Q. Are you referring to -- I've moved to Bates labeled 770. Is this the letter you're referring to?
(Reviewing document.)
**A. Yeah, yeah. Yeah, that looks like.**
Q. Okay. Okay. I wanted you to have that since you were referencing it, and --
**A. Yeah, it looks like it.**
Q. And -- and this letter is dated November 17th, 2022, so this is right after the third test.
**A. Yeah, I'm making sure that...**
(Reviewing document.)
**A. Yeah, this looks like what I'm thinking it was. There's also a -- this should have been what I copied, pasted into the PIP but I think this is right.**



(Reviewing document.)
**THE WITNESS: Sorry. I'm mumbling. I'll read to myself.**
(Reviewing document.)
**A. Okay. Yes. So the final paragraph. In the meantime, we agreed that you would return to shift and be allowed to continue to work on your heater board training. If a suitable resolution to your vision concerns is found prior to the 15th of December 2022, you will be given one final opportunity to take the full heater board unit review test to qualify for the heater board [as read], yeah.**
COURT REPORTER: Excuse me. May I ask which exhibit this is?
MR. SUDDUTH: Oh, goodness. 770 was Exhibit 7.
COURT REPORTER: Okay, thank you.
Q. So this comment here in -- in your -- in your note, in your e-mail that states If a suitable resolution to your vision concerns is found prior to December 15th [as read], first of all, what led to the December 15th marker there, that time marker?
**A. I think it was four weeks from the 17th of November.**



Q. Okay.
**A. I think it was intended to be 14 working days.**
Q. "If a suitable resolution to your vision concerns." Do you know what the "suitable resolution" was?
**A. It ended up being Jeannie -- let me say that I think it was Jeannie. Sorry. Let me back up to what I actually -- I -- I believe that it was the vision test, the retake of the vision test and Dr. Stanton evaluating it along with everything else he evaluated and indicating that his eyesight was acceptable for -- or was -- was acceptable and -- in -- in meeting their criteria for him to be able to qualify on his job.**
(Pause.)
Q. And based on your recollection, it was acceptable to qualify for the job without an accommodation. You know, from what you recall, Stanton didn't say give him a microscope. He didn't say, you know, change the lighting.
Your recollection was Warren as he is with his eyesight as it stands, you know, ought to be able to see everything just fine?



**A. That is my recollection, yes.**
Q. Okay. Did you ever talk to Dr. Stanton in person? I mean, did you know him at all?
**A. Yes.**
Q. Okay.
**A. Yeah.**
Q. Did you ever talk to him in person about Warren?
**A. I think only just the conversation that was after this -- this e-mail, that first conversation with him to -- to -- to figure out what -- what's our next -- what are some of our next steps. That was on the phone. That -- that conversation was just on the phone.**
Q. Do you know whether or not -- Dr. Stanton may be a -- he may be contracted, meaning he may be contracted by Chevron, but he has a Chevron e-mail address and it's stated that he's a medical director.
Is he inhouse at Chevron or is -- is he a private practitioner that's sort of contracted by Chevron? Or CP Chem. Excuse me.
**A. I don't know.**
Q. Okay. Do you know is he still affiliated with CP Chem?

**A. I don't think so, but I -- I don't know for sure.**
(Pause.)
Q. And so then fair to say when the fourth test was done, kind of based upon what we're hearing from -- what you're hearing from HR about what Stanton told HR, there weren't any changes that were made to the fourth exam. The fourth exam functioned materially very similar to the first three. Is that fair to say?
**A. Yes, sir, that is correct.**
Q. All right. The light that Warren talked about, you know, over -- the overhead light with the lamp thing, the -- the long arms, that -- that hadn't been fixed and there was no changes made to any of the displays and the brightness levels, anything like that. No material changes in any way from a vision perspective to that heater board console when he got tested the fourth time?
**A. That is correct.**
Q. All right. And then the fourth time as the previous three was, again, marked as a failed exam?
**A. That is correct.**
MR. SUDDUTH: And just so we have it



into the record because we talked about it, this is No. 4. It's marked "Not Successful," so I need to make this an exhibit.
It will be Exhibit 19. Exhibit 19 is going to be an in-globo exhibit of two pages. It's going to be 1347 to 1348.
(Exhibit 19; so marked.)
Q. And it appears as though the testers were Clay Ryan, Bryan Lohr, Josh Montalvo and yourself. Is that your recollection as well?
(Reviewing document.)
**A. Yes, sir, that is correct.**
Q. Okay. Is there any reason that Warren didn't sign this one?
**A. He was probably not there when the signatures were done.**
Q. Okay. So at -- at this point in time you've done your -- your four -- fourth exam. Your concerns from November we've talked about. You have the -- the marked unsuccessful test.
This kind of brings me back to something I was asking you about beforehand about kind of trying to find some alternatives out there, you know, for Warren. You know, what do we do from here.
And I think you told me that the



discussions at that point were kind of -- I think the word you used was "in passing." Do you remember that?
**A. I think you said "in passing." I -- I said just over the course of time there were -- there were -- there were short discussions; not a -- not a singular event where we sat and actually tried to identify something specific, and it would be over the course of time we'd ask questions about is there something else we can do for him.**
MR. SUDDUTH: Well, let me -- let me show you this. I'll mark this as Exhibit 20 to your deposition. This is Bates labeled as 778, madam court reporter and it's a one-page exhibit.
(Exhibit 20; so marked.)
Q. This it is an application for a job vacancy. The date of the application is 12/12 of 2022 for Warren Jones. 1544 Operator.
And it says, I, Warren Jones, hereby apply for the position of Instrument Tech in the Maintenance Department [as read], signed by Warren Jones; received by Chelse Cisneros. Did you know that he had applied to go work in maintenance to try to stay with CP Chem?
**A. Yes.**



Q. You're aware of that?
**A. Oh, wait. This is 2022?**
Q. Yeah.
**A. Oh, no. Sorry. I thought -- so later he actually applied at a different one of our CP Chem sites. Sorry. How about I -- how about I read this first before I...**
(Reviewing document.)
**A. No, I didn't know about this or at least I don't remember it.**
Q. Yeah, I -- I don't -- I don't see you with some of e-mails that -- that discuss it, but I remember Warren in his deposition talking about "the dock" is the way he phrased it.
He even wanted to go just as he put it, you know, work at the dock. He'd do manual labor. He just wanted anything to -- to try to stay with CP Chem.
And I was asking you before about whether there were openings or anything like that. Do you have -- do you remember having any conversations about this job vacancy over in maintenance on the dock?
**A. I -- I probably -- I probably knew about this at the time. I just don't remember. So -- so**

**the docks is not a singular job that you can just go do. It's a part of a group of jobs that have to be qualified in.**

**The jobs -- the dock happens to be one of the rotations you can be assigned to go do, but it's -- it's not a specific job that we go assign somebody to do and this is all that they do. They do a lot of other things as well.**

MR. SUDDUTH: Well, let me show you then -- I'll mark this as Exhibit 21 and it will be in -- will it be in globo? No, it's not in globo. It's a one-page exhibit, Exhibit 21, and it's 756. Bates labeled 756.

(Exhibit 21; so marked.)

(Reviewing document.)

Q. Do you know who Trisha -- is it --

**A. Opincar.**

Q. -- Opincar?

**A. Yes. Yeah, she's one of our recruiters.**

COURT REPORTER: I didn't hear the last name.

MR. SUDDUTH: Opincar.

COURT REPORTER: Thanks.

Q. So this -- this is January 12th of 2022 that this e-mail is being sent to Bryan, the Update



on the Terminal Operator Posting [as read].

His resume had been submitted about a month prior, December 12th of 2022. By this point in time Warren's been officially terminated, is that right?

**A. That -- that sounds right. I don't remember the exact date.**

MS. WILLIAMS: I'm -- I'm just going to object to the mischaracterization because of the date. It's a 2022 date; not a 2023 date.

**THE WITNESS: Oh, yeah. Look at that.**

(Reviewing document.)

MR. SUDDUTH: Yeah, I do -- I do see that which is...

(Reviewing document.)

Q. Well, I thought upon my first review that this is what the company decided to do with his December 12th of 2022 application, but this doesn't appear to relate to the December 12th of 2022 application.

Do you know what happened to the December 12th of 2022 application and his request to be on the dock or to be in maintenance?

**A. I don't know anything about this.**

Q. I'll just represent since I've already



marked this one as an exhibit, this is in January 12th of 2022.

So I -- I don't know. Maybe -- maybe he applied to be in maintenance back in 2021 or something as well. I -- I don't know, but this is in the discovery.

And it does have a line in it that I wanted to ask you about which is, "Warren Jones did apply for the role. He doesn't meet the minimum qualifications of having at least 3 years of dock, wharf and/or pipeline operator experience. He has only been a Safety Rep and a Production Operator." Did I read that correctly?

**A. You did.**

Q. Okay. The reason why I wanted to ask you about that is because Bryan Kubsch responds to that. He says, "No issue on phone interview timing. When I spoke to Warren, I asked about his experience and he described to me his role was pipeline and ship loading and unloading - very aligned with our dock role. I didn't ask about the duration of that experience. Is the issue time or skill? Have a nice vacation. We all need one."

Was this ever a discussion that you were ever a part of about trying to get him into this



dock role? And I don't ever even see a response, by the way, about whether the issue was time or skill.

(Reviewing document.)

MS. WILLIAMS: And I just -- I want to -- I'm sorry. I -- I just want to object. I -- I don't know if you mean it this way.

Obviously the -- the document is in 2022. I don't think you're relating it to 2023 or -- 2023 or the December 2022 thing, but to the extent that -- I'm just -- I'm going to object to the extent that it's mischaracterizing evidence that's in the record in that regard, but go on.

MR. SUDDUTH: Yeah, I'm -- I'm not -- I'm not relating it to that --

MS. WILLIAMS: Okay.

MR. SUDDUTH: -- because I don't know if this -- if this e-mail is misdated. Otherwise I don't really know why it's in the discovery, but, I mean, it's -- it -- it is related to a position that he applied for, but I don't see the application.

So I -- I -- I will agree with you, actually, that it is very confusing because I don't see an application in '21 that this kind of e-mail would relate to.

I see -- I see his application about

11 months after this line of e-mails in December of '22, so I -- I -- I don't want to try to relate them because I -- I hear what you're saying. I -- I agree with that.

But they are discussing Warren's experience and they are discussing the role and it is a role that he applied for in December of '22, so the two may not be related, but I do want to talk about the experience and I want to talk about his resume as it related to that experience, so I just want to clarify that for the record that I don't believe I'm mischaracterizing this at all.

But with that clarification, Mr. Wooters, this comment here about -- where he says When I spoke to Warren, asked him about his experience, he told me his role was pipeline and ship loading and unloading - very aligned with our dock role. I didn't ask about the duration of that experience. Is the issue time or skill? [as read].

Did you ever have any discussions with Mr. Kubsch about a role like this, like in the dock role for Warren?

**A. At what -- at what point?**

Q. That's a good question. I can break it up into two. Did you ever discuss it at any point in



time prior to -- prior to his third test?

**A. No.**

Q. Okay. After his third test up until his termination, did you ever discuss a dock role? So not another operator position or something like that, but this dock role that he'd actually applied for.

**A. No. Can I change my first answer? I don't remember the prior. We did not talk about this role in the second period you -- you mentioned.**

Q. Okay. Ms. Opincar makes a comment that he doesn't qualify because he doesn't have the three years of experience, but Bryan asks a follow-up question of "Is the issue time or skill?"

Here's what I want ask you: Have you seen situations where someone doesn't have the minimum number of years but they have the skill and so they're allowed to come into the role because of their skill sets?

**A. I -- I have seen that. It depends on the hiring manager's intent for why years of experience might be necessary though.**

Q. Right. Do you have any idea or any information at all as to this particular job and whether or not Warren was -- what Trisha did with



Warren's request to work in this role?

**A. I don't. I don't know.**

Q. Okay. I asked you previously about other jobs and other places that he can be placed within CP Chem. I brought this one up to you specifically.

Does this conversation about this job in particular jog your memory about any other positions that you may have discussed with anybody for Warren?

**A. No. No, it does not.**

(Pause.)

MR. SUDDUTH: What I'm going to do, Mr. Wooters, is we're going to take one final break. This break is for me to review my notes.

I think I am pretty close to done, if not done, but I'm going to review my notes and make sure and then we'll come back. Okay?

**THE WITNESS: Yeah, sounds great. What time?**

MR. SUDDUTH: Let's see. 1:11. So we'll do 1:20. Nine minutes.

THE VIDEOGRAPHER: We are now off the record. The time is 1:11 p.m. Central Time.

(A break was taken from 1:11 p.m. to 1:21 p.m.)

THE VIDEOGRAPHER: We are now on the



record. The time is 1:21 p.m. Central Time.

MR. SUDDUTH: Okay. Mr. Wooters, there were just a few points of -- points of clarification as I was looking through some final documents, and I -- I think that it may just be best to share my screen. I have to go kind of way back to the beginning here. This is Bates labeled 121.

This is a "Termination Recommendation Memo" prepared by Chelse Cisneros, and it looks like it was reviewed and supported by Sr. Counsel Stephanie John. I'm going to make this Exhibit 22 to your deposition, CP Chem 121. It is a one-page document, so it's a single exhibit.

(Exhibit 22; so marked.)

Q. You talked to me throughout your deposition today about the idea that, you know, the reason why kind of going outside the training or not doing the training or moving him from the heater board console to some other kind of training that there couldn't be deviations from that because of the policy, the training policy, and I just want to make sure I understand the training policy you're referencing.

Here in this Termination Recommendation Memo it states, "Per HR Training Guideline 2,

Section 4.5.3, Jones was then formally placed on a Performance Improvement Plan (PIP) on October 13, 2022, to address the deficiencies identified during his test with the Unit Review Committee."

The training guideline or policy that you were referencing when you were testifying to me earlier, is that what you were referencing, Training Guideline 2, Section 4.5.3?

**A. I -- I have to look at the -- the document. I don't remember the -- the number of it. This looks correct, but I -- I'd have to look at it to confirm.**

Q. Okay. I also think that I previously introduced as an exhibit the accommodation meeting. You know the one that happened October 3rd of 2022? You know, he sent that e-mail September with Dr. Hart's letter and there were minutes from an accommodation meeting.

It wasn't produced this way and I apologize. A lot of these documents -- this happens a lot in discovery. Documents can get produced and they may get reproduced later on. You know, it just tends to happen when you have voluminous documents.

And I want to make sure that I have a full production or I'm -- I'm introducing the accurate



document for the accommodation meeting.

I introduced one page, but in a different part of the discovery it's produced in a different way, so I'm going to show you Bates labeled 119 to 120. This will be an in-globo exhibit, 119 to 120. It will be the next exhibit in this deposition.

(Exhibit 23; so marked.)

Q. So you'll see were at 119. Here's Bates labeled 119. And you see at the top it says "Accommodation Meeting:" Do you see that?

(Reviewing document.)

**A. I do.**

Q. Okay. You remember this is -- the very beginning of your deposition we went over this together.

This is where, you know, I kind of went over all these different notes and points with you asking you if you remembered them and if you had any reason to dispute them. Do you recognize these notations here?

(Reviewing document.)

**A. Yes, sir.**

Q. Okay. I thought this was the end of the accommodation, you know, minutes, but it appears that it carries over to a second page to 120 where



there's some more notations here before it -- it ends.

Take a look at this, read over this. Do you recognize any of this? Does this sound accurate as though it was discussed in the meeting?

(Reviewing document.)

**A. It looks like it -- it would have been just based on the context and the way that it -- that the notes were written.**

Q. Okay. So then a couple points to just verify that are accurate. As we talked about before, "Jones stated this could be on going and Cisneros requested that she needed that in writing from the doctor."

So to clarify, this was not a limited duration disability like, you know, you told me about before --

**A. Sure.**

Q. -- where someone might have been injured. This was an ongoing issue and that was your first time dealing with such a -- a request, is that right?

**A. That is correct.**

Q. Okay. You guys talked about any aids that could be used to accommodate the request. I'm



interested in this comment here, though, that "Jones also stated that he gets headaches and aggravated with" his eyes or -- sorry -- "aggravated with eyes after looking at the console for too long."

When you talked with Stanton or you spoke with even HR about their conversation with Stanton, was there any discussion at all about how any headaches or migraines from the squinting or the eyesight struggles, how that might be affecting his testing or his testing abilities?

**A. I don't remember that specifically coming up.**

Q. Okay. There is a question here noted. If we're not able to accommodate your request, what other skill sets do you have? 17 years of safety experience, Maintenance, Can do anything [as read].

Is it -- is it fair to say, is it accurate to say that as of October, you know, 3rd, 2022, you had knowledge of at least these points, safety, maintenance and his willingness to do anything? As early as October 3rd of 2022 you knew of that willingness for Mr. Jones to work in other areas of CP Chem?

**A. Yeah, I -- I think this is evidence of that.**

Page 202

Q. All right. And it concludes with an "Action item- Warren to work with doctor to see if there are specific lighting/magnification devices that can help him, propose what will help you the most."

I did not previously have this page to the -- the memorandum and I just wanted to be accurate that based upon your recollection of the meeting you were in, this second page appears to also be accurate minutes of that meeting?

**A. To the best of my ability in determining it, it -- it looks like meet -- it matches the -- the first page.**

Q. Understood. Okay. All right. Mr. Wooters, I asked you about that just let me work outside kind of an accommodation. I'll just keep working outside.

And we -- we talked about the fact that, you know, Warren made that request and I asked you whether or not, you know, you did any kind of analysis of -- of the burden, but what I want to ask you is, did you and Clay talk about that, you and Clay Ryan talk about the idea of just letting him work outside?

**A. Yeah, we -- we -- we would have talked**

Page 203

**about it one time at least.**

Q. Okay. Do you recall did Clay have a position on it? I mean, was he opposed to it? He supported it? He was ambivalent? Do you remember?

**A. Our general comments about this topic because it's -- it's something that has come up before in discussions is that there is no outside-only position in the CBA and, therefore, it would have to be negotiated.**

Q. It has to be negotiated. Okay. Obviously since we're sitting here today I think, you know, we know the answer to this, but is it fair to say that those negotiations never took place about that particular topic?

**A. I'm not aware of them happening -- happening.**

MR. SUDDUTH: Okay. All right, Mr. Wooters. That's all I have for you today unless Ms. Williams has questions, then, you know, but we'll have some back and forth.

But that's all I have for you for right now, so thank you for your time today especially because of being international, so I know it's late for you this evening so -- so thank you for that.

Page 204

**THE WITNESS: Of course.**

MS. WILLIAMS: We'll reserve our questions for trial.

MR. SUDDUTH: Well, in that case it's really good news for you, Mr. Wooters, because you are in fact done because sometimes Ms. Williams can have questions.

**THE WITNESS: Thank you.**

MR. SUDDUTH: Do you want to -- do you want me to go over reading and signing with him, Ms. Williams, or do you want to do that or what?

MS. WILLIAMS: Yeah, we'll -- I'll go over it. Jud, you have the opportunity to review your deposition transcript and sign it.

And so, I mean, or you can waive it right now, but certainly, you know, if -- if you'd like to review and sign, we -- that's what we'll -- we'll do.

**THE WITNESS: What do you recommend?**

MS. WILLIAMS: Let's read -- read and sign.

**THE WITNESS: Okay.**

MS. WILLIAMS: Okay.

THE VIDEOGRAPHER: Well, since counsel doesn't have anymore questions, can we get orders on

Page 205

the record? Mr. Sudduth, do you normally get the standard video service? Did you want to upgrade that to a synced video or?

MR. SUDDUTH: Since I -- since I ordered the deposition, I know that the transcript and the video will come with that all, so all of my standard orders will be just fine.

THE VIDEOGRAPHER: Okay. Sounds great. Ms. Williams, did you need standard video or?

MS. WILLIAMS: Yes. And I -- I think that we may have -- for the prior depositions maybe kind of confirmed what -- what our order would be, but, yeah, we'll just kind of --

THE VIDEOGRAPHER: And you're with Ogletree, Deakins, Nash, Smoak & Stewart, correct?

MS. WILLIAMS: That's correct.

THE VIDEOGRAPHER: Okay, great. Can I have you just leave your e-mail in the chat for me? I can get that standard video order for you.

MS. WILLIAMS: Sure.

THE VIDEOGRAPHER: Okay, great. And I'll do our readout. Bear with me one second.

COURT REPORTER: I'm sorry. Did you want to ask about transcripts?

THE VIDEOGRAPHER: Oh, I thought they were ordering transcripts at the same time.
MS. WILLIAMS: Yeah.
THE VIDEOGRAPHER: Transcripts for counsel as well?
MS. WILLIAMS: Yes, please, for us.
THE VIDEOGRAPHER: And, Mr. Sudduth, do you need a copy of the transcript?
MR. SUDDUTH: Yeah, I believe it comes with -- with me ordering the depo, so, yes.
THE VIDEOGRAPHER: Okay, great. So this concludes the deposition of Thomas Judson Wooters for Warren F. Jones vs. Chevron Phillips Chemical Company LP. We're now off the record. The time is 1:32 p.m. Central Time.
(Whereupon, the deposition concluded at 1:32 p.m. Central Time.)



PLEASE ATTACH TO THE DEPOSITION OF
THOMAS J. WOOTERS.
CASE: JONES v.
CHEVRON PHILLIPS CHEMICAL COMPANY LP.
DATE TAKEN: 10-1-25

ERRATA SHEET

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this ____ day of ______, 2025.

______________________
THOMAS J. WOOTERS



COMMONWEALTH OF MASSACHUSETTS

I, SUSAN LOZZI, Registered Professional Reporter and Notary Public duly and qualified in and for the Commonwealth of Massachusetts do hereby certify that the foregoing statement is a true and correct transcript of my original stenographic notes.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this 15th day of October, 2025. Reading and signing of the transcript was requested.

Susan Lozzi

SUSAN LOZZI
NOTARY PUBLIC

My Commission Expires: March 20, 2031.

# Exhibit E

# Deposition Transcript

**Case Number: 1:24-cv-00350**
**Date: October 6, 2025**

**In the matter of:**

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

# CLAY RYAN

**CERTIFIED COPY**

Reported by:
Michelle R. Antos

**Steno**
**Agency, Inc.**

**315 West 9th Street**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(888) 707-8366**
**NV: Firm #108F**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

WARREN F. JONES, )
Plaintiff, )
)
vs. ) CASE NO. 1:24-cv-00350
)
CHEVRON PHILLIPS CHEMICAL )
COMPANY, LP, )
Defendant. )

ORAL VIDEOTAPED DEPOSITION

CLAY RYAN

OCTOBER 6, 2025

(Reported Remotely)

ORAL VIDEOTAPED DEPOSITION OF CLAY RYAN, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 6th day of October, 2025, from 1:06 p.m. to 3:36 p.m., before Michelle R. Antos, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine by Zoom and the witness appeared from Port Arthur, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR PLAINTIFF:
MR. JAMES E. SUDDUTH, III
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana 70601
Telephone: 337.480.0101
Fax: 337.419.0507
E-mail: james@saa.legal

FOR DEFENDANT:
MS. MARLENE C. WILLIAMS
OGLETREE DEAKINS, PC
Preston Commons West
8117 Preston Road, Suite 500
Dallas, Texas 75225
Telephone: 214.987.3800
E-mail: marlene.williams@ogletree.com

ALSO PRESENT:
Ms. Isabella Gaytan - Videographer
Ms. Stephanie John
Mr. Austin Matthews



INDEX


| | PAGE |
|---|---|
| CLAY RYAN | |
| Examination by Mr. Sudduth ........................ | 5 |
| Signature Page ................................ | 116 |
| Court Reporter's Certificate ................... | 118 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 45 |
| Exhibit 2 | Email with Doctor's Letter | 45 |
| Exhibit 3 | Accommodation Meeting Notes | 49 |
| Exhibit 4 | Email | 58 |
| Exhibit 5 | Bates Documents 811 to 812 | 60 |
| Exhibit 6 | Bates Documents 764-765, Dr. Hart Letter | 76 |
| Exhibit 7 | Email | 104 |


(The exhibits tendered during this deposition were not provided to the reporter prior to the completion of the final transcript. Exhibits may be produced by Counsel at a later date.)



THE VIDEOGRAPHER: Good afternoon. We are on the record at 1:06 p.m. Central Time, October 6th, 2025, to begin the deposition of Clay Ryan in the matter of Warren F. Jones versus Chevron Phillips Chemical Company, L.P. The venue of this case is in the United States District Court for the Eastern District of Texas, Beaumont Division. The case number is 1:24-CV-00350.
This deposition is taking place via Zoom. The legal videographer is Isabella Gaytan here on behalf of Steno, whose business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.
Would counsel please identify yourselves and state whom you represent.
MR. SUDDUTH: Yes. James Sudduth on behalf of the plaintiff, Mr. Warren Jones.
MS. WILLIAMS: Marlene Williams on behalf of defendant, Chevron Phillips Chemical Company.
THE VIDEOGRAPHER: Thank you, Counsel. Will the court reporter please identify yourself and state -- and swear in the witness.
THE REPORTER: Michelle Antos.
(Witness sworn)



CLAY RYAN,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. SUDDUTH:
Q. All right. Mr. Ryan, good afternoon, sir.
**A. Good afternoon.**
Q. Can you hear me okay?
**A. Yes, sir.**
Q. All right. Mr. Ryan, let me ask you, have you ever been deposed before, meaning in a deposition like this?
**A. I've sat in them, through arbitrations.**
Q. Through arbitrations, okay. Well, in an arbitration, the arbitration itself is the actual hearing.
Did you guys have depositions of witnesses before the arbitration or are you talking about just the arbitration itself?
**A. We just -- arbitration itself where we had witnesses on our behalf, just how I'm sitting here now.**
Q. Okay. So the arbitrations were actually conducted by Zoom?
**A. They were in person. It was before COVID, so...**
Q. Got you. So understanding that you sat through arbitration, what about a deposition, though? Have you ever been deposed before?
**A. No, sir.**

Q. Okay. First time for everything, huh?
**A. I guess so.**
Q. All right. Well, let me start by going over some ground rules with you. And I'm sure maybe the counsel for CP Chem went over some of these, but I'm going to go over some ground rules with you.
The first, sir, is to remind you that you are under oath, so a prime example, the arbitration that you go through. I know that this can seem kind of informal because, you know, it's just by videoconference, we don't have a judge or a jury sitting with us. But the oath that you just took is the same as if it was an arbitration, the same as if we were in front of a judge and a jury. So all the same obligations to tell the truth, all the same penalties of perjury if you do not, all of those attach here just as they would in a court of law.
Do you understand that, sir?
**A. Yes, sir.**
Q. And are you okay with that?
**A. Yep.**
Q. Very good. The next thing is to ask you to please verbalize your answers. What I mean by that is this: You're going to find it's really common throughout conversation to say things like "uh-huh" or "huh-uh" when you are answering a question. It happens all the time in conversation. The



problem here, though, is Madam Court Reporter is taking down everything that you're saying and it's going to later be put into a booklet format. It's really hard to get those "uh-huhs" and "huh-uhs" right.
And so if you would, please, sir, no matter what your answer is -- if it's yes, no, maybe, whatever your answer is -- verbalize that answer out loud. Okay?
**A. Yes.**
Q. Okay. Thank you.
Also, talking over each other. That also happens a lot in conversation. I'll give you an example of what I mean. I could be asking you a question today and you can sort of sense where my question is going, and so before I'm done asking it, you start to answer it. Well, the problem with that, even though it's fine in conversation, the problem here is it leads to a situation where I'm asking and you're answering and we're talking at the same time.
That is especially more problematic by Zoom, because Zoom will actually cut off one of the speakers entirely sometimes, so then we don't hear anything that you have to say. So if you would, please, sir, let me finish my question out all the way to its end. Even though it's kind of tedious and you know where I'm going, let me go all the way out to the end of that question before you start to answer. Okay?



**A. Got it.**
Q. Thank you so much.
The final thing I think I'll go over with you before I jump into things is -- is breaks. This is not a marathon. Okay? So if you need to take a break, water, bathroom, whatever the case is, you just ask and we're going to accommodate that. I also try to watch the clock a little bit and see if we're at about an hour, and I offer breaks to people just as comfort breaks. So we try to accommodate that the best we can.
My only request of you is this: If I have question that is pending on the table for you to answer, please answer that question before you go take the break that you desire. All right?
**A. Yes, sir.**
Q. Thank you so much.
Do you have any logistical questions for me before I press further?
**A. No, sir, I'm good.**
Q. All right. In that case, your full legal name and address for the record, please?
**A. Clayton Scott Lee Ryan, 6738 Bryan Hebert Lane, Groves, Texas 77619.**
Q. How far is Groves from Port Arthur?
**A. It's like a five-, ten-minute drive. It's right**



**here.**
Q. Okay.
**A. Depending on where you live at in Groves.**
Q. Clayton Scott Lee Ryan. We'll, I've got to say, I'm surprised to see that because you've got Ricky Bobby on your shirt. And I'll tell you this, I've been excited for, like, two weeks to get to meet you and depose you, because I've been hearing about Ricky Bobby the whole life of this case. I don't think you realize, Mr. Ryan, what a celebrity you are. But it's a thrill to meet the Ricky Bobby. So I'm going to start with that.
How did you get the nickname Ricky Bobby?
**A. Those four first names, so...**
Q. Oh, okay. Yeah, it makes sense.
**A. Clayton Scott Lee Ryan. One of the operators came up with it and it stuck. So I took it, because it could be a lot worse.**
Q. No doubt. Well, we can -- especially kids can be cruel. So high school, middle school, nicknames can be a lot worse than Ricky Bobby. So it stuck.
As I understand it, actually, a lot of people out there have nicknames. I mean, I was speaking to Jimmy Hays and he goes by Purple Haze. Is that right?
**A. Yeah, he does. Yeah, he has quite a few.**
Q. Well, it's nice to finally to meet you and put a --

put a face to the name of Ricky Bobby.
So Mr. Ryan, I'm going to ask you some questions just to get to know you a little bit because this is my only chance to do that outside of a trial.
So let's start with your education. Can you tell me, please, sir -- I assume you graduated from high school, but let's go ahead and confirm that.
Where did you graduate high school at?
**A. Little Cypress-Mauriceville in Orange.**
Q. Okay. Did you go on to any sort of vocational or trade school or community college after high school?
**A. Yeah, Lamar State, Port Arthur College and obtained my associate's degree in process technology.**
Q. How long did it take you to get the associate's degree?
**A. Two years.**
Q. Did you work while you were getting that or did you go straight through?
**A. No, I worked a full-time job, so...**
Q. After you got the associate's degree in process technology, any other master's or bachelor's degrees beyond that?
**A. No, sir, I was done with school.**
Q. Okay. Got your process technology degree and you were ready to work?



**A. Yep.**
Q. Okay. So let's talk about work, then.
You said you were working even while you were going to school. So let me get my timeframe here and let's get some years right.
What years were you going to school?
**A. I graduated high school in 2010, took a year off and started back up in 2011 and went to Lamar PA from 2011 to 2013. Graduated there in August of 2013.**
Q. Okay. Graduated in August of 2013.
So when you took that year off in 2010, from 2010 to 2011, were you working in that time?
**A. Yes, sir.**
Q. Okay. Where were you working at?
**A. Just odd jobs, like, Somnas Car Wash (phonetic) and then The World Of Finance.**
Q. Did you ever get terminated or involuntarily discharged from any of those odd jobs?
**A. No, sir.**
Q. Okay. After you graduated in August of 2013 from Lamar, did you go to CP Chem, or where did you first start working?
**A. I was doing an internship during my last couple of months of school. So I was in an internship at Air Products, and then I got hired on at CP Chem in December of 2013.**



Q. I'm sorry, your internship was with who?
**A. Air Products.**
Q. Air Products, okay.
Are they affiliated in any way with CP Chem?
**A. No, sir, not that I know of.**
Q. How did you come to -- sorry.
How did you come to find out about CP Chem?
**A. I was looking for a full-time job, so I was looking at Indeed, seeing what was out there. I applied and interviewed and got hired.**
Q. So when you applied, what position did you apply for?
**A. Process operator.**
Q. With Air Products, were you -- were you just an intern with them or were you working with them in any kind of a paid capacity?
**A. Yeah, I was getting paid. I don't remember the exact amount I was getting paid then. But yeah, I was pretty much working 30 to 40 hours there while I was doing an internship. No benefits or anything, so...**
Q. Okay. So it was a paid internship.
And did you do that from August when you graduated until December when you started at CP Chem?
**A. I want to say I started the internship -- I can't remember exactly, but I want to say May or June. And then I**



**left there in around September or October.**
Q. Did you leave that internship voluntarily or involuntarily?
**A. It ended and --**
Q. Oh. It ended?
**A. Yeah, it was just a rotation. And they weren't hiring at the time, so...**
Q. So when that ended in September, October, you know, you were already looking on Indeed anyway, so you just kept looking and then CP Chem popped up. Is that right?
**A. Yes, sir. I did a short stint with a scaffold building company during that time. But they went out of business, so...**
Q. What was the name of that scaffolding company?
**A. And I knew you were going to ask for that. I was trying to think of it. I really can't remember, honestly. It was through my sister's ex-boyfriend's dad's company, so...**
Q. Got you.
Okay. By the way, I know you live out in Groves, which is near Port Arthur. You went to college in -- at Lamar in Port Arthur.
Is that where you were born and raised, in that area, like southeast Texas?
**A. Yeah, southeast Texas. But I lived in Orange all**

**my life until I graduated high school.**
Q. Okay. So then you start CP Chem in December of 2013. You started as a process operator?
**A. Yes, sir.**
Q. Okay. As a process operator, I'm probably going to refer today to the ethylene unit. I might call it the 1544 unit. But as I understand it, when we talk about an ethylene unit 1544, what that means is, it's the ethylene unit located at Port Arthur. That's how that 1544 identifies it.
Is that all accurate, to my understanding, accurate?
**A. Yes, sir.**
Q. Okay. When you started as a process operator back in 2013, were you with the ethylene unit at Port Arthur?
**A. Yes, sir.**
Q. Okay. Have you been with ethylene 1544 -- meaning ethylene Port Arthur, have you been with that unit from when you started to the present day?
**A. Yes, sir.**
Q. Okay. So from 2013 to 2025.
All right. As a process operator, has your position, title, all that kind of stuff, has that stayed the same from '13 to '25?
**A. No, sir, it's changed twice.**
Q. Tell me about those two changes and when those two



changes occurred.
**A. The first one was in 2020. I want to say February or March timeframe. They called it a special assignment in the distillation area. Our unit superintendent wanted to have another guy on days covering, helping cover the unit. So I did that up until May of '21. And then I became the furnace coordinator, which I currently hold now.**
Q. So this special assignment in distillation, was it distillation -- I guess I should also say this.
I also understand from some depositions that the ethylene unit has six different positions, three inside, three outside. Is that accurate?
**A. Yes, sir.**
Q. Okay. The distillation that you were assigned to as a special assignment from February or March of 2020 to May of '21, was that inside distillation, like on the console, or was that outside?
**A. It was both. It was handling projects that came up outside in that area and then helping optimize the back end of distillation inside.**
Q. So when you were doing both, you said your shift was days?
**A. Yes, sir. I was scheduled just strictly days, four 10s.**
Q. Four 10s, meaning Monday through Thursday?



**A. Yes, sir.**
Q. Okay. Monday through Thursday, ten hours a day?
**A. Correct.**
Q. And off of the shift rotation, so off of nights?
**A. Yes, sir. No longer working the DuPont schedule.**
Q. Okay. Yeah, got you.
Is that what y'all were on, by the way, if you were on the shift schedule, it was the DuPont schedule?
**A. Yes, sir.**
Q. Okay. Did you like that, being off nights, four 10s, having your weekends, all that good stuff?
**A. Yeah, I mean, nights aren't my favorite things. So weekends didn't bother me, but I'd rather be off on nights. Especially now, I've got a kid, so...**
Q. Okay. Well, all right. Well, congratulations.
**A. Thank you.**
Q. So four 10s until May of '21, and then May of '21 you said furnace coordinator.
What is the furnace coordinator role?
**A. It oversees all, like, our heater retubes. So any heater outages, anything that really goes on in the furnace area, trying to optimize the heaters and push them to max capacity to make the most amount of ethylene.**
Q. If you were -- I'm sorry, go ahead, sir.
**A. No, I was just saying, and then you assist with**



**training also.**
Q. You assist with training in what way?
**A. I've done some of the outside classes, been the instructor. And then any time somebody is on the board and they ask, like, just to sit down and go over some things, I would sit down and go through things on the board with them and be involved in the testing part if I was available.**
Q. When you say "on the board," which board? Because I think there are three inside jobs.
**A. Yeah.**
Q. Which one are you talking about?
**A. The heater board.**
Q. Okay. So is the heater board the board that you are directly involved with as the furnace coordinator?
**A. Yes, sir.**
Q. Okay. The other one would be the distillation board. And then what's the third board?
**A. Compressor board.**
Q. Compressor board, okay.
In the move from process operator in the ethylene unit to the special assignment, aside from the fact that it was kind of a better shift, you know, working days and not nights, aside from that, was there any raise or increase in pay to that special assignment?
**A. Yes, sir.**

Q. Okay.
**A. 10 percent increase.**
Q. Okay. And then as furnace coordinator -- well, we didn't talk about this.
What is your shift as furnace coordinator?
**A. It's the four 10s still.**
Q. Okay. So then the good sort of schedule, the nice schedule kind of continues with furnace coordinator.
But what about the move then from the special assignment to furnace coordinator, did that carry with it an increase in pay?
**A. Yes, sir, it did. To tell you the pay off the top of my head of what it was then, I can't remember because it's all contractual, based on our CBA. I mean, I know what I -- around what I make now.**
Q. So when you say based on the CBA, you're referring to the collective bargaining agreement?
**A. Yes, sir.**
Q. And you are in the union?
**A. Yes, sir.**
Q. What is the -- what's the name of that union? What is the union that you're a part of?
**A. United Steelworkers.**
Q. How many employees out at CP Chem are part of the union?



**A. I would say roughly around 140, 135 maybe. I don't have an exact headcount. I know more of the ones that aren't in the union, so...**
Q. Okay. Yeah, what -- what exactly is the breakdown between union versus nonunion? Is the union half the -- half of the site out there? Is it just a small part of the site?
**A. There's only about six people not in the union.**
Q. Oh, okay. So the 135, 140, are they all operators?
**A. No, sir. It's operators, analyzer techs, instrument techs, metal trades, mechanics. I think that's all.**
Q. So yeah, almost all. Only six people not in the union.
The six people not in the union, is that because they're managerial?
**A. No, sir.**
Q. No? Oh, okay. I'm sorry, let me ask you this way.
The six people that are not in the union, are you referring to people who are, like, they're qualified, they could be in the union, but they've chosen not to be in the union?
**A. Correct.**
Q. I got you.
What I'm talking about at this Port Arthur facility is, how many total employees are out there?



If there are 135, 140 that are in the union, what about total employees?
**A. I couldn't give you an exact amount on that, honestly.**
Q. And, obviously, I'm going to be asking you questions today about your -- you know, your role with Mr. Jones and the fact that you're in the union. So when you brought that up, I just wanted to get some more details about that.
Back in 2022, which is what we're going to spend a lot of our time talking about today, back in 2022, what was your role with the union?
**A. Workman's committee chairman.**
Q. When did you get selected for that position?
**A. 2017.**
Q. Are you still in that position?
**A. Yes, sir.**
Q. How is the union structured?
Meaning, I assume it has a president or a chairperson or whatever. It has a head of the union and, you know, other officers. Describe that for me, though.
What is the sort of hierarchy or the organizational structure of the union?
**A. We have a local president for our group and then he has a vice. And then we have the workman's committee, which**



**includes seven people and I'm the chairman of that committee. And then we have a joint health and safety committee that's -- includes our union and the two other unions out there. And they handle, like, safety topics anywhere from our clothing to finding new vendors, so...**
Q. So the joint health and safety committee combines itself with two other unions.
Who are the two other unions out there?
**A. Oh, man. I think the electricians are IBEW.**
Q. Okay.
**A. The machinists, it's -- it's a weird -- it's a bunch of letters. So I don't know their -- it's like astronomical something. I don't know. I would be lying to you if I took a guess.**
Q. Got you. The workman's committee you said included seven people. You're the chairman of it.
When did you become the chairperson of it?
**A. In 2017.**
Q. Okay. So were you part of the union when you -- from the very beginning that you got out there in 2013, you were in the union?
**A. Yes, sir. After six months, our probationary period. You couldn't join it while you were in probation.**
Q. All right. So it was after six months you joined. And then it sounds like about four years into being in the

union, you became the committee chair?
A. Yes, sir.
Q. Okay. What about prior to becoming the chairperson? So between 2013 and 2017, were you one of the seven people that were part of the committee, you just weren't the chairperson?
A. No, sir. Well, since 2016, I was on the committee as an alternate and then one of the guys got terminated and so I took his spot. And then we had re-elections in '17, and that's when I took over.
Q. The person that got terminated, he got terminated from his position in the union or he got terminated from the company?
A. The company.
Q. What exactly does the workman's committee do? What does it cover?
A. It handles all the grievances that come up. We file the grievances and then also negotiate the contract between the ESW and CP Chem.
Q. Grievances, I think, from my understanding -- but I'm not in the union, you are, so you're the expert here. So I want to ask you.
Grievances, I think, cover certainly things like if someone is going to be fired and they want to contest the termination. Grievances would cover that. Is that



right?
A. Yes, sir.
Q. What other kind of things, if any, are covered by grievances?
A. I mean, to me it's anything that violates the contract, our CBA, that I could file a grievance on.
Q. Well, what kind of grievances, if any, have been filed on things that violate the contract outside of terminations?
I'm trying to figure out what kind of grievances you guys typically file. I mean, obviously, if you wanted to file a grievance over somebody getting fired and you thought it was wrongful, you could do that.
What if somebody got a write-up and they didn't think that they -- the write-up was fair or right or accurate? Could you file a grievance on that?
A. Yes, sir. We have before.
Q. What other kinds of things can you think of that you typically file grievances on, if any, outside of contesting write-ups and terminations?
A. I mean, there's times when, like, our overtime policy hasn't been followed, which is negotiated, given away -- given away to work in metal trades, like, given to a contractor. It has to be brought to our group first and then given away.



Q. Got you.
A. I'm trying to think of some other things. But it's been pretty -- pretty good here for a while now. We've established a pretty good relationship with the company, so...
Q. What does it take for an individual employee who wants to contest, you know, their termination, what does it take to get the union on board to join with that?
A. I mean, really I'll always -- we'll file a grievance. Like, say, if they were terminated, we'll file the grievance, we'll step it out. There's a three-step process. We type up what we think the company violated as the first step.
And they'll send us a response, and then back and forth.
And then the third step is we take it to the monthly meeting where we discuss it with PALT, which is the Port Arthur Leadership Team, and basically asking the plant manager to reconsider. And he's going to say no 99 percent of the time because we've already went through the grievance process.
So and then from there, I think we have 10 to 15 days to file for arbitration, so...
Q. And so the Port Arthur Leadership Team is the plant manager.



And who else is a part of that leadership team?
A. It's the plant manager, maintenance manager, the HR manager. But I think they've changed that, what that title is now. And then you've got your technical manager and EHS manager.
Q. So if you've gone through the grievance process and there's no remedy, the next step before arbitration is to go to the monthly meeting of PALT, the Port Arthur Leadership Team?
A. Yeah. So the third step, we go to PALT, to the Port Arthur Leadership Team. And then if there is no remedy there, I have 10 to 15 days to file an intent to arbitrate.
Q. The grievance process you -- you said you step it out, meaning, the first set -- the first step, second step, third step.
But what I'm curious of is when you file grievances, how often do they get resolved in the first or second step?
A. Hardly ever.
Q. Okay. And what about in the third -- well, I guess I know the answer to this question because you told me that 99 percent of the time the plant manager is not going to agree with you. So hardly ever does it get resolved in the first and second.

What about the third, how many times does it get resolved at the -- the PALT meeting?
**A. I've never had one resolved.**
Q. What about then in an arbitration, can you describe -- before we talk about the results of arbitration, let's talk about the process of arbitration.
When you go to arbitration, how is the arbitrator, the judge, the arbitrator, how is that person selected?
**A. Yeah. So it's been a while, so I'm trying to recollect my memory. So we file the intent and then the names get sent to us. I want to say it was, like, seven different names, arbitrator names, and then based on who selected -- who struck a name first. Like, I think this last time when we went to arbitration, we struck the name out first because the company went the other time. And you just go back and forth, striking names out until you're down to that one person left. And that would be our arbitrator if they were available.**
Q. Okay. Well, do you know -- because that process of striking arbitrators, I'm familiar with that through the -- the few cases I've arbitrated. Do you know what kind of agency you are using? Are you going through the AAA, the American Arbitration Association, or is there some other group you're going through?



**A. I can't remember, honestly.**
Q. Okay. Okay. So you file an intent and then you start striking arbitrators that are offered to you. Where do you guys arbitrate?
Is it at a neutral location or is it at the plant?
**A. At a neutral.**
Q. When was the last time you arbitrated?
**A. Oh man, I want to -- I want to say it was 2019, 2020 maybe. Because it was right when Bryan Kubsch got over here and we had some disagreements in our overtime policy.**
Q. So you guys went to arbitration probably about five years ago. That's the last arbitration you can think of?
**A. Yes, sir.**
Q. Between 2020 and 2025, so since the last arbitration to present day, how many grievances do you think you've filed?
**A. I would -- I wouldn't be able to give you a number, honestly.**
Q. Well, let's try to do it, then, in broad strokes.
Are you talking about you filing grievances to the tune of over 100, you filed just two, you filed a couple of dozen?
**A. Maybe 50 or less. And that's really me guessing**



**because, if, say, metal trades files a grievance and they get their's handled within the first or second step, I may not ever know about that.**
Q. No, I understand that. I appreciate that. I'm just trying to get a roundabout number of how many you think that you've been involved with. So you don't have to guess for me about other groups that you haven't been involved with.
But that you've been involved with, maybe 50 to 60 over the course of five years?
**A. Yeah, I mean, that's probably on the high end, honestly. Because these last couple of years of grievances, we haven't filed a lot of grievances. We've been able to kind of work everything out without having to file a grievance.**
Q. How many of those grievances over those last five years do you think were resolved in a favorable way for the employee?
**A. Can you rephrase, like, what you're trying to get at, I guess?**
Q. Yeah. So I asked you earlier, you know, how many got resolved in the first two steps, and how many got resolved in the third step. And I think your answer to me was, you know, hardly ever. So if -- if I've got -- and let's just use your number, it could be wrong, it could be



high. Let's just use 50 grievances.
If you've got 50 grievances in the last five years where, I don't know, the employee is -- is filing a grievance with the union support over whatever the issue is, how many of those 50 got resolved in a way that the union was -- was favorable, meaning the union wanted that result, or the employee wanted that result?
Clearly, the employee is upset. They're the one filing the grievance.
So I'm asking how many of those 50 grievances got resolved in a way where the employee was -- was satisfied?
**A. I don't think I'd be able to give you an exact number because most of the times we're handling those grievances. And if we do get them resolved, most of our issues affect, like, the group. When you talk about an employee, that's going to be over either some discipline or a termination. That would be fired -- that would be followed on, and as you can see, we haven't got anybody back from a termination in the past.**
Q. Well, wait, you haven't gotten any what back?
**A. Like anybody -- any time someone has been terminated, we've never got their job back, so...**
Q. Right. Well, I mean, you know what I'm going to ask you regarding Warren Jones. I mean, you filed a

Page 30

grievance for Warren Jones. Right? But -- but that result did not change the -- change the outcome. Right?
It didn't reverse Warren's termination?
**A. Uh-huh.**
Q. Is that right?
**A. Yes, sir.**
Q. Okay. So that's what I'm asking is whether it's system-wide, union-wide, or let's make it specific to Warren, or specific to an employee.
Can you think of how many of these grievances have been resolved in such a way that it has been to the union's satisfaction, the group's satisfaction, or the employee's satisfaction?
Meaning, the employee got their job back or the employee got their discipline reversed or the union got their grievance satisfied in a way that they were satisfied with, the policy was changed in a way the union wanted it changed.
So with that kind of context of what I mean by favorable, now I'll reask that question back to you.
How many, do you think, of those grievances were favorable?
**A. Just guessing, I would probably say 50/50. Just because, I mean, depending on what the grievance is. We've had discipline removed from people's files. We've had them**

Page 31

**taken off the program because the company had the wrong dates put in on the sick program so -- and missed it on FMLA. We've had those scenarios, which are wins to us and our employees because they're no longer on the program.**
Q. Sure. So in terms of discipline, it sounds like about 50/50.
What about the terminations, how many terminations have been reversed through a grievance?
**A. Zero. I only know of one instance where a guy could have had his job back, but he screwed that up hisself, so...**
Q. You mentioned to me the FMLA and that triggered in my mind the ADA.
If I say to you the ADA, the Americans with Disabilities Act, have you ever had any instances in your time as the chairperson where you've dealt with the ADA?
**A. Me personally, no, I've not dealt with them. I've heard of it.**
Q. Heard of it, yeah. Have you ever -- aside from Warren's case, which again, I'm going to talk to you more about.
But aside from Warren's case, any other cases where you've dealt with the ADA, the Americans with Disabilities Act?
**A. I can't remember if this guy -- I mean, I know he**

Page 32

**had some kind of disability -- that was terminated. But I don't know exactly what his issue was, because I know he was an honorable discharge from the military. But other than that, I don't really have any instances with them, so...**
Q. What about a reasonable accommodation? It's kind of a -- just a very common phrase in the law, a reasonable -- in disability law -- a reasonable accommodation.
If I said to you a reasonable accommodation, have you ever heard that term before?
**A. Not reasonable. I mean, I've heard of us doing accommodations for people.**
Q. Okay. Have you ever been involved from a chairman's perspective, from a union's perspective, with pushing for an accommodation for one of your union members?
**A. I mean, I've been involved. Maybe not pushing. But I've been involved in discussions of making sure that we're doing the right thing by the group and not just for an individual.**
Q. Doing the right thing for the group and not the individual.
Was that in Warren's case or some other case?
**A. Another case.**
Q. Another case. What was the particular accommodation at issue in that other case?
**A. It was a guy, he was an outside operator. He had**

Page 33

**two outside jobs, I think. And he broke his hand, so he was -- he was going to have to be off for a while because he can't operate valves or a wrench. But he was able to come inside and train on our board. So that was discussions we've had with the company, and his accommodations allowed him to work the DCS, so...**
Q. Okay. And I think, actually, I might have heard -- I think Judson Wooters may have told me about that same guy, the situation with the hand, the broken hand.
**A. Yes, sir.**
Q. But I don't want to -- I don't want to assume this. I want to ask you.
I'm assuming when you tell me a broken hand, this is the kind of situation where eventually the hand healed. It wasn't some kind of permanent disfigurement; eventually, with time the hand healed.
Am I right in my assumption?
**A. Yes.**
Q. Okay. So it wasn't a permanent disability, it was a temporary disability. Right?
**A. Yes, sir.**
Q. Okay. Have you ever dealt with accommodations with something that is a permanent disability?
Like, for example, I have vision problems, they're not going to go away. I've had them my whole life,

they're not going away, it's permanent.
Have you ever had that situation aside from Mr. Jones?
**A. No, sir.**
Q. Okay. And I don't mean just vision, by the way. I mean, any kind of permanent disability. Okay?
So it can be any disability someone has that's of a permanent nature, not temporary like my hand's going to heal. Permanent in nature.
Aside from Mr. Jones, have you had any accommodation you've dealt with that were permanent in nature?
**A. No, sir.**
Q. Okay. Now, we talked about terminations. We talked about accommodations.
Let me ask you now, if I use the phrase, "good faith interactive process," have you ever heard of that phrase? The good faith interactive process?
**A. I mean, I've heard of good faith, but --**
Q. Okay. Yeah.
**A. -- not the words you used.**
Q. Okay. All right. Yeah, fair enough.
Yeah. Good faith interactive process, I'll just represent to you, talks about kind of the process when you deal with an accommodation. Okay? So that's what I was



referencing. This is not -- I'm not giving you a bar exam right now to become a lawyer. All right? I just want to know what phrases you may have heard and dealt with in your capacity as the chairman.
In the context of an accommodation, in the context of asking for an accommodation, have you, your team, the employer, ever talked about a good faith interactive process? Ever use that language before?
**A. I don't recall using that language. I mean, I know we've had meetings where we've talked about making accommodations for Warren.**
Q. And I'm going to -- yes. Yes, I'm going to get to those because I see you're on some of those emails. But before I get to the specifics of what you did in Warren's case, what the union did, I want to know about the union, generally speaking.
In that -- in that arbitration that you told me about, the -- the most recent arbitration that was, like five, six years ago, in 2019, 2020, in that arbitration, what happened? Was it successful for the union? Negative for the union? What happened?
**A. Negative.**
Q. Okay. In order to go to arbitration, all right, so in order to go from grievance to an arbitration, what does it take to go to arbitration?



**A. I have to get the support of the union hall and they have, like, a vote with our E-board. And if they approve it, then they send it to our lawyer and they look over the case and then go from there.**
Q. You have to have the support of the union hall. Does that mean all 135, 140 members?
**A. No, sir.**
Q. What does that mean?
**A. It's really just me bringing it up to our local, like, because we have a president at the local and then we have a secretary/treasurer. And I bring it to them, go over the grievance process with them, let them know where we're at, and our next step is intent to arbitrate. So then they discuss it with our E-board, and if they agree, then we meet with our lawyer and go from there.**
Q. Okay. I missed that in your first answer, E-board. Do you mean executive board?
**A. Yes, sir.**
Q. Got you. Okay. So your executive board, meaning leadership.
Not all 135, just the leadership of the union has to agree?
**A. Yes, sir.**
Q. Is it a majority vote of the executive board or does it have to be unanimous?



**A. I want to say it's the majority, but I've never been a part of the E-board, so...**
Q. When the E-board votes, decides they're going to take something to arbitration, what are the financial implications to the union?
So, for example, if you want to arbitrate, do you have to pay your lawyer? Do you have to pay him hourly to go arbitrate?
**A. I'm not sure how that works, honestly.**
Q. Okay.
**A. I kind of stay out of the finance issue of it. I would just like to go arbitrate it, because that's what I feel we should do.**
Q. Right.
**A. And I pay dues for a reason, so they should listen.**
Q. Right, right. I'm just -- I'm trying to figure out, you know, why they would ever -- for example, I'm sure there are times where the executive board looks at it and says, I don't know if we have a strong case here so we're not going to arbitrate it. I'm sure that that's happened.
Has that happened?
**A. Yes, sir. I mean, that is the issue is finance, spending money to -- to go to arbitration.**
Q. So that is an issue?
**A. Yes, sir.**

Page 38

Q. Okay. Yeah, that -- that's kind of what I wanted to know. I'm sure there are times where it's got nothing to do with money, you're just making a decision because it's a bad case.

But what I also want to know is what about those times where it's a good case, you like the case, you think you guys are in the right, but you say we're just -- we're not going to push it because it's just going to cost us too much money.

Does that ever happen?

**A. It has. We've had disagreements about it, but I mean, that's between myself and the local, really. It doesn't involve, I guess, CP Chem.**

Q. Sure, yeah. Right.

Okay. I'm sure other questions are going to come up about the union, generally speaking, but I think that's all I wanted to talk about the union right now. But things will come up and I'll circle back to it. Let me turn now to the specifics, okay, to Mr. Jones and ask you some questions.

Let me start with, obviously, you heard us read off the caption of the case today, meaning you heard us say this is Warren Jones versus CP Chem, so you know what this case is about. You know it's about Warren Jones.

Did you know Warren Jones personally prior to

Page 39

meeting him at CP Chem?

**A. No, sir.**

Q. Okay. Fair to say the first time you ever met him was working out at the plant?

**A. Yes, sir.**

Q. Okay. When he joined the plant, were you already out there, or who was out there first?

**A. I was out there first.**

Q. So when Warren came into the facility, did he come in as a process operator?

**A. Yes, sir.**

Q. Okay. I also understand from some depositions that the shifts out there, when you are on shift, the shifts out there divide one, two, three and four. Is that accurate?

**A. Yes, sir.**

Q. Okay. You eventually got off shiftwork and got to your four 10s.

But while you were on shift, what shift were you on?

**A. I was Three Crew.**

Q. Three Crew. As I understand it, Warren was on Three Crew?

**A. Yes, sir.**

Q. Okay. Were you and Warren ever on Three Crew at the same time?

Page 40

**A. Yes, sir.**

Q. How long was that that y'all were on the same crew at the same time?

**A. I think he hired in in '16, if I remember correctly. And then I left in 2020.**

Q. Okay.

**A. So four years, give or take. And I was in between shifts too, because I worked a lot -- worked up a lot. So I would go off of shift and then go back to shift.**

Q. What do you mean you worked up a lot? What does that mean?

**A. Like, the job I'm in now, whenever this guy took vacation, I would backfill his job.**

Q. How does that -- how does that happen?

Is it just kind of like they walk in there and, like, ask, hey, who wants to work up? And the first person to raise their hand wins, or how does that happen?

**A. No, so it's contractual because working up, you get paid 10 percent extra. So the company gets to pick who gets to work up in those jobs.**

Q. Okay. So if I'm working out there on Three Crew with you and I want to work up, it doesn't matter if I want to work up, if the company chooses you over me, well, you're the lucky one?

**A. Correct.**

Page 41

Q. Okay.

**A. I mean, I would say there's other things that go into that, being able to work up.**

Q. What are some of the other things that go into it?

**A. Your competency, you're willing to learn, being involved, not just worrying about what job you're covering that day, helping out in other areas. I mean, you're trying to build a name for yourself, right?**

Q. Sure. I appreciate that.

But I want you to just assume for a second that, let's say, I'm just like you, except I'm not named Ricky Bobby. All right? I'm just as eager, I want to move up just as much as you do.

Let's just assume for a second we have the same level of competence so I'm just as good at the job as you are. All that -- everything else being equal. Okay? All the same strokes in every regard.

At the end of the day, though, all things being equal, the choice between James Sudduth and Ricky Bobby is not with us; the choice is with the employer?

**A. Yes, sir.**

Q. Okay.

**A. Now, I will say Judd did a better job of involving the union about work-ups and then kind of trying to spread the load. But past union superintendents weren't like that.**

Page 42

Q. Okay. So you had the opportunity to work up and you took those opportunities, you took advantage of those?
**A. Yes, sir.**
Q. Okay. For the time that you guys were on the same shift, though, from 2016 to 2020, give or take, I know if you were working up you wouldn't have necessarily been on the same shift.
But during those four years that you were on the same shift together, what does that look like in terms of interaction? Are you meeting or seeing Warren numerous times a day? Are you seeing him once a week? What does that look like?
**A. Yeah, I mean, it depends on what shift we're working. Like if we're nights, let's say there are four nights, Friday through Monday, I would see him most of the night. The inside guys interact with the outside guys a lot. We're all pretty much in the same building.**
Q. Okay. So for those four years, fair to say you guys interacted a lot?
**A. Yes, sir, I would say that.**
Q. Okay.
**A. I seen him pretty much every day if I was on shift, so I talked to him.**
Q. So describe that to me.
I mean, did you get along, have a bad

Page 43

relationship with Warren, good relationship with Warren? Tell me about that.
**A. No, Warren is a great guy. I have no ill will towards him.**
Q. Okay.
**A. Very polite, respectable. Nobody, to my knowledge, had any issues with him.**
Q. Yeah. I mean, so far from all the people I have deposed, I agree with that. I haven't heard a negative thing yet.
So you guys got along, good relationship. Would you all ever talk about, you know, personal stuff, just life, family, kids? Or was it always just kind of about the work?
**A. Yeah, I mean -- yeah, we would. Because I remember talking about his daughter and stuff doing track. I mean, there were occasions. I'm not one to open up a lot, so I'm pretty reserved myself. But, yeah, we would talk about stuff outside of work. Football. He's a big football guy.**
Q. What about in terms of his work ethic when the two of you worked together? How was Warren's work ethic?
**A. I had no complaints. He would -- if you asked him to go do something, he would do it. Every now and then, he might need some guidance on if it was, like, a different type of lockout, something to where some of the operators aren't**

Page 44

**used to, have to sit down and go over it with him. But we do that for a lot of people.**
Q. So you do that for a lot of people, you provide guidance.
And would he be receptive to the guidance?
**A. Yes, sir. I mean, I don't ever recall any pushback. Or there may be times where he'd ask me to come with him to make sure he's doing the right thing. But again, that's a normal thing when you're doing something that's not a normal lockout. So I mean, we do that to this day. Some of the younger -- we're pretty young out here now, so they rely on some of the -- I don't want to say I'm a senior guy, but I've been here quite a while now.**
Q. So he would be receptive to the guidance and he would listen the guidance and he would successfully complete the task?
**A. Yes, sir.**
Q. Okay. When you guys, when you moved to shifts, so -- I'm sorry, when you moved off of shift, four 10s, what that does that interaction look like? I mean, I'm sure that it was less, so you weren't with each other all day, every day kind of thing.
So were you seeing him once a week? Once a month? What did that look like?
**A. Depending on if I worked Fridays, because they**

Page 45

**worked that one Friday a month and then they worked their four days out of the month. So really, I would interact with him five days. And then I may see him, like, when he's coming in on his night shift, Tuesday through Thursday, just in passing, say hello and greet him. I mean, if he was specifically working in furnaces, there may be some things that I would go and talk to him and the other outside heater guy personally about, things they needed to do that night or look at something for me.**
Q. I see that we're coming up on pretty close to an hour. It's about 2:00. Do you want to take a break? How are you doing? You want the bathroom or do you want to keep going forward?
**A. I'm fine, if y'all are good.**
MR. SUDDUTH: Marlene, are you okay?
MS. WILLIAMS: I'm good.
Q. (BY MR. SUDDUTH) Let me show you, then, an exhibit. And I should have done this earlier.
MR. SUDDUTH: Madam Court Reporter, I'm going to mark Exhibit 1. It's the notice of deposition, and attach it hereto.
This will be Exhibit 2.
(Exhibits 1 - 2 marked)
Q. (BY MR. SUDDUTH) Let me share my screen. So stay focused on your screen, Mr. Ryan, and you should start seeing

my screen eventually.
Do you see my screen?
**A. Yes, sir, I do.**
Q. Very good. I'm going to mark this as an exhibit, Exhibit 2 in globo. It will be 706, CP Chem 706 to 707.
Mr. Ryan, you'll hear me do this throughout the day. I'll refer to a Bates label. What I've highlighted right here, this is a Bates label. Okay? It's a stamp we place on documents so when we have all these voluminous documents, we can track them and know what they are.
So if you hear Bates label, that's what I'm referring to down here. Okay?
**A. Okay.**
Q. This is 706 to 707, so it's an in globo, two-page exhibit.
You'll see here at the bottom, Mr. Ryan -- or at the top, excuse me -- of 707. It says, "Please find attached notes and concerns. Thank you, Dr. William Hart."
We'll scroll up to 706 and here is where Warren sends an email on September 19, 2022, to Judson Wooters, Aprile Danford, Clay Ryan and Chelse Cisneros. This is in September of 2022.
Do you recall getting this email which attached a letter from Dr. Hart that Warren would have sent?
**A. I mean, obviously, I did if my email is on there.**



Q. Okay. Well, was your email -- let's see, RyanCS@CPChem.com?
**A. Yes, sir.**
Q. Okay. Let me read it.
"Good morning. This letter is from my optometrist and my recent eye exam. Ever since I've been training on the heater board, I've been in and out of the eye clinic trying to get my vision where I can see the controls and reading clearly. During this time, my doctor found some concerns he wanted to share with you guys. Attached is a letter wrote by him on my behalf. Please look at the letter and get back with me, please. Thanks."
Did I read that correctly?
**A. Yes, sir.**
Q. Okay. First thing, did you open up the attachment and did you actually look at the letter from Dr. Hart?
**A. I'm sure I did.**
Q. Okay.
**A. I would think I did.**
Q. Any specific recollection that you have as you sit here today of that letter?
**A. Yeah, I mean, I want to say it was just talking about deterioration of his eye, but...**
Q. What about prior to this, prior to September 19, 2022? He had been training I think for a while before



September 19 on the heater board.
Were you aware of any eyesight concerns or vision concerns of Warren's prior to when he sent this email?
**A. I mean, none to, like, that extent. Like, people working the board, they -- some of them, they do squint sometimes to look at things. But I mean, to me, that's just a common occurrence between operators.**
Q. Yeah. So I guess what I'm asking is, was there anything prior to September 19th of 2022 that made you think that Warren's squinting was more than just another guy squinting, that this was actually a little more serious?
**A. No, sir.**
Q. Okay. Fair to say, was this the first time, this email and this letter from Dr. Hart, that you realized that the vision concerns were more intense?
**A. I would think so. I mean, it's kind of hard to recall that far back exactly, but...**
Q. Okay. When you got this email, what did you do? What did you do with it?
**A. I can't recall, honestly. Because usually I'm not involved in, like, the medical aspect of it unless the employee, like Warren, he shared with us. But for the most part that's handled between the company and the employee.**
Q. Okay. So if there was some kind of an accommodation that Warren needed, that was going to be



handled between the company and Warren?
**A. If the company could make accommodations, yes. But if it involved making accommodations that went against our CBA, they would usually involve us about how we can get this person back on shift, because they were either running out of sick-time pay. So that's why we would come up with things for them to do.**
Q. Okay. Hold that thought right there.
**A. Okay.**
Q. Let me show you -- I was going to show you Dr. Hart's letter. But given what you just said, I want to jump -- I want to jump to 8/14.
MR. SUDDUTH: I'm going to make this Exhibit 3. It will be the one-page document. It ends in CP Chem 814. It's a one-page exhibit, Exhibit 3.
(Exhibit 3 marked)
Q. (BY MR. SUDDUTH) So I just showed you that email of September 19th, 2022 that Warren sent.
Now we're on October 3rd, 2022, so about 10, 13 days later. It says, "Accommodation meeting, Warren Jones, 10/3/2022 at 4:00 p.m. Attendees; Chelse Cisneros, Judson Wooters, Warren Jones, Clay Ryan."
Do you remember attending an accommodation meeting with these folks?
**A. Yes.**

Page 50

Q. Is this an accurate list of who was present? It was just the four of you guys?
A. Yes, sir.
Q. Okay. Where was the meeting held, if you remember?
A. In Room 165.
Q. That was very detailed. That's a good memory from three years, four years.
A. I remember this meeting because it was pretty emotional.
Q. What made it emotional?
A. Warren, he got pretty emotional. And then I think it was -- Judd really cared for Warren, just based off of Warren's personality. Like I said, everybody liked Warren.
Q. Well, I mean, it says here that, "Jones asked for five minutes to tell us the background of his vision issues throughout his life."
So I mean, did he -- did he do that? He got emotional and told you guys about all his vision issues for his whole life?
A. Yeah, he did. Talking about playing football and how he had issues with it there.
Q. I want to read to you just a few of the notes that Chelse took and just see if that jibes with your recollection and your memory.
He says he feels completely burnt after the

Page 51

board. Does that sound accurate based on what you remember?
A. Yeah, I -- yeah. I mean, I guess he could -- he probably did say that, so...
Q. "Having to squint to view the console." We kind of talked about this before.
But does that coalesce with your memory as well, having to squint to view the console?
A. Yes, sir.
Q. Okay. "He has drops that he brings with him to work, but they don't help."
Do you remember that?
A. Yeah, I mean, if it's there, I'm sure we talked about it. Chelse takes pretty good notes.
Q. Okay. "The doctor stated his eyes will continue to deteriorate the older he gets, per Jones."
Again, even if you don't remember this, any reason to think this is wrong?
A. No, sir.
Q. Okay. "The doctor has stated that he doesn't think they will get better."
Any reason to dispute that?
A. No reason to dispute it if it's there.
Q. Okay. This line here, "Brought up outside operator accommodation that was made in the past. Clay said that never made it, quote, up here, assuming he meant HR. And

Page 52

that was all that was said on this."
Let me ask you a few questions about this, sir.
Do you remember this topic, first of all, just generally coming up, the idea of working outside?
A. I don't remember the exact topic, but I mean, I know of instances.
Q. Okay. Well, I know that Warren has testified, at least in his deposition, he testified that he -- he made this request, just let me work outside.
And let me just verify a few things.
A. Okay.
Q. Was he -- he was qualified on all three outside jobs at the time of this. Is that correct?
A. Yes, sir, from what I remember, yes.
Q. Okay. So you mentioned in your previous answer to me, you mentioned that you know of other instances.
What instances are you talking about? Let's discuss those.
What instances do you remember?
A. I mean, there was a guy whose name was Palmer Lee. He never worked the boards. But that was past union committees and past management that just kind of allowed him to slip under the radar. And then when Junior and myself kind of took over the union, we didn't have those same

Page 53

beliefs that the older guys did. Because we all make the same amount of money, so we should all be held to the same standard. Because the expectation is that you will be qualified on all six jobs.
Q. So you're saying it was previous union leadership that let Palmer Lee slip under the radar?
A. Yes, until -- until his -- we took over and then he started having to train on -- because he couldn't pass his last outside job, distillation. And then I want to say he even went to the boiler unit and then he ended up going off on disability.
Q. But he was allowed to work for CP Chem without having trained on everything successfully, until he left on his own accord on disability?
A. Yeah, I mean, if he didn't get disability, he was going to be terminated because he couldn't pass the test.
Q. So you mentioned Palmer Lee.
What about Gerald Devlanc?
A. So Gerald had one board qualification and then he ended up going out on disability also.
Q. Gerald Devlanc, I have from some previous testimony, retired. Is that not correct?
A. He might have retired. I know he went off for a while and then retired. Once they leave, we're kind of out of the loop on all that.

Q. Okay. So you said that when you and the younger guys kind of came in, you had a philosophy of everybody has got to train because we're all doing the same job.
And I think you mentioned Junior. Junior is a nickname, though. What's his actual name?
**A. Brian Lohr.**
Q. So let me ask you about that.
Did -- was your take or was the union's take that Warren just kind of needs to suck it up, we all make the same amount -- amount of money, he needs to train?
**A. Warren had the option to bypass. He chose not to bypass.**
Q. What do you mean -- what do you mean Warren had the option to bypass? I've deposed -- where are you getting that from?
**A. Because we've initiated -- we have seniority training in our contract and a lot of us felt like Warren wasn't ready for the board. And so we asked him, hey, stay outside a little longer, get some more time out there and then try to get on the board. And he felt like he was ready for the board. So he wanted to go to the board and train. And that's what happened.**
Q. Okay. I just want to make sure I'm understanding you, because I'm just going to represent to you, I've deposed Judson Wooters in this case and Judson said that there wasn't



an opportunity to bypass. You train. You have to train. That's what the training protocol says and you have to train.
Is it your testimony that Warren, he could -- he could bypass? He had the option to bypass, he didn't have to do this training right now?
MS. WILLIAMS: And I'm sorry, before you answer, Clay, I'm going to object to the extent it mischaracterizes Judson Wooters' testimony.
But you can go ahead and answer, Clay.
Q. (BY MR. SUDDUTH) Go ahead.
**A. So I mean, talking about those bypass -- Warren bypassing was probably conversations like we had with him myself, probably Jimmy Hays saying, hey, just stay outside. The intent is yes, you will train on the board. But if we think somebody needs a little more time, we're going to let them stay outside for a little longer and then bring them in.**
Q. Oh, okay.
**A. You're not going to make 20 years out here just staying outside.**
Q. Okay. So are you talking about like a temporary -- not a permanent bypass, just a temporary bypass?
**A. Yes, sir, just a temporary.**
Q. Okay. So eventually, though, he's going to have to go in there and he's going to have to train at some point in time?



**A. Yes, sir.**
Q. Okay. So what I'm asking is, was the union ever presented with -- was the union ever presented with the -- the accommodation request or anything like that to allow Warren to work outside because of his disability?
**A. Not to my knowledge.**
Q. Okay. Was -- and again, this is not a situation where it's a temporary disability. It's a permanent disability.
So what I want to know is, did the union ever even have any discussions at all as to what do we do with Warren? We have a guy that has got these vision difficulties and he's struggling to see the board.
Did the union ever have discussions on, do we force Warren to train? Do we push him through training despite the vision issues or do we lay off?
Was there ever even a discussion about what do we do with Warren?
**A. From what I remember, there were discussions, but like, so since he started the training he had to keep going, in my eyes, from the union standpoint. Because the vision, to my recollection, didn't come up until he started struggling with these tests.**
Q. What you said, I mean, does that make -- does that make a difference as to when it came up? I mean, of course



it came up when he was testing.
That's whenever his eyes are being strained. Right?
**A. Yeah, but I'm saying he's worked the board on other aspects of doing dryer regions and he never complained about vision.**
Q. Okay. So did -- did you just not believe the vision? Did you -- did you think he was lying about it?
**A. No, I didn't think he was lying. But that's why we tried to give him every accommodation he wanted. And to my recollection, he didn't follow up, but that Judd told him to go buy whatever he wanted. And I don't remember him ever doing that. And Judd would pay for that, so...**
Q. Really? Okay. Well, let me show you.
So, okay, to your -- to your understanding, Warren asked for -- Warren just never followed up on his accommodations? He never did what he was supposed to do?
**A. I don't know if he bought any of that stuff that we talked about in that meeting, like the little screens that go over for different lighting. He might have. I don't know because I wasn't with him on shift the whole time. I know he had a lamp that he brought out there.**
Q. Yeah, he brought a lamp from his house. Right?
**A. Uh-huh.**
Q. I want to show you 741, Bates label 741.

Page 58

MR. SUDDUTH: And I'm going to make this the next exhibit to Mr. Ryan's deposition.
(Exhibit 4 marked)
MS. WILLIAMS: James, is this 4? I'm sorry.
MR. SUDDUTH: I believe so. I believe this is 4. It will be a two-page exhibit, 742 and 741, a two-page exhibit, Exhibit 4.
Q. (BY MR. SUDDUTH) All right. So you see, Mr. Ryan, at the bottom here of the email chain, the top of 742 is really just the signature page from Chelse Cisneros, or her signature block from Chelse Cisneros.
But here after the accommodation meeting, this is October 19th, 2022, it says, "The company would appreciate you providing this list as soon as possible, but no later than November 11th of 2022."
And in the list what you're asking for is, "You agreed you would consult with your ophthalmologist to identify adaptive devices that the company could potentially provide to increase the visibility of the console."
Okay. I'm not suggesting you were part of this email, but I just want to represent to you this is what was sent to Warren. Okay? By no later than November 11, 2022, you've got to tell us what you need.
Any reason to disagree with that?
**A. No, I mean, it looks like it's in a formal email.**

Page 59

Q. Okay. Here is what he says the very next day. He doesn't take until November 11th.
The very next day, October 20th, 2022. "Good morning, really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine. The only light that works properly is the one over the computer. The other two seem to be broken."
Did I read that correctly?
**A. Yes, sir.**
Q. Okay. I know we were talking before about the request to work outside, and we're going to come back to that.
**A. Okay.**
Q. But in addition to that request, I'm showing you -- do you have any reason to disagree with me when I say this is one of the requests that he made regarding how to fix the lighting for him to see? Any reason to disagree with this?
**A. Not disagree with that email, but that's not the only lighting in that -- in that room.**
Q. No, I'm -- I didn't suggest that that was the only lighting in the room.
But this is the lighting that he's requesting being fixed. Any reason to disagree with that?
**A. No, sir.**

Page 60

Q. Okay. And then Judson Wooters says, October 20th, same day, he says, "Thanks, Warren. Are you referring to the long narrow lights on arms that can be moved around? Can you enter a G3 to get them fixed?"
So do you know -- do you know what Warren and Judd are talking about here, the long narrow lights with arms that can be moved around?
**A. Yes, sir.**
Q. Now, this was done October 20th of 2022.
Were you ever made aware of any of Warren's requests, any of that stuff?
**A. Not to my knowledge that I can remember right now.**
MR. SUDDUTH: Exhibit 5 will be the next exhibit. And it's going to be Bates-labeled 811 to 812, a two-page exhibit.
(Exhibit 5 marked)
Q. (BY MR. SUDDUTH) Take a look a 812, Mr. Ryan. You will see, again, just really kind of the end of a signature block on 812 and we carry it up to 811.
Okay. This is Monday, December 12th of 2022. Let me just verify with you that one of the last tests that Warren took, his fourth test, was in December of '22.
Does that sound right to you in terms of timeline?
**A. Yes, sir, I think so from the PIP that I have.**

Page 61

Q. Right. And he was fired early January of '23. Is that right?
**A. I think so, so...**
Q. Okay. Just so we have our timelines, in September he is notifying you guys with the letter from Dr. Hart. October he has an accommodation meeting. October, he says, "This is what I need to be fixed so I can do my job."
This is December. "Judd, do you know if the lighting above the heater board has been fixed? If you can, could you also provide the date the work order was put in for this?"
This is to Judd from Chelse Cisneros. Judd sends an email to Bubba Vandevender, who I think -- is he in maintenance?
**A. He's the OMC.**
Q. Judd to Mr. Vandevender, "Is this something you can check on?"
And Bubba responds December 12th of 2022, where he says, "Can we get these lights repaired on the heater board area? Limited lights in the area make it hard to see in the area. Bubba Van."
Did I read that correctly?
**A. Yes, sir.**
Q. And then at the very top Judson closes the loop by emailing back to Chelse and saying on December 12th of 2022,

"Chelse, this has not gotten repaired yet."
Did I read this correctly?
**A. Yes, sir.**
Q. Does this surprise you to learn as you sit here today that for the entire time that Warren Jones tested and trained, the one request that he made regarding the lighting, the accommodation that he made for the lighting, never got done?
It never got fixed. Does that surprise you to learn that?
**A. Yeah, it is surprising that a lightbulb didn't get fixed.**
Q. Yeah. And at no point in time did anybody ever notify you as the union rep that the accommodation that he requested was not complied with by the company, did they?
**A. Not to my recollection.**
Q. Were you ever part of any conversations, by the way, with the company where the company said to you at least, look, we think Warren's request is unreasonable, we think it's just too expensive, it's unreasonable, it's just too burdensome, we're not going to do this.
Any conversations like that?
**A. No. To me, it was the complete opposite.**
Q. Yeah. Okay. Was there ever any discussions about maybe we should hold the training after we fix the lighting



and then test him or train him?
Any conversations like that?
**A. No, sir, not that I recall.**
Q. Okay. What about as we shift back now to the outside operator accommodation thing, which was a previous exhibit. Let me go back to that page so that it's top of mind. That is 814.
"Brought up the outside operator accommodations made in the past. Clay said that never made it up here, assuming he meant HR."
Do you remember making that comment that the idea of an outside operator accommodation, it just never made it up here? Do you remember saying that?
**A. I mean, to me that was either for Palmer Lee or a guy -- the guy about the broken hand where I think me and Judd had a conversation to let him train on the board because it fell in his accommodations. Now, if Judd had conversations with HR, then I don't know.**
Q. Did you and your union team, did you guys ever have any discussions at all about the idea of allowing Warren to work full-time outside as the operator, full-time outside operator position due to his disability, as an accommodation to his disabilities?
Did you guys ever discuss it?
**A. Not to my recollection.**



Q. Okay. As I understand it from Judd, that, you know, basically the reason why -- and a lot of times I vehemently disagree with Ms. Williams when she objects to me mischaracterizing somebody's testimony. But I'll freely admit here that I could be misparaphrasing this.
But my recollection on this issue from Judd was that at least part of the reason why he couldn't do an outside operator accommodation job for Warren was because it was going to violate the CBA, you know, because it was going to violate the Collective Bargaining Agreement to do that kind of thing. That was at least one of the reasons why that couldn't be done.
Is that true, having him work outside full-time due to his disability, was that going to violate the CBA?
**A. Yeah, sorry, I misunderstood the first half of your question. I thought you were asking if we agreed or wanted to let him just work outside.**
Q. No. What I asked is did you ever discuss it?
**A. Yeah. No, I see. So we discussed that since he started his training he had to keep going. Because like I told you, that's how we felt, that everybody makes the same amount of money, you should be held accountable. And to me, his disability wasn't brought up before he started training on the boards like that.**



Q. So because his disability was not brought up before he started training on the board, that was the prohibition on him being removed from the training?
**A. I don't think we would stop anybody once they started training. I mean, if you can't make the adjust -- or accommodations, because he is required to train on the board and be a board operator, then can you really be an operator out here?**
Q. So that's what I'm asking you, is that apparently, according to your testimony, if he could not train -- despite his disability, if he could not train on the board, there was no accommodation that was going to be made to allow him to continue to work at CP Chem?
MS. WILLIAMS: Objection; calls for speculation and assumes facts not in evidence. And I think mischaracterizes some of the evidence in the case.
But Clay, you can go ahead and answer.
**A. So can you ask the question again?**
Q. (BY MR. SUDDUTH) Yeah. Was there any way -- well, strike that. Let me -- let me rephrase it this way.
Was it the union's position that they were not going to allow Warren to work outside full-time?
**A. With his disability or without? Because you asked both ways.**
Q. Well -- well, no. I mean, you can't get rid of his

Page 66

disability unless he has a cure.
With his disability -- and he's always had that vision issue. But with the vision disability, was it the union's position with his disability, with his eyesight issues, was it the union's position that we're not going to let him work outside full-time as an accommodation?
I guess what I'm trying to figure out -- let me ask it this way.
What I'm trying to figure out from you, Mr. Ryan, is did the union consider this accommodation request, or did you just say no to it? Or did the union just never consider it at all, meaning we never voted on it, yay, nay, up, down? We just never considered it; or no, we considered it and here is why we disagreed with it. Here's why we said no to it.
Does that help clarify kind of what I'm asking you?
**A. Yes, sir.**
Q. Okay. So with that clarification between those two different options, please go ahead and tell me.
**A. Yeah, I don't think we ever considered actually discussing it.**
Q. Okay. Meaning, let's just assume -- hypothetically, right -- let's just assume that he's got this disability.

Page 67

Despite our best efforts he just cannot qualify on that board. But, you know what? Given his situation, we're going to vote, we're going to vote as the union that for Warren -- not for everybody in the world -- but for Warren, we're going to make an accommodation and he's going to be allowed, given his eyesight issues, to work outside? That vote never came up?
**A. No, sir.**
Q. Never came up as a discussion with any board?
**A. No, sir.**
Q. Okay. Did Judd or anybody from the employer's side, by the way, so HR, Bryan Kubsch, Judson Wooters, anybody else in management, anybody else with the higher-ups at CP Chem, did any of them come to you guys and say in any fashion, form or substance, we would like to accommodate Warren, we would like him to stay working here, we would like to just let him work outside, but we need you guys, we need you as a union to vote that this is not going to violate the CBA, would you please consider it? Something like that? Anything like that?
**A. I don't recall any of those discussions to bring it to a vote.**
Q. Do you know -- and maybe it's outside your wheelhouse, maybe it's right in your purview, I don't know -- but do you know whether or not allowing someone to work

Page 68

outside as an accommodation under the Americans with Disabilities Act, do you know, would that violate the CBA?
**A. Honestly, I mean, it would go against our CBA. But with the disability I don't know because I don't know enough about the ADA.**
Q. Okay. Got you.
And fair to say, like, your E-board team didn't consult with your lawyer about whether or not it was going to violate -- violate the CBA, just those discussions never even happened?
**A. No. Because, I mean, my intent to arbitrate was based off termination, not his disability. It was the fact that he couldn't comprehend the test.**
Q. Well, and I mean, he couldn't comprehend the test because he couldn't see the test?
**A. Did he need to see the test to understand flow?**
Q. Well, isn't it true that there's -- as I understand it, there were two parts to the test.
There was one -- one was the written test, which he passed. Is that right?
**A. I guess. I'm not involved in the written test. That's just the training department.**
Q. Okay. Well, if I represented to you he didn't make an 85 percent, he made an 89 percent, any reason to disagree with that?

Page 69

**A. No, sir.**
Q. Okay. So he passed the written side of it. And then I'll go over with you some of the -- some of the sheets, the exam sheets.
But based on some of the questions that I saw, some of the questions were actually judging somebody on -- on their ability to navigate the panels, like how quickly could you navigate the panels and get to the spot that you needed to be at.
Were some of the things about navigation?
**A. For his issues?**
Q. No. I'm asking for some of the test questions, did some of the test questions test people on their ability to navigate the panels and navigate them cleanly, efficiently, that sort of thing?
**A. Are you talking about on his written test or the --**
Q. I'm talking about on the -- on the practical exam, the one that has the panel, where you guys --
**A. Okay.**
Q. -- judge him on the panel. Some of the questions that I saw that were circled included questions such as -- and his PIP even, I think -- no. Excuse me. The comments to his first exam reference this, not his PIP.
The comments to the first exam reference struggling to navigate between the panels.

Page 70

Is that a part of the panel test, navigating efficiently between the panels?

**A. I mean, I see what you're going off of. You're talking about the questions they circled to go over during his test?**

Q. Right.

**A. But yeah. I mean, it does come up about navigation because if the person doesn't know where to go, then how are they going to respond to, say, a leaking tube or a fouled exchanger? But it does come up. And I mean, that test is subjective, right?**

Q. It is, yes. And what if they -- what if they can't see it? Do you think if someone can't see it, it's going to impact their ability to navigate it?

MS. WILLIAMS: Objection; calls for speculation.

You can answer.

**A. It's possible. But there's lighting in there too, if you needed it.**

Q. (BY MR. SUDDUTH) I understand that. And this is not meant to be -- I'm not trying to be coy with you or flippant with you.

But with all due respect, when you say there's lighting in there, you're not an ophthalmologist, are you?

**A. No, sir.**

Page 71

Q. Okay. So whether or not the lighting that was in there was good enough for Warren, it helped Warren enough, maybe it was too much and it hurt his eyesight. I don't know, I'm not an ophthalmologist either.

But you can't sit here and tell me with any degree of expertise of whether or not the lighting that was in that heater board console was good enough for Warren to be able to do his job, can you?

**A. I mean, I can't. Everybody is different. Right? So...**

Q. Right. And you have no particular specialized expertise training as an ophthalmologist, do you?

**A. No, sir.**

Q. All right. So then there's the other things. There's things such as, you know, knowledge of flow and systems and that sort of thing.

There's that side of the panel exam too, isn't there?

**A. Yes, sir.**

Q. And that part is entirely subjective.

It's what you guys as a panel feel about whether or not the person adequately understands it or not?

**A. Yes. But I mean, when you bomb it that bad, it's not subjective when you can read it right out of the book.**

Q. When you can read it right out of the book.

Page 72

So the -- I guess, that's what I'm getting at here is when you use the phrase "bomb it that bad," that's not because you graded someone and said you got a one out of ten on this question. You're just saying in your personal belief that he bombed it on this exam. And we're not talking about Warren, I'm talking about just a hypothetical person, a person "bombed it that bad."

But that's just based on your subjective belief of how bad on that exam that he did. Right?

**A. For the exam, yes. But for certain scenarios that are strictly flow, that we've learned as an outside operator that was never bought up as an issue, he should know that.**

Q. So is it -- is it fair to say -- I mean, just you haven't directly said this yet, but just kind of reading the tealeaves on what you're saying, it sounds to me like you felt like Warren did not pass the test.

That's what your personal belief is?

**A. Yes, sir.**

Q. Okay. Did you ever, whenever you were factoring into how he did on the exam, did you ever factor in any of his eyesight or vision difficulties and how that might have been affecting him in his performance?

**A. I didn't, because I think we gave him adequate time to try to find things. And there were times where he would go to the wrong page and he would be like, oh, no, let me go to this page, so...**

Page 73

Q. Uh-huh. Part of the reason why I'm asking that is because if I -- you went to Lamar State, okay.

If you took an exam and you were sick, you had a migraine or you had a cold or something like that, do you think you would perform as well on the exam as if you were feeling 100 percent?

MS. WILLIAMS: Objection; calls for speculation.

MR. SUDDUTH: I'm going to respond just for the record to that. It's not speculation, it's his direct experience. It's his personal experience.

MS. WILLIAMS: Well, it's about a hypothetical situation which would require him to speculate.

But Clay, you can answer.

**A. I mean, maybe. I don't know, honestly.**

Q. (BY MR. SUDDUTH) You never took a test -- you never took a test sick?

**A. I'm sure I have.**

Q. Okay.

**A. But to know exactly what I made on that test or not, it's probably a little different for me and you. I'm just worried about passing, because a degree is a degree.**

Q. Ouch. I don't know if that's any different between the two of us. I know when I took the bar exam, I was trying

Page 74

to worry about passing.
**A. I mean, it's a lot harder for you than for me. I did good in school, but I'm not worried about how I feel. I know what is expected of me. I paid for my own school, so I put the effort in to make sure I had good grades.**
Q. Well, I mean, it sounds like -- let me phrase it this way.
Do you believe that it is the same taking an exam sick, not 100 percent, not your full self, versus if you are feeling well? Do you feel that there is no real material difference there?
MS. WILLIAMS: Objection; calls for speculation.
You can answer, Clay.
**A. I would say there is a difference, yes. You're not going to be 100 percent focused, I would think, depending on what kind of sickness you have, I guess.**
Q. (BY MR. SUDDUTH) Did you know -- and I know you told me earlier you don't recall if you read Dr. Hart's letter or not.
But do you know whether or not these vision struggles, having to squint and all that kind of thing, all the efforts he was going through to see the console, do you know whether or not those were causing him migraines?
**A. I mean, I'm sure he brought up that there were**

Page 75

**migraine issues. But at that time, I wasn't on shift with him. So anything that he brought up during his shift, they probably discussed then.**
Q. And ultimately, what I'm trying to get at, Mr. Ryan, is did you feel like Warren -- let's put aside the vision difficulties.
Did you feel like Warren, he just didn't get it, like, from an intellectual standpoint? Like I'm not -- I'm not trying to call my client stupid, because I don't believe he is.
But from just an intellectual standpoint, do you think that he just lacked the mental capacity, the intellectual capacity to get it, he just didn't understand the concepts?
**A. Yes, I would agree with that.**
Q. Okay.
**A. Yes, to me it was strictly competency.**
Q. And so that's why I say it that way. I'm going to call a spade a spade.
Because it doesn't seem like you're -- you're saying put vision aside, putting the vision troubles aside, I just don't think mentally the guy got it.
And that's kind of what I'm picking up from you. Is that fair?
**A. Yes, sir. Because even like you and me sitting**

Page 76

**here talking now, like if that was Warren, to me I should be able to talk about flow with him and him explain where it's going, where it's coming from, what it's doing. And he couldn't do that.**
Q. Right. And but in those times, in those exams, in those panel rooms, you didn't know if Warren was sitting there with a migraine, unable to think because of the fact that his vision was struggling on the board? That's not even something you guys contemplated, was it?
**A. Well, then how come none of this came up during his outside issues where you learn the flow? That's what I'm getting at. He didn't understand the flow on the board, which obviously said he didn't know the flow outside, which is why he went back to outside heater class.**
Q. But do you see the amount of hypotheticals that you are making there to get to that? Like here, let's take a look --
**A. Same thing as you making a hypothetical about if he had a migraine or not. I don't know that.**
Q. I'm not making -- I do, actually. I do, because Warren Jones has testified to it, number one. Number two, I've got medical documentation to support it. So I'm not making that up, Mr. Ryan. I can promise you that.
But let me show you the letter from Dr. Hart. I'll make this an exhibit, Bates label 764 and 765.

Page 77

(Exhibit 6 marked)
Q. (BY MR. SUDDUTH) As I go and navigate my screen to 764 and 765, was he able to work his job outside, by the way? I mean, did he seem to understand flows when he was outside?
**A. He had one area that he struggled in, from what I recall.**
Q. Well, when I asked you before how he did outside and if he was a good worker and that kind of stuff, you never brought this up before.
What was his area that he struggled in outside?
**A. Well, you asked how he was as an outside operator, if he did his job. And I told you he did his job. He did struggle in distillation. He had to go back, he did a week on days with myself and Michael DuBose, who was the office assistant at that time, to help him get prepared for his test because he was struggling to comprehend during a training.**
Q. And after doing that week of extra training with you, did he successfully pass that test?
**A. Yes, sir.**
Q. Okay. So did Warren, aside from this one instance where he did some extra training with you, did Warren understand the flows and understand how the system worked and understand the ethylene unit, at least the outside ethylene unit?

Page 78

Did he understand it, from your vantage point?
A. Yeah. I mean, to my knowledge, because I wouldn't have signed off on him if he didn't.
Q. Right. So again, forgive me, I'm not trying to be coy here.
But I mean, did he suddenly just become stupid when he went inside?
If he understood the flows outside, did he just suddenly stop understanding those concepts inside?
A. Well, I mean, that's just one area. So if he hasn't trained in the outside heaters in so long or kept his memory fresh, then he might have forgot those flows when he started training on the heater board. So I don't know, because he trained on -- the last job was distillation, to my recollection.
Q. Okay. So did you have any particular conversations with Mr. Jones, like meaning, did you speak with him in particular about why he was struggling in certain areas after he took the exams?
A. I mean, I'm sure I did. To exactly what we talked about, I can't recall. Because I know I sat down and went through each module with him to talk about it before those tests to try to get him prepared. And then, I mean, you can see, like during the PIP where he did really good up until the heaters, and then he didn't do good on heaters. And then

Page 79

the next test, the stuff that he did really good on, he did really bad on. And then he did good on heaters, so...
Q. So whenever you said earlier, to answer my question, you said, you know, who knows, maybe he -- maybe he just forgot the heater flows because it's been a long time since he's been working out on the heaters.
Do you know that that's what his issue was or are you just assuming that that was an issue?
A. I'm just assuming. I don't have no idea.
Q. Okay. So you don't have any specific recollection of whether or not he actually just forgot everything he knew about the heater flows outside?
A. No, sir. Just going off what the tests told me.
Q. Okay. But based upon -- as we sit here today, based upon the way the ethylene unit works, aside from this week of extra training, which apparently he successfully completed, he understood how the unit worked from a fundamentals standpoint?
The flows, he understood how it worked, at least externally or outside?
A. I would guess. I mean, they signed off on his outside qualifications. I wasn't involved in every single test with him, but somebody was.
Q. Right. So he passes the written test by 89 percent, he needs an 85 percent. And he's qualified on

Page 80

everything outside.
Is your statement to me earlier that Warren just didn't get it, is that based solely upon how he did in the panel exams, or are there other instances?
Meaning, just kind of working with him over the years, seeing what he did outside, are there other instances of him working that just made you go, man, this guy just doesn't get it? Or when you say he didn't get it, is that based upon how he did in the panel exam with you?
A. I mean, there was another instance that he had when he qualified on heaters that he did that I'm surprised he didn't get terminated for, but --
Q. What was that?
A. He closed, I think it was the upper fluid valve on a running furnace because he just thought that it needed to be closed. And then the heater board got a bunch of alarms because it lost flow, started pressuring up.
Q. When was this?
A. Oh. Maybe 2017. I can't recall exactly. I know -- because I want to say heaters was his first job, so it was while he was training on -- or after he qualified on outside heaters.
Q. Was he -- you say you're surprised he wasn't terminated.
Was he written up for it?

Page 81

A. I'm not sure if he was, because I didn't -- I wasn't involved since I wasn't the chair at the time in 2016.
Q. Okay.
A. I'm not sure what happened in that instance.
Q. So you don't -- and were you actually out there physically in the field with him when that happened?
A. I wasn't in the field, but I was on shift.
Q. Did he have any other issues like that with the heaters after 2017?
A. Not that I can recall.
Q. Okay. So he wasn't disciplined that you know of or written up that you know of. Certainly wasn't terminated.
And no other issues after that. Is that correct?
A. As far as I know.
Q. So let's go now to 764.
MR. SUDDUTH: I'm going to make this the next exhibit to this deposition. I don't know which number it is, but it will be a two-page exhibit, 764 to 765.
(Exhibit previously marked)
Q. (BY MR. SUDDUTH) So we were sort of talking about the vision issues and we were both sort of bantering back and forth about inside versus outside. So I want to read to you some spots from this letter from Dr. Hart.
Which says that, "Mr. Jones has been under my

care for 20 years. Mr. Jones has suffered from extremely high myopia. His initial refraction at my office was negative 20 diopters. That is over 10 times the average myope in terms of correction needed."

Let me stop there. Did you know that level of detail about his vision difficulties?

**A. Not until this letter.**

Q. Okay. Did -- and did you read this letter when you got it in September?

Do you remember knowing these facts about Mr. Jones back in September of 2022?

**A. Yeah. After seeing it, I recall reading this. But like I told you, we're not really involved in this aspect. So I just saved it in my file.**

Q. Did you do or change anything about the way that you examined him or the way that you questioned him on the panel because of this information?

**A. I mean, I tried to make sure he had enough lighting. And like I told you earlier, I gave him a little bit of time, of leeway to navigate the board, not judging him so quick on if it took him forever. But once you start going to multiple pages that aren't where you're going, and then all of a sudden you go to the right page and you find what you're looking for, then it kind of tells you, you didn't really know where you were going.**



Q. And when you say making sure there's enough lighting in the room, that's based upon what?

Because I showed you the documentation that they didn't fix the lighting that was requested. So what are you basing that on?

**A. Yeah. You're -- you're talking about one small light versus there's overhead lights that he could have turned on that go directly over his board. And we made sure to turn those on if he needed them.**

Q. If he needed it, okay.

**A. Well, we wanted to make sure, it's his test, make sure he's comfortable. Because to me, like I tell you, his disability is not something I'm there to handle. That's something between him and the company. I'm there strictly just to grade him on the test.**

Q. Right. Well, you weren't -- you weren't involved in the accommodation process?

**A. Yeah.**

Q. Is that accurate?

**A. Yeah, just besides that one meeting.**

Q. Right. "Recently" -- quote. This is from the letter.

"Recently, Mr. Jones came for a normal annual eye exam. And at that exam, he told me his vision when on the night shift was beginning to bother him. I performed a



complete eye exam and found two issues. Mr. Jones is beginning to have vision changes due to elongation of his eyes. A normal eye is approximately 23 millimeters long. Mr. Jones' eyes are 30 millimeters long. The problem his great elongation presents is the stretching of the retina inside the eye. This thinning of the retina leads to a decrease in retinal and especially macular function. It is my belief that with the drying of the eyes and the decrease in macular function, it's causing Mr. Jones to have difficulty with seeing small numbers and letters as well as being overwhelmed by the brightness of the lights on his operator board."

So as you can read here with Dr. Hart's letter, sometimes it's not just about turning on the lights. Sometimes the brightness of the board itself can create issues.

Did you guys have any discussions like that?

**A. Yeah. That's what was brought up in a meeting about him wanting -- if he wanted to order some of those screen protectors to put over the board to help with that lighting.**

Q. Okay. Did those ever get ordered?

**A. No. That was the issue I was talking about how Judd told him to look up and see what he wanted and he would get him whatever he needed.**



Q. Okay. So the company -- was the company expecting, by the way -- and if you remember, you remember, if you don't, you don't.

But was the company expecting that Warren was going to purchase these and they were going to reimburse him, or he was going to purchase them without reimbursement? What was the expectation there?

**A. My understanding --**

MS. WILLIAMS: I'm sorry, Clay. Objection; calls for speculation.

You can go ahead and answer.

**A. My understanding was for him to find things and Judd would get them.**

Q. (BY MR. SUDDUTH) Okay. He finds them, he points them out and then Judd would go buy them?

**A. Yeah. Things he wanted that would accommodate him. Because Judd didn't know exactly what accommodations he needed, to my knowledge.**

Q. And the one accommodation that we do know of, the one that I've shown you, Judd actually never got that done, did he?

**A. Yeah, I mean, obviously not.**

Q. Right. And is that something that at the time you were examining -- I want to understand from your mindset, in your head.

Page 86

At the time you were examining Warren and deciding is he qualified or not, did you think, did you believe that all the accommodations necessary for Warren to be successful, did you believe those were in place when you were examining him? Put me in your head.

**A. I mean, I would say yes, because I don't know what accommodations he needed.**

Q. Right.

**A. The only thing I ever heard about was him bringing a lamp. And when I asked him if that's all he needed, he said, "Yeah, I can see at night with this lamp." So I just assumed that he was good to go. And I was just basing him strictly off competency.**

Q. Right. Okay. That's what I need. That's what I want to verify. And I'm not attacking you about this. I want to know what your mindset was.

Was it that the company never came to you as a panel member and said, here's the accommodation Mr. Jones requested, did they?

**A. Not that I recall.**

Q. Okay. And you were never kept abreast or told if the accommodation was either fulfilled or not fulfilled or was pending fulfillment, they never had any of those discussions with you either?

**A. No, sir.**

Page 87

Q. Okay. So as you walk into the panel examination, right, you walk in to be judging Warren Jones, you're thinking as you sit there that, okay, I can completely judge him on how he does, where he goes, how he answers. I can judge his competence and his knowledge because we have handled all of these outside issues, they've been accommodated. So now, let's see how this guys does. This is about competence.

Was that where your head was when you were examining him?

**A. Yes, sir. To me it's strictly competence, because yeah, did he squint his eyes? Yes. But a lot of the operators squint their eyes trying to find stuff on a board.**

Q. Right. And by the way, that's why I'm showing you this letter. I squint too, but I don't have myopia that's over ten times the average in the nation.

So when other operators are squinting their eyes, do you see the point I'm making, Mr. Ryan?

**A. Yes, but I don't know what any of this means, so... I'm just an operator, remember.**

Q. And I'm just a believer, I'm not an ophthalmologist. I don't pretend to know, but I had to research it a little bit.

**A. I understand.**

Q. But I hear your point.

Page 88

And what I'm saying is, you don't know -- you didn't know at the time when Mr. Jones was squinting, you don't know if that's just the normal squinting that you do or I do versus the squinting that someone who has myopia ten times the average. Right?

**A. Yeah, I wouldn't know.**

Q. Okay. And so when you graded him or you subjectively discussed him, you assumed that you had an examinee who had all accommodations necessary to make him successful, meaning everything that we need to do for this guy to be successful is in place now. Now let's test. Now let's see how he does.

That's where your head frame was?

**A. Yeah, because I mean --**

Q. Yeah. Okay. And he said -- go ahead. I didn't mean to interrupt you. Go ahead. Go ahead.

**A. No, I'm just saying, because if I remember correctly, his email said the light was out over the computer, right? Which was the other side. And we -- we tested on the other side where the lights were working. So to me, everything was set in place for him to be able to have this test normal and be good to go.**

Q. Were you there present after the third exam whenever Judd and him discussed it, they had a debriefing after his third exam where sort of a new lighting concern was

Page 89

brought up? It was Judson who testified to.

Were you present during that debriefing?

**A. I could have -- I'm sure I was.**

Q. You're sure you were.

What was the concern that was brought up after the third one?

**A. I don't recall, honestly.**

Q. Well, if I represented to you that in addition to, yes, the lighting over the board, the problem also was the ability to see what was actually on the screen. I'm not talking about over my board, over the keyboard.

I'm talking about the backlighting from the LED coming through the screen so actually seeing the numbers and the digits on the flows on the screen itself. That's what Judson and I discussed.

Do you have any recollection of that conversation?

**A. Nothing is coming to mind.**

Q. Okay. So then let me go back to where we were before, about me asking you where your headspace was as to how you were evaluating him. And I wanted to follow up on that question by asking you this.

Isn't that where you want all of your examinees to be? I mean, wouldn't that be fair to your guys?

Don't you want all of your examinees to be in

a position where everything they need to be successful, if they need to see the board, if they -- I don't know, if they have some other kind of medical issues, that their issues are taken care of to where we actually truly grade on competence and knowledge? Isn't that where you want all your guys to be?

**A. Yeah, I would agree with that.**

Q. Okay. Because then, can we agree if we've dealt with the outside issues, these other issues, because then the integrity of the test is good. If I'm testing you and I don't have any of these outside issues anymore, they've been satisfied, now I know that my test is accurately and adequately testing competence and I can rely upon its results.

Can we agree with that?

**A. Yes, sir.**

Q. Okay. I know you weren't part of the accommodation discussions regarding the lighting and, you know, what to do with the lighting and all that kind of stuff. You told me that. But I want to go back now to the accommodation issue as it relates to working outside.

After he had failed for the fourth time, so let's just go through all four tests, whether I think it's right or wrong, it is what it is. He had four marked as failed exams. So here we are. We're in a position where he



has been marked as failed four times.

Was there any discussion between you and Warren? I'll just start there. I'll start very, very narrow. Let's start with you and Warren.

Did you and Warren ever talk about, "Warren, where do we go from here, man? You know, what do -- what do we do at this point?"

**A. After the fourth test?**

Q. Yes, sir.

**A. I mean, I'm sure we did have discussions. Exactly what they were called, I don't know. I mean, if you read the PIP, it tells you you'll be terminated after not meeting this.**

Q. What about -- okay. So nothing specific that you can remember?

**A. Not to my knowledge.**

Q. Okay. What about conversations along this line. Like, is there anyplace we can put you, Warren, in the CP Chem family?

Is there any place we can move you or put you? For whatever reason, hook, line and sinker, you just can't pass this heater board test for all the reasons that we just kind of bantered about this afternoon.

Okay. We are where we are. You didn't pass it. Where can we move you to?



Okay. So not just like you haven't met your PIP, now you're going to be terminated. What can we do to avoid termination?

Any discussions like that?

**A. I do remember having conversations with him about it. But I think because of the PIP and that he failed his test, strictly based off of competency, it was too late to try to move him in the hourly ranks because we didn't have any opening, that I can recall, in metal trades or instruments. Now, I know he had a -- because I want to say he brought up his safety background and trying to go into safety. But that's a salaried job, so I have no say-so over that or any input.**

Q. Did you even bring up the idea of salary -- well, strike that.

Did you bring up putting Warren into any other role with anybody in management, so like Judson Wooters or Bryan Kubsch, HR?

Did you bring up are there any roles for my guy -- because Warren's a union guy -- are there any roles for my guy even outside of the hourly classification?

**A. We may have had conversations. I can't recall exactly what was said if we did. Because I know we talked heavily -- I know at least with Warren -- about his safety background because he was wanting to get something in safety.**



**But I think everybody agreed it was too late at that point because he'd already taken his test and failed it. And to me, it was just competency. It's not his disability.**

Q. Yeah. And that's the second time you've said that.

But we've gone through how the disability may have affected competency. And that wasn't an analysis you ever did, was it?

**A. No.**

Q. Okay. So let me ask you about this.

In terms of him working on the dock, because I've got an application here of him asking to go work on the dock, loading and unloading in the warehouse, something like that.

Is that an hourly position?

**A. It's hourly, but it's not part of our union. The company owns those jobs.**

Q. Ah.

**A. So we have no say-so for them.**

Q. Got you.

Did you have any discussions with the company about trying to place him there?

**A. No, because if I remember correctly, he interviewed over there at one time and didn't get selected.**

Q. What makes you think that he actually got to interview, that he actually got that far, that they -- the

company actually interviewed him? What makes you think that?
**A. I thought conversations with him, but I could be wrong.**
Q. So we talked about the dock. What about, let me ask you this.
Did you have any conversations with your fellow union leadership, so other members of the committee or members of the E-board, about what to do with Warren? After -- and sorry, I should have clarified this.
After the fourth failed exam. So we kind of are where we are, we have the four failed exams. What do we do now?
We have a union guy, we have one of our guys who is in this position, what can we do?
**A. No, I didn't. But I know you're hinting at the disability still. But to me the whole time it's based off competency. So that's why I had no interest in trying to move him somewhere else.**
Q. Okay. So you had no interest in trying to move him?
**A. I mean, there was no openings for him to go. I wasn't trying to move -- he failed his tests. He couldn't meet the requirements of the job, is what we're going off of. And we have a signed PIP that says you will be terminated if you can't pass these tests. And I'm strictly looking at**


**competency and not being able to pass.**
Q. So were you -- and that would be good to know.
Were you opposed to moving him because you just viewed him as incompetent?
**A. I don't think that's an option to move him.**
Q. Why do you think it wasn't an option?
**A. I mean, so we just don't move everybody that can't pass the tests.**
Q. That wasn't -- that wasn't my question. Why did you think that it wasn't an option?
**A. Because he's an operator and he failed his tests and the PIP said he would be fired.**
Q. Yeah. And I mean, and you -- and you've never dealt with a disability accommodation before. Right?
Warren was your first case of that?
**A. Yeah. Besides the military guy that had a disability.**
Q. Yeah. And his heals itself. Right? It was a hand that was going to eventually --
**A. No, that's a different guy.**
Q. Oh, okay. Okay. Tell me about the other one, the military guy. What was his disability?
**A. Some kind of back injury that he sustained in the military. I don't remember if it was in boot camp. He ended up getting terminated for sleeping. And then the company**


**settled with him.**
Q. Was he asleep -- well, I don't know how much -- how many details you know about him.
But I mean, did you -- what was the accommodation that you did for the gentleman with the back pain, if you even recall what that accommodation was?
**A. Yeah, I mean, we weren't really involved in that. I knew about it. They ordered him a specific chair that was to accommodate his back. He picked it out, I think, and they bought it. But then he got caught sleeping on some grading out on the heaters.**
Q. Okay. So if I can phrase it this way.
I mean, it sounds like you know about it, but you weren't involved in the actual accommodation or that accommodation process for this gentleman with the back pain?
**A. Yeah. No, I mean, I was a part of it. But, like, I wasn't involved on what they decided on the accommodations until I seen this chair show up in the control room. And then he had a chain wrapped around it so nobody could use it.**
Q. Okay. So then as it relates to -- you did not -- to Warren's case -- you did not believe that moving Warren into another position was an option to you because of the fact that he had failed the training. Is that fair?
**A. Yes. And the -- to me, the signed PIP was what ultimately I felt like he was going to be terminated because**


**he didn't pass the tests.**
Q. Okay.
**A. Because this was only the second time I've seen a PIP since I've been at CP Chem. And I remember the first time it happened, I called the hall and they pretty much said you have to sign it. And the company said if he didn't sign it, he would just be sent home.**
Q. Right. I actually appreciate what you just said. I was actually going to ask you that because when you answered my question, you kept answering it and then you would add, "and the signed PIP."
And the reason why I'm smiling is because I'm thinking to myself, did Warren have a choice? I mean, if Warren didn't sign the PIP, they were going to fire him that day.
It ain't like he had a choice to not sign the PIP. Right?
**A. Yeah. From my past recollection with another employee that got put on a PIP, I mean, I was told from our hall that we have to sign it too.**
Q. Okay. So what in the world does it matter that he signed the PIP? I'd sign the PIP too.
**A. Yeah. If you want to keep working.**
Q. And I do. I'd like to have food.
**A. Yeah.**

Q. So I'd sign a PIP.
So he signed a PIP. And then he failed the training.
So in your mind, you were -- we have -- there's nowhere else we can move him, there is nothing else we can do, we're at the end of the rope?
**A. Yes, sir.**
Q. Okay.
**A. Just based off competency.**
Q. I hear you.
**A. I just want to make sure my words don't get tangled up.**
Q. Look, I will let you -- you can continue to say based on competency for the rest of this deposition. You can say it a thousand more times. But every time you say it, I'm going to ask you this follow-up.
You did not analyze his disability as it may have impacted his competency, did you?
**A. No, sir.**
Q. Okay. So we'll do that to each other for the rest of the deposition. But I hear you, okay? I got you. I know where you're coming from.
Now, you believed that you were at the end of the line or the end of road in terms of what your options were.



Did you ever discuss, though, what could be done in terms of where to place Mr. Jones as an accommodation itself, as the form of an accommodation?
Did you ever have those discussions with anyone?
**A. Not that I recall. Not to move him anywhere.**
Q. Can you tell me as you sit here today, when I use the word "burden," this is -- this is what I mean. I mean the burden could be like a staffing issue, it could be a financial issue, something like that.
Did you ever have any conversations or discussions with CP Chem like management, so again, Judson or it could be HR, it could be Bryan Kubsch, things like that -- were there ever any discussions with those guys about, we can't let Warren just work outside because it's going to cost the company too much money? We can't afford to let Warren just work outside?
**A. I never had any of those conversations.**
Q. Okay. Did anybody with -- with the company, so again, Bryan Kubsch, anybody higher up than him, Judson Wooters, HR, anybody on management -- anybody ever discuss with you as a union rep what a burden it was going to be -- if it was going to be a burden, I don't know -- did they ever discuss what kind of burden it was going to be to have Warren work just outside as an outside, you know, operator?



Was the concept of a burden, was that ever talked about in your presence?
**A. Yeah, I mean, I guess I'm not understanding what the burden would be, because --**
Q. Well, I don't know either. That's what I'm trying to figure out.
**A. I mean, the issue to me is what I talked about, how he kind of started moving with the union and the company and making sure everybody is held to the same standard since we all make the same amount of pay. I don't think it would be a burden. But then I think we open ourselves up for other people wanting to try to do the same thing, which we don't want to allow.**
Q. Yeah. Yeah, okay. So I appreciate that because I've kind of -- I've suspected that. I haven't heard it, but I've suspected that.
Kind of the argument of, yeah, well, if I let you do it, then I'm going to have to have -- you know, everybody else is going to want to do it. So I kind of -- I do want to talk about that now that you mentioned it.
Do you know -- in terms of everybody else is going to want to do it, do you know of your 135, 140 members, how many of them have a qualifying disability under the ADA?
MS. WILLIAMS: Objection; calls for speculation.



Q. (BY MR. SUDDUTH) If you know?
**A. I mean, I really don't know. I know we have some guys that are honorable discharge that get disability from the government or military. But other than that, I have no idea.**
Q. And did you guys ever actually have some of those debates, some of those discussions -- debate might be the wrong word.
Did you guys ever have some discussions like that where you actually got into the weeds on, hey, if we allow Warren to do this, okay, maybe it's not going to be a burden for Warren, but if we allow Warren to do this, I don't know, we might have five more people coming after him, or we might have 20 more people coming after him, I think we might have half the group coming after him?
Did you guys ever actually get in the weeds on how much of a problem you thought that was going to be?
**A. I mean, not to my recollection on that. Because again, I mean, it wasn't about Warren and his disability, because there's guys that just don't want to work the board. Like, they just want to be an outside operator. That's -- that's not the case here at CP Chem.**
Q. Right.
**A. We're not -- we make sure you work all six jobs. And that's what, to me, as the union, I didn't want to open**

**myself up to say, well, if Warren can decide not to train on the board, other guys are going to do because that's what they want to do.**

Q. Right. And that's what I'm really pushing on here is, I hear you. There may be guys that just, I don't want to do the heater board, I'd rather not.

But you as a union could look at that person and say, hey, if you don't have a disability like Warren, I don't want to hear it. You're going to have to train like everybody else trains. Right?

I'm trying to understand how many people were you actually legitimately -- legitimately subject to having to make accommodations for?

Because if I work for you, if I'm in your union and James Sudduth works for you and I just don't want to work the heater board, I'm out of luck. I'm out of luck, because I don't have a disability that I know of. Maybe I do, but I don't have one that I know of. So I'm going to have to train.

So what I'm asking is how many were you legitimately subject to? Not just I don't want to, but legitimately, you know, this person might have a disability, we might have to move him.

What was your legitimate burden? Do you know?

MS. WILLIAMS: Objection to the extent it



calls for a legal conclusion. And also calls for speculation.

You can answer, Clay.

**A. Yeah, I mean, I really don't know, honestly.**

Q. (BY MR. SUDDUTH) Okay.

**A. It wouldn't be a burden of them just being an outside operator. It's the concept of what's expected here when you hire in.**

Q. Got you. It's a -- it's a problem with -- I think you phrased it well, a concept. So, okay. I hear you.

What I'm going to do, I don't need to take a break for convenience or comfort, but now I'm going to take a break to review my notes. I actually think we pressed through, Mr. Ryan. We just kind of pushed through and I could cover a lot with you.

I want to look at my notes because I want to see, to be very candid with you, I want to see if -- I want to actually go over the scoresheets with you. That's the only thing I haven't gone over with you is the scoresheets from the actual exams, because I think you were a part of those exams. So I want to go over my notes. I may come back and say, yeah, let's talk about those exams a little bit more or I may not. But I think I've covered everything else with you.

So let's take -- it's 3:12. Let's just take



an eight-minute break to 3:20. And then I'll come back and that will be the last little area, if we go into it, that we'll go into. Okay?

**A. Okay.**

THE VIDEOGRAPHER: We are now off the record. The time is 3:12 p.m.

(Recess taken)

THE VIDEOGRAPHER: We are now on the record at 3:22 p.m. Central Time.

Q. (BY MR. SUDDUTH) Mr. Ryan, back on the record after a brief break. Thanks again for your patience.

Let me show you what I'm going to mark as Exhibit, 7 which is Bates-labeled as CP Chem 770. And it is just one page, it's just 770.

(Exhibit 7 marked)

Q. (BY MR. SUDDUTH) I'll share my screen, bear with me.

Okay. Do you see my screen, sir?

**A. Yes, sir.**

Q. All right. This is an email from Judson Wooters to Warren Jones with a CC to Nick Graham and to yourself, to Aprile Danford and to Bryan Kubsch. It says, "PIP update" on the subject line, 17 November, 2022.

Do you have any -- take your time, read over it. I don't know if it's something that you looked at before



your deposition or not, but take your time to read over it if you need to refresh your recollection on it.

But do you have any recollection of this email in particular or just -- do you just recall it because I'm bringing it up, you know, and you see your name right there?

**A. Yeah, I'm just recalling it because I see it.**

Q. Got you. Okay. I'm going to represent to you when I deposed Mr. Wooters, he described this email as the one that postdated or it was after his third exam.

Do you have any reason to disagree with -- with my statement there and that this email would have been after the third exam?

**A. No. Yeah, I would think so.**

Q. Okay. And I'm also going to represent to you that this is kind of a little summary for us of what I talked to you about earlier in your deposition, where there was a debriefing that occurred with everybody after the third exam. And I want to read to you this third paragraph in this email and ask you a few questions.

"In addition, during our discussion, you indicated that you continue to have vision concerns that periodically interfere with your ability to view texts on the screens. To be sure we adequately address the continued vision concerns, we will be reaching out to the company doctor following the Thanksgiving holiday."

Page 106

First question is simple, did I read that correctly?
**A. Yes, sir.**
Q. Okay. I know we've kind of talked about this -- well, kind of, we've talked a lot about it today. But my question is going to be a little bit more narrow. This comment here about the company doctor.
Do you know who the company doctor was at the time?
**A. No. No, sir.**
Q. Okay. I'm just going to represent to you, I think the person -- based upon the documents that I've seen, I think the person is Dr. James Stanton.
Does that name sound familiar to you now that I say it?
**A. Yes, sir.**
Q. Okay. Did you ever have any discussions -- since you were on the panel, did you ever have any discussions with Dr. Stanton, either on this date, the 17th of November, or at any point after the 17th of November, about Warren Jones?
**A. I don't recall personally having any conversations with him.**
Q. Okay. So is it fair to say that you do not recall anything of what Dr. Stanton may have found, what his analysis was, what he thought, you know, what his take was on Warren Jones's situation?

Page 107

This whole follow-up with the company doctor thing, if that occurred, certainly none of the analysis was ever relayed back to you?
**A. Correct.**
Q. Okay. About the exams, or I think rather than, you know, going through them actually line by line of the exams, what I just want to verify with you about the exams is that based upon the documents I've seen, you were not on his first and second panel, you were on his third and fourth panel.
Does that sound right?
**A. Yeah, I didn't attend the second one with Judd?**
Q. No. No, you did. You absolutely did. You did, you were right.
You did not attend the first, but you attended the second, third and fourth?
**A. Yes, sir.**
Q. Okay. So with the second, third and fourth, was there any particular reason you were not on the first panel, but you were on all the remaining?
**A. The first one, I'm not required to be there. I'm kind of in and out because I still got stuff that I'm doing, so...**
**And I may have been there and just not have stayed for the after part of it. I can't recall, honestly, on that one. And then the second, third and fourth, I wanted to be there as a rep for him once the superintendent got involved. I didn't want him to have to be there by hisself.**

Page 108

Q. Okay. I appreciate that.
But you had used the word before, you said "required." "On the first one, I'm not required to be there."
In addition to wanting to be there, you know, as a union rep, were you required to be there after the first exam was failed?
**A. No. Judd wanted me there, I want to say just based off my -- the job I'm in, the furnace coordinator, so I was there for that. And then to be a rep for Warren to make sure we were doing what's in line of what we've done with past employees of testing.**
Q. Okay. So no requirement of the CBA or anything like that, that as a union rep that you be there; it was simply that Judd wanted you there and you also wanted to be there as the rep?
**A. Yes, sir.**
Q. And so you were there for exams two, three and four. Based on the exam sheets that I have looked at, there don't appear to be a lot of notes. Across all four exams, there's not a lot of notes.
Were you a note-taker or no?

Page 109

**A. I'm not really a note-taker, because I'm usually asking questions if I'm sitting there.**
Q. Okay. Well, you actually -- you preempted my next question. I was going to ask you, I know Montalvo was the training coordinator.
So I think I've heard from some people that the training coordinator tends to lead a lot of the questions. Is that accurate or no?
**A. Yeah, probably the first test. I want to say once we kind of got involved, we kind of led it.**
Q. When you say "we," who is the "we" you're referring to?
**A. Myself. And I want to say Junior was probably there. Brian Lohr. And the head operator, which would be Jimmy Hays. But I don't know if he was there because I remember he went on vacation at some point. I don't remember the exact dates.**
Q. Yeah, I'll just represent to you that Jimmy Hays is not on the third and fourth. And based upon my deposition of him, that was because of vacation, I think is what he told me.
So your recollection is that for the second, third and fourth exam, you and Junior and maybe Jimmy -- and Junior is Brian Lohr -- you, Brian Lohr and Jimmy Hays led the questioning as opposed to Montalvo?

**A. Yes, with Jimmy not being there for the third and fourth, it would have been me and Junior. And Judd, I'm sure, asked questions also.**
Q. If you and Brian Lohr are leading the questioning, certainly in exams three and four because Jimmy is out, are you also part of selecting the questions?
You know, so I see here there's 97 questions that you can -- you can pick from. And then 25 are circled as the questions that are going to be asked of the 97.
Are you circling those? Are you going through that with Brian and selecting the ones to circle, or is Montalvo still the one who's choosing the question to ask?
**A. Yeah. So usually, how I've always done it anytime I've been involved, we meet before we go to give the test and everybody goes through and kind of picks out questions that we think are good for the operator to know, and see if they can answer them.**
Q. Do you have any specific recollection on whether or not the questions were consistent from two, three or four, or were they changed from two, three or four? Do you remember?
**A. I don't think they were changed. I don't recall changing them. Do you mean in the actual Word document that they're on?**
Q. No, not -- not changing them in the Word document, just changing the ones you're circling, right? So you're



going through and you're circling --
**A. Oh, they do that.**
Q. They could have been changed?
**A. Yes, sir, could have been. Yeah.**
Q. Do you recall if, as you sit here today -- and the reason I have to kind of poke at you and your memory from three years ago is just because there's just not a lot of notes, so I have to go off of your memory.
Do you recall any specifics of the conversation before you tested, meaning, when you guys were choosing the questions that you're going to ask? Do you recall any specifics on why you all as a panel chose the questions that you chose?
**A. No, sir, I do not. I mean, because really they circle those questions, but as you're working through the test, the operator is going to answer most of the questions that are on that test by just going through, like, the page. And so really, by the time you get to answering -- asking those questions, they've already answered it if they understood the flow and being able to talk about the control schemes.**
Q. Okay. And then do you recall in particular any questions that you asked of Mr. Jones in the second, third or fourth exam?
**A. No, sir.**



Q. Okay. And I wanted to verify with you rather than going through every one of these questions, I just wanted to verify that it is not as though there is a number placed upon a question. Okay?
So if I see Question No. 3 is circled and I ask you Question No. 3, and you give me a decent but not a great answer, so I'm going to give you four out of five points. It's not like that?
**A. Yeah, that's the bad thing about having a subjective test like that. It's everybody's opinion. And I mean, from a union standpoint we don't agree with how that test is administered. We went back and forth with the company on it because I don't like the subjectiveness of it. Depending on whether you like the person or don't like the person, it could sway your answer.**
Q. Right.
**A. So it doesn't pertain to that certain question, No. 3 or whatever.**
Q. Right. And then the same thing, by the way, at the end of it. So I asked it per question and it's not -- I'm now going to ask it overarchingly, like as a -- as a total.
So at the end of the exam, it's not as though each panel member goes and says, yeah, I think he was an 85 percent. I mean, at no point in time does anybody ever put any kind of numerical metric; it's entirely subjective?



**A. Yes, sir. Pass or fail.**
Q. Got you.
MR. SUDDUTH: Okay. Mr. Ryan, Ricky Bobby, I appreciate your time today. I have no further questions for you.
**THE WITNESS: Yes, sir. Thank you.**
MS. WILLIAMS: I reserve our questions for trial.
MR. SUDDUTH: In light of that, I have no follow-up based upon that. So you truly are done, Mr. Ryan.
Let's see, reading and signing?
MS. WILLIAMS: So Clay, you have the right to review your transcript and then to sign it. Is that something that you want to do?
**THE WITNESS: Do I have to do it?**
MS. WILLIAMS: No, you don't have to do it.
MR. SUDDUTH: That's a great question.
MS. WILLIAMS: You're not required to, so you can waive it.
**THE WITNESS: Okay. I'll waive it.**
MS. WILLIAMS: Okay.
MR. SUDDUTH: Madam Court Reporter, do you have any spellings that you need, or would you like to do that off the record?
THE REPORTER: I'll do those off the record.

I think our videographer will take some orders and then we can do that off the record.

THE VIDEOGRAPHER: Mr. Sudduth, we have you for standard video ordering. Would you like any additional orders?

MR. SUDDUTH: No, the standard is fine. Thank you.

THE VIDEOGRAPHER: And then, Ms. Williams, would you like any video orders today?

MS. WILLIAMS: Not today. Thank you.

THE VIDEOGRAPHER: And then, Ms. Williams, your transcript order, please?

MS. WILLIAMS: I always get asked this and I never know the answer. Whatever we usually do, whatever we've done in the previous depositions.

MR. SUDDUTH: Yeah, I think you guys have just ordered the transcript and not the video.

MS. WILLIAMS: Yeah, we just get the transcript, not the video. I don't know that there are any other special instructions in terms of how we get it -- the transcript. But whatever it is, that's what we'll do.

THE VIDEOGRAPHER: Okay. And then, Mr. Sudduth, your transcript order?

MR. SUDDUTH: The same. The standard order that I have from ordering the deposition today.



THE VIDEOGRAPHER: Okay. Perfect. This concludes the deposition of Clayton Ryan for Warren F. Jones versus Chevron Phillips Chemical Company, L.P. We're now off the record. The time is 3:36 p.m. Central Time.

(Proceedings concluded at 3:36 p.m.)

(Signature waived)



STATE OF TEXAS
COUNTY OF TRAVIS

REPORTER'S CERTIFICATE

ORAL VIDEOTAPED DEPOSITION OF CLAY RYAN

OCTOBER 6, 2025

(Reported Remotely)

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, state that prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was not requested.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this 20th day of October, 2025.



Michelle R. Antos, CSR
Texas CSR 7001
Expiration: 4/30/27
STENO AGENCY
Firm Registration 11909
319 W. 9th Street, Suite 807
Los Angeles, California 90015
937.296.4775

ACKNOWLEDGEMENT OF DEPONENT

I, __________________, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and accurate transcription of the testimony given by me, and any corrections appear on the attached errata sheet signed by me.

_______________ ____________________________

(DATE) (SIGNATURE)



ERRATA SHEET

CHANGES IN TESTIMONY

WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

CLAY RYAN

October 06, 2025

Page Line From To

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

SIGNATURE:_______________________DATE:___________

CLAY RYAN

# Exhibit F

# Deposition Transcript

Case Number: 1:24-cv-00350
Date: September 3, 2025

In the matter of:

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

# CHELSE MORRIS

CERTIFIED COPY

Reported by:
MELANIE STINSON-KONSTANTINIDIS

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CIVIL ACTION NO.1:24-cv-00350

WARREN F. JONES,

Plaintiff,

-vs-

CHEVRON PHILLIPS CHEMICAL COMPANY LP,

Defendant.

---

VIDEOTAPED TELECONFERENCE

DEPOSITION OF CHELSE MORRIS

September 3, 2025
STENO
Aventura, Florida 33160
1:02 p.m. - 3:31 p.m.

Melanie Stinson-Konstantinidis

Page 2

A P P E A R A N C E S:

On behalf of the Plaintiff:
JAMES E. SUDDUTH, III, ESQUIRE
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana
james@saa.legal

On behalf of the Defendant:
MARLENE C. WILLIAMS, ESQUIRE
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
500 Dallas Street, Suite 2100
Houston, Texas 77002
lesly.alvarado@ogletreedeakins.com
marlene.williams@ogletree.com

PRESENT:
JASON PERNICIARO, VIDEOGRAPHER

Page 3

W-I-T-N-E-S-S


| | |
|---|---|
| CHELSE MORRIS | 6 |
| DIRECT EXAMINATION BY MR. SUDDUTH | 6 |


Page 4

E X H I B I T S
EXHIBITS RETAINED BY COUNSEL


| | |
|---|---|
| Exhibit 1, Deposition Notice | 34 |
| Exhibit 2, Bates 705 | 34 |
| Exhibit 3, Bates 706 | 41 |
| Exhibit 4, Bates 712 | 44 |
| Exhibit 5, Bates 739-740 | 46 |
| Exhibit 6, Bates 741 | 50 |
| Exhibit 7, Bates 814 | 55 |
| Exhibit 8, Bates 811-812 | 69 |
| Exhibit 9, Bates 834-835 | 70 |
| Exhibit 10, Bates 850 | 71 |
| Exhibit 11, Bates 745-748 | 82 |
| Exhibit 12, Bates 744 | 91 |
| Exhibit 13, Bates 809-810 | 94 |


Page 5

THE VIDEOGRAPHER: Good afternoon. We are on the record at 1:02 p.m. Central Time on September 3rd, 2025 to begin the deposition of Chelse Morris in the matter of Warren F. Jones versus Chevron Phillips Chemical Company, LP. The venue of this case is in the United States District Court for the Eastern District of Texas, Belmont Division. The Case Number is 1:24-cv-00350. This deposition is taking place via Zoom. The legal videographer is Jason Perniciaro here on behalf of Steno, whose business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent.

MR. SUDDUTH: Yes. James Sudduth on behalf of the plaintiff, Mr. Warren Jones.

MS. WILLIAMS: Marlene Williams on behalf of the defendant, Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, Counsel.

Will the court reporter please identify yourself and swear in the witness.

THE COURT REPORTER: Melanie Stinson-Konstantinidis. I'm court reporting from Aventura, Florida. My NCRA number is 819052.

If the witness can please raise their right hand to be sworn in.

P R O C E E D I N G S

\- - -

Deposition taken before MELANIE STINSON-KONSTANTINIDIS, RPR, Registered Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause:

Whereupon,

CHELSE MORRIS,

having been sworn in, testified as follows:

DIRECT EXAMINATION

BY MR. SUDDUTH:

Q. Okay. Ms. Morris, good afternoon.
**A. Good afternoon.**
Q. Can you hear me okay?
**A. I sure can. Can you hear me okay?**
Q. Perfect. Perfect. So, Ms. Morris, let me start by asking you, have you ever been in a deposition before, meaning deposed like this?



**A. No, I have not.**
Q. All right. First time for everything, huh. Okay. So, let's go over some ground rules, then, for you. I'm sure Ms. Williams has gone over some rules but I want to go over them as well.

The first one is certainly the most important, I believe, which is to remind you that you are under oath. So, I know this can seem somewhat informal, you know, you're in a conference room, you're not in a courtroom, I'm in my conference room, we're by videoconference right now so we don't have a judge or a jury sitting with us, but the same oath that you just took is the same oath that you would take if you were in a courtroom and we did have a judge with us and we did have a jury sitting with us. And so all the same obligations to tell the truth, all the same penalties of perjury if you do not, all of those attach here as they would in a court of law. Do you understand that?
**A. Yes.**
Q. And are you okay with that?
**A. Yep.**



Q. Very good. The second thing, Ms. Morris, is to please encourage you to keep verbalizing your answers. What I mean by that is you'll find it's really common in conversation to say things, like, uh-huh and uh-uh when you're answering a question, especially in the south, we do that a lot. But that happens in conversation all the time. There's no harm no foul in conversation, but in a deposition, it's really difficult to accurately transcribe those uh-huhs and uh-uhs, so whatever your answer is, whatever it is, yes, no, maybe, whatever your answer is, verbalize that out loud, okay?
**A. Okay.**
Q. Thank you. The next thing I want to go over with you is talking over each other. I'll give you an example. Sometimes there may be times where I'm asking a question and you can sort of sense where my question is going and so before I'm done asking it, you start answering it.

Well, again, in conversation, there's no problem with that. But here, the problem is that, especially by Zoom, Zoom will



tend to cut off one of the speakers entirely if they're speaking at the same time. So then we don't get anything that you're saying.

So it's very important for the court reporter that we not talk over each other and I'm sure we will break that rule. I'm sure we'll be guilty of it. It just -- it happens when people get into a conversation. But we will try to do our best, please, to let me finish that question all the way to its end before you start to answer. Does that make sense?
**A. It does.**
Q. All right. I think the final thing to go over with you is breaks. This is not a marathon, okay? If you need to take a break and go to the bathroom or water or something like that, you're welcome to do so.

My only request of you is, is that if I have a question that's pending on the table, meaning a question for you to answer, that you please answer that question before you go take any break, okay?
**A. Okay.**
Q. Very good. Ms. Morris, do you have

any logistical questions like that about the process for me before I go further?
**A. No, I do not.**
Q. All right. Then your full legal name, please, and address for the record. If you wish to use a business address instead of a home address, you're welcome to do so.
**A. My full legal name is Chelse Hernandez Morris. The address is a business address, it's 9500 Lakeside Boulevard, The Woodlands, Texas.**
Q. Okay. Is that where you are geographically at right now is out in The Woodlands?
**A. Yes.**
Q. Okay. And also, just a bit of housekeeping, I'm going to refer to you as Morris, you've introduced yourself as Morris and your notice of deposition says Morris, but there's a whole lot of paperwork on here that says Cisneros. And I understand, from my earlier deposition today, with Ms. April, that you've recently gotten married; is that right?
**A. That is correct.**
Q. Well, first of all, congratulations. Secondly, in light of that, if we see documents



-- I'm just going to refer to you as Chelse Morris or as Ms. Morris, but I just want to be clear for the record, if we see documents, I show you documents that have emails or other paperwork that says Chelse Cisneros, that's the same person, I'm talking to the right person; is that right?
**A. That is right.**
Q. Okay. Let me get -- yeah, before I jump to your notice here, let me get some background about you. Ms. Morris, this is my only opportunity, outside of a trial or a courtroom, to get to know a little bit about you. So let me get some background on you, both education wise and experience wise. I assume you graduated from high school but let me just confirm that. Did you?
**A. Yes, I did.**
Q. All right. And then did you go into any sort of vocational or trade school or college or community college after high school?
**A. I went to college.**
Q. Where did you go?
**A. Lamar University.**
Q. Is that in -- that's in Orange?



**A. That is in Beaumont, Texas.**
Q. Beaumont. Okay. Did you graduate from Lamar?
**A. Yes.**
Q. In what?
**A. A bachelor's in human resource management.**
Q. So you actually went to school for what you're working in?
**A. Yes.**
Q. All right. Bachelor's in human resources management. When did you obtain that degree?
**A. In May of 2022.**
Q. I should have clarified this earlier. Did you work, or I'm sorry, did you kind of go straight through with school, meaning you graduated high school then you went straight to Lamar, so on and so forth, or did you have breaks in there where you worked?
**A. I went straight to college after high school.**
Q. Okay. And then how long was that bachelor's program at Lamar, was that four years?



**A. Yes.**
Q. Okay. So, with you graduated in May of '22, did you go on to get any sort of master's or any further education beyond that?
**A. Yes.**
Q. Okay. What did you get?
**A. A master's in general business.**
Q. And where did you get that?
**A. Lamar University.**
Q. Were you working while you got your master's or continued just full-time school?
**A. I was working.**
Q. When did you obtain the master's?
**A. May of 2024.**
Q. When did you start that program?
**A. It was the fall of 2022.**
Q. So, a lot of actually what we are going to be talking about today occurred during the fall of 2022, until about the termination was January of '23. So, when you say fall of '22, did you start the semester in August when school typically starts?
**A. Yes.**
Q. Okay. So, it's August of '22. And when did school wrap up for that semester? I

assume it was maybe December sometime of '22?
**A. It was the beginning of December.**
Q. Beginning of December.
Tell me about your schedule, because I know, from all this paperwork, you were working for Chevron Phillips at this time. So I bet your schedule was probably a little bit insane. Tell me about it.
**A. I went to school part-time so it was pretty flexible with my work.**
Q. Okay. So, what were your working hours?
**A. At the time, I was on a 9/80 schedule.**
Q. I'm sorry, you were on what?
**A. A 9/80 schedule.**
Q. Okay. Well, I'll plead ignorance. I don't know what a 9/80 schedule is, so tell me.
**A. So, a 9/80 schedule is you work nine hours Monday through Thursday, and then eight hours on your Friday to work. But you work every other Friday.**
Q. Okay. Okay. Every other Friday. So a 9/80 schedule meaning in a two-week period, you still get 80 hours, but you're getting those 80 hours because you're doing the nine hours or



the one extra hour a day Monday through Thursday?
**A. Yes.**
Q. Okay. Those working hours, let's first take the nine-hour day. The nine-hour day ran from what to what?
**A. So, I believe at the time, I was working a seven to five.**
Q. And then on the Friday that you were not off, that was what, seven to four?
**A. Yes.**
Q. Okay. And then what was your school schedule?
**A. I was online.**
Q. Online?
**A. Yes.**
Q. So, when would you -- how many hours were you taking that semester?
**A. I was part-time, so six.**
Q. Six, meaning two classes?
**A. Yes.**
Q. Okay. So, you would watch these classes online so I guess you -- no?
**A. They were fully remote and so the professor would post everything on blackboard,**



**and you would have the flexibility to do it as your schedule allowed. So there was no set times for me to join a class.**
Q. Okay. But, I guess, for clarification, I mean, were there lectures, that at your leisure, you would watch just whenever you wanted to or there were no lectures at all?
**A. There were lectures that I could watch at my leisure.**
Q. Okay. All right. So, you would do that just at whatever time worked for you once you got home?
**A. Yes.**
Q. Okay. And then in terms -- same thing with assignments and homework and quizzes and exams and that kind of thing, you would just do that as your schedule allowed in the evenings?
**A. Yes, but typically, I would time those to do on the weekends, so I didn't have to do schoolwork during my work week.**
Q. Gotcha. So you would focus in on the weekends for the assignments?
**A. Yes.**
Q. Okay. And you told me that obtained that master's in general business in May of '24.



When did you start working for CP Chem? And by the way, if I refer to CP Chem or Chevron Phillips, that's the same thing, right?
**A. Yes.**
Q. When did you start working for CP Chem?
**A. July of 2022.**
Q. How did you find out about the job opportunity at CP Chem?
**A. So, I received a phone call from the HR assistant asking me if I'd like to interview for the role.**
Q. Well, it doesn't get more convenient than that, does it?
**A. Right.**
Q. They come to you. I love that. Wish my job search was like yours. Okay.
So, they gave you a call and did you go interview and if you did, what position were you interviewing for?
**A. So, I interviewed via Teams and I interviewed for the HR grad position.**
Q. I'm sorry, the HR what?
**A. Grad, G-R-A-D.**
Q. HR grad position. And what is that?

**A. It is a entry level human resources position at our company.**
Q. Was this job in HR, was this the first job you held in the human resources sector?
**A. No.**
Q. Okay. What other jobs have you held in the human resources?
**A. So, I interned at the City of Nederland as an HR assistant. And then I briefly worked for the Medical Center of Southeast Texas as the HR coordinator.**
Q. You say briefly, how brief?
**A. It was from May to July.**
Q. And that was where?
**A. The Medical Center of Southeast Texas.**
Q. And you interned, you said, at the City of Nederland. For how long?
**A. One year.**
Q. That was while you were in school?
**A. Yes.**
Q. Okay. The HR coordinator and the intern position, were those paid positions?
**A. Yes.**
Q. Once you started with Chevron, which -- did you -- I assume they offered that



job and you accepted the job as HR grad?
**A. Yes.**
Q. How long did you hold the HR grad position or is that still your position?
**A. So, I was an HR grad for two years.**
Q. So, from July of '22 to July of '24?
**A. Correct.**
Q. Okay. And then so July of '24, we're now in '25, so what happened in July of '24?
**A. July of 2024, I became an HR business partner and rolled off of our grad program.**
Q. So you're now an HR business partner as of July '24. Is that still your title to today's date?
**A. It is not.**
Q. Oh, okay. So, July '24 you became an HR business partner. What site were you assigned to?
**A. In July of 2024?**
Q. Yeah.
**A. I was assigned to Orange and Port Arthur.**
Q. Okay. And so how long were you an HR business partner?
**A. A year and two months.**



Q. Oh, let me guess. What I heard earlier this morning, did you guys just change all our positions on Monday? Is that what you're referring me to?
**A. Yes.**
Q. Uh-huh. Yes. Life changed on Monday. Okay. So, Monday, what's the knew title as of Monday?
**A. I am an HR generalist.**
Q. Got it. Okay. Is it fair or accurate to say that the HR business partner to the HR generalist, and I'm only basing this on what I've heard from Ms. Danford earlier today, it sounds like this was largely a restructure or a reclassification. I don't really think that job duties changed too much. So is that an accurate summary of what happened with this HR generalist move?
**A. That is accurate.**
Q. So it would be viewed as, sort of, a lateral just change from HR business partner to HR generalist?
**A. Correct.**
Q. Okay. Now, I assume it was different than moving from HR grad to HR business partner.



I assume that was a bit of a promotion?
**A. Yes.**
Q. Okay. It also came with an increase in pay?
**A. Yes.**
Q. Okay. Have you ever been disciplined, in any way, at your time at CP Chem?
**A. I have not.**
Q. Okay. Do you have any direct reports, meaning people who report to you?
**A. I do not.**
Q. And who is your direct supervisor as of today's date?
**A. As of today's date, Laura Morales.**
Q. And what is her role? Her title?
**A. She is the senior HR generalist.**
Q. Okay. Back in 2022, who was your direct supervisor?
**A. In 2022, April Danford.**
Q. Okay. Did you have any reports subordinates underneath you back in '22?
**A. I did not.**
Q. You've told me about formal education, the bachelor's and the master's, I want to ask some questions now about just, kind of,

certifications. Do you hold any certifications, and that could just be through, like, for example, I know of SHERM, the society of human resource managers. There are other third-party groups out there like them that are HR, you know, organizations. Are you part -- so first, my first question is are you part of any organizations like that?

**A. No, I am not.**

Q. So, do you hold any additional certifications or specializations or licenses with any of those groups?

**A. I do not.**

Q. Okay. Do you voluntarily attend any kind of trainings or classes or continuing education trainings outside of your employment with CP Chem, you know, related to human resources or the state of discrimination law?

**A. I have not.**

Q. Do you attend anything like that internally with CP Chem, annual trainings or continuing educations on the latest updates to employee rights and employee benefits law?

**A. Yes.**

Q. What's that like? You know, how often



does it happen? What are the courses like?

**A. So, our compliance team will put together presentations and present them to us.**

Q. Okay. How often does that happen?

**A. It really is based upon -- there are certain changes to laws or any policies. Most of the times, they do refreshers.**

Q. Okay. Do you recall, as you sit here today, when the last one was that you guys did?

**A. We actually recently went over some compliance training at the beginning of this year.**

Q. Beginning of '25?

**A. Yes.**

Q. So, if I use, you know, phrases like the ADA and I'm referring to the Americans Disabilities Act there, do you know what I'm referring to?

**A. Yes.**

Q. If I use phrases like Title Seven, do you know what I'm referring to?

**A. Yes.**

Q. If I use phrases like discrimination, harassment, retaliation, do you know what I'm referring to?



**A. Yes.**

Q. As it relates to another little buzz phrase, the good faith interactive process, do you know what I would be referring to if I said that?

**A. Yes.**

Q. Okay. In your role as HR business partner, I want you to prescribe for me, please, what were your job duties in that role?

**A. As an HR business partner?**

Q. Yeah, because as I understand it -- no, you know what, that's not accurate, because as an HR business partner, you didn't start that until '24; is that right?

**A. That is correct.**

Q. July '24. Okay. Tell me what your job duties looked like as an HR grad?

**A. So, as an HR grad, I was working on the day-to-day items, just employees who come in, had questions. I was also learning policies and reading different ones as I first started.**

Q. What about employee relations issues, you know, so if an employee came in and said, hey, I feel like, you know, Bob is discriminating against me and having to conduct



the investigations into that, you know, witness statements about that, talk to people about that, did you ever do any of that investigative stuff as an HR grad?

**A. As an HR grad, yes, I did do investigations.**

Q. Okay. Did you have anybody that supervised you or that oversaw your work or you were allowed to do it yourself?

**A. I had someone who was more tenured do them with me.**

Q. And who was that at that time?

**A. So, at the time, I handled a couple of them, so I can't -- so, one of them was Aaron Martinez, our compliance and labor relations person. And then at the time, as well, Kelsey Bounds would help me because she was my counterpart.**

Q. Kelsey was what, was she an HR grad as well?

**A. No. She was a tenured HR business partner.**

Q. Okay. When you're saying that she's a tenured HR business partner, are you just referring to the fact that she is a more

Page 26

experienced business partner?
A. **Correct.**
Q. Okay. What was Kelsey's last name?
A. **Elms.**
Q. And the other name you mentioned for me was Aaron Martinez?
A. **Yes.**
Q. Okay. Aaron, is that a male or a female?
A. **That is a male.**
Q. Okay. Was Aaron a tenured HR business partner or a more tenured HR business partner?
A. **So, he was not an HR business partner. He was in our compliance space.**
Q. Compliance, okay.
So you handled a couple of employee relations things. Did you ever discipline an employee as an HR grad?
A. **Yes.**
Q. How many?
A. **I cannot recall.**
Q. Okay. Were these disciplines that you did, like, they were sort of consultative between you and the supervisor who wanted the discipline or the manager who wanted the

Page 27

discipline, or, like, how many of these were deferred totally to you to your discretion versus your working in consultation with a supervisor to effectuate what they want?
A. **So, I never handled discipline to my discretion. It's always a collaborative decision.**
Q. Right. Okay. So, let's talk about disability. You handled -- how many employee relations investigations, by the way, do you think you did before I turn to disability, as an HR grad?
A. **I can't recall an accurate number.**
Q. Well, I mean, are we talking dozens? Are we talking, like, less than six? Give me a range here.
A. **Probably more than six. I can't give you a definite number.**
Q. No, that's fine, just a range.
Okay. Now, in terms of disability, so doing an interactive process for, like, an accommodation, request an accommodation, how many did you do of those processes during your two years as an HR grad?
A. **I think just one.**

Page 28

Q. Just one, which would be Mr. Jones?
A. **Yes.**
Q. So, Mr. Jones was your first accommodation that you did?
A. **Yes.**
Q. Okay. I think you may have seen this, you may not have seen this, but your notice of deposition which set your deposition for today -- yeah, it's really, really small. I know. Sorry. Because I'm not actually -- I'm not going to share my screen and show you this document, okay, but your notice of deposition set your deposition for today, September 3rd, 2025 at 1:00 p.m. via Zoom. Did you receive this notice of deposition? Do you remember seeing a notice of deposition that maybe one of lawyers from the company might have forwarded you or no?
A. **No, but I also can't see what is exactly in your hand, so ...**
Q. Right. Okay. Well, how were you notified? And I don't want to know, by the way, any -- don't tell me any specific conversations that you might have had with any of the lawyers for the company. I'm just trying to figure out

Page 29

did you find out about your deposition today through legal? Did you find out through April? Like, how did you find out that your deposition was set for today?
A. **I found out through legal.**
Q. Okay. So when you were notified of the deposition, I'm sure you probably asked, okay, well, what's this about and what's the case and what's going on. When you heard the name Warren Jones, if I said the name Warren Jones, do you know who that is?
A. **Yes.**
Q. Okay. Did you know Mr. Jones at all outside of the workplace, meaning, had you ever met him or known him before seeing him out at CP Chem?
A. **Yes.**
Q. Okay. How did you know him from outside of work?
A. **So, at my prior place of work as a waitress, I waited on him a handful of times, but that's it.**
Q. Okay. Where were you a waitress at?
A. **Tequila's Mexican restaurant.**
Q. So, Mr. Jones would come in there, I

guess, to eat. And so, did you, like, did you just recognize him when you went to CP Chem as, you know, a former kind of patron or client of yours from the restaurant?

**A. Yes.**

Q. Okay. Well, how were your interactions with Mr. Jones, you know, prior to the workplace? Was he, like, the worst customer you ever had? Was he just kind of forgettable? He was great? You know, what -- any bad interactions with him?

**A. He was just another customer.**

Q. Okay. Just another guy.

So, then when you saw him at CP Chem, any bad interactions with him working with him at CP Chem?

**A. Not that I can recall.**

Q. Okay. How often -- and I don't know, I assume with you being HR and him being out in operations, the two of you probably didn't cross paths a whole lot, but how often would you see him, like, physically in person? Is this once a day you would see him and say "hi?" Is this, you know, only if there was a reason to see him is when you'd see him? Tell me about that.



**A. I would only see him if there was a reason to see him.**

Q. Okay. So, I mean, obviously, I'm going to go through a lot of documents and emails and things with you today about the process and things that you and Mr. Jones worked on together through the process. But the first time that I ever see the two of you kind of coming in contact, and this would have been not even physically, this would have been just, you know, by email, would have been when Mr. Jones sent his ophthalmologist note in September of '22.

Is that the first interaction that you recall having with Mr. Jones at CP Chem was back in September with that letter from his doctor?

**A. No.**

Q. Okay. So, you had some interactions prior to that?

**A. Yes.**

Q. All right. Tell me about those.

**A. I believe we just exchanged an email prior to that email.**

Q. Okay. What email was that?



**A. It was an email from Mr. Jones to myself and my boss at the time.**

Q. Okay. But I'm sorry, it might have been a poor question. What was the email about, like, what was the topic about?

**A. He requested to disqualify from the unit that he was on.**

Q. Requested to disqualify from the unit he was on meaning, what, the heater board?

**A. No. So, he worked on the ethylene unit, and he requested to disqualify back into the pool per our union contract.**

Q. Okay. I think I've seen something about that. So he requested to disqualify from the ethylene unit. What does that mean, disqualify?

MS. WILLIAMS: Okay. One second, James. I think we're having a technical issue with her computer. It's about to shut off.

Is it not charging?

**THE WITNESS: No, it's just saying you're getting an update.**

THE VIDEOGRAPHER: Would counsel like to go off the record?



MR. SUDDUTH: Yes, please.

MS. WILLIAMS: Definitely, yes.

THE VIDEOGRAPHER: We are now off the record. The time is 1:34 p.m. Central Time.

(Recess was taken from 1:34 p.m. to 1:37 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:37 p.m. Central Time.

BY MR. SUDDUTH:

Q. Okay. Ms. Morris, we're back on the record after some technical difficulties, so thanks for bearing with us through that.

We were talking about an email I think you said that was exchanged prior to the medical letter from my client's ophthalmologist that you said was actually the first interaction you guys had. So, I just want to clarify before I show you that email. Was that the first and/or only communication you had with Mr. Jones prior to the ophthalmologist's letter?

**A. You're referring back to the email, correct?**

Q. Yes, ma'am.

**A. Yes.**

Q. Okay. So, let me share my screen with you. Are you able to see my screen?
**A. Yes.**
Q. I don't know how far away it is, but I'm going to try to zoom in for you. Is that better to see?
**A. Yes.**
MR. SUDDUTH: Madam Court Reporter, I should have done this earlier. The notice of deposition is going to be Exhibit 1. This will be Exhibit 2, Bates labeled pace 05, CP Chem 705.
(Whereupon, Exhibit 1, Deposition Notice was marked for identification.)
(Whereupon, Exhibit 2, Bates 705 was marked for identification.)
BY MR. SUDDUTH:
Q. Ms. Morris, what I meant by Bates label is you'll see these numbers here stamped at the bottom of the document. This is a Bates label which says 705.
This is a chain of emails. As we typically have to do, we have to, sort of, start at the bottom and work our way up. So here's an email from Warren Jones to April and with a CC



to you. It says, subject, operator pool.
Says, "Good evening. I want to be removed from under the bar of having a permanent schedule as a 1544 operator and be placed back into the pool, please. Thank you both."
My first question is: Did I read that correctly?
**A. Yes.**
Q. Okay. Let's start with a 1544 operator. What is that?
**A. That is the type of operator Warren was.**
Q. Okay. Would a 1544 operator, they work outside? They work just on ethylene? Can you describe that for me or do you know?
**A. A 1544 operator is the -- 1544 is the ethylene unit, to clarify that. He was an operator in that unit specifically and any operator in that unit works all the jobs within that unit, so I believe there's six jobs.**
Q. Okay. Any operator inside the ethylene unit works all six jobs. Do you know what the six jobs are?
**A. You have three outside jobs and three**



**board jobs. I do not know the specific names for each.**
Q. Okay. Three outside jobs and three, you said, board jobs?
**A. Correct.**
Q. When he refers to being put back into the pool, the operator pool, I don't know what that means, but I'm hoping your knowledge with CP Chem will help me with this. What's he referring to there? What is the operator pool?
**A. So, per our collective bargaining agreement, our USW operators have the ability to disqualify back into the pool, meaning they will still continue their training, they just have the ability to be in that pool and once a job is open on our other unit, they are able to bid for it.**
Q. One of units we've been talking about is 1544 which is the ethylene unit. How many units are there?
**A. Two.**
Q. Okay. So there's the 1544 ethylene unit. What's the other unit?
**A. It is our aromatics unit. It's also referred to as cyclohexane.**



Q. So, within the ethylene unit, there are six jobs, three outside and three board jobs. He is requesting to be put back into the pool so that he can, what, qualify for maybe the aromatics unit?
**A. No.**
Q. No. Why does he want to be back in the pool, if you know?
**A. So, typically, they are able to then bid into the other unit. That's all that means. He still has to continue training on his current unit.**
Q. Right. He has to continue training on the current unit, but when we say bid, are we talking about bidding in for any opening positions that come in into the other unit and the other unit would be what you call the aromatics unit; is that right? I thought you called it the aromatics. Maybe I got the name wrong.
**A. Yes. The other unit is the aromatics unit.**
Q. And that's the one that he could bid into?
**A. If the job became available, yes.**

Q. Okay. It looks like you forwarded that email on September 14th as an FYI and you say, "We wanted to make you both aware of his request." And that goes to Bryan -- how do you pronounce that last name, is it Kubsch?
**A. Kubsch.**
Q. Kubsch. Okay. It goes to Bryan and with a CC to Wooters and Chelse Cisneros. And Bryan says: "10-4. I support the request." Is that right?
**A. Correct.**
Q. And then you send an email back to April saying, "Both Bryan and Judd were made aware of Warren's request. Brian responded with his support."
Did I read that correctly?
**A. Yes.**
Q. Okay. What did Judd ever say about this request?
**A. I can't remember.**
Q. Did he ever respond in writing or in person at all?
**A. At this time, I can't remember if he responded in writing, but I'm sure we had a conversation about it in person.**



Q. Okay. If you're sure that you had a conversation about it in person, do you recall what he said in that conversation?
**A. I do not recall.**
Q. Okay. In order for him to disqualify himself and go back into the pool, does he need the support of both Bryan and Judd?
**A. Yes.**
Q. Okay. Was this request that was made in September, was this request ever -- what happened with this request?
**A. He became a pool operator.**
Q. Okay. So this request with Bryan's approval, this request was approved and he was put back in the pool?
**A. Yes.**
Q. Okay. Do you know when that happened?
**A. I can't recall.**
Q. Would there be any sort of paperwork that would document or record the moment when he went into the pool, some kind of notation in his personnel file, some kind of form approving the transfer, some kind of donation on his -- or yeah, denotation on his payroll, anything like that? Would there be any kind of documentation



that we could go back and look at that would help us iron out the specific date where he became a pool operator?
**A. His employee history detail should have that.**
Q. Okay. Is it your understanding that Mr. Jones was having to -- and I -- let me strike that question.
You told me before that there were three outside jobs and three board jobs in the ethylene unit. Is one of the board jobs the heater board?
**A. Yes.**
Q. Do you know whether or not Mr. Jones was qualified on all the outside jobs?
**A. I do not.**
Q. Okay. Was it your appreciation, around this time, that he was having to train on the heater board?
**A. Yes.**
Q. Do you know when that training for the heater board started?
**A. I can't recall a specific date.**
Q. Okay. Let me scroll down and make this Exhibit 3 to the deposition. This is CP



Chem 706.
(Whereupon, Exhibit 3, Bates 706 was marked for identification.)
BY MR. SUDDUTH:
Q. And you'll see here at the bottom 706, and I want you to take a look at this email in the middle, which purports to be from Warren Jones dated September 19th of '22 to Judson Wooters, April Danford, Clay Ryan and yourself. Do you recall receiving this email?
**A. Yes.**
Q. Let's go over it. It says, "Good morning. This letter is from my optometrist and my recent eye exam. Ever since I've been training on the heater board, I've been in and out of the eye clinic trying to get my vision where I can see the controls and reading clearly. During this time, my doctor found some concerns he wanted to share with you guys. Attached is a letter wrote by him on my behalf. Please look at the letter and get back with me, please. Thanks."
My first question is: Did I read that correctly?
**A. Yes.**

Page 42

Q. Okay. When you received this email, what did you do with it, if anything?
**A. When I first received it, I brought it to my boss' attention.**
Q. And your boss at this time was April?
**A. Yes.**
Q. What did April say?
**A. I believe she asked me to initiate our reasonable accommodation process, but first to read through and ensure I understood it.**
Q. To read through and understand what?
**A. Our process.**
Q. The accommodation process?
**A. Correct.**
Q. Okay. In here where he says, "Ever since I've been training on the heater board, I've been in and out of the eye clinic," did you formulate any opinion or thoughts once you read that line right there?
**A. Not that I can recall.**
Q. Okay. Where he continues here and he says, "I've been in and out of the eye clinic trying to get my vision where I can see the controls and reading clearly," did you formulate any thoughts or opinions about that line?

Page 43

**A. Not that I can recall.**
Q. Okay. And it looks like April then sends an email to yourself and to Kelsey, and Kelsey Bounds up there, that's the other person you're telling me about who would work in consultation with you?
**A. Yep. I mean, yes.**
Q. Okay. So, after you read through and felt like you understood the accommodations process, did you initiate the accommodations process?
**A. Yes. So, I initiated the interactive process.**
Q. Excuse me, yes, thank you, the interactive process regarding the accommodation.
Let me flip now to 712.
MR. SUDDUTH: And this will be the next exhibit, I believe would --
MS. WILLIAMS: James, can we just get clarification on the record, Exhibit 3 is -- you mentioned 706. I just want to make sure we understand all the pages that make up Exhibit 3.
MR. SUDDUTH: Yes.
MS. WILLIAMS: And also with Exhibit

Page 44

2, I think maybe it's just one page but I just wanted to make sure.
MR. SUDDUTH: Exhibit 3 is just page 706, it is just one page, I believe. Well, no, technically, thank you for the clarification. It does look like because of Hart Eye Center's letter that goes with it, that Exhibit 3 should be 706 to 709 in Globo. And Exhibit 2, I believe, is a one-page -- let me just verify that -- yes, Exhibit 2 is just 705. And then Exhibit 1 was the notice of deposition.
MS. WILLIAMS: Okay. Thank you.
MR. SUDDUTH: Sure.
BY MR. SUDDUTH:
Q. Exhibit 4 is going to be Bates labeled as 712 by CP Chem. Let's take a look at it.
(Whereupon, Exhibit 4, Bates 712 was marked for identification.)
BY MR. SUDDUTH:
Q. All right. This is dated October 5th, 2022 to Warren Jones, and it looks like, at the bottom of it, and it is a one-page document, 712, it looks like at the bottom it's signed by you; is that right?

Page 45

**A. This looks like a draft document.**
Q. This is a draft?
**A. Yes, that does not look like the final.**
Q. Well, I will say that there are numerous, throughout the production. I'm trying to figure that out. There are numerous different -- I don't think the meet-and-confer document ever, like, the meet-and-confer date definitely was October 3rd. Would you agree with that?
**A. Correct.**
Q. But I've seen numerous different iterations of this. Do you know what the final version is?
**A. So, the final version was sent in an email to Warren.**
Q. Okay. When was it sent?
**A. I believe October 19th.**
Q. We'll still leave this marked as Exhibit 4, but let's go now to what I may make Exhibit 5. It depends. How about this one which is Bates labeled as 739to 740. It's in Globo, and it's dated October 19th of '22. Does this look like the final?

**A. Yes.**
Q. Okay. Then I'm going to mark this as Exhibit 5, which will be 739 to 740.
(Whereupon, Exhibit 5, Bates 739-740 was marked for identification.)
BY MR. SUDDUTH:
Q. Okay. Let's go through this together. And you believe you emailed it the same day, October 19?
**A. I believe so.**
Q. "There's a few things I want to discuss with you here, which is on September 19th of '22, the company became aware of your request for an accommodation. In accordance with the doctor's note you presented to the company from your ophthalmologist, William B. Hart, you were having difficulties viewing, 'small numbers and letters,' as well as becoming, 'overwhelmed by the brightness of the lights on your console.'"
Let me stop right there. Is that a correct summary of the company's awareness and the company's position?
**A. Yes.**
Q. It continues that you had the meeting



October 3rd of '22. And that, it says, "During our meeting on October 3rd, 2022, you said that you were not requesting to be removed from nights as communicating the letter from your ophthalmologist, but rather, you were making the company aware of your vision difficulties. You further mentioned that you are currently bringing a lamp to and from work to help increase the lighting. You agreed that you would consult with your ophthalmologist to identify adaptive devices that the company could potentially provide to increase the visibility of the console. The company would appreciate you providing this list as soon as possible, but no later than November 11th, 2022. The company is also consulting with our corporate occupational health department regarding additional information and resources that could be helpful and will continue to do so as necessary."
**A few questions there, one, who is the corporate occupational health department? Who is that?**
**A. At that time?**
Q. Yes, ma'am.



**A. At that time, it was Dr. Stanton.**
Q. Who is it now?
**A. I cannot recall their name.**
Q. Is Dr. Stanton still with the company or is he no longer there?
**A. I believe he's no longer with the company.**
Q. Do you know why he's no longer being used by the company?
**A. I do not.**
Q. In here, you talk about, "You would consult with your ophthalmologist to identify adaptive devices the company could potentially provide to increase the visibility of the console, no later than November 11th of 2022."
Did Warren get you the adaptive device that he would need or any accommodation he would need to help to see things before November the 11th?
**A. Yes.**
Q. Okay. And we'll go over that together. I'll scroll down for now. And it says, "Simultaneously, on September 22nd, 2022, you were unsuccessful in passing the heater console operator final exam which resulted in



your being taken out of schedule for a period of 35 days, so that you can focus on retraining. We will continue to engage in this interactive process with you as needed, while you are retraining on the console on day shift. Upon your return to normal shift assignment and implementation of any accommodation, the company will schedule a follow-up meeting within 30 days to review and evaluate." Let me stop right there.
Is that an accurate statement of company policy, that "upon your return to a normal shift assignment and implementation of any accommodation, the company will schedule a follow-up meeting within 30 days to review and evaluate." Is that accurate?
**A. Can you ask that question again?**
Q. Yeah. Is this an accurate statement here regarding the company's position that, "Upon your return to normal shift assignment and implementation of any accommodation, the company will schedule a follow-up meeting within 30 days to review and evaluate." Is that accurate?
**A. Yes.**
Q. Okay. Now, it looks like -- and this

will be the next Exhibit which is Exhibit 6.
(Whereupon, Exhibit 6, Bates 741 was marked for identification.)
BY MR. SUDDUTH:
Q. It looks like this here, in Exhibit 6, which is Bates labeled 741, it looks like this might be the email that you sent on October the 19th, 2022 at 3:01 p.m. to Warren with this summary or this -- yeah, the summary of the meet-and-confer meeting which you sent him on the 19th. Does this appear to be the email?
**A. Yes.**
Q. It looks as though Warren responded within one day. He responded back on October 20th, the next morning, saying, "Good morning. Really all I need from you guys is the lighting over the heater board console to work properly, so I can see the keys on the board. Everything else will work out fine. The only light that works properly is the one over the computer. The other two seem to be broken. Thanks."
Do you recall receiving this email?
**A. Yes, I do.**



Q. Okay. So, did you take that as his response to your summary, his response to this by November the 11th, 2022, you want to know what the accommodation is that he needs?
**A. Yes.**
Q. Okay. October 20th, same day, Judson Wooters with a CC to you, says, "Thanks, Warren. Are you referring to the long, narrow lights on arms that can be moved around? Can you enter a G3 to get them fixed?"
And then the next email, at least that I have in this chain, is from you to April with an FYI. Did you tell April about this accommodation that Warren was making to fix the overhead lighting above him in the console?
**A. Yes.**
Q. Okay. Were you aware of or tracking the progress of this G3 request to get it fixed?
**A. No.**
Q. Do you think you should have?
**A. No.**
Q. During this time period, as I understand it, he continued to train, he continued to test, he continued to go through retrainings, and as I understand it, those all



were marked as a fail on the exam attempt; is that your understanding?
**A. Yes.**
Q. Walk me through kind of what was happening during this time frame, because, I mean, we've got the initial email from the ophthalmologist or the letter that was emailed from the ophthalmologist, September 19. We've got the October 19 email summarizing things from you, and we've got his response October 20th.
From October 20th forward, what's happening in the interactive process? Bring me into the room of the interactive process, into your mind. What's happening from October 20th forward?
**A. So after October 20th, once I received that email from Mr. Jones, I determined that he had stated all he really needed was the light over the heater board to be fixed and they put in a request for it to be fixed. For the time being, I was just -- I figured that it was already taken care of for now because he was using his lamp that he was bringing from home.**
Q. Okay. You assumed that it was taken care of for now because of the lamp. Who told



you that the lamp was adequate? You know, nowhere in Warren's email does he say the lamp is adequate. He says that he needs to get the overhead thing fixed.
So, I'm not criticizing or attacking you here, I'm just asking. Did you make an assumption that the lamp was adequate or did Warren tell you the lamp was adequate?
**A. So in Warren's email that you just showed me, he stated that all he really needed was the lighting over the heater board to be fixed and then everything else should work out fine. But then also, in that October 3rd meeting, he stated he was utilizing that lamp and it's been helping him fine.**
Q. What he says is not that my lamp is working out fine for me. What he says is he needs the overhead light fixed and then it should work out fine. So, that's what I'm saying. Did you assume that that lamp was giving adequate light to solve the problem?
**A. I didn't assume.**
Q. Okay. Then who told you that the lamp was adequate?
**A. Warren.**

Page 54

Q. Did he tell you that in person?
**A. I believe in that October 3rd meeting, he did.**
Q. Okay. Well, let's take a look at the October 3rd meeting.
MS. WILLIAMS: Not to get you off track, but I just wanted to make sure, again, Exhibit 6 you mentioned CP Chem 741. I think it's -- is it 741 through 742 that make up Exhibit 6?
MR. SUDDUTH: You are doing a good job of keeping me in line. Let's see.
MS. WILLIAMS: I just want to get it so when the court reporter gets it, we all know what pages we're talking about.
MR. SUDDUTH: I do think that 741 rolls onto 742 because there's a signature block that does flow through to 742.
MS. WILLIAMS: Okay.
MR. SUDDUTH: You are definitely right, yes. So it should be 741 to 742. Okay. Thank you for that.
BY MR. SUDDUTH:
Q. I apologize. It took me a second to find the exact page, but there's actually a

Page 55

summary that I think you prepared that is Bates labeled at 814 and Ms. Williams is going to be proud of me, I'm going to clarify this is a one-page exhibit.
So 814, this is Exhibit 7 at 814.
(Whereupon, Exhibit 7, Bates 814 was marked for identification.)
BY MR. SUDDUTH:
Q. Is this your accommodation meeting kind of summary minutes from the meeting?
**A. They are my own minutes, yes.**
Q. Okay. And this is from the 10/3 meeting that you then sent a summary recap on 10/19?
**A. Yes.**
Q. Okay. In the middle of the page, it says, "Based on the letter your healthcare provider sent us, what is the accommodation you are requesting? Jones asked for five minutes to tell us the background of his vision issues throughout his life."
And then he proceeds to tell you all of the issues that you detail here; is that correct?
**A. That's correct.**

Page 56

Q. Okay. And there's a few notes here that I want to ask you about because this is in the October 3rd meeting. It says, "Jones states -- Jones says when he is on the heating board, he feels he knows the material, but the anxiety that comes over him."
Do you recall him saying that, at least enough to notate it here?
**A. Yes.**
Q. You also state, "He doesn't want to put anyone in harm's way because he cannot properly see."
Is that a correct recollection of what he said?
**A. Yes.**
Q. Okay. So, at the time that you were meeting with him, at the time that he's sending this ophthalmologist's letter talking about his eye difficulties, he had his lamp at that time, did he not?
**A. Yes.**
Q. So, with his lamp, he's having difficulties, he can't see, he tells you he can't see, and he also expresses concern he doesn't want to put people in harm's way.

Page 57

So that's why I'm pressing you a little bit, Ms. Morris, when you tell me that you assumed everything was okay because the lamp was adequate. Where, in anything Mr. Jones is telling you, are you determining that?
**A. Based on his response to the letter that I sent him, his response stated that all he really needed was the lighting over the heater board to be fixed, but then again, he had his lamp at that time, so simultaneously, while he was using the lamp, we were also working to get the light fixed.**
Q. Let's go back to 741. I don't want to quibble with you too much. I'll just get your testimony and we'll move on. But I want to take a look at 741 one last time.
Take a look at this email that he sends October 20th. " Good morning. Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the keyboard."
Let me stop right there. At this time, October 20th of 2022, he is using his lamp. His lamp is on the heater board, right?
**A. Yes.**

Q. So, he's still writing, on October 20th, that he can't see, even with the lamp on there. He doesn't talk about my lamp in this email. He says, "Really all I need from you guys is the lighting over the heater board," what Judson clarifies for us is the long, narrow lights on arms that can be moved around.

"The only light that works properly is the one over the computer. The other two seem to be broken. Thanks. "

Is there anywhere in this email where he references that his lamp is sufficing for now? Does he say anything like that in this email?

**A. No.**

Q. Okay. Now, let's go back to 814. Down here, I thought this was an interesting note that you had which was, "Brought up outside operator accommodation that was made in the past. Clay said that never made it 'up here,' assuming he meant HR and that was all that was said on this."

Do you recall him making that request of an accommodation to work outside?

**A. No.**



Q. You don't? Do you have any reason to believe that your note here is inaccurate that you wrote?

**A. No.**

Q. Okay. So, you don't dispute this entry here on your note; you're just saying you don't recall him making that request?

**A. By him, do you mean Warren?**

Q. Yes, ma'am.

**A. I do not recall Warren specifically asking to be an outside operator.**

Q. Okay. But no reason to dispute your entry here on your minutes?

**A. No reason to dispute it.**

Q. Okay. The reason I ask you about that entry there is because I want to read to you some parts from Mr. Jones' lawsuit. And I should have asked you this earlier, and I apologize, I usually ask people what documents they reviewed in preparation for their deposition today.

Did you review Mr. Jones' lawsuit? Have you ever seen it? I don't know if, you know, you looked it up online or it was shown to you by counsel? Have you ever seen his



lawsuit?

**A. I've seen it once in the past, but I did not review it today.**

Q. Okay. I want to read to you, this is just -- I'm not going to introduce this as an exhibit, but just for counsel's reference, this is pages six and seven of the lawsuit, which is paragraph -- starting at paragraph 30. And when it says "plaintiff," Ms. Morris, that's referencing Mr. Jones, okay?

Paragraph 32. "Plaintiff provided the physician's note to his union representative, Clay Ryan, hereinafter Ryan, and thereafter provided a copy of the physician's note directly to Wooters on September 19th, 2022.

Paragraph 33. "On October 3rd, 2022, plaintiff attended a meeting with Clay Ryan" -- well, no, excuse me. "Plaintiff attended a meeting with Ryan, last name unknown, a human resources representative, Chelse Cisneros and Wooters about the physician's note/accommodation request." Let me stop right there.

Is that accurate that the meeting



on October 3rd, 2022 had yourself, Wooters, Jones and a Ryan from HR?

**A. There was no Ryan from HR in that meeting.**

Q. Okay. That's what I wanted to clarify. So October 3rd of '22, that was the date of the meeting; is that right?

**A. Right.**

Q. Who else was present, if anyone, aside from yourself, Wooters and Mr. Jones?

**A. Clay Ryan.**

Q. Anyone else?

**A. That's all I can recall.**

Q. Okay. All right. So the Ryan there is referring to Clay Ryan. Okay.

Paragraph 34. "During the meeting, plaintiff described his medical history, upbringing and nearsightedness, to which Cisneros responded by asking whether there was another job plaintiff could perform." Let me stop there.

Do you recall asking him that?

**A. Yes.**

Q. Okay. And number 35. "In immediate response, plaintiff indicated that he could

Page 62

forego the promotion and remain an outdoor operator, the job duties of which he had successfully performed for several years."

That's what Mr. Jones recalls and your note, there, seems to corroborate that, that he immediately said, look, just let me work outside. You don't recall anything like that where he requested to work outside?

**A. I don't recall him specifically asking that.**

Q. But once again, you don't dispute what you put in your minutes there, do you?

**A. I don't.**

Q. Okay. Then at 36. I think this is the final paragraph and I'll read from the suit.

Paragraph 36. "Wooters immediately refused to honor the accommodation request and permit plaintiff to remain an outdoor operator. Instead, Wooters stated that he would require plaintiff to retest the practical portion of the board operator exam."

Do you remember Wooters saying anything about a request for Warren to stay outside, like, it's not going to happen, we're not doing that, anything like that?

Page 63

**A. Not that I can recall.**

Q. Okay. So, for whatever reason, and I'll have a chance to depose Mr. Wooters, but for whatever reason, nothing came, I guess, of this note here that says, "Brought up outside operator accommodation that was made in the past." And so that never went any further than that moment on October 3rd?

**A. No, it did not.**

Q. Okay. Did you discuss with your higher up, you know, with April or anybody else in the HR department, about allowing Mr. Jones to stay outside as a form of an accommodation, right? So I know that fixing the light could be an accommodation or maybe helping letting him bring something from the house could be an accommodation. What about letting him work outside as an accommodation? Was that ever even discussed as an option?

**A. We didn't give it as an option because everyone in that unit is required to work and qualify on each of those jobs.**

Q. Right. Yeah, I understand that's the normal protocol, but would you agree with me that accommodations, they go outside normal

Page 64

protocol. That's why they're an accommodation.

So who made the decision that that was never even going to be discussed or contemplated?

MS. WILLIAMS: I guess I'm going to object to the extent it calls for a legal conclusion the way it was framed at the beginning but I understand maybe the follow-up question was not exactly that.

You can go ahead and answer.

**THE WITNESS: Can you reask that question? Sorry.**

BY MR. SUDDUTH:

Q. Yeah. Well, I mean, that's fine. Let me ask the witness: What's your understanding of an accommodation?

**A. My understanding on an accommodation?**

Q. Yeah.

**A. That they're all treated on a case-by-case basis depending on what the request is.**

Q. Okay. Who, within the company, said that you weren't going to consider allowing him to work as an outside operator as an accommodation? You know, look, we have a policy

Page 65

and our policy is that everybody has to train, so we're not going to deviate from our policy. We're not going to consider that. Who made that decision, if you recall?

**A. Not one single person makes that decision.**

Q. Okay. Who was the team or grouping of people that decided that we are not going to modify our policies as an accommodation?

**A. So, as a collective, it would be the operations manager and the HR manager and site medical. We'd all cohesively agree if we could accommodate or not.**

Q. Operations manager, HR manager and who else?

**A. Site medical and then the superintendents also involved as well. We all have a conversation. It's not one set person.**

Q. All right. Let put some life to that. The operations manager at the time was who?

**A. Bryan Kubsch.**

Q. HR manager was April?

**A. April Danford.**

Q. Yep. Site medical was who?

**A. Jeanie Johnson.**

Q. And the superintendent?

**A. Judson Wooters.**

Q. Okay. Did that group, Bryan, April, Jeanie, Judd, did that group ever get together and discuss the idea of allowing, as an accommodation, deviating from policy to allow Warren to work outside given his vision difficulties?

**A. No.**

Q. Okay. So therefore, I think I know the answer to my next questions but I need to ask them anyway. So, therefore, there wasn't any sort of analysis done, that you're aware of, of what kind of undue burden modifying the policies would create?

**A. No.**

Q. Okay.

MS. WILLIAMS: Can we take a break?

MR. SUDDUTH: Yeah. Of course, and actually, it's right about an hour, isn't it, and so I blew past my own rule. I like to try to stop at about an hour and I just flew past it. So thank you for that.

Yeah, let's take a break. It's 2:18. Do you want 2:30, Ms. Morris; is that fair?



**THE WITNESS: That's fine.**

MR. SUDDUTH: Okay.

THE VIDEOGRAPHER: All right. We are now off the record. The time is 2:18 p.m. Central Time.

(Recess was taken from 2:18 p.m. to 2:32 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:32 p.m. Central Time.

BY MR. SUDDUTH:

Q. Okay. Ms. Morris, we are back on record after a brief break. Are you prepared to proceed?

**A. Yes.**

Q. All right. We left off and I think you had told me that you were going to, sort of, let the process, you know, play out. I was asking you kind of what happened after October 20th, whenever he said I need to get this light fixed and you said, so from an accommodation standpoint, you kind of want to let that process play out and get that light fixed. There was, you know, nothing really for you to do but to kind of follow up and make sure that that light is getting fixed.



So, is that a fair summary of where we kind of left off with the accommodation process?

**A. I don't think I said that I would follow up on the light getting fixed but everything else was accurate.**

Q. Okay. That you would just let the process play out regarding the light getting fixed?

**A. Correct.**

Q. Okay. Well, then let's take a look at Bates labeled 811. And this is 811 to 812 so it is a two-page exhibit.

I'm going to share my screen again. And you'll see here, Ms. Morris, as I scroll down, bleeding on to CP Chem 812, really all that's on 812 is this signature block that carries over. So we go back up to 811. Here at the bottom, there appears to be an email from you to Judson Wooters with a CC to April Danford. The subject is lighting above the heater board.

And you state, "Judd, do you know if the lighting above the heater board has been fixed. If you can, could you also provide the



date the work order was put in for this."

Did I read that correctly?

**A. Yes.**

Q. Did you send that email?

**A. Yes.**

Q. If your job was not to follow up or you didn't view it as following up, what prompted you to followup and see about this getting fixed?

**A. I can't recall exactly what prompted me to follow up on this, but I would assume a conversation between myself and April.**

Q. Okay. And the date on this, is this date any reason to dispute this date December 12th of 2022?

**A. No reason to dispute.**

Q. Okay. I will jump back to this document 811 because I want to go through it with you, but I need to clear up another date while we're clearing up dates. So you send this email December 12th of 2022.

I'm going to make this Exhibit 8 that I'm looking at right now, 811 to 812.

(Whereupon, Exhibit 8, Bates 811-812 was marked for identification.)

(Whereupon, Exhibit 9, Bates 834-835 was marked for identification.)
BY MR. SUDDUTH:
Q. Exhibit 9 is going to be Bates label 834. 834 to 835. So it's two pages, 834 to 835.
Exhibit 9, this shows, Ms. Morris, a termination recommendation seven-factor test. The date on it says December 27th, 2022. Do you have any reason to dispute that?
**A. No.**
Q. Did you prepare that or did Ms. Danford prepare that?
**A. I prepared it.**
Q. It's my understanding that the termination was not actually effectuated, meaning they didn't call, you guys didn't call Warren until sometime after the first of the year after Christmas, like, January of the following year. Does that sound right to you?
**A. Yes.**
Q. Do you recall the date that his termination was effective?
**A. I cannot.**



Q. If I told you it was the end of the year, December 31, '22, any reason to disagree with that?
**A. No reason to disagree.**
Q. Okay. And then the final document I want to show you regarding this timeline is Bates labeled 850. This would be Exhibit 10, Bates labeled 850.
(Whereupon, Exhibit 10, Bates 850 was marked for identification.)
BY MR. SUDDUTH:
Q. And it is a one-page memo so it is 850 only. Do you recall drafting this document, Ms. Morris?
**A. Yes.**
Q. Okay. It appears as though it was prepared by you on 12/22 of '22. So you prepare the termination recommendation memo. By 12/27, you had the termination form with the seven-factor test.
My question to you, though, is I want to know when were the conversations being had, prior to the creation of these documents, regarding the fact that termination was going to occur, right?



So not just the drafting of the documents, but how soon, prior to the drafting of these documents, did people start saying, well, we just -- we've got to get rid of -- we've got to let Mr. Jones go?
**A. It should have been or it would have been after his failure to successfully qualify on his last test.**
Q. Okay. So, based on your memo here, it looks like December 15th of 2022 is whenever he failed, for the fourth time, to qualify on the heater board. So, based on your recollection, it sounds like maybe sometime after December 15th is when the wheels started getting put in motion to effectuate this termination?
**A. Yes.**
Q. All right. So December 15th, his fourth test is coming up on the heater board, and if we go back to now to 8/11, you are following up as of 8/12. I mean, do you think maybe you knew the test was coming up and that's why you followed up? Is this jogging your memory at all as to maybe what would have caused you to follow up like this?
**A. Yes.**



Q. Okay. If it's jogging your memory, what do you think was the impetus that led you to follow up?
**A. It probably was that his test was coming up and I just wanted to know if the lighting over the heater board was fixed.**
Q. Okay. So, then Judson Wooters sends email to Bubba Vandevender and says, "Is this something you can check on?"
Mr. Vandevender is, as I understand it from Ms. Danford, he is, what, in maintenance, I think?
**A. Bubba?**
Q. Yeah, Bubba. Is he in maintenance?
**A. Yes.**
Q. Okay. Do you know, by the way, did you ever find out, in the course of any investigations on this, did you ever find out when the request was put in, when the work order was put in?
**A. Not that I can recall.**
Q. Okay. Then it looks like Vandevender sends an email to a whole bunch of folks. Maybe that's his team. I don't know. But he sends an email to Claude Richardson, Danny Gay, Greg

Johnson, Warren Jones, Judson Wooters and Andy Coots. Looks like he mentions here the heater board lights and lamps and says, "Can we get these lights repaired on the heater board area? Limited lights in the area make it hard to see in the area. Bubba Van."

Did I read that correctly?

**A. Yes.**

Q. Then you get an email December 12th, same day, by the end of the day, December 12th at 5:39 p.m. from Judson Wooters telling you, "Chelse, this has not gotten repaired yet."

Did you receive that email?

**A. Yes.**

Q. Okay. So throughout the entirety of his PIP, the 35 days of retraining, from October 20th when he asks for the light to be fixed, until up to December 12th, this light still isn't there, right?

**A. Yes.**

Q. So, when you saw that and you knew his test was coming up in three days and you saw, for the entirety of this time, that his accommodation hadn't been satisfied, did that cause you any concern?



**A. No.**

Q. Interesting. Why not?

**A. Because in the request for -- well, I'm sorry, let me go back. So, in the letter from his ophthalmologist, the ophthalmologist clearly stated it was to do with his vision at night. In the process of retraining, he only worked days and when his test happened, it was during the day.**

Q. Okay. Well, I mean, did you ever express that to Mr. Jones that, hey, look, I know you want this light fixed, but that's not what your ophthalmologist said. Your ophthalmologist didn't say you need that light above your keyboard fixed. He said just don't work at nights. Did you ever express to Mr. Warren that you weren't going to satisfy his accommodation request?

**A. No.**

Q. So, Mr. Warren is still believing that eventually that light's going to get put in place. Did you contact anybody, before December 15th, and tell them to stop the retest until the light's put in?

**A. No.**



Q. When the retest occurred on the 15th and then termination began to be -- the wheels began to be put in motion, did you ever raise any objection to anybody, did you ever notify anybody that maybe we should take a second look at this because we're going to terminate and we never provided the accommodation in the form of the light? Did you ever notify anybody higher than you about that?

**A. No.**

MS. WILLIAMS: I'm sorry. Objection to the extent it mischaracterizes the evidence.

You can answer. Go ahead.

BY MR. SUDDUTH:

Q. Go ahead. Did you ever notify anybody of the higher ups while the termination was going forward, that the entire time of retraining, the light had never been replaced?

**A. Can you ask that again? I'm sorry.**

Q. Did you ever notify anybody, once the termination wheels were in motion, right, so there's termination forms being filled out and documents being filled out to effectuate the termination, did you ever notify anybody in your



chain of command, April, anybody else, Bryan, anybody higher up in the plant, that the accommodation of the light had never been fulfilled prior to his termination?

**A. No.**

Q. I want to turn your attention back to 850, Bates label 850, because I am confused by something here. In your termination memo, and this is Exhibit 10, in your termination memo, you state, "During the PIP, Jones received additional classroom and one-on-one training. Despite the additional training, Jones was, again, unsuccessful on his third attempt at qualifying on the heater board on November 17th of 2022."

To be clear, at this time, his request for a lamp or his request for that light, that above board light above or overhead light, that had not been satisfied; is that right?

**A. Yes.**

Q. Okay. During that time period, he was unsuccessful in his training and then you state here, "Jones indicated at this time, the existence of a medical condition that may have

been relevant to his qualification attempts."
It's that sense that I want to focus on. You state here, "Jones indicated at this time, the existence of a medical condition." So I want to make sure I understand that sentence. Are you saying in that memo, that Jones indicated, for the first time, his medical struggles or his medical condition, meaning, it would have been sometime after November 17th of 2022?
**A. Can you repeat that?**
Q. Yeah. "During the PIP, Jones received additional classroom and one-on-one training. Despite the additional training, Jones was, again, unsuccessful on his third attempt at qualifying on the heater board on November 17th, 2022. Jones indicated at this time, the existence of a medical condition that may have been relevant to his qualification attempts."
I read that to say that what you're saying there in your memo is that for the first time that Jones ever notified the company of his medical condition, was sometime after November 17th, 2022. Is that what you're saying there?



**A. No.**
Q. No. That's not what you meant to say there?
**A. No.**
Q. Because that wouldn't be accurate, would it, to say that?
**A. No.**
Q. He notified the company before November 17th of his medical condition with his eyesight?
**A. Yes.**
Q. In fact, he notified the company as of September 19th of 2022 of his eyesight?
**A. Yes.**
Q. It's rather -- it may be a moot point because it's not in the document. I just want to confirm it's not in the document. In this termination memo, did you ever put anywhere in the memorandum, anything about whether or not the requested accommodation for an overhead light had been satisfied or not satisfied?
**A. No.**
Q. Okay. Do you think it would be relevant to the decision makers to know whether or not the accommodation that was requested had



been satisfied? And I want to be sure that my questions is clear here, okay? I'm not saying whether or not you agree with what Warren wanted, whether you think what Warren wanted was fair or not fair, whether you think his ophthalmologist would support what he wanted or not wanted.
What he requested, as of October 20th, was an overhead light to be fixed. That was the request. Whether right, wrong or indifferent, that was the request. Do you think it would be relevant to the decision makers that they know whether or not that requested accommodation had been satisfied at the time of termination?
**A. No.**
Q. Okay. And then you state here that, "As a result of his failure to qualify on the heater board after four attempts, everybody supports the recommendation to terminate." Is that right? Is that right?
**A. Can you clarify what you mean by everybody?**
Q. Yes, but I'm interested in -- yeah, I'm interested in that. Was there someone who



didn't support it, because I need to know who that is. Was there someone at the company who didn't support the termination?
**A. No.**
Q. Okay. So, everyone supported it?
**A. Yes.**
Q. Okay. So, then let me ask you this: If it wasn't relevant to let them know about the status of the -- did I lose you? It looks like you froze there for a second.
Okay. I think we're back. Okay. If it wasn't relevant to let the decision makers know about the status of the accommodation, if you didn't even think that that accommodation was necessary because the ophthalmologist only talked about it happening at night, every single time I've asked you about the accommodation, your answer to me has largely been no.
What was the point of the accommodation, then? What was the point of having Warren tell you what he thought he needed to get better? What was the point of even asking him?
**A. To engage in the interactive process to ensure that we were providing him the tools**

**that he needed to be successful in his training.**

Q. I agree with that. Would you agree with me that you didn't -- you did not provide the tools that he needed to be successful for his training?

**A. No.**

Q. You don't agree with that. The one tool the man requested was a light and you never provided the light and you disagree with me?

**A. Yes.**

Q. I want to turn your attention to -- this will be a multi-page exhibit which is going to be Bates labeled 745 to 748.

(Whereupon, Exhibit 11, Bates 745-748 was marked for identification.)

MS. WILLIAMS: Is this getting marked as an Exhibit, James?

MR. SUDDUTH: It is. This will be Exhibit 11.

MS. WILLIAMS: Did you ever -- did you mark the complaint as an exhibit?

MR. SUDDUTH: I never did, no.

MS. WILLIAMS: Okay.

BY MR. SUDDUTH:

Q. Now, you'll see that the Bates label



at the bottom, Ms. Morris, is 748 and as I scroll up, this is coming from April Danford, okay, to Lauren Rudloff. But the summary, okay, the summary, the reason why I marked Bates label 850, your termination recommendation memo and went over it with you, is because it looks like, and I'm not picking on April here. She's your boss. But it looks like she kind of copied and pasted your work and put it in this email. Because this summary here looks like exactly the same summary that you typed up in your termination recommendation memo.

And I just want to confirm that, that if you look at this email for me, please, does this summary here that Lauren is passing up the chain, I'm sorry, that April is passing up the chain to Lauren and other folks, does this appear to be the same summary or substantially the same summary is what I just showed you over in Exhibit 10?

**A. Are you able to scroll down so I can see the entirety of it?**

Q. Of course.

**A. Scroll up. Yes.**

Q. Okay. So that summary gets passed on



to Lauren Rudloff. She then forwards this to Jacob McAlister. Who is Jacob McAlister, if you know?

**A. He, at the time, was our plant manager's manager. I'm not sure what his title was at the time.**

Q. Okay. And she notes here that it's his failure to qualify on the heater board as required when she sends this email to Jacob. And Jacob appears to forward this to Bryan Canfield. Do you know who Bryan Canfield is?

**A. Yes.**

Q. Who is that?

**A. At the time, he was the SVP of manufacturing.**

Q. I want you to look with me at this email from Jacob to Bryan. Here's what Jacob relays to Bryan, and you'll see it here in the middle of the email.

"Over the past several months, Warren Jones has had four attempts with one-on-one training associated with a PIP to qualify on the furnace board post. The fourth attempt came after determining a potential medical issue. However, he failed all four



times. See additional information from April below."

That's not right, is it, what Jacob is reading your memo to read, that the fourth attempt is the only one that came after determining a medical issue, that he's not accurate there, is he?

MS. WILLIAMS: Objection; calls for speculation as to the meaning of Jacob's words, but you can answer the best you can.

**THE WITNESS: Can you repeat that question?**

BY MR. SUDDUTH:

Q. Yeah. Do you remember whenever I showed you your memo at 850, and I'll scroll down to it, where it says, "Jones indicated, at this time, the existence of a medical condition that may have been relevant to his qualification attempts."

That's what I'm referencing there.

**A. Yes.**

Q. Right. And I thought that we agreed that that statement -- that's not true. He didn't indicate it after November 17th of '22.

Page 86

He indicated it well before that and I thought we agreed on that?
**A. Yes.**
Q. Okay. So, Jacob is sending an email now, the higher-ups are discussing termination. That's why I'm asking you about this. Because Jacob is telling Bryan that it was only -- the fourth attempt came after a potential medical issue, not the other ones. The fourth attempt came after determining a potential medical issue. That statement by Jacob -- I'm not asking you to speculate about his mental intent -- that statement by Jacob is incorrect, isn't it?
MS. WILLIAMS: Same objection as to speculation, but you can answer.
**THE WITNESS: No, it's not incorrect.**
BY MR. SUDDUTH:
Q. Okay. Help me out. How is it not incorrect?
**A. Per our HR training guideline that was quoted in the termination recommendation, we typically only give employees three times to qualify. So he was given an additional time attempt.**

Page 87

Q. Okay. I mean, I appreciate that, but respectfully, that wasn't my question. My question was, "The fourth attempt came after determining a potential medical issue."
So I'm going to go back now and I'm not going to even assume that we had the conversation about Exhibit 10. I thought we agreed on this but I'm not even going to assume that anymore.
Did the company find out about his medical issues for the first time after November 17, 2022? Is that the first time?
**A. No.**
Q. Okay. So there were more attempts than just the fourth attempt. There were more attempts than that where the company knew of the medical issue. That's what I'm driving at. That's my question. Not about the policy about three is the typical number. What I'm talking about here is this comment here, "The fourth attempt came after determining a potential medical issue." That is objectively not a true statement.
MS. WILLIAMS: Objection; mischaracterizes the document, calls for

Page 88

speculation.
You can still answer.
**THE WITNESS: I don't agree with what you're saying, so I'm not sure how to answer that.**
BY MR. SUDDUTH:
Q. Why do you not agree with what I'm saying?
**A. Because had Warren not had asked for his accommodation, he would have been terminated after his third attempt.**
Q. Right. An accommodation that he asked for. Specifically, he started the process in September but he asked for it specifically October 20th of 2022. So, he asked for it prior to his third attempt. Can we agree on that?
**A. Yes.**
Q. Let me ask it this way, then. Is there any particular reason why you never recommended to the company or to anyone else, to April, to anybody, that his testing be delayed until his accommodation be put in place and then he be tested?
**A. So, the specific reason I never followed up with Warren was because in his email**

Page 89

**on October 20th, all he needed was the light to be fixed and everything else would work itself fine. And then at the same time, he was utilizing his light which was sufficient for the time being.**
Q. Right. And we've gone over that. I don't want to rehash that with you, you know, the overhead light versus the lamp. We've been through that.
What I'm asking is, and I guess I'm just trying to clarify, is that I know you're not going to agree with me, Ms. Morris, I know you won't and that's okay. I just want to clarify what you did and what you didn't do, okay, because I know we don't agree.
You never told anybody or recommended to anybody, did you, that they wait until the overhead light is fixed before they test him again? Never said that?
**A. No, I did not.**
Q. All right. Never brought it up to anybody's attention that the requested accommodation was not done, at any of the testing attempts, the lighting, as requested, had not been fixed. You never brought that up

to anybody, right?
A. **Right.**
Q. And, you know, up here where Jacob says, "This is the first of two termination requests coming your way regarding operators at Port Arthur. I realize this is not ideal, considering how we are working to grow this population, but in both cases, the individuals have been given ample opportunities to qualify and cannot pass even after multiple attempts."
His comment there, "I realize this is not ideal, considering how we are working to grow this population," do you have any reason to disagree with his statement right there? Any evidence, anything to dispute what he's saying there, that they're trying to grow that population?
A. **No.**
Q. Okay. And then Bryan seems to echo that. Bryan sends an email back to Jacob, "I support the recommendation. I know we need personnel, but we need quality over quantity."
Any reason to disagree with what Bryan is saying there, his comment about, "I know we need personnel, but we need quality over



quantity"?
A. **No.**
Q. Okay. And then it looks like it comes back down the chain after Bryan and Jacob approve it. You know, Lauren is told of the approval and then Lauren tells April of the approval to terminate.
MR. SUDDUTH: And again, Madam Court Reporter, that chain we just went through is 745 to 748 or Exhibit 11.
(Whereupon, Exhibit 12, Bates 744 was marked for identification.)
BY MR. SUDDUTH:
Q. Now, I want to ask you about -- I'm going to turn your attention to 744. This will be Exhibit 12. Tell me about the process with Dr. Stanton and Jeanie Johnson. As I understand it, it's part of the reasonable accommodation process. You guys -- this is coming from Ms. Danford, you guys had the company doctor take a look at Mr. Jones; is that correct?
A. **That is correct.**
Q. Okay. What did -- it's my understanding, also, that Dr. Stanton requested, as -- he spoke with Mr. Jones and requested,



after he spoke to Mr. Jones, a vision acuity or visual acuity test; is that accurate?
A. **Yes.**
Q. And it looks like the visual acuity test here in Exhibit 12, this is Jeanie Johnson sending this to you. "Chelse, here is the visual acuity for Warren Jones that you requested, performed today, 12/12 of '22."
Interestingly, you're getting this visual acuity test back the exact same day that you're following up asking about the lights and whether or not they had been fixed. Is that coincidental or was it maybe this that triggered you to send the email following up about the lights?
A. **I can't recall.**
Q. Okay. Did you have any particular -- I mean, I know, I'm not an ophthalmologist, you're not, at least I don't believe you are, from the questions I've asked you today. I mean, did you have any particular understanding from this email? Did you do anything with it or just forward it on?
A. **I believe I asked Jeanie a follow up.**
Q. Okay. Well, let's -- I don't see that



I see you just forwarding it to Dr. Stanton. "Below are the results for Warren Jones' visual acuity exam. Please let us know of your thoughts or suggestions on how we should proceed."
Do you recall what you asked Ms. Johnson as a followup?
A. **I believe I asked her if this -- if those showed any differences from his prior eye exams.**
Q. Did you ask her that over email or did you ask her that in person or over the phone?
A. **I believe it was over email.**
Q. Do you recall how she responded?
A. **I believe she responded with there are no changes.**
Q. So at this point in time, as of December 12th, the company doctor has spoken to Warren Jones directly. He asked for a vision acuity test to be done and that was done. And than now you forwarded all of that back to Dr. Stanton to get his suggestions on how to proceed. What did he tell you as to how to proceed? What were his thoughts or his suggestions on how to proceed?

Page 94

**A. I can't recall.**
Q. He didn't send an email back? A phone call? Nothing?
**A. We probably had an email or a phone call regarding, but at this moment, I cannot recall what was stated in either the email or a phone call.**
Q. Did Dr. Stanton ever give you any suggestions or thoughts? I mean, aside from his recommendation to do a vision acuity exam, that's just a diagnostic test to see what his eyesight actually is. Did he ever give you any recommendations, that you recall, on how to help with Warren's eyesight?
**A. I believe he followed up in an email format with a statement maybe, but I can't recall what that email says. But I do remember an email from Dr. Stanton.**
Q. Let's take a look at Bates label 809 to 810 and make this Exhibit 13.
(Whereupon, Exhibit 13, Bates 809-810 was marked for identification.)
MR. SUDDUTH: Excuse me if I said 808. I meant 809 to 810.
BY MR. SUDDUTH:

Page 95

Q. It appears here that you send, on December 5th, to Dr. Stanton, an email saying, "Dr. Stanton, thank you for the time to join Beth and I in our meeting this afternoon. I've attached the letter from Warren's ophthalmologist and provided his contact information as well. Please let me know if you have any questions or any further information."
And he responds to you the next day, saying, "Hi, Chelse, I had a long conversation with Mr. Jones this afternoon and I think I have a better understanding of his overall situation and what solutions may or may not be feasible. If you want to give me a call, we can discuss or if you prefer, we can do another Teams meeting with Beth. Just let me know. Regards."
Do you recall receiving that email?
**A. Yes.**
Q. Now, this is before the vision acuity test, but both the email I showed you December 12th and the email here, Dr. Stanton, sort of, refers to suggestions that he may have but he n ever actually outlines them in these emails. Do

Page 96

you know what suggestions he had here? Did you guys have a call to discuss? Did you have another Teams meeting? What did he tell you here?
**A. I can't recall that meeting, but we did discuss, at that time, other devices that could be used.**
Q. You discussed other devices with Dr. Stanton that could be used?
**A. Yes.**
Q. What other devices?
**A. We discussed utilizing possibly a magnifier and some other apparatuses that could help him see.**
Q. So, why do you maintain the position that Warren's lamp from the house was sufficient for him, if even the company's doctor is talking with you about alternatives and magnifying glasses and other things such as this? Why did you maintain your position that the lamp was sufficient?
**A. We have to explore other options.**
Q. You have to explore other options because despite the lamp, he was still having vision difficulties, wasn't he?

Page 97

**A. Well, although he stated in his email about all he needed was the lamp, I know we don't agree on that, but it was also left up to Mr. Jones to come back to us with something or say something, but to come back with a note or something from his doctor stating what other apparatuses that we could have provided him. Which again, he responded the way he did on the 20th, that all he needed was the light. But again, we still explored other options.**
Q. Okay. Well, I just -- I want the record to be clear because, it -- you know, we don't -- I can just see the problems coming down the train track on this. I don't want lamp and light to get confused because they're very close. So we're going to go back to 741 and clarify this.
This is 741 which is Bates labeled Exhibit 6. To be clear for the record, Warren Jones says, "Good morning. Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the keyboard. Everything else will work out fine. The only light that works properly is the one over the computer. The

Page 98

other two seem to be broken. Thanks."
To be clear, for the record, Warren does not say his lamp from the house is sufficient. He says he needs the lighting over the heater board console, something Chevron would have to fix. Not his personal lamp but the lighting offer the heater board console.
I just want to agree on what the set of facts are. Can we agree that he's not talking about his lamp here?
**A. Yes.**
Q. Okay. Now, you said that he needs to -- he needed to get us some kind of additional alternatives. It's his duty to work with his employer. Did you ever have any subsequent followup with Dr. Hart, the ophthalmologist. Now, I know you got the letter which he sent you back in September, but did you ever have any additional followup from him?
**A. No.**
Q. Did you ever suggest to Dr. Stanton or ask Dr. Stanton to speak directly with Dr. Hart, so the two doctors get on the same page about whatever the issue was?
**A. Not that I can recall.**

Page 99

Q. What you told me earlier was you were trying to explore additional, you know, alternatives and that sort of thing, still trying to look for other opportunities and alternatives. I don't see any email in here from you guys so I just want to see if maybe it was a verbal conversation or something like that.
Did you ever have a verbal conversation with Mr. Jones where you said something to the effect of, hey, the lighting above the console, don't worry about that for now. We need other alternatives. So go back to Dr. Hart and get us some other alternatives. Was there ever any discussion like that, along those lines with Mr. Jones?
**A. No.**
Q. Okay.
MR. SUDDUTH: What I'm going to do, Ms. Morris, it's 3:15. I'm going to take a brief break, review my notes, but I think I'm just about done with my questions but I want to review my notes. So let's take a break and we'll come back. I'd like to say 3:20 but I may be a few minutes longer than

Page 100

that. But let's shoot for 3:20, five minutes.
MS. WILLIAMS: All right.
THE VIDEOGRAPHER: All right. We are now off the record, the time is 3:15 p.m. Central Time.
(Recess was taken from 3:15 p.m. to 3:20 p.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 3:20 p.m. Central Time.
BY MR. SUDDUTH:
Q. All right. Back on the record after a brief break. Thanks for your patience, Ms. Morris.
Yes, I did want to just close the loop back on this issue I was talking to you about, about the acuity test with Dr. Stanton. And I'll pull that back up for you at Bates label 744. It's already been marked as an exhibit.
So we talked about this. This is at 744 and you send to Dr. Stanton, "Below were the results for Warren Jones' visual acuity exam. Please let us know of your thoughts or suggestions on how we should proceed."

Page 101

And I just want to refresh my memory about this. Did you say that you think you spoke to him? You don't recall if you spoke to him? You did not speak to him after this?
**A. I can't recall if I either spoke with him or if there was another email.**
Q. Okay. And the reason I ask about this is because of the timeline here. If you see that you sent this email to Dr. Stanton at 1:04 p.m. on December 12th of 2022. About four hours later at 5:05 p.m. the same day, you're sending an email to Judson saying, "Judd, do you know if the lighting above the heater board has been fixed? If you can, can you provide a work order? This was put in."
So about four hours after you get the vision acuity results and you email Dr. Stanton asking for suggestions, you're emailing Judson to check on the lights. And I'm trying to see if any of this is jogging your recollection as to anything that Stanton may have told you, said to you, recommended to you, any of his findings? Because I'm not seeing an email after your email to him on December 12th, were his thoughts back.

Page 102

If I'm missing it, I could be missing it and I apologize, but I'm not seeing an email. So I'm trying to find out if there was a conversation with some suggestions.
**A. At this time, I can't recall the conversation, if we had one.**
Q. And Dr. Stanton is no longer with and is no longer contracted by Chevron; is that right?
**A. That is correct.**
Q. And just to, I guess, verify your role, I think you were in the termination phone call that happened with Mr. Jones; is that right?
**A. That is correct.**
Q. Okay. To be clear, though, you did not have any decision making over whether or not to terminate Mr. Jones; is that right?
**A. That is correct.**
Q. Did you ever make -- well, actually, you did. You made the recommendation for termination. That termination recommendation memo was yours; is that correct?
**A. No.**
Q. Oh, I thought -- let's go back to the

Page 103

share screen. I thought 850, Bates label 850 was yours. Let me see. 850, termination recommendation memo prepared by Chelse Cisneros. I thought that was you.
**A. Yes.**
Q. Okay. So, you prepared the termination recommendation memo?
**A. I did.**
Q. Was it your decision by yourself to recommend termination or was this at someone else's prompting?
**A. It was not my decision.**
Q. Okay. Who instructed you, then, to prepare the termination recommendation memo?
**A. So the recommendation was made by the operations manager.**
Q. Which was who?
**A. Go ahead.**
Q. Sorry, which was who?
**A. Bryan Kubsch.**
Q. Bryan made the recommendation for the termination recommendation memo?
**A. Correct.**
Q. Okay. So, once Bryan asked you or told you to prepare the termination

Page 104

recommendation, that's when you prepared this document that we're looking at here, Bates labeled at 850?
**A. Correct.**
Q. Okay. Were you part or privy to any of the conversations with Bryan when the decision to terminate was being made?
**A. I was involved in some.**
Q. Well, tell me about that, because that's what I'm trying to figure out is the universe of what your knowledge is on this case. So, if you were in the room or on the phone call or on the Teams meeting whenever terminating Mr. Jones was being discussed, I want to know about that. So how many conversations were there about termination that you were part of?
**A. I was a part of multiple conversations.**
Q. About termination of Mr. Jones?
**A. Correct.**
Q. How many?
**A. Multiple.**
Q. Two? Ten? Twenty?
**A. I can't put a specific number to it. There was multiple conversations that happened.**

Page 105

Q. Okay. With whom?
**A. So, again, there is no sole decision maker on our termination, so we all get together as a collective to determine if we are going to terminate. So again, the recommendation comes from our operations manager, but then it also has to be reviewed and supported by our plant manager and our general manager manufacturing up to the SVP as you showed in the previous email.**
Q. Right. So there is no sole decision-maker?
**A. Correct.**
Q. Okay. Who did you have discussions with then? I mean, you had verbal discussions with people about termination of Mr. Jones. You've told me there were multiple conversations but you don't recall exactly how many. Were these conversations in person? Over the phone? By Teams?
**A. In person. By Teams.**
Q. Okay. Who was on these calls, or who was in person and who was on Teams?
**A. I can't recollect that at this moment.**
Q. Do you recall when these different meetings were held?

**A. I can recall that they happened in December of 2022, but I can't recall specific dates.**
Q. Okay. So, multiple meetings in the December, 2022 time frame was either in person or by Teams. You don't recall who was part of those conversations. What was discussed?
**A. I can't recall specifics at this time, but again, we were discussing the recommendation of the termination of Mr. Jones.**
Q. And you don't recall any specific said by anybody?
**A. I do not.**
Q. And during these different multiple meetings, were you ever asked for your recommendation, you know what you thought needed to happen with Mr. Jones?
**A. No.**
Q. Did you ever volunteer any information into the meeting so maybe you weren't asked, but you interjected something and you said something in the meeting about your take or your position on things?
**A. No.**
Q. Did anyone in the meeting, meetings, excuse me, did anyone in the meetings ever ask you about the status of the accommodation process? And it could have been in any form, fashion or substance. You know, hey, Chelse, how did the accommodation go, hey, Chelse, what happened with the accommodation, see that he brought that up, you know, what's going on with that, anything like that?



**A. Not that I can recall.**
Q. Okay. And you didn't volunteer anything about it either?
**A. Not that I can remember.**
Q. And in that discussion, was there -- or yes, in those meetings, was there ever any discussion that you can recall about the idea of Mr. Jones being allowed to work as an outside operator? Was that ever bounced around?
**A. No.**
MR. SUDDUTH: Okay. All right, Ms. Morris, I think that's all I have for you. Thank you for your time today. Ms. Williams may have questions for you, though so I'll defer to her.
MS. WILLIAMS: I do not. We will reserve for trial.



MR. SUDDUTH: All right. Then in that case, Ms. Morris, you are, in fact, done because I have no followup based upon that. So reading and signing?
MS. WILLIAMS: Yes, please.
THE VIDEOGRAPHER: Okay. All right. Thank you, counsel. And again, just wanted to ask about video or transcript orders before we go off the record. Mr. Sudduth, we have your standing order for --
MR. SUDDUTH: As far as ordering the transcript or as far as ordering the depo, I'll get a video and a transcript and that will be fine for me. Thank you.
THE VIDEOGRAPHER: Thank you, sir. Ms. Williams?
MS. WILLIAMS: Yeah. We will follow up as I indicated earlier, just to confirm.
THE VIDEOGRAPHER: Perfect. Thank you.
MS. WILLIAMS: Thank you.
THE VIDEOGRAPHER: All right. If we could just stand by for the official readout.
This concludes the deposition of Chelse Morris for Warren F. Jones versus Chevron Phillips Chemical Company, LP. We are now off the record. The time is 3:31 p.m. Central Time.



(Witness excused.)
(Thereupon, the deposition was concluded at 3:31 p.m.)

CERTIFICATE OF OATH

THE STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that CHELSE MORRIS personally appeared before me and was duly sworn.

I further certify, that pursuant to FRCP Rule 30(e)(1), that the signature of the deponent CHELSE MORRIS was requested by the deponent or a party before the completion of the deposition.

WITNESS my hand and official seal this 12th day of September, 2025.

MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires: 5/22/2029
My Commission No.: HH655949



C E R T I F I C A T E

THE STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, MELANIE STINSON-KONSTANTINIDIS, RPR, Registered Professional Reporter, State of Florida at large, do hereby certify that I was authorized to and did report said deposition in stenotype; and that the foregoing pages, numbered from 1 to 109, inclusive, are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of September, 2025.

MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires: 5/22/2029
My Commission No.: HH655949



DEPOSITION ERRATA SHEET

JONES
vs.
CHEVRON PHILLIPS

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding I offer these changes as if still under oath.

Signed on the ______ day of
____________, 20___.

___________________________________

CHELSE MORRIS



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
CHELSE MORRIS

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

CHELSE MORRIS



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

CHELSE MORRIS

**0**

**05** 34:12

**1**

**1** 34:10,13 44:11
**10** 71:7,9 77:9 83:20 87:7
**10-4** 38:9
**10/19** 55:14
**10/3** 55:12
**11** 82:14,19 91:10
**11th** 47:15 48:15,19 51:3
**12** 91:11,16 92:5
**12/12** 92:8
**12/22** 71:17
**12/27** 71:18
**12th** 69:15,21 74:9,10,18 93:18 95:23 101:10,24
**13** 94:20,21
**14th** 38:2
**1544** 35:4,10,14,17 36:19, 22
**15th** 72:10,14,17 75:23 76:1
**17** 87:12
**17th** 77:14 78:10,16,24 79:9 85:25
**19** 46:9 52:8,9
**19th** 41:8 45:19,24 46:13 50:8,11 60:15 79:13
**1:00** 28:14
**1:02** 5:2
**1:04** 101:9
**1:24-cv-00350** 5:10
**1:34** 33:4,6
**1:37** 33:6,8

**2**

**2** 34:11,15 44:1,9,11
**2022** 12:14 13:16,19 17:7 21:17,19 44:22 47:2,15 48:15,23 50:8 51:3 57:23 60:16,18 61:1 69:15,21 70:10 72:10 77:15 78:10, 17,24 79:13 87:12 88:15 101:10 106:2,5
**2024** 13:14 19:10,19
**2025** 5:3 28:14
**20th** 50:15 51:6 52:10,11, 14,16 57:18,23 58:2 67:19 74:17 80:9 88:15 89:1 97:9
**22** 13:3,21,24 14:1 19:6 21:21 31:13 41:8 45:24 46:13 47:1 61:6 71:2,17 85:25 92:8
**22nd** 48:23
**23** 13:20
**24** 16:25 19:6,8,9,13,16 24:14,16
**25** 19:9 23:13
**27th** 70:10
**2:18** 66:24 67:4,6
**2:30** 66:25
**2:32** 67:6,8

**3**

**3** 40:25 41:2 43:20,23 44:3, 8
**30** 49:8,15,22 60:8
**31** 71:2
**315** 5:13
**32** 60:11
**33** 60:17
**34** 61:16
**35** 49:2 61:24 74:16
**36** 62:14,16
**3:01** 50:8
**3:15** 99:20 100:5,7
**3:20** 99:25 100:1,7,9
**3:31** 109:3,7
**3rd** 5:3 28:13 45:10 47:1,2 53:13 54:2,5 56:3 60:17 61:1,6 63:8

**4**

**4** 44:16,18 45:21

**5**

**5** 45:22 46:3,4
**5:05** 101:11
**5:39** 74:11
**5th** 44:21 95:2

**6**

**6** 50:1,2,5 54:8,10 97:19

**7**

**7** 55:5,6
**705** 34:12,15,21 44:11
**706** 41:1,2,5 43:21 44:4,8
**709** 44:8
**712** 43:16 44:17,18,24
**739** 46:3
**739-740** 46:4
**739to** 45:23
**740** 45:23 46:3
**741** 50:2,6 54:8,9,16,21 57:13,16 97:16,18
**742** 54:9,17,18,21
**744** 91:11,15 100:19,22
**745** 82:13 91:10
**745-748** 82:14
**748** 82:13 83:1 91:10

**8**

**8** 69:22,24
**8/11** 72:19
**8/12** 72:20
**80** 14:24,25
**807** 5:14
**808** 94:23
**809** 94:19,24
**809-810** 94:21
**810** 94:20,24
**811** 68:12,18 69:18,23
**811-812** 69:24
**812** 68:12,16,17 69:23
**814** 55:2,5,6 58:16
**819052** 6:4
**834** 70:5
**834-835** 70:1
**835** 70:5,6
**850** 71:7,8,9,12 77:7 83:5 85:15 103:1,2 104:3

**9**

**9** 70:1,4,7
**9/80** 14:13,15,17,18,23
**90015** 5:15
**9500** 10:10
**9th** 5:13

**A**

**Aaron** 25:14 26:6,8,11
**ability** 36:12,15
**accepted** 19:1
**accommodate** 65:13

# Exhibit G

# Deposition Transcript

Case Number: 1:24-cv-00350
Date: September 3, 2025

In the matter of:

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

# APRILE DANFORD

CERTIFIED COPY

Reported by:
MELANIE STINSON-KONSTANTINIDIS

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CIVIL ACTION NO.1:24-cv-00350

WARREN F. JONES,

Plaintiff,

-vs-

CHEVRON PHILLIPS CHEMICAL COMPANY LP,

Defendant.

---

VIDEOTAPED TELECONFERENCE

DEPOSITION OF APRILE DANFORD

September 3, 2025
STENO
Aventura, Florida 33160
9:06 a.m. - 11:23 a.m.

Melanie Stinson-Konstantinidis

Page 2

A P P E A R A N C E S:

On behalf of the Plaintiff:
JAMES E. SUDDUTH, III, ESQUIRE
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana
james@saa.legal

On behalf of the Defendant:
MARLENE C. WILLIAMS, ESQUIRE
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
500 Dallas Street, Suite 2100
Houston, Texas 77002
lesly.alvarado@ogletreedeakins.com
marlene.williams@ogletree.com

PRESENT:
JASON PERNICIARO, VIDEOGRAPHER

Page 3

W-I-T-N-E-S-S

| | |
|---|---|
| APRILE DANFORD | 6 |
| DIRECT EXAMINATION BY MR. SUDDUTH | 6 |

Page 4

E X H I B I T S

EXHIBITS RETAINED BY COUNSEL

| | |
|---|---|
| Exhibit 1, Deposition Notice | 58 |
| Exhibit 2, Bates 809-810 | 73 |
| Exhibit 3, Bates 811-812 | 75 |
| Exhibit 4 Bates 122-123 | 79 |
| Exhibit 5, Bates 712 | 85 |
| Exhibit 6, Bates 121 | 92 |

Page 5

THE VIDEOGRAPHER: Good morning. We are on the record at 9:06 a.m. Central Time on September 3, 2025 to begin the deposition of Aprile Danford in the matter of Warren F. Jones versus Chevron Phillips Chemical Company L.P.

The venue of this case is in the United States District Court for the Eastern District of Texas. The case number is 124 -- cv -- 00350.

This deposition is taking place via Zoom. The legal videographer is Jason Perniciaro, here on behalf of Steno, whose business address is 315 West 9th Street, suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent.

MR. SUDDUTH: Yes. James Sudduth on behalf of the plaintiff, Mr. Warren Jones.

MS. WILLIAMS: Marlene Williams, on behalf of the defendant, Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, counsels.

Will the court reporter please

Page 6

identify yourself and swear in the witness.
THE COURT REPORTER: Melanie Stinson-Konstantinidis. I'm court reporting from Aventura, Florida. My NCRA number, which is the National Court Reporters Association number, is 819052.

P R O C E E D I N G S

- - -

Deposition taken before MELANIE STINSON-KONSTANTINIDIS, RPR, Registered Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause:
Whereupon,
APRILE DANFORD,
having been sworn in, testified as follows:

DIRECT EXAMINATION

BY MR. SUDDUTH:
Q. Ms. Danford, good morning.
**A. Good morning.**
Q. I know we haven't met before. My name is James Sudduth and I'm representing Mr. Jones, so it's nice to meet you.
Let me start by asking you, have you ever been deposed before, meaning a deposition like this?

Page 7

**A. Yes, on a personal effect, not through work.**
Q. Personal. Okay. And how long ago was that?
**A. Over 15 years ago.**
Q. Okay, it's been a minute. So, I imagine 15 years ago the deposition probably wasn't by Zoom, it probably was in person?
**A. They came to my house, it was on behalf of a friend.**
Q. Okay, curbside service. So, there's some things I want to go over with you that could be unique to Zoom and there's some things that are not unique. Just some reminders of things that were probably the same 15 years ago.
But the first is something I do with everybody, which is to remind you that you are under oath. So, I think it can seem somewhat informal, you know. You're wherever you are located, I'm in a conference room. We're not in a courtroom, we don't have a judge or a jury sitting with us, we're on a video conference call, so it can seem a little bit informal. But the oath that you just took is the same oath as if we were in a court of law

Page 8

and we had a judge sitting here with us. And, so all the same obligations to tell the truth, all the same penalties of perjury if you do not, all of those are attached here, like they would in a courtroom. Do you understand that?
**A. I do.**
Q. Are you okay with that?
**A. Yes.**
Q. Very good. The next thing is, and you've done a good job of this so far, is just keep verbalizing your answers. You'll find it really common, especially in conversation to say things like uh-huh or uh-uh when you're answering questions, you know, or nod your head one way or another.
That's perfectly fine and natural in conversation, but the problem in a deposition is Madam Court Reporter is taking down into a written format everything that you say. And it's really hard to get accurate the uh-huhs and uh-uhs. So whatever your answer is, yes, no, maybe, whatever your answer is, please verbalize that answer out loud, okay?
**A. Okay.**
Q. Thank you very much. The next is very

Page 9

important for Zoom purposes. Talking over each other, it's really common in conversation for people to talk over each other, I'll give you an example. I can be asking you a question, you'll sort of sense where my question is going. And so you'll want to answer it before I'm done asking it.
Well, again, that's perfectly fine in conversation, but the problem here is, and especially more problematic by Zoom, is when we're talking over each other like that, Zoom will actually cut off one of the speakers sometimes, so we won't hear anything you have to say at all. It's also very difficult for the court reporter to get that down.
So, if you would please, even though you know where I'm headed, let me finish that answer or the question all the way out to its end before you start to answer, okay?
**A. Okay.**
Q. Thank you so much. Breaks, I think is the last thing I'll cover with you, then we'll jump in. You're welcome to take a break, you know, anytime you wish. This is not a marathon, all right. So if you need water or a bathroom

Page 10

break, something like that, you just let me know and I'll accommodate that. My only request of you is, if I have a question that's pending on the table for you to answer, please answer that question before you go take any break that you desire, all right?
**A. Okay.**
Q. Very good. Do you have any logistical questions of me before I jump into this?
**A. No.**
Q. Very good then. Ms. Danford, your full legal name and address for the record, please?
**A. Aprile Askew Danford. And my -- are you asking home address?**
Q. You can give me a business address if you wish.
**A. I'm not exactly sure of the business address.**
Q. Okay, all right. Well, then we will skip over that unless you're comfortable giving a home address. I don't think it's necessary for purposes of this, so we'll skip over that for now.
Ms. Danford, since this is my

Page 11

only time to kind of get to know you and ask questions of you outside of a trial, let me get some background on you.
I assume that you graduated from high school?
**A. Yes.**
Q. Did you go on after that to any sort of trade school, vocational school, community college or college?
**A. Yes.**
Q. Where to?
**A. I went to Wharton County Junior College and then University of Houston, downtown.**
Q. The community college, did you get any sort of degree from there?
**A. Yes.**
Q. What degree was that?
**A. Associates of general studies, I believe is what they call it.**
Q. And then to the University of Houston. Well, first, let me ask this: Did you go straight from Wharton County straight into the University of Houston, or did you have a break, through where you worked in between?

Page 12

**A. I went straight through, but I actually worked the whole time I went to college.**
Q. At the University of Houston, did you finish there or did you obtain any sort of degree from there?
**A. Yes.**
Q. What was that in?
**A. It's a Bachelor's of Business Administration.**
Q. After you obtained that, did you go in to obtain any sort of Masters or any further education?
**A. No.**
Q. You said you were working throughout this time that you were going to school, where were you working at?
**A. Phillips 66 and then Chevron Phillips after the merger.**
Q. So, how long have you been with Philips 66, now Chevron Phillips?
**A. I just got a loud beep on my end, can you repeat the question?**
Q. Sure. We can still hear you okay. So you're still coming through okay. If you hear

Page 13

anything else like that or if you lose the connection or something or you feel like you're losing connection let us know. But you seem to still be coming through okay.
**A. Okay.**
Q. I'd asked you how long because you said you were working for Phillips 66 at the time you were going through school. So I asked you how long had you been with Phillip 66 and/or Chevron Phillips?
**A. Thirty-four years.**
Q. So, fair to say that the majority, if not all of your professional working career has been with them?
**A. Yes.**
Q. In fact, have you had any jobs aside from that, like odd jobs where you were a teenager or something, you know, working at a fast-food place or something like that? Any, you know, professional jobs that you had outside of Chevron Phillips?
**A. No.**
Q. When you started with Phillips 66, I know right now I'm going to be speaking with you a lot today about HR and your role with HR, but

have you always been with HR with Phillips 66?
**A. No.**
Q. When you started with the company what was your role with them?
**A. Actually, I started through high school, so I was a vocational office student.**
Q. I can honestly say I have no idea what that is. What's a vocational office student, what is that?
**A. I worked kind of as an admin assistant through high school. It was a co-op program.**
Q. So, they got you early, they got you in high school. You didn't have the odd jobs with the fast-food, did you, you went straight to Phillips 66.
So you did that first and then what was your next job after that?
**A. When I hired on permanently with the company, it was as an administrative assistant in the operations department.**
Q. How many different roles or titles or positions do you think you've had over your tenure there?
**A. Probably five.**
Q. Let's walk you through those. So we



know the first one is the admin assistant in the operations department. How long were you in that role?
**A. I would say about nine years.**
Q. Okay.
**A. Counting when I was in high school?**
Q. I'm sorry, those nine years were counting or not counting?
**A. Counting.**
Q. Then what was your next position?
**A. Payroll administrator.**
Q. How long did you do that?
**A. For about three and a half to four years.**
Q. Let me ask you this: This move from admin assistant to payroll administrator, was that something -- explain to me how that came about. Did you request it, did you see a job posting about it, did a supervisor come to you and suggest that you should go apply for it; tell me about that?
**A. It was during the joint venture of when Chevron Phillips or whenever that came about, when Phillips and Chevron merged and I was asked if I wanted to move into the payroll**



**department.**
Q. Obviously, you accepted or you said yes because you went into that role?
**A. Yes.**
Q. Was there an increase in pay for you?
**A. I don't recall.**
Q. Okay.
**A. I believe it was probably like a lateral.**
Q. Lateral move, okay. And after the payroll administrator what was next?
**A. HR assistant.**
Q. For how long?
**A. About one year.**
Q. What led you to move from payroll administrator to HR assistant?
**A. I was close to finishing my degree and they wanted me to see different aspects of HR before I moved into my next role.**
Q. Finishing your degree at University of Houston?
**A. Correct.**
Q. As an HR assistant, that one year there, what exactly were your duties as an HR assistant?



**A. I was rolling out policies. I was interviewing employees, doing hiring, running some reports. And again, I was trying to learn more of the facets of HR to prepare me when I graduated from college.**
Q. So, in that role it sounds like if you were interviewing employees, were you doing onboarding of employees?
**A. Yes.**
Q. What about from a disciplinary standpoint, were you doing any discipline, coaching, write-ups, things of this nature?
**A. No, I did not actually do discipline in that role.**
Q. What about in that role in terms of investigating, you know. So somebody comes into HR, makes a complaint about harassment or discrimination or retaliation or something like that, some kind of personnel conflict that requires investigating, talking to witnesses, things of this nature, did that role encompass that or no?
**A. I don't recall. This was over 20 years ago.**
Q. So you did that for one year. What

was the next position?
A. **Human resources business partner.**
Q. And how long were you in that role?
A. **Thirteen years.**
Q. Then from human resources business partner to human resources manager?
A. **Correct.**
Q. And that's where you are now?
A. **Yes. My title just changed on Monday, but yes.**
Q. Okay, let's see. HR manager. Let's start with: What year do you think that you became HR manager?
A. **2018.**
Q. 2018. So, 2018 until Monday you were the HR manager. What are you now?
A. **Senior HR business partner.**
Q. So, help me with the differences in titles, roles, duties. If we go from HR assistant to HR business partner, HR manager and now HR senior or, excuse me, senior HR business partner, let's just take this from the start.
HR business partner, what exactly were the duties and contours of that role?
A. **That would have been dealing with**



**different employee relations, labor relations. it would have been all of the different facets of an employee's life cycle with the company. Working through from hiring to any types of investigations, development, promotions discipline, into separations.**
Q. So it was the full life cycle?
Is that a "yes?"
A. **Yes.**
Q. So, in that role then, what I described earlier when I was asking you about an HR assistant, it sounds like in the business partner role, you did do the investigative side. Meaning, talking to witnesses, doing the employee-relations side of things when there's a complaint about harassment or discrimination, something like that; is that fair to say?
A. **Yes.**
Q. You also said that you dealt with discipline. Describe that for me from a business partner standpoint. If a supervisor wants to discipline his or her subordinate, do they do that themselves or do they have to run that through HR, through you guys, and you do the discipline?



A. **A supervisor would consult with HR. We would confirm that that was a reasonable discipline level maybe they were wanting to administer. And then depending upon the level and the supervisor's comparability, we may or may not sit with them. There are certain levels we did sit in on and other levels if the supervisor asked us to help.**
Q. So, describe that for me or explain that to me. When you say "levels" are you talking about the levels of the employee's seniority, like how high up the employee was or the levels of how serious the infraction was; what are you referring to there when you say levels?
A. **Levels of discipline.**
Q. So, meaning a coaching, simply a verbal coaching, would be on the low side, all the way up to full termination on the high side?
A. **Correct.**
Q. When you say the supervisor would consult with HR, so let me give you a hypothetical and get your take on this. If a supervisor comes and says I want to discipline or write-up or I want to coach an employee for



absenteeism or tardiness, something like that, would you and your team actually go and physically look at the records yourselves, to cross-check and see if the person was, in fact, tardy or was, in fact, absent or are you simply taking the supervisor's word for it and then providing advice based upon what that supervisor tells you?
A. **Yes. We would confirm that the tardies, maybe the number of tardies the person has had and what infraction that the supervisor wanted to impose, based upon that, to ensure we are kind of handling it the same across the facility.**
Q. There was some independent review by you guys. You weren't just simply taking their word for it, you would independently put your eyes on it yourself?
A. **Correct.**
Q. Was that consistent across all levels of discipline from coaching on up to the terminations?
A. **Yes. For written and the finals and things of that nature, we would sit in and do investigations and actually consult with the**

**employee for those types of levels and not -- maybe not just the supervisor.**
Q. Describe for me the role now for an HR manager. I guess it might help to get a hierarchy perhaps in the HR department. Is an HR manager -- you have an HR business partner or numerous HR business partners that are underneath the manager?
**A. That was the structure prior to Monday, yes.**
Q. So, this is going to be a fresh topic then because this is all changing as we talk, but--
**A. Correct.**
Q. So, tell me about prior to Monday, what the hierarchy or structure of the HR department looked like?
**A. You would have the HR manager would be the lead for the site and then reporting to an HR manager, would be one or more HR business partners, as well as one or more HR assistants.**
**And then in addition, the training team. You would have like a training superintendent and some training coordinators would all report to the HR manager.**



Q. So then as HR manager, is it accurate to say that you are the head HR person on site. If you're the HR manager on Sunday, you're the head HR over that site?
**A. Yes.**
Q. So that was the role that you occupied for approximately seven years, 2018 to 2025?
**A. Yes.**
Q. The people within the HR team itself, so your business partners, your training folks, the HR assistants that are under the business partners, were those people under your direct line of supervision for lack of a better word?
What I mean by that is, I'm sure you helped and guided other supervisors around the site, but I'm talking about those employees that you had direct supervision over yourself, you were responsible for doing their discipline.
The people within the HR department, were they directly reporting to you?
**A. Yes.**
Q. How many was that?
**A. That directly reported to me, I had a training superintendent, an HR business partner and an HR assistant. And then reporting into**



**the training superintendent, there were four training coordinators.**
Q. So, you had three directed reports as the HR manager?
**A. Correct.**
Q. How exactly did the role differ from HR business partner to HR manager?
**A. The HR manager is more of a strategic role and working with more of the manager level at the site on different initiatives and maybe setting strategies for the site, objectives and working in tandem with day-to-day HR, but being more of the consultant as well to the business partner, where they're handling most of the day-to-day.**
Q. So, when you reach the HR manager, it's obviously going to be much more oversight, much more big picture, much more vision strategy than the day to day; is that accurate?
**A. Yes.**
Q. So, if you have an employee, let's just take my example I've used previously, of an employee files a complaint about harassment or discrimination or something like that, and requires someone to go out and do the



investigation, go out and interview witnesses, that sort of thing. That sounds like that's more of the business partner's role than it is the HR manager's role; is that correct?
**A. Yes.**
Q. Would you still get directly involved in investigations even as manager?
**A. It's possible. We had a small team and we did cover two sites, so there were sometimes that I was more involved than other times.**
Q. Was there any particular rules of the road as to when you would become more involved, versus when you would not be involved or it was just kind of a case-by-case basis?
**A. Maybe a little of both. Certainly case-by-case, but I was always involved whenever we are moving discipline to any type of final warning or termination.**
Q. Okay.
**A. I was typically consulted for a verbal or written as well, just to ensure that I was okay with it.**
Q. But always involved when it reached the level of final warning or termination?

**A. Yes.**
Q. You said that you were over two sites, what were those two sites?
**A. It's Port Arthur and Orange.**
Q. How many total employees do you think between the two sites were you all overseeing?
**A. Approximately 450.**
Q. And then as of a few days ago, senior HR business partner, what exactly is that?
**A. My role doesn't change, the expectations and pieces of it, except they change the reporting structures and I no longer have anyone that reports to me.**
Q. So, the three people we discussed as being direct reports, that no longer is the case?
**A. Correct.**
Q. So, then your role or your duties are substantially similar to what they were as an HR manager?
**A. Yes. Without having the direct influence as far as development, discipline and things of my direct reports.**
Q. So then, under the new structure of the HR department, are there numerous senior HR



business partners or there's one senior and that's you?
**A. Each site has a business department business partner, which is the only HR contact that's sitting physically at the site. And depending upon the level of that person it depends upon whether they're a senior HR business partner or an HR business partner.**
**And then, all of the former HR business partners were retitled to HR generalist and are all housed at our corporate office now, along with all of our HR assistants.**
Q. Let me ask it this way: When you were HR manager, who was your direct supervisor, who did you report to?
**A. Lauren Ridloff.**
Q. What was her title?
**A. Senior HR manufacturing manager, I believe.**
Q. And now who is your director of the new structure, who is your direct supervisor?
**A. Same person.**
Q. Is her title the same?
**A. Yes.**
Q. How many HR managers did she have



under her, that were her direct reports prior to Monday?
**A. That number would not have changed, it's one per site.**
Q. One per site, okay. So, the change of the title sounds to largely be, if I can put it this way, a restructure or reorganization and retitling, that your duties and your roles sounds to be and looks to be the same or substantially similar; is that accurate?
**A. Yes.**
Q. For the deposition for today, we sent you a notice through your counsel's -- the counsel for the company to set your deposition for today, September 3rd, 2025 at 9:a.m. via Zoom.
Sometimes they show this to people, sometimes they don't. I just like to ask and see. Did you receive a copy of this notice of deposition, have you seen this paper before, or no?
**A. There was a form that I had to sign, yes.**
Q. Obviously, the form says or the deposition is slated as Warren F. Jones,



plaintiff, versus Chevron Phillips Chemical Company, defendant.
If I say the name "Warren Jones" to you, does that ring any bells, do you know who Warren Jones is?
**A. Yes.**
Q. Did you work with Warren out at the site?
**A. Yes.**
Q. Which site was he at?
**A. Port Arthur.**
Q. Did you know Mr. Jones prior to him starting at the company?
**A. No.**
Q. Do you recall approximately when he started at the company?
**A. No.**
Q. So, aside from the form that you mentioned that you signed in preparation for this deposition today, were there any other documents that you looked at or signed or executed in any way prior to your deposition today?
**A. I've reviewed the documents from 2022, yes.**

Q. Do you recall any of the particular documents that you reviewed as you sit here today, that might have been emails, that could have been evaluations; do you recall specifically what you looked at?

**A. I reviewed Mr. Jones' note from his doctor. I reviewed our meet and confer letter that we sent to Mr. Jones. I reviewed his performance improvement plan and I reviewed the emails that were going through during that time frame.**

Q. Aside from the attorneys for the company, and I don't want to know of any conversations that you had with the attorneys for the company. But aside from the attorneys for the company, have there been anyone else that you have discussed your testimony with or the fact that you're going to be deposed today?

**A. The fact that I'm going to be deposed, yes. Not my testimony, no.**

Q. So, the topics of what, you know, you were going to testify to or any information that you have about this case, that was not discussed with anybody other than the attorneys for the company?



**A. The HR business partner, Chelse Morris. And I did have a brief discussion about one document that she reminded me of.**

Q. I should have asked you this earlier when I was wrapping up your experience section, I was asking you about with your history and your career with Chevron.

So, I apologize for jumping around on you, but this just struck me: I've gone through your education and your experience but I wanted to ask you: Are you required to take any sort of continuing education or additional, like, CLE or other courses like that in HR-related topics as part of your employment with Chevron Phillips?

**A. No.**

Q. What about, are there some of these third-party groups out there? SHERM is one, for example, the Society of Human Resource Managers, are you part of that or any other third-party HR group that gives trainings, annual refreshers, things like this?

**A. No.**

Q. In terms of this, does Chevron provide in-house any kind of annual trainings, teachings



upgrades, updates on the state of the law with HR, so you don't have to go outside to a third-party, do they do it in-house?

**A. Yes.**

Q. Describe that for me?

**A. We typically have an annual compliance day and we'll discuss any updates made to policies, procedures, laws, things of that nature. As well as, as laws are changed, we might have a quick call to discuss anything that was going to affect CP Chem or how we needed to handle things.**

Q. Who puts those annual compliance days on, is that in-house legal, corporate, HR, who does that?

**A. It's usually a partnership between in-house legal, as well as our compliance department.**

Q. So, if I were to mention to you the ADA or the Americans With Disabilities Act, are you familiar with that Act?

**A. Yes.**

Q. If I were to say to you the phrase "Good Faith Interactive Process," are you familiar with that, that phrase?



**A. Yes.**

Q. In terms of retaliation, as retaliation is contemplated, I guess I'll use that word "contemplated," retaliation as it's contemplated like in Title VII or in the ADA, are you familiar with that concept?

**A. Yes.**

Q. You seem to hesitate on that one.

**A. Well, I think when you say "retaliation," we always say we do not tolerate any retaliation, but you are referring more to the law.**

Q. Yes. So, and that's a very, very good distinction that I have to go over with so many potential clients that come to me and want to hire me and I have to go over that with them. It's not retaliation for all things, it's retaliation for certain things. So I'm glad you mentioned that, I want to ask you about that.

I mean, obviously the law prohibits retaliation, as I said in the context of Title VII and the ADA. But you mentioned that you don't tolerate or Chevron does not tolerate retaliation in any context. Describe that for me, what do you mean by that?

**A. We actually have a policy that talks about retaliation. And if you have a fear for reporting something with being a manufacturing industrial company, if you have a fear for reporting maybe something that was safety, there is no retaliation if you're making a good-faith effort to report something that you see is unsafe. That, you can't be retaliated against, same thing, we have a 1-800 number.**

**If you were to call in to report something, that there is no fear for retaliation to report any information.**

Q. You said something there when you said if somebody steps forward and they have a good-faith belief. So, is that a component of the policy that the person has to have a good-faith belief in what they're reporting to be a problem or a concern?

**A. I do believe the policies state something, that you have to have a reason that you are reporting this.**

Q. I'm glad you mentioned the 1-800 number. What are the other avenues by which an employee is allowed to complain or raise complaints? I'm sure they can go to their direct supervisor, they can go HR, what else?



**A. At Port Arthur it's a union site. They can also go to someone at -- one of their union representatives and then they can go to their department manager or even another manager.**

Q. Is there 1-800 number they can call?

**A. Yes.**

Q. How does that work if an employee calls the 1-800 number, where does that go, where's that phone call go?

**A. It's answered by a third party.**

Q. The third party takes that information about whatever the complaint is. Where does that information that the third party takes down, where does that information go?

**A. It comes back to the company to -- I'm not sure what his title is, John Scott.**

Q. John Scott?

**A. The legal department.**

Q. Have you ever seen one of those, a 1-800 number complaint that's typed out by a third-party company and sent back to, say, you for an investigation or something like that, have you seen one of those?



**A. Yes.**

Q. When those come to you from John Scott or they may come directly from the third-party, I don't know, when they come to you do they have any identifying information whatsoever on who the caller or complainer is?

**A. The caller can give their name or they can report anonymous.**

Q. If they report anonymous, is there any identifying information in the form that you receive that identifies who that person was?

**A. No.**

Q. So, their direct supervisor, any other manager, their union rep, if they are within the union, the HR department, a 1-800 number, any other avenues or have we covered them?

**A. I think that's pretty good coverage of the avenues.**

Q. In terms of CP Chem's discipline, we talked about the life cycle, meaning from being hired to coachings and write-ups and warnings and a performance improvement plan, so on and so forth. I typically refer to it as kind of a three strikes you're out policy. A lot of companies may refer to it as progressive discipline, there's a wide variety of ways to refer to this.



But essentially, the idea is that you're not going to be terminated on your first offense. If things are going to gradually and progressively get worse, meaning we'll start with a verbal and written or a coaching, a verbal warning, something like that. Then we may move to a written warning and then we may move to a suspension, then to a termination, so on and so forth, so it will get worse as we go or progressive discipline.

Is that the kind of policy that CP Chem has is progressive discipline or is it something else?

**A. Yes, we do have progressive discipline.**

Q. Are there kinds of employment that do not qualify for progressive discipline? Meaning, you do this you don't get a written warning, it's going to be immediate termination?

**A. Yes.**

Q. What are those sorts of things that lead to immediate termination under the policies?

Page 38

**A. It could be theft. I just went blank. Fraud.**

Q. Let me ask it this way: Is there a -- Does Chevron Phillips -- and I've called it CP Chem also, by the way. If I say CP Chem or Chevron Phillips, that's the same thing, right, that's how it's referred to, as CP Chem?

**A. Yes.**

Q. Does CP Chem have a zero tolerance or no tolerance policy, meaning there are certain infractions of which they have zero tolerance?

**A. I'm not aware of a policy, zero tolerance in the way that you're referencing.**

Q. What about -- and I'll explain it so you at least understand where I'm coming from. If this is not how it exists, it's not how it exists.

I draw a distinction, at least for myself, between zero tolerance and no tolerance. Zero tolerance means if this happens even one time, I don't care how good your intentions were or how innocent you may have been about it, if you made a mistake and you did it at zero tolerance you're fired.

No tolerance simply says, we are

Page 39

going to discipline you to some degree. We're going to discipline you. We don't tolerate it, it's against our rules. And so, it doesn't mean immediate termination, but you're going to be disciplined to some regard. It could be a coaching, it could be a termination, but there's no tolerance versus zero tolerance, at least in my head that's how I distinguish it, that may not be how CP Chem distinguishes it.

Are there any infractions out there that based upon what I just described to you, you think would qualify as either zero tolerance or no tolerance?

**A. Yes.**

Q. What would those be? You've already told me theft and fraud, but what else would exist out there if you can think of anything else?

**A. I'm just going blank on what you call it. Like, if you -- if you sign something and you are misrepresenting -- falsification.**

Q. Okay.

**A. Falsification of documentation.**

Q. Falsification of documentation. What about harassment or discrimination? You know,

Page 40

if you do your investigation, let's say an employee. Say, I'm working at CP Chem and I come to you and I say, you know, Ms. Danford, I feel like Bob is discriminating against me, okay. And you investigate it, you talk to witnesses, you do your investigation. And you find that you believe it's substantiated.

You believe that Bob is, in fact, violating Title VII in regards to he's discriminating against me. Is that zero tolerance, is Bob fired or is he coached and put on a PIP, that sort of thing?

**A. I have not experienced one that's been substantiated, so I can't answer how that will be treated.**

Q. What about the context of retaliation, rather than discrimination. So again, take my example: I'm working at CP Chem. I see something that I think is unsafe, so I'll report it.

My manager or supervisor, Bob, begins to retaliate against me because of that. So I come to you and I tell you about the retaliation. You investigate and it's substantiated.

Page 41

You find that Bob is, in fact, retaliating against me because I raised that complaint. What happens to Bob, is that immediate termination or is that a PIP coaching, possible termination, could be anything?

**A. I don't have a direct answer. I would be guessing of how we would handle it.**

Q. So, then is it accurate to say, kind of similar to what you told me on the discrimination side, would it be the same thing on the retaliation side, that you've yet to experience a situation where a retaliation complaint by an employee has been substantiated?

**A. Yes, correct.**

Q. So, now kind of with that framework in place, because I wanted to get some of those details from you, I want to turn now to the specifics of the case that we are here on, which is, obviously, Mr. Jones. As I do that, I started asking you if the two of you knew each other beforehand. And if you recall when he went to work there.

Let me further that just a little bit by asking you, okay, once Mr. Jones was there, what were the kind of interactions that

you had with him, if any, you know, at the beginning.
Is this kind of a thing where maybe you'd see him out at the site once a week, once a month and you'd say hi, would you see him every day. Did you not see him for months at a time. Describe for me what those interactions looked like, if anything?
**A. I would have had very few, if any, interactions with him prior to his notice to us in September.**
Q. Okay.
**A. And even after that, I still had very few interactions with him. They were mainly with the business partner.**
Q. Was the business partner who was signed to work this case?
**A. Her name at the time was Chelse Cisneros. She has since married.**
Q. So, that was the Chelse. And I think you used her now-married name you told me earlier. What is her new last name?
**A. Morris. Chelse Morris.**
Q. That's right, Morris.
Was Chelse Cisneros, now Chelse



Morris, was she the assigned business partner on Mr. Jones's case for the entirety of that case?
**A. Yes.**
Q. So, in terms of day-to-day interactions, like you would have had little to no interaction with Mr. Jones until the notice in September.
So, did you have any opinion of him one way or another prior to seeing him in September? I mean, did you know of him as a good employee or a bad employee? It might have been the first time you have ever even physically seen him, it might have been in September, I don't know, so tell me about that?
**A. I would say I have no opinion of him.**
Q. Have you had any discussions and -- by the way, I'm sorry. When was the first time that you physically met or saw Mr. Jones?
**A. I do not recall.**
Q. The issues with Mr. Jones and his employment, how were they, at least, first brought to your attention?
**A. Mr. Jones sent an email from his ophthalmologist.**
Q. Was that presented to you or did you



receive that directly?
**A. He emailed it to me, as well as others directly.**
Q. Was that something that he did pursuant to your request, that he emailed that to you directly or it just -- it came from Mr. Jones' email, kind of out of the blue?
**A. It came from his email, kind of out of the blue.**
Q. So, once you received it, what did you do with it?
**A. I met with Chelse and Mr. Jones' superintendent, Mr. Wooters, who also all got the same email.**
Q. So, that email from his ophthalmologist that Mr. Jones kind of -- if I can use this word "unprompted," he sent you. That email was the first time that Mr. Jones landed on your radar, for lack of a better word?
**A. Yes.**
Q. So, you get that email and you decide to meet with Chelse and Wooters. When you have that meeting, is that over the phone, is that a video conference like this, is it in person?
**A. I believe we spoke in person.**



Q. Was anybody else present for that meeting aside from the three of you?
**A. No.**
Q. Do you remember when that meeting was held?
**A. It would have been very close to when we got the notice, so probably that day, or the day following.**
Q. What was discussed in that meeting?
**A. Just the letter from the doctor.**
Q. But, I mean, in terms of a strategy or a plan on what to do with it, how to deal with it, what the issues were, what was discussed in that regard?
**A. That Chelse would start what we call the interactive process with Mr. Jones and sit down and have a meet and confer meeting. I believe it was the following day that she sent him an email to set up the date of the meeting.**
Q. So, when I asked you earlier about the good faith interactive process, that's exactly what was started in that meeting?
**A. Correct.**
Q. What did Mr. Wooters say, if anything, during this meeting?

Page 46

**A. I don't recall him having anything specific to say about the -- just how are we going to handle the request. So we said we would start the process.**

Q. Did you or Chelse ask any questions of Mr. Wooters as to maybe what would have prompted Warren Jones to send you this letter because if I understand your testimony correctly, this is out of the blue.

I mean, your email just receives an email from his eye doctor. There's no context as to why that might have been necessary or what the reason was behind that. So, I mean, did you and Mr. Wooters discuss that?

**A. No, that wouldn't be uncommon for an employee just to send us something whenever they are needing some type of an accommodation request.**

Q. So, is that how you interpreted that email from Mr. Jones, was it an accommodation request because of his eyes?

**A. Based on the verbiage from the doctor on the note, yes.**

Q. Which is why you initiated the interactive process?

Page 47

**A. Correct.**

Q. According to what you told me earlier, Chelse initiated and sent an email about the meet and confer to start that process. What was your level of involvement, if anything, with the day-to-day interactive process?

**A. She just kept me informed with what was going on. I read the notes of the meeting, reviewed the letter before she sent it to Mr. Jones, but I did not attend any of the meetings.**

Q. So, you preempted my next question I was going to ask. Did you attend any of the interactive process meetings?

**A. No.**

Q. Do you know how many times they met?

**A. No.**

Q. When Chelse kept you apprized of things, do you recall anything that she told you about how the process was going?

**A. I do recall that she mentioned that Mr. Jones was not necessarily looking for the accommodations, as outlined in the letter from the doctor.**

Q. This is something that Chelse told

Page 48

you?

**A. Yes, after her meeting with Mr. Jones.**

Q. Do you recall which meeting, was it the beginning, in the middle, toward the end?

**A. This would have been after their first meeting. And Mr. Jones had also followed that back up with an email as well, responding to the accommodations he was actually requesting.**

Q. The email that you said Mr. Jones followed up with, with the accommodations that he's actually requesting, was that also sent to you?

**A. Yes, I believe so.**

Q. So, Chelse tells you that he's not necessarily looking for an accommodation as outlined in the letter, what specifically did he mean by that?

**A. The doctor had asked for him to be taken off of a rotating shift schedule.**

Q. When he said he wasn't necessarily looking for that, did he specify to Chelse what he was looking for?

**A. A line to be repaired over the heater board console.**

Q. Was that the only request that Chelse

Page 49

relayed to you that he made?

**A. Yes.**

Q. Was that particular request satisfied?

**A. Yes. A work order was entered for it to have it corrected. It wasn't like an immediate thing, it had to be ordered and installed.**

Q. Was that something that work order, the process of doing the work order and getting that approved and getting it installed, was that something that you were directly involved with?

**A. No.**

Q. Who was, if you know?

**A. I did see an email that I believe was forwarded to me and Wooters asked Warren or, excuse me, Mr. Jones to put in a work order to have the line replace or repaired.**

Q. Once that work order goes in for that to be replaced who is the team, who's the department, who's the person or group of people who would get that done?

**A. It would be the maintenance department.**

Q. Do you know how long it took to get it done?

**A. No, I do not.**
Q. Do you know if it was, in fact, done?
**A. Yes.**
Q. How do you know that?
**A. We followed up and asked if it was completed and were told yes.**
Q. Who told you that?
**A. Mr. Wooters.**
Q. You mentioned that in addition to Chelse telling you this; that was not necessarily the accommodation he was looking for. Meaning, to be taken off of rotating shifts he, himself, followed up with an email. Do you recall the specifics of what he said in that email?
**A. About that he wanted the light fixed over the heater console board and that was the email to which Mr. Wooters replied, to put in a work order to have it repaired.**
Q. So, at this point in time the interactive process has been initiated. They have gone back and forth with a few meetings, you were not directly involved with them, but Chelse is giving you updates. One of the updates she gave you was the lights need to be



repaired over the heater board, and we talked about that.
Were there any other requests that Chelse made you aware of or updated you on?
**A. I know that they had asked if he needed any type of other lighting and he said that he was using his own personal lamp and so he didn't need anything else.**
Q. Is that something you personally heard from Mr. Jones or that was relayed to you?
**A. Relayed to me.**
Q. By who?
**A. Chelse.**
Q. Any other requests or updates that she relayed to you?
**A. No, not that I recall.**
Q. Was the interactive process just deemed satisfied, it was completed and satisfied when the heater board lamp has been changed or the light above the heater board has been changed, so the process is now complete?
**A. At the same time there were other things going on with Mr. Jones. And he had gotten put on a straight-day assignment, I believe it was going to be for 35 days. So,**



**Chelse had mentioned that when he went back to shift work, that she would reach out to him within 30 days to see how the accommodation process was going.**
Q. Do you know who put him on the straight-day assignment?
**A. Mr. Wooters.**
Q. Do you know any specifics of what that straight-day assignment?
**A. To train on the heater board.**
Q. So, just so I can understand the timeline here, this straight-day assignment to train on the heater board, is this assignment, is that coming after Warren's request for Mr. Jones' request that the light be repaired above the heater board?
**A. Yes, it is after.**
Q. So, he's already -- and just for some background to make sure we're on the same page, was it your understanding that Mr. Jones at this time, he was being moved from where he was working and where he was certified to work outside and he was being moved by Mr. Wooters inside to train on the heater board. Was that your understanding?



**A. Repeat the question, how you're asking it.**
Q. Sure. Was it your understanding that at this time in Mr. Jones' employment, he had been moved by Mr. Wooters from where he was certified on the different machines and equipment outside, where he had been working, his whole career was outside and now he is inside work on the heater board. Was that your understanding that that's what he was doing was training on the heater board?
**A. It wasn't simultaneous as to this time. He had been training on the heater boards. Our process requires you to qualify on all positions at the unit. So it was his turn to train on the heater board.**
Q. Right. That's what I am trying to verify, so that we are on the same page here, that was it your understanding that at the time this letter from the ophthalmologist came in, that's what Warren was up to, that's what he was doing, that's what was happening in the life of his employment at CP Chem, was he was currently training on the heater board at the time that letter came through?

**A. Yes, he was working on his qualifications of that board, correct.**

Q. So, initially the first thing that comes through is the light to be repaired over the heater board console. After that, he's placed on an 35-day-straight assignment to work on the heater board.

What exactly was that, why did the 35-day assignment come through, if you know? It may have been at Wooters' call, I don't know.

**A. So, during all that time frame, he was trying to qualify and he was unsuccessful on his second attempt to qualify, which then -- and we have a policy that we put you on a performance improvement plan, with that you go in a straight-day assignment where you're training, so that you have another attempt at taking a test and qualifying.**

Q. So that straight-day assignment for the 35 days, that's designed as part of the PIP. That's designed to help Mr. Jones successfully train up or successfully qualify on the heater board?

**A. Yes.**

Q. So, in terms of the interactive



process, did the interactive process stop during those 35 days?

**A. No, it did not stop. However, I'm not aware of them having any additional meetings or Mr. Jones requesting anything additionally.**

Q. What was the reason that they had no meetings in those 35 days? I think you told me earlier that Chelse said because of the straight-day assignment she wasn't going to meet with him, she would just follow-up after the straight-day assignment. When he gets back on shift work then she would follow-up. What was the rationale behind that?

**A. His doctor's note had mentioned when he worked night shift is when he had more difficulties.**

Q. But Warren, himself, had already relayed that in addition to whatever his doctor's note said, one of the issues was the light above the heater board console. Do you know, by the way, during that 35-day run of time, did he have a properly functioning light above the heater board during that time?

**A. I do not know.**

Q. So, after the 35 days, it sounds like



you or Chelse didn't meet with him during that time after. Did Chelse have a meeting with him after that time?

**A. I don't know when their next meeting was.**

Q. What about yourself, when was your next meeting with Mr. Jones?

**A. I didn't have any meetings with Mr. Jones.**

Q. You never met with him in person?

**A. Not on any of this process, no.**

Q. So the involvement that we are talking about here with the ophthalmologist's letter and the emails, that's all happening via email, that's all just simply happening via correspondence.

You're not actually seeing or talking with Mr. Jones when all of those communications are transpiring?

**A. No, I'm not talking with Mr. Jones. My correspondence is all emails, yes.**

Q. So, you said that you did not speak with him regarding this process. Did you speak with him at some point?

**A. I do not recall.**



Q. So, at any point in time, I mean from his -- even his termination meeting, I mean from termination through the minute he sent you the ophthalmologist's letter, you have no recollection of ever meeting with him in person?

**A. Not a specific instance, no.**

Q. What about over the phone? Were there ever any teleconferences, phone conferences where Mr. Jones was on the call and you were or he was in a meeting and you were present by phone?

**A. I don't recall anything specifically.**

Q. Obviously, there's more to cover, but I'd like to try to be conscious of people's time. It looks like we have been going for a little over an hour, so around the hour mark I try to give people a break, just to stretch their legs, use the bathroom, maybe refresh that cup of coffee.

So let's take a break about ten minutes, we are at 10:11, until 10:20. And we'll resume, give you a chance to stretch your legs, Ms. Danford.

**A. Okay, thank you.**

THE VIDEOGRAPHER: All right. We are

Page 58

now off the record then. The time is 10:11 a.m. Central Time.
(Recess was taken from 10:11 a.m. to 10:23 a.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 10:23 a.m. Central Time.
BY MR. SUDDUTH:
Q. Okay, Ms. Danford, we are back on the record after a brief break. I forgot to do this before the break. Let me go ahead and mark and attach your notice of deposition as Exhibit 1 to this deposition.
(Whereupon, Exhibit 1, Deposition Notice was marked for identification.)
BY MR. SUDDUTH:
Q. Ms. Danford, we left off talking about the fact that you didn't recall any specific or particular meetings that you had with Mr. Jones in particular. Let me follow-up on that and ask you, did Mr. Wooters ever consult with you or talk with you regarding the recommendation of termination for Mr. Jones?
**A. Are you asking ever if he did? Yes.**
Q. How did he do that, in person or just over the phone, email?

Page 59

**A. We had a discussion in purpose -- in person.**
Q. Who else was present for that discussion?
**A. I couldn't tell you exactly, but it was in the office.**
Q. Do you recall that there was at least other people or do you recall it just being the two of you?
**A. I don't recall.**
Q. Was this the only discussion the two of you had regarding his recommendation to terminate?
**A. We would have had more than one discussion during the process.**
Q. You say you would have. Is that just would have because the normal protocol would have been that, but you don't have any specific recollection of that?
**A. Correct.**
Q. So, it sounds like the only specific recollection you have is one meeting?
**A. I don't have a specific recollection of one meeting, but we would have sat and talked about it, yes.**

Page 60

Q. So, you would have -- the procedures you have, but you don't have a specific recollection of it?
**A. Correct.**
Q. Well, do you have any recollection of what was discussed?
**A. No.**
Q. Okay. I would assume that at a termination level, based upon what we discussed earlier in your deposition, when it reaches the level of some kind of final adverse action or termination, you're going to get involved, you're going to be notified of it.
So whatever termination recommendation was made, did you or Chelse go back and review Warren Jones' personnel file to see if you thought the termination was justified?
**A. I cannot tell you specifically his personnel file, but we would have reviewed the performance improvement plan, the requirements of that, as well as the training guidelines and the contract, the union contract.**
Q. Did you consult with or discuss -- I believe his name is Ryan Clay, did you

Page 61

discuss -- or Clay Ryan, did you discuss with him from the union, the union's position on this?
**A. No.**
Q. In terms of Mr. Jones' employment with Chevron Phillips, is it fair to say that aside from this issue with the heater board he was a good employee, I mean no issues?
**A. I have not reviewed his personnel file. I cannot speak to that at this point.**
Q. Do you ever recall anybody else bringing up any other employment deficiencies or performance deficiencies in Mr. Jones?
**A. Not specifically.**
Q. Was the sole basis or the sole reason of the termination recommendation, as you appreciate it, was because of his failure to qualify on the heater board?
**A. Yes.**
Q. Here is my question that I just cannot get past, why not allow Mr. Jones to go back and work where he was qualified to work and where he had been working for years before, if the sole reason for termination is failure to qualify on the heater board, not some other deficiency like

he was, I don't know, fighting in the workplace or something, if the sole deficiency is this heater board issue, why not allow him to remain working where he was?

**A. It's a job qualification to qualify on all jobs at the union, not just one or two, you have to follow all.**

Q. Right. And at this point in time, you had received a letter from the ophthalmologist, you engaged in the interactive process, why was moving his job duties or changing his job duties or maybe it was -- let me strike that question.

Was allowing Mr. Jones to go back out and work outside and not having to qualify on the heater board, was that considered as a reasonable accommodation for Mr. Jones and his eyesight, did CP Chem consider that as an accommodation?

**A. That was not the request, so no. That would not necessarily be considered as a reasonable accommodation, as all employees are required to qualify on all jobs. And there's more than one board job, so you're only speaking of one board job, there are several. After he would have qualified on that board, he would have had to go to another board.**



Q. Well, there are several parts to your answer there I need to break up and discuss.

So, the first part of your answer was, well, that was never discussed as an accommodation. So is it your testimony that Warren Jones never made the request to just let him go back out and work outside?

**A. Not to me, no.**

Q. Not to you. Do you have any knowledge at all as to whether or not it was brought up to anybody else?

**A. No, I do not.**

Q. Now, the second part of what you said was, even if he would have made that request to you, that would not have been a reasonable accommodation, so, tell me why?

Why was allowing Mr. Jones to not have to qualify on the heater board, why was that an unreasonable accommodation?

**A. As an operator, you have to qualify on all of the jobs. So, by him not qualifying on the inside jobs, he would not be in that rotation which is required by the union contract.**



Q. Yeah, I understand that that's the normal protocol, but I mean, can we agree, Ms. Danford, that's the purpose of an accommodation, right. The accommodation does something that you don't normally do, that's why it's an accommodation, you're doing something different.

So, what I am trying to figure out is, I know it was different, I get that. What I am trying to understand is what would have been the burden to CP Chem of allowing Warren Jones to continue to work outdoors and not qualify on the heater board?

MS. WILLIAMS: Objection. I'm sorry. To the extent it's calling for a legal conclusion.

But, Aprile, you can go ahead and answer.

**THE WITNESS: I was going to say, we would have had to evaluate that. And I can only speculate what an evaluation would have been if one person asked for it, but, obviously, if there were additional employees, then it would become an undone hardship on the company.**



**I'm only speculating. That was not a request that was made nor discussed.**

BY MR. SUDDUTH:

Q. Well, let's break that up again. It was not a request that was made to you, is what your testimony was, correct?

**A. Correct.**

Q. That request, if it was made, never got elevated to you for your consideration or your review of that request?

**A. Correct.**

Q. Also, down that same line, also because that request was never made, I suppose because for whatever reason, whether or not or what kind of a burden that brings into the company that was never even analyzed, you guys never even engaged in that kind of a discussion, analysis, strategic review to see what the burden was. So is it fair to say, you don't know what the answer is to that question?

**A. Correct.**

MS. WILLIAMS: I'm sorry, I'm going to object to the extent it calls for speculation.

But go ahead.

BY MR. SUDDUTH:
Q. Well, No. I mean, I'm not asking you to speculate on whether it was a burden or it was not a burden. My question, Ms. Danford, was you don't know. You don't know whether it was or it wasn't because you never engaged in that analysis, right?
**A. Correct.**
Q. Then you also mentioned that, you know, whether it would be a burden -- I'm trying to think back to your answer. Whether it would be a burden with one person you don't know, but you said, well, if, you know, if numerous, employees began to do this, right. If numerous employees began to ask for this kind of an accommodation could that create an undue burden?
And just to be clear, this is not something where an employee is asking to not work the heater board because they just have a personal hatred for heater board hads. This is an ADA interactive process. Was that your understand of Mr. Jones' request? This is not a personal issue, it was a medical issue?
**A. Yes.**
Q. Okay. Whenever Mr. Wooters -- again,



you have no specific recollection of this, but you're assuming that you guys would have had that conversation. Do you recall talking with Mr. Wooters at all, like in lieu of termination what are some other things we can do. Did you have guys have that kind of discussion?
**A. After the completion or the incompletion of the PIP, yes.**
Q. Okay, you did. What did that conversation look like, what did you guys discuss?
**A. We got our medical provider involved in the process.**
Q. And this was at the conclusion of the PIP?
**A. Yes.**
Q. Do you recall when that was approximately that the PIP ended?
**A. I believe it was the mid-November time frame.**
Q. There haven't been many documents that I have shown you, but there is one that I believe that I'm going to -- at least one, I'm going to go over with you. But while I'm pinpointing that document and I'll need to pull



it up on my screen for you. So, just bear with me, I may take a break to get that organized and then show it up on the screen for you.
But in November the PIP ends. You got your medical provider involved, who was that?
**A. Dr. Stanton.**
Q. Is Dr. Stanton -- let me ask it this way: What is he? He's not in-house, is he, I assume, he's somebody you contract with?
**A. He was a contract doctor, correct.**
Q. And what specifically did he do for the company?
**A. He would engage with employees to have an understanding of what the issue was in order to make recommendations to the company.**
Q. So, was Dr. Stanton specific to ADA issues or was Dr. Stanton someone you used for, I don't know. Like, say somebody got injured on the job or something, like a Workers' Comp situation and they say they can't move their hand anymore or move their arm, was he looking at every kind of issue for the company?
**A. I can't state to what all he did for the company.**



Q. All right. So Dr. Stanton was at least tasked with Warren Jones to what, meet with him, do almost like an independent medical examination of Mr. Jones?
**A. He was asked to call him and have a discussion. I do not believe they met face to face, but I don't know.**
Q. Do you know if anybody else was on the call aside from Stanton and Jones?
**A. No, I do not.**
Q. How were you informed of the result of that call with Stanton?
**A. He sent a recommendation, that email, to have a visual acuity test done on-site, by our on-site nurse.**
Q. I'm looking at, I believe you're cc'd on this email. And just for the record, this is a CP Chem 809. I'll read it to you just for sake of brevity, but it appears to be an email from James M. Stanton, that says:
Hi, Chelse I had a long conversation with. Mr. Jones this afternoon and I think I have a better understanding of his overall situation and what solutions may or may not be feasible.

If you want to give me a call we can discuss or if you prefer, we can do another Team's meeting with Beth, just let me know.
Regards, James M, Stanton, MD.
Do you recall receiving that email?
**A. Yes.**
Q. Is that the email that you're referring to?
**A. Yes.**
Q. Did you hop on a call with Stanton or Dr. Stanton or was that just Beth and Cisneros that did that?
**A. I couldn't tell you who was on the call. I do not recall being on it.**
Q. So, as you sit here today, do you know what -- when he says I understand his overall situation and what solutions may be feasible or not feasible, do you know what he means by that, what solutions he's referring to or what's feasible and what's not feasible, do you have any understanding of that?
**A. I just know what came as a result of that conversation.**
Q. What came as a result of that



conversation?
**A. Site medical, conducting a visible visual acuity test.**
Q. By the way, when I asked before about Stanton and you said he's somebody you contract with and I just noticed here, his email address is@CP Chem.com, he's listed as medical director. So, it appears as though he might be in-house with CP Chem. Do you have any reason to disagree with that?
**A. Yes.**
Q. Why did you dispute that?
**A. He was -- he did work for CP Chem or at CP Chem, but he was not direct in-house. He was contracted.**
Q. Why did they give him a CP Chem email address if he's contracted?
MS. WILLIAMS: Objection, calls for speculation.
You can answer, if you know.
**THE WITNESS: All of our contractors that work here on-site have a CP Chem email address.**
BY MR. SUDDUTH:
Q. So you said on-site. I'm sorry, did



you say on-site medical or on-site -- who did the visual acuity test?
**A. It was our nurse that's on-site at Port Arthur.**
Q. Who was that?
**A. Janie Johnson.**
Q. What was the result of her visual acuity test?
**A. I don't have the results.**
Q. Well, I thought -- I think you testified earlier that you only knew what came of it. When you say what came of it, what did you mean by that?
**A. The request to do the visual acuity test.**
Q. Oh, okay, I see. So you don't know the results of the visual acuity test, you just know that the visual acuity test was requested?
**A. Correct.**
Q. So, what I am going to do, and I apologize, rather than taking a break, let's just -- kind of bear with me while I pull this document, so I can share my screen with you. So I don't want to -- actually, you know what, Mr. Videographer, it would be better for the



deposition, wouldn't it, if I took a break so this is off the record.
So, I apologize. I know we just took a break, but I guess you get to go take another break quickly. So my apologies for the inconvenience, Ms. Danford. Let me pull this document, okay, and then give me five minutes and then we will come back.
**A. Okay.**
THE VIDEOGRAPHER: We are now off the record then. The time is 10:41 a.m. Central Time.
(Recess was taken from 10:41 a.m. to 10:45 a.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 10:45 a.m. Central Time.
BY MR. SUDDUTH:
Q. All right, Ms. Danford, we are back on the record. Thanks for your patience. Let me share my screen.
Okay. Do you see my screen?
**A. Yes.**
(Whereupon, Exhibit 2, Bates 809-810 was marked for identification.)

BY MR. SUDDUTH:
Q. All right, very good. You'll see here at the bottom, this is what I was referring to as a Bates label earlier, CP Chem 810. This will be Exhibit 2 in Globo, Madam Court Reporter, it's going to be from 809 to 810.
As we have to do with these emails, you have got to start from the bottom and roll your way back up. So, at the bottom here we have a signature block. As we roll into 809, you will see an email from Chelse Cisneros. It appears that you are cc'd, along with Beth Roberts.
I'm trying to zoom in for you to help to see it. Can you see it okay?
**A. Yes.**
Q. Okay. First of all, Beth Roberts, who is she?
**A. Our labor and compliance manager.**
Q. So, this email here appears to be an email that was maybe setting up the phone call between Dr. Stanton and Warren Jones.
"Dr. Stanton, thank you for taking the time to join Beth and I in our meeting this afternoon. I've attached a letter



from Warren's ophthalmologist and have provided his contact information as well. Please let me know if you have any questions or need further information."
Do you believe this to be the email that was teeing up Dr. Stanton to have the phone call with Mr. Jones?
**A. Yes.**
Q. As we scroll up here at the top of 809 is the summary email that we were talking about earlier. I just wanted to put something visual to what we were discussing before that. This is Dr. Stanton's response back, that you believe led to the visual acuity test being ordered; is that correct?
**A. Yes.**
Q. With 809 and 810 being Exhibit Number 2, let me scroll with you now to 811, which will be Exhibit 3.
(Whereupon, Exhibit 3, Bates 811-812 was marked for identification.)
BY MR. SUDDUTH:
Q. Now, I don't believe it's 811, technically to 812. So, Madam Court Reporter, it is in Globo's it does stretch to 812. 812



only has the signature block on it.
As we scroll back up to 811, it looks look the only thing, Ms. Danford that you might have been cc'd on were some of these bottom emails, I'm not sure if you on the very top, but let's just take it step by step.
Here at the bottom, it says from Chelse with cc'd to you and Judson Wooters. Subject: Lighting before the heater board. This is December 12th of 2022.
Quote, "Judd, do you know if the lighting above the heater board has been fixed? If you can, could you also provide the date and work order that was put in for this."
"Thanks, Chelse."
JUD July.
Did I read that correctly?
**A. Yes.**
Q. Do you recall receiving this email?
**A. Yes.**
Q. Now, at this point in time, December 12 of 2022, just to refresh your recollection, I have Mr. Warren's -- or Mr. Jones' termination occurring December 27th of 2022, any reason to disagree with that?



**A. The actual termination, yes, I disagree.**
Q. You disagree. It looks like the date of the recommendation form was December 27th of 2022. Any reason to disagree with that?
**A. No.**
Q. When was the actual termination effectuated?
**A. The actual calling of Mr. Jones?**
Q. If that's what actually effectuated his termination which was the phone call, then yes, that date?
**A. The termination as I recall, was effective December 31st. And we contacted him to -- if it would have been Chelse and Judd Wooters that contacted Mr. Jones.**
Q. So, you were not on that call?
**A. Correct.**
Q. Do you know when they called him?
**A. I believe it was January the 2nd, when we reported back to work after New Year's.**
Q. January 2nd, to let him know this was effective 12/31?
**A. Right.**
Q. Do you know when that recommendation

Page 78

form is issued, the termination recommendation form is issued, when it runs up the line who does it go to for review?
**A. You want me to go through each person that reviews the recommendation.**
Q. Yes, ma'am.
**A. So, typically Chelse would put it together for me to review and then I would -- either her or I would work with legal counsel. And after we get the support of legal counsel, then it would go to my direct supervisor Lauren Ridloff. And after her review she would reach out to the plant manager's direct supervisor, as well as the vice president of manufacturing.**
Q. So who was Brian Kubsch?
**A. Kubsch. He was Judd's direct supervisor, the operations manager.**
Q. You said the vice president of manufacturing?
**A. Yes, Brian Canfield.**
Q. Brian Canfield. Okay. Anyone else?
**A. The site plant manager would also be -- would also approve the action before we went out at the site.**
Q. Who was that at that time?

Page 79

**A. Gary. I believe it was Gary Parsley. It could have been Andy Woods.**
Q. Throughout the entire process of Chelse putting this together, you were viewing it and then you sending it up the line to all these different individuals, did you ever receive any pushback or any negative feedback from anybody at the line?
**A. No.**
Q. Fair to say that you or Chelsea's recommendation, which you reviewed and forwarded up the line was accepted by every party who reviewed it?
**A. Yes.**
Q. Were any questions raised by anybody at the line that you recall?
**A. Not that I recall.**
(Whereupon, Exhibit 4 Bates 122-123 was marked for identification.)
BY MR. SUDDUTH:
Q. I will attach the termination recommendation form. I'll show it for you before we formally attach it.
But, Madam Court Reporter, that's Bates labeled at 122 to 123. That'll become

Page 80

Exhibit 4.
But let's get back to Exhibit 3. Exhibit 3 here, I just want to get the timeline in the December time frame. So this is about 15 days, two weeks, about 15 days before Chelse recommends termination. She's asking about the lighting above the heater board; is that right?
**A. Yes.**
Q. So, Judd's response is to Bubba Vandevender. Who is Bubba Vandevender?
**A. His title is an operations maintenance coordinator.**
Q. Okay. I love the fact that his first name is actually Bubba. So Bubba Vandevender is in maintenance. And Judd emails him and says, is this something you can check on? His response, I'm just looking to verify, it did not include you.
Is that correct that Bubba Vandevender's response on Monday, December 12th, was to Claude Richardson, Danny -- is it Danny Gay, Greg Johnson, Warren Jones, Judson Wooters and Andy Coots. I don't believe this went to you?
**A. Correct.**

Page 81

Q. So we are just stating here for the record. He says, "Can we get these lights repaired on the heater board area, limited lights in the area make it hard to see the area."
Bubba Van.
Did I read that correctly?
**A. Yes.**
Q. All right. Then you did not see this email. It doesn't appear because it went just to Chelse. On December 12th Judd responds back to Chelse and says Chelse, this has not gotten repaired yet.
Did I read that correctly?
**A. Yes.**
Q. Is this the first time you're seeing this?
**A. I do believe that that was forwarded to me as well by Chelse, as an FYI.**
Q. Does this change your analysis or thought process at all, throughout the 35 days that he was training, throughout the entire time that he was on the PIP, the only request according to you, and Mr. Jones may disagree with you, but the one thing, at least right now

that the two of you agree on, is there was at least a request made to change out the lighting.
As at December 12th of 2022, throughout the entire time of the PIP, the entire time of the training, the light had never been repaired. Does that not change your analysis?
**A. Mr. Jones never came back and said anything else, that he was having any initial problems or anything else was happening. He told us he had a lamp that he was using in the time being.**
Q. Well, in addition to the lamp because he had told you that he was bringing a lamp back in September when he sent you the ophthalmologist's letter, didn't he?
**A. Correct.**
Q. In addition to that, your previous testimony has been he did request the lights above the heater board be replaced, which prompted you to open the interactive process; is that correct?
**A. No, that was not the prompt.**
Q. Excuse me. The prompt was the ophthalmologist's letter?



**A. Correct.**
Q. The lamp was part of one of the requests for accommodation -- excuse me, not the lamp, the repairing of the light above the heater board, was one of the requests or one of accommodations, that was part of the interactive process; is that correct?
**A. That was a statement that Mr. Jones made after the interactive process by email, that if we could just get that light fixed, that was all he needed.**
Q. That was a statement Mr. Jones made after the interactive process. I thought your earlier testimony was that he said that during the process with Chelse?
**A. During the entire process, but it wasn't part of that first meeting. It was after he received the letter that she gave him that he responded to that letter and said all he needed was the light fixed.**
Q. Which letter are you referring to?
**A. The actual meet and confer letter that was from the date of their meeting, where Chelse was typing up what transpired in that meeting.**
Q. So, it was after or in response to the



meet and confer letter that he brings up repairing that light?
**A. Correct.**
Q. When was the meet and confer? I mean, the meet and confer was, I think you told me shortly after the ophthalmologist's letter was sent?
**A. I believe it was early October.**
Q. Now, because the letter, the ophthalmologist's letter came through in September?
**A. Yes, mid-September.**
Q. Mid-September. In early October we're having the meet and confer. And then after the meet and confer is whenever he informs about fixing the light?
**A. Upon receipt of the letter and he was given some actions as well, that if he -- if there was anything different than what was stated in the letter that he recalled to object to the letter, as well as he was requested to reach out to his doctor to see if there was any other apparatuses or devices that could be provided that would help with his situation. And he was given deadlines on both of those in**



**the letter.**
Q. Yeah. So, let's talk about the letter then. We are going to make that Exhibit 5.
(Whereupon, Exhibit 5, Bates 712 was marked for identification.)
BY MR. SUDDUTH:
Q. This is dated October 5th of 2022. It's Bates labeled CP Chem 712. This appears to be a summary of the meet and confer meeting held October 3, 2022.
So, I guess let's just nail down our dates here. September 19th of 2022, is whenever the company became aware of the request because of the ophthalmologist William B. Hart. Any reason to disagree with?
**A. No.**
Q. All right. October 3rd, the company had held the meet and confer meeting with Warren Jones. Do you have any reason to disagree with that?
**A. No.**
Q. And by October 5th, she had delivered this letter; is that correct?
**A. She delivered it on October the 5th, but that is what it's dated.**

Q. Do you have any personal knowledge as to what date it was delivered, if not on the 5th?
**A. It was emailed to Mr. Jones, but I do not recall the specific date.**
Q. Okay. So let's go through the different timelines. You talked about the different trigger dates because one of them is here at the top.
Quote, "If we do not receive a response from you or anyone speaking on your behalf by October 28th of 2022, we will assume the summary set forth in this letter is accurate." End quote.
Did you receive a response from Mr. Jones by October 28, 2022, disputing any of this?
**A. No.**
Q. So, then his silence was his answer, right? By October 28th of 2022, this was accurate and this was the guidepost the company was going to move forward on?
**A. Correct. He did send an email, but it was not disputing the letter.**
Q. The email was specifying the help he needed?



**A. Right, clarifying what he was actually requesting.**
Q. Right. Which was not so much the shifting or the shift schedules, but the light?
**A. Correct.**
Q. That email, was that email sent before? Actually, the date that I think is relevant is not October 28th, I think it's November 1st, but was that email by Mr. Jones specifying that the heater board light be fixed, was that sent before November 1st of 2022?
**A. Yes.**
Q. So, down here -- well, let me verify something first.
Quote, "In accordance with the doctor's note you presented to the company, you were having difficulties of viewing small numbers and letters, as well as becoming overwhelmed by the brightness of the lights on your console." End quote.
Did I read that correctly?
**A. Yes.**
Q. Was that your understanding of some of his difficulties from the letter?



**A. Yes.**
Q. As we go further, this is where you talk about the apparatuses.
Quote, "During our meeting on October 3rd, 2022, we came to an agreement that you would consult with your ophthalmologist, William B. Hart, to find apparatuses that the company could potentially provide to increase the visibility of the console."
"The company expects for you to provide a list of these item by November 1st, 2022. We will then review this list and evaluate the equipment that you feel will provide you the best support, while completing your job responsibilities. The company will review the effectiveness of these apparatuses provided after a period of 30 days." End quote.
Did I read that correctly?
**A. Yes.**
Q. One of the apparatuses that he mentioned was the lamp that he was bringing with him; is that right?
**A. Yes.**
Q. Another apparatus that he mentioned was actually fixing the light above the heater board; is that correct?



**A. Yes.**
Q. That was provided to the company before November 1st of 2022?
**A. Correct.**
Q. Now, with that understanding let's go back to 811. By December 12th it had not been repaired. One of the apparatuses that he identified in accordance with your request by the day you requested it, still had not gotten repaired by this date; is that correct?
**A. According to this email, yes.**
Q. And also according to the letter, what actually is supposed to happen is that once that is completed, once the equipment is in place and completed, the company is then going to review the effectiveness of that provided after a period of 30 days.
So, if I am reading this correctly, you just tell me if I'm not reading it, if I provide you this equipment on December 15th, let's say hypothetically, just say hypothetically, I provide it to you December 15th, we're going to let you have 30 days with equipment and we are going to take a look at how

that's going.
So if I provided it to you December 15th, January 15th, thereabouts, I'm going to look and see how's that going, how's that working for you. Is that what that's stating?
**A. Correct.**
Q. Do you know as you sit here today, when the heater board lamp got repaired, if ever?
**A. No.**
Q. So, we don't know the date that it was repaired, if ever. And we certainly don't know if this 30-day period in this letter was even offered to Mr. Jones before he was terminated?
**A. I'm not aware.**
Q. I did mention, Ms. Danford, that I would put visualization to the termination recommendation form and I want to do that.
MS. WILLIAMS: I'm sorry, can I ask just a quick housekeeping?
Exhibit 5, what pages does that comprise, is it just 712 or --
MR. SUDDUTH: Exhibit 5 does appear to just be one page, it appears to just be --



MS. WILLIAMS: Just wanted to make sure, thank you. Sorry about that.
MR. SUDDUTH: No, no. No worries, sure.
BY MR. SUDDUTH:
Q. This is, Madam Court Reporter, this is a two-page document. So this is in Globo 122. The employee termination form which is 122 to 123. And this appears to be a termination recommendation form with the date of December 27th of 2022.
Is this the termination recommendation form, Ms. Danford, that you recall receiving from Chelse, that you reviewed and forwarded up the chain?
**A. It is one of the forms, yes. That is the seven factor test.**
Q. I'm confused when you say one of the forms. Was it the form that was submitted from Mr. Jones or was there another one?
**A. That is not the actual full recommendation. That is the seven factor test. It's one of the attachments.**
Q. Oh, okay. What is the actual form that was submitted?



**A. It is an email summary.**
(Whereupon, Exhibit 6, Bates 121 was marked for identification.)
BY MR. SUDDUTH:
Q. Madam Court Reporter, am I on Exhibit 6 at this point?
Yes, okay. All right. Thank you.
Let's go to 121. I'll make this Exhibit 6. 121. This appears to be a termination recommendation memo. Is this what you're referring to?
**A. Yes.**
Q. I see. Okay. And then the form, the seven factor form, goes with that memo?
**A. Correct.**
Q. Understood. So, the termination recommendation memo, which is Exhibit 6 -- excuse me, which is CP Chem 121, we will make that Exhibit 6 to your deposition.
This was -- the recommendation was, quote, "As a result of Jones's failure to qualify on the heater board after four attempts, Brian Coots, operations manager, recommends termination of Jones' employment, Gary Parsley,



plant manager, supports this recommendation prepared by Chelse Cisneros. Reviewed and supported by senior counsel, Stephanie John.
Was this also brought to your attention for your review and approval?
**A. Yes.**
Q. Now, that we've gone through some of these emails and timelines specifically regarding the heater board lamp, the idea that the four failed attempts, the PIP and the 35-day training, all occurred when one of the identified apparatuses that Mr. Jones requested and the timeline the company asked for, was never provided to him during that time period, does that change your analysis at all, as to whether or not you would support recommendation for termination on the failure to qualify for the heater board?
**A. No.**
Q. Really, why not?
**A. At none of the times during his testing did he bring up anything to do with not being able to see the board and -- that was raised to me.**
Q. At no point in time was anything about

Page 94

difficulty to see the board raised to you?
**A. During his actual -- during the testing. He never mentioned during his testing that he was having a problem seeing the board and that was causing difficulties with his testing.**
Q. Is that something that you're saying he never raised this at all or are you just saying he never raised this to you?
**A. So, I'm not aware of them raising at all, it was never raised to me.**
Q. The fact that Mr. Jones is -- I guess I'm not arguing with you, per se, I just want to, I guess, understand your testimony. It sounds like you don't view Mr. Jones sending his ophthalmologist's letter as sort of him saying, I'm struggling to see the board. I'm testing on the heater board.
In the middle of testing on the heater board, for the first time in my employment I'm going to send you guys a letter from my eye doctor.
You didn't construe that or take that as the employee saying I'm having some struggles?

Page 95

**A. Could you rephrase your question?**
Q. Yes. When I asked you earlier whether all of these things I've shown you changed your analysis and you said no, and I said why you said, well, because he never told me that he was having difficulty seeing the heater board. So, I'm pushing on that answer a little bit. I'm saying okay, he never told you -- well, let's go through the different things the happened in this case.
One of the things that happened in this case was he sent you an ophthalmologist letter. He's training on the heater board and he sends you a letter from his eye doctor talking about difficulty in seeing small numbers and letters.
Is it fair to say, you did not construe that letter sent by Mr. Jones from his doctor, you didn't construe that letter as a cry for help or as Mr. Jones saying I'm struggling, you didn't construe it that way?
**A. I would not say that's correct.**
Q. Okay.
**A. We did partake in the process. We did allow him to supply a lamp while we were waiting**

Page 96

**on the light to be repaired. And, in addition, we gave him an extra attempt on the test that we do not give to other employees.**
Q. Well, I appreciate that, so forgive me for being somewhat cynical here. But if I can't see in round one, what is going to make a difference for me in round two?
**A. That I cannot answer.**
Q. So, then the request beyond his lamp, meaning to fix the lighting above the heater board, did the company ever tell him, by the way, Warren, look, that we just -- that's unreasonable, that's too much. We are not going to do that, we don't want to do that. Forget it, right.
Was there ever any kind of affirmative response from the company, we are not going to do that to your knowledge?
**A. No.**
Q. So, if Warren is expecting, hoping, thinking that that light is going to be fixed, is that a reasonable expectation for Mr. Jones to have?
**A. Yes.**
Q. Since it didn't change your analysis

Page 97

the fact, that it was never fixed before his termination, what would Mr. Jones have needed to do to change your view on things?
You know, the fact that that heater board lamp was never fixed didn't change your analysis. So what did Mr. Jones not do that you wanted him to do in order to save his job?
**A. So, he was providing the lamp himself until the light got corrected. And never were we told I can't see at all or I still can't see. It was the lamp was a temporary fix until the light got repaired.**
Q. So, I'm guessing then, but I don't want to guess, I want to make sure I'm clear, is it fair to say then that it was HR's assumption and, you know, it's the best word I can think of, was it HR's assumption then based on everything you had received and known and heard, was it HR's assumption that that lamp was an adequate temporary fix? Meaning, yeah, that's what he was bringing in from the house, but HR was assuming, okay, that's going to do it, that's going to help him. He can see adequately until we get the other light repaired. HR was

operating under the assumption that that fix was solving everything for Warren. It was temporary, yes, but it was solving everything, was that the operating assumption?
**A. Yes.**
Q. If Warren was expressing to others, either his committee team that was evaluating him, Judson Wooters, who was making these decisions about him. Chelse, his interactive process person. If he was explaining or expressing to other people, that despite his lamp, he was still having difficulties. Fair to say, those people never brought it to your attention?
**A. Correct.**
Q. If they had brought it to your attention, would that have changed your analysis?
**A. Yes, possibly.**
Q. In terms of your personal knowledge regarding this case and I know I've already taken up a good part of your time, that I spent about two hours, but in regards to your personal knowledge of this case, it's very clear that Chelse had far more personally to do with this



case, she was much more involved with Warren day-to-day than you were, but have we covered everything today that you personally were involved with, decisions you made, conversations that you had.
Again, I know you weren't as boots on the ground as Chelse was, but I don't want to continue to ask you questions you just weren't present for, you know, you weren't there for that meeting or weren't there for that phone call.
So, is there any other conversation with the relevant parties that I have not covered with you today?
**A. No, I'm not aware of any.**
Q. To be clear, I'm even asking about conversations that may not have been with Mr. Jones directly in the interactive process. I'm also asking about questions or -- excuse me, I'm also asking about meetings and interactions that would have happened with Judson or any other higher about termination. Do you recall any specific conversations with either Judson Wooters or anybody up the chain of command above you, regarding termination,



whether to terminate or not, what factors were considered. Any specific conversations that you recall?
**A. I don't recall anything specific.**
Q. Okay. With those exhibits being attached, I don't believe I have anything further for you. Thank you, Ms. Danford, for your time.
Now, Ms. Marlene may have some questions for you, but I have nothing further at this time.
MS. WILLIAMS: Can we take just like a five-minute break?
MR. SUDDUTH: Sure.
THE VIDEOGRAPHER: We are now off the record. The time is 11:16 a.m. Central Time.
(Recess was taken from 11:16 a.m. to 11:22 a.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:22 a.m. central Time.
MS. WILLIAMS: We don't have any questions. We will reserve for trial.
MR. SUDDUTH: Okay. In light of that, I have no questions, if they have no



questions for follow-up.
But one final thing: Are you reading and signing, did you want to go over that with her, Marlene?
MS. WILLIAMS: Yes. We will read and sign.
MR. SUDDUTH: Okay.
THE VIDEOGRAPHER: All right. Thank you. Counsel is done with questioning. Would anyone like to place a video or transcript order of today's deposition before we go off the record.
MR. SUDDUTH: Since I ordered the deposition, I get it as part of my standard order. So just my standard that came with ordering the depo.
THE VIDEOGRAPHER: Thank you, sir.
MS. WILLIAMS: I'll have my office follow-up. I think we have your contact information just to confirm the details. Thank you.
THE VIDEOGRAPHER: All right thank you, Ms. Williams.
If everyone could stand by then. This concludes the deposition of Aprile Danford

for Warren F. Jones versus Chevron Phillips Chemical Company, LP. We are now off the record. The time is 11:23 a.m. Central Time.

(Witness excused.)

(Thereupon, the deposition was concluded at 11:23 a.m.)



CERTIFICATE OF OATH

THE STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that APRILE DANFORD personally appeared before me and was duly sworn.

I further certify, that pursuant to FRCP Rule 30(e)(1), that the signature of the deponent APRILE DANFORD was requested by the deponent or a party before the completion of the deposition.

WITNESS my hand and official seal this 12th day of September, 2025.

MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires: 5/22/2029
My Commission No.: HH655949



C E R T I F I C A T E

THE STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, MELANIE STINSON-KONSTANTINIDIS, RPR, Registered Professional Reporter, State of Florida at large, do hereby certify that I was authorized to and did report said deposition in stenotype; and that the foregoing pages, numbered from 1 to 102, inclusive, are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of September, 2025.

MELANIE STINSON-KONSTANTINIDIS, RPR,
REGISTERED PROFESSIONAL REPORTER
Notary Public - State of Florida
My Commission Expires: 5/22/2029
My Commission No.: HH655949



DEPOSITION ERRATA SHEET

JONES
vs.
CHEVRON PHILLIPS

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding I offer these changes as if still under oath.

Signed on the ______ day of
____________, 20___.

___________________________________

APRILE DANFORD

# Exhibit H

# Deposition Transcript

Case Number: 1:24-cv-00350
Date: September 4, 2025

In the matter of:

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

# BRYAN KUBSCH

CERTIFIED COPY

Reported by:
SUSAN LOZZI

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| WARREN F. JONES | ) | |
| Plaintiff | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 1:24-cv-00350 |
| | ) | |
| CHEVRON PHILLIPS | ) | |
| CHEMICAL COMPANY LP, | ) | |
| Defendant | ) | |

VIDEOTAPED DEPOSITION OF BRYAN G. KUBSCH, a witness in the above-entitled cause, taken remotely from Borger, Texas, before Susan Lozzi, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, pursuant to the Federal Rules of Civil Procedure, on Thursday, September 4, 2025, commencing at 2:05 p.m. ET.

APPEARANCES:

SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana 70601
(337) 480-0101
For the Plaintiff.
BY: JAMES E. SUDDUTH, III, ESQ.
james@saa.legal
(via Zoom.)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
500 Dallas Street - Suite 2100
Houston, Texas 77002
(713) 655-0855
For the Defendant.
BY: MARLENE C. WILLIAMS, ESQ.
marlene.williams@ogletree.com
(via Zoom.)

ALSO PRESENT (via Zoom):
Enmanuel Mejia, Legal Videographer.
Stephanie John, CP Chem Representative.



INDEX


| BRYAN G. KUBSCH | | Page |
|---|---|---|
| Direct Examination by Mr. Sudduth | | 5 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| Exhibit 1 | NOTICE OF DEPOSITION of Bryan Kubsch. | 25 |
| Exhibit 2 | E-mail correspondence, CP CHEM 000705. | 35 |
| Exhibit 3 | Accommodation Meeting: Warren Jones 10/3/2022 4:00 pm, CP CHEM 000814. | 44 |
| Exhibit 4 | E-mail correspondence with attached notes and concerns by Dr. William Hart, CP CHEM 000706 through CP CHEM 000709. | 52 |
| Exhibit 5 | E-mail correspondence CP CHEM 000741 and CP CHEM 000742. | 56 |
| Exhibit 6 | E-mail correspondence, CP CHEM 000811 and CP CHEM 000812. | 64 |
| Exhibit 7 | E-mail correspondence, CP CHEM 000809 and CP CHEM 000810. | 80 |
| Exhibit 8 | Summary of Meet and Confer Meeting Held October 3, 2022, CP CHEM 000808. | 87 |
| Exhibit 9 | E-mail correspondence, CP CHEM 000745 through CP CHEM 000748. | 90 |


*** Original exhibits retained by the court reporter and returned to Mr. Sudduth ***



P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER: Good afternoon. We are on the record at 1:05 p.m. Central Time, September 4th, 2025, to begin the deposition of Bryan Kubsch in the matter of Warren F. Jones vs. Chevron Phillips Chemical Company LP.

The venue of this case is in the United States District Court for the Eastern District of Texas, Beaumont Division. The case number is 1:24-cv-00350.

This deposition is taking place via Zoom. The legal videographer is Enmanuel Mejia, here on behalf of Steno, whose business address is 315 West Ninth Street, Suite 807, Los Angeles, California 90015. Would counsel please identify yourselves and state whom you represent?

MR. SUDDUTH: Yes. James Sudduth on behalf of the Plaintiff, Mr. Warren Jones.

MS. WILLIAMS: Marlene Williams on behalf of Defendant Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, Counsel. Will the court reporter please identify yourself and swear in the witness?

COURT REPORTER: My name is Susan



Lozzi. I am a court reporter. The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.

The parties and their counsel further agree that while I am a notary public, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me.

If any party does have an objection to this manner of reporting or anything stated above, please state so now.

(Pause.)

COURT REPORTER: Hearing none, we can proceed. Would you please raise your right hand and I'll swear you in.

BRYAN G. KUBSCH, having been sworn to tell the truth, testified as follows:

DIRECT EXAMINATION BY MR. SUDDUTH:

Q. All right. Mr. Kubsch, my name is James Sudduth. I know we haven't met before, but I'm representing Mr. Warren Jones. It's nice to meet you, sir. Let me ask you, have you ever been

deposed before, meaning in a deposition like this?
A. **Not like this.**
Q. Not like this. Okay. So did you have one that was maybe in person?
A. **Yes. I was questioned as part of a criminal case.**
Q. Okay. How long ago was that?
A. **Oh, 20 years.**
Q. Okay. Yeah, so it definitely wasn't by Zoom 20 years ago and it's probably -- was it a deposition in a criminal case or was it an interview with the cops?
A. **It may have been an interview with the -- with the -- the attorney was present but it was with the police.**
Q. Understand. Well, let me give you then some ground rules about what --
A. **Okay.**
Q. -- kind of what to expect today and some housekeeping matters before I jump into the actual meat of things.
The first ground rule I like to go over, sir, is to remind you that you are under oath. I know things can seem a bit informal. It looks like from your background maybe you might be in your



office and I'm in a conference room. We're not in courtroom right now. We're doing this by videoconference.
So it can seem a little bit informal, but the oath that you just took is the same oath you would take as if you were in a court of law and we did have a judge and jury sitting with us.
And so all the same obligations to tell the truth, all the same penalties of perjury if you do not, all of those attach here just like they would in a courtroom. Are you okay with that?
A. **Yes, sir.**
Q. All right. And you understand it?
A. **Yes, sir.**
Q. Very good. The next thing, sir, is to remind you to please verbalize your answers. You've been doing a good job of that so far today, but you'll find, I -- I promise, throughout the deposition today it's very normal for people to say things like mh-hmm and uh-uh when they're answering questions.
Again, there's no problem with that in conversation, but the problem here is that since the court reporter is taking down everything you're saying into a written booklet, when you say an uh-uh



and an mh-hmm it's very difficult to get that transcribed accurately, so whatever your answer is, yes, no, maybe, whatever it is, please verbalize that out loud. Okay?
A. **Okay.**
Q. Thank you, sir. Also, talking over each other. This happens a lot, too, in conversation. For example, I can be asking you a question and you're sort of sensing where that question's going and so before I'm done asking it you start to answer.
Well, again, there's no harm with that in normal conversation but here the problem is twofold. One, it's really hard to pick up on people when we're talking over each other at the same time.
But, number two, it's especially more problematic by Zoom because with Zoom, Zoom will sometimes cut off one of the speakers entirely if they're speaking at the same time so then we got nothing that you're saying.
So if you would, sir, please wait till I finish my question all the way to the end even though you know where I'm headed and then you can begin to answer. Okay?
A. **Sure.**



Q. Thank you, sir. I think the final thing I'll go over with you before we jump into things is breaks. This is not a marathon. Okay? So if you need to take a break, you're welcome to it. Bathroom, water, whatever the case is.
My only request of you is if I have a question that's pending on the table for you to answer, please answer that question before you go take any break. All right?
A. **Fair.**
Q. Okay. Well, in light of that, do you have any questions of me before I press further?
A. **No, sir.**
Q. All right. Then your full legal name, please, and your address for the record. If you wish to use a business address, you're welcome to do that as well.
A. **My full name for the record is Bryan Graham Kubsch, G-R-A-H-A-M. My address is 2707 Portland Avenue. That's Amarillo, Texas 79118.**
Q. Okay. And that address you gave, is that a residential?
A. **It's my home.**
Q. Okay. Got you. All right, sir. Well, since this is my only opportunity to talk to you

Page 10

outside of a trial, I want to just get a little bit of background about you but I don't need too terribly much.
I want to start just professionally speaking. How long have you been working for Chevron Phillips or CP Chem?
**A. Since 1997.**
Q. So if my math is right, what's that? About 28 years give or take?
**A. Give or take.**
Q. Okay. Have you always had the same position with them or have you --
**A. No.**
COURT REPORTER: I'm -- I'm sorry. I didn't get the question. I'm sorry.
Q. Yeah, see, that's -- you picked up where I was going with my question and you started to answer, so -- and like I said, it's normal. It happens, but -- so let me repeat my question.
**A. Sure.**
Q. Have you held the same position with CP Chem the entire time or have you had a variety of different positions?
**A. I've had a variety of positions.**
Q. Okay. Why don't we take that from the

Page 11

start. So when you hired on, what was your position?
**A. Oh, I was a operator in the 1797 Unit at Cedar Bayou.**
Q. How long did you do that?
**A. In round numbers, six or seven years.**
Q. Okay. What was your next position?
**A. Training coordinator.**
Q. And how long did you do that?
**A. Five or six years seems about right.**
Q. And by the way, the move from operator to training coordinator, is that something that was voluntary? Did they come to you about it? Did you go to them? How did that happen?
**A. I was in a -- I was in the -- kind of a similar role on special assignment as a special assignment operator. Kind of put on a straight day assignment to train other operators and that position had been newly created by the company and I was appointed to that position.**
Q. Did that position come with any sort of pay raise? Like was it considered a promotion of any kind?
**A. It -- it came with a pay demotion. It was less pay.**

Page 12

Q. Oh, all right. So was that -- was that discipline in any way?
**A. No, sir. It just happened to be that before the -- I was on the operator's schedule, a 12-hour overtime, nonexempt from -- from a nonexempt hourly employee to a salaried position. Salaried position paid less.**
Q. Got you. Okay. So you did that for five or six years. What was the next position?
**A. I became the operations specialist at the K-Resin plant in Pasadena, Texas.**
Q. And how long did you do that?
(Pause.)
**A. I don't recall exactly.**
Q. Okay. What was your next position after that?
**A. I was the superintendent of the K-Resin and utilities operation, operating units.**
Q. And how long did you serve as a superintendent?
(Pause.)
**A. A couple of years.**
Q. And after that?
**A. I became the Plant 8 operations superintendent at Pasadena.**

Page 13

Q. Let me go back through a few of these that I've noted. So the operations specialist and the superintendent, now the part -- the Plant 8 operations superintendent, each of those particular moves, were those considered moves that were promotions and carried increases in pay or did those moves, were they considered more lateral? Describe that for me.
**A. Sure. From -- from specialist to superintendent, that would have been a promotion.**
Q. Okay.
**A. I don't recall a promotion between K-Resin and Plant 8. They're -- they're more or less the same job in different operating functions.**
Q. Got you. How long did you do the Plant 8 operations superintendent role?
(Pause.)
**A. It was at least two and a half years. Maybe three years.**
Q. Plant 8, where is that geographically?
**A. It's in Pasadena. The Pasadena Plastics Complex.**
Q. Okay. And what was your next role?
**A. I was the Bartlesville research operations manager.**

Q. And how long did you serve in that capacity?
**A. Six years.**
Q. Six years. Was that lateral from Plant 8 or was that a promotion?
**A. That was a promotion.**
Q. Okay. Where was that at again?
**A. Bartlesville, Oklahoma.**
Q. And your next role?
**A. Port Arthur operations manager.**
Q. I think that's probably the role that we're going to spend the majority today talking about, the Port Arthur operations manager role. What were the years that you were in that role?
**A. All of 2019, '20, '21, '22, '23, '24 and half of '25. I take that back. I -- I didn't arrive in 2019 until April, now that I say that out loud.**
Q. Okay. So you say half of '25, so it sounds like maybe here recently perhaps in '25 you -- you had a move?
**A. I -- I moved to the Borger facility here in North Texas. I was here on site July 1st.**
Q. July 1st of this year?
**A. Yes, sir.**



Q. Okay. And what is your role there?
**A. I am the specialty chemicals operations manager.**
(Pause.)
Q. So from research operations manager over to the Port Arthur operations manager, was that lateral or was that a promotion?
**A. Lateral.**
Q. Lateral. Okay. And then over to your current facility. Was that lateral or a promotion?
**A. Lateral.**
Q. The move from Port Arthur over to where you are now, was that something you applied for? The company asked you to take it on? How did that happen?
**A. I expressed interest in the position when the position came open. I talked to the plant manager here and I was -- I was offered the job.**
Q. Got you. Has this time, these 28 years with CP Chem, has this been the entirety or at least the vast majority of your professional career or did you have other jobs professionally prior to that?
**A. No. This has been the vast majority of it.**
Q. Okay. Have you experienced any discipline



or write-ups for -- aside from the demotion that was really more of a demotion I think just because of the change from exempt to nonexempt, if I understood your testimony correctly. It didn't sound like it was a demotion because of performance issues.
So have you experienced any discipline, write-ups, demotions because of performance issues, things of this nature over your time with CP Chem?
**A. Once as an hourly employee, yes.**
Q. And as an hourly employee, was that back when you were an operator?
**A. Yes, sir.**
Q. Okay. So the very beginning of your career?
**A. It was at the very beginning of my tenure, yes, sir.**
Q. Okay. And you said that occurred once?
**A. Once.**
Q. What about prior to CP Chem? Were you ever fired or discharged from any job involuntarily prior to CP Chem?
**A. Not that I recall, no.**
Q. Okay. And then educationally speaking, I assume you graduated from high school. Did you go on to any sort of college or vocational training or



anything of that nature?
**A. Yes, sir.**
Q. Okay. Where to?
**A. I went to the University of Houston at Clear Lake.**
Q. Did you obtain any sort of degree from the University of Houston?
**A. I have a bachelor's degree in finance.**
Q. So do I. That was my bachelor's before I went to law school. After you got your bachelor's in finance, did you go on to get any sort of master's or doctorate or did you enter the workforce?
**A. No, sir.**
Q. Okay.
(Pause.)
Q. So at your time then with Port Arthur as the operations manager, tell me kind of from a -- from a hierarchy standpoint what -- what that looks like. How many people did you have that were people that directly reported to you?
**A. Direct reports were just three: two superintendents and an administrative assistant, and then indirectly 125 in round numbers.**
Q. Right. Okay. So 125 total employees that

may have been underneath your hierarchal structure?
**A. Yeah, kind of org chart.**
Q. Got you. But directly underneath you you said were two superintendents. Do you recall -- and we don't have to do it for the entire time you were there because I'm sure positions may have changed.
But I'm most interested in the period of the fall of 2022, which is what we'll talk a lot about today, from kind of August, September of '22 until the very beginning of January of '23 is what we'll talk about. So during that time frame, who were your two superintendents?
**A. In the ethylene unit in that time frame, Judson Wooters would have held that position. It's unclear to me exactly when we changed.**
**I think it's right in that spot where we changed over the -- the aromatics team leader. Cameron Crager would have been the incumbent. Josh Shenkir was the employee that I hired.**
Q. And so Wooters would have been over ethylene?
**A. Yes.**
Q. Okay. Underneath Wooters, would Warren Jones have directly reported to Mr. Wooters or would



there have been somebody in-between?
**A. There would have been a shift supervisor in-between. A plant shift coordinator, that's their job title, between Warren and Judson.**
Q. Do you recall who that would have been at that time?
**A. My apologies. I do not recall who his supervisor was.**
Q. Okay. And the only reason why I ask that is because, you know, in a lot of these e-mails and documents that I'm looking at, I see, you know, HR involved.
Sometimes I might see you involved, but -- I certainly see Judson Wooters involved a lot, but I've -- I've not seen, you know, another name that would have been a plant shift coordinator kind of involved in meetings with Warren and that kind of thing.
**A. Yeah.**
Q. So as -- as you recall right now, no particular name that you can think of?
**A. No, sir. Not -- not related to Warren Jones.**
Q. Okay. In terms of discipline, in your role where you had 125 people kind of within your



org chart, describe to me how -- how that goes. I would imagine at your level you're not really boots on the ground in terms of discipline except for maybe your three direct reports. Is that a fair statement?
**A. It's fair.**
Q. Okay. So if -- if Judson wants to discipline somebody, if Cameron Crager wanted to, if -- if a shift coordinator wanted to discipline somebody, do they have to run that up the line to you to get approval for that?
**A. Depending on the severity, yes.**
Q. Okay. Let's -- let's talk about that a little bit. So if I want to, you know, just to give a verbal coaching or maybe a written warning, does that need to go to your level?
**A. Those are two different questions. If somebody wanted to just give some coaching, they -- they don't have to bring that to me.**
**They want to talk to their employees about performance or behavior, that's -- that's certainly -- I would like to be made aware of those things but not -- not like an approval. Discipline would exceed that to a written, something we were going to put in somebody's file, yes, that would**



**usually land across my desk. I would like to understand the circumstances of that. I would speak with HR, make sure we were being consistent and equal, treating people fairly.**
Q. Okay. And so I would imagine then if written warnings were going to go to you, then everything beyond that in terms of severity would also go to you, meaning things like suspensions or demotions or terminations? Those would also go to you?
**A. Yes, sir. I would be involved in those situations.**
Q. Okay. Describe for me, please, the degree of involvement and there's not really a right answer here. It just depends -- every person's different.
I don't know if when people bring something like a written warning or a suspension or a termination to you, is that something that you take your supervisor's word for it or do you independently go in and investigate it yourself?
**A. Again, it would depend on the severity and what the circumstances were.**
Q. Meaning if it's so severe it's -- it's going to be a termination, your independent review of the circumstances is going to be more than it

would be in other circumstances?
**A. Yes.**
Q. Okay. What about in terms of not discipline but other maybe HR-related things? So let's talk about something like an accommodation request for a disability.
Is that something that you would stay involved with? Do you defer that to HR? Tell me about that.
**A. I would be involved.**
Q. To what degree?
**A. If an employee would present an accomodation request through the medical office and through HR, it kind of comes that direction to us.**
**It usually presents itself as this employee needs to sit at the board for six weeks because he has a broken foot. Do you have the work available for him to sit and do that.**
Q. Got you.
**A. And based on that employee's qualification or skill level, from there we would make that determination did we or did we not have that available work. Our goal is always to put people to work where we can.**
Q. Understood. Let me -- let me turn now



kind of specifically to some of the issues in this case, and -- and I just -- I want to start, though, with some opening questions about kind of what you've done to prepare for today.
Sometimes -- we always issue what's called a Notice of Deposition for somebody's deposition. It's called a notice of a deposition. Sometimes that gets sent to people like you, the witness, and sometimes it doesn't. Have you seen your Notice of Deposition?
**A. No, sir.**
Q. Okay. How were you notified of this deposition? If it was through Legal, just tell me it was through Legal.
I don't want to know the details of any conversations you may have had with any attorneys representing CP Chem, but if you were told about it by somebody else, I'd like to know about that.
(Pause.)
**A. I would say I was told by Legal.**
Q. Okay. In terms of preparation for your deposition today, did you discuss this case or your recollection of this case or the facts and circumstances surrounding this case, did you discuss that with anybody aside from Legal prior to today?



**A. No.**
Q. Okay. Regarding preparation as it relates to documents, what sort of documents have you reviewed in preparation for your deposition today, if any?
**A. I've seen some e-mails that were --**
Q. Okay.
**A. -- were sent back and forth that I set aside.**
Q. Okay. What about the lawsuit that Mr. Jones filed? You know the lawsuit's filed in Federal Court so you could go online and pull that if you wanted to. Have you ever seen that lawsuit?
**A. I have not seen the lawsuit.**
Q. Are you generally aware of what Mr. Jones' allegations are? Would you even have an idea of what he's alleging in this suit?
**A. Generally, I would -- no. I'd be making an assumption. I don't know what he's alleging.**
Q. Okay. So then let's just kind of start from the top with your knowledge of Mr. Jones and the beginning of getting to know him. So let me just start first with...
MR. SUDDUTH: Let me just say this: Madam court reporter, I'm going to take the Notice



of Deposition and mark it as Exhibit -- Exhibit 1 to this deposition and I'm send that to you as a PDF.
(Exhibit 1; so marked.)
Q. Okay. In terms of knowing Mr. Jones, did you know him outside of work or is the first time you met him when he joined CP Chem?
**A. He was there when I got there, as I recall.**
Q. That's right. You said you got there in April of '19 at --
**A. Yeah.**
Q. -- Port Arthur. Okay. So when you arrived in April of '19, he was already there?
**A. Yeah, he -- my recollection is he was already an employee.**
Q. Okay. You did not know him, though, prior to when you arrived at Port Arthur?
**A. No.**
Q. Okay. Describe for me what your interactions with Mr. Jones would have been like in terms of frequency. Okay?
Is this a situation where you were going to see and run into Mr. Jones every day? Once a month? Once a week? How did that go?
**A. His schedule, he was on a rotating**

Page 26

schedule, so my schedule and his schedule didn't line up every day. In fact, his schedule is on days only 13 times a year, so I would only see him, have that potential to see him there.
I would only see him casually in the control room or out in the field where he was working. I got to know him enough to know his name and that he was -- that I liked Warren.
Q. Okay. Well, that was actually going to be my -- my next question was, in your interactions with him, any negative interactions with him? Any problems with him?
A. No, sir. Very pleasant person to be around.
Q. Okay. In regards to any work performance issues, and we'll get to the whole training on the heater board thing in a second.
A. Okay.
Q. Prior to the training on the heater board, any performance deficiencies? Any problems with his work or work product or anything like that?
A. Outside of training, I would say I was not aware of anything that was detrimental from his workload. He -- I would generally say he was a conscientious operator who made -- made the rounds,

Page 27

did the kind of work we needed him to do. I didn't find him sleeping on the job or camped out in a closet. He was generally out in the plant working.
Q. Got you. Okay. When -- so when -- we'll turn now to that training issue. When did the issue of Warren training on the heater board kind of first surface at your level that you recall?
A. Let's see. At the heater board?
Q. Yes, sir. Was there other training that was an issue for Warren aside from the heater board?
A. I'm -- I'm aware of previous issues, yes.
Q. With training?
A. With training.
Q. Okay. What were some of the previous issues then with training?
A. In his -- when I first kind of got to work there, he was qualifying I believe in the -- in one of the outside jobs. I can't recall which outside job in that position, and he had struggled through the qualification of that exam.
And subsequently we'd ask the ops specialist to go out and review the work with him and verify that he really -- he really did know the work and -- and that was the outcome, that he really did know the -- know the plant.

Page 28

Q. So what was the particular struggle if he knew the work? Was he struggling with, like, the written exam or what was he struggling with?
A. My recollection is that he could not describe the process flows well in certain sections of the area, of the plant and -- but he could go out and explain that in -- well, this goes from here to here. He could walk that system down and show where things -- things went; not necessarily from a recall situation.
Q. Okay. So -- and if I'm misstating this, correct me --
A. Go ahead.
Q. -- if I'm misstating it, but if I'm understanding you correctly, it sounds like he knew the process. He knew what was going on. He couldn't articulate it in his exam. Is that a fair summary or no?
A. I think that is a fair summary of -- of the earlier outside qualification area, yes.
Q. Okay. What -- and tell me again. What did the company do? You said there was a specialist or something like that? What did company do to help deal with that issue?
A. Michael -- Michael Dubois was the

Page 29

operations specialist of the unit.
Q. Okay.
A. He's a, you know, 40-year oper -- operations person. I had him go out and spend time with Warren and evaluate whether he was or was not qualified.
Q. And after Michael spent time out there with him, he -- it sounds like he made the ultimate decision that Warren was in fact qualified?
A. Yeah, he came back and said Warren really did understand the equipment. He had given him some kind of retraining and got him to the point where he was qualified to do the work.
Q. Okay. So now we can turn now to the heater board issue unless -- were there other trainings prior to -- aside from that?
A. No. Those are the only two issues, the -- the previous outside job and then the heater board --
Q. Okay.
A. -- was the ultimate problem, yeah.
Q. Right. Right. Okay. So then as we turn to the heater board, when were you first made aware that -- let me phrase the question this way: When were you first made aware, if you were, that Warren

Page 30

was going to begin training on the heater board?
A. **So prior to him training, there was a discussion -- I remember holding a discussion with Judson around the potential to bypass Warren for that training.**
**Our Collective Bargaining Agreement requires us to train in a seniority order, if that makes sense. We -- we train the most senior person who's available for the job in that next job.**
**The company and the employee directly can request or -- or ask to be bypassed and so Warren would have had an opportunity to be bypassed at the start of the heater board training.**
**Judson and I talked about going and maybe encouraging him to bypass simply because we didn't -- didn't know how well he was going to perform at the board.**
**And we ultimately decided -- my recollection is we decided to let him make that decision and he chose to train at the board.**
Q. Wait. So if I understand you correctly, Warren -- Warren had the choice to bypass this? He didn't have to go through this heater board training?
A. **He would have had the option per our**

Page 31

**Collective Bargaining Agreement to be bypassed if he and the company would have agreed.**
Q. If he and the company would have agreed. Okay.
A. **Yes.**
Q. When -- and this conversation that you were having with you and Judson, --
A. **Yeah.**
Q. -- was anybody else present for that conversation?
A. **I don't recall anyone else present.**
Q. What was your opinion on if Warren would have said, yes, I want to bypass, were you going to be okay with that?
A. **I would have wanted to talk to Warren about that because ultimately the company -- our goal is to train them fully. It wouldn't be an indefinite bypassing.**
**We would -- there would come to a point where we would want to train him and based on his tenure with the company, it was time, so I -- hard to say what I would or would not have done.**
Q. Okay. Well, what about -- what about Judson? Did Judson express an opinion that you recall about whether or not he would have been okay

Page 32

with Warren bypassing?
A. **I think he would -- I think he -- yes. I think he relayed that he would have been okay.**
Q. Okay. So it was -- it was really ultimately left up to Warren?
(Pause.)
A. **That's not the way -- that's not -- that's not accurate.**
Q. Okay.
A. **The decision would have been twofold between the company and Warren.**
Q. Who would have made the decision on behalf of the company?
(Pause.)
A. **I think Judson and I would have had to come to agreement.**
Q. Okay. I know that at your level, you're fairly high up. I don't know exactly -- that's what today is about. I don't know exactly what you know and what you don't know about the process.
But were you aware of Warren Jones submitting an accommodation request because of the heater board training?
A. **Not because of the heater board training, no.**

Page 33

Q. Okay. Why did you think that he submitted an accommodation request?
A. **He was having trouble with his eyesight.**
Q. Yeah. Did you know specifically what the eyesight issues were?
A. **Specifically, no, I did not understand the medical problem.**
Q. What about in terms of how it was affecting him in his training? Did you know how the vision issues were affecting the training, if they were at all?
A. **So at one point I believe he expressed that he was having trouble with training because he couldn't see the board.**
Q. Okay. He expressed that to you?
A. **Yes.**
Q. Do you recall, was that in person or over the phone or e-mail or what?
A. **It would have been in person.**
Q. In person?
A. **Yeah. It would have been in one of those casual conversations in the control room.**
Q. I'm -- I'm curious about the bypass thing because this is the first I'm hearing of this, and -- and I'm going to talk to you more about it

Page 34

because of some documents I'm going to show you, but is this something that -- does Warren have to make the decision to bypass in the beginning? It's kind of like if you don't call bypass in the beginning, you lose it. Like, once you start training you don't get to call bypass or could you call bypass after training for a little while?

**A. I think the practice would be that it was done beforehand.**

Q. Would there be a prohibition on him requesting it? I understand the typical practice would have been beforehand but what if he would have done it after?

(Pause.)

**A. That's not the way the contract is written, as I recall.**

Q. Okay. So is it fair to say that you don't really know what would have happened if he would have submitted a bypass --

**A. Sure.**

Q. -- request?

**A. Yeah, that's fair. I don't know what would have happened.**

MR. SUDDUTH: Okay. Then let me -- let me just show you this e-mail. We'll kind of

Page 35

start our dive into the documents here with this document and take it from here. I'm going to share my screen with you, sir, and bear with me here.

(Pause.)

MR. SUDDUTH: Go to Bates label 705. Madam court reporter, this will be Exhibit 2 to the deposition. It's Bates labeled at 705.

(Exhibit 2; so marked.)

Q. Mr. Kubsch, you'll see down here at the bottom. This is what I'm referring to as a Bates label. I'm highlighting it. This CP CHEM 705.

This is the way we track the voluminous documents in the litigation, so if you hear me say "Bates label," that's what I'm referencing, sir.

**A. Okay.**

Q. Can you see my screen okay? I'm going to zoom in maybe. I don't know if that -- does that help?

(Reviewing document.)

**A. Yes, better. Thank you.**

Q. Yes, sir. So this is kind of the beginning. This is back in September of '22. This is September 13, 2022. This is an e-mail that appears to be from Warren Jones. It says to Aprile Danford with a cc to Chelse Cisneros.

Page 36

It says, "Good evening. I want to be removed from under the bar of having a permanent schedule as a 1544 Operator and be placed back into the pool please. Thank you both." My first question to you, sir, is, what is a "1544 Operator"?

**A. A "1544 Operator" is an operator who operates the 1544 Unit. I'm not trying to talk in circles. That is the -- that is the job that we're talking about.**

Q. So it's an accurate answer for -- for a guy like me who doesn't work at CP Chem. It doesn't help me very much, but it's --

**A. Yeah, I can tell you what a 1544 Operator does.**

Q. All right. That might help me a little bit.

**A. They're -- they're responsible for the day-to-day operation and manufacture of ethylene, propylene, butadiene and raw paralysis gasoline. They take feedstocks and convert them to finished products. Put them down the pipelines.**

**They -- they operate all of the equipment, pumps, exchangers, furnaces, control systems. All of the things that are necessary to make that conversion.**

Page 37

Q. So would it be fair to say that a 1544 Operator is going to be on the ethylene side of things?

**A. It is. 1544 is the ethylene nomen -- is the ethylene unit.**

Q. Got you.

**A. Numeric -- numeric unit. I'm sorry.**

Q. Got you. Okay. I'm -- I'm curious about this language, though, remove from under the bar of having a permanent schedule [as read].

Is there some kind of burden as a 1544 Operator that would be different from if you're a pool operator?

**A. A burden...**

(Pause.)

**A. So the sentence doesn't quite make sense, "to be removed from under the bar." That -- that's not -- that doesn't make sense.**

Q. That's why I'm asking you because I wasn't too sure what that meant of "under the bar."

**A. Yeah.**

Q. But --

**A. I can't -- I -- I can't read into what he was trying to -- to say. I understand the -- the second part of the clause is "placed back into the**

Page 38

**pool." I understand what that means and his intent.**
Q. Okay. So tell me what that -- so -- and I understand if you don't understand kind of what he's trying to convey there in the first part, that's a perfectly fair answer, but let's jump to the second part. I want to go "back into the pool please." What's he referencing there?
**A. So if you would think about the hierarchy, if you will, in an operating unit, the pool operators are kind of a utility operator.**
**They're -- they're an operator that can be used in any way, in any function, in any fashion that the company sees to use them, inclusive of I could send an operator into the maintenance department to help a maintenance person.**
**Typically, in the ethylene unit pool, we have just left those employees in the operating unit. We've assigned them back to the same job that they disqualify from.**
**So they would disqualify themselves and -- and go under the bar. The bar describes the bar that's in the Collective Bargaining Agreement on the line of progression. They go under the bar and into the pool. If they remain there at six -- six months, 180 days, they have the option to bid to a**

Page 39

**different job. That's effectively what that gives him the option to do is that within 180 days of that date and going back into the pool, he loses his permanent schedule and he has the option to go back into -- to bid for a different position.**
Q. Okay. And --
**A. You could work in the pool for the rest of your career if that's what you so choose to do.**
Q. Okay. And so he's -- well, I guess let me ask it this way: You can work in the pool for the rest of your career if you so choose to do.
What does that do in terms of training? You know, if you choose to just work in a pool for the rest of your career, what about the obligation to train?
**A. We could -- we could train you in one job. We could train you in all jobs. I could train you in the ethylene unit and the boiler unit and the aromatics unit. There's no -- there would be no restriction on what the company would train you to do.**
Q. Okay. So as we scroll up here, it looks like Chelse forwards this to Judson and to yourself.
**A. Yeah.**
Q. It just says, "FYI... We wanted to make

Page 40

you both aware of his request." You respond it looks like -- I want to say -- yeah, the very next day. You respond on the 14th of September and you say, "10-4 I support the request."
**A. Yeah.**
Q. Okay. And then --
**A. The company can reject his qualifications to the pool.**
Q. The company can reject a request to go to the pool?
**A. Yes.**
Q. Okay. You support the request, but the only thing I see at the end of this chain is this e-mail from Chelse which says -- this is to Aprile in HR. It says, "Both Bryan and Jud were made aware of Warren's request. Bryan responded with his support."
You'll notice there notably absent is anything about what Jud's response was about the request.
So I'm asking you if you know, and you may not and I'll have the chance to depose Mr. Wooters, himself, but do you know whether or not Jud supported this request to go back in the pool or not?

Page 41

**A. You'd have to ask Judson. I don't recall.**
Q. Okay. Well, what about from just a procedural standpoint? If you supported the request, was that enough for the company to say 10-4. We're good to go?
**A. Yeah.**
Q. Okay. So when you supported the request for him to go in the pool, he's made the request himself as of September 13th. You supported it. Did this happen? Did he go back into the pool?
**A. With reading the e-mail, yes, I would say he's -- he's a pool operator unless he changed that later on.**
Q. Okay. So as of September, based upon these e-mails, he would be a pool operator?
**A. Based on what I read here, yes.**
Q. What does that do then in terms of obligations to train? Like obligations to train on the heater board.
**A. I don't think it changes the obligation at all.**
Q. Okay. So even though he's a pool operator, he's still now required to train on the heater board?
**A. Yeah, if the company decides that we need**

**to train him and we're going to train in that position, we give him the option to be bypassed. He chose not to bypass and we needed qualified operators.**
**Again, he could be in the pool operator for ten years. In the meantime, we needed trained operators in 1544. That's where our need was at.**
Q. Okay. So him being a pool operator then, if I understand you correctly, really had nothing to do with him training with the heater board?
**A. No. The pool is more about his desire to be eligible in 180 days from that point to bid into a different job or to bid back into the ethylene unit. He could make that choice as well.**
Q. How then procedurally does it work with the bypass proposal? Is there a formal written document presented to Warren giving him the chance to say I bypass or I do not bypass?
**A. No written document, no.**
Q. Okay. How was the request to bypass, was that presented to him, the request to bypass?
**A. I'm not aware of that, no.**
Q. Is there a particular reason why he didn't get the -- the -- the option to bypass? Why wasn't that presented to him?



**A. Well, I -- I think that that was asked. I just don't think -- I wasn't aware of it.**
Q. Okay. You said you think it was offered to him. Why do you think that?
**A. Because of the conversation Judson and I had prior to him training.**
Q. Okay. So is -- is that then an assumption that you're making that Judson would have then gone ahead and talked with him about that?
**A. Sure. I -- I think maybe I am assuming that, but he also was aware of the contract. He understood that he could bypass.**
Q. When you're saying that he's aware of the contract, you're saying he was aware of the CBA?
**A. Yes.**
Q. Okay. Well...
(Pause.)
MR. SUDDUTH: Grab the exact page number here.
MS. WILLIAMS: James, can I just ask? On Exhibit 2 is it just Page 705? It looked like it might have spilled over to 706. Maybe just a signature line, but I just -- no, it's not. Okay.
MR. SUDDUTH: Yeah, it doesn't spill. Just 705.



MS. WILLIAMS: Okay.
MR. SUDDUTH: Let's go then -- we'll make this Exhibit 3. This will be Bates labeled 814, Exhibit 3 to this deposition.
(Exhibit 3; so marked.)
Q. I'm not going to suggest, sir, that you were present for this. It doesn't say that you were, but I want to first ask you, did you know that the company opened an accommodations process or an interactive process is also how it's referred to with Mr. Jones regarding his eyesight?
**A. I'm aware, yes.**
Q. Okay. Were you made aware they met and they had their first kind of meet-and-confer meeting on October 3rd, 2022? Did you know that level of detail?
**A. I knew they had a meeting. I couldn't have told you when.**
Q. Okay. I'm just going to represent to you because I've already taken her deposition, this is drafted by Ms. Chelse Cisneros, now Chelse Morris. She drafted these minutes of kind of what was discussed. Okay? And I've talked to her about --
**A. Okay.**
Q. -- this document, so I want to ask you



about this document. There's a comment here that, "Jones asked for 5 minutes to tell us the background of his vision issues throughout his life."
And there's a couple comments here. Quote, he "Feels completely burnt after the board." "Having to squint to view the console."
Jones says that when he's on the heater board, he feels he knows the material. The anxiety that comes over him [as read].
"He doesn't want to put anyone in harm's way because he cannot properly see." The doctor stated he doesn't think it will get better [as read].
Any of those kind of comments about the vision, how the vision was affecting the heater board training, any of that ever relayed to you?
**A. Not that I recall.**
Q. Okay. It's this comment down here at the bottom that I want to ask you most specifically about.
"Brought up outside operator accommodation that was made in the past." "Clay" I think referring to Clay Ryan, "said that never made it 'up here' assuming he meant HR and that was all that was said on this."

I will tell you Mr. Jones has testified in his deposition and it's mentioned right here in the minutes of this meeting that he specifically said take me off the heater board. I don't want to be on the heater board because of all these issues. Let me just work outside.

Was that ever brought to your attention that -- that he did at this point in time, October 3rd? I don't know if you want to call this a formal bypass or not; that's why I was kind of surprised to hear about the bypass.

I don't know if he did it the right way. I don't know if there was a bypass procedure, but he's certainly saying take me out. I don't want the heater board anymore. Was this ever brought to your attention?

MS. WILLIAMS: I'm just going to -- before you respond, Bryan, I'm going to object to the extent it mischaracterizes the evidence and the document, but, Bryan, you can go ahead and respond.

**A. I would say that I do not recall that being asked as an accommodation.**

Q. You do not recall that being asked of an accommodation. Well, yeah, you weren't in the room, right?



**A. Yeah, that's not the nature of the discussion that I recall, that it --**

Q. Yeah.

**A. -- was an accommodation. I don't recall him ever asking to go back outside, no, sir.**

Q. Okay. Well, and I think that's what I'm trying to confirm here, is that this document wasn't drafted by Warren. This was drafted by Chelse.

And it says here "Brought up outside operator accommodation that was made in the past." I asked Ms. Morris, do you have any reason to dispute what you've written there and she told me no.

What I'm trying to confirm is, forget for a second whether Warren made the request to go outside or did not make the request to go outside. Is it fair to say such a request, i.e., allowing Warren to work outside, that was never even brought to your attention for you to consider?

**A. It was not brought to my attention to consider, no.**

Q. Okay. So then I think I know the answer to these next couple of questions, but I'm going to ask them. Is it fair to say that you never conducted -- at that point in time in 2022, you



never conducted any kind of analysis on whether or not such an accommodation would have been feasible or possible, did you?

**A. I know it's -- I know it would not have been.**

Q. So you know retroactively that it would not have been possible to do this?

**A. So the job that he has, the operator job at 1544, that job entails working all of the positions. Inside and outside.**

Q. And so there have never been other operators that -- that have been allowed to work on certain specific roles and forgo the training?

**A. Not that I'm aware of, no, sir.**

Q. Okay.

**A. Our goal would have been to have everybody trained in all of the jobs.**

Q. Did you -- did you ever consider -- well, no, you didn't. To confirm, you never considered making an accommodation for Warren due to the medical issues and forgoing that training that you just described for me?

**A. I was -- I was not asked for a medical accommodation that put him outside.**

Q. Right. So in terms of -- if Warren would



have worked -- yeah, describe this for me. Let's just say hypothetically that the company did decide to put Warren outside as a medical accomodation. What kind of burden would that have put on the company, if any?

MS. WILLIAMS: Objection to the extent it calls for a legal conclusion and it calls for speculation, but, Bryan, you can go ahead and answer.

MR. SUDDUTH: And just for the record, I will respond to -- to the form comment about the legal conclusion.

This witness has already testified retroactively, quote, this would not have been possible, end quote, so I'd -- I'd like to get his take on what that means.

MS. WILLIAMS: Well, and to clarify my objection, that is a different question from asking him about burden, which is a legally defined term, but, Bryan, as I said, you can go ahead and answer.

**A. Well, I would have think he's only doing half the job we pay him to do.**

Q. Okay. So the -- the burden on the company would be that he's -- he's still working and doing everything he's supposed to do as an outside

Page 50

operator, right?
**A. Again, that's only half of the work that we pay people to do.**
Q. The other half would be to train?
**A. To -- to work at the board jobs, yes, sir.**
Q. And so -- go ahead.
**A. I was going to say make sure that you understand that an operator, the 1544 Operator works inside and outside. Both.**
**There is -- we -- we sometimes say it as a job, but it's really a -- it's a job function outside and a job function inside. It is one position as an operator, 1544 Operator.**
Q. Right. So -- okay. And -- and that's -- I guess that's why I'm getting confused here because I was very, very surprised to hear you say at the beginning of your deposition there's a bypass option because all I've ever heard in this case is the just imperative, the essentialness of training. We have got to train. Train on everything. Train, train, train.
**A. Yeah.**
Q. Is it -- do you have the right -- as a 1544 Operator who's got to work the outside jobs and the inside jobs I can declare I don't want to train?

Page 51

**A. Not indefinitely. We would have to have a good reason to let somebody bypass.**
Q. What about a medical accomodation? Is that a good reason?
**A. It depends on what the medical accomodation would be. I don't -- I don't know.**
Q. Fair to say this particular medical accomodation with Warren Jones was never even presented to you for you to consider?
**A. Fair.**
Q. Okay. They can't postpone it indefinitely. I want to talk about that a little bit. That's interesting. How long can they postpone it?
**A. Whenever -- whenever we would think was -- would be reasonable. I might have let them bypass once or twice but eventually I need them to train.**
**And, again, good reason. Maybe they need more soak time in the field. Maybe they need more outside experience before we put them at the board.**
(Pause.)
Q. So then I -- I guess is it -- is it fair to say that the length of time or the duration of time that someone would be allowed to bypass is left to your discretion or if not your discretion perhaps

Page 52

the company's discretion? Is that accurate?
**A. Yeah, I think that's -- I think that's fair, sir.**
MR. SUDDUTH: Okay.
(Reviewing document.)
(Exhibit 4; so marked.)
Q. I want to show you what I'll mark as the next exhibit, which is No. -- the Bates label is 706.
(Reviewing document.)
Q. I don't know if this was ever brought to your attention, but I'll read it to you and we'll talk about it.
I'll just represent to you, sir, this is kind of the e-mail from Mr. Jones that started everything. This is dated September 19th of 2022. It's sent to Judson Wooters with a cc to Aprile Danford, to Clay Ryan and to Chelse Cisneros.
It says, "Good morning. This letter is from my Optometrist and my recent eye exam. Ever since I've been training on the heater board I've been in and out of the eye clinic trying to get my vision where I can see the controls and reading clearly." During this -- or "Doing this time my Dr. found some concerns he wanted to share with you

Page 53

guys. Attached is a letter wrote by him on my behalf. Please look at the letter and get back with me please. Thanks." Has this e-mail ever been shared with you?
**A. I don't recall seeing this e-mail, no.**
Q. What about the letter from the optometrist? Was that ever shared with you?
**A. I -- I have read that letter, but I don't recall the details of the letter. It's been a while.**
Q. Do you recall when you read it?
**A. Not specifically.**
Q. Okay. So in here he's talking about how the heater board is affecting his eyesight or the heater board training is affecting his eyesight.
When do you first recall that particular problem being brought to your attention? So not that he's training on the heater board but that the particular problem he's having with the heater board is this. Was that ever brought to your attention?
**A. Would you clarify what "this" is?**
Q. Yeah, and that's -- that's -- that's kind of exactly what I'm -- what I'm pushing at is that was the eyesight -- when I say "this," was the eyesight and the heater board troubles, was that

ever brought to your attention?
**A. I was aware that Warren had seen a specialist and that they had written a letter asking us to do -- to -- to help him see more clearly while he was training at the heater board. When that occurred, I don't -- I don't recall.**
Q. And who informed you of it?
**A. I believe Chelse did.**
Q. Okay. What was your response to that? I mean, was there any sort of action item for you to do or was that more for just your, like, situational awareness?
**A. No. I mean, I read it for, you know, what -- I was looking for what do we need to do to help him and I did not get that out of the letter. There were things in there that we couldn't do.**
Q. What were the things you couldn't do?
**A. One of things was assign him to a dayshift schedule. We didn't have that job available.**
Q. Okay. So at that time in the fall of 2022, there was no dayshift operator schedule available?
**A. There was not an opening, no, sir.**
Q. In order to determine all of the different positions that were out there and the openings that were out there and not out there, what sort of document would I need to look at from CP Chem to confirm what you just told me?



(Pause.)
Q. Perhaps an org chart that might have existed at the time? Payroll records? What do you think?
**A. I have no idea what documents you might look at.**
Q. Okay. I'll show you some e-mails from some other individuals here in a little while that -- that cause me some confusion with what you just testified about no openings, but we'll talk about that in a little bit. Let me keep going --
**A. Okay.**
Q. -- with this optometry issue. All right. So you looked at the letter to see what you could do to help Warren and some things you couldn't do. One thing you couldn't do was the nightshift. What else, if anything, could you not do?
**A. Didn't real ask us to do anything else that I recall.**
Q. Then was this -- I'm just going to represent to you because, again, you weren't present for the meet-and-confer meeting, but after the



meet-and-confer meeting, there was an obligation placed on -- which this will be at 741. It will be the next exhibit at Bates label 741.
(Exhibit 5; so marked.)
Q. There was an obligation placed on Mr. Jones to let the company know. You know, what do you need? What is the specific accommodation you are looking for? So this is the next exhibit, 7 --
MS. WILLIAMS: I'm sorry. James, I'm sorry. Is Exhibit 4 just 706? Because I think that's a string, but I think you referred to just Page 706. I'm just trying to make sure we have all the pages for Exhibit 4 on the record.
MR. SUDDUTH: Yeah, let's see. Marlene does a good job of keeping me -- let's see.
(Reviewing document.)
MR. SUDDUTH: Well, 706 does bleed. I never referenced 707 but it does bleed, so we can make Exhibit 4 706 to 707.
MS. WILLIAMS: Well, is it beyond 707 though? Because it -- I mean, it's up to you, but it seems it's referring to the attachment too, so...
MR. SUDDUTH: Right. Yeah, it is referring to the attachment so it's probably best that 70 -- that Exhibit 4 go from 706 to 709.



MS. WILLIAMS: Okay. Sorry about that. You were on 741. Didn't mean to interrupt.
MR. SUDDUTH: That's okay. Let's see. 741. All right.
Q. Okay. We'll take a look now at Exhibit 5, which is 741, and I'll go ahead and say this needs to be Bates labeled as 741 to 742 so it is in globo because it does spill over, but we're primarily going to focus here on 741.
You'll see here at the bottom of 741 an e-mail from Chelse to Warren with a cc to Aprile Danford and that's what I was representing to you earlier.
It says, "Hi Warren, thank you for attending the meeting this afternoon. As stated in the letter, You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but no later than November 11, 2022." Let me just stop there. Did I read that correctly, sir?
**A. I believe so.**
Q. Okay. So this is what I was telling you about earlier, that there was an obligation on

Warren to as soon as possible, no later than November the 11th specify this: adaptive devices that could potentially provide to, you know, increase the visibility of the console. Okay?
So do you have any reason to disagree with that, that that was an obligation on Mr. Jones that he needed to do that?
**A. We wanted to be able to help him, yes.**
Q. Okay. And this is beyond what the ophthalmologist sent in his letter back in -- in September.
There -- this is asking him, "You agreed you would consult with your Ophthalmologist to identify adaptive devices," so we're not going beyond the letter. Okay?
**A. Yeah.**
Q. All right. Now, --
**A. I wasn't there so I don't know what they agreed to, but...**
Q. Okay. I'm going to scroll up and -- and show it to you. This is what Warren says the next day. October 20th, 2022 at 6:59 a.m. Warren says, "Good morning! Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board.



Everything else will work out fine. The only light that works properly is the one over the computer. The other two seem to be broken. Thanks."
Were you ever made aware of that specific request, that specific accomodation request that the lighting over the heater board console work properly? Did you know that that was the specific adaptive request that he made?
**A. Yes. I -- I recall him -- him asking us to get the light fixed.**
Q. Okay. Describe that for me because kind of going back and forth about the lighting issue. Do you know what he's referencing when he says "the lighting over the heater board console"? Do you know what he's talking about?
**A. There are ceiling lights. There are lights at the desk and then there are lights on an arm, so I don't know specifically which light.**
Q. Okay.
**A. My -- my assumption it was the lights in the ceiling.**
Q. Okay. And it -- it looks like here that Judson kind of asked the question that -- that we just talked about. Judson -- "Thanks Warren, are you referring to the long, narrow lights on arms



that can be moved around? Can you enter a G3 to get them fixed?" Were you ever made aware of a work order going in to get these things fixed?
**A. After the fact I've heard there was a work order, yes, sir.**
Q. I'm sorry. The beginning of your answer, did you say after --
**A. After the fact. Long after the fact.**
Q. Long after the fact. How long after the fact? Like after Warren was fired?
**A. Yes, sir.**
Q. Okay. And then Chelse forwards this to Aprile as an FYI. Okay. During this time period from September to October to November through December, Warren's continuing to test.
He's continuing to train and continuing to test and continuing to fail on the tests for the heater board. Is that your recollection?
**A. Say that again, if you would, please. I got distracted with the timeline.**
Q. That's okay. So September he sends the letter. September 19th he sends his ophthalmologist's letter. September 19.
**A. In '20 --**
Q. October --



**A. '22 -- '22 or '21? Sorry.**
Q. '22.
**A. '22. Okay.**
Q. September of '22 he sends the letter from his ophthalmologist. Throughout that fall, though, October, November he's continuing to train on the heater board. Is that your recollection?
**A. That is my recollection, yes.**
Q. He continued to take exams to try to pass the heater board training during that time. Did you know about that?
**A. That is part of the process, but I did not know specifically about him taking those tests.**
Q. Okay. Did you ever -- did you know at the time of the results of his test?
**A. No. That would have never made it to my desk.**
(Pause.)
Q. Then can you describe for me then, it seems like -- and maybe I just misunderstood you, but it seems like Warren's training struggles back on the outside did kind of make it to your attention and you took some steps to help it along back when he was outside.
**A. Yeah. Yeah.**

Page 62

Q. Fair enough. And I think, you know, a good thing to do, but on the heater board, it never made it to your attention.
Can you describe for me the difference there? Why did the outside struggles make it to you but the heater board struggles didn't make it to you?
**A. I think it's when those -- those -- when I'm made aware. Along the way, your description of the testing along the way through the training, not necessarily plugged into they pass or fail this module, this section of the test.**
**But at the final exam or when they're -- when they're trying to decide if somebody's qualified or not, if they fail qualification, I'm almost always notified somebody has failed qualification.**
Q. Okay.
**A. So if the outside job was the final qualification step, I was notified that he failed the qualification.**
Q. I got you. Okay. Notified he failed the qualification. And is that when you then stepped in --
**A. Yes.**

Page 63

Q. -- sorry -- to add the specialist?
**A. Yes.**
Q. Okay. Were you ever notified then with the heater board of kind of the same thing with the outside job? Were you ever notified on the heater board, hey, sir, he has now failed; he has failed qualification?
**A. Yes. I was made aware that he failed his qualification.**
Q. Okay. Do you remember who made you aware?
**A. I think Judson did.**
Q. Judson did. Okay. And do you remember when he made you aware that he had been deemed as failed his qualification?
**A. I -- the timeline escapes me. I don't know exactly when.**
Q. Okay.
(Pause.)
Q. We'll -- we'll come back to that but let me finish with -- so I showed you the letter from the ophthalmologist or at least the one e-mailed about the letter back in September.
**A. Yeah.**
Q. Then we just went through together his request October 20th of 2022 about fixing the

Page 64

lighting. I want to take you now...
(Pause.)
Q. To the next exhibit which is going to be Exhibit 6 and that's going to be Bates labeled as 811 and 812 because it does bleed. 811 to 812. Bleeds over to the next page.
(Exhibit 6; so marked.)
Q. So you can see here, sir, 812 at the bottom. As I scroll up, it just has the ending of a signature block. Let's get to 811.
Okay. At 811, at the bottom, Chelse sends an e-mail Monday, December 12th of 2022 to Judson Wooters and to Aprile Danford and the Subject is "Lighting above the heater board."
And it says, "Jud, Do you know if the lighting above the heater board has been fixed? If you can, could you also provide the date the work order was put in for this?"
Were you -- I don't see you as a cc or a bcc on this e-mail. Were you aware of this chain of communications?
**A. I was not.**
Q. Okay. Judson --
**A. That would not be uncommon.**
Q. All right. Judson Wooters forwards this

Page 65

to Bubba Vandevender. Do you know who that is?
**A. He's the operations maintenance coordinator. Works for Judson.**
Q. Okay. So he's over maintenance?
**A. He's the interface between operations and maintenance.**
Q. I see. All right. So he asks Bubba to check on this. It says, "Is this something you can check on?"
Then there's this e-mail here, December 12th sent to Claude Richardson and Danny Gay and Greg Johnson and Warren Jones with a cc to Judson Wooters and Andy Coots.
And it says, "Can we get these lights-repaired on the Heater Board area? Limited lights in the area, make it hard to see in the area. Bubba Van." This is as of December 12th of 2022.
Now, I want to ask you about where my cursor is here where it says 10/25 of 2022. Is that date there, 10/25/2022, do you know what that date means? Do you know what it signifies?
**A. I know it's part of the work order, but I don't know what the date is.**
Q. Okay. I will tell you it's totally my assumption, so that's why I'm trying to get evidence

about this. I -- I would assume that 10/25/2022 is the date the work order was put in. Is that what that means or am I just wrong?
**A. I -- I don't know.**
Q. Okay. All right.
**A. It -- it comes from SAP and SAP's full of all kinds of dates.**
Q. Okay. So we'll have to find out when that work order was put in. But as of December 12th of 2022, Bubba Van is trying to see if we can get these lights fixed.
And Judson responds to Chelse December 12th of 2022, "Chelse, this has not gotten repaired yet." Did I read that correctly?
**A. Yes.**
Q. Were you made aware of that at that time, December 12th of '22, that the light had not been repaired?
**A. No.**
Q. I will just represent to you that December 15th, three days later, is when he failed the exam for the fourth time. Any reason to dispute that date?
**A. The dates? No, sir.**
Q. Okay. I will also represent to you just



based on the timeline, the dates, the documents I have here that the December time frame, December of 2022 is when the wheels started getting put in motion to have Warren terminated. Does that sound about right to you?
**A. It sounds about right.**
Q. Okay. I want to go back to the documents, but before I do, I want to ask you just generally what your role was in the process regarding termination.
So when the termination request came through for Mr. Jones in December of 2022, is that something that you played a part in? Did you have to approve it? Were you part of the meetings about it? Tell me about that.
**A. Yeah, I was part of the meetings about it.**
Q. Okay. How many meetings were there?
**A. Oh, I don't recall how many meetings there were.**
Q. Were the meetings in person? By Zoom? Over the phone?
**A. Most all -- most all of those kind of meetings were in person, at least with the local folks.**
Q. And you don't recall who was present for



them?
**A. No, not exactly.**
Q. Okay. Who -- if you don't recall everybody, who do you recall that was present for those meetings?
**A. I would have spoken with Judson about the situation. I would have spoken with Aprile Danford about the situation. I would have spoken to the plant manager about the situation.**
Q. Who was the plant manager?
**A. Gary Parsley.**
COURT REPORTER: I didn't hear the name.
**THE WITNESS: Gary Parsley.**
Q. Who made --
**A. Let me -- if I may, again, the timeline, I'm struggling a bit with the time frame. We may have actually had a plant manager change at that point and I'm not recalling exactly who I spoke to, whether it was Andy Woods, the prior plant manager or the current plant manager.**
Q. Okay. That -- that's -- that's --
**A. Sorry.**
Q. No, that's okay. That's fair. All right. So in these meetings when you guys are discussing



this, who brought up the idea? Who made the request or who made the recommendation we need to fire Mr. Jones? Who -- who made that request?
**A. I don't think it worked quite like I want to -- I'm requesting termination. We talked about the circumstances of the qualification failure, about the duration of the time he had spent training, the types of problems he had come -- come through during the training cycle, did we ever think he was going to be able to qualify and -- and pass. We tried several -- several times and he just wasn't passing. Ultimately --**
Q. Well, and I -- I'm sorry to interrupt you. Go ahead, sir.
**A. I was going to say ultimately we recommended that we end his -- ended his employment because we couldn't see a clear path to him ever completing the 1544 Operator qualification process.**
Q. Yeah, I -- I think my question may have insinuated that somebody, you know, desired it or wanted it and that -- that's not what I meant to insinuate.
What I'm saying is the idea of -- of Warren Jones' future, where do we go from here, do we need to terminate, that had to be initiated by

Page 70

somebody. Who initiated it?
**A. I would say Judson initiated that -- that process.**
Q. Okay. Once that process is initiated and you guys were talking about it, I have several questions for you.
The first is, is it fair to say that when Judson brought this to your attention, that he -- is this when he's bringing it to your attention that, okay, Warren's failed. He's failed the qualification attempt. Was it in these meetings when you were told he's failed the qualification?
**A. Yeah, I believe just shortly after, the same day even, Judson was in my office telling me that, you know, they had gone through the qualification process and that he had failed.**
Q. So I -- I want to ask you why you didn't do what you did back on the first qualification struggle with this one because I think what you did the first time was laudable. It actually helped Warren to continue his employment.
Once you were notified this time he failed this qualification, why didn't you kind of take similar steps this time to say what can I do to help this guy get through qualification?

Page 71

**A. Well, this was the -- this was the second or third time we had tried to qualify him. The first time that he failed, my recollection is I asked Judson to make sure that he had good trainers with him and that he assigned Clay Ryan to work with him. Clay is the heater specialist, the hourly heater specialist, and -- and he was doing that.**
Q. Okay.
**A. So I wouldn't characterize it that I didn't do the same thing. I did something different.**
Q. Okay. No, I hear what you're saying that, you know, the -- the reason why you didn't -- didn't do what you did back with the outdoor operator position was 'cause this was the second or third time that he had failed.
**A. Yeah, you're asking about termination. The termination conversations were well beyond that first time he failed.**
Q. No. No. No, sir. Sorry. I wasn't asking about the termination conversations. I was asking about in those meetings when it was brought to your attention that he's failed the qualification on the heater board, did you consider doing the kinds of things you did back when he was struggling

Page 72

to qualify on the outdoor position?
**A. Yeah.**
Q. Did you consider doing something like that with this struggle on the heater board?
**A. To be -- be more clear, when he failed the first time, my recollection is I asked Judson to make sure that he had the best trainer we had available, in Clay Ryan, trying to help him learn the heater board.**
**My understanding is that was months before he finally failed for the third time or second time. I -- I don't know how many times he -- he actually tried to qualify.**
Q. Okay.
**A. So my -- my action was taken at the first failure just like the outside. Just -- it was just done -- done in a different way.**
(Pause.)
Q. All right. To refresh your recollection so you understand the documents I'm referencing, I've already marked these as exhibits.
But I'm going to go back to what I marked as Exhibit 2, and I'm going to show you that -- you recall here back -- excuse me. That's -- that's not -- that's not accurate. Excuse me.

Page 73

(Reviewing document.)
Q. Yeah, my apologies. This is the one you need to see. You recall we discussed this e-mail back on October 20th of 2022. This is Bates labeled at 741.
You recall we discussed where Warren specifically says what I need from you guys -- "Really all I need from you guys" is how he phrases it "is the lighting over the heater board console to work properly so I can see the keys on the board."
**A. Yeah.**
Q. You recall we discussed this accommodation, right?
**A. Yes.**
Q. Okay.
**A. I recall we discussed it.**
Q. I'm going to take you to 811. As of December 12th of 2022, that very accomodation had not gotten repaired yet. Okay?
So my question for you is this: Does it change your thought process or change your recommendation for termination now that you know that the entire time Warren was training on the heater board he didn't have the one thing he had asked to have as part of his reasonable accomodation

Page 74

process? The entire time he asked for a light and he didn't have the light. Does that change your analysis?
**A. It does not, sir.**
Q. Really? Okay. So you still would have recommended to terminate him?
**A. Yeah, so in my walk through the control room, I made observations of Warren sitting at the board. Warren had found a better solution I think than our light being repaired.**
**He brought his own light to work. He was using his own personal light to see the board, to see the controls, to see the documents and when I asked him about it, he said it was working just fine.**
Q. So the -- the lamp that he brought from his house, you made the -- you made the decision I guess at least in your mind that that -- that lamp that he had brought was a sufficient solution, is that fair?
**A. He said -- he said it was.**
Q. He said it was. Who else was present when he said this?
**A. There were other operators in the room, but I couldn't tell you who they were.**

Page 75

Q. Okay. You aware of any documents, written documents where he ever said that?
**A. No.**
Q. Okay. When did he bring the lamp from his house?
**A. It was after the initial letter but before he was terminated.**
Q. Yeah, so if I represented to you that he -- he had that lamp there for quite sometime.
**A. Okay.**
Q. Any reason to dispute that?
**A. No, no reason to dispute it.**
Q. In fact, as of that October 20th, 2022, e-mail where he's saying that really all I need from you guys is for the light to be repaired above me, do you know whether or not he -- he had his lamp with him at that time?
**A. I don't -- I can't tell you whether he did or did not, but while he was training at the board, my observations through the control room was that he had that light and when I asked about it, he said it was working great and he was doing just fine training.**
Q. So -- so then did -- did you or anybody else ever tell Warren that you guys deemed his

Page 76

accomodation process satisfied because of the lamp?
**A. No, sir.**
Q. Okay. So as far as Warren is concerned, he's still operating under the assumption at this point in time that his request to fix the lighting is actually going to happen. I'm --
**A. Yes.**
Q. I'm just curious. You made a decision or at least you determined in your own mind that the lighting issue was satisfied based upon Warren's apparent representations to you?
**A. Yes.**
Q. Okay. And you are not an ophthalmologist?
**A. I am not.**
Q. Okay. And you've not reviewed his medical records?
**A. No, sir.**
Q. Did you consult or talk with Dr. William Hart about whether or not this -- the lamp was adequately assisting Mr. Jones?
**A. No.**
Q. Okay. And did you talk with the company's doctor, Dr. Stanton about Dr. Stanton's review, analysis and conversations with Mr. Jones?
**A. No.**

Page 77

Q. Did you talk with Jeannie Johnson, who is the onsite nurse who actually did a vision acuity test of Mr. Jones, about her observations and tests of Mr. Jones?
**A. I don't think so.**
Q. And at the time you made the recommendation to terminate Mr. Jones, did you even know that the light had never been fixed? Did you know at that time? I know you found --
**A. No.**
Q. -- out after the fact the light was not working.
**A. Yeah. Yeah. I -- I did not know.**
Q. Didn't know that.
(Pause.)
Q. And so as we sit here today, your position is that that lighting solution that Warren requested would not have changed your analysis, right?
**A. Right.**
Q. And --
**A. His -- his solution -- his solution solved the problem.**
Q. Right. Based upon a verbal conversation you're stating happened in the control room?
**A. Yeah.**

Page 78

Q. Okay. And in addition to that, it's also your testimony that -- if I understand you correctly, that it would not have been possible to allow Mr. Jones to work outside as an accomodation due to his vision struggles on the heating board. That was not an option.
**A. It would not have been a job that he -- he held, no, sir.**
Q. I'm sorry?
**A. It would not have been the job he held. The 1544 Operator job works inside and outside in a full rotation.**
Q. Is -- is there any other kind of operator job aside from a 1544 Operator? Is there any other kind of operator job in the entirety of the CP Chem family that he could have been moved to as an accomodation to try to help avoid this eyesight problem?
**A. Not in my organization.**
Q. Did you even look?
**A. In my organization, yes, sir.**
Q. You did. Okay. Did you ask any of your colleagues and fellow operations managers out there if there were any positions out there?
**A. No.**

Page 79

(Pause.)
Q. I know you weren't on the e-mail from Judson to Chelse where Judson says this has not been fixed.
Did Judson ever tell you, though, verbally, in person, phone call, anything like that, did he ever tell you what he had relayed to Chelse so that you knew, hey, Bryan, the -- the light that he wanted it -- it never got fixed?
**A. I think at some point he did tell me that, but I don't recall when.**
Q. Well, let me -- let me phrase it this way: Did he tell you about that lighting not getting fixed prior to the termination?
**A. No.**
Q. Okay. That was something that after the termination came up?
**A. I -- I don't recall the timing, sir.**
(Pause.)
MR. SUDDUTH: Let me do this: I -- I have a general rule that I like to every hour take a break and I just blew right past it, didn't I? It's been about an hour and a half, so I apologize but we were -- we were making good headway on discussing this case so I wanted to keep going.

Page 80

So let me take about a ten-minute break. Okay? And we'll come back. I may actually not have that many questions when I come back, actually, but I want to just take a break, give you a chance to stretch your legs a little bit.
**THE WITNESS: Okay.**
MS. WILLIAMS: Bryan, we generally just mute. We go on mute and turn cameras off while we're on break, so you can do that.
**THE WITNESS: Okay. I'm new to Zoom so I've got to figure out how to do that.**
COURT REPORTER: Can we go off?
THE VIDEOGRAPHER: Let's go off -- let's go off the record and I can help. We are now off the record. The time is 2:32 p.m. Pacific -- Central Time.
(A break was taken from 3:32 p.m. to 3:42 p.m. ET.)
THE VIDEOGRAPHER: We are now on the record. The time is 2:42 p.m. Central Time.
(Exhibit 7; so marked.)
Q. Okay. Thank you, sir, for your patience after that brief break. We'll get back into it. So let me show you another document we're going to -- this is Bates labeled at 809 to 810.

Page 81

(Reviewing document.)
Q. I'm not going to suggest that you -- that you've seen this document before. I don't believe you're cc'd or bcc'd on any of this, but I -- I do want to ask you about it.
This is an e-mail from James Stanton, who is a medical director for Chevron Phillips. Do you know who Dr. Stanton is?
**A. I do.**
Q. Okay. Is Dr. Stanton still with the company?
**A. I don't think so.**
Q. Okay. This is to Chelse Cisneros. It's dated about six days before December 12th, what we were going through earlier about the lighting request to be -- to be fixed.
This is what Dr. Stanton says. Hi Chelse, I had a long conversation with Mr. Jones this afternoon and I think I have a better understanding of his overall situations and what solutions may or may not be feasible [as read].
"If you want to give me a call we can discuss, or if you prefer we can do another teams meeting with Beth. Just let me know." Let me confirm something with you. Chelse and/or Aprile,

Page 82

it could have been either one or both, Chelse and/or Aprile, were one of them or both of them in these meetings when you guys were discussing termination of Mr. Jones?
**A. At some point they would have been, yes.**
Q. Okay. Did they ever raise in any of these discussions the fact that Dr. Stanton had been consulted about Mr. Jones' eyesight?
**A. I don't recall that being the case, no.**
Q. Did they ever raise or discuss any of the proposed solutions or feasibility that Dr. Stanton is referencing here in the termination discussions?
**A. What I recall is that there was not anything actionable from Dr. Stanton.**
Q. You recall that there was not anything actionable from Dr. Stanton. What does that mean?
**A. That there was nothing we were going to do. There was nothing that we were asked to do.**
Q. There was nothing you were asked to do. That -- that came from whom?
**A. I would -- I'm -- I'm making -- from HR. It would have been Chelse or Aprile. I don't recall who.**
Q. So did Chelse or Aprile actually tell you what Dr. Stanton said or did they simply summarize

Page 83

it as there's nothing we can do?
**A. I -- I believe it was summarized. I wouldn't have been privy to the details.**
Q. Okay. So then is it fair to say you didn't have the details of what Dr. Stanton said or didn't say.
You only had the summary from HR and the summary from HR was, in essence, there's nothing that we can do, nothing we should do, nothing we can do?
**A. Yeah, that -- that's generally -- we kind of operated at arm's length from the medical office. We don't want to know the details of the medical circumstances.**
**It's simply how do we try to accommodate whatever the requests are, so I didn't recall -- I don't recall having a request from Dr. Stanton.**
Q. I mean, did anybody -- aside from your verbal conversation with Warren about his lamp, did anybody else opine that the lamp was sufficient?
**A. Not that I'm aware of. Those were private conversations between Warren and I.**
Q. Okay. Private conversations, with an S. Were there numerous conversations about the lamp?
**A. Maybe only once about the lamp, but I saw**

Page 84

**him use the lamp from time to time when I was in the control room and he was training.**
Q. Okay.
**A. And checking in with him, asking him, hey, how are things going? I was getting a thumbs up, you know. Things are going -- going just fine. There was no complaining about the lighting.**
Q. Well, I mean, aside from all of these documents and e-mails that we have from Warren talking about them, right?
**A. Yeah.**
Q. Okay.
MS. WILLIAMS: Objection to the extent that mischaracterizes all the evidence. Go ahead.
MR. SUDDUTH: Yeah, well, I'll -- I'll just state the documents speak for themselves as to what Mr. Jones is --
MS. WILLIAMS: Well, I think you referred to multiple documents from him and I don't know that that's been in the record with -- with complaints, but any -- continue.
Q. Well, so let me ask you, you know, when you're asking him how are things going and he's just giving you a thumbs up, I mean, did you ever walk up to him -- aside from the one time that you told me

Page 85

you asked about the lamp, did you ever walk up to him and specifically say -- aside from how are you doing, how's the training going, did you ever walk up and specifically say how's the lighting? How can you see? Is the seeing going okay?
**A. No.**
Q. Okay. That only happened on one occasion which was when you asked about the lamp?
**A. That's -- that I -- that I recall, yes.**
Q. Okay. When did that conversation happen?
**A. While he was training at the heater board.**
Q. I -- I got you, yeah, but, no. When did it --
**A. I'm not trying to be -- I don't -- I can't give you any more discrete than that. I don't know when that occurred.**
Q. Okay. Well, and the reason I'm pushing on it is because, I mean, that sounds like that was a significant conversation to you because it -- it at least edified in your mind that he was -- that his -- his little fix from the house was sufficient.
So it's important for me to know when that happened. Was that early in his training? Was that in September? Was that November? Was that right towards the end in December? So forgive me, but I

am going to push just a little bit.
**A. Yeah, go ahead.**
Q. When exactly, if you know, if you don't, you don't, but do you recall with specificity when that question-and-answer moment was?
**A. Not -- the -- the specific as I can get is that it happened after the letter from his doctor because before that I was not aware of any -- any kind of concerns throughout his entire training time that he was having trouble seeing.**
**But after the letter from the doctor, I was in the control room and I saw the lamp, and I know I -- I said, hey, where did you get the lamp? He's like, oh, I brought this from home. My wife got this for me. That's -- that's the kind of conversation it was.**
**It wasn't -- and trust me, I was not trying to open up the -- to the room that he had a medical problem. I didn't want to open that door with a whole bunch of people standing around.**
Q. Sure, yeah. So it was a casual conversation about that he had brought the lamp from the house his wife bought him?
**A. Yeah. Yeah, he said it was working great. He could see. I had no reason to think that that**



**was -- that training wasn't going smoothly.**
Q. And who else was present for that conversation?
**A. Again, I would say that there were other operators in the room, but I couldn't be specific more than that.**
(Pause.)
Q. Did you ever make any sort of request that the work order to fix the lighting be canceled because of the lamp?
**A. No.**
(Pause.)
MR. SUDDUTH: Madam court reporter, what exhibit was that that was 809 to 810? Was that Seven?
COURT REPORTER: Yes.
MR. SUDDUTH: Thank you. Then I'm going to mark this next exhibit as Eight, which is going to be 808, Bates labeled 808.
And I don't believe it bleeds at all. I believe it's just 808. So I'm going to scroll up one page. Mark 808 as Exhibit 8.
(Exhibit 8; so marked.)
Q. And, again, I don't believe this is a document you've seen, sir, but it's dated



October 19th of 2022 and it's a summary of the meet-and-confer held on October 3rd of 2022.
And the reason I'm going to show this to you is because of your comment about the lamp. I want to read this third paragraph to you and ask you some questions.
Quote, During our meeting on October 3rd, 2022, you stated that you were not requesting to be removed from nights as communicated in the letter from your Ophthalmologist, but rather you were making the company aware of your vision difficulties. You further mentioned that you were currently bringing a lamp to and from work to help increase the lighting. You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but no later than November the 11th, 2022. The Company is consulted -- has also consulted with our Corporate Occupational Health Department regarding additional information and resources that could be helpful and will continue to do so as necessary [as read]. Did I read that correctly, sir?



**A. As far -- yes, sir. I think so.**
Q. Okay. So to be clear, this letter, which is dated October 19th of 2022, indicates that the company knows about the lamp.
So at least as -- at least by October 19th of 2022 he had the lamp out there. Is that -- can we agree on that?
**A. Sure.**
Q. Okay. And despite the fact that he has a lamp, he mentions the lamp. They're aware of the lamp, he still is continuing with the interactive process.
He's still requesting further accommodations beyond the lamp because the very next day, October 20th, with the lamp in his possession he still says I need the overhead lighting fixed. Do you remember that e-mail?
**A. Yeah.**
Q. Okay. That additional request beyond the lamp, that was something you were not made aware of at that time?
**A. I knew that we needed to improve the lighting of the console. I was not aware of which light it was until later on.**
Q. Do you recall when that was?

Page 90

**A. No, not specifically, sir.**
(Pause.)
MR. SUDDUTH: And then to -- this will be Exhibit 9, which will be an in globo exhibit. It does span several pages. It runs from Bates label 745 to 740 -- 748. 745 to 748.
(Exhibit 9; so marked.)
Q. This is the end of the Exhibit 9, sir. You'll see here 748. Aprile Danford sends her termination recommendation and she sends it to Lauren Rudloff.
You'll see that that gets forwarded on from Lauren to Jacob McAlister. Let me stop here. Jacob McAlister, who is that?
**A. He was the plant manager's boss. I think his title was manufacturing manager, but I'm not a hundred percent on that.**
Q. All right. And there's another individual I just need to get his identification for right now. Bryan Canfield, who was that?
**A. He would have been -- he would have been Jacob's boss.**
Q. Okay.
**A. He's the vice president of manufacturing.**
Q. Okay. Jacob McAlister then in terms of

Page 91

the hierarchy, is higher than you?
**A. Yes. By two -- two levels.**
Q. By two levels. Okay. The reason why I want to show you this, it's not to suggest you've seen these e-mails. You -- you probably haven't. You weren't included on them.
But, rather, I want to use these e-mails to ask you about a question that I told you I would circle back on, which was your contention that there were no available positions out there to move Warren into.
As the termination recommendation is being sent up the line, this was what Jacob says about it. Jacob writes an e-mail dated December 29th, 2022, to Bryan Canfield and this is what he says.
"Bryan, This is the first of two termination requests coming your way regarding Operators at Port Arthur. I realize this is not ideal considering how we are working to grow this population, but in both cases, the individuals have been given ample opportunities to qualify and cannot pass even after multiple attempts."
Let's stop right there. Is that true? You guys were working to grow the operator population?

Page 92

**A. All the time.**
Q. Okay. And then if we scroll up, Bryan seems to echo those sentiments. Bryan on December 31st says, "I support the recommendation. I know we need personnel, but we need quality over quantity." True statement? You guys needed personnel at that time?
**A. Absolutely. We're always looking for good folks.**
Q. Is Warren not a good folk?
**A. No. I think he was a good -- a good employee.**
MR. SUDDUTH: Okay. I have nothing further for you, sir. I appreciate your today.
MS. WILLIAMS: We don't have any questions. We'll reserve for trial.
MR. SUDDUTH: Well, in that case I have no follow-up based upon her question which was no question, so you are done, Mr. Kubsch. So let me ask you about reading and signing or Ms. Williams about it. Reading and signing?
MS. WILLIAMS: Yeah, we'll -- we'll read and sign, yes.
MR. SUDDUTH: All right. And, Manny, my standard video order as part of me ordering the

Page 93

deposition will be just fine. We can go off the record to deal with spellings.
THE VIDEOGRAPHER: Okay. Ms. Williams, transcript order? Video orders?
MS. WILLIAMS: Yes. We are going to send -- I don't know if it's gone out to you all yet, but we're going to send a note regarding our request. I just have my assistant handling that. Sorry.
THE VIDEOGRAPHER: Okay. Would you --
MS. WILLIAMS: We'll be getting -- we -- we would like a copy of the video and the transcript.
THE VIDEOGRAPHER: Okay. Standard is fine for the video or you want the one that includes also the exhibits with it?
MS. WILLIAMS: With the video? I'm sorry?
THE VIDEOGRAPHER: Yeah. Yeah, for the video.
MS. WILLIAMS: I don't think we need the video with the exhibits. We'll have that with --
THE VIDEOGRAPHER: Okay. Perfect.
MS. WILLIAMS: -- the transcript so

that should be fine, yeah.

THE VIDEOGRAPHER: Just standard then.

MS. WILLIAMS: Yes.

THE VIDEOGRAPHER: Anything else you need, madam court reporter, before we go off the record?

COURT REPORTER: No.

THE VIDEOGRAPHER: Okay. Understood. So let me do my readout. One second.

(Pause.)

THE VIDEOGRAPHER: This concludes the deposition of Bryan Kubsch for Warren F. Jones vs. Chevron Phillips Chemical Company LP. We are now off the record. The time is 2:57 p.m. Central Time.

(Whereupon, the deposition concluded at 3:57 p.m. ET.)



PLEASE ATTACH TO THE DEPOSITION OF BRYAN G. KUBSCH
CASE: JONES v.
CHEVRON PHILLIPS CHEMICAL COMPANY LP.
DATE TAKEN: 9-4-25

ERRATA SHEET

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this ______ day of ________, 2025.

______________________________
BRYAN G. KUBSCH



COMMONWEALTH OF MASSACHUSETTS

I, SUSAN LOZZI, Registered Professional Reporter and Notary Public duly and qualified in and for the Commonwealth of Massachusetts do hereby certify that the foregoing statement is a true and correct transcript of my original stenographic notes.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this 15th day of September, 2025. Reading and signing of the transcript was requested.

SUSAN LOZZI
NOTARY PUBLIC

My Commission Expires: March 20, 2031.

# Exhibit I

# Deposition Transcript

Case Number: 1:24-cv-00350
Date: October 3, 2025

In the matter of:

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

# Nicholas Graham

CERTIFIED COPY

Reported by:
Teresa Bentley Willis

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

WARREN F. JONES )
)
vs. )CIVIL ACTION NO. 1:24-cv-00350
)
CHEVRON PHILLIPS CHEMICAL )
COMPANY, LP )JURY TRIAL HEREIN

ORAL VIDEOTAPED DEPOSITION

NICHOLAS GRAHAM

October 3, 2025

ORAL VIDEOTAPED DEPOSITION OF NICHOLAS GRAHAM, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of October, 2025, from 9:14 a.m. to 10:31 a.m., before Teresa Bentley Willis, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine in Port Arthur, Texas, pursuant to Notice, the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFF:
MR. JAMES E. SUDDUTH, III
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana 70601
Telephone: (337) 480-0101
E-mail: james@saa.legal

FOR THE DEFENDANT:
MS. BROOKE JONES AND MS. MARLENE WILLIAMS
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
500 Dallas Street
Suite 2100
Houston, Texas 77002
Telephone: (713) 655-0855
E-mail: brooke.jones@ogletree.com

ALSO PRESENT:
Mr. Enmanuel Mejia (Videographer)
Mr. Austin Matthews (Chevron Representative)



INDEX

| | PAGE |
|---|---|
| NICHOLAS GRAHAM | |
| Examination by Mr. Sudduth ........................ | 4 |
| Court Reporter's Certificate ..................... | 59 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 26 |
| 2 | Bates 1341-1342 | 40 |
| 3 | Bates 1343-1344 | 48 |
| 4 | Bates 764-765 | 55 |
| 5 | Bates 814 | 57 |



THE VIDEOGRAPHER: Good morning. We are on the record at 9:14 a.m. Central Time October 3rd, 2025 to begin the deposition of Nicholas Graham in the matter of Warren F. Jones versus Chevron Phillips Chemical Company, LP. The venue of this case is in the United States District Court for the Eastern District of Texas, Beaumont Division. The case number is 1:24-CV-00350. This deposition is taking place via Zoom. The legal videographer is Enmanuel Mejia, here on behalf of Steno whose business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent?

MR. SUDDUTH: Yes. James Sudduth on behalf of the Plaintiff, Mr. Warren Jones.

MS. JONES: And Brooke Jones on behalf of the Defendant CP Chem, Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, Counsel.

Will the court reporter please identify yourself and swear in the witness?

COURT REPORTER: Teresa Willis.



NICHOLAS GRAHAM,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. SUDDUTH:
Q. All right. Mr. Graham, good morning, sir.
**A. Good morning.**
Q. Nice to meet you. I -- I have not introduced myself to you. This is the first time we're meeting. My name is James Sudduth. I'm representing Mr. Jones. Let me ask you, Mr. Graham: Have you ever been deposed before, meaning in a deposition?
**A. I have not. This is the first time.**
Q. First time for everything, huh?
**A. Yeah. Yeah.**
Q. All right. Well, first of all, thank you for your patience this morning. I'm running a few minutes late, so I appreciate that from you. Second, let me start by going over with you a few ground rules. So, the first ground rule I go over with folks is the one about the oath. I know this can seem a bit informal because it looks like you might be in an office. We're by video conference right now. I'm in my office as well. We're not in a courtroom. We don't have a judge or a jury sitting with us. So, I know it can seem a little bit informal, but the oath that you just took is

the same oath as if you were in a court of law and we did have that judge with us. And so all the same obligations to tell the truth, all the same penalties of perjury if you don't, all those attach here as they would in a court of law. Do you understand that?

**A. I do.**

Q. All right. Are you okay with that?

**A. Yes. Yes, I am.**

Q. Good deal.

The next thing, sir, is to ask you to please verbalize your answers for me. You're going to find it's really common, especially in conversation, to say things like "uh-huh" or "huh-uh" when you're answering a question.

**A. Uh-huh.**

Q. That's fine in conversation. The problem is here in a deposition, it's really hard for the court reporter to get that accurately because she's typing everything you say into a booklet format. And when this is all over with, that will be prepared. So, whatever your answer is today, sir, if you would please actually verbalize your answer out loud. So, if your answer is "yes," "no," "maybe," whatever your answer is, just verbalize it out loud for me, okay?

**A. Okay.**



Q. Thank you, sir.

Also, talking over each other, this also happens a lot in conversation. I'll give you an example. I could be asking you a question today and you sort of sense where my question is going and so you want to start to answer it. Well, the problem is at least a situation where I'm asking and you're answering at the same time and we're talking over each other. That's especially problematic by Zoom because Zoom sometimes will cut off one of the speakers entirely. So, we won't hear anything that you're saying. So, if you would, even though it's kind of tedious and you know where I'm headed, let me finish that question out all the way to its end before you start, okay?

**A. Sounds good.**

Q. Very good.

I think the final thing is breaks. This is not marathon, okay, man? So, if you need a break, bathroom, water, whatever the case is, you just ask for that and we're going to accommodate that. My only request of you is that if I have a question that's out there, meaning a question that I've asked that's pending on the table to be answered, answer that question first before you go take any break you want, okay?

**A. Got you.**



Q. All right. Do you have any logistical questions for me before I go further?

**A. No, I do not.**

Q. All right. Well, then, Mr. Graham, your full legal name and your address for the record, please, sir?

**A. Nicholas Graham. My address is 2630 Angie Lane, Orange, Texas 77632.**

Q. And, Mr. Graham, since this is my only chance to kind of talk to you outside of a trial, let me ask you a few background questions about yourself. I assume you graduated from high school, but let's just go ahead and verify that. Did you graduate high school?

**A. I did.**

Q. All right. Did you go on to any sort of college or community college or vocational school after that?

**A. Yes. Lamar.**

Q. Lamar?

Okay. And did you obtain any sort of degree from there?

**A. I did not.**

Q. Okay. How long did you go to Lamar?

**A. A little over a year.**

Q. A little over a year?

**A. I received a -- I was going to Lamar and I got a job for the same thing I was going for, operator, so....**



Q. Operator. Okay.

**A. And it didn't really make sense to keep going, I guess, at the time.**

Q. If you were going to get a job and you got a job, it didn't make sense?

**A. Yeah. Basically, yeah.**

Q. All right. So, I'm kind of familiar with like -- I'm -- I'm in Lake Charles, so I'm familiar with SOWELA. SOWELA has a -- a process technology kind of program. Is that the kind of program you were in at Lamar?

**A. Correct.**

Q. Okay. All right. The operator position you said you got was with whom?

**A. That was Flint Hills Resources in 2011.**

Q. You said Flint Hills Resources?

**A. Correct.**

Q. Okay. That was in 2011. So --

**A. Yes.**

Q. -- in 2011 -- well, strike that.

Let me just tie up any loose ends. Outside of that year with Lamar, any other education?

**A. No.**

Q. Okay. So, in 2011, is that when you entered the work force sort of in earnest?
**A. Yes. For this position, basically. I had done some contract work here and there, but, you know, made my way through college, but, yeah. As far as processing or chemical processing goes, that's the beginning.**
Q. Okay. The prior jobs were sort of odd jobs to make it through school?
**A. Correct.**
Q. Okay. So, with Flint Hills Resources, you start with them in 2011. How long did you work there?
**A. I worked there until March of 2022. In 2019, end of 2019, it switched to -- Motiva Enterprises had purchased that site. So, it became -- my employer became Motiva Enterprises. And then I left there in 2022, the beginning of 2022.**
Q. Okay. So, did your job title change at all when Motiva bought them out?
**A. Basically, the actual job did not. The -- what they called the title, I guess, did. But it went from -- like we called it a shift -- shift -- just a shift supervisor and it changed to a production team lead. PTL was Motiva's name for it.**
Q. Okay. So, is it fair to say that aside from the change in title from shift supervisor for production team lead, the day-to-day duties and effects of the job were the same?



**A. Correct.**
Q. Okay. And that was still at the same physical location and physical plant still doing the same work, simply the fact that the employer bought out or the employer was sold to a different employer changing names to Motiva?
**A. That's correct.**
Q. Okay. That occurred, you said, when, in 2019?
**A. It was sometime in the fall, I believe, of 2019.**
Q. Okay.
**A. I can't remember the exact month, but it was somewhere around the fall when the transition happened.**
Q. During that time from 2011 to 2022, were you ever disciplined or demoted in any way with either Flint Hills or with Motiva?
**A. Not that I can recall, no.**
Q. Okay. What led you to leave, then, in 2022?
**A. Just really heard a lot of good things about CP Chem. I had some friends that worked here and just trying new things, really. I guess everybody kind of gets curious after a while, so I wanted to, you know, come try it out and see what kind of opportunities they have here. So, it was kind of a -- you know, just a stab at trying a different place. I had been there for so long, so -- you know, I didn't know anything else. I didn't know if I could really do it anywhere else, so I wanted to try and kind of test myself, but also, you know, just see what they had to offer, so....**



Q. Yeah. A little personal challenge?
**A. Yeah. I guess so, get kind of stagnant.**
Q. Was it -- was it -- aside from just kind of personal challenge, personal growth, was it a raise in pay for you?
**A. It was pretty much a parallel move.**
Q. Parallel. Okay.
**A. For myself, yeah.**
Q. What was your title when you joined CP Chem?
**A. My title when I joined and my current title is a PSC, which is a -- they call it -- it's a plant shift coordinator, but it's basically the same thing as a shift supervisor.**
Q. Okay. So, it sounds like it's -- it's pretty similar to what you were doing with Motiva?
**A. Correct.**
Q. Okay. You told me that you stopped in March of '22 with -- with Motiva. When did you start with CP Chem?



**A. That -- that day. It was like -- like a week transition.**
Q. Okay. All right.
**A. I think I took like a week off and then -- just to kind of get my head straight and came straight here.**
Q. Didn't give yourself much down time, did you?
**A. No. Well -- I don't know. I just kind of nervous, but eager at the same time.**
Q. Got it. So, March of '22 to present day?
**A. Correct.**
Q. Okay. And have you been disciplined or demoted in any way with CP Chem?
**A. No, I have not.**
Q. All right. So, as a plant shift coordinator or shift supervisor, I -- I think I know this from previous depositions I've taken, but I want to verify this. Are you -- are you considered a supervisor? I mean, are -- are you overseeing a group of guys?
**A. That is correct. I am.**
Q. Okay. How many people do you supervise?
**A. It's ranged anywhere from 10 to 15 depending on the -- you know, you have some people leave, you get some new hires. So, I think right now, I -- I can't remember the exact number, but I believe it's 13, 14, somewhere in there. We just got some new people and**

Page 14

**moved some people off shifts. Sometimes they -- we move people around, like they go on special assignments, they come back and stuff.**

Q. So, you actually -- I mean, you didn't start with CP Chem as just an operator. You started with them in sort of a leadership role. You started supervising folks?

**A. Right.**

Q. Okay. In this supervisory role, kind of give me some details on that. Whenever you're supervising folks, to what degree are you supervising them? And what I mean by that is do you have the authority to discipline your guys?

**A. I do, yes.**

Q. Okay. So, I assume, then, without going to HR, without going to your higher ups, you can issue like verbal warnings or verbal coachings to your guys?

**A. Correct.**

Q. Okay. Let's take it one step further. What about like a written warning? If you actually wanted to do a written write-up for one of your guys? Do you need to consult with HR then or can you do that on your own accord?

**A. That usually -- I'll back up just a second. If I did a coaching, I usually document it. And I say**

Page 15

**usually. It's always documented unless it's just like an out in the unit kind of thing. If it's an actual coaching, it's documented. The written warnings are usually more of a conversation between maybe myself, HR and the superintendent. And then we issue that warning -- I will usually deliver the warning unless it's, you know, something that the superintendent feels like they want to do or is required and then we deliver that to the employee.**

Q. Understood.

But that written warning is something that you're not doing on your own accord. It's consultated (sic) with HR?

**A. Correct.**

Q. Okay. The same thing for anything higher up beyond a written warning. So, what I mean by that is things such as suspensions or demotions or even maybe a termination. If it reaches that level, can you do that on your own accord or does that have to run up the flag pole?

**A. No, I cannot. That has to run up through HR and supervision above me.**

Q. Okay. So, I've asked you some kind of supervisory questions on the discipline side. Now, I want to ask supervisory questions on the positive side.

Page 16

Do you have the ability to give raises on your own accord?

**A. No, I do not.**

Q. Okay. As a shift supervisor, do you control their -- their schedule, their shifts, meaning when they're going to show up and the times they're going to show up and that sort of thing?

**A. Very little. And what I mean by that is I don't control the time that they show up. They have a set schedule that's rotating. The only thing that I control is the -- the jobs that they work, the qualification or the area that they are qualified. We try to rotate them out in different areas so they stay fresh on it. And -- and then like I'll grant vacations, personal days if they need one, something like that. I'll work into the schedule.**

Q. Okay.

**A. But as far as -- I'm sorry.**

Q. No, no. Go -- go ahead.

**A. I was going to say but as far as like just moving somebody to another shift, that's not in my control. That's usually done by the superintendent or someone higher.**

Q. Okay. So, if -- if I -- if I use the -- the phrase today the 1544 unit or the ethylene unit, do you

Page 17

know what I'm referring to?

**A. Yes. That's the unit I'm in charge of.**

Q. And that's the unit you're in charge of?

**A. Correct.**

Q. Okay. And just so we're clear, 1544 is just another way, another descriptive way, to describe the ethylene unit. If I say "ethylene unit" or I say "unit 1544," I'm talking about the same thing?

**A. Yeah. Correct. The EU is ethylene unit and 1544, to my understanding, is the number assigned to the site unit. So like, for example, 1592, 1594 are units in Baytown. So, that's how they keep track of their -- which unit they're talking about.**

Q. So, we know that we're talking about the ethylene unit that's in Port Arthur by saying ethylene unit 1544?

**A. Correct.**

Q. Okay. And it is that unit, the ethylene unit 1544 in Port Arthur, that you are in charge of?

**A. That's correct.**

Q. Okay. And as the shift supervisor or as the PSC, I should say, as the PSC for that unit, there's about anywhere from 10 to 15 people, it ranges, but 10 to 15 operators that you are the shift -- or the plant shift coordinator for?

Page 18

**A. That's correct.**
Q. Okay. I hear what you're saying when they're vacation and personal days, you can grant that. I understand that. But this part here, just because I don't work out there with you, I want you to explain this a little bit more to me. The part where you said you control the area that they're qualified on, you control the area that they're working in, what -- what do you mean by that? Describe that to me.
**A. Okay. So, like if -- like, just for example, we have three areas outside that they can qualify on. And when they qualify on them, say each of the outside areas, just to keep them from working the same job and, you know, staying to keep them fresh on other jobs, we rotate them out. So, they might work one job for a rotation, which would be about a month. It's a 28-day rotation. And then we try to roll them into another one just so they can stay familiar with those areas of qualifications. It's kind of a requirement that we use a tracker somewhat on our own to do that. It's just to make sure that if somebody hasn't worked that job for a long time, we keep them in it, keep them fresh and keep their qualification up to date, so....**
Q. I got you.
So, as I understand it, there are, I

Page 19

think, six total qualifications, at least at that unit. There's three outside and three inside; is that right?
**A. That's correct.**
Q. Okay. The three outside are what?
**A. You have compressors, the compressor, the distillation area.**
Q. Okay.
**A. Then you have furnaces or heater area, as they call it.**
Q. So, if I have an -- an operator who's qualified on the three outside units, compressor, distillation, heaters and furnaces, if I'm in your shoes, what I want to do is I want that operator to do compressors for 28 days, then maybe move to distillation for 28 days and maybe move to heater for 28 days and keep rotating like that so they stay fresh on those different areas?
**A. Ideally, yes. If -- if they -- if it allows you to.**
Q. Okay.
**A. Most of the time, we can accommodate that. There's very rare occasions where we maybe can't just do the training or something, but it's pretty -- you rotate them pretty regularly.**
Q. Once somebody's qualified on an area, is there anything where, I don't know, let's just say that the --

Page 20

the shifts happen to work out a certain way where for whatever reason, it's been six months since I've been out on a compressors. I just -- for whatever reason, I just didn't rotate over at compressors. Can I lose my qualification if it's been too long?
**A. You know, I'm not sure if they actually disqualify them. Not to my knowledge, but I'm -- I'm not a hundred percent sure on that.**
Q. Okay.
**A. Since I've been here, I cannot recall anyone have gone really that long without -- at least on my shift, without rotating to another job.**
Q. Okay.
**A. That's just based on my shift -- knowledge of my shift and, you know, since I've been here.**
Q. So, is it fair to say that at least in your time, in your experience, you have not seen one of your guys lose a qualification after they've gotten a qualification?
**A. I have not seen it, no.**
Q. Okay. So, we talked about the outside jobs, compressors, distillation, heaters. What are the three inside jobs?
**A. They're listed the same, but you have a compressor console, you have a distillation console and**

Page 21

**then you have a heater console or a furnace console.**
Q. Okay. So, the exact same areas, just simply one is inside on the console, one is outside?
**A. Basically, yes.**
Q. Understood.
Okay. You started out there in March of 2022. When you got out there in 2022, were you assigned to ethylene, meaning for the entire time you've been there '22 to '25, you've been on the ethylene unit 1544?
**A. That's correct. I hired in as the ethylene or EU 1544 unit shift supervisor.**
Q. Okay. And that reminds me. You said you hired in. I should have asked that earlier. How did you -- when you hired in, how did you find out about the job?
**A. Like before I applied?**
Q. Right. Yeah.
**A. As I mentioned earlier, I think I had some friends that worked here. And one of them kind of recommended -- recommended me the -- the job when it opened, kind of sent it to me. So, I looked into it and, you know, applied and went from there.**
Q. Who was that friend? Is he still there?
**A. He's not. He -- he took a -- a role. He -- he was in engineering. He took a -- basically, a -- somewhat of a move up in -- into a role of a -- I'm**

Page 22

**trying to remember what it was. But it's out at one of the new L and G plants that they're building currently.**
Q. Oh, out in -- in Golden Pass maybe?
**A. Sorry. I may not have said that clear. That's in Port Arthur.**
Q. Yeah. I had the opportunity to take the deposition of Judson Wooters, and somebody's name came up and I asked if that person was still there and he said: No. We lost him to Golden Pass. And I'm won -- wondering if we have -- if we're thinking of the same person.
**A. Oh. Probably not only because there's been a -- a few that have gone to Golden Pass.**
Q. Got you.
Okay. So, anyway, this friend of yours recommends you over to it. You apply. Was it a competitive interview process meaning like did you just get the job when you applied or do you have to go through some interviews?
**A. I wish, but no. No. Same, you know, interview format. I've been to a few at different plants over the years off and on, I guess. It's -- yeah. It was just a normal formatted interview, so....**
Q. Okay. So, obviously, you -- you heard when we started the deposition today when the videographer read

Page 23

the caption of the case, he said Warren F. Jones versus CP Chem, and I introduced myself. So, you've either through reading the notes of the deposition or just even hearing about it today, you've seen the name Warren Jones. Let me ask you: Do you know Warren Jones?
**A. I do.**
Q. Okay. Did you know Warren beforehand, like before you went out to CP Chem, did you guys know each other personally at all or the first time you met him was out at the facility?
**A. No. I didn't know him before I was here that I learned who he was.**
Q. Okay. When you got out there in March of 2022, Warren Jones had already been out there, I think, prior to you arriving?
**A. That is correct.**
Q. Okay. When -- when you come in as PSC, Warren's role at that time was operator?
**A. Yes. He was just an outside operator.**
Q. Outside operator. Okay.
**A. Correct.**
Q. What's that interaction look like between a PSC and one of their operators? Are you seeing Warren just once a day? Do you see him once a week, once a month? What's the interaction like?

Page 24

**A. No. It's, I would say, multiple times a day just depending on what's going on.**
Q. Okay.
**A. We have shift meetings at the beginning of shift where everybody is in the room. We kind of discuss what's going on, what we're going to do. And then it's -- it's really just interactions throughout the day if something is going on or if you see him. I don't really know how else to explain it. It's more of a case-by-case basis. But I would say if they were on the consoles, it's all throughout the day, but sometimes outside guys are, you know, making rounds, looking at things. So, you might run across them outside. So, I'd say anywhere from four to five times a day at least you'd run into them.**
Q. Okay.
**A. Typically see them -- I mean, we're here 12 hours, so we see just about all of them off and on throughout the day.**
Q. I -- I -- some of the other guys -- some of the other people, I should say, that I've deposed in this case, they were higher ups, HR or higher up in the unit. So, they would see him, you know, maybe once a month, if that, or on an as-needed basis. So, you actually, though, got to see him pretty frequently. You guys

Page 25

interacted on a -- on a frequent daily basis?
**A. Correct.**
Q. Okay. How were your -- your interactions with him? Was it good, bad, great guy, horrible guy? How was it?
**A. From what I remember in the beginning, I mean, I'm kind of learning everyone a little at a time. So, it takes a while to get to know all those people at once. But I recall Warren being -- I guess one of my first impressions was he was kind of a hard worker. Like he -- if we had jobs to do, he seemed to be, you know, more than willing to go out and -- and perform those jobs.**
Q. Okay. Any -- any bad interactions? If you tell him to do something, he would say "no" or would give lip back or anything like that?
**A. No. I never experienced anything like that from Warren.**
Q. Okay. So, it sounds like the working experience between the two of you was -- was positive?
**A. In my experience, yes.**
Q. Okay. So, let me ask you that as I turn towards this a little bit, Mr. Graham. Did you review any documents in preparation for today? You might have talked to the attorneys for CP Chem, and if you did, I

don't want to know about those conversations, but I do want to know about any documents. So, if you looked at any documents in preparation, you may have, you may not have. I don't know. I'd like to know about those.
**A. I did not view any documents.**
Q. Okay. All right.
MR. SUDDUTH: What I'm going to do, Madam Court Reporter, is I'm going to mark the Notice of Deposition of Mr. Graham as Exhibit 1 and attach it hereto to his deposition.
(Exhibit No. 1 marked)
Q. All right. So, Mr. Graham, we talked about you kind of meeting Mr. Jones when you come in in March and what that process was like. As I understand it, around that time maybe, correct me if I'm wrong, I think that Warren was training on the heater board console probably around the time that you came in. Does that sound right?
**A. I think he had -- I'm not sure exactly when he began his training, but, yes. Upon me arriving on site, I had spent about a four-week rotation with each shift to kind of learn, you know, how things worked as far as the day to day. And then I was placed on that shift and then from there, kind of learning where -- who was working what job, who was training, what they're**



**training on, just kind of getting the lay of the land, I guess, getting a feel for what was going on.**
Q. That's a good point. I should have asked that earlier. You said four weeks -- four weeks with each shift. Let's talk about that for a second. At ethylene 1544, how many shifts are there?
**A. Four.**
Q. Four.
Okay. How were the shifts labeled? Is it A, B, C, D?
**A. They use 1, 2, 3, 4 here.**
Q. 2, 3, 4.
Okay. So, shifts 1, 2, 3 and 4, you spent the beginning four weeks with each shift. Which shift was Warren assigned to when you came in in March of '22?
**A. I believe he was assigned to 3. Upon me being assigned to 3, Warren was on that shift. So, if there was anything changed before that, I -- I wasn't aware of it.**
Q. Is it fairly evenly split meaning let's just assume for a second that you had 12 operators -- trying to give a number that's easily devisable by four. If you had 12 operators, would you have three operators on each one of the four shifts?
**A. If -- if you're -- you're asking, I guess, if**



**they're balanced as far as the number of people?**
Q. Yes.
**A. Yeah. They're -- they're fairly balanced. You might have one or two differences here and there, but that's really because sometimes you end up with an odd number and you can't split them, you know. So, they're -- they're pretty evenly matched, though. They try to keep them that way. The staff, I should say. Sorry.**
Q. When you came in, we talked about the three outside areas, three inside areas. Are you qualified on all six areas right now --
**A. No.**
Q. -- as we sit -- no.
Okay. So, you're qualified on what right now?
**A. So, the qualifications are for the hourly union employees only. For contract, not required to train or qualify on them. I can learn them on my own, but there's no qualification required for myself.**
Q. Okay. Okay. Actually, that was -- you preempted me. I was asking to ask: Are you part of the union?
**A. No, I am not.**
Q. Okay. So, you are salaried and you are



nonunion?
**A. Correct.**
Q. Okay. So, as a salaried nonunion employee, you do not have the requirement to qualify on these different areas?
**A. Correct.**
Q. Okay. You can voluntarily take it upon yourself learn it and that sort of thing, but you're not going to have to go through the kind of testing, training thing that -- that Warren was going through?
**A. That is correct.**
Q. Okay. Have you taken it upon yourself -- as you mentioned, you -- you can kind of voluntarily do it. As I understand it, there is -- when you do these testings and trainings, there's two components. There's sort of a written component where you go on a computer and you take a computer-based exam and then there's a practical component where you have to sit with a panel and answer questions?
**A. Correct.**
Q. Have you ever taken -- I don't know why you put yourself through the torture, but I'm just curious. Did you ever voluntarily go and take one of those exams on the computer?
**A. No, I didn't. It's not really a common**

Page 30

**practice for the PSCs to do that, so, no, I have not.**
Q. Okay. Have you ever sat through a panel not as a questioner, but as a -- as an examinee, meaning you have to answer the questions, a panelist posed questions to you and you had to answer the questions?
**A. At my current job, no.**
Q. Okay. Did you have to do it at Motiva?
**A. When I was an operator, I did.**
Q. Okay. When you were an operator at Motiva, were you doing the same kind of stuff, by the way, at Motiva? Were you on an ethylene unit at Motiva?
**A. That's correct.**
Q. You were?
Okay. So, as an operator, were you union at Motiva?
**A. I was as an operator, not when I was salaried or supervisor.**
Q. Okay. When -- did we go over that? I don't think I got that -- that timeline from you. I think you started in 2011. When did -- when were you an operator at Flint Hills/Motiva and when did you become supervision?
**A. I became a supervisor it was early 2016, I believe.**
Q. Did Motiva or Flint Hills Resources -- well, I

Page 31

guess since you became a supervisor in 2016, the entire time that you've been a union operator, it would have been as Flint Hills?
**A. Correct.**
Q. Okay. At the time that Flint Hills, back when you were working the ethylene unit?
**A. Yes.**
Q. And you were working as a union operator?
**A. Correct.**
Q. Okay. Did Flint Hills have the same divisions that CP Chem had, meaning they had three outside units and three inside units?
**A. No. It was broken up a little differently.**
Q. Differently. Okay.
**A. Similar, but just the -- the unit layout didn't allow for the same job breakdown or boundary.**
Q. Okay. How many panel things, panel tests, panel exams did you go through at Flint Hills?
**A. It was a handful of them. I can't remember the number. Probably five to seven, something of that sort.**
Q. Those five to seven panel experiences, do you remember the different areas that you were qualifying on back at Flint Hills?
**A. Yes, I do.**
Q. Okay. What were those different areas?

Page 32

**A. They had a -- they had a heater area that was similar to these, I guess. They had a compressor area and then they had a distillation and a converter area. And then they had consoles to reflect those inside along with a cyclohexane unit and a boiler unit and like an off -- they call it an off plot, but it's like a tank farm like logistics-type area.**
Q. The -- how many of those -- you said five to seven panels. How many of those panels were for inside jobs, meaning like console jobs?
**A. Four.**
Q. Four of them?
**A. Yeah.**
Q. And so then anywhere from one to three of your panels were for outside?
**A. Correct. Yeah. I think that one was laid out with seven outside and four inside, I believe, if I remember right.**
Q. Okay. Okay. Seven inside, four inside. And so we've got 11 total areas. And it sounds like in the time you were there, you trained on anywhere from -- it sounds like about half. If there were 11 total areas, you were about five to seven of the 11?
**A. That's correct. Yeah.**
Q. Okay. All right. Of the five to seven, do you

Page 33

remember how many of those were inside that you tested on and how many of them were outside?
**A. Two inside.**
Q. Two were inside.
Okay. The two inside that you tested on with the panel, what were they?
**A. I did a -- I trained on the compressor job there.**
Q. Okay.
**A. The heater job there. And then they had a -- it's a different blend inside, but I started training on the third ethylene console.**
Q. You started training on the third, but did you complete it?
**A. No. I got the shift supervisor job before I finished that.**
Q. Okay. The training on the compressor and the heater on the inside, what did that testing consist of? Did it consist of the panel, like CP Chem, a written test or what did that testing look like?
**A. Yeah. It was pretty similar. From what I remember, it was a -- a written. I did a handwritten test instead of an online computer. But, basically, the same thing, answering questions. And then a -- the panel review there was, I would say -- I guess the best**

**way to put it is there was more just people just asking questions. Here, we have kind of a set format which I like because it's a little -- it's -- I guess, it's more fair for each person doing it. It's a list of questions that everybody runs through. So, it's very consistent. So, I will say that I did like that better here as compared to my previous job, which was kind of just left up to whoever -- you know, you might get a drilled with questions for a long time. It was kind of whoever wanted to ask what, so anyway.**

Q. So, if you -- if you pulled the unlucky card and you got -- you got a tough guy asking you questions, you were going to have to a bad panel experience, I guess, right?

**A. You could, yeah. You kind of would.**

Q. Or you could get a laid back person and you're going to have an easy panel experience?

**A. Correct.**

Q. Yeah. Okay.

I want to ask you about that because I do. I see these listing of questions and I was going to go through that with you. I see 97 different questions that the panel can choose from, but I -- on every one of these sheets, I see circles on certain questions. And what I understand from talking to some folks is that you



never ask 97 questions. You chose 25 out of the 97 to ask. Is that accurate?

**A. I don't know if there's a set number, but usually, we get handed that paper from the training coordinator. And the last couple that I think I've been in, they asked I think just about all of the questions. Now, I will say that sometimes the -- upon being asked the question, the operator, if you look at some of them or understand them, I guess, when they answer one, sometimes they answer multiple, meaning like if they elaborate on the control scheme or how it operates, they'll answer other questions as well. So -- if that makes sense. As you're -- as you're asking one question, sometimes they answer that question, but they elaborate more and end up answering a few more, so....**

Q. Okay. Obviously, I want to ask you some questions about the testing with -- with Mr. Jones.

**A. Yeah.**

Q. But before I do, I want to -- I don't want to waste your time asking questions of things that you don't know about. So, I want to kind of understand what your universe of knowledge is as you sit here today. At any point in time, were you part of any discussions with anybody at the company, including even Warren, about any accommodation request that he may have made? And what I



mean by accommodation request is any vision difficulties that Warren was have -- having and the accommodations he was asking the company for. Were you part of any of those discussions?

**A. Not to my knowledge. I don't recall any -- any accommodations being needed.**

Q. Okay. Yeah. So, as far as you're concerned, the company never came to you and discussed with you any accommodations that Warren had requested?

**A. No.**

Q. Okay.

**A. Not that I can remember.**

Q. Do you recall at all any discussions with Montalvo, the training coordinator, about any accommodations needed for Warren and the testing process?

**A. As far as?**

Q. Vision accommodations.

**A. No.**

Q. Okay. Were you part of any discussions regarding the ultimate decision to terminate Mr. Jones?

**A. No. I don't believe that that decision lies in my power or ability. That is above me.**

Q. Okay. And that's -- that's fair, but, you know, sometimes the higher ups, since you're his shift



supervisor, they may come seek your input or come seek your -- your thoughts and your recommendation on: Hey, we want to terminate Warren. What do you think, Nick? And I'm just wondering if that happened here.

**A. No. I think in this case, it kind of went -- they just followed the -- the protocol they had here. I'm not really a -- each test that was not passed, it just led closer and closer to that. So --**

Q. Okay.

**A. -- I think at that point, it wasn't a matter of, you know, maybe how we felt about it. It was a matter of that, you know, the requirements weren't met. So, that's ultimately how the -- the company here views the training. And if you can't meet qualifications here, I mean, eventually, you may not work here. So, I think that's just the road that it went down.**

Q. It sounds like -- it sounds like the way you're describing this is kind of whether we wanted to do it or we didn't want to do it, our hands were tied?

**A. Yeah. I mean, it's -- yeah. I mean, basically, that's -- that's how they have it laid out. They have it laid out like that for everyone. So, regardless of the person, good employee, bad employee, you know, like them or not like them, if -- if they can't meet qualifications, then they're ultimately not**

**going to be able to work here, so....**

Q. Well -- and this -- again, this is why I'm asking these questions because I don't want to spend a bunch of time down these lines of questions if it's not in your wheelhouse. But if I -- if I told you about the Americans with Disabilities Act and reasonable accommodations that the law mandates within the ADA, the Americans With Disabilities Act, would -- would you -- were you part of any discussions like that with the company?

**A. No.**

Q. Okay. Did you have any discussions with the company regarding not an accommodation specifically related to Warren's vision, but changing Warren's job, moving Warren's job around, changing his job description as a form of an accommodation? Was that discussion ever even had with you?

**A. No.**

Q. Okay. Your role, as I understand it, in addition to being a shift supervisor, your role was that I think you sat on his panel for testing?

**A. That's correct.**

Q. Okay. I also understand it that he had four tests that he took. Is it your understanding, would you agree with me, that Warren passed the written exam, the -- I think they call it the LMS exam, the computer-based exam? Did you know whether or not he passed that or not?

**A. I'm not sure if he did. Like I didn't actually see him pass it, but typically, what they do is they do that exam before they continue on with the panel. So, most of the time, the training coordinator gets with them. They go through the test, the written test. And then, you know, if they don't do it on the written test, we usually don't perform the panel. So, if he passed the written test -- or I assumed he did because he -- we were doing the panel, so if that makes sense to you.**

Q. Well, yes. I mean, I'll just represent to you from the records that I have, he -- he had an 89 percent and needed an 85 percent. So, he had an 89 percent on the second time he took the test. The written test, the first time he took it, he made an 81. And he took it the second time and made an 89 and was labeled as a pass. Do you have any reason to dispute what I just said there?

**A. No.**

Q. Okay. So, after the second time taking it, he's passed the written exam. Now, he's taking the panels. And I see four panels. Let me just go ahead and show you -- let's -- let's go ahead and share my screen. We'll go over these together. It is 9:58, sir, so we've been going about an hour. I like to try to keep a watch on the clock to see if people need the bathroom or anything like that. Do you want me to share my screen and kind of keep pressing forward or do you want a break?

**A. I'm fine.**

Q. Fine?

Okay. All right. So, let's see. So, you should see my screen. Do you see my screen, sir?

**A. I do.**

Q. Okay. I'm going to take you to 13 -- 1341. And -- and what I'm representing there is -- where I'm referencing there is where I'm highlighting the CP Chem 1341. That's what we call a Bates label, Mr. Graham. It's just a way that lawyers label a document when we have these voluminous documents in cases. So, the Bates label on this is 1341, but the document is this Unit Review Committee for Job Qualification. There's a No 1 put on it. I'll go ahead and mark this as Exhibit 2 to your deposition. It will be an inglobo exhibit, 1341 to 1342 because it's a two-page exhibit. 1341 and 1342.

(Exhibit No. 2 marked)

Q. All right. As I understand from Mr. Montalvo -- I've already deposed Mr. Montalvo. As I understand from him, he did the handwriting up here. He filled this out up here at the top. And then I see names down here at the bottom: Warren Jones, Jimi Hayes. I see your name, Josh Montalvo and then Jud Wooters. Were you on the panel for the first exam?

**A. I was.**

Q. Okay. The first panel included Jimi Hayes, yourself, Josh Montalvo, three people; is that right?

**A. That's correct.**

Q. As I understand it -- again, we -- we said that not every question is -- is asked, but what I was curious about is how are certain questions selected to be asked. And I want to go into further detail with you on that because your earlier answer to me suggested that the training coordinator kind of circles and selects the questions. And then all you guys on the panel go on that. So, is that accurate? Do you have any say at all in what questions are selected to be asked or it's just handed to you and these are the questions you're going to ask?

**A. The -- in my experience so far, they're -- they're handed to you really already circled or -- either that or the training coordinator has his circled, but it's not left to that only necessarily, but sometimes I think they -- it seems to me with someone**

**even like maybe answers one incorrectly, we try to ask them in a different -- in a different way maybe to spark or jog memory. After all, it is an evaluation, so it's -- it's trying to see what they know and trying to give them a successful chance at passing it and give us a gauge of their knowledge. So, those are the questions we have in front of us. They're circled, I think, more of a -- as a consistent gauge, but also there's other questions you can see throughout that, you know, are not limited to -- to the circle, but sometimes you can see that questions are similar. And if maybe they get one wrong, they can ask one similar to it in hopes that they can answer the question, so....**

Q. Okay. Well, let me try and unpack that a little bit. I've -- I've scrolled to Bates label 1330 which has a No. 1 put up at the top corner of it. So, from our understanding from Mr. Montalvo, that No. 1 tells me that this was a question sheet from the first test. And I see, you know, Nos. 2, No. 3, No. 4, but from the first test, is there -- there's not many comments on here, but let me just ask you: Were you a comment writer or did you write a lot of comments down on your sheets or did you have sheets kind of like this where you just check marked?

**A. Sometimes I -- I will write little notes**



**sometimes, but mostly mine are for followup. Like if they got it completely wrong, you know, I might put an "X" and -- but occasionally, if -- if there is a -- if there's something odd, like I might write something in there, but usually, it's a got it right or didn't.**

Q. Okay.

**A. That's usually how I do it, a check or an "X."**

Q. Okay. Well, let's just take No. 3 here, you know. It's -- this is circled. So, if Warren was asked this: Locate the Deaerator Level Control on the DCS console and explain how this works. Is this something that the questions that are selected have like a certain numerical value meaning: Okay. I think Warren answered No. 3 great, so I'm going to give him five points or -- or is it there's no points. It's just totally kind of field based?

**A. Yeah. I think it's -- I don't know if there's actually any points given to it that I'm aware of. I do not myself. It's just kind of scrolling through and -- or running through the questions and gauging their actual knowledge and ability.**

Q. Okay. So, let me -- let me press a little bit further on this, then, in terms of a question. Let me give you two different scenarios. I want you to assume for a second that this question is asked: Locate the



level control and explain how this works. I suppose it's possible -- I'm not even asking about Warren. I suppose it's possible that you could ask this question and the person just completely gets it wrong, okay. It's not like the answer is inadequate. They just get it wrong. They don't adequately or they don't even explain it correctly. Has that happened in questions?

**A. It has, but I think there's a -- there's more to just answering the question than like -- so, if you read that question: Locate the Deaerator level control on the DCS console and explain how this works. So, when you ask that question, you're also gauging their knowledge of where it's located on the console. So, this is to gauge what I call like a response factor of like if they can -- if they have an issue with it, can they get to it swiftly enough to respond or are they having to thumb through pages to find it because they're not sure where it's located or what it is. And then when they do find it, they have to find that level control and they have to be able to speak on it. So, let's just say they found it, but it took them a long time. So, I'm concerned that they don't know what this is. So, if they have an issue, like they haven't spent enough time running through these pages or enough time training or looking at it to understand where this is**



**located. So, then, when they do find it, it's a matter of going through there and answering the -- the question as it's -- as it reads. So, I'm -- I'm saying that to say that there's -- it's kind of a gauge of their ability to move through the console as well. Because a lot of this stuff is -- can be time sensitive in this unit, can be -- you know, you have to be able to respond swiftly.**

Q. I see.

Okay. So, let me -- it sounds like there's almost -- and we'll just take No. 3 since this is the one we're talking about. There's almost two components to this. There's the ability of the person to navigate swiftly, efficiently through the console and, at the same time, so sort of secondary to that, after they navigate it. Okay. Once you're there, can you explain it. Is that a fair summary?

**A. Correct.**

Q. Okay. And the reason why you want to navigate quickly, efficiently, swiftly, that sort of thing, is because it's time sensitive and -- and safety is important and -- and lives are at stake?

**A. Correct.**

Q. Okay. If -- did you guys ever -- as a panel, did y'all ever discuss at all if -- if -- if someone has

vision difficulties, meaning they can't see the console, did y'all ever discuss how that might impact their ability to navigate through the console as a panel? Did y'all ever talk about that?
**A. No, not to my knowledge. I've never had that come up.**
Q. Okay. Because I see in one of the -- the little notes after the -- after the test, we'll go back to 13. This is Exhibit 2. This is 1342. Go back to 1342. So, 1342 are kind of some notes after, you know, the signature page here where he's marked as not successful, No. 1. And then there's some notes. And, you know, it talks about different system problems. But one of the -- one of the comments here -- actually, two of the comments. There's a comment here that says: Navigating control -- or console panel. There's a comment down here: Navigating heater feed, steam, you know, something feed pages, I think, and control. So, is that kind of what you're telling me about before when talking about navigating the console?
**A. Yeah. Like -- yeah, basically. It's like if you're asking for them to call up a certain piece of equipment and they -- you know, it not necessarily that they have to go to it and run like the first button they press, but if they're -- if it appears that they're like**



**skimming through different pages trying to find it, then it kind of gives you that feeling that they're not really sure where it is.**
Q. Uh-huh. Let's see. I show that you're not on the third and the fourth test that Mr. Jones took; is that right?
**A. That's correct. I don't believe I was here. I think I was on vacation when those went through.**
Q. I got you. So, yeah. I was going to ask about that, if there's any particular reason why you were not --
**A. I'm not. I'm sorry.**
Q. That's okay. Is there any reason why you were on the panel for the first two and then off the panel for the second two?
**A. I've tried to look up or recall, I guess, what I could of those. And I -- I think I was on vacation. I'm not positive, but I do not remember being on the third and fourth panel, only the first and second.**
Q. Right. And -- and, I mean, your memory is correct because I don't see your name on the third and fourth, but I just wanted to verify and ask you whether you were or not and then the reason that you weren't. And it sounds like the reason is because of vacation?
**A. I believe so.**



Q. Okay. And if you take a look, we'll mark this as Exhibit 3 to your deposition.
(Exhibit No. 3 marked)
Q. This is 1343.
MR. SUDDUTH: It will be inglobo, Madam Court Reporter. 1343 and 1344, because it is a two-page exhibit, Exhibit 3.
Q. If you take a look at -- this is the Unit Review Committee for Job Qualification No. 2, exam No. 2. It has Warren, Clay Ryan, Jimi Hayes, Nick Graham, Josh Montalvo, John Watkins and Jud Wooters. Does that sound correct as to who was there?
**A. As far as I remember, yeah. That's -- that's pretty typical for our panel.**
Q. Okay. Do you recall -- how many questions did you ask? I guess I'm trying to figure out. I know the questions are circled, but is this something where, you know, one person asks a question and then you kind of follow up maybe on a question or how does that go?
**A. I -- I don't recall the ones I would ask. Usually, the training coordinator will ask all the questions and kind of runs the -- the panel or kind of keeps the pace of the -- the -- the test. We're allowed to interject or -- or like ask follow-ups or, you know, sometimes if you ask the question one way, maybe**



**somebody can -- can help out by asking it a different way and maybe lead them onto the right answer. That's -- that's usually how it goes.**
Q. Let me show you -- so, talking about No. 2, I'll flip to Bates label 1360. So, you'll see here at 1360, there's a No. 2 red ink. No. 3 is circled again. This handwriting on here, is this yours?
**A. It is not.**
Q. Okay. What about here (indicating)? Is this your handwriting?
**A. No. It does not appear to be.**
Q. Okay. One of the -- one of the things I was curious about -- and I'm not sure who this is. Maybe I eventually will get to this person in their deposition, but, you know, we talked about how there's not points, but this particular person, whoever it is -- you know, let's take a look at No. 4.: Locate the Superheater minimum flow controller on the DCS console and explain how this works. Whoever this person is wrote: Ok. 80%. Is -- is -- is that common, like maybe he didn't -- maybe you guys don't give points, but you're giving a percentage of how someone did on a question?
**A. I -- I don't know that that's common. I'm not sure why they wrote that.**
Q. Okay. And they seem to do it consistently.

Down here, he says: Good explain on 75 and 89 but got lost on other graphic. 50%. So, as far as at least in their head, this is how they're grading things. How would you -- I'm -- I'm seeing how this guy is grading things or how he's analyzing things. How would you analyze as you went through your questions?

**A. I don't -- I don't put percentages or numbers to them necessarily as like a -- a checkmark if they got it right. I'll do an "X" if they got it wrong or if there's -- I might write a note if there's maybe something to look at, like if they got -- you know, maybe navigation was slow, but whenever they got there, they understood it correctly. So, I can just say: All right. Navigation slow. And it's more -- for me, it's a followup for them so I can tell them like: Hey, you did good here, but, you know, work on this.**

Q. Okay. So, for example, if -- if there were 25 questions asked -- and I'll just represent to you from taking Mr. Montalvo's deposition. As I understand, maybe nowadays, you guys are asking closer to almost all the questions, but back then, you weren't asking all the questions. So, if you're asking 25 questions, was there any kind of set parameter such as take the way you do things. You put a checkmark if it's right and an "X" if it's wrong. If you had somebody get 20 checkmarks and



five "X" marks, meaning they got 20 out of 25, was there any kind of set barometer that this number of right questions versus this number of wrong questions means pass or fail on a panel?

**A. Not that I'm aware of.**

Q. Okay. Let's -- let me -- let me press it this way. What about afterwards when the panel is discussing how the trainee did? And let's just say No. 4. Let's say you listened to Warren on No. 4 and you thought he did -- he did well. You thought that he located the Superheater minimum flow and explained it well, but let's say you got two or three people that thought he did bad on No. 4. How is that reconciled? I mean, is it a vote cast on every single question?

**A. I -- I can't remember a time when we really had a -- a dispute on it on the ones I've been in. It's usually pretty consistent across the panel. I don't -- I don't recall any kind of discussions, you know, behind closed doors when we were discussing whether they did good or bad on individual areas or sections, any real disagreements on. And it's usually everyone kind of feels the same way, from my experience.**

Q. Have you ever been part of -- after the panel kind makes their -- their group consensus on whether or not the person passed or failed, have you ever been part



of any discussions after that when you take the trainee and you're talking to the trainee about: Okay. You failed or you passed and if you failed, here's why you failed. Have you ever been part of those discussions?

**A. I have, but it's not solely me. It's the -- the panel after the -- after the test.**

Q. And --

**A. Sorry.**

Q. No. I'm sorry. Go ahead.

**A. I was going to say after the decision is made, they are called back in and we kind of go around the room and each person gets a chance to kind of tell them how they did. Usually, the trainer or the training coordinator will tell them what the decision is first and then -- or the superintendent can speak on it if they're there. And then we kind of roll around the room on how we thought they did and what we thought they did good or bad. And it's kind of a closing for -- you know, a direction for them to work on. Everybody kind of discusses what they think they need to work on and, you know, gives them a chance to -- to speak after that as well.**

Q. Right. So, in the two that you were in, in both of those exams, he was deemed to have failed the panel portion. So, were you present in the sort of I'll



call it debrief? Were you in the debrief after the decision was made, Warren's called in, told to tell him how he did, explain to him, you know, why he failed. Were you part of that debrief in both instances after the first exam and the second exam?

**A. Yes, I was.**

Q. Okay. Let's take each exam at a time. After the first exam, did you say anything after the first exam to Warren as to what your problem was, meaning why you thought he struggled or what he had to get better at or did you kind of stay silent and let Montalvo do the talking?

**A. I don't really remember the -- you know, word for word. I -- I know I make it a practice as their supervisor to tell them something after each one. So, I'm confident that I did. What I said exactly, I -- I can't recall, but I usually try to leave them with something myself.**

Q. Okay. But fair to say that as you sit here today, you can't recall what it was that you told Warren?

**A. I can't -- I can't remember word for word, no, not enough to tell you exactly what it was.**

Q. Okay. The same series of questions now, but for exam 2. After exam 2 in that debrief, do you recall

what guidance or things you told Warren to work on after exam 2?
**A. No. Kind of the same thing. I -- I mean, I -- we do several of these with different people, so it's happening all through the year. So, I don't -- word -- if I told you, it would be paraphrasing and stuff that I normally tell them based on how they did. So, it's not -- it wouldn't -- I can't remember word for word, to be completely honest with you.**
Q. Okay. Let me do this. There's, I think, two more documents I want to show you, but you may not need a break, but I want a break. So, how about this. We're going to take a little break from 10:19, take a few minutes, maybe 10:25 or so, five, six minutes, and we'll come back and hopefully wrap up pretty soon. So, that's the good news, okay?
**A. Sounds good.**
THE VIDEOGRAPHER: All right. We are now off the record. The time is 10:19 a.m. Central Time.
(Recess taken)
THE VIDEOGRAPHER: We are now on the record. The time is 10:26 a.m. Central Time.
Q. All right, Mr. Graham. We're back on the record after a brief break. Thank you for your patience, sir.



I want to show you two more documents and just ask you some questions about them.
MR. SUDDUTH: Madam Court Reporter, I'm going to mark this as the next exhibit. It's going to be an inglobo exhibit and it's going to be two pages because it's inglobo. It's Bates labeled 6 -- I'm sorry 764 and 765.
(Exhibit No. 4 marked)
Q. All right. Mr. Graham, can you see my screen?
**A. I can.**
Q. Okay. Let me zoom in just to make sure you can see it okay. I -- I don't believe you've ever seen this document before, but I have some questions for you about it. Have you seen this document from the Hart Eye Center?
**A. Are you asking if I can see or have I seen it?**
Q. Have you seen it?
**A. Not until right now, no.**
Q. Okay. All right. Two things I want to read to you in here. It says: My name is William B. Hart, MD. I am writing on behalf of my patient Mr. Warren Jones. Mr. Jones has been under my care for 20 years. Mr. Jones has suffered from extremely high myopia. His initial refraction at my office was a negative 20 Diopters, that is over ten times the average myope in



terms of correction needed. Were you aware of that, sir?
**A. No, I was not.**
Q. Okay. He -- he goes further to write that: Mr. Jones comes in for a normal eye exam. He told me his vision (when on night shift) was beginning to bother him. I performed a complete eye exam, and found two issues. Mr. Jones is beginning to have vision changes due to the elongation of his eyes, a normal eye is approximately 23 millimeters long. Mr. Jones eyes are 30 millimeters long. The problem this great elongation presents is stretching of the retina inside the eye. This thinning of the retina leads to a decrease in retinal, and especially macular function. It is my belief that with the drying of the eyes, and the decrease in macular function is causing Mr. Jones to have difficulty with seeing small numbers and letters, as well as to get overwhelmed by the brightness of the lights on his operator's board. Were any of those issues ever brought to your attention in the testing, sir?
**A. No.**
Q. Okay. Now, what I want to show you next is going to be Bates labeled 814. It will be the next exhibit to this deposition.



(Exhibit No. 5 marked)
Q. You'll see here 814 is a one-page document, so it doesn't need to be inglobo. But 814 and it says at the top of it Accommodation Meeting. This is October 3rd of 2022 of Warren Jones. It -- it appears to have Chelse Cisneros with HR, Judson Wooters, Warren Jones and Clay Ryan present in this meeting. They're discussing some different things about what I just went over with you and Dr. Hart. And I want to point you to just a few specifics. One is this comment here, he feels completely burnt after the board. The second having to squint to see to view the console. The next is: Jones says when he is on the heating board, he feels he knows the material but the anxiety that comes over him. It also says: He doesn't want to put anyone in harm's way because he cannot properly see. Okay. Those comments that Jones is raising to Judson Wooters and HR and Clay Ryan, did Justin Wooters or HR ever make you aware of any of those sentiments from Mr. Jones?
**A. No. I do not believe so.**
Q. Okay. As you as a panel member -- as you a panel member as you evaluated Mr. Jones' ability to navigate the console, did you consider in any way any of these things that I just went over with you in these two documents as you -- as you evaluated his adequacy in

navigating the console?
**A. No. I wouldn't have -- wouldn't have noticed that or wouldn't have thought that from my evaluation.**
Q. Got you.
Okay. I have no further questions for you. Thank you, sir.
MS. JONES: And we'll reserve our questions for the time of trial.
THE VIDEOGRAPHER: All right. Perfect. Before we go off the record, I do need to take transcript orders and video orders on the record. So, first, Mr. Sudduth, anything specific about the transcript for the court reporter?
MR. SUDDUTH: No. As far as ordering the depo, whatever my standard is, the transcript as well as the standard video will be fine.
THE VIDEOGRAPHER: Standard video. Understood.
Ms. Jones, transcript order, video order?
MS. JONES: Yes. We would like a copy of the transcript. No video at this time.
THE VIDEOGRAPHER: Understood. Thank you so much.
All right. This concludes the deposition of Nicholas Graham for Warren F. Jones versus Chevron



Phillips Chemical Company, LP. We are now off the record. The time is 10:31 a.m. Central Time.
(Proceedings concluded at 10:31 a.m.)



STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF NICHOLAS GRAHAM
October 3, 2025

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

Signature of the witness was waived.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 5th day of October, 2025.

Teresa Bentley Willis, CSR
Texas CSR 3520
Expiration: 04/30/26
STENO AGENCY, INC.
Firm #11909
315 W. 9th Street



Suite 807
Los Angeles, CA 90015

# Exhibit J

# Deposition Transcript

**Case Number: 1:24-cv-00350**
**Date: October 3, 2025**

**In the matter of:**

# WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL CO. LP

# JIMMIE HAYES, JR.

**CERTIFIED COPY**

Reported by:
Teresa Bentley Willis

**Steno**
**Agency, Inc.**

**315 West 9th Street**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(888) 707-8366**
**NV: Firm #108F**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| WARREN F. JONES | ) |
| | ) |
| vs. | )CIVIL ACTION NO. 1:24-cv-00350 |
| | ) |
| CHEVRON PHILLIPS CHEMICAL | ) |
| COMPANY, LP | )JURY TRIAL HEREIN |

ORAL VIDEOTAPED DEPOSITION

JIMMIE HAYES, JR.

October 3, 2025

ORAL VIDEOTAPED DEPOSITION OF JIMMIE HAYES, JR., produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of October, 2025, from 1:27 p.m. to 2:56 p.m., before Teresa Bentley Willis, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine in Port Arthur, Texas, pursuant to Notice, the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFF:
MR. JAMES E. SUDDUTH, III
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana 70601
Telephone: (337) 480-0101
E-mail: james@saa.legal

FOR THE DEFENDANT:
MS. MARLENE WILLIAMS
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
500 Dallas Street
Suite 2100
Houston, Texas 77002
Telephone: (713) 655-0855
E-mail: brooke.jones@ogletree.com

ALSO PRESENT:
Mr. Enmanuel Mejia (Videographer)
Mr. Austin Matthews (Chevron Representative)
Mr. Stephanie John (Chevron Representative)



INDEX

| | PAGE |
|---|---|
| JIMMIE HAYES, JR. | |
| Examination by Mr. Sudduth | 4 |
| Court Reporter's Certificate | 74 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 9 |
| 2 | Bates 741-742 | 26 |
| 3 | Bates 764-765 | 29 |
| 4 | Bates 814 | 32 |
| 5 | Bates 811-812 | 35 |
| 6 | Bates 1341-1342 | 40 |
| 7 | Bates 1360-1370 | 64 |



THE VIDEOGRAPHER: Good afternoon. We are on the record at 1:27 p.m. Central Time October 3rd, 2025 to begin the deposition of Jimmie Hayes, Jr. in the matter of Warren F. Jones versus Chevron Phillips Chemical Company, LP. The venue of this case is in the United States District Court for the Eastern District of Texas, Beaumont Division. The case number is 1:24-cv-00350. This deposition is taking place via Zoom. The legal videographer is Enmanuel Mejia, here on behalf of Steno whose business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent?

MR. SUDDUTH: Yes. James Sudduth on behalf of the Plaintiff, Mr. Warren Jones.

MS. WILLIAMS: Marlene Williams on behalf of Defendant Chevron Phillips Chemical Company.

THE VIDEOGRAPHER: Thank you, Counsel.

Will the court reporter please identify yourself and swear in the witness?

COURT REPORTER: Teresa Willis.

JIMMIE HAYES, JR.,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. SUDDUTH:



Q. All right. Mr. Hayes, good afternoon, sir.
**A. Good afternoon.**
Q. Can you hear me okay?
**A. Yes, sir.**
Q. All right. Very good.
Well, first of all, again, as I expressed off the record, my apologies for the delay. Thank you for your patience this afternoon. My name is James Sudduth, and I represent Mr. Warren Jones. It's nice to meet you. Let me start by asking you, sir: Have you ever been deposed before, meaning in a deposition?
**A. No, sir.**
Q. All right. First time for everything, huh?
**A. Yes, sir.**
Q. Okay. Let me go over some ground rules, then, with you, please, sir. The first is is that you are under oath, okay? So, I know this can seem a bit informal because we're just by video conference right now. But the oath that you just took is the same oath you'd take as if you were in a court of law and we had a judge and a jury sitting right here with us right now. And so all the same obligations to tell the truth, all the same penalties of perjury if you don't, all those attach here as they would in a court of law. Do you understand that?

Page 6

**A. Yes, sir.**
Q. And are you okay with that?
**A. Yes.**
Q. Very good.
The next thing, sir, is to ask you to please verbalize your answers. You've done really good, actually, by the way so far with the little bit that we've communicated so far with verbalizing your answers, but I promise you it's going to happen throughout the -- the day today that you'll -- you'll say "uh-huh" or "huh-uh" when you're answering my question. It happens a lot. If you hear me tell you: Is that a "yes" or is that a "no," I'm not being rude. I'm asking you to verbalize that answer because the court reporter is taking everything that you say down into a booklet. And a lot of times, it's really hard to get those "uh-huhs" and "huh-uhs" accurate. So, whatever your answer is today, if it's "yes," "no," "maybe," whatever the answer is please verbalize that answer out loud, okay?
**A. Yes.**
Q. Thank you, sir.
Also, talking over each other, that can happen a lot in the course of just having conversations. I'll give you an example. I can be asking you a questions, you can sense sort of where my question is

Page 7

headed and so you want to go ahead and start and answer it. Well, in conversation, that's fine, but the problem here is at least a situation where I'm asking and you're answering and we're talking at the exact same time, that's especially more problematic by Zoom. Because Zoom will sometimes cut off one of the speakers entirely. So, we won't hear anything that you're saying. So, if you would, please, sir, even though it's kind of tedious, let me finish my question all the way to its end before you start to answer, okay?
**A. Yes, sir.**
Q. Thank you so much.
The final thing I'll go over with you before I jump into this or in the meat of this is breaks. If you need a break, it's not a marathon, all right? So, if you need water, bathroom, something like that, you just ask me and we're going to accommodate that. My only request of you is this. If I ask you a question meaning I have a question pending on the table for you to answer, please answer that question before you go take any break you want, okay?
**A. Yes.**
Q. Thank you, sir.
Do you have any logistical questions for me before we go further?

Page 8

**A. No, sir.**
Q. Okay. And your full legal name and address for the record, please?
**A. Jimmie Hayes, Jr., 3729 Terrain Avenue, Port Arthur, Texas 77642.**
Q. And I see there in the little name at the bottom of your screen, it says Jimmie Hayes, Jr. I've -- I've learned in the course of this case that you guys out there at CP Chem, y'all like nicknames. And I think your nickname, as I understand it, is Jr. is what they call you; is that right?
**A. No. I'm not Jr.**
Q. You're not Jr.?
**A. No. I'm Purple Hayes.**
Q. Somebody else is Jr.?
**A. Yes, Brian Lore.**
Q. Oh, Brian Lore is Jr.?
**A. Uh-huh.**
Q. Okay. Okay. Brian Lore is Jr. Well, what's your nickname?
**A. Purple Hayes.**
Q. Okay. All right. I get the chance later on to depose Ricky Bobby, otherwise known as Clay Ryan; is that right?
**A. Correct.**

Page 9

Q. Okay. All right. So, I got -- I got one out of three right. I got Ricky Bobby right. Okay.
Well, Mr. Hayes, I got your Notice of Deposition here. I'm going to mark this as Exhibit 1, attach it to your -- attach it hereto as Exhibit 1 to your deposition.
(Exhibit No. 1 marked)
Q. Let me ask you, sir: Did you -- did you review any documents in preparation for your deposition today? I mean, this Notice of Deposition which set your depo for today, they might have sent this to you and you may have looked at this, you may not have. But have you seen this Notice before today?
**A. No, sir.**
Q. Okay. All right. And what about any documents? Did you look at any documents before your deposition today?
**A. No, sir.**
Q. Okay. Have you discussed your testimony or what you're going to testify to today, have you discussed that with anybody outside of maybe lawyers for CP Chem?
**A. No, sir.**
Q. Okay. This is my only chance to talk with you and get to know you absent asking you questions at a

trial, so I need to get some background information about you. Would you tell me, sir, from an education standpoint. I assume you graduated high school, but let's just confirm that. Did you graduate high school?
**A. Yes, sir, and college.**
Q. I was about to ask you if you went onto college after high school. Where did you go to college?
**A. Lamar State College Port Arthur.**
Q. All right. And what did you graduate in?
**A. I have a degree in instrumentation and I have degree in electronics.**
Q. Okay. Instrumentation and electronics. When did you obtain that degree?
**A. 2005. One was the year before, which was 2004.**
Q. Okay. One of the degrees was in '04, one was in '05?
**A. Yes.**
Q. Okay. Do you recall which one was which?
**A. Electronics first and then instrumentation.**
Q. What is that considered? Is that considered a bachelor's degree?
**A. Yes, two associates degrees each equals a bachelor's.**
Q. Two associates equal a bachelor's. Okay.
Did you go on to obtain any sort of



master's or doctorate or any further education beyond those two?
**A. No, sir.**
Q. Okay. I know sometimes people will work, go back to school and go back in the work force. Some people go to school straight through and then begin working in earnest. What was your situation? Did you go to school all the way and then commence work or did you work in between?
**A. I worked while I was in school.**
Q. Okay. All right. When did you start working for CP Chem?
**A. In March of 2006.**
Q. Okay. So, you started at CP Chem after you got these degrees?
**A. Yes, sir.**
Q. Okay. Where were you working prior to CP Chem?
**A. The state prison, T -- the Youth Commission, TYC.**
Q. What does TYC stand for?
**A. Texas Youth Commission.**
Q. Okay. How long had you worked for them?
**A. Eight years.**
Q. Okay. So, from, let's see, 1998 maybe to 2006?
**A. And I had one other job between that working at**



**Helena Laboratories.**
Q. What did you do for the -- you called it -- was it Helena Laboratories?
**A. Helena, yes.**
Q. Okay. What did you do for them?
**A. I repaired blood machines.**
Q. You did that laboratory job before the Youth Commission?
**A. After Youth Commission, right before I came to CP Chem.**
Q. Got you.
Okay. So, with the state prison, the Texas Youth Commission, what did you do for them?
**A. I worked as the kitchen administrator.**
Q. And you did that, you said, for eight years?
**A. Yes.**
Q. Okay. While you were working there for them as the kitchen administrator for those eight years, were you ever disciplined or demoted during that time?
**A. No, sir.**
Q. Okay. Did your employment with them end voluntarily or involuntarily, meaning that did you just leave on your own accord? Were you terminated, laid off?
**A. After I got my degrees, I found a better job.**



Q. Okay. All right. So, you were going to school while you were working for the -- the Youth Commission?
**A. Yes, sir.**
Q. Got you.
Decided no more working for the state prison, huh?
**A. Right. They don't pay well.**
Q. I understand.
All right. So, when you got the -- I guess let me ask this: The laboratory job that you mentioned repairing machines, was that before you got your degree or after?
**A. After.**
Q. That was after. Okay.
Okay. So, was that kind of your first job using your degrees of instrumentation or electronics?
**A. Yes.**
Q. Okay. And you worked for them for how long?
**A. It was only like two months.**
Q. Oh. And then you left them voluntarily or involuntarily?
**A. I got discharged and I voluntarily left.**
Q. How did you find out about this opportunity over at CP Chem?
**A. I was prompted to take a test. They had**

Page 14

**openings.**
Q. They had openings. What, you saw it on the newspaper, online, what?
**A. It was online and through the Workforce Commission.**
Q. Okay. And you said you got prompted to take a test. What was the test?
**A. The operations test for mechanical to take the ASVAB -- what is that test called, the Valtera, I believe it's called.**
Q. So, you took that and in March of 2006, you started with CP Chem?
**A. Yes. We knew about this job December of the year '05. Yeah.**
Q. Have you worked continuously for CP Chem from March of 2006 through the present day?
**A. Yes, sir.**
Q. Okay. You started in March of '06 for CP Chem as what? What was your title?
**A. Trainee operator.**
Q. How long did you do that for?
**A. For a little over a year until we got the -- all the jobs qualified.**
Q. Until -- I'm sorry. Until what happened?
**A. We got qualified on jobs.**

Page 15

Q. And --
**A. Once you are qualified on the job, you no longer become a trainee. You become an operator, like a pool operator.**
Q. Oh, okay. I may have misunderstood you. You weren't training other operators, you were training yourself to become an operator?
**A. Yes. Yes.**
Q. Okay. Okay. Okay. Were you training on the ethylene unit?
**A. Yes, sir.**
Q. Okay. So, when I refer to the ethylene unit 1544, that means the ethylene unit out at Port Arthur?
**A. Yes.**
Q. And that's what you were training on?
**A. Yes.**
Q. As I understand it from some other depositions, there are six units -- not six units. There's six different jobs, I want to say, or six different qualifications within that ethylene unit, three inside, three outside; is that right?
**A. That's correct.**
Q. Okay. When you were going through the qualifications to become an operator, did you -- during that year, did you qualify on all six during that year?

Page 16

**A. Just three, the outside jobs.**
Q. The three outside jobs. Okay.
**A. Yes.**
Q. So, if you qualified on the three outside jobs, then you became a -- a full-time operator?
**A. Yes, sir.**
Q. Okay. And it sounds like in, if my timeline is right, became a full-time operator sometime around 2007 maybe?
**A. Correct.**
Q. Okay. And how long did you serve in that role?
**A. Then they pushed us to go to the next qualification, which is the board training because we had a lot of people retiring at that time.**
Q. Okay. When was that that they were pushing you the board training?
**A. The next year, in '08.**
Q. '08?
**A. Uh-huh.**
Q. Okay. So, the board training, did you do all three inside jobs that you -- you trained on in '08 or one?
**A. Yeah. I think I got two of them down and then the last one was between that and the next year to get the last of the third jobs inside.**

Page 17

Q. So, in 2008 and 2009 is when you qualified on the three inside jobs?
**A. Yes.**
Q. Okay. So -- but was your position still that you're qualified as an operator?
**A. I'm a head operator now.**
Q. Okay. So, I was going to ask about, yeah, time on positions. So, you were an -- an operator from 2007 until when? When did you become a head operator?
**A. That's a good question. I don't remember --**
Q. Okay. All right.
**A. -- when I got qualified as a head operator.**
Q. Yeah. You said qualified as a head operator. Are you promoted to head operator or there's like a test you have to take for that?
**A. I was -- you have to take a test still to actually become a head operator.**
Q. Is that test like a written test on the computer or is that a panel exam that you answer questions or what is that?
**A. It's both, a panel exam and a written test.**
Q. And you don't recall when that was you took that?
**A. No. I have an e-mail. It was in the 2000s.**
Q. Okay. And so that's the role that you still

serve in today, which is as head operator?
**A. Yes, sir.**
Q. Okay. I had the opportunity to depose and ask questions of Mr. Nick Graham, who's the -- the PSC. Can you kind of describe for me the hierarchy? I mean, you're a head operator. He's the PSC. I mean, does he report to you? Do you report to him? How does that go?
**A. I report to him. I'm the last person in the union role and he is a company person.**
Q. I got you.
Okay. So, you're -- you're the highest up on the union side and then it heads to him on the salaried nonunion side?
**A. Yes, sir.**
Q. Got you. Okay.
**A. So, I report to him.**
Q. What's that?
**A. I report to him.**
Q. Okay. So, as the head operator, do you have any sort of like supervisory authority or managerial authority over any of your fellow operators?
**A. Yes. I'm in control of all the outside and inside people.**
Q. Okay. So, describe that for me. You say you're control of them. What does that mean?



**A. I'm their line of defense in case anything happens or anybody needs help, I have to organize them to help each other. And then I also have to help, if need be, and find other resources if we need other outside help for like maintenance or instrumentation.**
Q. Okay. When we mentioned at the beginning of this deposition today that it was, you know, Warren F. Jones versus CP Chem, if I say the name Warren F. Jones, do you know who Warren Jones is?
**A. Yes, sir.**
Q. Okay.
**A. He's one of the members of my crew.**
Q. He was on your crew.
All right. As I understand, there were -- there were four shifts at the ethylene unit, which the way the shifts are labeled is 1, 2, 3 and 4. What shift was Warren on?
**A. 3 crew -- 3 shift.**
Q. 3 shift?
**A. Yes.**
Q. As the head operator, are you assigned any particular shift or are you over all the shifts?
**A. I'm assigned the third shift.**
Q. Okay. So, you were on the same shift with him?
**A. Yes, sir.**



Q. Now, Warren Jones, when you got out there in -- you were out there as early as 2006. Do you remember when Warren -- was Warren out there in 2006 when you got out there or when did Warren join?
**A. Warren didn't join until the 2000s, I believe.**
Q. Okay. Did you know Warren at all prior to him being a CP Chem, meaning did you know him personally in some way before he -- he went out to the facility?
**A. No, sir.**
Q. Okay. The first time you met him was at the facility?
**A. Yes, sir.**
Q. Okay. When he started at the facility, did he start in shift three and you were in shift three?
**A. Yes, sir.**
Q. Okay. So, you guys have worked closely together since he started?
**A. Yes, sir.**
Q. There's other people I talked to that were in HR, superintendents, things like that. They might have seen Warren, you know, once a month maybe if the shifts kind of aligned to where they could see him, but with you on shift 3, did you see him pretty much every day?
**A. Yes, sir.**
Q. Numerous times a day?



**A. Yes, sir.**
Q. Okay. When you first started working with Warren, describe for me -- I mean, how did that go? Was he a great guy, horrible guy, things went well, things went bad? What was that like?
**A. He was a great guy. He was pretty much a story teller.**
Q. Okay. All right. So, you guys got along?
**A. Yes, sir.**
Q. Good working relationship?
**A. Yes, sir.**
Q. How would you describe Warren's work ethic?
**A. He always tried to get it all done and if he didn't, he asked questions.**
Q. Okay. Did the two of you ever -- I mean, were y'all friendly enough that like you talk about home life and things going on at the house and problems in life or was it always just kind of talked about work stuff?
**A. Every now and then, we talked about outside things, but not often.**
Q. Okay. So, obviously, you were on the panel for Warren for two of the exams, as I have it, for two of the panel exams that he took. And I want to ask you questions about that today, but I also don't want to waste your time asking you questions about things that

you don't know about. So, let me try to figure out what that is. In terms of Warren's eyesight and eyesight issues that he was having and the accommodation requests that he was making to the company, were you part of any of those discussions?

**A. Yes, sir.**

Q. Okay. All right. I wasn't aware of that. So, tell me about that. What did you know about his eyesight?

**A. He -- when he first got on the board, he was having trouble seeing the lines, the four colored lines on the screen. And he had requested that he have some kind of assistance. So, Judson Wooters, we spoke with him and he tried to get him some kind of help. So, he was trying to work with a doctor to get some glasses that would help him see differently.**

Q. Go ahead.

**A. And he was working with a lighting issue too that we had worked out.**

Q. You said working on a lighting issue you had worked out?

**A. Yes. The -- they have lights over each one of the boards separating the control room that could be controlled.**

Q. Okay. And as -- as I understood it, the -- the lighting that Warren requested to be fixed, that -- that lighting never got fixed during the time of his training. Is that correct?



**A. It was some -- it was a portable light they end up getting for him, but I'm not sure what was the request.**

Q. A what light?

**A. A portable light.**

Q. Portable light.

Oh, are you talk -- are you talking about the -- the portable lamp that he brought from his house?

**A. Okay. Maybe so. I guess. I'm not a part of -- I didn't be a part of the lighting part.**

Q. Okay. You weren't part of the lighting part. What part were you a part of?

**A. The glasses with the eye doctor he was talking to.**

Q. The glasses.

Okay. You said that in the beginning, he was having trouble seeing the -- and you described it as the lines. Did you say the four lines?

**A. Yes. It's a graph with four lines on it and on the side, they have the numbers. It's the way the VCS board is made.**

Q. So, I guess let me ask you about that. You



actually have -- that's the most detail I've heard yet about what exactly was the -- the thing he was struggling to see. So, were you sitting with him? Were you training him?

**A. No. I wasn't his trainer, but I was the -- I'm the assistant to everybody.**

Q. Okay. All right. Do you know who his trainer was?

**A. I believe it was Justin Ridgaway.**

Q. So, if Justin Ridgaway wasn't training him, then was it you?

**A. No. It would be somebody else that was working that board at the time.**

Q. Okay. So, how did you come to know, then, about what specifically he was having trouble seeing in the four lines then? How did you come to find that out?

**A. He had mentioned it because I went and sat with him and see what his issue was at the beginning before we presented it to Jud.**

Q. Okay. So, you sat with him and he -- he was explaining to you what that struggle was?

**A. Yes.**

Q. Okay. Do you recall when that was, like what the time frame was on that?

**A. It was in the beginning of his training.**



Q. So, at that time, at the beginning of his training, you had an appreciation of -- he was going to work with his doctor to try to get some new glasses or something. I think you had said that earlier. What makes you think that? Is that what Warren told you or what makes you think that?

**A. Yeah. That's what he had told us and him and his doctor -- his doctor had wrote him a letter that he turned in.**

Q. Okay. Had you seen that letter?

**A. I didn't see it, but he was supposed to have turned it in to Judson.**

Q. Okay.

**A. And Judson had wrote an e-mail -- we wrote an e-mail to Judson about being supportive to him and trying to get him all the help he need and Judson also replied on that e-mail.**

Q. In terms of the -- any kind of glasses or anything like that to -- to change things, do you know if that ever happened?

**A. He was supposed to have got some new glasses, but I'm not sure how much -- effective they were.**

Q. Okay. So, since you're mentioning the -- some of those, gosh, troubles that he was raising, let me share an exhibit with you. I'm going to share my

screen.
MR. SUDDUTH: I'm going to mark this as Exhibit 2 to his deposition.
(Exhibit No. 2 marked)
Q. Let me see. This will Bates labeled as 740 -- I'm sorry. Bates labeled as 741 and 742. So, it will be Exhibit 2 inglobo, 741 to 742. Can you see my screen okay, Mr. Hayes?
**A. Yes, sir.**
Q. Okay. When I reference a Bates label, this is what I mean is I'm highlighting down here at the bottom. It's just a stamp that we place on -- on documents when we have a voluminous amount of documents. It tells us what document is what, okay? So, that's that Bates label 742 to 741. I want to direct your attention up here to 741 in the middle. October 20th of 2022, Warren writes this e-mail. It says: Good morning. Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine. The only light that works properly is the one over the computer. The other two seem to be broken. Thanks. End quote. Did I read that correctly?
**A. Yes, sir.**
Q. The way he's describing that, do you know the



light that he's referring to there?
**A. There's a -- it's like a desk light that can be moved that's attached to the board.**
Q. Okay. So, whenever we talk about the lighting issue, are you -- we're on the same page about that's what the particular request was on the lighting issue?
**A. Yes.**
Q. Okay. So, you had some knowledge about that. Were you involved in any way with maintenance getting that light fixed, any of that process?
**A. No, sir.**
Q. Okay. Were you involved in any way with any accommodation discussions between Warren and the company about whether or not the request to fix that light was reasonable or not?
**A. No. I wasn't in the discussion.**
Q. Okay. What about any discussions where Warren was asking to simply just work outside? You know, given his eyesight difficulties, he was willing to just work outside as an outside job. Were you part of those discussions?
**A. No. I don't have any decisions in that.**
Q. You don't have any decisions in that?
**A. No.**
Q. You kind of -- you kind of smiled and -- and



laughing at that one. So, was that something that Warren had brought up to you that he made that request? Did you know that?
**A. I remember it was requested, but I wasn't here at the time he did that.**
Q. Okay.
**A. I was on vacation by then.**
Q. So, the entire time that that was being considered, talked about, thought about, whatever the case was, you weren't here for that?
**A. No. I was on vacation.**
Q. Okay. Is that why, by the way -- because I see that you were -- you were on his panel for the first and second exam, but not the third and fourth.
**A. Correct.**
Q. Was that -- okay. I was going to ask why you weren't on third and fourth. Is that why?
**A. Yes, sir.**
Q. Because of the vacation?
**A. Yes, sir.**
Q. Okay. In terms of -- well, there were some discussions actually after his third exam, but to be clear, you were not part of his third exam and you also were not part of any debriefing with Warren about how he did on his third exam; is that right?



**A. That's correct.**
Q. Okay. You mentioned, you know, having some knowledge about the -- the eyesight and then the letter he was supposed to get from his -- from his doctor. So, let me -- let me go over that with you since you've referenced it. This will be Bates labeled 764 to 765. It will be Exhibit 3.
(Exhibit No. 3 marked)
Q. And it will be inglobo as numerous -- it's two pages.
Let me share my screen. This -- this letter here from Hart Eye Center, I can kind of scroll through it. I'm going to read to you certain parts of it, but just briefly scrolling through it, does it look familiar? Did you ever actually see the letter or you just kind of heard Warren talk about: I'm going to get a letter from my doctor?
**A. I've heard him talk about it. I've never seen it.**
Q. Okay. Okay. Let's take a look at just a few parts here. It says: Mr. Jones has been under my care for 20 years. Mr. Jones has suffered from extremely high myopia his initial refraction at my office was negative 20 Diopters, that is over ten times the average myope in terms of correction needed. Mr. Jones -- well,

I'll stop there. Did you know any of the specifics of what his actual eye issue was?

**A. No, sir.**

Q. Okay. So, me reading that to you, that's the first time you're hearing this?

**A. Yes, sir.**

Q. I want to read this last paragraph and ask you some questions about it. Quote: Recently, Mr. Jones came for a normal annual eye exam, and at that exam he told me his vision (when on night shift) was beginning to bother him. I performed a complete eye exam, and found two issues. Mr. Jones is beginning to have vision changes due to the elongation of his eyes a normal eye is approximately 23 millimeters long. Mr. Jones eyes are 30 millimeters long. The problem this great elongation presents is stretching of the retina inside the eye. This thinning of the retina leads to a decrease in retinal, and especially macular function. It is my belief that with the drying of the eyes, and the decrease in macular function is causing Mr. Jones to have difficulty with seeing small numbers and letters, as well as overwhelmed by the brightness of the lights on his operator's board. Those kind of specific comments there at the end about the difficulty seeing small numbers and letters and overwhelmed by the



brightness of the lights of the operator board, did anybody from HR ever come to you since you were on his panel and tell you kind of what some of the specific struggles were with his eyesight?

**A. No, sir.**

Q. Okay. Was anything ever changed -- I know you can't talk to me about the third and fourth test, but was anything ever changed in the first or second test in terms of the board itself, the console board itself, meaning were the lights dimmed or brightened in any way during his testing?

**A. They tried to adjust the overhead lighting. Each one of the boards can be controlled off a panel in the wall, so they did adjust that. And the new glasses he had was supposed to help him see kind of the lines and the numbers.**

Q. Okay. When you say they adjusted the overhead -- the overhead lights, what lights -- are you talking about the lights of the actual screen, like the lights of the LED screen of the board or are you talking about the lights up in the ceiling?

**A. The lights up in the ceiling.**

Q. Oh, okay.

**A. He was able to adjust his own lighting to whatever he preferred from the ceiling.**



Q. What about the -- what about the lighting of the actual -- the brightness of the lights on his operator's board? What about the lights on the actual LED screens of the board?

**A. They can be adjusted by anybody.**

Q. Okay. Were -- do you have any specific recollection of whether or not those lights were -- were adjusted for his test?

**A. No, I don't.**

Q. Okay. What about here with difficulty seeing small numbers and letters? You said that he was supposed to have new glasses. Do you have any personal knowledge that he actually had new glasses?

**A. He showed me some glasses, but I'm not sure exactly if those were the ones that the doctor gave him or not.**

Q. Okay. Then I will show you -- go to 814 and mark this as Exhibit 4.

(Exhibit No. 4 marked)

Q. The company had an accommodation meeting with Warren in light of the letter from his doctor. That's what these minutes are which occurred on October 3rd, 2022. Chelse Cisneros, Judson Wooters, Warren Jones and Clay Ryan were present for that. Did you -- since you were head operator, did you have any conversations with



Clay about this accommodation meeting that Warren had?

**A. No, sir.**

Q. Okay. Clay never talked to you about it?

**A. No, sir. Jud had told us about some meeting they were having.**

Q. Sorry?

**A. Jud had mentioned the meeting they were having with HR.**

Q. So, Jud mentioned they were having a meeting with HR and he mentioned that before they had the meeting or after?

**A. After.**

Q. After.

Okay. What did he say about the meeting?

**A. He didn't give any specifics. He just said that they were going to try to accommodate him to whatever he needed. It would be where they do the same.**

Q. What was the last part that you said?

**A. He said they would do the same, accommodate him whatever he needed.**

Q. Accommodate whatever he needed.

Okay. So, in here, there are minutes that reflect that: Jones asked for five minutes to tell us that the background of his vision issues throughout his life and there are other minutes or other notations in

here. And I -- I want to go through just a few of them. One, he can't wear contacts because of surgery. He feels completely burnt after the board. He's having to squint to view the console. Mr. Jones says when he's on the heating board, he feels he knows the material, but the anxiety that comes over him. He doesn't want to put anyone in harm's way because he cannot properly see. A doctor has stated that he doesn't think that they will get better. Did -- were you aware of the fact that the doctor didn't think that the eyesight was going to get any better?

**A. No, sir.**

Q. Okay. What about the fact that he was having to squint to see the board and felt burnt, completely burnt after being on the board? Were you aware of that?

**A. No, sir.**

Q. In fact, any of these things in here, any struggles in here that he's detailing about the board, was any of this -- did Chelse Cisneros, did Jud Wooters, anybody -- since you were on the panel questioning him, anybody tell you about this stuff?

**A. No, sir.**

Q. Okay. The -- this line here: He doesn't want to put anyone in harm's way because he cannot properly see. Would you agree with me and agree with Mr. Jones



that -- that if he can't properly see the board, it's probably not a good idea to have him on the board because safety is involved?

**A. That's correct.**

Q. Okay. The accommodation that he asked in order to be able to see the board and perform his job, we looked at that, was the -- the lighting issue. And you told me you -- you know the light that he's referring to, right?

**A. Yes.**

Q. Okay. I want to show you an exhibit in light of the comment that you told me that Jud had told you after the meeting that they were going to try to accommodate him in whatever way that they could. So, I'm going to mark as Exhibit 5, it will be an inglobo exhibit of two pages, 811 to 812.

(Exhibit No. 5 marked)

Q. And we'll go to that together. As is typical with these e-mails, you guys start from the bottom and work your way up. So, you see here 812 -- and, really, all that carries over on 812 is the end of this signature block. And then we scroll up to 811. I -- I realize that you were on vacation around this time, but let me just verify. December 12th of 2022 were you still out on vacation?



**A. Yes, sir.**

Q. Okay. As I appreciate it, I think it was maybe around the first of the following year. So, the first of 2023 that Mr. Jones was terminated. Were you aware of that?

**A. Yes, sir.**

Q. Were you back when he was terminated?

**A. Yes. I came back at the -- after the first of the year.**

Q. After the first of the year. Okay. So, here's Chelse with HR sending Jud an e-mail. Subject: Lighting above the heater board. Jud, do you know if the lighting above the heater board has been fixed? If you can, could you also provide the date the work order was put in for this?

Jud sends an e-mail to Bubba Vandevender about that. Mr. Vandevender is -- Bubba is also a nickname, right? That's not his actual name?

**A. Yeah. His name is Bubba.**

Q. Oh, his name is Bubba?

**A. Yes.**

Q. Okay. All right. So, he sent an email to him. And -- and Mr. Vandevender is with what, maintenance?

**A. He's the OMC of the maintenance group.**

Q. What is OMC?



**A. He's the guy who coordinates all the maintenance jobs and put them on the schedule.**

Q. Okay. So, he e-mails him and says: Is this something you can check on?

And Bubba Vandevender responds with: Can we get these lights repaired on the Heater Board area? Limited lights in the area, make it hard to see in the area. And that was December 12th of 2022. Did I read that correctly?

**A. Yes, sir.**

Q. Okay. Then Jud sends an e-mail back to Chelse on -- on December 12th at 5:39 p.m. It says: Chelse, this has not gotten repaired yet. Did you know, that as of December 12th, 2022, the one accommodation that Warren had requested had not been done?

**A. No. I had been gone since the middle of November.**

Q. Did you know that even after this December 15th when they gave him his fourth and final exam, did you know that the fourth exam, the one accommodation he requested had still never been done?

**A. No. I did not know that.**

Q. Okay. Did you know that as of the date of his termination, every single exam he took, he took without the requested accommodation. Did you know that?

Page 38

**A. That's correct.**
Q. Okay.
**A. For the first two for sure.**
Q. And I'm showing you this e-mail so that I -- I can show you what happened later on. And I know you were out on vacation, but seeing this, this is the -- is this the first time that you're aware that for any of his exams, all of his exams, not just the first exam, but all the exams, that had not been repaired? Is this the first time you were made aware of that?
**A. Yes, sir.**
Q. Okay. Now, I want to turn to the fact that you were doing the -- the -- let's get to the actual exam. First, I want to ask about the practical -- excuse me. I want to ask about the written part of the exam, not the panel part of the exam. In the written part of the exam, which is done on the computer, as I understand it. On the computer part of the exam, it is what I will call objective, meaning there's an actual just right or wrong answer. There's multiple choice, true, false, whatever. There's a specific answer to select that is correct. Is that -- is that right?
**A. That is correct.**
Q. All right. In the written portion of the exam or the computer-based portion of the exam, do you have

Page 39

any knowledge as to whether or not Mr. Jones passed that?
**A. He did pass that.**
Q. Okay. I have notations that he made an 89 percent and needed an 85 percent; is that correct?
**A. That's correct.**
Q. Okay. If somebody passes that exam, that written exam, the computer-based exam, does that tell you anything about their competence that they know what they're doing on the board?
**A. No, sir, not necessarily. The actual training part of the board where you actually see -- discuss the knowledge of understanding what you're working on or how is it working is what determines.**
Q. Okay. So, what's -- what's the point, then, in giving him the computer exam then? I mean, he -- he passed it. I thought it was a good thing for Warren, but it sounds like it don't matter too much?
**A. It's -- it's pretty much a formality.**
Q. It's a formality. Okay. The -- the big thing is the panel exam?
**A. Right, because if you can work correctly on the board and give situational answers, you could actually work by yourself and not with assistance. You can be left alone.**

Page 40

Q. Got you. Got you.
So, let's take a look at -- I'll make this Exhibit 6, which is going to be a two-page exhibit, 1341 to 1342.
(Exhibit No. 6 marked)
Q. Bear with me. I'm going to share my screen here and then we'll -- we'll jump over to 1341. All right. So, we're at 1341 here. It says No. 1 in red indicating it's the first exam. I have the handwritten notes up here at the top, which Mr. Montalvo already told me that was his handwriting. And down here (indicating), I see Warren Jones, Jimmie Hayes, Nick Graham, Josh Montalvo and then Jud Wooters. Is that your signature and your name there, sir?
**A. Yes, sir.**
Q. Okay. And you were on his first exam?
**A. Yes, sir.**
Q. Okay. I have also a listing of the different kinds of questions. And I don't know if I'm going to mark this as an exhibit or not. It just kind of depends upon any insight you can give me. But let's go to 1312, which is some of these questions from the first exam. And I see -- let's see here in 1312, we have these Unit Review Committee questions and it has No. 1 up at the top. These questions, how do you guys as a panel -- how

Page 41

do you decide which questions you're going to ask?
**A. We usually let the training coordinator go through the questions. And he usually circles a couple and asks the panel if they were okay with the questions that are asked.**
Q. Okay. So, from what you recall, Montalvo is the one who selects and circles these -- these certain questions?
**A. Yes, sir.**
Q. Okay. If you're circling -- because this says -- and I understand from Mr. Montalvo that maybe now you guys might not be asking all 97 questions. You're asking a lot more of the questions. But back then, it says here you select 25 questions. Is that your recollection back in '22, that -- that you guys were selecting 25 questions out of the 97 to ask?
**A. Yes, sir.**
Q. Okay. And based on your recollection, Montalvo is the one who selects the 25 and then kind of presents it to the panel to say: Do you guys agree?
**A. Yes, sir.**
Q. When he circled the 25 questions, did you guys agree with it?
**A. Yes, sir.**
Q. Okay. Are you asking any questions or is -- is

the training coordinator kind of leading the questions?
**A. He's leading the question. And if he makes an answer that don't understand or we can get elaborated on, we ask the questions then to elaborate on those questions.**
Q. Okay. Do you have any specific recollection, as you sit here today, of any questions that you asked Mr. Jones in his first exam?
**A. Well, most of the time, once they ask the question, if he doesn't understand one, we try to elaborate with him to try to get him to remember what the reason it works or it doesn't work while they trying to get the answer out of him.**
Q. But do you have any recollection of any times that you did that, any particular questions that you asked him?
**A. Not until he got to like the Lummus and the Swec heaters. He struggled a bit more on the heaters.**
Q. The Lummus and the Swec heaters?
**A. Yes.**
Q. Okay. So, like right here, we can just take No. 3.: Locate the Deaerator level control in the DCS console and explain how this works. Are you the kind of guy who takes notes, you know? Would you -- would you -- on your thing, would you have notes about how he did on this question?



**A. We had took a couple of notes, yeah. We turn them into the training department.**
Q. Okay. Is this something where you guys are giving like points on each one of these questions? You got 25 questions, you know, each question is worth four points or something for a total of 100 points? Are there any points that you give?
**A. No. We just kind of do the count at the end and see like most of the ones he had correct or incorrect and do the majority rules.**
Q. The majority rules meaning like if you got three people on the panel and two people thought he passed and one person thought he didn't pass, then the majority rules?
**A. Yeah. We go into the discussion of: Do you think he'd be able to go to the next level or to the next module to keep going?**
Q. Okay. So, that -- that's kind of what I've heard from other people is that there's no particular points, there's no particular percentage. It's not as like if he -- if he passed 20 of the questions or he got 20 questions right and he got five questions wrong, then he'd have a pass percentage. It sounds like it's very much of a feel thing. If you guys feel like he passed it, if you feel like he knew it, then you passed him. Is that accurate to say?



**A. For the most part, yes.**
Q. Okay. And I'll scroll with you and we'll -- we'll take our time scrolling through this, but I just want to see if there's anything on these questions that bear No. 1 that make you think this -- these were your notes? Because really, throughout a lot of this, it's just circles. I don't see a lot of comments. I don't see anything in particular that would indicate one way or another which question sheet belongs to which person, but do you have any recollection as to if you did anything particular on your question sheet, maybe wrote your name on it, something like that?
**A. No, sir.**
Q. Okay.
**A. We don't write our names on it.**
Q. Okay. So, you can see this first one, we've made it through the 97 questions, really just circles. There's another one here that bears again No. 1. But, again, largely circles. We'll scroll through and see if we -- we see anything. So, in terms of the exams that I have that show No. 1, I don't really see any comments as to why he would have passed or failed. Now, this one here is in red. It bears No. 1. This one has a little bit more to it. It's got some check marks, question marks, things of this nature. Does this look like maybe what you would do on your comment sheet? Does this look like your -- your comment sheet?



**A. No. I think I wrote some things on mine.**
Q. Okay. So, there's really nothing that I can see in terms of writing that -- or written comments that tell me why he failed. I -- I don't see percentages and points as to why he failed. And based on what you've told me, it's very much of a feel thing for you all as a panel. So, let me ask you: What do you recall in particular about exam No. 1 that made you think that he failed -- or I guess I should -- I should say this. Did you agree with the assessment that he failed?
**A. Yeah. He -- he had a lot of struggling points. And sometimes he was tracing the line on the board to see where they went, to what control is being controlled by some of the things. And we helped him with some of that stuff, but it was like the first -- the first was like a preliminary test to the test, which was the second one, to see what the struggling is.**
Q. Okay. So, the first was a pre-test getting ready for the real test, which was the second?
**A. Yes.**
Q. Because here, the -- the notes on the first one

indicate that -- Montalvo's here, if you look at the screen that says 1342, he talks about different areas in the operation that he seems to be struggling with, like the Superheater operation or the mix feed operation. I'm curious about these comments here like: Navigating the console panel or navigating the heater feed, steam, feed pages and control. When he talks about navigating the control panel or console panel, would you agree with that, he struggled with navigating it?

**A. Yes, sir. He would like -- when you trace a line on the screen when we ask you a question, it's kind of like a navigation issue. Because it's like you not understanding what's connected to what, to be actually in control.**

Q. Now that we've gone through together some of these notes from -- from his doctors, do you think that if -- if he has myopia problems that are ten times the average problem, do you think that could affect how he might navigate the console panel?

**A. It could definitely because it's smaller writing.**

Q. Right.

Let's look at the -- and -- and, by the way, nobody from HR, even after the first exam, did you guys get together as a panel and join with HR, join with



administration and talk about: Okay. How do we properly test Warren given the eyesight difficulties? Was that ever even a conversation that was discussed?

**A. Only Jud would probably meet with HR and probably Ricky Bobby.**

Q. Okay. Ricky Bobby being Clay Ryan?

**A. Yes, sir.**

Q. Okay. Then we have exam No. 2. I have the -- the, you know, notes there in red, No. 2. The folks on this one, we have Warren, we have Clay Ryan, Jimmie Hayes, Nick Graham, Josh Montalvo, John Watkins and Jud Wooters. Does John Watkins still work out there, by the way, at CP Chem?

**A. Yes, sir.**

Q. Okay. Does this seem right as to who was -- who was present for the panel?

**A. Yes, sir.**

Q. Do you have any particular recollection as to any questions that you asked in exam No. 2?

**A. We just did some elaboration in exam No. 2.**

Q. Did exam No. 2 function the same way as exam No. 1? And what I mean by that is was Montalvo the one who was leading the questions? He was the primary one asking the questions?

**A. Yes. We always try to leave one person in**



**control so everybody doesn't talk over each other.**

Q. Got you.

Okay. Was there any difference in exam No. 2 and exam No. 1 in terms of what you just told me about as to how you guys select the questions? You know, Montalvo sort of circles them and then you -- you guys discuss what he circled? Was it -- was it the same way on exam No. 2 as it was for No. 1?

**A. Yes, sir.**

Q. Okay. Did you, as a panel, did you guys meet beforehand to discuss the exam before it was administered to Warren?

**A. Yes, sir.**

Q. Okay. What did you guys talk about?

**A. We talked about trying to get him to those areas that were in question and going back through the whole thing all over again to bring him back up to see if he remembered what he answered on test No. 1.**

Q. Okay. Were there any particular areas from test No. 1 that you -- that you recall that he struggled on that you were trying to talk about in test No. 2?

**A. He struggled on a lot of the heater stuff again and like the E/Pmix system and some of the steam condensate.**

Q. Now, I mean, really, here, there's not a whole



lot of descriptiveness. It refers me to a PIP that -- in terms of what issues need to be addressed. Did you guys have a debriefing after the second exam where you talked with Warren about, you know: Hey, you failed the second exam. Here's why?

**A. Yes. They did have a discussion. We were involved. And I really believe he didn't read what his PIP said before he signed it.**

Q. Oh, really? Well, what makes you -- what makes you think that?

**A. Because he had an idea that he was going to be tested over what he struggled on and not the whole entirety, which was written on his PIP.**

Q. Okay. Well, I mean, I guess how -- how does that work practically? I mean, if I'm -- if I'm given a PIP that, say, I -- I disagree with, right? Like I -- I think that I should just be retested where I struggled versus retested on the whole thing. If I disagree with my PIP, does it really matter if I disagree? I mean -- or does it -- I don't know. Maybe if you're union, it -- it matters. I don't know.

**A. Yeah. I believe he could dispute his PIP.**

Q. Okay. So, just kind of from your discussions with Warren, he -- did he relay to you or at least you -- you felt like his impression was that he was

going to be tested on just where he struggled?
**A. Right. And then when I read his -- I actually read his PIP and I'm like: That's not what was written on this paper that you signed.**
Q. And was he surprised?
**A. Yes, he was.**
Q. Okay. Were you surprised?
**A. My first time reading it was after he had already signed it, so I was.**
Q. Okay.
**A. But I really think he didn't read it in its entirety.**
Q. Because if he would have read it, he -- he probably wouldn't have signed it?
**A. Right.**
Q. Got you.
Okay. So, in the second one, do you remember anything in particular in the second debriefing session? I'm going to ask you some questions about the exam itself, but in the debriefing session, do you remember anything in particular that you advised Warren on, like: Hey, Warren, I thought you did really well here, here and here, but you struggled on "X"? Do you remember, as you sit here today, any debriefing that you gave?



**A. I told him that I really think he struggled in some of the stuff that he didn't study the second time because he thought he didn't have to redo it, which was part of the PIP.**
Q. Okay.
**A. There was a lot of that. That's why I don't believe he read it.**
Q. So, it sounds like there was kind of some -- some miscommunication, like maybe he was focusing on areas that he didn't do well on in exam No. 1 because he thought that's what No. 2 was going to focus on?
**A. Correct.**
MR. WILLIAMS: Objection -- I'm sorry. I'm just going to object to the extent I think it mischaracterizes the evidence and calls for speculation as to the miscommunication part.
MR. SUDDUTH: And, you know, I realize it's a form objection. I'm just going to say I think the answer speaks for itself in terms of mischaracterizing the evidence. What he just testified is correct, but -- so, I'm not mischaracterizing the evidence, but I understand it's a form objection.
Q. And, by the way, I didn't tell you this earlier. That reminds me. Thank you. I didn't tell you this earlier, Mr. Hayes. There will be objections



periodically throughout your deposition, but as I told you at the beginning, we don't have a judge here to decide the objections. We put them on the record and we go forward. So, that's kind of how that works, okay, if there's an objection.
Okay. Then in terms of the -- do you remember any particular areas in the second that were struggles?
**A. It was still mostly the heater part, how it's controlled.**
Q. What about other people who gave a debrief to Warren? Do you recall other specific suggestions or advice or guidance that other people gave to him after in a debrief session, so, not yourself?
**A. They were telling him that he needed to more understand what controls, how controls worked and how systems worked as a whole.**
Q. What was -- what was his response to that?
**A. He just said he'd study up and he'd try and get it all under his belt.**
Q. You testified earlier that, you know, Warren kind of felt like what was weak in the first was going to be tested on in the second. Do you know how Warren got to that impression? Like, for example, did you have that same impression that he did?



**A. No, sir.**
MR. WILLIAMS: Objection to the -- I'm sorry, to the extent it calls for speculation about how Mr. Jones got to that impression, but you can answer, Mr. Hayes.
**A. No, sir. I have no idea how he got to that impression.**
Q. Okay. But you testified that you felt that that was his impression. How did -- how did you come to -- to think that? Did he tell you that?
**A. When I read his PIP and I questioned him about his PIP, he said he didn't understand what he had signed.**
Q. Okay. Okay. That's how your -- okay. Makes sense.
That goes back to what I asked you before. I asked you before did it surprise you. It certainly surprised him, but did it surprise you that his PIP was different than what he understood it to be?
**A. It did surprise me, but that's why I said, I had never read it until after they had did the signing.**
Q. Understood.
I want to show you now some evaluations or just some -- some of the question sheets that I showed you from exam No. 1. I'm going to show you now some

Page 54

that bear No. 2 on it just to see if any of these are -- are yours. And they may not be, but maybe some of these -- some of these in exam No. 2 by the way, they have some notes on them, so we'll have some handwriting to look at. So, here's the first one Bates labeled 1349. It says No. 2. We have some circles. Keep scrolling through, though. So, nothing really in this first one. The second one bears No. 2, but there's some blue ink here and actually for the first time some -- some words. This handwriting, is this you?

**A. That looks like my handwriting.**

Q. Okay. All right. I think we -- I think we found you.

Okay. So, maybe some comments. So, No. 3, you put "a little fuzzy."

**A. I think he was getting close to the weeds. He was trying to explain his self out of the actual answer.**

Q. Okay. No. 4, you say: Basic?

**A. He must have gave the minimal answer he could give to justify that he understood it.**

Q. Okay. Here's one of the questions I have. We talked about how like there wouldn't be a number. There wouldn't be number of points or things like this. It looks like you put an 85 on No. 9. What -- what does that mean?

Page 55

**A. It must have meant that he made 85 percent of the answer.**

Q. Okay.

**A. In terms of numbers, I guess.**

Q. Okay. Okay. So, even though you're not actually giving an 85 percent in grade just in your head, you sort of felt like he gave an 85 percent, he gave a B of an answer basically?

**A. Correct.**

Q. Okay. You know, what exactly -- help me understand just even on this first page. If I just look to questions 3, 4, 8 and 9. You know, 3, you say he was a little fuzzy. He got in the weeds. No. 4, you say minimum or basic. No. 8, I see like an NA, maybe not applicable. And No. 9, I see an 85. If I'm talking to you, I'm talking to go Jimmie Hayes about Warren Jones and these are my four questions, which one of these four questions would you characterize as he knew enough to -- to -- to pass versus he didn't know the answer enough to pass?

**A. Probably be the No. 4 that had the basic on it. He knew enough -- he knew enough to probably be by his self, but be watched.**

Q. Okay. Okay. So, based on what we're looking at here, you would think that 3, 8 and 9 would be

Page 56

passing. No. 4 would not be?

**A. Oh, you said which one would be passing and which one would not be?**

Q. Right. Because just looking at your -- your comments, your comments don't tell me which ones in your head, in your mind, that you think: Yeah, you know look. He did -- he did all right or did great. He did all right. It's good enough or no, it's not good enough. None of these tell me which ones you say pass or fail on. So, I'm trying to figure out based on your comments what you would rank as a pass versus a fail. So, kind of walk me through your notes and what you ultimately would say as a pass/fail.

**A. 4 would probably get him in the door and No. 9 would give him a chance to pass, but No. 8, it looked like -- that actually looks like a "no."**

Q. Oh, okay. Okay. Good. Thanks for correcting me. Okay. So, let's zoom in and make sure of that, all right? So, you think No. 8 is not an NA, you think that's a "no"?

**A. I think that's probably a "no."**

Q. Okay.

**A. Because his explanation of those controls probably didn't suffice what they actually did.**

Q. Understood.

Page 57

Okay. Let's see. We scroll to the second page. And the second page just has a -- a checkmark. Would you do that sometimes, just put a checkmark?

**A. Yeah. That means he gave the correct answer to pass that one.**

Q. Okay. So, on 17, you know, no really need for a comment, sounded -- looks good to you, so you checked it. Good to go?

**A. Good to go.**

Q. All right. No. 21, you said basic/knows low press. Did I read that right?

**A. Yes.**

Q. Okay. Would you consider that a passing answer?

**A. Okay. Yeah. That would -- yeah, be a passing question.**

Q. Okay. No. 27, check mark. No. 28, partial, found answer. What do you think that means?

**A. That means he gave a partial answer. He probably found it on the board with a little bit of help.**

Q. Okay. So, with -- with these notes here, is 28 a pass or a fail?

**A. It would be a 50/50.**

Q. 50/50.

Page 58

Okay. I mean, at 30, 31, 33, 36, we don't have a check -- I'm sorry. Not 30. For 31, 33 and 36, we don't have a check or anything like that, no -- no -- no comments?
**A. It looks they were located on the board.**
Q. What's that?
**A. It looks like a question about locating on the board. He just had to navigate on the board to find where it was.**
Q. Okay. But there's -- there's no comments or anything on here. So, on those locate ones, what does this tell you?
**A. It tells me he probably located it and had it -- had a good explanation.**
Q. Okay. And then for No. 30, you say: Explain the basic steps taken should we lose quench water circulation. And you say: Missed some stuff?
**A. That means he gave an answer that could -- was partial to what he really needed to answer. They had more steps he had to take.**
Q. Okay. So, based upon that, would you rate that as a pass or a fail?
**A. That's usually a fail because that's like a critical question.**
Q. Okay. No. 48, I don't see anything on 48.

Page 59

What does that tell you?
**A. It tells me he probably did good on that.**
Q. Okay. No. 50, it says: Don't know. So -- so, does that -- what does that tell us? Does that tell us --
**A. That it's definitely a fail.**
Q. That was definitely a fail?
Okay. No. 52, you have "half understanding." So, with that, what does that tell you? Was that a pass or a fail?
**A. That would be another 50/50.**
Q. 50/50.
Okay. 64 and 65. 64, you say "searching." What does that tell you?
**A. That tells me he didn't understand at all. He was trying to figure out what the answer was.**
Q. Okay. So, would you rate that as a pass or a fail?
**A. That would be a fail.**
Q. And No. 65, you say "partial." Would you rate that as a pass or a fail?
**A. That would be probably another 50/50.**
Q. Okay. No. 73 has a check mark. So, what does that indicate to you?
**A. That that was a pass.**

Page 60

Q. Okay. No. 80 says "75 percent." So, given how you -- you've told me so far as you've walked me through your test, you said 50/50 a few times. What is 75 percent to you? Is 75 percent a pass?
**A. Yeah, in terms of -- in terms of numbers, yes, it would be a pass.**
Q. Okay. All right. What about No. 81 where you say "confused"?
**A. He was very -- probably very confused about the answer and didn't get there. So, it probably would be a fail.**
Q. And, I mean, what's -- what's interesting with -- and I want to ask you about the -- because Montalvo actually had a -- he had a theory on the lead horse to water thing. Apparently, he used that expression. But I -- so, I want to -- I want to ask you because on these two, they both say "locate" and you wrote "locate" before when you talked about --
**A. There's an explanation that goes with locate once you get there.**
Q. Once you get there. Okay. What I'm trying to figure out, though, is it says: Locate the charge regulators on the -- on the DCS on the Lummus heaters. Explain how charge rates can be controlled. This explanation should include how to access and operate the

Page 61

total feed controller. What was he confused on? Was it locating? Was it explaining or was it both?
**A. It may have been both, confused.**
Q. And 82: Locate the dilution steam regulators and explain how those rates can be controlled. What does: Lead horse to water mean?
**A. I think we probably had to lead him close enough to get to the answer.**
Q. Did you have to lead him in terms of locating, explaining or both?
**A. Both. Because it looked like I tried to write confused at first and then I changed it.**
Q. Oh, yes. I do see that. Yeah. Struck -- yeah. Struck through that. Okay. 91, 93, 95, circled, but no comments. What does that indicate to you?
**A. It indicates he may have had the right answer.**
Q. Okay. 97 circled, but no comments. Does that indicate the same thing, right answer?
**A. I'm not sure. I don't know if they cut this test off early or did they finish all the way through.**
Q. I don't know. I mean, 97 is the end of the line. It's the last question and it's circled like 91, 93, 95.
**A. Okay.**
Q. And then it moves on to a new examiner, No. 2,

Page 62

and it starts for a new examiner. So, do you have any reason to think on 97 that it was not a pass?
**A. No. I don't have no idea about that.**
Q. Okay. So, going through this exam with you, I wrote down -- I start with No. 8. No. 8, you wrote "no." I want to be fair and accurate about that, that No. 8, if you wrote "no," did you think that was 50/50 or you thought that was a fail?
**A. That would probably be a fail.**
Q. Okay. So, I had a -- a fail at 8, I had a -- I think you told me with -- with -- with 28, the partial and the found -- found the answer, did you mark that as a 50/50?
**A. Yeah. I would probably rate that as a 50/50.**
Q. Okay. I had 30 marked as a failed because you said "missed some stuff" and I think you said failed. Is that accurate?
**A. That's correct.**
Q. Okay. On 31, 33 and 36 didn't have any notations on them. Then I marked 50 as a fail because you said: Don't know. Is that accurate?
**A. Correct.**
Q. I had 52 as a 50/50 because the "half understanding." Is that accurate or no?
**A. That's correct.**

Page 63

Q. Okay. Then I had -- 64, I had as a fail because you said "searching"; is that right?
**A. That's correct.**
Q. And then for 65, I had it at 50/50 because of the "partial"; is that right?
**A. Correct.**
Q. Okay. And then I had both 81 and 82 would be a fail?
**A. Correct.**
Q. Yeah. We had 97. Okay. So, I have 8, 30, 50, 64, 81 and 82. So, going through the exam with you with 25 questions, I have six fails out of 25, which is 19 out of 25 or 76 percent. I realize you guys don't do it this way. I know you don't do it this way. I got you. I'm just trying to do it from my head, the math in my head. So, help me with that. I've got a guy that has 19 that are -- that are right or close to right and I've got 6 that are fails. Where -- where -- where is the line on that?
**A. The line usually comes into real world situations. Because when something actually happens on the plant, we all have to scramble to our positions to try and save the unit from a catastrophic fire or whatever else could happen. So, you have to be able to be left alone for a couple of minutes or whatever to**

Page 64

**make a decision.**
Q. Yeah. So, it -- it really does. And it -- it comes down to kind of that feel of like do I trust that this guy could be on this -- this guy or gal, that this guy or gal can be on this board, this console by themselves and -- and work it.
**A. Correct.**
Q. And then for exams No. 3 and 4, you were not present?
**A. No.**
Q. Okay. Let me mark -- if I didn't do that because I didn't go over in detail with you your exam. So, let me mark whatever exhibit number it is. I think it might be 6. But, let me mark as the next exhibit and inglobo exhibit pages -- Bates labeled pages 1360 to 1370. Yeah. 1360 to 1370 and make that and attached an exhibit to your deposition.
(Exhibit No. 7 marked)
Q. So, Mr. Hayes, you were on this panel for -- for the two exams and you saw areas he struggled with and you saw areas that -- that he was doing well with. If -- if his eyesight issues weren't getting any better or couldn't improve or get any better, do you think there was a pathway by which he could have -- where he could have passed the exam?

Page 65

**A. On his knowledge, he should have been able to pass it. With study time and whatever, yes.**
Q. With his knowledge, what do you mean by that, his years of experience?
**A. Yes, his experience.**
Q. Okay. What about the -- if -- if you have an individual who -- and, by the way, as a head operator, have you ever encountered a situation in your time at CP Chem where someone has struggled to qualify, at least in part or because of or -- no. Strike that. Let me phrase it this way.
Have you ever had a situation when you've been at CP Chem and you had one of your operators struggle to qualify and also had a disability at the same time?
**A. No, sir.**
Q. Okay. This situation with Warren with his eyesight and going into a qualification, was that your first time ever experiencing that?
**A. Yes, sir.**
Q. Okay. Did you have any discussions -- because you were the head operator. Did you have any discussions with Jud or anybody else, for that matter, on ways to accommodate Warren or maybe other ways to -- to help him bring value to CP Chem, keep him in the CP

Page 66

Chem family despite the qualification struggles?
**A. No. Those wouldn't be on my pay grade.**
Q. That was -- was outside your pay grade. Okay. All right. Do you recall in any of the panel discussions whether or not -- how other people felt about whether or not Warren had passed or not? You've told me how you felt for exams one and two. Do you remember how anybody else expressed their opinion?
**A. They expressed that he needed like more study time, that he needed to pretty much understand what he was looking at as far as reading in the book and trying to function on the board.**
Q. Have -- have you ever seen -- have you ever seen situations where somebody has tested or qualified -- I don't -- I don't want to use the word "in part," but I -- I guess that's maybe the best way to phrase it. But this is what I mean when I say "in part." Have you seen people qualify on things by basically they take the exam. If they struggled in a certain area, then their second exam focuses only in those areas where they struggle? You know, it's sort of taken, like I said, in part. I took the whole exam the first time and I really struggled with sections A, B and C. So, when I take the second test, they ask me a lot of questions about just A, B and C. Have you ever seen that happen?
**A. No. Most of the time, they usually do the whole exam over again.**
Q. You say most of the time --
**A. They've always -- they've always went back and did the whole exam in part all the way over again.**
Q. All the way over.
Okay. So, then, that -- that's -- that's why I wanted to ask you why did it surprise you? You know, Warren was surprised that his PIP had him take the whole thing over again. Why did it surprise you?
**A. Because I'm -- like I say, when I read it, he had -- he told me that he was just taking the test over the parts he had missed. And I was like: I don't know if you can do that. And then when I did see the PIP, I was reading like: Yeah, that's not what the case is.**
Q. Did -- did Warren ever express to you how he came to be under that impression?
**A. No, he didn't.**
Q. Okay. Did you ever ask him?
**A. I asked him, but he didn't have an answer for me.**
Q. Have you ever had a situation in your time at CP Chem where you've had one of your operators struggle to qualify or fail to qualify on something?

Page 67 ends; Page 68

**A. Yes, sir.**
Q. Do you recall any names aside from Warren?
**A. It was -- I think his name was Palmer Lee Miller.**
Q. Who?
**A. Palmer Lee Miller.**
Q. That was an operator?
**A. Palmer Lee.**
Q. Palmer Lee Miller. And Palmer Lee Miller was, what, an operator at ethylene?
**A. Yes, sir.**
Q. Okay. Where did Palmer Lee Miller struggle?
**A. He struggled on the outside job.**
Q. On the outside jobs.
What happened with Palmer Lee Miller when he couldn't qualify on the outside jobs?
**A. They -- they end up stopping his training and then he end up going out on sick leave.**
Q. They stopped his training and he went out on sick leave?
**A. Yes.**
Q. Okay. Did he ever come back from sick leave?
**A. No, sir.**
Q. Oh, he -- he just never came back from sick leave?

Page 69

**A. No, sir.**
Q. Do you know why he went on sick leave?
**A. I'm not sure.**
Q. Do you know if he was terminated?
**A. No. I would think -- believe he was on long term disability or whatever it is they go to.**
Q. Oh, okay. Do you recall anybody else?
**A. They had one operator who struggled after he qualified on one of the boards.**
Q. Who was that?
**A. Gerald DeBlanc.**
Q. Gerald DeBlanc struggled after he qualified on the board. Well, let's break that up into parts. What did he qualify -- what board did he qualify on?
**A. Distillation.**
Q. Distillation.
Okay. And in what way did he struggle?
**A. He had a couple of incidents.**
Q. Based upon those couple of incidents, what happened with Mr. DeBlanc? What did they do?
**A. He was due for retirement soon, so they just stopped him at that board and let him stop in his training into retirement.**
Q. They stopped his training and they stopped him working in distillation until he retired?

Page 70

**A. Yes, sir.**
Q. Did you know that Warren had made a request, given the qualification struggles, on the heater board console, did you know that Warren made a request to just let me work outside. I'll work outside. I'll stay outside and work on the jobs I'm qualified for?
**A. No, sir. I didn't know about that.**
Q. You didn't know about that?
**A. Because I wouldn't be able to make a decision on that.**
Q. Okay. All right. Yeah. I've talked to -- I haven't talked to Clay Ryan yet or Ricky Bobby. I'll have to ask Ricky Bobby about this, but I know Judson Wooters said that that was going to have to be something that -- at least this is what -- what Judson relayed, that that was going to have to be -- the idea of letting Warren just work outside, having like an outside only position, that the union was going to have to vote on that or something like that was the way he phrased it to me. Is that accurate?
MR. WILLIAMS: I'm going to object. I'm sorry. Just to the extent I think it mischaracterizes Wooters' testimony, but you can go ahead and answer, Jimmie.
**A. Yeah. I believe the way the structure is set up for everybody to go forward and finish training.**

Page 71

Q. Yeah. So, to make an exception to that, there would have to be some kind of amendment or vote or alteration or collective bargaining agreement, something like that?
**A. Correct.**
Q. Yeah. Okay. Do you know whether or not those negotiations even took place, whether the union even considered it?
**A. I have no idea.**
Q. Okay. I think you're part of the union, right?
**A. Yes, sir.**
Q. Okay. You attend union meetings?
**A. Yes, sir.**
Q. Was the idea of making an accommodation for Warren or allowing there to be an outside only job, did that conversation ever come up in any of the union meetings with you present?
**A. No, sir.**
Q. Okay. So, it wasn't as though Clay Ryan brought that to you, discussed it with you, discussed it with the union and then the union voted it down or something like that. That -- that didn't occur?
**A. No, sir. I think the chain of events would be the union would meet with the company first and then the company and union would agree for us to vote on it.**

Page 72

Q. Okay. Okay. As far as you know, did the union and company have those kind of discussions?
**A. I have no recollection.**
Q. Okay. Well, I -- I -- you know, I appreciate that. I'll have the chance to talk with Mr. Ryan about that, so -- okay. Well, Mr. -- Mr. Hayes, I don't think I have any further questions for you, sir. I appreciate your time today.
**A. No problem.**
MS. WILLIAMS: We'll reserve for the time of trial, which means you're done, Mr. Hayes.
COURT REPORTER: Not yet. Don't -- don't leave just yet.
MS. WILLIAMS: Yes. Don't leave.
THE VIDEOGRAPHER: Perfect. I'll -- I'll -- before we go off the record, we need transcript orders and video orders on the record. Mr. Sudduth, transcript order for the court reporter?
MR. SUDDUTH: Yes. Standard order for the transcript and the standard video with that that comes with the order of the depo, please. Thank you.
THE VIDEOGRAPHER: Understood.
Ms. Williams?
MS. WILLIAMS: Yes. I think the order of the transcript. I think we -- we have not ordered the videos, yeah. So, that's fine.

Page 73

THE VIDEOGRAPHER: So, just the transcript?
MS. WILLIAMS: Yes, please.
THE VIDEOGRAPHER: Understood. Thank you so much.
So, this concludes the deposition of Jimmie Hayes, Jr. for Warren F. Jones versus Chevron Phillips Chemical Company, LP. We are now off the record. The time is 2:56 p.m. Central Time.
(Proceedings concluded at 2:56 p.m.)

STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ORAL VIDEOTAPED DEPOSITION OF JIMMIE HAYES, JR.

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was not requested.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 5TH day of OCTOBER, 2025.

Teresa Bentley

Teresa Bentley Willis, CSR
Texas CSR 3520
Expiration: 04/30/26
STENO AGENCY, INC.
Firm #11909
315 W. 9th Street
Suite 807
Los Angeles, CA 90015



ACKNOWLEDGEMENT OF DEPONENT

I, __________________, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and accurate transcription of the testimony given by me, and any corrections appear on the attached errata sheet signed by me.

_______________ ____________________________
(DATE) (SIGNATURE)



ERRATA SHEET
CHANGES IN TESTIMONY
WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL CO. LP
JIMMIE HAYES, JR.
October 03, 2025

Page Line From To

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

SIGNATURE:_______________________DATE:___________
JIMMIE HAYES, JR.

# Exhibit K

# Deposition Transcript

Case Number: 1:24-cv-00350
Date: October 2, 2025

In the matter of:

## WARREN F. JONES v CHEVRON PHILLIPS CHEMICAL COMPANY LP

## JOSHUA PAUL MONTALVO

CERTIFIED COPY

Reported by:
Blanche J. Dugas

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| WARREN F. JONES, | § | CIVIL ACTION FILE NO. |
| | § | 1:24-cv-00350 |
| Plaintiff, | § | |
| vs. | § | |
| CHEVRON PHILLIPS CHEMICAL COMPANY, LP, | § | |
| Defendant. | § | |

~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
JOSHUA PAUL MONTALVO
CONDUCTED REMOTELY

2:09 p.m. CST
Thursday, the 2nd day of October, 2025

Blanche J. Dugas, FCRR, RMR, CRR

Steno #:1909193
~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff:
JAMES E. SUDDUTH III, Esquire
Sudduth & Associates, LLC
1109 Pithon Street
Lake Charles, Louisiana 70601
(337) 480-0101
(337) 419-0507 (facsimile)
james@saa.legal

On Behalf of the Defendant:
BROOKE JONES, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart, PC
Suite 2100, One Allen Center
500 Dallas Street
Houston, Texas 77002
(713) 655-0855
brooke.jones@ogletree.com
WILLIAM J. BARILLAS, Esquire
Hall Booth Smith, PC
Suite 2900
191 Peachtree Street, NE
Atlanta, Georgia 30303
(404) 954-5000
(404) 954-5020
wbarillas@hallboothsmith.com

Also Present:
Alex Nicasio, videographer
Stephanie John, Chevron Phillips
Austin Matthews, Chevron Phillips



INDEX OF EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| EXAMINATION BY MR. SUDDUTH | 5 |


\- - -

INDEX TO PLAINTIFF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of deposition of Christopher Montalvo | 30 |
| Exhibit 2 | In-globo exhibit, Bates-labeled 1341 and 1342 | 30 |
| Exhibit 3 | In-globo exhibit, Bates labeled at 1343 to 1344 | 59 |
| Exhibit 4 | PIP dated October 13th, 2022 | 64 |
| Exhibit 5 | In-globo exhibit, Bates-stamped 1347 to 1348 | 82 |


(Original Exhibits 1 through 5 have been retained by counsel.)



Videotaped Deposition of Joshua Montalvo
October 2, 2025

VIDEOGRAPHER: Good afternoon. We are now on the record at 2:09 p.m. Central Time, October 2nd, 2025 to begin the deposition of Joshua Montalvo in the matter of Warren F. Jones versus Chevron Phillips Chemical Company, LP.

The venue of this case is in the United States District Court for the Eastern District of Texas, Beaumont Division. The case number is 1:24-CV-00350.

The deposition is taking place via Zoom. The legal videographer is Alexander Nicasio here on behalf of Steno, whose business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent.

MR. SUDDUTH: Yes, James Sudduth on behalf of the plaintiff, Mr. Warren Jones.

MS. JONES: And Brooke Jones on behalf of Defendant CP Chem.

VIDEOGRAPHER: Thank you, Counsel. Will the court reporter please identify



yourself and swear in the witness.

JOSHUA PAUL MONTALVO,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SUDDUTH:

Q. All right. Mr. Montalvo, good afternoon, sir.

**A. Good afternoon.**

Q. I know we haven't met before, so I'll introduce myself to you. My name is James Sudduth, and I'm representing Mr. Warren Jones, who has --

**A. I'm sorry. You just cut out. Can you start over?**

Q. Sure.

**A. I got you now, I think.**

Q. Okay. You got me? Okay. Yeah, if you have any problems with me, please let me know.

But --

**A. I will.**

Q. Okay. I know we haven't met before. My name is James Sudduth, and I'm representing Mr. Warren Jones. But let me ask you, sir, have you ever been deposed before, meaning in a deposition like this?

**A. Yes, I have.**

Page 6

Q. All right. How long ago was that?
**A. Maybe two years ago.**
Q. Two years ago. Okay.
**A. Yeah.**
Q. Was that in your personal capacity or was that in your professional capacity, kind of like this?
**A. Personal.**
Q. Personal. Okay. In that particular deposition, was it done by Zoom like this one or was it in person?
**A. Now, I don't remember what it was. I think it was Zoom, but I'm not 100 percent.**
Q. Okay. Well, I want to go over a couple of ground rules with you. It may be duplicative because it has been two years, but it hasn't been that long since you've been deposed, but I'm going to go over some ground rules for you that -- for today's deposition.
The first, sir, is to remind you that you are under oath. I know things can seem a bit informal today because we're kind of on a conference call, we're not in a courtroom with a judge and a jury sitting with us. But the oath that you just took is the same oath you'd take as if you were in a court of law. And so all the same obligations to tell the

Page 7

truth, all the same penalties of perjury if you don't, all of those attach here just like they would in a court of law.
Do you understand that?
**A. I do.**
Q. All right. And are you okay with that?
**A. Yes, sir.**
Q. Very good.
The next thing, sir, is to ask you to please verbalize your answers. You'll find it's really common in conversation to say things like uh-huh (affirmative) or huh-uh (negative) when you're answering a question one way or the other.
That's really difficult on Madam Court Reporter to get that down accurately, and she's taking everything down that we say today into a booklet format. So whatever your answer is today, yes, no, maybe, whatever the answer is, please verbalize that answer out loud; okay?
**A. Okay.**
Q. Thank you.
**A. Understood.**
Q. Also, talking over each other, that happens a lot too in conversation. I'll give you an example. There could be a time where I'm asking you a question

Page 8

and you can sort of sense where my question is going, and so you begin to answer the question before I'm done asking it.
Well, there's no harm in conversation when you do that, but here, the problem is, at least with a situation where I'm asking and you're answering and now we're talking over each other at the same time, when that happens it's especially more problematic by Zoom because Zoom will cut off one of the speakers entirely and we don't get anything that you're saying.
So if you would, sir, it's kind of tedious, but if you would, please, let me finish that question out all the way to its end before you start to answer; okay?
**A. Yes, sir. I understand.**
Q. Very good.
The final thing, and then we'll jump into this. The final thing is breaks. If you need a break, Mr. Montalvo, this is not a marathon; all right. So if you need a break, you just say the word and we'll take care of you; okay?
Water, bathroom, whatever the situation is, you just let me know. I only have one request of you, which is if I have a question that's pending on the table for you to answer, answer that question first

Page 9

before you go take any break that you want.
All right?
**A. Yeah, that's -- that's fine. I understand.**
Q. Good deal.
All right, Mr. Montalvo, do you have any logistical kind of questions for me before I jump in?
**A. No. I mean, I know I've done this once, but, you know, I'm not an expert, so here I am. So...**
Q. Fair enough. Fair enough. Well, you'll be fine. I promise.
All right. Well, give me your full legal name and your address for the record, please, sir.
**A. Yes. Joshua Paul Montalvo. I live at 4639 Wilson in Groves, Texas 77619.**
Q. All right. Mr. Montalvo, just since this is my only opportunity to get to know you, absent going to trial, let me ask you a couple of questions about your background.
I assume you graduated from high school, but can you confirm that for me?
**A. Yes, sir.**
Q. All right. Did you go on to any college after that?
**A. Yes, sir.**
Q. Okay. Where did you go?

Page 10

**A. I went to Lamar State College, Port Arthur, for two years, and then Lamar University for two.**
Q. And did you obtain any sort of degree from there?
**A. Yes, sir. I have a -- both an associate's of science in business administration, and a bachelor's in general business concentration.**
Q. You said a bachelor's in general business?
**A. Yes, sir.**
Q. Okay. Any further education, like a master's or doctorate or anything like that?
**A. I wish. One day hopefully.**
Q. Okay. All right. Fair enough.
When did you graduate from Lamar?
**A. It was 2004.**
Q. Okay. So the reason why I ask this is, you know, sometimes people go to college while they're working. Sometimes they'll go to college and go to work and come back.
Did you sort of go to school straight through, finish, and then enter the workforce or were you working and going to school kind of at the same time?
**A. Well, so when I got out of high school, I went to Lamar Institute of Technology for one**

Page 11

**semester, but that wasn't for me so then I took two years off. I went back when I was 19, and I basically went straight through and finished out.**
Q. Okay. So then whenever you -- when you took that -- that break there, you said it wasn't for you, I think you said it was two years, did you work for CP Chem during that time?
**A. No, sir.**
Q. Okay. When did you start for CP Chem?
**A. My original hire date was March 1st, 2007.**
Q. Okay. So from March 1st, 2000 -- excuse me. From 2004 when you graduated until 2007, who did you work for or did you work?
**A. Yeah. Let's see. Yeah, I had multiple jobs. I mean, too many to really name.**
Q. Okay. Well, let me ask you this --
**A. I mean --**
Q. Let me ask you this way, 'cause -- yeah, because if it was just odd jobs, I don't need to hear every single one of them, but I'll ask it this way: In any one of those jobs that you had from '04 to '07, did any one of those end involuntarily, meaning that you were fired?
**A. '04 to '07. The only thing was I was working at Walgreens during -- I think it was one of the major**

Page 12

**hurricanes come through, and the store manager wanted me to stay two hours past the mandatory evacuation, and I decided that that would be the last time that I worked for Walgreens and I left. So whatever you want to call that, I never went back.**
Q. Okay. I don't blame you. Okay.
But aside from that, every other situation, you left that job because it was voluntary, meaning you got a better job --
**A. Yeah.**
Q. -- or a better opportunity?
**A. Right.**
Q. All right. Right?
**A. Yes, sir.**
Q. Okay. So March 1st of 2007, have you worked straight through -- or excuse me -- have you worked consistently from 2007 until the present date, 2025, for CP Chem?
**A. No, I left in 2000- -- I think I was going from CP Chem from 2009 to '12. I don't remember the exact month, but it was almost three years to the day. And I believe I come back sometime in July of 2012, and I've been here ever since.**
Q. Okay. Let me ask you about that -- that break. What led you to leave in 2009?

Page 13

**A. I wanted to pursue -- I wanted to be an oil analyst, and I took a job in Dallas. I did outside sales for an electrical broker, which was different from what I thought, and then, you know, during that time period, everything that was going on in the economy. So about six months later, I came back home.**
Q. So it sounds like maybe that job in Dallas ended because of economic reasons?
**A. Yes. Nobody was -- I was trying to find another job. I wanted to stay, but, you know, they had 35, you know, year experienced people out on the street and people with MBAs and it was very competitive and I wasn't able to land a job, so I come back.**
Q. Got you.
When you came back, did you just work odd jobs to kind of fill the gap from '09 to 2012?
**A. So I applied at Wells Fargo Advisors. I become a -- a financial advisor for their brokerage firm. I did that for a year. I wasn't making enough money, so I ended up having to give that up.**
**And then after that, my family has a -- or they had a -- a -- well, we had -- they have a family business and I went to work for them and basically stayed working for my family until I came back to**

Page 14

**Chevron -- or CP Chem.**
Q. Okay. What was your position or your role, your title in the time from March 1, 2007 until 2009?
**A. I was an operator.**
Q. And what facility were you an operator at?
**A. Port Arthur.**
Q. Okay. So then you come back in 2009 -- excuse me. You come back in 2012 to CP Chem. When you came back in 2012, how did you hear about there being an opening in 2012?
**A. I don't -- I don't exactly remember how I found out, but I knew they had an opening and I applied.**
Q. The position you came in to in 2012 was what?
**A. It was a process operator.**
Q. Process operator. Okay. So from 2012 until present, 2025, you've been at CP Chem consistently. Have you held the job of process operator -- see, if -- by my math, 2012 to 2025, that would be 13 years give or take.
So have you been a process operator for these last 13 years or have you had different roles?
**A. So in 2015, I took the training coordinator position.**
Q. Was the training coordinator position, was

Page 15

that considered a promotion for you, was that lateral, what was that?
**A. I mean, I think it was good, but it's just a different role. Yeah. I would say different position.**
Q. How did you find out about the training coordinator position coming open?
**A. It came open, I applied.**
Q. Did -- when you applied, did other people apply for that position? Meaning was there a competitive interview process for it?
**A. Yes. That's correct.**
Q. Okay. And have you been serving as the training coordinator consistently from 2015 to 2025?
**A. No. So it's been about a year now, I don't know the exact date. I think it's been about a year, I took the training superintendent role. So now I am training superintendent for Port Arthur and the Orange facilities.**
Q. I'm sorry. It's kind of hard for me to hear you at the end there. You said you're the training superintendent for what facilities?
**A. Yeah, so I'm currently the training supervisor for Port Arthur and Orange facilities. So I -- I'm -- at those sites, I'm responsible for two**

Page 16

**facilities.**
Q. Understood. Okay. Training supervisor.
Is the training supervisor position, is that a promotion from training coordinator?
**A. I -- the position came open. I applied for it. I got it. So however you want to look at it, you know.**
Q. I guess let me ask it this way --
**A. So I -- I applied, there was an interview. I got the job. That's what I'm trying to say.**
Q. No, I -- I hear you. Yeah, I understand.
I guess is it more money for you?
**A. Yes.**
Q. Okay.
**A. Yes.**
Q. All right. As the training coordinator, from 2015 until you said about a year ago, you became the supervisor. So, what, 2024?
**A. Yeah. Yeah. Yeah, I don't -- you know, don't know the exact day right now, but it's been about a year.**
Q. As the training coordinator, was your role limited to the Port Arthur facility?
**A. Yes, sir.**
Q. Okay. Obviously I'm going to talk to you

Page 17

today about some of the training with Warren Jones, which was in the ethylene unit. When you were the training coordinator, were you just doing trainings in the ethylene unit or were you doing trainings in other -- all over the facility? Tell me about that.
**A. Yeah, I was specifically the -- the ethylene training coordinator.**
Q. Okay. So -- and sometimes throughout today, you may hear me refer to things as 1544, Unit 1544. So if we talk about 1544 --
**A. Right.**
Q. -- ethylene, that's the same thing. We're talking about the same unit; is that right?
**A. Yes, sir. That's correct.**
Q. Okay.
**A. Yep.**
Q. So as training coordinator for the ethylene unit, what are the different positions that you trained people or what are all the different positions that you had to train?
**A. So I'm the -- I was a training coordinator. So I coordinated training. So --**
Q. I guess describe that for me.
**A. You know, there's --**
Q. Go ahead.

**A. There were times where I would -- there were times where I would do unit training, but, you know, it just depends on what was going on at the time. So -- but my primary job is to coordinate trainings. So...**
Q. Describe for me the difference, then, between coordinating a training versus actually doing the training. Help me with that.
**A. Yeah. Sure. Yeah. Sure.**
**So coordinating the training is, you know, building a training schedule, meeting with all of the unit leaders to make a final decision on who ultimately will train, getting -- giving them all of their qualification paperwork, you know, kind of touching base with them throughout their training when I get to see them, and making sure that I get all the -- when they go to qualify, making sure all their paperwork is completed, and then proctor their -- their test and participate in the walk-arounds.**
**And then a unit trainer would be, for instance, one who actually facilitated any type of unit training whether it be classroom or OJT, which is on-the-job training, field training, et cetera.**
Q. So then, like, in terms of inside jobs versus outside jobs, if I refer to something that way, as an



inside job versus an outside job, do you know what I'm talking about there?
**A. Yes, sir. Absolutely.**
Q. All right. So somebody is going to train on an inside job. Let's just say the heater board console, and they were trained on that inside, your role as the training coordinator is you weren't going to be the on-the-job trainer. You weren't going to be actually training the person on how to work the heater board console. You're coordinating the overall training plan for that role.
**A. That's correct.**
Q. Okay. Obviously you heard, as we started the deposition today, the videographer announced, you know, Warren F. Jones versus CP Chem. So let me ask you. When you hear the name Warren Jones, do you know who that is?
**A. Yes, sir. Yes.**
Q. Okay. Did you know Warren personally? Meaning did you know him, like, before meeting him at CP Chem or was the first time you met him was out there at CP Chem?
**A. No, I met him at CP Chem.**
Q. Okay.
**A. Yeah, I didn't know Warren before.**



Q. Okay. When you met him at CP Chem, describe for me how often you guys would get to interact. And I know he's -- he's working as an operator. He's kind of out in the field and you're doing the training stuff.
Is this something where you'd see him once a day, once a week, once a month? How often would the two of you interact?
**A. Well, when I was training coordinator, so I tried to go see the trainees when they're on those four days. So, you know, they do a rotating shift. So once a month they're on there for four days.**
**So yeah, when I'm on in the four days, I try to go catch up with them and see how things are going, if they need anything, you know, things like that.**
Q. Had you met or dealt with Mr. Jones prior to when he was training on the heater board console?
**A. Yes. Yeah.**
Q. Okay. How were y'all's interactions? I mean, did you and Warren get along, hate each other, a great guy? I mean, describe that for me.
**A. Yeah, I mean, I didn't have any problems with Warren, you know. He's a good guy.**
Q. Okay. Did you train him up or did you coordinate any of his other trainings?



As I understand it, as I appreciate it, he was qualified on all of the outside jobs. So he had already trained on, like, three of the six positions out at the ethylene unit.
Did you coordinate any of those trainings for him?
**A. So yeah, I would have been a part of them. You know, I don't recall any exact, like, details of you know how involved I was. I mean, over the years, I did some unit training. So I'm not sure if I was one of his classroom trainers at some point. I don't remember, you know.**
**And I know that I most likely took, you know -- I probably was in his qualification test. I just -- for the outside jobs, I don't remember for each one. I do know that I was part of his outside distillation qualification walk-arounds, so...**
Q. You were part of his outside distillation walk-around you said?
**A. Yeah. Well, the whole thing. So it was a qualification process.**
Q. Do you recall who the actual trainer was for the outside distillation role?
**A. No, I don't.**
Q. You told me earlier that when you're

Page 22

coordinating a training, you'll decide who will train, the qualification, paperwork, all that sort of thing.

When this training on the heater board console came up -- which is what we're going to spend a lot of time talking about today. When the training on the heater board console idea came up, can you describe for me -- I assume that was you working with Judson Wooters about how to decide who was going to train, but I don't want to make that assumption. You tell me.

Who did you work with to decide who was going to train on the heater board console?

**A. Yeah, so you can think of it as, you know, what I like to do is -- is look at the unit as a whole and try to understand what moves we need to make next.**

**I will go, you know, consult with people on the unit to get their thoughts, and then, you know -- and also obviously go visit with Jud, and, you know, always -- but at the end of the day, it's ops' decision on who they train. So, you know, I just took it as I'm kind of, you know, starting the process and -- and getting, you know, people's opinion and, you know, go from there.**

**But at the end of the day, I just want to know who's training so I give them their paperwork and -- and we can get them going.**

Page 23

Q. Okay. So fair to say you're not making the ultimate call on who's going to train, you just want to know who is there to be trained?

**A. That's correct. Right. Yeah. As you can -- you know, you can kind of set, like, a tentative plan, you know, here's a proposal, what do y'all think, and then, you know, tell me, you know, who do we end up with. So...**

Q. Did you make a proposal on -- on who you -- you preferred or who you thought should be training on the heater board console? Did you ever make a proposal for that?

**A. Yeah. I've trained so many people over ten years, I don't -- I don't know that exact one. I'm sorry.**

Q. Okay.

**A. I'm sure I had it on paper, you know what I mean, or something. But yeah, I don't remember the exact details.**

Q. Do you still have that paper handy? Do you still have those notes or those papers with you?

**A. I'm not sure. I'm not sure.**

Q. Okay.

**A. Yeah, nowadays we use different stuff, so, you know, that's all. I have no idea.**

Page 24

Q. Well, that actually reminds me, asking you about that document.

Did you review any documents in preparation for your deposition today? I assume that you may have spoken to the attorneys for CP Chem, and I don't want to know anything that you or the attorneys said to each other. But I do want to know what documents you looked at.

So did you look at any documents in preparation for today?

**A. Yeah, I reviewed the -- I reviewed the documents I submitted to them. So --**

Q. Okay. What documents did you submit to them?

**A. The -- the -- some of those qualification paperwork, like the heater DTS one. And then -- I don't have a list in front of me. I think some correspondence about some training or starting and -- and then maybe the meeting invite of when he was going to start and things like that.**

Q. Okay. So I know you don't have your paper with you, you don't really recall because you've done a lot of trainings, but let me just try to put a bow around that and summarize it.

Do you recall at all whose decision it was to have Warren Jones train on the heater board console? If it wasn't your decision, do you know who ultimately made that decision, if you remember?

Page 25

**A. No, I do not. I don't know who made the final call.**

Q. Okay. Another series of questions I want to ask you is just to understand kind of what you were part of and what you weren't part of. Because I don't want to waste time with you asking you questions about things you weren't part of.

So let me just verify with you, when it came to Warren Jones', like, accommodation request regarding his eyesight and how to deal with that, did you have any role in that process at all?

**A. No, not that I recall. No.**

Q. Okay. In terms of any medical review, medical documentation, for example, Dr. Stanton, Nurse Jeannie Johnson that conducted some eye tests and reviewed records, did you have any role with that at all?

**A. Not that I recall, no. Huh-uh (negative).**

Q. Okay. Were you part of any decisions or discussions about how best to accommodate Mr. Jones?

**A. No, not that I recall, no.**

Q. Okay. Were you part of any discussions or

Page 26

round-table discussions or anything like that whenever the ultimate decision to terminate Mr. Jones was being made? Were you part of any of those discussions?
A. **Yes, I was. Yep.**
Q. Okay. All right. So we'll talk about that. And then obviously I have some paperwork here. You were -- it looks to me, you know, for the four times that he was tested, I've got your signature on all four of those tests.
A. **Yes. Yeah.**
Q. So accurate to say that you were on his panel of people asking him questions on the heater board for all four of the exams?
A. **Yes, sir. That's correct.**
Q. Okay. So obviously I'm going to ask you a lot of questions about that, and then we'll ask -- I'll talk to you about the ultimate decision on termination. But let me ask you, were you part of any discussions or decisions on whether there were alternative jobs, meaning other jobs that Warren could do as an accommodation?
Were you part of any discussions with anybody at CP Chem about that?
A. **No, not that I recall, no. Huh-uh (negative).**

Page 27

Q. Okay. So let's turn now, then, to the testing. When it comes to the testing, as I understand it -- please correct me if I'm wrong -- there's two components to this test. One is what I'll call an objective component, which is you simply -- multiple choice, true or false. There is a right answer, so you can answer right or wrong and you can pass or fail that test.
And then there is a panel that asks you questions, and the panel judges how you answer the questions. So you have the written test, and then you have the panel examination.
Is that accurate?
A. **So yes -- yeah, that's a pretty good characterization of it.**
Q. Okay. In the objective test, meaning just the multiple choice questions, the true or false questions, that kind of thing, as I understand it, Warren passed that test.
A. **The second time.**
Q. Okay. So you pre-empted my next question I was going to ask you.
Did he pass the written on the first time, or he passed the written on the second time?
A. **So it's really not a written. It's an electronic test, but he did not pass the first test. He did pass the second test.**

Page 28

Q. Okay. So it's electronic, so it's taken on the computer?
A. **Yes, sir. That's correct.**
Q. Does the computer automatically grade it, meaning you submit your answers and the computer spits back a grade?
A. **Yes.**
Q. Okay. For that test, the -- the -- I called it a written test. We can call it an electronic, you know -- it doesn't matter. But for this electronic test, Warren took it twice. What is considered a passing grade? What is the percentage that's placed on a passing grade?
A. **85.**
Q. 85 percent?
A. **Yeah.**
Q. What percentage did he make the first time?
A. **Yeah, I don't remember exactly. I'd have to look at it.**
Q. Do -- is there any sort of prohibition on taking the electronic test more than once? I guess what I'm asking is: Have other people trained up and failed the first time and they take it a second time and they pass? Is that common?

Page 29

A. **I wouldn't say common, but that's the process. Right. I mean, our job is for our employees to be successful, so yeah, if they fail the first time, we're -- they're going to get a second time.**
Q. Okay.
A. **That's normal.**
Q. Okay. So he took it the second time. He passed it. Do you know what percentage he got the second time?
A. **No, I'd have to look at the paperwork. I don't know an exact number.**
Q. Can you describe for me kind of the timing, meaning did he have to pass that electronic test first before he moved to the panel questions or were they happening at the same time?
A. **Typ- -- typically we do the electronic test first. So I don't exactly remember how it went down. I would imagine that he took the electronic test first before the panel review. That's kind of, you know, normal.**
Q. So that's the typical process, but is it fair to say you don't have any specific recollection on what the timeline was for Warren Jones?
A. **No, I -- I -- no, I don't.**

Page 30

Q. Okay. Let me show you -- we'll take a look at these unit review committee documents.
MR. SUDDUTH: And Madam Court Reporter, I apologize, I should have said this earlier. I'm going to make the notice of deposition of Christopher Montalvo as Exhibit 1 to his deposition.
(Plaintiff's Exhibit 1 was marked for identification.)
BY MR. SUDDUTH:
Q. This will become Exhibit 2 to your deposition, sir.
I'm sharing my screen with you. Let me know if you can see it. Can you see my screen, sir?
(Plaintiff's Exhibit 2 was marked for identification.)
**THE WITNESS: Yes, sir. Yep.**
BY MR. SUDDUTH:
Q. Very good. I'm going to make Exhibit 2 to your deposition, Bates-labeled 1341 and 1342. So it's an in-globo exhibit because it's two pages.
Let's take a look together at the first page, which is 1341. And it has in red -- and I'm going to zoom in here for you. Is this okay? Do you want me to zoom in more or can you see it okay?

Page 31

**A. No. No. That's fine. That's big enough.**
Q. Okay. It said in red ink, No. 1, and it has a date at the top of 8/24/2022. Does that sound about right to you as the first time he took his test was 8/24/22?
**A. Yeah, I put the No. 1, and that's my writing, so yes.**
Q. I was going to ask. Okay. So this handwriting up here, all of this up here, is that your handwriting?
**A. That's correct.**
Q. Okay. And then down here there are signatures, and looks like we have Warren Jones, Jimmy Hayes, Nick Graham, I see your name there and Jud Wooters.
Is that all the people that were on his panel for the first test?
**A. Yeah, so Jud, he probably wasn't there. Typically what happens, if one of them -- if we have somebody that failed the first time, I will go bring the paperwork to the unit superintendent so that they're aware of it and usually they sign there. But then second -- the second test or any test after that, they're required to be there. So that's kind of the workflow there.**

Page 32

Q. Okay. Who decides who is going to be on the panel?
**A. We basically have guidelines for -- for who should be there. So typically, I like for their head operator to be there, their PSC to be there, I'm there, and then the other -- and then also we utilize a unit SME, which are basically subject matter experts or, you know, somebody that, you know, has a lot of experience in the area.**
Q. I see PSC here is Nick Graham. What does PSC stand for?
**A. So just take the shift -- the shift supervisor.**
Q. Okay. So yeah, so you had his PSC or his shift supervisor there. You were there. Jimmy Hayes, was Jimmy Hayes there basically as the head operator?
**A. Yes.**
Q. Okay. I do want to ask you about the second page here, which has these -- these handwritten notes. Are these your notes?
**A. Yeah, the first and second column are me. The third column, that initial -- that -- that may be Warren's.**
Q. Oh, the -- the third column that says, "Action employee will take to" --

Page 33

**A. Address the deficiencies. Right.**
Q. Okay. That would be Warren's handwriting there?
**A. I mean, I'm not a hundred percent, but I see a W -- Warren -- yeah, it's not mine.**
Q. But you do feel comfortable in saying that these first two columns, the deficiencies identified and the required actions to resolve the deficiencies, those two columns are yours?
**A. Yes, sir. That's correct.**
Q. Okay. I want to come back and read through those, but before we do, I want to ask you about the -- about the panel portion, specifically kind of how it's graded.
I define the written test as objective because if I've got a multiple choice question, I can either select A, B, C or D, and that answer is going to be right or it's going to be wrong.
How exactly do you grade an answer with the panel?
**A. Yeah, so we're trying to determine competency at the end of the day. So, you know, basically we'll go system by system. Typically it's on the board, we ask the -- the trainees to, you know, explain -- it's basically, you know, go ahead, explain the system, you**

know, tell us everything you know, and if we have any follow-ups, then we'll ask them.

And so we'll typically go system by system. And then -- yeah, like I said, so depending on, you know -- like I said, we're trying to determine competency. So if we determine that they're competent in that system or that page or that control scheme, then we move on.

Q. Okay. Well, like, for example, I have these EU 1544 unit review committee, it says heater DCS, and it has, you know, quite a few questions, 97 questions. It says here --

A. Right.

Q. -- select 25 of them.

So it looks like there's circles next to some of the questions. So I'm guessing of the 97 potential questions, 25 get circled as the questions to be asked?

A. Yes. If that's what it says, then yes.

Q. Well, I mean, don't -- don't take my word for it. I'll show it to you. Let me --

A. Right. No, I understand. Yeah.

Q. Let me share my screen here and show you what I'm looking at. This is --

A. Okay.



Q. This is 1312. Bates label 1312.

So you'll see here at the bottom, sir, this is what I'm referencing when I say Bates label. It's this stamp here that we put on the bottom of documents --

A. Uh-huh (affirmative).

Q. -- to identify when we have a lot of documents.

So 1312, so you see here there's a number one up at the top where my cursor is. It says, "Heater DCS unit review committee to select 25 questions." And I see circles here.

MS. JONES: James, before you go on, are we marking this as Exhibit 3?

MR. SUDDUTH: No, I haven't done that yet.

MS. JONES: Okay.

BY MR. SUDDUTH:

Q. So you'll see circles here. That's what I'm asking you. You'll see a total of 97 questions. Is that what you guys are --

A. Yeah, so --

Q. 95 --

A. I'm glad you brought that up. So over -- so yeah, see, over the years we've -- I mean, we've, you



know, updated our training process to improve it over the years. If -- I don't remember if -- if I had circled 25 of these, we may have asked the 25 that -- at that point in time, that may have been what we were doing.

Q. Okay. Well, I mean, this testing was in 2022. We're now in 2025. So you say it's changed over the years. I mean, when did it change --

A. Yeah.

Q. -- from this?

A. Well, we -- I'm not sure, like, I mean, we're always trying to get better, right. So we're always making adjustments. I can't -- I don't know the exact date that we, you know, moved away from asking 25 to -- you know, to a more comprehensive exam like I explained to you a second ago.

Q. Well, you said -- go ahead.

A. Well, I was just saying -- so basically what I'm trying to explain to you is that if you only ask 25 questions, you know, you're -- you're really -- we've determined over the years that you're not really getting the -- the same comprehensive exam as if you get them to, you know, go system by system.

And we still refer to these questions because if -- you know, if you know all these questions,



then -- then like this -- these questions are basically a reference sheet for us. Again, at the end of the day we're trying to determine if they're competent, like, you know, our job is to make sure they're successful, but we cannot qualify somebody if they're not -- if they don't demonstrate competency. That's what we're trying to do.

Q. Yeah, no, I understand that. I'm going to ask you a lot of questions about that, the competency problem that you had there. But I want to know right now just about process. And right now, it looks like you've got a template of 97 potential questions of which you're selecting 25 questions.

Was that at least what the process was back in 2022?

A. Yeah. I mean, that's what it looks like, you know. If -- if I had that statement on there -- here and you said, are you familiar with 25 questions, I'd circle 25, then -- and then we would've asked those 25. I mean, that's -- you know, I don't -- you're talking three years ago.

You may remember what you did, you know, three years ago, but, you know -- so I'm just looking at paper. Based upon what I see on this paper, we would have definitely asked 25 questions.

Q. Okay. You said that since then, you guys are always trying to improve your systems to try to make things better. How did you change your testing from what you did in '22 to what you're doing now to make it better? Meaning what problems did you have with your training back then that you're trying to rectify and make it better now?

MS. JONES: Objection, assumes facts not in evidence.

You can answer if you know.

**THE WITNESS: I mean, we're just -- I mean, don't you try to get better every day? I mean, you know we're always looking for ways to improve, you know. We don't bake cookies out here; you know what I mean? So we're always -- me personally, I'm all about continuous improvement. So I'm looking at, you know -- you know -- what do the trainees think, you know, what do we think, you know, how are things going, you know. I'm looking at everything and always looking for ways to improve. So really --**

BY MR. SUDDUTH:

Q. I'll answer your question. Yeah, I'm always



looking to improve. I agree with you 100 percent absolutely, continuous improvement, but that wasn't my question.

My question was you said that you've changed the training to improve it. And so what I want to know is: What were those areas that you guys identified in your training that you feel like it needed improvement?

Not just -- I'm not asking you generally that you're looking to continuously improve. I hear you. I got you.

**A. Yeah. Yeah.**

Q. I'm asking what specific things were you trying to improve with your training?

**A. So I would say we -- we utilize more of these questions, meaning that -- like I told you, we go system by system and have them explain it and we'll use these as a reference. You know, nowadays we may ask every single one of these, you know, it just depends.**

**Like I initially told you, we'll go system by system. We'll ask them to explain it. Then if -- you know, if they don't explain it in enough detail or they give a really high-level thing to where they're really not telling us how it works where we can know**



**and -- know and -- knowing that they understand, that, you know, they -- they're competent on how it works, then -- then we'll ask, you know, more questions.**

Q. Okay. So it sounds like one of the things you did was you're asking more questions. Sometimes you're asking all of the questions.

Is there a new standard or are you asking 50, 75, or do you ask all?

**A. Well, again, it depends. So like I said, the -- so we ask the trainee to basically explain how the system works. So if they explain how the system works in detail, then they've covered all of these situations. And so -- so we would basically, you know, either check it off or say that we're good and we'll move on.**

Q. Got you. Okay.

So then we go back to 2022 when you're doing the 25 questions. Who determines which one of the 97 are going to be circled? How is that determined?

**A. So most likely I selected them. It would have been me.**

Q. Okay. How did you select them? What method or methodology did you use to select these?

**A. I try to select, let's say, a number of questions on each system if that makes sense; you know**



**what I mean?**

**So like, I don't want to -- you know, like, basically average it out across the board the best I can. Of course it's not perfect, but definitely try to hit every system.**

Q. At the time that Warren Jones was testing on the heater board, how many other people were testing on the heater board, training on the heater board at that time?

**A. I don't recall. I don't know.**

Q. Would you have been the training coordinator for these people as well?

**A. Most likely, yes.**

Q. Okay. Did those people receive the same random assortment of questions that Warren did? So, for example, if Warren got asked Questions 3 and 4 -- because I see those two right here circled. If Warren got asked Questions 3 and 4, would all the other examinees get asked Questions 3 and 4 as well?

**A. Most likely, yes. Yep.**

Q. I know you don't recall who else was training at the time on the heater board. Is there any document that you could reference that would refresh your recollection as to who else was training at that time?

**A. I mean, not that I have with me. I don't know if I have that.**
Q. I don't believe this one that I'm showing you -- yeah, there are none. There are no comments. But so just bear with me 'cause we're going to scroll through this. And the reason why I'm going to scroll through it is because some of these question sheets have comments; some do not. As I said, this one doesn't, which is why I didn't want to mark it as an exhibit. It doesn't have a whole lot to it.
But so this one here with -- with red ink, is there anything that you see on any one of these sheets as we're scrolling through that identifies which one of these sheets were yours?
Do you recall, do you typically take notes on yours? Is there anything that would tell me --
**A. No, I -- so typically -- so -- so in not all instances, but in most instances, I kind of drive the panel review. And I want the trainee to feel at ease. So typically you won't see notes on my copy because I'm basically sitting next to the trainee, you know, and kind of driving the, you know, the facilitation.**
**And so, you know, No. 1, I want to listen. Two, if I want to put negative comments on the sheet, then they're going to look down and see that I'm writing, you know -- you know, what I'm writing down. So typically I don't put comments on the sheet.**



Q. Okay. We talked about the other exam having a percentage. You know, 85 percent means you passed. In terms -- in terms of this, like the panel, do each one of the questions have, like, a certain weight to it?
Meaning, like, is Question No. 3 worth five points, is it worth one point or do the questions even have a numerical point to them?
**A. Yeah, so based upon what I see here, so during this time, so this would -- we -- it's a unanimous -- so we as a panel make a unanimous decision whether the trainee is successful or not.**
**So, you know, there's no official scoring. It's a unanimous decision.**
Q. Okay. So -- and again, I'm not saying this is good, bad or indifferent. I'm just trying to understand the system, and I want to be clear that during this time, on the panel questions, it is not as though each individual member of the panel is writing down, Okay, I think Warren Jones got four out of five points for Question No. 3.
There's no points being given at all on these questions; is that accurate?



**A. Not -- not -- yes, sir, not officially. That's correct.**
Q. Okay.
**A. Yeah.**
Q. Is each panel member grading Warren as they go or is it, like, being discussed after the fact as a group?
**A. Yeah, so, I mean, we're not keeping score, right. So, you know, typically everyone has a copy. There are instances where somebody will say, No, I don't need one or whatever.**
**But at the end of the day, no, we have a conversation after where we unanimously decide if they're successful or not successful.**
Q. Okay. So for -- let's just take the one we're looking at right here. You're having a conversation afterwards to decide if they have been successful. For the first exam, we had Nick, yourself and Jimmy that were on the panel.
So if you and Nick and Jimmy are sitting around afterwards talking about Question No. 3: Locate the deaerator level control on the DCS console and explain how it works.
What happens is Josh Montalvo thinks that Warren did just fine on Question 3, thought that he answered it just fine, but Jimmy and Nick think, I don't know, I don't feel like he did a good job on that. What happens?



**A. We'll talk it out.**
Q. You talk it out until there's a unanimous decision?
**A. We look at the test as a whole. So, you know, don't think, like, a successful or not successful on every question. Think of it as a whole.**
Q. Okay. So is it -- I mean, is it fair to say this is really very much a feel thing. I mean, the panel sits down afterwards and just says, Do I feel like this guy gets it or do I feel like he doesn't get it?
**A. No. Everyone on the panel is, you know, experienced at some level. I mean, our job is to ask questions to listen to what the trainee says and determine if they understand how the system works to where we will find that they are qualified and able to work that job position.**
**So it's very important to us.**
Q. No, I understand that. I understand that it's an important process. But I'm trying to understand how you -- you get to the point of pass/fail. And I've asked you questions about

numbers, points, points value. I've even gone by question, and you've said no to all of those.

So I'm trying to understand how then does the panel kind of make that determination, come to that unanimous decision that this person is qualified or they're not qualified.

And it feels like it's kind of a feel thing from listening to you that, Do I feel like this guy knows his way around the console or does he not.

MS. JONES: Objection; misstates the testimony.

You can answer.

**THE WITNESS: I mean, yeah, feel just seems a little like -- we take pride in what we do. Our job is to make sure every trainee is successful. So we're really looking at whether, you know, they can run the board or not as a team. That's our job.**

**And -- and so, you know, if the trainee demonstrated that they understand how the systems work, then, you know, they will be successful.**

**If -- if they demonstrate that they don't know the flow or how things operate,**



**you know, and so forth, then we're not going to sign on a piece of paper saying that they're qualified and let them work that job. They have to demonstrate competency, so...**

BY MR. SUDDUTH:

Q. Yes, but what I'm trying to understand is how you measure the competency because you're not measuring it numerically. So help me with this.

If you ask an examinee a question and the examinee answers the question, how do -- how do we determine if the answer was sufficiently adequate? What's the measure stick?

**A. Yeah -- well, it's through the conversation that we have after the test. We -- we'll go question by question and see how they answered. You know, if they're way off, it's easy, you know -- you know, but at the end of the day, we -- you know, we make a unanimous decision as a team whether we're going to sign them as being successful or not.**

**So I don't really know -- really that's it, so I don't know what else to tell you.**

Q. Okay. So is there any -- is there any other objective measure that you could give me, aside from this -- and I'm going to try to paraphrase it, and if



I'm wrong, you just call me right out that I'm wrong.

As I understand it, you and the panel meet afterwards and come to the unanimous decision on whether or not you-all feel as though, as a group -- you-all feel as though the trainee is sufficiently knowledgeable about the heater board console that they're training on? Is that an accurate --

**A. Yes, sir.**

Q. -- way to decide whether they passed or they failed?

**A. Yeah, based upon the answers that they gave us, yes.**

Q. Okay. It's not as though when the panel is done, you know, Warren knows that he was at a 65 and needs to be at a 70. It's not like that.

**A. So he -- so he knows that after the fact.**

Q. He knows a grade after the fact?

**A. No, not a grade. He knows what those deficiencies are. They were listed on that paper that you showed.**

Q. Okay. All right. So let's go over that, then. So you guys do discuss after the test what you thought was deficient?

**A. Yes, sir. Absolutely.**

Q. All right.



**A. Our job is to -- yeah.**

Q. So we're back at what we marked as an exhibit. This is 1341. This is Exhibit 2 in globo. So let's take a look at 1342.

And forgive me. I'm not trying to be rude to you, but it's kind of hard for me to read your handwriting so you'll have to help me with it. Don't worry, I've got terrible handwriting.

**A. Don't worry. I feel the same about my own.**

Q. So let's see. The first block up here kind of where my cursor is, if I'm reading this right, "Did not pass the LMS final exam, 82 point" --

**A. Yeah, would you like me to read this and explain this page to you?**

Q. Yeah. Yeah, please, that's great.

**A. Okay. All right. So yeah, the deficiencies identified. So Warren did not pass on the final exam. He made an 82.4, those are my initials, JPM. Over to the middle column, "Required actions to resolve deficiencies and complete successful unit review committee."**

**So Warren needed to retest on the LMS final exam and situational deficiencies, and, "What are the actions the employee will take to address the deficiencies?"**

So this is what Warren will do to address deficiencies. And whoever wrote this said, I guess, shaping or sharpening knife -- I'm not sure what he meant -- shaping knife on EP mix vaporizer system along with superheater system and sweat heaters and quench water system with navigating.

So that's the whole thing. So then I'll move -- let's go back to the first column on the left --

Q. No, I'm sorry. If I can -- if I can -- sorry, Mr. Montalvo.

A. Yeah.

Q. It's going to be easier for me to kind of deal with the deficiency and then ask you about it and then move to the next deficiency.

A. Okay. That'll work.

Q. We'll just take the first deficiency you read out for us: "Did not pass the LMS final exam, 82.4."

Is that the electronic thing we were talking about that requires 85 percent?

A. Yes, sir. It's official -- we call it LMS assessment. It's their LMS final exam, so...

Q. Got you. Okay. So that's the electronic one that we actually get a grade for. So it looks like he missed the 85 percent by 2.6 percent.



A. That's correct.

Q. Okay.

A. Or whatever -- yeah.

Q. 82.4 percent, needed an 85 percent. Okay. So it looks like he took the written -- excuse me -- he took the electronic, didn't pass it, and then he actually did have his panel. Even though he didn't pass the first one, he still had his first panel.

A. That's correct.

Q. All right. So the first deficiency has really got nothing to do with the panel. The first deficiency is retake your written exam.

A. That's correct.

Q. Okay.

A. Yeah.

Q. Thank you for that.

Now go ahead and read to me the second deficiency you noted here.

A. Okay. So the first column underneath that, "Navigating console pages." So he was deficient in being able to navigate the console pages, meaning know how to get from system to system.

Q. Okay. So is that physically navigating around the console?

A. Yes.



Q. Okay. With physically navigating around the console, did you and Warren or did any of the panel members discuss with Warren any vision difficulties he was having?

MS. JONES: Objection; calls for speculation.

You can answer if you know.

THE WITNESS: Not -- not at this time, no.

BY MR. SUDDUTH:

Q. Okay. Not at that time. All right.

What's the next deficiency you noted?

A. Superheater operation -- which is a system that's on the heater board.

Q. Okay. I guess --

A. So he was deficient in understanding how the superheater worked. That could be flow; that could be process; that could be control scheme. So he failed to demonstrate how the superheater worked or operated, however you want to say it, so...

Q. I want to go back to the navigating console pages because you said you go over this stuff with Warren, and then, you know, so that he knows what his deficiencies are.

Let me -- so let me ask you some more



specifics about that. When you told Warren that, Look, you had difficulty navigating the console pages, what specifically did you tell him? We want to see you move faster, you didn't know where you were going, or where did he struggle?

A. Yeah, well, if that's Warren's signature to the right, I mean, he's acknowledging what's navigating. So he struggled being able to navigate to get from system to system.

Q. Can you give me any specifics on what that means?

A. Yeah. So either you could use the screen, there's buttons on the screen where you can go from system to system, and there's a keyboard with -- it tells you -- each button is a different page or a system so you could click, you know, on the -- it's a piece -- it's a keyboard, so you can use that to navigate or you can use the screen to navigate.

Q. And when you say navigating, are we talking about, like, right now with my cursor, I'm using my cursor to move around the screen?

Is that what you're talking about?

A. No. I'm talking about going from -- so okay. Yeah, I don't know if you -- well, so the heater board could have -- let's just call it eight different

Page 54

systems; okay. And each -- so -- and they're all most likely related somehow.
So, for instance, like, the steam. So the superheater. So, you know, the superheater comes from the furnaces, and then from the furnaces it goes to the superheater and from the superheater it hits the 850-pound steam system, you know. There are different pages for each part of the system.
So Warren was deficient in being able to navigate from basically page to page or, you know, get to a system or get to an important part. Like, for instance, the superheater may have three different pages that, you know -- of control schemes for the superheater itself. So he was deficient in, you know, being able to navigate around.
Q. Well, that's what I'm trying to figure out is how was he deficient. Can you be specific for me on how he was deficient?
A. Yeah, so let me give you an example. So if I told you to, okay, let's go to the EP mixed feed system and you can't get there. So that's a problem.
Q. Okay. Okay. Do you believe that if someone cannot adequately see the board that that could impact their ability to navigate?
A. I mean, if he can't see, yeah.

Page 55

Q. Okay.
A. But that would have nothing to do with his deficiencies. This is about knowing, you know, what to use, how to get there. Again, you have the keyboard, but there's so much more than that. You know, you -- being able to explain how the superheater works so that the EP mixed feed operation works, you know, or, you know, we're trying to determine competency here, so -- so at the end of the day, he did not determine competency in multiple areas on the heater board, so...
Q. Okay. Well, I mean, we're -- we're going to get to that because I see you saying the superheater operator need fix -- or mixed feed operation. I see that. What I'm asking you about right now is navigating the console pages. That's what I was asking about.
And -- okay. So now, understanding how you define for me deficiency on navigating the console pages, what was the deficiency with the superheater operation?
A. So explaining to us how it works, how the control schemes work, what the flow was. You know, I don't recall the exact issues with the operation, but if we listed it on here, then the team felt like, you

Page 56

know, he did not demonstrate competency, understanding how the superheater worked to where he could work the board on his own as qualified.
Q. Okay. So nothing you can recall right now specifically, just the group felt like his knowledge on that was not adequate?
A. Yeah, based upon, you know, his responses and his answers. That's fair.
Q. Right. The next is this mixed feed operation. What was the deficiency there?
A. Same thing.
Q. Okay.
A. So basically you could take it as -- as Warren was -- we determined that Warren had not learned enough and did not understand enough about five major systems on the heater board, and that's -- that's very concerning. So -- there's a lot there. Those are major systems that could do a lot of damage if you don't know what you're doing.
Q. And this -- this last part here, I think it starts with "Navigate." Can you read that for me?
A. Yeah, that's, "Navigate" -- yes, sir. "Navigate heater feed, steam, fuel pages and control."
So basically what I was saying there is he did not understand how the furnaces operated -- or to

Page 57

navigate -- I mean -- well, it says navigate. So he wasn't able to navigate from the heater feed page to the steam page to the fuel pages and the feed controllers.
So basically, you know, he did not know how to get around on -- on the -- the -- and I did not list luminous or slice two different types of heaters. So because I put navigate heater feed, so I take it as both of them because if it would have only been one, I would have listed that.
Q. And if I -- and if I can't see the screen adequately, do you think that can impact my ability to navigate it?
A. No, because you have the keyboard.
Q. Okay. So you think that vision impairments would have no ability or no impact on navigation?
A. I mean -- I mean, first of all, I don't know what the impairment is, you know. I don't know how bad you're talking. You know, he -- Warren went all through -- I mean, I don't know what to tell you.
Q. Okay.
A. That's a loaded question.
Q. No, I appreciate that. And I mean, I think that's kind of part of the problem, right. You did not have any knowledge at all as to what his visual

impairments were, did you, at any point in time?
**A. Not until later on, and all Warren said to me -- I don't remember if it was during the third test -- second, third or fourth, he told me that he needed to go to the doctor to get better glasses. That was the only thing that he ever said to me.**
Q. And not just what Warren said to you. The human resources department, they never came to you and talked to you about Warren's vision difficulties, did they?
**A. No. Huh-uh (negative).**
Q. Okay.
**A. Not that I remember.**
Q. None of the higher-ups, meaning Bryan Kubsch, Judson Wooters, none of those guys ever came to you and discussed with you any vision difficulties and gave you any specifics on that, did they?
**A. No, not that I remember.**
Q. Okay. What about Dr. Stanton or Nurse Johnson? Did they ever come to you and discuss any specifics with you?
**A. Not that I remember.**
Q. Okay. You were also on his second test. And the second test as I have it -- and I will mark this as the next exhibit -- which is Bates labeled at 1343



to 1344, and that will be a two-page exhibit in globo, 1343 to 1344. Up here at the top, sir, is this your handwriting?
(Plaintiff's Exhibit 3 was marked for identification.)
**THE WITNESS: Yes, sir.**
BY MR. SUDDUTH:
Q. Okay. This looks like this is in September. Looks like it has Warren Jones's signature. At this point in time, we've now got Clay Ryan. Clay Ryan was the union rep?
**A. Yes, sir. Yep.**
Q. Okay. Jimmy Hayes, Nick Graham, yourself, John Watkins and Jud Wooters.
You've told -- you've told me already why Jud would be in the second and third test, because if you failed the first one, you said you'd bring Jud Wooters in. So I understand you there.
Why was John Watkins and Clay Ryan added to the panel?
**A. We're trying to -- to -- I mean, same thing. We're trying to determine competency. So, you know, we brought in other people to, you know, be part of the team to make sure we made the right decision, you know.**



Q. Okay. What was -- John Watkins, what was his role? Was he an operator? What was his position?
**A. So he is an OA, operations assistant.**
Q. What is that, an operations assistant?
**A. You could call it kind of an ethylene SME, like a 1544 SME or a process SME.**
Q. Okay. Now, on this one, as we scroll down on this exhibit, this one just says, "Refer to PIP." Are those your initials?
**A. Yes, sir, that is. Yep.**
Q. Okay. Now, obviously you told me that the -- the second written exam or electronic exam, you know, he passed that one. Do you have any recollection on did he pass that exam prior to this second unit review panel?
**A. I mean, I'm sure he would have. I'm not a hundred percent on which one took place, but I'm -- I mean, it's pretty standard to do the LMS testing first.**
Q. Right. Okay. But no specific recollection whether or not he had passed the electronic exam prior to the second panel exam?
**A. So, I mean, he has to do both of them. So, you know, in that sense, I'm not -- I would -- like I said, I would think that we did the LMS assessment**



**first to -- to see if he passed that, and then move to the panel. That's typical.**
Q. Okay. And once he passes the LMS exam, and once he has over 85 percent on the LMS exam, what -- put it in your words for me so I understand it from your standpoint.
If somebody makes an 85 percent or above on the LMS exam, I mean, does that indicate that they have a degree of competency on the heater board or sufficient competency on the heater board, meaning they understand the systems, or is that really --
**A. So you could look at it as it's basically concepts. So -- and, you know, for instance, you know, it could be, you know, where -- I don't know typically, you know, what are the heater feeds, you know, and you pick A, B or C for them or whatever. What's the typical temperature out of a tower. You know, things like that, kind of close-ended questions.**
**The situations are, you know, how are you going to bring up a heater? You know, explain how the deaerator works. Explain how the EP mix system works. Explain what you do if you get low pressure on the EP mix system. What your responses?**
**So you could look at it as like, you know, close-ended questions first, situationals where you**

**would have to explain the answer, and then we also make sure that they, you know, understand the flow.**

**For instance, you know, like I explained before, the -- you know, steam coming from the furnaces goes to the superheater. It's superheated then it hits the 850-pound steam system and goes to, blah, blah, blah.**

**So they have -- they have different purposes.**

Q. Okay. And if I can phrase it this way, it sounds like on the written exam, it's more close-ended and more conceptual versus the panel is more situational, giving them an open-ended situation and asking them to explain the situation.

Is that a fair summary of what you told me?

**A. That's correct. Yeah.**

Q. Okay.

**A. Yeah.**

Q. All right. What I'm going to do, sir, if you can bear with me, is I have a scheduling conference with a federal court in another case that's been set for 3:30. They typically are very short because we're just picking a trial date. So I'm going to take our break.

I know I went a little bit longer than an hour, but I like to try to give people a break at an



hour, but I kept going to get closer to 3:30 so that I wouldn't take numerous breaks on you. I could try to lump the break together to minimize inconvenience for you.

We'll break now at 3:25, and if you'll just bear with me, it'll be a little bit longer of a break, maybe closer to ten minutes or a little bit longer than that as opposed to just, like, a five-minute break just because I have to do this scheduling conference. But I apologize for that, but I appreciate your patience with me.

MS. JONES: We can plan to be back at 3:45, and if you're running later then that, James, that's of course fine.

MR. SUDDUTH: That's fine. All right. I didn't want to delay, you know, you guys too long, but 3:45 is perfectly fine.

VIDEOGRAPHER: Okay. I'm going to read us off the record really quickly.

We are now off the record. The time is 3:24 p.m. Central Time.

(A recess was taken.)

VIDEOGRAPHER: We are now on the record. The time is 3:50 p.m. Central Time.



BY MR. SUDDUTH:

Q. Okay. Mr. Montalvo, back on the record after a brief break. Thank you for your patience again.

So we left off, we were talking about going through the different exams, and I was on the second exam, going over that document with you. I'm going to go back to sharing my screen, and I want to go back here. We're looking at the second qualification, which is marked as not successful. And then it says, "Refer to the PIP."

And so what I'd like to do now is bounce over to a different document. I'm going to mark this as the next exhibit to our deposition today -- or to your deposition today, which will be an in-globo exhibit because it's two pages. It's Bates-labeled as 847 to 848, which appears to be the PIP.

So I want to show you this document. It's dated October 13th, 2022. It says, "Performance improvement plan. Manager or supervisor: Judson Wooters. Employee name: Warren Jones. Position/title: Operator."

Do you recognize this PIP, sir?

(Plaintiff's Exhibit 4 was marked for identification.)

**THE WITNESS: I -- I mean, I haven't**



**seen this exact document, but yeah, I think I -- I think I did see the PIP at some point, yep.**

BY MR. SUDDUTH:

Q. Okay. Well, what you wrote on the -- on his qualification exam, what you wrote, "Refer to the PIP." So had you seen the PIP at the time that you wrote refer to it?

**A. The way this works is that, you know, Jud basically takes it from there. So, you know, this would be Jud, you know. I'm sure he consulted with me, but this is Jud. So I'm just saying refer to PIP.**

Q. Okay. So basically Jud is going to take the reigns on trying to get this guy qualified. And so whatever Jud is putting in the PIP, you may not know what's in it, you may not have seen what's in it, but you're saying to Warren, refer to that PIP and work with Jud.

**A. Yes, sir. They're -- yes. They're working together -- everyone is working to get Warren qualified, so yes.**

Q. Okay. Well, let's take a look at this document here, which says, "The performance issue is not meeting training expectations," and it says, "Heater console console training. First attempt at

Page 66

training and testing, did not perform well enough on final exam to qualify for the job. Second attempt at training and testing, again, unsuccessful in passing your final exam to qualify for the job necessitating this PIP."

Did you write that or is that Mr. Wooters?

**A. No, that's not me.**

Q. Okay. Then here, where it says, "Required actions to bring performance to fully successful level," the first one is to "Attend the heater outside classroom to refresh on heater area flows. Class is October 3rd of 2022."

Do you have any personal knowledge, did Warren take that class and did he go to that class?

**A. Yeah. Yes, I'm certain that he did. Yeah.**

Q. Okay.

**A. Yep.**

Q. Okay. And then it says -- which is where I want to spend more of my time talking to you is here. It says, "Retrain and qualify on the heater board. A qualified heater board operator and/or special assignment operator will be made available to assist in your retraining."

Do you know who was made available to assist him in his training?

Page 67

**A. I don't know exactly. That was probably all hands on deck. I mean, it could have been Clay. It could have been other qualified heater board operators, you know. I don't know exactly who was involved. I just know that, you know, a situation where somebody isn't successful is kind of all hands on deck to help to see them succeed. So...**

Q. Yeah. Well, it says here for metrics, Section F, metrics, "Complete review of all module situations with qualified heater board operator and HO/PSC to confirm competency."

Do you know whether or not he did complete a review of all the module situations with his HO or PSC?

**A. I'm -- I take it he did. I mean, we -- we had a third test, so yes.**

Q. All right. So -- and by the way, I mean, by the third test, he's passed his -- his written exam. He's gotten over the 85 percent. He's done the classroom on October 3rd. He's completed a review of all the module situations with his HO or his PSC.

Let me ask you about this , this comment here: "Pass the full heater board unit review. The review team will assess your ability to demonstrate competency in situation questions and flows relevant

Page 68

to the heater board. Unit review will be scheduled for the week of 17 November 2022."

Did I read that last part correctly?

**A. I'm sorry. I kind of lost focus there. I was thinking.**

**"Pass the heat" -- "the full heater board unit review. Review team will assess your ability to demonstrate competency in situation questions and flows relevant to the heater board."**

**Yeah, that's pretty standard.**

Q. Yeah. Well, I mean, here's my question: Why on the PIP -- and if you don't know, you don't know. But since it's saying refer back to the PIP, there's nothing in this document that says anything like, Okay, Warren, you really struggled on this particular system. I want to see you be able to explain this system like this.

It just says pass the heater board unit review. Is there some other document out there that you're aware of that actually does provide that level of specificity, such as, We didn't like your answer about this system; you need to be able to explain this system better?

**A. Yeah, so the way it works is that after Warren failed the second test or, you know,**

Page 69

**demonstrated he wasn't competent, then we would have a conversation with Warren, you know, and talk about the deficiencies just like we did the first time.**

**And then although it's not noted on that sheet -- maybe that's something I could get better at, but -- but this is where, you know, I'm sure Jud and him had conversations and -- and this is what we -- this is what, you know, we, they, decided to do, that's to help Warren out. And part of that was because he demonstrated that he did not know the flow of the heaters, then he was going to attend outside heater classroom to -- to help him close that gap.**

**And then to verify that -- that he is gaining knowledge and -- and, you know, headed in the right direction, then they did field walk-throughs with his HO and PSC to confirm that, you know, that he was heading in the right direction.**

**So -- and then after that, retrain and qualify on the heater board. So that means that, you know, they brought in as much help as they could and to make sure that, you know, he would be successful. So he was then to basically start over retraining on the heater board, you know, with the additional help, and with the check points of the head operator and PSC to make sure that he's headed in the right direction,**

**and ultimately retake the -- the unit review committee or panel review to, you know, assess his ability to demonstrate competency in the situation questions and flows relevant to the heater board.**

Q. Okay. Well, we agree that regarding this document here, there are no specifics on what part of the heater board he was good at answering versus bad at answering. It just says, "Pass the heater board review."

Can we agree on that?

**A. No, not really because it's telling you that he needs to refresh on all heater flows, okay, like, basically you're starting, like, we've taken two tests. You -- you know, you -- you have -- you're not successful. We're going to start at square zero with learning the flows, and then basically starting on Module 1 to -- you know, to learn or relearn or learn each system and how it works before we test you again.**

**So in my opinion, this is a -- you know, a comprehensive plan to -- to make sure that, you know, he is ready before he takes his review on November 17th.**

Q. Okay. Respectfully, I just must not be getting it because this document -- you just told me this document is we're starting from Square 1. We're



going to go back to Square 1. We're going to learn the flows. We're going to start at Square 1.

I want to take that comment and I want to cross-reference it to this. Let's go back and look at this.

**A. Okay.**

Q. This is 1342. You identified -- at 1342, you identified particular systems, particular things within the heater board that he had issues with. Not the entire thing, not starting at Square 1, but you identified particular systems that you took issue with; is that right?

**A. That's correct. Yes.**

Q. Okay. Why, in the PIP, if the PIP does not specifically state, Here are the particular systems where you were deficient, here's the issues that I had," if I can't reference that in the PIP, the only thing that I can do is ask you, right, or ask other panel members, ask you what specifically you told Warren about where to improve because the PIP doesn't tell me that. The PIP says I'm starting from Square 1.

**A. Yeah, there was a reason for that. The reason for that is -- is that where Warren did good in the first test, he did not -- he struggled in the**



**second test. Therefore, everything that we thought he knew in the first test, he did not demonstrate that in the second test, which means that now we're going to basically, well, you know, start at Square 1, look at the whole thing and get him the help he needed so that he could be successful.**

**So that -- I think that's where you're -- you know, it's hard to understand from where you're sitting, but -- but that's based upon Warren, like I said, what he did good on the first test, he did not do good on the second test. So he did not retain the knowledge and demonstrate competency on what he did on the first test, which is alarming, but yeah.**

Q. No, I -- I appreciate you telling me that. That is actually helpful. It helps me understand, you know, a little more with some specificity what the issue is.

So what he did well on the first test, he didn't do well in the second test. Is there any particular reason why you did not notate what you just told me -- which seems very succinct, by the way -- any reason why you didn't notate that anywhere in any documentation that that was the particular issue?

**A. No. All I could tell you is, you know, I'm going to learn in this process. It's probably**



**something that -- that I'm going to get better at, right, is that to, you know, get more detailed in what I write. But I'm just telling you that's the reason, that's the way it happened.**

Q. Yeah. No, and I appreciate that. Because it's leaving me in a situation where the only way I know what you said to Warren or what detail was given to Warren is by asking you these questions in your deposition.

So let me ask you: Did you tell Warren that? Did you tell Warren, Warren, okay, here's your problem. In the first exam, you did really well with section, say, A, B, C and D. Well, come to exam two, all of a sudden you're not doing well in A, B, C and D.

Did you express that to him?

**A. So I can't tell you exactly what I told Warren, but my job is to ensure that Warren is successful and do everything I can. So, you know, I'm almost certain that I would have because that's my job. My job is to help them succeed.**

Q. Yeah, in terms of -- I appreciate that. You mentioned that a lot. It's about trying to help the examinee succeed, help them to be successful.

Is that fair? Is that accurate? What you're

trying to do is you're trying to help this trainee, you want him to be successful in training?

**A. Yeah. I want everybody to be successful.**

Q. Okay. If you have an examinee who is struggling to see, doesn't -- you don't believe that impacts his ability to perform on the exam?

**A. Based upon the answers Warren told me, Warren didn't understand how the systems worked.**

Q. In terms of your desire to make him successful and you want him to be successful, wouldn't you agree with me that you would want to remove any obstacles to success?

If Warren is having any eyesight issues and your job and your desire is to make Warren successful, can we agree that you would try and do everything you can to remove those obstacles to give Warren every shot at success?

**A. Yeah, but I didn't know that and we're sitting at the test, my job is to make sure he's successful, and if he doesn't demonstrate competency, then he didn't. I mean, you know, I'm doing all I can.**

Q. I got you. Yeah, so I mean, yeah, so you're the training coordinator. You're evaluating Warren and you don't have a clue that he's having vision



difficulties.

**A. If that's how you want to characterize it. For me, you know, when -- No. 1, he could get around on a keyboard. No. 2, you know, at the end of the day, like I said, I mean, we're not baking cookies. This is very serious. So if you can't, you know, talk about the systems at this point and how they worked, you know, you're not competent, so that's all I can tell you.**

Q. Actually, I -- I greatly appreciate your comment that you're not -- you're not baking cookies because it is very serious, isn't it?

**A. Yes, sir.**

Q. You want to make sure, for people's safety, that they know what they're doing on those heater boards, don't you?

**A. Well, it's on any qualification, yeah.**

Q. Did you know that -- that Warren had actually -- had actually written that as part of his accommodation meeting that, you know, he's -- he's concerned 'cause he knows how serious it is and he doesn't want to cause any safety issues. And so he's concerned about how his vision is impacting his ability to work on the heater board.

Did you know that or are you hearing this for



the first time as I'm telling you?

**A. No, I don't recall knowing that, no.**

Q. Okay. And so actually, I was actually giving you some credit when I said earlier that you didn't have a clue about it. What I meant by that was there was nobody from HR, Chelse Cisneros, Aprile Danford, Bryan Kubsch, none of these people ever came to you so that you would be fully informed when you're grading Warren, none of these people ever came to you and said, You should know, here are these different issues. Hey, Mr. Training Coordinator Montalvo, help us to help Warren.

Those folks never came to you, did they?

**A. Like I said, I didn't know.**

Q. Okay. We went over the PIP, which I marked as an exhibit. Now I want to go to the fourth exam. As we just went over the third one together -- no, I'm sorry. Excuse me. I did not mark the third as an exhibit. Let's do that.

The third is going to be the next exhibit to your deposition, which is Bates-labeled 1345 to 1346. 1346 is upside down, but I apologize. But it says, "Refer to PIP," with your initials there.

1345 to 1346, is this your handwriting here, sir?



**A. Yes, sir.**

Q. All right. In this exam, we have, again, yourself, we have Judson, we have Clay Ryan, we have Warren. This time we have Brian Lohr. Did I say that name right?

**A. Yes, sir. That's correct.**

Q. Okay. Who is Brian Lohr?

**A. So Brian Lohr is -- at this time, he should have been the operations assistant, if I'm not mistaken.**

Q. Again, this particular question is not me picking at you or attacking you in how things were done. I'm just more curious.

**A. Uh-huh (affirmative).**

Q. I'm seeing different names for every panel member -- I'm sorry -- for every panel. For example, Brian Lohr wasn't in the first two exams. Clay Ryan wasn't in the first one, but he was in the second. In the second one, John Watkins and Jimmy Hayes and Nick Graham are in there. Those guys are not in the third one.

My question is this: Don't you think in terms of creating consistency it would have been better if Nick Graham and all the participants were the same for Exams 1, 2, 3 and 4?

Page 78

So if Nick had an issue with the way he answered the fourth question or the way he answered a particular system, Nick could evaluate his own issue, his own problems, he could evaluate it again in the next round of the exam.

Do you think that that would have helped with consistency?

**A. Well, you know, understanding dynamics of this, so Brian Lohr and Clay Ryan are two most knowledgeable individuals in the heater areas and, you know, they have a relationship with Warren. So this is actually a very good step for Warren to be successful.**

Q. Okay. So basically Clay and Brian being in there, if I'm understanding you correctly, you're telling me that Clay and Brian being there were kind of better examiners, more friendly examiners, I guess, for Warren than maybe some other folks. Is that -- am I hearing that right?

MS. JONES: Objection; form.

You can answer.

**THE WITNESS: Was that?**

MS. JONES: I just said objection to form, but you can feel free to answer.

**THE WITNESS: Yeah, so I mean, you know, this is what we decided for, you know, really trying to create the -- the -- you know, an environment for Warren to be successful to have Clay and Junior and myself and Jud there. So that was what we decided --**

Page 79

BY MR. SUDDUTH:

Q. I'm sorry, you said --

**A. -- for the panel.**

Q. Who is Junior?

**A. That was our panel. I'm sorry. Brian Lohr. That's a nickname.**

Q. Got you. Okay. Yeah. Okay. I lost --

**A. Sorry about that.**

Q. That's why I was asking, because there's a lot of nicknames out there. Like, for example, Clay Ryan is Ricky Bobby, isn't he?

**A. Yeah. So like I said, that's what we -- you know, that's what we decided.**

Q. Okay.

**A. That would be the panel for this test.**

Q. And I appreciate that, but just explain to me why, if you don't mind, please, sir. You say that we decided that Brian and Clay and yourself would be the panel for the third round and that that would be the best panel for Warren to be successful.

Page 80

Explain to me, please, sir, why that is. Why did you think that?

**A. Well, like I said, they're the two most knowledgeable heater area ECS, you know, outside the people we have on the unit, in my opinion. And so -- but yeah, so that's a pretty strong team right there to -- to be that panel.**

Q. Do you think that -- as we're sitting here talking about it, do you think that having the same people on the panel would have created more consistency in the exam?

**A. I mean, I'm -- you know -- okay. You're asking my opinion.**

Q. Yes, sir.

**A. I think, you know, this is a strong panel. I mean, you would have to ask Warren if he thought that, you know, consistency mattered here.**

**I would imagine that Warren wouldn't have had a problem with this setup at all. And -- and so, you know, that's it, you know.**

Q. Okay. Well, then I'll -- I'll ask Warren about that. But let me ask you, since this is after the third exam, I have taken the deposition -- I'll just represent to you I've taken the deposition of Judson Wooters just like I'm deposing you right now. And Jud Wooters testified to me that he specifically recalled after the third exam -- he had a very specific recollection of the third exam and the conversation that he had with Warren after that exam.

Page 81

Did -- were you present for that conversation, the conversation that Jud had with Warren after the exam?

**A. Yeah, I'm not sure what conversation you're talking about.**

Q. As I understand it, it would have been a conversation kind of like a debrief that you're telling me about that happens after every one of these panel exams after the panel occurs where the person has deficiencies or where they need to improve, you guys apparently meet with the trainee and you tell them, Here are some areas you were deficient or some areas where you need to get better.

**A. Yeah, sorry, I don't -- I don't recall, you know, whether I was there or not. I mean, it could have been. I just don't remember that -- that one.**

Q. All right. Well, I'll -- I don't want to ask you stuff you don't remember.

Let me -- okay. Now, here, it looks like we have this final exam, Exam No. 4. Is this your

handwriting up here?
A. **Yes, sir, that is.**
Q. Okay. And this one has Clay Ryan, Brian --
MS. JONES: Are we marking this as an exhibit? Sorry, I don't mean to interrupt.
MR. SUDDUTH: No, that's okay. Thank you, because I do intend to mark it. So yeah, if I don't do that, thanks for reminding me.
BY MR. SUDDUTH:
Q. Yes, I'm going to mark this as an exhibit, and this will be an in-globo exhibit, 1347 to 1348, and you'll see the final thing says, you know, refer to the PIP, with your initials.
Is this who was on the panel for his fourth exam: Clay Ryan, Brian Lohr and yourself and Jud?
**THE WITNESS: That's what it says, yes, sir.**
(Plaintiff's Exhibit 5 was marked for identification.)
BY MR. SUDDUTH:
Q. Okay. Are there any -- I think there may be -- you-all took notes from that fourth exam?
A. **I mean, it's the same thing as we talked about earlier. So I'm sure some people did. I'm not**



**sure. We'd have to look at it.**
Q. Yeah. So the reason I want to look at the notes for the fourth exam is because after this exam, this is whenever -- after the fourth failed exam, this is whenever the decision was made to terminate Mr. Jones; is that right?
A. **That's correct, to my knowledge, yes.**
Q. So I want to look at some of these notations here. We'll start at 1465. I'll just represent to you, sir, that 1465 is the first notation that I see for the fourth exam. It's the first time that I see No. 4 written.
The other ones are for 1, 2 and 3. So I'll mark this -- well, now let me wait and hear what the answer is and I'll decide.
1465, you can see up here in red is No. 4. This handwriting, is this your handwriting?
A. **Yeah, that's mine. Yep.**
Q. That's yours? Okay. Very good. Good. Good. Okay.
So I will mark this as an exhibit. And we're going to make this an in-globo exhibit, so we go 1465 until 1475. Yeah, ten pages, 1465 to 1465. And let's just verify the other ones that are No. 4 and then we'll come back to yours that we've marked as an



exhibit.
Right here, this handwriting here, "WJ No. 4," this handwriting, is that your handwriting?
A. **Yeah, at the top, that's mine. Yep.**
Q. At the top -- okay.
A. **Yeah.**
Q. I guess what I meant to say -- and I apologize. What I was asking is in the body of the document, all throughout here, is this your handwriting in the body of the document?
A. **No. No, that's not mine.**
Q. Okay. Do you recognize whose handwriting it might be?
A. **No. I couldn't tell you whose handwriting that was.**
Q. Let me go back to what I marked before as an exhibit and let's get to a spot where there's some handwriting.
Right here, here, and then here. In the body of this document in red, is that your handwriting?
A. **Yeah, that's mine right there.**
Q. Okay. All right.
A. **So continuous on TLE. Next need to -- temporary -- yeah -- yeah, there's no telling. Sometimes -- I'm not sure -- 220 to 750, I'm not sure**



**what I'm -- what I was seeking there.**
Q. Okay. But just to verify for right now -- we'll come back to this, but just to verify for right now, not only is the WJ No. 4 your handwriting, but also in the body of the document is your handwriting as well.
A. **Yeah, that 220 to 750, that little thing right there, that looks like that was mine, yeah.**
Q. Okay. So let's scroll through and just look through No. 4, Exam No. 4, take a look at those.
All right. We verified that this one here at 1476 is not your handwriting. And do you -- you don't recognize whose handwriting this is?
A. **No.**
Q. Okay.
A. **Sorry. I don't.**
Q. Okay. This one here, again, "WJ No. 4," let's scroll down into the body of the document and see. Doesn't appear to be a lot of -- there's a little handwriting there, but mainly it's scribbling. Just scribbling, I guess.
Any idea -- I knew that's only one word, but any idea, based upon that word right there, whose handwriting that was?
A. **Oh, whose it was? No. No. No idea.**

Q. No idea. Okay.
And then this one here, again, WJ No. 4. Let me scroll through, see if we can find some handwriting.
All right. I don't see any handwriting for that particular exam. So let's go back to the one that we know is you.
**A. Uh-huh (affirmative).**
Q. We'll start at 1465. This notation up here, can you read that for me as best as you can? What -- what --
**A. Yeah. My chicken scratch. Yeah, "220 to 750." That would have been short for continuous -- oh, "continuous versus intermittent," and then, "Continuous on TLE," and then, "Vent 220 to atmosphere."**
Q. Okay.
**A. So those are -- for whatever reason, I was -- I wrote that down, but -- yeah.**
Q. What is the -- what do those notes signify to you? What do they tell you? Do they tell you anything about how he did on the test?
**A. "Continuous on TLE" is wrong. That's not correct. "Vent 220 to atmosphere." There's different scenarios. But 220 to 750, I'm not sure what that**



**was. And continuous versus intermittent. So we have intermittent blowdown and continuous blowdown. So then I wrote, "Continuous on TLE." So maybe I said that the -- it was continuous blowdown on the TLE, which is not correct, but -- but yeah. Continuous versus intermittent, so maybe he was -- he had them backwards.**
Q. Okay. So --
**A. That's part of how the -- how the heater works, the boiler feed water flow on the heater.**
Q. Do you know what those comments -- which question they're related to?
**A. No. No idea.**
Q. All right. I want to ask you about the checkmark that I see at No. 3. And then, for example, I see checkmarks, you know, throughout this. For example, I see at 14, I see it at 19. What I want to ask you is: If you put a check there, like that at No. 3 with no comments, does that signify that he answered it adequately, like, he answered it well enough and you can move on to the next question? Is that what the checkmark means or does it mean something else?
**A. It could have meant that -- well, it could have meant that we asked the question. Typically,**



**that's, you know -- sometimes that's what I do is put a check by it after we ask it, but I'm not sure.**
**It could also have indicated that he got it right. I'm not sure what I did on that date. But typically, I'll mark, like, something to where I know that we asked it. So...**
Q. Okay. Well, I mean, here, it looks like -- what is that word there in red near No. 8?
**A. Yeah, "Review" -- looks like an eight, "Review No. 8."**
Q. Okay. What is -- what is -- what does that mean right there?
**A. Well, it could have meant that we either -- well, it probably means that we need to review No. 8 with him. So I'm -- I'm -- it's been a long time, but I do remember him struggling with how this control scheme worked. So I think he struggled on this question.**
Q. For example, you have "review" again at No. 15 versus you have a checkmark at No. 14. Does that --
**A. Yeah, probably the same thing.**
Q. So 14 -- and I guess the reason why I'm asking about the checkmark is because I also see, like, these dots. You know, you circled 16 --



**A. Yeah.**
Q. -- you have a dot near 16. A dot near 15.
**A. Yeah.**
Q. You put a dot over here on the other side of the question. Is the dot what you're using to indicate that you actually asked the question?
**A. Yeah, quite possibly. Yes. Yeah.**
Q. Okay. So if I'm seeing a check --
**A. In other words, I have two -- I have two dots on 16. So I'm not sure what I was doing that day.**
Q. Okay.
**A. That's interesting. Yeah.**
Q. And for -- let's see. Then we have -- what did you write here at 21?
**A. Yeah, "Add air or speed up."**
Q. What does that mean?
**A. "Add air" -- I'm sorry. I'm sorry. "Add air to speed up."**
**So something he was explaining on how the pressure controller works. So I'm not sure if he had actually said that or if that's what he didn't say. I don't remember.**
Q. Okay. I see the word "review" again.
**A. Review. Yeah.**
Q. And, you know, along here, we've got lots of

checkmarks, one, two, three, four, five, six. Is there anything that you can help me with to know whether or not these checkmarks means you asked it or does this checkmark mean that he was successful on the question?
**A. Yeah, I'm not sure. It may have meant that he was -- I thought he was successful to have the dots.**
Q. We have the checkmarks again. Checkmarks again. I just see the dots. I don't really see any comments or checkmarks. Checkmarks.
**A. Yeah.**
Q. And then we get to 97.
So, you know, this is one that we -- we know was yours. We've got the checkmarks. But I see a few spots where it says "Review." I mean, a review is mentioned, I think, three times. Here --
**A. Yeah, and the two dots. The dots.**
Q. -- here, and -- and here at No. 8.
So, you know, looking -- looking at this and looking at the checkmarks, does this give you any recollection or refreshment as do you feel like he passed the fourth one?
**A. No, I didn't.**
Q. Okay.



**A. I do not feel that way.**
Q. Okay. And there's really no -- there's nothing on this particular -- on your notations that tell me why you think that he didn't pass it, is there?
**A. No. Again, you know, I don't remember where I was sitting. I was -- you know, most of the time, I'm sitting right next to him. So like I said in the beginning, typically, I don't write -- I don't like to write notes because they're -- they're looking at what I'm writing, and I don't want them to get nervous or anything, so...**
Q. Okay. So then going back to just -- all I have is your recollection -- what specifically did Warren struggle on in the fourth exam that led you to fail him?
**A. Yeah, I -- I don't -- I did not feel that he was ready to work the heater board. In my -- he wasn't there. He did not demonstrate enough competency to where I felt like he was ready to work it on his own.**
Q. Aside from the fact that you didn't feel that he was ready to work it on his own, is there any specifics that you recall as you sit here today that you can tell me as to what made --



**A. No. I mean, I -- I don't -- from the fourth test, I don't recall any specifics right now. Sorry.**
Q. Okay. Let me just verify something with you. The heater board console where he's being -- you know, where he's being tested, he's being tested at the heater board console where he was training? That's where the test is occurring?
**A. Yes. Yeah.**
Q. Okay.
**A. That's correct.**
Q. The physical room that he was in, the physical space that he's in when he's being tested is -- is that -- was that particular room, was it in any material way different in any one of the four tests? 'Cause you're one of the few people who is present for all four of the tests.
So what I mean is was any of the lighting changed or adjusted in any one of the tests?
**A. I don't -- I don't know. I'm not certain.**
Q. Okay. What about on the actual board itself? So not over the board where he's sitting, okay, but I'm talking about up at the console screens. Up on the screens, were any of the screens and digits and numbers on the screens, were any of those screens adjusted or dimmed or brightened in any way in between



any of the four different exams, if you recall?
**A. Yeah, no, I don't recall.**
Q. Okay.
**A. I don't know.**
Q. Did Warren -- if you recall, was Warren wearing anything different? Meaning different glasses, different contacts, any magnifying glass. Was there any adaptive device for eyesight that he had on him that was different from Exams 1 through 4 that you recall?
**A. Not that I recall, no. Huh-uh (negative).**
Q. Okay.
**A. I don't remember anything like that.**
Q. All right. So after the -- after the fourth exam, I asked you at the very beginning today -- I said I wouldn't waste your time. I was going to focus my questions on the things that you were a part of.
You told me at the beginning today, when we started your deposition, that you were part of discussions regarding the termination of Mr. Jones, so I want to talk to you about that.
How many discussions were there regarding what to do with Mr. Jones and, you know, his future with CP Chem? How many discussions were there?
**A. Did you say I was a part of the conversations**

**to --**
Q. Yeah. You had told me -- unless I misunderstood you. I thought you said that you were part of termination discussions for Mr. Jones when I asked you earlier today about that?
**A. No. No. That's -- no, I wasn't part of that.**
Q. Okay. All right. So -- so I -- okay. I want to make sure that's clear then. So any discussions, decisions that were -- were -- any conversations, round tables where Mr. Jones' termination was being discussed, were you part of any of those conversations?
**A. So we can be clear, part of his termination conversation, no.**
Q. Okay. Got you. Yes. Thank you.
MR. SUDDUTH: Well, then that made your deposition quicker because I don't need to ask you about those because you weren't part of them.
So in light of that, Mr. Montalvo, I am done sooner than I thought I would be. So I don't have any further questions for you today. Thank you for your time, sir.
MS. JONES: And we'll reserve our



questions for the time of trial.
**THE WITNESS: Okay.**
MR. SUDDUTH: Okay. So I have no follow-up based upon that.
Do you want to go over reading and signing with him, Brooke, or you want me to? What do you want to?
MS. JONES: I can go over. Yes, we'd like a copy to read and sign, please. We'd like the witness to read and sign, and you can send it to us.
MR. SUDDUTH: All right. And my standard order, since I ordered this deposition, will be fine, Alex. The -- the video and the transcript. I think that that's part of ordering it.
And I guess do y'all want to do spellings, if you have any, Ms. Dugas? Do you want to do your spellings off the record?
VIDEOGRAPHER: Okay. So -- and so just to clarify, standard order and your regular transcript you said?
MR. SUDDUTH: Yes, please.
VIDEOGRAPHER: Very good. And



Mrs. Jones, would you like a copy of the transcript?
MS. JONES: Yes, a copy of the transcript, please.
VIDEOGRAPHER: Did you need a copy of the video?
MS. JONES: Not at this time.
VIDEOGRAPHER: All right. Very good. Okay. So I'll take us off the record, and then any spelling, is that okay, Miss -- or Madam Reporter?
COURT REPORTER: Yes.
VIDEOGRAPHER: Please, one moment.
This concludes the deposition of Joshua Paul Montalvo for Warren F. Jones versus Chevron Phillips Chemical Company, LP. We are now off the record. The time is 4:32 p.m. Central Time.
(Deposition concluded at 4:32 p.m.)



C E R T I F I C A T E

I, Blanche J. Dugas, FCRR, RMR, CRR do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

________ That the witness requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

________ Signature is waived.

________ The changes made by the witness are appended to the transcript.

________ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 2nd day of October, 2025.

Blanche J. Dugas
FCRR, RMR, CRR

DEPOSITION ERRATA SHEET

Case Caption: Jones vs. Chevron

Witness: JOSHUA PAUL MONTALVO - 10/02/2025

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and The same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

_________________________________
JOSHUA PAUL MONTALVO



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
JOSHUA PAUL MONTALVO



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
JOSHUA PAUL MONTALVO

# Exhibit L

Chevron Phillips Chemical

# Employee History Detail Report

*Report Run Date:* *15-Dec-2022*

## Current Information

| | | | |
|---|---|---|---|
| **Employee Name** | Warren Jones | **SBU** | Manufacturing |
| **Department** | Olefins Crew 3 | **Location** | PA01 - Port Arthur |
| **Position** | Pool Operator | **Supervisor** | Nicholas Graham |
| **Salary Grade** | PA10 | **Grade/Lvl Start Dt** | 27-May-2019 |
| **Annual Salary** | $90,833 | **Compa Ratio** | |
| **Employee Group** | Full Time | **Employee Subgroup** | Hourly-Rep |
| **Service Years** | 7 | **Retirement Eligible** | N |

## Performance History

| Year | Rating |
|---|---|
| 2021 | ME: Meets Expectations |
| 2020 | ME: Meets Expectations |
| 2019 | ME: Meets Expectations |

## Education History

| Year | Level | Branch of Study | School |
|---|---|---|---|
| 2012 | Associates Degree | Process Technology | Lamar State College Orange TX |

## Position History

| Eff Date | Position Title | History Ind | Location |
|---|---|---|---|
| 13-Sep-2022 | Pool Operator | CPC | PA01 - Port Arthur |
| 16-Aug-2021 | Operator | CPC | PA01 - Port Arthur |
| 27-May-2019 | Operator Crew 3 | CPC | PA01 - Port Arthur |
| 07-Dec-2018 | Pool Operator | CPC | PA01 - Port Arthur |
| 07-Dec-2015 | 99999999 | CPC | DEF - Default |
| 07-Dec-2015 | Operations Trainee - Crew 2 | CPC | PA01 - Port Arthur |

## Salary History

| Start Date | Type of Change | History Ind | Grade | Annual Salary |
|---|---|---|---|---|
| 01-Oct-2022 | Work Sch Rule Change | CPC | PA10 | $90,833 |
| 01-Feb-2022 | Fixed Rate Increase | CPC | PA10 | $90,833 |
| 01-Dec-2021 | Data Change | CPC | PA10 | $88,605 |
| 01-Feb-2021 | Fixed Rate Increase | CPC | PA10 | $103,372 |
| 11-Nov-2020 | Data Change | CPC | PA10 | $99,397 |
| 01-Feb-2020 | General Fixed-Rate Increase | CPC | PA10 | $85,198 |
| 27-May-2019 | Job Progression | CPC | PA10 | $82,315 |
| 01-Feb-2019 | General Fixed-Rate Increase | CPC | PA11 | $82,315 |
| 07-Dec-2018 | Job Progression | CPC | PA11 | $79,541 |
| 07-Jun-2018 | Job Progression | CPC | PA11 | $75,654 |
| 01-Feb-2018 | General Fixed-Rate Increase | CPC | PA11 | $72,924 |
| 07-Dec-2017 | Job Progression | CPC | PA11 | $70,456 |
| 07-Jun-2017 | Job Progression | CPC | PA11 | $66,459 |
| 01-Feb-2017 | General Fixed-Rate Increase | CPC | PA11 | $61,130 |
| 07-Dec-2016 | Job Progression | CPC | PA11 | $59,339 |

| | | | | |
|---|---|---|---|---|
| 07-Jun-2016 | Job Progression | CPC | PA11 | $55,102 |
| 01-Feb-2016 | Lateral Move | CPC | PA11 | $48,266 |
| 07-Dec-2015 | New hire | CPC | DEF | $44,637 |

# Exhibit M

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**Date:** **13-Oct-2022**

**Manager/Supervisor Name:** **Judson Wooters**

**Employee Name:** **Warren Jones**

**Position Title:** **Operator**

**Company/Division/Department:** **Port Arthur Operations**

Your performance has fallen short of the expectations of an employee of your level of experience. The purpose of this document is to record the areas needing improvement as previously discussed and develop a plan that will enable you to improve to the level expected of you. (Primary reason(s) for PIP are indicated below. Multiple boxes may be checked if applicable.)

☐ Overall Annual Performance Rating "Needs Improvement"
☒ Specific Skill or Competency Deficiency
☐ Working Relationships

**A. Overall Timeline**

The PIP will be in effect from 03-October-2022 through 17-November-2023, although nothing in this PIP alters your at-will employment status or guarantees employment for any specified period of time. You are expected to make immediate and ongoing improvement while on the PIP, and a fully successful level of performance must be continually sustained once expectations are met.

**B. Summary of Performance Issues and Organizational Impact**
*(Explain the problem and its impact on the organization)*

**Performance Issue:** Not Meeting Training Expectations
**Organizational Impact:**
**Current PIP (13-Oct-2022 – 17-Nov-2022)**

- Heater Console Console Training
  - 1st attempt at training & testing (18-Mar-2022 to 24-Aug-2022) – did not perform well enough on final exam to qualify for the job
  - 2nd attempt at training & testing (25-Aug-2022 to 22-Sep-2022) – did not perform well enough on final exam to qualify for the job necessitating this PIP

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**Action Plan**

| C. Performance Issue | D. Required Actions to Bring Performance to Fully Successful Level | E. Action Employee Will Take to Address the Problem | F. Metric(s) | G. Results/Expectations Met or not Met | *TCD | **ACD |
|---|---|---|---|---|---|---|
| Not Meeting Training Expectations | Attend heater outside classroom to refresh on heater area flows Class:03-Oct-2022 | | • Field walk through with qualified outside operator & HO/PSC to confirm understanding of heater board system flows. | Met<br>Nick Graham<br>Jimmy Hayes<br>Clayton Ryan | 28 Oct 2022 | |
| | Retrain and qualify on the heater board.<br><br>A qualified heater board operator and/or a special assignment operator will be made available to assist in your retraining. | | Complete review of all module situations with qualified heater board operator & HO/PSC to confirm competency.<br>Pass the full heater board unit review. The review team will assess your ability to demonstrate compentancy in situation questions and flows relevant to the heater board. Unit review will be scheduled for the week of 17-Nov-2022. | Met<br>Justin Ridgaway<br><br>Not Met<br>Jud Wooters<br>Clayton Ryan<br>Bryan Lohr<br>Josh Montalvo | 17 Nov 2022 | |

*Target Completion Date (TCD)
**Actual Completion Date (ACD)

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**Scheduled Check-In**
The PIP will be reviewed every two weeks and you are responsible for scheduling the review meetings with your supervisor. The first review will be the week of 17-October at the Ethylene PSC office and in the field.

At each review meeting, you must be prepared to report progress and share results in obtaining/meeting expectations. You are required to present your progress on reviewing heater area training material by board/field walkthrough. Your head operator may be present during the review meetings.

Your supervisor will document each review meeting identifying areas where progress has been made and where performance remains deficient, and will provide appropriate guidance and support if you so request.

| Date (Target) | Attendees | Current Progress |
|---|---|---|
| (17-Oct) | | |
| (31-Oct) | | |
| (15-Nov) | | |

**Consequences:**
Failure to make immediate and ongoing improvement and successfully complete the PIP will result in termination of your employment.

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

## PIP Implementation Acknowledgement

PIP Implementation Discussion Conducted By/Title: ______________________/______________________

______________________ HR Representative Signature ______________ Date

Signature of anyone in attendance other than employee, employee's Manager and HR (if any):

______________________ Name ______________________ Title ______________ Date

**To Be Completed By Employee:**

**I have received a copy of this Performance Improvement Plan and fully understand the conditions set forth and the consequences to my employment of not meeting the above expectations.**

______________________ Employee Signature ______________ Date

Note: Employee should only sign after section E "Action Employee Will Take to Address the Problem" has been approved and included in the action plan.

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

## PIP Conclusion Acknowledgement

PIP Conclusion Discussion Conducted By/Title: ______________________/______________________

☐ ______________________ **has successfully met the requirements of this PIP.**
Employee Name

☐ ______________________ **has not met the requirements of this PIP.**
Employee Name

______________________ ______________
Employee Signature Date

______________________ ______________
HR Representative Signature Date

Signature of anyone in attendance other than employee, employee's Manager and HR (if any):

______________________ ______________________ ______________
Name Title Date

cc: Personnel File

Note: If employee has met the requirements of the PIP, failure to sustain a fully successful level of performance may result in disciplinary action up to, and including termination.

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**PIP Update:**

- 17-Nov-2022 – This was emailed to Warren Jones to document the unit review that took place on this day. The unit review team included Jud Wooters, Nick Graham, Clayton Ryan, Jimmie Hayes and Josh Montalvo.

> Warren,
>
> Thank you for meeting with me this afternoon to discuss the status of your PIP (copied). This email serves to document our discussion. Attendees in this meeting were Jud Wooters, Nick Graham, Warren Jones, Clayton Ryan, and Jimmie Hayes.
>
> As required by the PIP, you completed the heater outside classroom and have continued to review heater board material since 22-Sep-2022. Today was your scheduled "full heater board unit review" to determine if you could be qualified to work the heater board. While you showed proficiency answering questions in the quench and feed prep areas, your answers to questions in the Lummus/SWEC heater area were not acceptable. Therefore, I cannot qualify you to work alone at the heater console.
>
> In addition, during our discussion, you indicated that you continue to have vision concerns that periodically interfere with your ability to view text on the screens. To be sure we adequately address the continued vision concerns, we will be reaching out to the company doctor following the Thanksgiving holiday.
>
> In the meantime, we agreed that you would return to shift and be allowed to continue working on your heater board training. If a suitable resolution to your vision concerns is found prior to 15-Dec-2022, you will be given one final opportunity to take the full heater board unit review test to qualify for the heater board.
>
> -- Jud

- 12-Dec-2022 – Consistent with the email sent to Warren Jones on 17-Nov-2022, the company reviewed his vision concerns with company medical and council and it was determined that those concerns should be treated independing of your ability to perform the heater board job. As such, it was determined that a fourth heater board unit review test would be given.

  On 15-Dec-2022 a board unit review team consisting of Jud Wooters, Clayton Ryan, Bryan Lohr and Josh Montalvo performed a heater board assessment to determine if you could be qualified to work the heater board alone. While you showed some improvement in answering the board unit review team's questions, you did not meet the teams expectations, and therefor I cannot qualify you to work alone at the heater console.

From: "Wooters, Judson" <wootej@cpchem.com>
Sent: Thursday, November 17, 2022, 5:36 PM
To: "Jones, Warren F" <JONESWF@cpchem.com>
Cc: "Graham, Nick" <GRAHAN@cpchem.com>; "Ryan, Clay S" <ryancs@cpchem.com>; "Danford, Aprile A" <askewam@cpchem.com>; "Kubsch, Bryan G" <KUBSCBG@cpchem.com>
Subject: PIP Update 17-Nov-2022
Attachments: PIP-W.Jones.pdf

Warren,

Thank you for meeting with me this afternoon to discuss the status of your PIP (copied). This email serves to document our discussion. Attendees in this meeting were Jud Wooters, Nick Graham, Warren Jones, Clayton Ryan, and Jimmie Hayes.

As required by the PIP, you completed the heater outside classroom and have continued to review heater board material since 22-Sep-2022. Today was your scheduled "full heater board unit review" to determine if you could be qualified to work the heater board. While you showed proficiency answering questions in the quench and feed prep areas, your answers to questions in the Lummus/SWEC heater area were not acceptable. Therefore, I cannot qualify you to work alone at the heater console.

In addition, during our discussion, you indicated that you continue to have vision concerns that periodically interfere with your ability to view text on the screens. To be sure we adequately address the continued vision concerns, we will be reaching out to the company doctor following the Thanksgiving holiday.

In the meantime, we agreed that you would return to shift and be allowed to continue working on your heater board training. If a suitable resolution to your vision concerns is found prior to 15-Dec-2022, you will be given one final opportunity to take the full heater board unit review test to qualify for the heater board.

-- Jud

**T. Judson Wooters** | Olefins Superintendent | O (409) 985-0757 | C (409) 332-9309 |
wootej@cpchem.com
Information contained in this e-mail is subject to the disclaimers found by clicking on the following link:
http://www.cpchem.com/forms/disclaimer1.asp

From: "Wooters, Judson" <wootej@cpchem.com>
Sent: Monday, November 28, 2022, 12:30 PM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Subject: Fwd: PIP Update 17-Nov-2022
Attachments: PIP-W.Jones.pdf

---

Sent from my iPhone

Begin forwarded message:

**From:** "Wooters, Judson" <wootej@cpchem.com>
**Date:** November 17, 2022 at 5:36:16 PM CST
**To:** "Jones, Warren F" <JONESWF@cpchem.com>
**Cc:** "Graham, Nick" <GRAHAN@cpchem.com>, "Ryan, Clay S" <ryancs@cpchem.com>, "Danford, Aprile A" <askewam@cpchem.com>, "Kubsch, Bryan G" <kubscbg@cpchem.com>
**Subject: PIP Update 17-Nov-2022**

Warren,

Thank you for meeting with me this afternoon to discuss the status of your PIP (copied). This email serves to document our discussion. Attendees in this meeting were Jud Wooters, Nick Graham, Warren Jones, Clayton Ryan, and Jimmie Hayes.

As required by the PIP, you completed the heater outside classroom and have continued to review heater board material since 22-Sep-2022. Today was your scheduled "full heater board unit review" to determine if you could be qualified to work the heater board. While you showed proficiency answering questions in the quench and feed prep areas, your answers to questions in the Lummus/SWEC heater area were not acceptable. Therefore, I cannot qualify you to work alone at the heater console.

In addition, during our discussion, you indicated that you continue to have vision concerns that periodically interfere with your ability to view text on the screens. To be sure we adequately address the continued vision concerns, we will be reaching out to the company doctor following the Thanksgiving holiday.

In the meantime, we agreed that you would return to shift and be allowed to continue working on your heater board training. If a suitable resolution to your vision concerns is found prior to 15-Dec-2022, you will be given one final opportunity to take the full heater board unit review test to qualify for the heater board.

-- Jud

**T. Judson Wooters** | Olefins Superintendent | O (409) 985-0757 | C (409) 332-9309 |
wootej@cpchem.com

Information contained in this e-mail is subject to the disclaimers found by clicking on the following link:
http://www.cpchem.com/forms/disclaimer1.asp

# Exhibit N

#### 4.5.2 First Extension

If the trainee fails to meet the established criteria for passing Unit Review Committee #1, retraining and reevaluation are required. The Unit Review Committee will specify the allowed duration for the First Extension, which should not exceed 20% of the base timeframe for that qualification area unless approved by the Unit Superintendent. The trainee will be evaluated again through Unit Review Committee #2 by the end of that specified duration, ensuring that any deficiencies previously noted are covered and understood.

#### 4.5.3 Second Extension

If the trainee does not successfully pass Unit Review Committee #2, the Training Coordinator will facilitate a discussion with the Unit Leadership to determine the path forward which could include a Second Extension for retraining and reevaluation through Unit Review Committee #3 or placing the employee on a Performance Improvement Plan to address the deficiencies listed on the Unit Review Committee Form. (Human Recourses will be consulted as necessary). If the Unit Leadership assessment approves a Second Extension, they will specify the duration of that extension, which should not exceed 20% of the base timeframe for that qualification area unless approved by the Unit Superintendent. The trainee will be evaluated again through Unit Review Committee #3 by the end of that specified duration ensuring that any deficiencies previously noted are covered and understood.

#### 4.5.4 Unsuccessful Third Attempt

If the trainee does not successfully pass the Unit Review Committee #3, Unit Leadership will consult with Human Resources to determine appropriate action.

# Exhibit O

# Compliance

**2150 Employment of Individuals with Disabilities**

**I. General**

Chevron Phillips Chemical Company (hereinafter referred to as "Company") strives to employ and advance in employment qualified individuals with disabilities. To comply with applicable laws ensuring equal employment opportunities to qualified individuals with disabilities, the Company will make reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless doing so would result in an undue hardship or pose a direct threat to the health or safety of the individual and/or others.

**II. Guidelines**

**A. Definition**

For these purposes, an individual with a disability means any individual who:

1. has a physical or mental impairment that substantially limits one or more of such person's major life activities,

2. has a record of such impairment, or

3. is regarded as having such impairment.

A "qualified individual with a disability" is a person as defined above who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position.

**B. Responsibilities**

1. Management, at all levels, is responsible for assuring compliance with the guidelines and relevant laws and regulations. All employees are expected to be aware of the Company's commitment to equal employment opportunity and to comply with this policy.

2. It is the responsibility of the Human Resources function in conjunction with management to assure that reasonable accommodations are provided and that employee selection is based entirely upon the individual's ability to perform the essential functions of the job with or without reasonable accommodation.

3. Local Human Resources will provide interpretation and consultation in administering all phases of this policy.

4. The Occupational Health Staff is responsible for establishing work limitations for employees and/or applicants based on medical information obtained through physical examinations performed by authorized physicians.

**C. Administration**

1. Physical Examination

A post-offer pre-employment physical examination may be required of each job candidate with a disability only if it is required of all other candidates, in order to determine whether or not the applicant is able to perform the essential functions of the job. The examination, which is conducted by the Occupational Health Staff (including authorized physicians), is intended to ensure that the applicant can perform the essential functions of the job for which he or she has applied with or without a reasonable accommodation. Specifically:

a. Work limitations or other restrictions must be relative to the essential functions of the specific job for which the person is being considered. Each case must be evaluated on an individual case-by-case basis.

b. It is the responsibility of the employing supervisor to acquaint the Occupational Health Staff physician with the physical requirements and working conditions of the job. A Physical Requirements and Working Conditions form (Functional Job Description) should be used for analyzing and recording these job requirements.

c. Information obtained from the employee's/applicant's physician regarding diagnosis, prognosis, and recommended work limitations should be considered to make this determination, and

d. Differences in opinion between an employee's/applicant's physician and a Company authorized physician should be referred to the Occupational Health Staff physician servicing the area. The Occupational Health Staff physician will have final authority in evaluating the employee's/applicant's ability to perform the essential functions of the job.

2. Confidentiality

Medical information must be maintained as a confidential medical record. Access to Protected Health Information (PHI) is restricted and limited to only authorized personnel. Supervisors and managers may be informed about necessary restrictions on the work or duties of an employee and necessary accommodations. Emergency and safety personnel may be informed, when appropriate, if the disability might require specialized treatment or if any specific procedures are needed in case of fire or other cause for an evacuation.

3. Employment Decision

Once an employment offer has been extended and accepted, a medical examination may be conducted only if all employees entering into the same job classification are required to take such medical examination. Any employment decision must be directly related to the employee's ability to perform the essential functions of the job with or without an accommodation, and whether the employee can perform the essential functions of the job without posing a "direct threat" to the health or safety of himself/herself and/or others.

The employing supervisor and Human Resources will make a determination as to the employability of an applicant (who has been offered employment) with a disability after reviewing work limitations including an assessment of reasonable accommodation needs.

Before withdrawing an employment offer due to assessment findings and the medical evaluation, the employing supervisor must consult with Human Resources to:

a. Ensure that there is complete understanding of the physical requirements of the job by the physician. Each case must be evaluated on an individual case-by-case basis.

b. Ascertain what reasonable accommodations could be made, and whether such accommodations will result in an undue hardship or pose a direct threat as defined by applicable law.

c. Consider the Company's obligation to avoid practices that deny employment to a qualified applicant because of the applicant’s disability or the need for the Company to make reasonable accommodations.

If local management concludes that, because of work limitations, the applicant is not qualified for the job, the matter should be reviewed with local Human Resources before taking final action.

Local Human Resources must consult with the Corporate HR Compliance Manager prior to the withdrawal of an employment offer based upon assessment findings. The Corporate HR Compliance Manager will be responsible for consulting with the Office of General Counsel as appropriate.

4. Requesting Reasonable Accommodation

Any applicant or employee who requires an accommodation in order to perform the essential functions of the job should contact his/her supervisor or the local Human Resources Business Partner and request the accommodation. The accommodation request can be written or oral and can be made by the employee or by someone else on the employee’s behalf. The accommodation request should specify the accommodation the applicant or employee needs to perform the job. If the requested accommodation is reasonable and will not impose an undue hardship or a direct threat to the health or safety of the individual and/or to others, the Company will make the accommodation in accordance with applicable law. The Company may propose an alternative to the requested accommodation or substitute one reasonable accommodation for another, but the Company retains the ultimate discretion to choose between reasonable accommodations.

Employees are expected to fully cooperate in the accommodation process. The duty to cooperate includes making every effort to provide management with current medical information. Employees who do not cooperate in the accommodation process will waive the right to accommodation.

5. Self-Identification

Any employee may self-identify as having a disability or update his/her disability status at any time by accessing the Employee Self Service (ESS) portal via the Company's intranet (insight) site. An employee may utilize an alternate method of self-identification by contacting his/her local HR Business Partner.

**D. Counsel**

Counsel on this policy may be obtained from local Human Resources.

# Exhibit P

**Accommodation Meeting: Warren Jones 10/3/2022 4:00 pm**

**Attendees:** Chelse Cisneros (HR), Judson Wooters (Olefins Superintendent), Warren Jones (Employee), Clay Ryan (Union Rep).

**Purpose:** The purpose of this meeting it to better understand what the employee is requesting to be accommodated. There will be no decisions made or communicated at this meeting.

**Introduction to meeting:**

- Let the room know that this is an information gathering meeting to understand the request made by the employee. After this meeting I will work with leadership and medical to determine if an accommodation can be made.
- Communicate that there will be no decisions made or communicated at this meeting

**Questions to be asked (Be direct and ask the right questions in order to get more information on the employee's request):**

- Based on the letter your healthcare provider sent us, what is the accommodation you are requesting?

Jones asked for 5 minutes to tell us on the background of his vision issues throughout his life.

- Has had a visual impairment since kid, right eye -18 whole life, -14 left eye
- 8th grade year, retina detachment from playing sports
- McGuirt Lasik surgery roughly 12 years ago, went beautifully
- Can't wear contacts because of surgery
- Go back to glasses
- Is having trouble with the material on cards
- Feels completely burnt after the board
- Has spent $2,200 trying to get prescriptions, 4 different prescriptions since January
- Having to squint to view the console
- Has drops that he brings with him to work but they don't help
- Always fought through this difficulty, has dealt through whole life
- The doctor stated his eyes to deteriorate the older he gets per Jones
- Jones says when he is on the heating board, he feels he knows the material but the anxiety that comes over him
- He doesn't want to put anyone in harm's way because he cannot properly see
- Doctor has stated that he doesn't think they will get better
- Brought up outside operator accommodation that was made in the past Clay said that never made it "up here" assuming he meant HR and that was all that was said on this.

**Employee said that he was not asking to be taken off nights, he was making the company aware of his vision difficulties.**

- How long would the duration of this be? (If it is stated that it is only for a certain period of time or that it is infinite, request that he provide this in writing from the healthcare provider)
- Jones stated this could be on going and Cisneros requested that she needed that in writing from the doctor

- Are there any aids we could use to accommodate the request?
  - Judson Wooters presented the aids
  - Better Lighting in the room
  - Could we get Console specific lighting?
  - Judson asked if we could buy area lighting to make it brighter, moved couple lights over
  - Temporarily lighting
  - Magnifying screen filters
  - Process control if there are different or automated within the Honeywell that can change display screen size

Warren stated he does well with the lighting it is just afterwards

  - Cisneros asked Jones if he had any recommendations or suggestions magnification/lighting
  - Jud stated, anything to make it easier for you to use

Jones stated that he does well with the current lighting, they have been able to move around lamps and he also bring a lamp that his wife bought him to help increase the lighting.

Jones also stated that he gets headaches and aggravated with eyes after looking at the console for too long.

- If we are not able to accommodate your request, what other skill sets do you have?
  - 17 years of safety experience
  - Maintenance
  - Can do anything

**<u>Action item-</u>** Warren to work with doctor to see if there are specific lighting/magnification devices that can help him, propose what will help you the most

# Exhibit Q

**Termination Recommendation Memo**

**Employee:** Warren Jones
**Position:** Pool Operator
**Location:** Port Arthur
**Date of Hire:** 12/7/2015
**Performance History:** 2021 – ME; 2020 – ME; 2019 - ME

**Facts:**
Warren Jones has been unsuccessful in qualifying on the heater board four times over the course of 8 months. Jones started training to qualify for the heater board role on March 18, 2022. He was unsuccessful when he tested for the first time on August 24. Jones completed another month's training and then was unsuccessful when he retested on September 22. Per HR Training Guideline 2, Section 4.5.3, Jones was then formally placed on a Performance Improvement Plan (PIP) on October 13, 2022, to address the deficiencies identified during his test with the Unit Review Committee.

During the PIP, Jones received additional classroom and one-on-one training. Despite the additional training, Jones was again unsuccessful on his third attempt at qualifying on the heater board on November 17, 2022.

Jones indicated at this time the existence of a medical condition that may have been relevant to his qualification attempts. The Company engaged in an interactive process with Jones and, among other things, permitted Jones to make a fourth attempt to qualify. On December 15, 2022, Jones failed for a fourth time to qualify on the heater board and per Stipulation 35, Operator Training, in the United Steelworkers Plant Group Collective Bargaining Agreement, an employee who fails to meet the training program requirements may be dropped from the payroll.

**Recommendation:**
As a result of Jones's failure to qualify on the heater board after four attempts, Bryan Kubsch, Operations Manager, recommends termination of Jones's employment. Gary Parsley, Plant Manager, supports this recommendation.

Prepared by Chelse Cisneros on 12/22/2022
Reviewed and supported by Sr. Counsel Stephanie John

Chevron Phillips CHEMICAL

# TERMINATION RECOMMENDATION – Seven-Factor Test

**Date: December 27, 2022**

| | |
|---|---|
| **Employee Name:** Warren Jones | **Position Title:** Pool Operator |
| | |
| **Company/Division/Department:** CPChem/Port Arthur Manufacturing/Operations | **Manager:** Bryan Kubsch, Operations Manager |
| | |
| **Date of Hire:** 12/7/2015 | **Performance History:** 2021 – ME; 2020 – ME; 2019 – ME |
| | |

When considering whether to terminate an employee in a Union or non-Union facility, the line supervisor and appropriate HR Business Partner should review the questions below in making a final decision. Generally, when an allegation of a Life-Saving Rule (LSR), work rule, policy, guideline, or procedure violation is reported, or when an employee has uncorrected performance deficiencies, the line supervisor and the appropriate HR Business Partner shall determine the proper course of action. Arbitrators evaluating union grievances use a test known as the Seven Factors of Just Cause, which we have adapted below as guidance in considering whether to recommend termination. The "just cause" standard only applies to our Union-represented employees because our non-represented employees are employed on an "at will" basis. Nonetheless, considering the seven factors listed below in all cases will help ensure that termination decisions are made fairly and consistently.

| |
|---|
| 1. Did the Employee have forewarning as to the possible or probable consequence of the alleged conduct? (i.e. Was the Employee aware of the LSR, work rule, policy, guideline, or procedure and the consequences of violating it? Was the employee aware of his/her performance deficiencies and the consequences of failing to correct those deficiencies?) **Yes, Jones was placed on a Performance Improvement Plan (PIP) on October 13, 2022, that detailed specified deficiencies that needed to be improved. The PIP was scheduled to be in effect for 5 weeks, October 13, 2022 – November 17, 2022. Additionally, Operator training and expectations are outlined in HR Training Guideline 2 and expectations in Stipulation 35 in the United Steelworker Collective Bargaining Agreement.** |
| 2. Is the Employer's rule reasonably related to (a) the orderly, efficient, and safe operation of the business and (b) the performance that the Employer might properly expect of the Employee? **Yes, the employee is expected to perform the roles and responsibilities of a fully qualified operator, which includes training on various jobs and passing qualification tests. However, Jones was unable to successfully pass the heater board test resulting in not being a fully qualified operator.** |
| 3. Have we made an effort to discover whether the Employee did in fact violate or disobey the LSR, work rule, policy, guideline, or procedure, or where appropriate, fail to correct his/her performance deficiencies? (i.e. Did we conduct a comprehensive and thorough investigation?) **Yes. Jones was given multiple attempts at training and testing to qualify for the heater board. Additionally, Jones signed a form that certified his agreement with the training expectations and responsibilities.** |
| 4. Did we conduct a fair and impartial investigation of the incident, or where appropriate, the performance deficiencies? (i.e. Did we have an open mind to receiving the results of the investigation before determining the appropriate action? Generally, an investigation is "fair" when the employer provides the employee suspected of misconduct the opportunity to tell his/her side of the story and to provide an explanation for the challenged conduct.) **Yes. Jones was provided with additional one-on-one training and allowed for multiple attempts to pass the test in order to qualify for the heater board.** |
| 5. Have we sufficiently proved that the alleged violation occurred? (i.e. Do the facts support our conclusion that the violation occurred?) **Yes, Jones was unsuccessful in passing his heater board qualification exam on four separate occasions.** |
| 6. Have we applied our rules evenhandedly and without discrimination to all employees? (i.e. Have we treated others in a similar fashion, given all of the circumstances?) **Yes.** |

TERMINATION RECOMMENDATION – Seven-Factor Test

| |
|---|
| 7. Is the recommended action reasonably related to the seriousness of the proven offense and have we considered the Employee's overall work record, including company service? (i.e. Does the recommended action fit the violation?) **Yes, all were considered.** |

**Termination Recommended By/Title:** **Bryan Kubsch/Operations Manager**

**Human Resources Representative/Title:** **Chelse Cisneros/ HR Associate**

# Exhibit R

**Termination Talking Points**

Employee Name: Warren Jones
Date of Notification: January 3, 2023
Company Rep Present: Judson Wooters and Chelse Cisneros
Union Rep Present: Sabas Garcia
Call Began at: 10:33 am

Judson notified warren who was in the room.

**Supervisor**

- As you know, you have been suspended since **December 20, 2022,** due to failing to qualify on the heater board as required. As a result of your performance deficiencies, the decision has been made to separate your employment from CPChem effective **December 31, 2022.**

**HR**

- As previously mentioned, your separation of employment with CPChem is effective **December 31, 2022,** you have do not have any vacation remaining to be paid out.
- Do you have any company owned property that needs to be returned? (keys, tools, radio, etc.): Not that he can think of, radio is in locker.
- A union and a company representative will clean out your locker. Which locker is yours? The one with the Obama face on it. Do you have a lock on it? No, lock was drilled off. Are there any personal items in particular that you want to ensure we send you? If so, what are those items. No personal items, can give items to Jimmie Hayes if there is anything that is his
- Is your current mailing address 6920 Silver Lane Lake Charles, Louisiana 70607?
- If you make any changes to your mailing address or banking information, please contact the HR Service Center to update at 1.800.446.1422 (1-benefits, 2-pension, 3-HRSC)
- Your medical and dental insurance coverage is effective thru December 31. Should you have any questions regarding your medical and/or dental coverage, please contact the Benefit Service Center at 1-800-446-1422, Option #1. Please also be sure to contact Fidelity at 1-866-771-5225 regarding any 401(k) and Pension Plan questions you may have.
- You will receive additional information regarding COBRA benefits for medical, dental and vision coverage from PayFlex within approximately two weeks after your regular coverage ends on December 31.
- EAP benefits continue to remain available to you if you so choose. You can contact Magellan Healthcare EAP at 1-800-446-1422, Option 8.
- We have an Exit Confidentiality Form that we ask you to review, sign and return back to me. Do you have a personal email address that we can email this to? Warren.jones73@gmail.com
- If you have any additional questions or need assistance, please contact Chelse Cisneros, (409)-985-0823

- Do you have any questions at this time? No, let Judson know that his best advice to CPChem PA Training program sucks. Try to give due diligence to those who are actually training the trainee.

Call ended at: 10:44 am

# Exhibit S

#1

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
    a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
    a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
    a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
    a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
    a. Comments:
6. Locate and explain on the DCS console how the economizer works.
    a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
    a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
    a. Comments:
9. What basic steps should be taken upon loss of instrument air?
    a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

## EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    a. Comments:

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

    a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

    a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

    a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

    a. Comments:

55. Locate the flare dump page graphic on the DCS.

    a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

    a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

    a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

    a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

    a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.

    a. Comments:

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

    a. Comments:

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

    a. Comments:

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.
    a. Comments:
88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.
    a. Comments:
89. Show on the DCS how to add air when decoking a heater.
    a. Comments:
90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.
    a. Comments:
91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.
    a. Comments:
92. Show on the DCS how to initiate the furnace start up and swap.
    a. Comments:
93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.
    a. Comments:
94. Show on the DCS how to vent the high-pressure steam.
    a. Comments:
95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.
    a. Comments:
96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.
    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

#1

EU1544 Unit Review Committee

# EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.

    a. Comments:

12. Locate the natural gas pressure controller on the DCS and explain its function.

    a. Comments:

13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.

    a. Comments:

14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?

    a. Comments:

15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?

    a. Comments:

16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.

    a. Comments:

17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.

    a. Comments:

18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.

    a. Comments:

19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.

    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

    a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

    a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

    a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

    a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

    a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

    a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

    a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

    a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

    a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

    a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

    a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    a. Comments:

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments:
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments:
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

#1

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: ✓
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works. ?
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments: ✓
9. What basic steps should be taken upon loss of instrument air?
   a. Comments: ✓
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488. ✓
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

    a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

    a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

    a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

    a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

    a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

    a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

    a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

    a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

    a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

    a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

    a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.
    a. Comments:
41. What would happen if we were to get "heavies" in EA 117A and what should be done?
    a. Comments:
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments:
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

## EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments:
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments:
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

    a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

    a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

    a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

    a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

    a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

    a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

    a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

**CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR**

Chevron Phillips

## Unit Review Committee for Job Qualification

| | | | |
|---|---|---|---|
| Date: | 8/24/22 | ☐ Successful | |
| Trainee Name: | Warren Jones | ☒ Not Successful | #1 |
| Unit: | EU1544 | ☐ 1st Attempt | |
| Qualification Area: | Heater DCS | ☐ 2nd Attempt | |
| LMS Course Code: | PAR00006 | ☐ 3rd Attempt | |

A Successful indication above signifies that the Trainee has demonstrated the knowledge, comprehension, and ability to work the area unassisted and is now qualified in the area for which they trained.

**Extension duration and approval** (if needed):

Approved Extension Duration (shifts) ____________ ☐ 1st Extension

Next OJT Review Committee Date ____________ ☐ 2nd Extension

Unit Superintendent Approval
(if >20% of base duration) ______________________________

A **Qualified Solo Work Cycle** will be required for 6 weeks following this qualification.

**By signing below, I certify agreement with the Review Committee's determination.**

If Not Successful is indicated above, the Trainee accepts responsibility for addressing any deficiencies that have been identified and completing the Action Plan associated with those deficiencies prior to the next Unit Review Committee attempt.

| | Print: | Sign: | Date: |
|---|---|---|---|
| Trainee: | Warren Jones | [signature] | 8-24-2[illegible] |
| Area Qualified Operator(s) | Jimi Hayes | [signature] | 8-24-22 |
| (if applicable): | N/A | N/A | N/A |
| PSC: | Nick Graham | [signature] | 8/24/22 |
| Training Coordinator: | Joshua Merritt | Joshua Merritt | 8/24/2[illegible] |
| Other Personnel (if applicable): | N/A | N/A | N/A |
| Unit Superintendent (if applicable): | Jud Wolters | [signature] | 22-Sep-22 |

CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR

# Unit Review Committee for Job Qualification

**Summary of Deficiencies and Action Plan**
*(Explain the deficiency and identify actions needed)*

| Deficiencies Identified | Required Actions to resolve deficiencies and complete a successful Unit Review Committee | Action Employee Will Take to Address the deficiencies |
|---|---|---|
| Did not pass the LMS Final Exam. 82.4 JM | Retest on LMS Final Exam + Situational deficiencies | Shaping knife on E/P Mix |
| Navigating Console Pages Superheater operation | in 4 sets (week of Sept 19). JM | Vaporizer system along with superheater system and SWC heaters |
| EP Mix Feed operation (system) Quench Tower operation (system) | | w/ [illegible] |
| Flare load shedding | | |
| Navigate heater feed, steam, fuel pages + control JM | | and QW system w/ navigating |
| | | |
| | | |

| Dept: Training Department | Page 2 of 2 | Rev: 0 | Revision Date: 4/26/2021 | |
|---|---|---|---|---|
| The most recent revision of this document should be obtained and used. Current revisions can be printed from the Document Management system on the Web. This copy is valid for 24 hrs. from print date. | | | Print Date: 7/28/2022 | Print Time: 8:18 AM |

CP CHEM 000160

# Exhibit T

CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR

Chevron Phillips

# Unit Review Committee for Job Qualification

| | | | |
|---|---|---|---|
| Date: | 9/22/22 | ☐ | Successful |
| Trainee Name: | William Jones | ☒ | Not Successful |
| Unit: | 1544 | ☐ | 1st Attempt |
| Qualification Area: | Heater DCS | ☐ | 2nd Attempt |
| LMS Course Code: | PAR00006 | ☐ | 3rd Attempt |

#2

A Successful indication above signifies that the Trainee has demonstrated the knowledge, comprehension, and ability to work the area unassisted and is now qualified in the area for which they trained.

**Extension duration and approval** (if needed):

Approved Extension Duration (shifts) ________ ☐ 1st Extension

Next OJT Review Committee Date ________ ☐ 2nd Extension

Unit Superintendent Approval (if >20% of base duration) ________

A **Qualified Solo Work Cycle** will be required for 6 weeks following this qualification.

**By signing below, I certify agreement with the Review Committee's determination.**

If Not Successful is indicated above, the Trainee accepts responsibility for addressing any deficiencies that have been identified and completing the Action Plan associated with those deficiencies prior to the next Unit Review Committee attempt.

| Role | Print | Sign | Date |
|---|---|---|---|
| Trainee: | [signature] | [signature] | 9/22/22 |
| Area Qualified Operator(s) (if applicable): | Clay Ryan | [signature] | 9-22-22 |
| | Jimi Hayes | [signature] | 9.22.22 |
| PSC: | Nick Graham | [signature] | 9/22/22 |
| Training Coordinator: | Vottie Mintle | Vottie Mintle | 9/22/22 |
| Other Personnel (if applicable): | John Watkins | [signature] | 22-SEPT-22 |
| Unit Superintendent (if applicable): | Jud Wooters | [signature] | 22-Sept-22 |

| Dept: Training Department | Page 1 of 2 | Rev: 0 | Revision Date: 4/26/2021 | |
|---|---|---|---|---|
| The most recent revision of this document should be obtained and used. Current revisions can be printed from the Document Management system on the Web. This copy is valid for 24 hrs. from print date. | | | Print Date: 9/22/2022 | Print Time: 6:28 AM |

CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR

Chevron Phillips

# Unit Review Committee for Job Qualification

**Summary of Deficiencies and Action Plan**
*(Explain the deficiency and identify actions needed)*

| Deficiencies Identified | Required Actions to resolve deficiencies and complete a successful Unit Review Committee | Action Employee Will Take to Address the deficiencies |
|---|---|---|
| Refer to PIP VAM | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Dept: Training Department | Page 2 of 2 | Rev: 0 | Revision Date: 4/26/2021 | |
|---|---|---|---|---|
| The most recent revision of this document should be obtained and used. Current revisions can be printed from the Document Management system on the Web. This copy is valid for 24 hrs. from print date. | | | Print Date: 9/22/2022 | Print Time: 6:28 AM |

EU1544 Unit Review Committee

#2

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
    a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
    a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
    a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
    a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
    a. Comments:
6. Locate and explain on the DCS console how the economizer works.
    a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
    a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
    a. Comments:
9. What basic steps should be taken upon loss of instrument air?
    a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.
    a. Comments:
41. What would happen if we were to get "heavies" in EA 117A and what should be done?
    a. Comments:
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments:
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.

    a. Comments:

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

    a. Comments:

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

    a. Comments:

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

    a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

    a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

    a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

    a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

    a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

    a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

    a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

#2

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: Lil fuzzy
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments: Basic
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   No
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   85
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

CP CHEM 000178

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments: BASIC / KNOWS low PRESS
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP. ✓
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#. PARtial Found ANSWER

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments: Missed some stuff

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

 a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

 a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

 a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

 a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

 a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

 a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

 a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

 a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

 a. Comments:

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

 a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

Don't know

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments: half understanding

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

# EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments: searching
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments: Partial
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure. 75%

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER. confused

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments: ~~confused~~ Lead Horse to Water

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.
    a. Comments:
88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.
    a. Comments:
89. Show on the DCS how to add air when decoking a heater.
    a. Comments:
90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.
    a. Comments:
91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.
    a. Comments:
92. Show on the DCS how to initiate the furnace start up and swap.
    a. Comments:
93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.
    a. Comments:
94. Show on the DCS how to vent the high-pressure steam.
    a. Comments:
95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.
    a. Comments:
96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.
    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

#2

EU1544 Unit Review Committee

**EU1544 Heater DCS**

BETTER ON FINDING GRAPHICS BUT STILL NEEDS WORK

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: CLOSE VALVE TO GET MORE WATER TO DEAERATOR??
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works. OK 80%
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments: GOOD EXPLANATION ON 7589 BUT GOT LOST ON OTHER GRAPHIC. 50%.
9. What basic steps should be taken upon loss of instrument air?
   a. Comments: TROUBLE FINDING RIGHT GRAPHIC. ANSWER OK - 60%
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments: OK ANSWER 80%
    FOLLOW UP QUESTIONS 50%. LOST ON FUELGAS GRAPHIC
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

# EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works. 100% FLOW SPEED UP/SLOW DOWN PUMPS – STRUGGLED ON AUTO STP
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP. OK 60
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#. 60%

DIDN'T UNDERSTAND FOLLOW UP QUESTIONS

EU1544 Unit Review Committee

ON PAUSING THE TEST - WARREN'S ANSWERS WERE MUCH BETTER

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments: QUESTION OK BUT LOST ON FOLLOWUP

58%

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments: OK 80%

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments: 50%

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

# EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    a. Comments: STRUGGLING

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

    CONFUSING QUESTION

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments: JU -

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.

    a. Comments:

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

    a. Comments: NEEDS MORE PRACTICE FINDING GRAPHICS – SWEC OK LUMMUS OK

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

    a. Comments: OK 70%

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments: OK

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

    a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

    a. Comments: 75%

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

    a. Comments: 75%

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments: OK

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

    a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

    a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

    a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

    a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.
    a. Comments:
88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.
    a. Comments:
89. Show on the DCS how to add air when decoking a heater.
    a. Comments:
90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.
    a. Comments:
91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.
    a. Comments: ok
92. Show on the DCS how to initiate the furnace start up and swap.
    a. Comments:
93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.
    a. Comments: 0%
94. Show on the DCS how to vent the high-pressure steam.
    a. Comments:
95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.
    a. Comments:
96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.
    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

#2

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: Less valve means more level to deaerator
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments: • Keeps load on superheater   D opens on high pressure
   • A opens to pull [illegible] to steam
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments: 7582 Drags boiler steam to superheater   I don't remember his answer
9. What basic steps should be taken upon loss of instrument air?
   a. Comments: • bring on [illegible]
   • $N_2$ kicks in when it gets too low, notify [illegible] to notify [illegible]
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

CP CHEM 000200

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:

12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:

13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:

14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:

15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:

16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:

17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments: Said VLD could be stopping flow, contact VLD

18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:

19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

I asked ... what happens when you lose FG pressure + import is wide open. Had to further answer b/f eventually found it

CP CHEM 000201

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments: · controls trim
       · spare pump will kick on when pressure fails
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments: could be catastrophic to trays/packing in tower
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.
    · brittle fracture
    · QT will get hot
    · Cut furnace charge

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments: ◦ Cut charge as needed
◦ Cut burners

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments: ✓ But needed some help

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments: ✓

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.
    a. Comments:
41. What would happen if we were to get "heavies" in EA 117A and what should be done?
    a. Comments:
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments: said to cut charge to min
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

PC412

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments: - cut charg
- save equipment

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

# EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments: ✓
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments: Needed lots of help
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

a. Comments: Needed help

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments: Needed help

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments: ✓

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments: 50%

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

# EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.
    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.
    a. Comments:

89. Show on the DCS how to add air when decoking a heater.
    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.
    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.
    a. Comments: Needed since huff 5%

92. Show on the DCS how to initiate the furnace start up and swap.
    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.
    a. Comments: need help

94. Show on the DCS how to vent the high-pressure steam.
    a. Comments:

✓ 95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters. check 701/702 pumps
    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.
    a. Comments:

CP CHEM 000209

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

#2

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   90%
   a. Comments: 90%
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   85%
   a. Comments: little Slow To answer
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work. Does not under Stand.
   50%
   a. Comments: Looking for the answer. Trying to remember the answer. Not going to Work in an upset
9. What basic steps should be taken upon loss of instrument air?
   25%
   a. Comments: Cannot find instrument air Page took a bout a min.
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

CP CHEM 000211

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    50% a. Comments: Didn't really answer, Kinda

    How to respond to low fue gas pressure? He could not answer.
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

Look around to much

CP CHEM 000212

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.

    a. Comments:

21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works. got it, Kinda slow though / Question asked about low pressure Had some trouble,

50% a. Comments:

22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.

    a. Comments:

23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.

    a. Comments:

24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.

    a. Comments:

25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.

    a. Comments:

26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.

    a. Comments:

27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP. → Had some trouble, but answered

75%

    a. Comments:

28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#. could not answer, does not understand concept

50%

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation. *most seemed memorized

75% a. Comments: Had to help with most of the answer

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

50%, 100% a. Comments: Kinda struggled understood basics doesn't understand how pressure is controlle

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

100% a. Comments: Kinda Struggled

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

This is worse than last time

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    0% a. Comments: Doesn't understand

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

0% 50. Show how we could tell if the charge to an ethane header could be increased or decreased.

Doesn't understand

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

50 6/6 a. Comments: Kinda answered

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.

    a. Comments:

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

50% a. Comments: Can't find the page. Took a long time

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

0% a. Comments: Not even Close

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

SD 9/8 a. Comments: Took a while

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure. Does not understand.

a. Comments: Could not perform this by hisself

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER. Skip Doesn't understand how the DMC works, at all

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

50% a. Comments: Kinda struggled

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

50% a. Comments: Kinda struggled. Doesn't Reall understand

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments: Does not ~~understand~~ understand

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

25% a. Comments: Got some

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

# Exhibit U

| CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR | |
|---|---|
| Chevron Phillips — Unit Review Committee for Job Qualification | |

Date: 11/17/2022
Trainee Name: Warren Jones
Unit: EU1544
Qualification Area: Heater DCS
LMS Course Code: PAR00006

☐ Successful
☒ Not Successful
☐ 1st Attempt
☐ 2nd Attempt
☐ 3rd Attempt

#3

A Successful indication above signifies that the Trainee has demonstrated the knowledge, comprehension, and ability to work the area unassisted and is now qualified in the area for which they trained.

**Extension duration and approval** (if needed):

Approved Extension Duration (shifts) ________ ☐ 1st Extension
Next OJT Review Committee Date ________ ☐ 2nd Extension

Unit Superintendent Approval
(if >20% of base duration) ________________

A **Qualified Solo Work Cycle** will be required for 6 weeks following this qualification.

**By signing below, I certify agreement with the Review Committee's determination.**

If Not Successful is indicated above, the Trainee accepts responsibility for addressing any deficiencies that have been identified and completing the Action Plan associated with those deficiencies prior to the next Unit Review Committee attempt.

| | Print | Sign | Date |
|---|---|---|---|
| Trainee: | Warren Jones | [signature] | 12/13/22 |
| Area Qualified Operator(s) (if applicable): | Clay Ryan | [signature] | 12/13/22 |
| | | | |
| PSC: | Bryan Lohr | [signature] | 12/15/22 |
| Training Coordinator: | Joshua Mentzel | [signature] | 12/13/22 |
| Other Personnel (if applicable): | N/A | N/A | N/A |
| Unit Superintendent (if applicable): | [signature] | JUD WOSTEIN | 15-DEC-2022 |

| Dept: Training Department | Page 1 of 2 | Rev: 0 | Revision Date: 4/26/2021 | |
|---|---|---|---|---|
| The most recent revision of this document should be obtained and used. Current revisions can be printed from the Document Management system on the Web. This copy is valid for 24 hrs. from print date. | | | Print Date: 11/14/2022 | Print Time: 4:09 PM |

CP CHEM 000163

CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR

# Unit Review Committee for Job Qualification

**Summary of Deficiencies and Action Plan**
*(Explain the deficiency and identify actions needed)*

| Deficiencies Identified | Required Actions to resolve deficiencies and complete a successful Unit Review Committee | Action Employee Will Take to Address the deficiencies |
|---|---|---|
| Refer to AIP [initials] | | |
| | | |
| | | |
| | | |
| | | |
| | | |

W. J. #3

EU1544 Unit Review Committee

**EU1544 Heater DCS**

Dearator controls drawings . . . had trouble explaining min flow for GA703, but did alright w/ most below on BFW

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
    a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
    a. Comments:
3. ★ (circled) Locate the Deaerator level control on the DCS console and explain how this works.
    3/5 a. Comments: Was able to explain the level control, but when asked about high level, he just said we'd drop water. Forgot about jumpover
4. ★ Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
    4/5 Did pretty good, flow question mostly ok
    a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
    a. Comments:
6. (circled) Locate and explain on the DCS console how the economizer works.
    a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
    a. Comments:
8. ★ Locate and explain how 44PC 7589 and 44FC 7582 work.
    a. Comments:
9. (circled) What basic steps should be taken upon loss of instrument air?
    a. Comments:
10. ★ (circled) What basic steps should be taken upon loss of boiler feed water pressure?
    5/5 a. Comments: check pumps
    blowdown
    inlet to economizer
    check for UXX/TLE
    Take heaters off

CP CHEM 000222

EU1544 Unit Review Committee

Fuel gas system .. did pretty well

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.

    a. Comments:

12. Locate the natural gas pressure controller on the DCS and explain its function.

    a. Comments:

13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.

    a. Comments:

14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?

    a. Comments:

★ 15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked? Didn't go into depth

3/5

    a. Comments:

16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.

    a. Comments:

★ 17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.

4/5

    a. Comments: · Could have been cut out of VLO
    · Way1 could take it (had to be prompted)

18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.

    a. Comments:

19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.

    a. Comments:

## EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works. 4/5 Did pretty good
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. ☆ Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs. 5/5 Answered well
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

E/P mix tank ... had trouble explaining feed for tower dp

a. Comments: had trouble getting to cold line on FA 18

did pretty good explaining most [illegible]

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

★ 30. Explain the basic steps taken should we lose quench water circulation.

5/5

a. Comments: ◦ Check pumps ◦ Start [illegible] tower down

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

4/5

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

5/5

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

# EU1544 Unit Review Committee

FA115 ... had trouble talking confidently on met b...

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.
    a. Comments:
41. What would happen if we were to get "heavies" in EA 117A and what should be done?
    a. Comments:
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments:
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

# EU1544 Unit Review Committee

had trouble explaining [illegible]

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.

    0/5

    a. Comments: Not good

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    3/5

    a. Comments: struggled on follow up [illegible]

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

    5/5

    a. Comments: pretty straight forward

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

    a. Comments:

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low. Does not know what conversion means

2/5

a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

0/5 a. Comments: Did not get this

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

2/5 a. Comments: Doesn't know what C/R means

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

S/S

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

    a. Comments:

W. V. #3

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. ✓ – Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: Good Explain
4. ✓ – Locate the Superheater Minimum Flow controller on the DCS console and explain how this works. Jump Over GA-703
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. ✓ – Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments: let down min flow
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. ✓ – What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments: Good Thoughts TLE USX > Rupture

CP CHEM 000233

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    a. Comments:

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.

    struggle

    a. Comments:

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

    a. Comments:

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

    a. Comments:

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

✓ – 71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

✓ – 72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

✓ – 73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

    a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

    a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

    a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

    a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

    a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

    a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

    a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

    a. Comments:

V.T. #3

York

EU1544 Unit Review Committee

**EU1544 Heater DCS**

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: ✓
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works. ✓
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments: ✓
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments: ✓

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked? ?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488. ?
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

# EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs. ✓
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

- Is there a TC tied to PC154?
- 103's are lell at more speed

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments: ✓

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

- Ask Brittle Fracture question on FA18
... cut 10K lb of charge on EA; wou...
... back (how is everything affected.

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    a. Comments:

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used. CCS 7 X6
    a. Comments: 1/2
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function. 1/2
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments: ✓
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments:
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low. 1/2 Definition of conversion?

a. Comments:

72. ~~Show on the DCS how to adjust the temperature on the Attemperator.~~ what is the purpose of the Attemperator on a SWEC? "heat up bru"!

a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

a. Comments: 3/4

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on. (1/0)

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure. ✓

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local. 1/0 Explain what critical to take when the COTs continue to fall and you get a high output Fuel Gel 1/2

a. Comments: ✓

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

   a. Comments: ✓

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

   a. Comments:

89. ~~Show on the DCS how to add air when decoking a heater~~.

   a. Comments: During decoking, explain when to add or remove air ✓

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

   a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

   a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

   a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

   a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

   a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

   a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

   a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

    a. Comments:

~~98. Explain what moves to make~~

V.T. #3

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

# EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.
    a. Comments:
41. What would happen if we were to get "heavies" in EA 117A and what should be done?
    a. Comments:
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments:
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:

NO

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments:
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments:
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

√ 71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

a. Comments:

1/2 72. ~~Show on the DCS how to adjust the temperature on the Attemperator.~~ What is the purpose of the Attemperator on a SWEC?

a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on. (10)

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

Explain what critical to the when the COTs continue to fall and you get a high output Fuel Gas

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

CP CHEM 000263

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

   a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

   a. Comments:

89. ~~Show on the DCS how to add air when decoking a heater~~.

   a. Comments: During decoking, explain when to add or remove air

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

   a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

   a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

   a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

   a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

   a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

   a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

   a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

    a. Comments:

~~98. Explain what moves to make~~

W. T. #3

J.V.

EU1544 Unit Review Committee

**EU1544 Heater DCS**

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

    a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

    a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

    a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

    a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

    a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

    a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

    a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

    a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

    a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

    a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

    a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.
    a. Comments:
41. What would happen if we were to get "heavies" in EA 117A and what should be done?
    a. Comments:
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments:
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments:
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments:
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

a. Comments:

72. ~~Show on the DCS how to adjust the temperature on the Attemperator.~~

a. Comments: What is the purpose of the Attemperator on the SWECS?

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. ~~Show on the DCS how to add air when decoking a heater.~~

    a. Comments: During decoking, explain when to add or remove air?

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heate r.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

    a. Comments:

# Exhibit V

CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR

Chevron Phillips

## Unit Review Committee for Job Qualification

| | | | |
|---|---|---|---|
| Date: | 12/15/22 | ☐ Successful | |
| Trainee Name: | Warren Jones | ☒ Not Successful | #4 |
| Unit: | EU1544 | ☐ 1st Attempt | |
| Qualification Area: | Hector DCS | ☐ 2nd Attempt | |
| LMS Course Code: | PAR00006 | ☐ 3rd Attempt | |

A Successful indication above signifies that the Trainee has demonstrated the knowledge, comprehension, and ability to work the area unassisted and is now qualified in the area for which they trained.

**Extension duration and approval** (if needed):

Approved Extension Duration (shifts) ________ ☐ 1st Extension

Next OJT Review Committee Date ________ ☐ 2nd Extension

Unit Superintendent Approval (if >20% of base duration) ________________

A **Qualified Solo Work Cycle** will be required for 6 weeks following this qualification.

**By signing below, I certify agreement with the Review Committee's determination.**

If Not Successful is indicated above, the Trainee accepts responsibility for addressing any deficiencies that have been identified and completing the Action Plan associated with those deficiencies prior to the next Unit Review Committee attempt.

| | Print: | Sign: | Date: |
|---|---|---|---|
| Trainee: | | | |
| Area Qualified Operator(s) (if applicable): | [signature] | [signature] | 12-15-22 |
| | N/A | N/A | N/A |
| PSC: | Bryan Lolis | [signature] | 12/15/22 |
| Training Coordinator: | [signature] | [signature] | 12/15/22 |
| Other Personnel (if applicable): | N/A | N/A | N/A |
| Unit Superintendent (if applicable): | [signature] | JUD WOOTERS | 19-DEC-2022 |

| Dept: Training Department | Page 1 of 2 | Rev: 0 | Revision Date: 4/26/2021 | |
|---|---|---|---|---|
| The most recent revision of this document should be obtained and used. Current revisions can be printed from the Document Management system on the Web. This copy is valid for 24 hrs. from print date. | | | Print Date: 12/13/2022 | Print Time: 6:57 AM |

CP CHEM 000165

CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR

Chevron Phillips

# Unit Review Committee for Job Qualification

**Summary of Deficiencies and Action Plan**
*(Explain the deficiency and identify actions needed)*

| Deficiencies Identified | Required Actions to resolve deficiencies and complete a successful Unit Review Committee | Action Employee Will Take to Address the deficiencies |
|---|---|---|
| Refer to PIP plan | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Dept: Training Department | Page 2 of 2 | Rev: 0 | Revision Date: 4/26/2021 | |
|---|---|---|---|---|
| The most recent revision of this document should be obtained and used. Current revisions can be printed from the Document Management system on the Web. This copy is valid for 24 hrs. from print date. | | | Print Date: 12/13/2022 | Print Time: 6:57 AM |

CP CHEM 000166

EU1544 Unit Review Committee W.V. #4

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: ✓
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work. Review (7)
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

CP CHEM 000277

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation? ✓
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked? review
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point. ✓
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.

    a. Comments:

21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works. Add c.r to speed up

    a. Comments:

22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.

    a. Comments:

23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.

    a. Comments:

24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.

    a. Comments:

25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works reverse without DMC control.

    a. Comments:

26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.

    a. Comments:

27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.

    a. Comments:

28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation. ✓

a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works. ✓

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower. ✓

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works. ✓

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works. ✓

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works. ✓

a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

# EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it. ✓
    a. Comments:
41. What would happen if we were to get "heavies" in EA 117A and what should be done? ✓
    a. Comments:
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates. ✓
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works. ✓
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments:
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

# EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel. ✓

    a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18. ✓

    a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works. ✓

    a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

    a. Comments:

55. Locate the flare dump page graphic on the DCS.

    a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

    a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

    a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

    a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

    a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.

    a. Comments:

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments:

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

    a. Comments:

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

    a. Comments:

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low. ✓

a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

a. Comments: ✓

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit. ✓

a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally. ✓

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure. ✓

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.✓

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function. ✓

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

# EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

EU1544 Unit Review Committee

W.V. #4

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: BH, Comp., Rice Energ. output to raise level Cont. OD comes from furnaces
   LC283 dumps level to FA702
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works. TC147 fuel gas to burners
   A opens to keep flow, B opens @ 60% 50% vents it
   850 to 220 letdown
   Keeps flow from BH
   why do we have?
   Keep it warm
   a. Comments:
   FA116 - drain manually in field
   Do not want it carryover
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments: Vents steam to startup machines close vent as machine comes up
   Vents if a machine trips
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments: Startup spare, check water to caustic
    PSV to economizer, USX rupture, go thru TLE?
    check BFW regulators
    Three trips?
    blow downs?

CP CHEM 000288

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation? valve plugged, open bypass
    can ~~[illegible]~~ foul burners
    a. Comments: explosion?
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked? do not export & bring in Nat. gas
    check bypass on 3654
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow. FI 3675
    PDC 3301
    drops fuel pressure for burners?
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point. injects to each feed
    outside heaters get sniffs 25-50
    HO tells when to add or cut
    a. Comments:

# EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.

    a. Comments:

21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.

    DA-101 Cool effluent
    Condense steam
    High Dp collapse trays
    FA-173 oil + water separates

    a. Comments:

22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.

    FA-131 oil + water separates
    Did not know skip or RPG

    X

    a. Comments:

23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.

    a. Comments:

24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.

    a. Comments: Flare load shedding

25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.

    146 opens to warm mid
    195 will close as a result

    a. Comments:

26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.

    a. Comments:

27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.

    a. Comments:

28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments: check spare pumps reduce charge, take furnaces offline, check eg 207 possible two compressors shutting down

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

a. Comments: PC144 runs 110 psi

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower. blocked in goes to teltrary used to Leetup QW

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

a. Comments: PC1220 manipulates QW

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

a. Comments: PC175

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

# EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.
    a. Comments: Alky 1242 3 streams
41. What would happen if we were to get "heavies" in EA 117A and what should be done?
    a. Comments: take a bleed
42. Locate on the DCS, how we know how much propane we are getting from 1242.
    a. Comments:
43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.
    a. Comments:
44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.
    a. Comments:
45. Locate and explain on the DCS how we control the level in EA 303 without DMC.
    a. Comments:
46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.
    a. Comments:
47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.
    a. Comments:
48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.
    a. Comments:
49. Explain why we should not let FA 116 blow through if we were taking in DPG.
    a. Comments:
50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18. did not mention fuel gas or BFW

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments: TC410 uses 50# steam to control temp

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.

    a. Comments:

61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.

    a. Comments:

62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used. Take each controller go to Auto or Ma

    raise or lower charge on feed controller

    a. Comments: Did not talk about main controller on furnace

63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

    a. Comments: Did not mention why or when we would adjust

64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.

    a. Comments:

65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.

    a. Comments: still doesn't know conversion

66. Show on the DCS how to switch feed types for the SWEC heaters.

    a. Comments:

67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.

    a. Comments:

68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

a. Comments:

✓ 71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

a. Comments:

✓ 72. Show on the DCS how to adjust the temperature on the Attemperator. said its cooling steam coming from drum still doesn't understand how its superheated

a. Comments:

✓ 73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

a. Comments: did not know completely how to manipulate ratio / did know decoke criteria

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

a. Comments:

ask Rick do you float a SWEC?

✓ 77. Explain on the DCS what we could look for to tell if a USX has ruptured internally. ✓

a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER. Does not understand how to add or cut charge on feed controller

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

✓ 88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

✓ X 91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

✓ 96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments: ESD

~~Does not know how to answer~~

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on. ~~Does not Know the moves to save 770 steam~~

a. Comments:

Verify pressure, rod out

lower charge

Does not Know action level

W. T. #4

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works. ✓
   a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is. ✓
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work. ✓
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure? ✓
    a. Comments:

CP CHEM 000299

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works. ✓

a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower. ✓

a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works. ✓

a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works. ✓

a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works. ✓

a. Comments: [signature]

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    a. Comments:

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments:
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments:
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

# EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments: dilution

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

# EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.
    a. Comments:
88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.
    a. Comments:
89. Show on the DCS how to add air when decoking a heater.
    a. Comments:
90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.
    a. Comments:
91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.
    a. Comments:
92. Show on the DCS how to initiate the furnace start up and swap.
    a. Comments:
93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.
    a. Comments:
94. Show on the DCS how to vent the high-pressure steam.
    a. Comments:
95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.
    a. Comments:
96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.
    a. Comments:

# EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

   a. Comments:

W.V. #4

EU1544 Unit Review Committee

**EU1544 Heater DCS**

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

EU1544 Unit Review Committee

20. List the basic items to check if the outside heater assistant called in and told you that a sniff of "zero" was obtained from the EP Mix heaters.
    a. Comments:
21. Locate on the DCS, the pressure controller for the main Quench Water Pumps and explain how it works.
    a. Comments:
22. Locate on the DCS, the controllers for the dirty water side of the quench settler and explain its function.
    a. Comments:
23. Locate on the DCS, the controller for the mid circulation flow to the Quench Tower.
    a. Comments:
24. Locate on the DCS, the PDC controller for the quench water headers and explain its function.
    a. Comments:
25. Locate on the DCS, the bottom temperature controller for DA 101 and explain how it works without DMC control.
    a. Comments:
26. Explain what would happen to the quench water system if DA 407 pressure were to go above 280 lbs.
    a. Comments:
27. Locate on the DCS the differential pressure indicator for the quench tower and explain the potential hazards of a high DP.
    a. Comments:
28. Explain what would happen to the quench water system if DA 402 pressure were to go above 390#.

# EU1544 Unit Review Committee

a. Comments:

29. Show on the DCS how one would determine that EA 113 E/F and EA 114 A/B are fouling.

    a. Comments:

30. Explain the basic steps taken should we lose quench water circulation.

    a. Comments:

31. Locate the E/P Mix Header Pressure Controller on the DCS console and explain how it works.

    a. Comments:

32. Locate the temperature controller for the quench water from EA 118 on the DCS and explain how it effects the quench tower.

    a. Comments:

33. Locate the pressure controller for FA 18 on the DCS and explain how it works.

    a. Comments:

34. Show how to tell what the composition of the EP Mix is coming to the unit.

    a. Comments:

35. Locate the Propane Feed Drum, level controller on the DCS console and explain how it works.

    a. Comments:

36. Locate the low - pressure override for the EP Mix Pipeline on the DCS and explain how it works.

    a. Comments:

37. Explain what would need to be done if the pressure on the EP Mix pipeline were to start falling.

    a. Comments:

38. Show on the DCS, how we bring in propane from the Alkylation unit.

    a. Comments:

39. Show on the DCS, how we would bring in emergency propane from DA 406.

    a. Comments:

EU1544 Unit Review Committee

40. Locate the pressure controller for the propane header on the DCS and explain how we use it.

    a. Comments:

41. What would happen if we were to get "heavies" in EA 117A and what should be done?

    a. Comments:

42. Locate on the DCS, how we know how much propane we are getting from 1242.

    a. Comments:

43. Locate the BI- Directional flow meter on the DCS, for the Ethane/EP Mix Spills and explain what each of them indicates.

    a. Comments:

44. Locate the pressure controller on the DCS, for the ethane surge drum and explain how it works.

    a. Comments:

45. Locate and explain on the DCS how we control the level in EA 303 without DMC.

    a. Comments:

46. Explain what to look for if the pressure on the ethane header were to go above what PC 144 were running.

    a. Comments:

47. Explain what to look for if the temperature indicator TI5506 downstream of EA 503 were to start dropping.

    a. Comments:

48. Explain what should be done on the board if PC144, PI 194 or PI 195 had to be worked.

    a. Comments:

49. Explain why we should not let FA 116 blow through if we were taking in DPG.

    a. Comments:

50. Show how we could tell if the charge to an ethane header could be increased or decreased.

EU1544 Unit Review Committee

a. Comments:

51. Explain what basic steps should be taken if we wanted to route EP Mix to unit fuel.

a. Comments:

52. Explain what basic steps should be taken if we were to lose the EP Mix to FA 18.

a. Comments:

53. Locate the temperature controller for EA 140/141 on the DCS and explain how it works.

a. Comments:

54. Locate the steam controller for the flare on the DCS and show how to increase and cut steam to it.

a. Comments:

55. Locate the flare dump page graphic on the DCS.

a. Comments:

56. Locate the pressure controller for EA 125 outlet on the DCS and explain how we normally use it and how it can be used.

a. Comments:

57. Show on the DCS how 44PI 418A and 44PI 425 affect 44PC 426.

a. Comments:

58. Locate 44PC 209 on the DCS and explain what should be done if it were found to be dumping to fuel.

a. Comments:

59. Locate 44PC 4740 on the DCS and explain how a high pressure here could affect the ethylene product flow.

a. Comments:

EU1544 Unit Review Committee

60. Show on the Refinery Fuel or EA 140/141 graphic how we know that there is excess high-pressure fuel gas available for the unit to use.
    a. Comments:
61. Explain what basic moves should be made if we were to have a low temperature on the inlet of EA 140/141 and we were losing ethylene product flow to the pipeline.
    a. Comments:
62. Locate the charge regulators on the DCS for the SWEC heater and explain how the charge rates can be controlled. This explanation should include how to access the TOTAL FEED CONTROLLER and explain how this and the Ramp button are used.
    a. Comments:
63. Locate the dilution steam regulators on the DCS for the SWEC heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.
    a. Comments:
64. Show on the DCS how to select or de-select a coil temperature for the AVG CONTROL TEMPERATURE SELECTOR and for the PASS BALANCING TEMPERATURES SELECTOR.
    a. Comments:
65. Explain how the COT AVG CONTROLLER works in Auto Local and in Remote.
    a. Comments:
66. Show on the DCS how to switch feed types for the SWEC heaters.
    a. Comments:
67. Show on the DCS how to bypass the heater shutdowns if necessary for the SWEC heaters.
    a. Comments:
68. Show on the DCS how to reset the chopper valve after a heater trips off, or when putting it on.

EU1544 Unit Review Committee

a. Comments:

69. Show on the DCS how to control the draft on a SWEC heater. This explanation should also include running the draft in Auto Local and Remote.

    a. Comments:

70. Show on the DCS how to bypass the feed analyzers if they are faulty or need to be worked on.

    a. Comments:

71. Show on the DCS how to read a conversion and what should be done if the conversion is too high and too low.

    a. Comments:

72. Show on the DCS how to adjust the temperature on the Attemperator.

    a. Comments:

73. Show on the DCS how to check the coil pressure ratios and explain what is the high limit.

    a. Comments:

74. Show on the DCS how to check the concentration of CNOX and CCO in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

75. Show on the DCS how to initiate the furnace start up and swap program.

    a. Comments:

76. Show on the DCS how to get to the decoking air page and show how we control the air to the tubes.

    a. Comments:

77. Explain on the DCS what we could look for to tell if a USX has ruptured internally.

    a. Comments:

78. Show on the DCS how to vent the High-Pressure steam.

EU1544 Unit Review Committee

a. Comments:

79. Explain what moves to make on the board if a USX pressure were at .9 and we wanted to keep the heater on.

a. Comments:

80. Explain the basic moves needed to restart a SWEC heater after tripping off on low hydrocarbon pressure.

a. Comments:

81. Locate the charge regulators on the DCS for the Lummus heaters and explain how the charge rates can be controlled. This explanation should include how to access and operate the TOTAL FEED CONTROLLER.

a. Comments:

82. Locate the dilution steam regulators on the DCS for the Lummus heater and explain how the steam rates can be controlled. This explanation should include how to access the DILUTION STEAM RATIO controller and explain its function.

a. Comments:

83. Show on the DCS how to select or de-select a coil temperature or average for the TEMPERATURE SELECTOR.

a. Comments:

84. Explain how the COT CONTROLLER works in Auto Local.

a. Comments:

85. Show on the DCS how to switch feed types for the Lummus heaters.

a. Comments:

86. Show on the DCS how to bypass the fuel gas analyzers for the Lummus heaters.

a. Comments:

EU1544 Unit Review Committee

87. Show on the DCS how to bypass the feed analyzers for the Lummus heaters.

    a. Comments:

88. Show on the DCS how to control the draft on a Lummus heater. This explanation should also include running the draft in Auto Local and cascade.

    a. Comments:

89. Show on the DCS how to add air when decoking a heater.

    a. Comments:

90. Show on the DCS how to read a conversion and what should be done if the conversion is too high or too low.

    a. Comments:

91. Show on the DCS how to check the concentration of CO and O2 in the heater stack flue gas. In this explanation we should explain how to control these levels.

    a. Comments:

92. Show on the DCS how to initiate the furnace start up and swap.

    a. Comments:

93. Explain on the DCS what we could look for to tell if a TLE has ruptured internally.

    a. Comments:

94. Show on the DCS how to vent the high-pressure steam.

    a. Comments:

95. Show what basic moves should be made upon reduction of BFW pressure to the Lummus Heaters.

    a. Comments:

96. Show what basic moves should be made upon loss of dilution steam to a Lummus heater.

    a. Comments:

EU1544 Unit Review Committee

97. Explain what basic moves to make on the board if a TLE pressure was high and we wanted to keep the heater on.

a. Comments:

# Exhibit W

From: "Johnson, Jeannie M [c]" <JOHNSJM@cpchem.com>
Sent: Monday, September 19, 2022, 11:58 AM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Cc: "Bounds, Kelsey" <boundk@cpchem.com>
Subject: RE: W. Jones - Vision

Good morning Chelse-

I did his annual eye exam on 5/3/22 this year when he had his annual surveillance.

His eye exam results were comparable to the results from 11/2021, and his vision did not worsen.
I have compared the results from 2020 to this year's results, and the results are not any worse.

He did pass his eye exam.

Sincerely,

*Jeannie Johnson, APRN, MSN, FNP-C*
Family Nurse Practitioner|Port Arthur
In Affiliation with CareOnSite

Office: 409-985-0752
Fax: 409-985-0796
Email: Johnsjm@cpchem.com

Chevron Phillips Chemical Company LP | Performance by design. Caring by choice.™

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Monday, September 19, 2022 10:20 AM
**To:** Johnson, Jeannie M [c] <JOHNSJM@cpchem.com>
**Cc:** Bounds, Kelsey <BOUNDK@cpchem.com>
**Subject:** W. Jones - Vision

Good Morning Jeannie,

Warren Jones sent an email to us in regards to his vision. He stated that ever since he has been training on the heater board he has been in and out of the eye clinic. Do you do any annual eye tests on Warren. If so, what types of test results do you have on him?
I have attached the letter from his optometrist.

Thanks,
Chelse Cisneros

Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.℠

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Monday, September 19, 2022, 10:19 AM
To: "Johnson, Jeannie M [c]" <JOHNSJM@cpchem.com>
Cc: "Bounds, Kelsey" <BOUNDK@cpchem.com>
Subject: W. Jones - Vision
Attachments: Scan_001.tif

Good Morning Jeannie,

Warren Jones sent an email to us in regards to his vision. He stated that ever since he has been training on the heater board he has been in and out of the eye clinic. Do you do any annual eye tests on Warren. If so, what types of test results do you have on him?
I have attached the letter from his optometrist.

Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips CHEMICAL | Performance by design. Caring by choice.℠

Hart Eye Center

See better for the rest of your life.

William B. Hart, MD

To whom it may concern:

My name is William B. Hart, MD. I am an Ophthalmologist with 40 years of practice history. I am writing on behalf of my patient Mr. Warren Jones.

Mr. Jones has been under my care for 20 years. Mr. Jones has suffered from extremely high myopia (his initial refraction at my office was negative 20 Diopters, that is over ten times the average myope in terms of correction needed. Mr. Jones was referred to me by Dr. Rick McGuirt of 20/20 Vision clinic for the treatment of his high myopia.

After initial attempts to fit glasses and contacts, Mr. Jones and I decided to perform photorefractve keratectomy. This form of treatment was chosen because of the high degree of tissue removal necessary to correct Mr. Jones's myopia. Postoperatively, it took Mr. Jones 24 months to fully recover a normal corneal surface.

Recently, Mr. Jones came for a normal annual eye exam, and at that exam he told me his vision (when on night shift) was beginning to bother him. I performed a complete eye exam, and found two issues. Mr. Jones is beginning to have vision changes due to the elongation of his eyes (a normal eye is approximately 23 millimeters long. Mr. Jones eyes are 30 mm long. The problem this great elongation presents is stretching of the retina inside the eye. This thinning of the retina leads to a decrease in retinal, and especially macular function. It is my belief that with the drying of the eyes, and the decrease in macular function is causing Mr. Jones to have difficulty with seeing small numbers and letters, as well as to be overwhelmed by the brightness of the lights on his operator's board.

# Exhibit X

From: "Stanton, James M [c]" <STANTJM@cpchem.com>
Sent: Wednesday, October 12, 2022, 8:46 AM
To: "Johnson, Jeannie M [c]" <JOHNSJM@cpchem.com>
Subject: RE: Employee's vision changes & issues on night shift

Jeannie-

That's a very informative letter from the ophthalmologist, Dr. Hart. Many docs are not that helpful.

As Dr. Hart has said, there are basically two issues: (1) Retinal thinning/macular changes and (2) Dry eyes. Regarding the first, there is likely little or nothing to be done at this stage. If there were, I'm sure Dr. Hart would have provided or recommended it. As to the second, the dry eyes, use of some lubricating drops such as the OTC product "Refresh" might be helpful. I'd recommend he try something like that.

Dr.Hart also mentions that Mr. Jones may be bothered by the intensity or brightness of some of the board lights. It's possible that wearing some very lightly tinted dark glasses might help to reduce the contrast. Obviously, the tinting would have to be minimal so as not to interfere with seeing the dimmer board lights. I suspect that there are other employees within CPChem who have experienced similar vision difficulties, so it might be worthwhile asking others how they have handled the problem.

In answer to Bryan's question, in my experience we have never "required" an employee to undergo any corrective surgery in order to remain in a job. And of course, we really can't force anyone to undergo some particular treatment, surgical or otherwise. Clearly, if a given vision impairment is incompatible with safe and effective job performance, and a corrective procedure is available but the employee declines to undergo it, that would mean the employee could not continue in that position.

I would note the Mr. Jones has acceptable visual acuity, so that would not appear to be an issue.

We can discuss further on the call at 10 AM.

**James M. Stanton, M.D.** | Medical Director |

**Chevron Phillips Chemical Co, LP | (832) 813.4989 Office | (713) 724.7766 Mobile |**
**stantjm@cpchem.com**
Disclaimer: www.cpchem.com/forms/disclaimer1.asp

**From:** Johnson, Jeannie M [c] <JOHNSJM@cpchem.com>
**Sent:** Tuesday, October 11, 2022 12:13 PM

**To:** Stanton, James M [c] <STANTJM@cpchem.com>
**Subject:** Employee's vision changes & issues on night shift

Dr. Stanton-

I have another case to discuss with you. Warren Jones is an operator here in Port Arthur, and he sent HR a letter from his Ophthalmologist about his vision changes that he has noticed while working the night shift.

I had reviewed his previous eye exams that we do annually, and his vision has actually improved in the past couple of years. He wears transitions and bifocals. Mr. Jones did have Lasik eye surgery 8-10 years ago.

This morning, our Operations Manager Bryan Kubsch came to talk to me about this case, and about any accommodations that we could make for this employee. He also asked me if we would ever “require” an employee to have eye surgery to fix an eye issue (if it was correctable) so they could do their job effectively. I didn't know the answer to that question so I wanted to ask you. Bryan wanted suggestions on things we could do here to assist this employee while on the job. I told him I would talk to you and get your opinion on this.

I have attached the Ophthalmologist's letter, as well as the annual eye exams from the past 5 years.

Please advise.

Sincerely,

*Jeannie Johnson, APRN, MSN, FNP-C*
Family Nurse Practitioner|Port Arthur
In Affiliation with CareOnSite

Office: 409-985-0752
Fax: 409-985-0796
Email: Johnsjm@cpchem.com

Chevron Phillips Chemical Company LP | Performance by design. Caring by choice.™

# Exhibit Y

From: "Johnson, Jeannie M [c]" <JOHNSJM@cpchem.com>
Sent: Monday, December 12, 2022, 12:09 PM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Subject: Visual Acuity for Employee

Chelse-

Here is the visual acuity for Warren Jones that you requested (performed today 12.12.22):

Rt eye: 20/50
Lt eye: 20/50
Both eyes: 20/40

**This was performed with prescription glasses on.**

Sincerely,

*Jeannie Johnson, APRN, MSN, FNP-C*
Family Nurse Practitioner|Port Arthur
In Affiliation with CareOnSite

Office: 409-985-0752
Fax: 409-985-0796
Email: Johnsjm@cpchem.com

Chevron Phillips Chemical Company LP | Performance by design. Caring by choice.™

Chevron Phillips Chemical Company LP

cority

# Clinic Visit Progress Notes

Page 1 / 1
Date 04/05/2023
Report ClinicVisitProgressNotes.rpt
Created By Shoemaker, Debra / SHOEMDS

**Employee Name** **Jones, Warren** **Gender** **M** **Date of Birth** **10/27/1973**
**Employee Number** **01009756** **Date of Hire** **12/07/2015**

| Note Date | Note Time | Case Number | Chief Complaint | Practitioner | Notes |
|---|---|---|---|---|---|
| 12/12/2022 | 1211 | | VISUAL ACUITY - REQUESTED BY HR/DR. STANTON WITH EMAIL ATTACHED | Jeannie Johnson, FNP-C | Visual acuity (performed today 12.12.22) as requested by HR Chelse Cisneros/Dr. Stanton :<br><br>Rt eye: 20/50<br>Lt eye: 20/50<br>Both eyes: 20/40<br><br>This was performed with prescription glasses on.<br><br>HR Chelse Cisneros notified of results as requested by Dr. Stanton.<br>SEE EMAIL ATTACHMENT. |

Confidentiality Statement. This medical record is confidential sensitive personal information that should only be obtained and handled for legitimate business and compliance purposes. The unauthorized use or disclosure of medical records or information may subject the Company and employee to liability under federal and/or state law.

# Exhibit Z

EQUIFAX®

Employer Portal

## CaseBuilder

Claimant: WARREN JONES

Reference Number: 97511653

### Claim History Details

#### Case Summary

| | |
|---|---|
| **Reference Number:** | 97511653 |
| **Claimant:** | WARREN JONES |
| **Location:** | PA01PORTARTHUR - PORT ARTHUR,TX |
| **Due Date:** | 01/25/2023 12:00 PM CT |
| **SSN:** | 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 |
| **State Filed:** | TX |
| **Liability:** | $ 13546.00 Calculated |
| **Date of Claim:** | 1/8/2023 |
| **Submitted Date:** | 1/16/2023 |
| **Submitted By:** | Chelse Cisneros |
| **Claimant Statement:** | Discharge |
| **Request Type:** | SIDES Initial Claim |
| **Entity Name:** | CHEVRON PHILLIPS CHEMICAL COMPANY LP |
| **Account Number:** | 08-172769-4 |

#### Separation Reason

| | |
|---|---|
| Select a category that best fits the claimant's reason for separation or employment status: | Involuntary |
| Based on -**Involuntary**- What best fits the claimant's reason for separation or employment status: | Job Performance |
| Based on -**Job Performance**- What best fits the claimant's reason for separation or employment status: | Involuntary-Unsatisfactory work performance. |

#### Additional Questions

| | | |
|---|---|---|
| 1 | You have selected a non-disqualifying separation reason. If you believe the claimant's separation involved misconduct that should disqualify them from benefits, please select a different reason. For available reasons, click the 'Separation Reasons' link. | |
| 2 | First Day Worked? | **12/7/2015** |
| 3 | Please provide the last date the claimant reported to work for your company. | **12/15/2022** |
| 4 | What was the claimant's separation date? | **12/31/2022** |
| 5 | Job Title? | **POOL OPERATOR** |
| 6 | Why was the claimant discharged? | **Claimant was discharged due to his failure to qualify on the heater board after four attempts.** |
| 7 | Had there been any recent changes such as job duties, managers/supervisors, or since hire? | **no** |
| 8 | What was the date of the final incident? | **12/15/2022** |
| 9 | Provide details of what happened during the final incident, where the incident occurred, if there were any witnesses and if they provided an explanation/admission. | **On December 15, 2022, Jones failed for a fourth time over an eight-month period to qualify on the heater board. Jones started training to qualify for the heater board role on March 18, 2022. He was** |

| | | |
|---|---|---|
| | | **unsuccessful when he tested for the first time on August 24. Jones completed another month's training and then was unsuccessful when he retested on September 22. Per HR Training Guideline 2, Section 4.5.3, Jones was then formally placed on a Performance Improvement Plan (PIP) on October 13, 2022, to address the deficiencies identified during his test with the Unit Review Committee. Per Stipulation 35, Operator Training, in the United Steelworkers Plant Group Collective Bargaining Agreement, an employee who fails to meet the training program requirements may be dropped from the payroll.** |
| **10** | Was he/she aware of your policy? | **Yes** |
| **11** | How was he/she made aware of your policy? Written, Verbal or Both? | **Written and Verbal** |
| **12** | Did the claimant violate company policy? | **Yes** |
| **13** | If you feel he/she was able to perform the work, but was negligent, careless, or disobedient, please give examples. | **N/A** |
| **14** | How long had he/she performed in his/her current position, and how was he/she advised of his/her duties? Once initially trained, had any additional/extended training occurred? | **Started training on 3/18/22 and tested on 8/24 and did not pass. Completed another month of training and was unsuccessful on his 2nd attempt on 9/22. Was given additional classroom and one-on-one training and failed his 3rd attempt on 11/17. Tested and failed on his final and 4th attempt on 12/15.** |
| **15** | If the claimant had prior warnings, please provide copies and use the available link to input that information. | **No answer provided.** |
| **16** | Was the claimant able to meet the employer's performance expectations in the past? | **Yes** |
| **17** | Did anything change about the job? | **No** |
| **18** | Who discharged the claimant? | **Judson Wooters** |
| **19** | Title of person who discharged him/her? | **Olefins Superintendent** |
| **20** | If you have no additional comments, please leave this field blank. Additional comments. | **No answer provided.** |
| **21** | If he/she is receiving pension/retirement, did he/she contribute to the pension? | **No** |
| **22** | If the claimant received any special pay types (Bonus, Holiday, Vacation, etc), please use the available link to input that information. | **No answer provided.** |
| **23** | If he/she contributed to pension/retirement, what was the percentage of his/her contributions? | **N/A** |

**Prior Incidents:**

| Date | Reason | Warned |
|---|---|---|
| 09/22/2022 | Not being able to qualify on the heater board after two attempts. | Yes |

## Documentation

**Master Document:** View Master Document

**Files in Master Document:**

| Document Type | File Name |
|---|---|
| Company Policy | HR Training Guideline 2, Section 4.5.2-4.5.4.JPG , Stipulation 35.JPG |
| Miscellaneous | Unit Review Results W. Jones.pdf |
| Policy Acknowledgement | Training Expectations & Responsibilities Signed.pdf |
| Warning | PIP-W.Jones.pdf , Additions to PIP.pdf |

☐ I will fax documentation.
☐ I will Email documentation.
☐ There are documents on this case, but they are not available at this time.
☐ No documents are available.

## Case Activity

Below is a history of activities associated with this case.

| Date | Activity Description |
| --- | --- |
| 01/16/23 12:06 PM CT | Chelse Cisneros has submitted information to be reviewed. |
| 01/16/23 12:05 PM CT | Chelse Cisneros has uploaded the following document(s): (Unit Review Results W. Jones.pdf) |
| 01/16/23 12:05 PM CT | Chelse Cisneros has deleted the following document(s): Termination Recommendation - W Jones.docx. |
| 01/16/23 12:05 PM CT | Chelse Cisneros has removed Termination Recommendation - W Jones.docx from Termination Document. |
| 01/12/23 03:09 PM CT | Chelse Cisneros has saved information to be reviewed. |
| 01/12/23 03:09 PM CT | Chelse Cisneros has uploaded the following document(s): (Termination Recommendation - W Jones.docx, PIP-W.Jones.pdf, Additions to PIP.pdf, HR Training Guideline 2, Section 4.5.2-4.5.4.JPG, Stipulation 35.JPG, Training Expectations & Responsibilities Signe |
| 01/12/23 03:07 PM CT | Chelse Cisneros has provided Prior Incident information. |
| 01/11/23 11:06 AM CT | Karen Fain has marked CaseBuilder Call work as In Progress. |

# Exhibit AA

From: "Johnson, Jeannie M [c]" <JOHNSJM@cpchem.com>
Sent: Thursday, September 22, 2022, 1:51 PM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Subject: RE: Warren Jones - Functional Job Description
Attachments: Functional Job Desc Process Operator.pdf

Chelse,

Warren is an operator, so I have attached the Functional Job Description for Process Operator.

Sincerely,

*Jeannie Johnson, APRN, MSN, FNP-C*
Family Nurse Practitioner|Port Arthur
In Affiliation with CareOnSite

Office: 409-985-0752
Fax: 409-985-0796
Email: Johnsjm@cpchem.com

Chevron Phillips Chemical Company LP | Performance by design. Caring by choice.™

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Thursday, September 22, 2022 1:36 PM
**To:** Johnson, Jeannie M [c] <JOHNSJM@cpchem.com>
**Subject:** Warren Jones - Functional Job Description

Hi Jeannie,

Could you please email me a copy of the Functional Job Description for Warren Jones?

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.™

# CHEVRON PHILLIPS CHEMICAL CORPORATION
## Port Arthur Plant

**JOB TITLE: Process Operator**
**DEPARTMENT: Aromatics, Olefins** Revised: March 2017

## FUNCTIONAL JOB DESCRIPTION

**JOB OBJECTIVE:**
Oversees manufacturing process for the production of chemical products.

**ESSENTIAL JOB FUNCTIONS:**
1. Monitor, read & record process conditions (in / out doors).
2. Promptly responds to process alarms / constraints.
3. Operates 1 ½ " to 26" block, chain, and hammer valves of varied orientation. Valve heights range from 6" to above shoulder.
4. Break flanges with pipe wrenches and/or impact wrenches.
5. Unload, mix/add chemicals as indicated.
6. Collect and deliver laboratory samples.
7. Change oil drums.
8. Uses hand tools to perform minor mechanical repairs.
9. Prepares equipment for maintenance.
10. Gauge storage tanks.
11. Drives forklift and plant vehicles and rides bicycle as indicated.
12. Ability to wear personal protective equipment and to don/doff SCBA.
13. Responds to inception stage of fire, able to operate charged 1.5 –inch fire hose.
14. Changes filters.

**EQUIPMENT/CLOTHING USED TO PERFORM JOB:**

**Personal Protective Equipment (PPE):**
- Fire retardant clothing (Nomex)
- Hardhat
- Safety glasses/goggles/face shield
- Hearing protection
- Gloves
- Leather boots/shoes
- SCBA
- Chemical suit, jacket, pants and hood

**Hand tools:**
- Pliers
- Crescent/pipe wrenches
- Valve wrenches
- Impact wrenches
- Screw drivers

**Assistive Equipment:**
- Fork lift
- Drum dolly/4-wheeled dolly
- Bicycle
- Elevator
- Pick-up truck

**Process Equipment:**
- Computers / copier / fax
- Telephone/2-way radio
- Adjustable office chairs /stools
- Control instrument panels / electronic and pneumatic instrumentation
- 5-gallon bucket
- Reeled water/fire hoses
- Pyrometer
- 5-12 step rolling ladders
- Oil pum

**ENVIRONMENTAL FACTORS:**

- Work environment - 50 % inside, 50 % outside- will vary based on job assignment
- Exposure to heat / cold
- Exposure to noise levels
- Exposure to chemicals
- Cement, metal grating, uneven gravel walking surfaces

**WORK SCHEDULE:**

- 42 hours a week, 12 hour rotating shifts
- Breaks available between process activities
- 30 minute lunch

**CRITICAL DEMANDS OF THE JOB:**

The following information describes the physical activities that are performed during the normal workday by the associate performing this job classification. The percentage of the normal workday that the physical activity is conducted will be defined as follows:

| Frequency Classification | Activity Time: in 12 hour work day | Percent of Workday |
|---|---|---|
| Never (N) | | 0 % |
| Rare (R) | Up to 36 minutes | 1-5 % |
| Occasional (O) | Up to 4 hours | 6-33 % |
| Frequent (F) | Up to 8 hours | 34-66 % |
| Continuous (C) | Up to 12 hours | 67-100 % |

**Critical Demands:**

| Activity | Freq. | Wt. | Description |
|---|---|---|---|
| Lifting from the floor | 0 | 1 5-35# | Rubber chemical hoses ea. |
| | R | 12-25# | Filter boxes |
| | R | 40# | Hydraulic oil bucket |
| | 0 | 24# | Nitrogen hose |
| | R | 50# | Box of copier paper |
| Lifting- waist to shoulder | 0 | 15-35# | Rubber chemical hoses ea. |
| | 0 | 24# | Nitrogen hose |
| | R | 38# | Impact wrench (30 min duration) |
| | R | 30# | SCBA Scott air pack |
| | R | 23# | Sample basket |
| | R-O | 30# | Tool bucket |
| Lifting – above shoulder | R | 1 0# | Hand tools, valve wrenches |
| | R | 30# | SCBA Scott air pack |
| | R-O | 2-6# | Filters |
| Pushing * | R | 60# | 366# oil drum on drum dolly - to break over |
| | R | 25# | 366# oil drum on drum doll, pushed up to 75 ft |
| | R-O | 32# | Filled trash dumpster up to 406 ft |
| | R-O | 10-12# | 5-12 step rolling stairs |
| | R | 52# | Dumpster lid – filter disposal |
| Pulling * | 0 | 10# | Empty chemical hose |
| | R | 30# | Fire hose - 1.5" charged |
| | R-O | 123# | Open/close valves by hand |
| | R-O | 76# | Open/close valves with valve wrench |
| | R-O | 88-238# | Open/close chain valves |
| | R-O | 40# | 4-wheeled cart with soiled filters up to 75 ft |
| | R-O | 10-12# | 5-12 step rolling stairs |

# Exhibit AB

(B) Plant seniority, as defined in Subsection (A) of this section, and fitness and ability to perform the job shall be the determining factors in all promotions and demotions as covered in this article.

(C) The term "department," as used in this article, means "Chevron Phillips Chemical Company, Port Arthur Plant".

(D) Promotional charts shall be established for all lines of promotion. Promotions, demotions, bidding, and other applications of seniority shall be made according to these charts and as outlined in this article, except as otherwise provided in Section 2(A)1, Section 3(A)1, and Section 4.

(E) A new employee shall start his employment on any job that is designated in the promotional charts as a starting job and may advance into a line of promotion as outlined in the promotional charts in accordance with his plant seniority and as vacancies occur. The starting jobs are Tester Trainee, Maintenance Helper, and Operations Trainee.

(F) The term "classification," as used in this article, means "job classification." A classification may consist of one or more jobs in the same wage bracket in the same line of promotion.

(G) In the event all eligible employees decline temporary promotion, the senior, qualified employee may be required to take the job. A vacancy may be filled without doubling or calling out an employee even though it may require upgrading an employee on his shift.

(H) After the date of this Agreement, any employee who is transferred from a department not included within the coverage of this Agreement into any department included within its coverage, shall, for the duration of his employment therein, be subject to the provisions of this Agreement; and, likewise, any employee transferred from a department within the coverage of this Agreement to a department over which this Agreement has no coverage, shall be subject to the existing rules or agreement that may be in effect in the department to which he is transferred.

**Section 2 - Filling Permanent Vacancies**

(A)

1. Except as provided in Section 6, subsection (B) and Section 7, subsection (B) of this article, and except in the case of vacancies in starting jobs, all permanent vacancies in permanent jobs in the bottom classification, all permanent vacancies in permanent classifications above the bottom classification in any line of promotion which cannot be filled by promoting employees in the line of promotion shall be posted for bid within five (5) calendar days after the opening occurs, for a period of seven (7) calendar days on the plant bulletin boards. All eligible employees shall be allowed to bid on the posted job.

   An employee who desires to bid shall be required to submit a written application to the Company before the expiration of the seven-(7)-day period. An employee who is eligible to bid on a job, but is absent during the seven (7)-day period the job is posted, shall, (1) if he has been absent on military leave, be allowed to file application in writing within five (5) calendar days after he applies for reinstatement or, (2) if he has been on excused absence for other reasons, he shall be allowed to file his application in writing within five (5) calendar days after he returns to work, which application shall be restricted to jobs posted within ninety (90) calendar days prior to his return.

If such employee bids on and accepts a job after it has been filled by a bidder, the employee who first bid-in the job or any employee affected thereby shall return to his former job; except that, when an employee who has been on military leave bids on and accepts a job that was posted for bid more than ninety (90) calendar days prior to his return, the employees affected thereby will be reduced in accordance with the provisions of Section 3 of this article. The Company shall offer the job to the senior bidder within five (5) days, exclusive of Saturdays, Sundays, and holidays, after the close of bidding, on the basis of plant seniority, fitness and ability to perform the job being sufficient, with the exception that where the senior, qualified bidder is absent any time during the five (5)-day period, the job will be offered to such employee within five (5) days, exclusive of Saturdays, Sundays, and holidays, after he returns to work.

The following shall govern in bidding, accepting, or rejecting jobs posted for bids:

An employee may bid simultaneously on more than one job; however, upon the close of bids and within twenty-four (24) hours after being offered a job in a classification posted for bid, the employee must signify his acceptance or rejection of the job. If a bidder rejects the job, he will be permitted to remain in his present classification and the job will be offered to the next senior qualified bidder. If a bidder accepts a job, all other bids that he may have will be automatically canceled, with the exception that in the case of an employee who bids on and accepts a job on a new unit who subsequently becomes the senior bidder on a higher job on a new unit will be considered for the higher job. The bidder will be assigned to the job within ten (10) calendar days from date of acceptance, provided he is available for work, with the exception that a bidder who accepts a job on a new unit will be assigned to the unit as determined by the Company, taking into consideration the starting up time of the new unit, training time, if any, needed on new units, etc.

If an employee, after accepting a job is disqualified during his trial period, or if he disqualifies himself at any time, he will be returned as follows:

| **Bid From** | **Returned To** |
|---|---|
| Operating Job | Pool Operator |
| All Other | Maintenance Helper |

Such an employee may then bid on any job that is posted after the date he returns. If an employee disqualifies himself or is disqualified during his trial period, the vacancy thus created will be filled by the next senior, qualified bidder on the original posting, provided one is available; if no bidder is available, the job will be posted for bid. If an employee disqualifies himself after completing his trial period, the job will be posted for bid. In the event of claim that an employee's disqualification by the Company was arbitrary or unjust, such claim may be processed through the procedure provided in Articles XVIII and XIX.

2. In the event there are no qualified bidders on any vacancy posted for bid, the Company may fill the vacancy as they desire; however, an employee in a higher classification will not be assigned to the vacancy unless he so desires.

(B) Promotions from one classification to another in a line of promotion shall be made as vacancies occur, from the lower classification to the next higher classification on the basis of plant seniority, provided that the employee to be promoted has six (6) months' permanent experience in the next lower classification immediately preceding the date of the vacancy. In the case of a line of promotion embracing two (2) or more types of units or operations, such as EU 1544, 1741 and 1746 Cyclohexane Complex if the employee entitled to the

promotion has six (6) months' permanent experience immediately preceding the date of the vacancy in the next lower classification on a unit other than the unit on which the vacancy occurs, such an employee may be required to transfer to said next lower classification on the unit on which the vacancy occurs and work six (6) months therein in the aforesaid lower classification in order to gain experience and qualify for the vacancy. During this qualifying period, his permanent classification will be considered as being the classification for which he is qualifying. In the interim, the job in the higher classification shall be filled temporarily by the next senior, qualified employee, who shall be displaced by the senior employee immediately upon his qualifying for the higher job. The employee so displaced shall return to his former job. In any case, if the senior employee in the next lower classification has not had six (6) months' permanent experience in said lower classification immediately preceding the date of the vacancy, the vacancy will be filled permanently by the next senior employee who has the required experience. In the event no employee in line for promotion to the next higher job has six (6) months' permanent experience as outlined herein in the next lower classification, the senior, qualified employee will be assigned to the job on a permanent basis; however, he may be required to work in the appropriate lower classification or classifications until he has gained the required six (6) months' experience. In the interim, the Company may fill the job temporarily as it sees fit. Employees will not be paid the Head Operator rate of pay until they qualify for the job.

(C)

1. In the case of an operating job, the employee in line for promotion shall be given a trial period of one hundred and eighty (180) calendar days to qualify for the job.

2. In the case of a mechanical job, the employee in line for promotion shall be given a trial period of one hundred and eighty (180) calendar days to qualify for the job, provided he has indicated by his work in his present classification that he is capable of performing the duties of the higher classification, with the exception that in the case of a mechanical job involving operation of equipment, the employee in line for the promotion shall be assigned to the job only after he satisfactorily demonstrates that he is capable of handling such equipment.

3. If prior to or during any trial period it is reasonably evident that an employee cannot qualify for the job, he will be disqualified and demoted according to his plant seniority, except in the case of an employee qualifying for a job posted for bid, he will be returned as provided in Section 2(A) of this article. If his seniority permits, he will be entitled to a second trial after one (1) year, provided there is a vacancy and said second trial shall be his last. After an employee disqualifies himself or is disqualified a second time on similar jobs, he will be considered as having been given his second trial. If an employee qualifies for the job, subsequent demonstrations of incompetence, neglect, or failure to live up to the requirements of the job shall be cause for discharge or suspension within the limitations of Article XVI. Application of Article VI, Section 3, and Article IX shall not limit the right of the Company to suspend or discharge any employee for cause as provided in Article XVI, Section 1. The determination of an employee's fitness and ability to perform any job is the responsibility of the Company. Consistent with the foregoing, in event of claim that an employee's disqualification was arbitrary or unjust, such claim may be processed through the procedure provided in Articles XVIII and XIX.

(D) If the Company rejects any employee for a permanent vacancy on the ground that he is not qualified, and tentatively appoints the employee next in line for such vacancy, the Company shall immediately notify the Union and the employee, in writing, of such appointment. If the rejected employee or the Workmen's Committee fails to file a grievance within ten (10)

calendar days from the date of notice, the rejection shall be considered as having been accepted.

(E) An employee who bids into and qualifies for a job shall remain therein for a period of six (6) months, if the Company so desires, before he may again exercise his rights to bid. If within such six (6) months he is promoted to a still higher classification in the same line of promotion, his bidding rights shall be restored.

It is not the Company's intent to unnecessarily deny operating employees the right to disqualify or bid on jobs which are posted. However, there may be occasions when the circumstances on units are such that disqualifications or bids cannot be approved. In those cases where a bid is denied, the senior employee having been denied the bid will be entitled to the next vacancy in the classification to which the employee bid provided he can be spared from the unit at that time. If he cannot be allowed to leave the unit for the second vacancy, he will remain on the list for subsequent vacancies. The Company's decision with regard to whether an employee may or may not disqualify or bid in accordance with the provisions of this paragraph shall not be subject to Article XVIII and XIX.

Notwithstanding the above, one employee on operating units with four (4) or less employees per shift will be allowed to bid or disqualify off of the unit every two (2) years and one (1) employee per year will be allowed to bid or disqualify off of units where there are five (5) or more employees per shift. If two or more employees on a unit are the senior bidders on a job or jobs, which are posted for bid at the same time, the senior person will be awarded the bid when the bids are awarded under the conditions outlined in this paragraph.

(F) Except as may be approved by the Company, employees hired into the Laboratory Division after January 8, 1982, with the exception of Maintenance Helpers must remain in the Laboratory for a period of four (4) years before being eligible to bid to other departments.

(G) Effective February 1, 2019, an employee may only self-disqualify two (2) times during his employment.

(H) Within a six (6)-month period, a maximum of one (1) operator may move from a "pool" classification to a permanent vacancy in a unit different from the unit to which the operator is currently assigned (e.g., if a pool operator assigned to the ethylene unit accepts a permanent vacancy in the aromatics unit, another ethylene operator may not move to the aromatics unit for a period of at least six (6) months, nor may an aromatics operator move to the ethylene unit within that same six (6)-month period).

**Section 3 - Reduction in Force and Demotions**

(A) When the number of employees in a line of promotion is reduced, the employee with the least plant seniority in such line shall be the first to be eliminated therefrom and upon being eliminated he shall be entitled to exercise his plant seniority against incumbent employees in the following manner:

1. If he has had experience in any line of promotion, he shall be entitled to exercise his plant seniority therein on any job on which he has had six (6) months' permanent experience; or,

2. An employee reduced from an operating department line of promotion shall be entitled to exercise his plant seniority on the bottom classification in any other line of promotion within the same department, and after six (6) months' work in each classification, he shall be entitled to advance to the next higher classification if his



CONFIDENTIAL 

An employee entering the training program shall receive the Mechanic Trainee's starting rate upon entering the program. Upon satisfactorily completing one-half the program, the employee shall receive the Mechanic Trainee's intermediate rate for the remaining period of his training.

It is realized that the purpose of the Mechanic Training Program is to train first-class mechanics; therefore, it may be necessary to make changes in the program (on-the-job training and related study) from time to time in order to accomplish this purpose.

It is understood that there shall be no contention by either party that senior employees who have not entered the Mechanic Training Program should be promoted to the Mechanic's classification in place of employees with less seniority who have completed the Mechanic Training Program.

Employees in the Mechanic Training Program are considered to have seniority only among such employees and reductions and layoffs will be on that basis.

It is further understood that employees in the Mechanic Training Program shall in no way be affected by the application of Article VI, Section 3.

If an employee is absent during the time a Mechanic Trainee job is posted, he shall, in accordance with the limitations as outlined in Article VI, Section 2(A), be allowed to bid on such job upon his return to work. If such an employee would have been placed in training rather than the employee presently in training, he will be considered for the next vacancy in the Mechanic Training Program in the particular craft in which the vacancy occurred.

An employee in training shall perform any duties in line with his training he may be assigned under whatever instructions, if any, the Company deems necessary.

In the event an employee is disqualified from the training program after he has entered the program, such disqualification shall be subject to the procedure outlined in Articles XVIII and XIX.

**STIPULATION NO. 5**
**BASE WAGE RATES**

The base wage rates effective February 1, 2019, as set out in Exhibit "A," attached, shall remain firm and in effect until February 1, 2020. The base wage rates effective February 1, 2020, as set out in Exhibit "A" shall remain firm and in effect until February 1, 2021. The base wage rates effective February 1, 2021, as set out in Exhibit "A" shall remain firm and in effect and shall continue in effect thereafter until terminated by either party upon sixty (60) days' prior written notice to the other. All wage rates set out in Exhibit "A" include everything in connection with the job that is walking time, preparatory time, and everything else, nothing remains outside.

**STIPULATION NO. 6**
**PERMANENT "X" CLASSIFICATION**

Certain permanent relief classifications, designated as "Pool" classifications, which have been established are considered below the bottom classification within the department and are not connected to the line of promotion. Permanent vacancies in the line of promotion in the department which have "Pool" classification will be offered to the senior, qualified employee in the "Pool" classification. To be eligible for promotion, an employee in the "Pool" classification must have completed one hundred and eighty (180) calendar days' continuous, permanent experience in the "Pool" classification immediately preceding the vacancy.

In the event no employee in the "Pool" classification has the required experience, the vacancy will be offered to the senior, qualified employee in the "Pool" classification. An employee in the "Pool" classification may be assigned without regard to seniority to any temporary vacancy within a department, and the privilege under Article VI, Section 1(G) of declining temporary promotions shall not apply. When an employee is reduced from a line of promotion he will be reduced to a permanent "Pool" classification and he may then exercise his seniority as provided in Article VI, Section 3(A), Paragraphs 1 and 2. In order for an employee to exercise his seniority as provided in Article VI, Section 3(A), Paragraphs 3 and 4, he must first have been reduced out of the permanent "Pool" classification. An employee exercising his seniority as provided in Article VI, Section 3(A)3 into a department having a permanent "Pool classification may do so only in the "Pool" classification, and after he has had one hundred and twenty (120) calendar days' continuous, permanent service in that classification, he may exercise his seniority in the bottom classification in any line of promotion within such department, and then advance at six (6) month intervals, as provided in Article VI, Section 3(A)3.

**STIPULATION NO. 7**
**PERMANENT EXPERIENCE REQUIRED IN MAINTENANCE HELPER CLASSIFICATION FOR PROMOTION OR BIDDING**

With reference to Article VI, Section 2(B), employees assigned to the Maintenance Helper classification are required to have only one hundred and twenty (120) calendar days' continuous permanent service in that classification in order to exercise their seniority for filling vacancies in the line of promotion. In addition, employees in the Maintenance Helper classification are required to have only one hundred and twenty (120) calendar days' continuous permanent service in that classification to be eligible to bid on Mechanic Trainee job.

**STIPULATION NO. 8**
**REDUCTION IN FORCE AND PROMOTION IN MECHANIC CLASSIFICATIONS**

It is agreed that where employees in the Metal Trades Mechanic, Instrument Mechanic, Analyzer Mechanic, and Welder classifications or higher classifications in the Maintenance Division are reduced below the level of the listed classifications, they will be placed in a pool to be established for their craft composed of former employees in the same classification who have been reduced. Trainees, upon completion of their training, will be placed in the pool established for their craft. It is further agreed that as long as there are employees in the pool the provisions of Article VI, Section 2, will not apply to filling permanent vacancies in the above classifications but that permanent vacancies will be filled from the pool according to plant seniority. An employee in the pool will so remain until he declines a permanent promotion to his former classification or reaches a classification level in another line of promotion comparable (as nearly as possible to the same rate of pay) to his former classification.

**STIPULATION NO. 9**
**REDUCTION IN FORCE AND DEMOTIONS IN THE MECHANICAL SECTIONS**

It is agreed that in the event of a reduction in force involving employees in the Instrument Mechanic, Analyzer Mechanic, Metal Trades and Welder classifications, the employee or employees with the least plant seniority in the classification or classifications determined by the Company to be over manned shall be reduced in his branch of the line of promotion but no further down than the Maintenance Helper classification. They shall have all rights provided for in Article VI, Section 3.



CONFIDENTIAL 

In the event a former employee who is recalled to work in accordance with Article VI, Section 4, is rejected for reemployment because of failure to pass the physical examination as provided in Article IX, Section 1, and is unwilling or refuses to accept the physician's verdict, he may appeal the verdict according to the procedure outlined in Article IX, Section 3.

**STIPULATION NO. 18**
**FORMER EMPLOYEE RECALLED TO WORK BUT WHO IS UNABLE TO REPORT FOR WORK BECAUSE OF AN INDUSTRIAL INJURY**

In the event a former employee who is recalled to work in accordance with Article VI, Section 4, is unable to report for reemployment because of an industrial injury which occurred prior to being laid off, he will be reinstated for seniority purposes only, on the date he would have reported for work had he been able to pass the physical examination.

**STIPULATION NO. 19**
**ELIGIBILITY FOR BENEFIT PLANS AFTER BEING RECALLED**

It is agreed that employees who are laid off and later recalled to work in accordance with Article VI, Section 4, will be eligible to participate in the Basic, Supplemental, and Dependent Life Insurance Plans, Profit-Sharing/Savings Plan, and Medical Plan on the same basis as employees who have been recalled in the past, with the exception that their eligibility date for participation shall be the first of the month following the date they are reinstated. With reference to the Short-Term Disability Plan, the employees' eligibility date for participation shall be the first of the month following the date they are reinstated, and such employees shall then participate on the same basis as when they were laid off.

**STIPULATION NO. 20**
**EMPLOYEES RETURNING TO WORK FROM AN EXTENDED LEAVE OF ABSENCE**

With reference to Article VI, Section 6(D), it is agreed that an employee who is granted an extended leave of absence in excess of thirty (30) calendar days, other than a military leave of absence, will not be considered for promotion to vacancies which occur during his absence. Upon return to work, he shall be reinstated to the classification to which he was assigned at the time the leave was granted, provided he would not have been demoted had he remained actively at work. Within twenty-four (24) hours after being reinstated such an employee may claim any job to which his seniority would have entitled him and still entitles him, had he remained actively at work, with the exception that in the case of jobs posted for bid, he may claim only jobs posted for bid within thirty (30) calendar days prior to his return.

In case the employee claims a job posted for bid, the employee who first bid-in the job or any employee affected thereby shall return to his former job. In case the employee claims a job in a classification to which he would have been entitled by promotion, a demotion shall take place in accordance with Article VI, Section 3.

**STIPULATION NO. 21**
**TRAINING PROGRAM FOR OPERATING EMPLOYEES**

It is agreed that an employee when assigned to the classroom phase of the Operator's Training Program shall receive his permanent rate of pay while participating in this phase of the training program.

When scheduling training for a certain job, the most senior person on shift who lacks qualification for that job will be asked to train before being bypassed.

**STIPULATION NO. 23**
**TEMPORARY REPLACEMENT EMPLOYEES**

In the event it is necessary to provide temporary employees in the various operating and mechanical lines of promotion or to work with mechanics as craft helpers, such temporary employees will be obtained from the Maintenance Helper classification. Maintenance Helpers assigned to perform work historically performed by craft helpers will continue to receive their permanent rate of pay for such work.

Assignments from the Maintenance Helper classification for these purposes may be made without regard to seniority. The privilege of declining temporary promotions as provided in Article VI, Section 1(G), shall not apply in these instances. The number of Maintenance Helpers needed for such temporary assignments may vary depending on the needs of the business as determined by the Company.

**STIPULATION NO. 24**
**SIX MONTHS PERMANENT EXPERIENCE REQUIRED FOR PROMOTION AS IT APPLIES TO VACANCIES ON NEW UNITS**

With reference to filling vacancies on new units, it is agreed that employees who are assigned to the original vacancies on the new units will, on the date they are assigned to the new units, be considered as having six months' permanent experience in the classifications to which they are assigned as required for promotion as outlined in Article VI, Section 2(B). This exception applies only in the case of vacancies on the new units, and does not apply to vacancies on other units in the same line of promotion.

**STIPULATION NO. 25**
**BIDDING ON JOB WHILE ABSENT BECAUSE OF SICKNESS OR INJURY**

An employee off from work because of sickness or injury whom, because of physical limitations, the Company's doctor will not release to return to his classification, shall be allowed to bid on jobs posted for bid while he is off, provided the Company's doctor agrees that he is physically qualified for the jobs posted. An employee released for such a job shall be restricted to that job as long as the Company's doctor feels that it is necessary. Physical qualification for such job shall not be subject to the medical arbitration provided in Article IX, Section 3.

**STIPULATION NO. 26**
**BYPASSING MECHANICAL EMPLOYEES FOR OVERTIME**

With respect to mechanical sections, as referred to in Article V, Section 8(B), the Company shall pay the eligible employee on the overtime list if he is bypassed for overtime, provided the following conditions are met:

Vacancies in the Material Specialist classification will be filled one-half by bid from eligible bidders and one-half by Company appointment from the bargaining group.

With reference to Article VI, Section 2(B) on employee promoting to fill a vacancy in the Head Material Specialist classification, must have a minimum of two (2) years' continuous, permanent experience in the Stores Department immediately preceding the vacancy.

**STIPULATION NO. 35**
**OPERATOR TRAINING**

The parties hereby establish a three year training program for Operating employees. Employees entering the Operator Training Program will be classified as Operations Trainees. Positions in the Operations Trainee classification will be filled by the posting of bids to eligible employees. Positions which cannot be filled by bid may be filled by appointment or by the hiring of new employees.

A step rate wage progression has been established for the Operations Trainee classification. To advance to the next step rate, employees must qualify in a minimum of one additional Operating location each year and satisfactorily complete a minimum of 20 hours of self-study courses each year as prescribed by the Company. It is recognized that long term sickness and accidents that are beyond an employee's control may occur which will warrant granting to the employee additional time to meet the requirements of the training program. In such cases the Union and Company agree to meet and discuss the circumstances of the particular situation and the length of additional time to be granted, if any, to complete the training program. Employees in the Operations Trainee classification will be assigned to the Operations Pool and may be assigned to fill temporary vacancies as outlined in Stipulation No. 22. Upon completion of the Operator Training Program, employees in the Operations Trainee classification will be reclassified as Pool Operators.

Employees entering the Operations Trainee Program, whose rates are above the minimum will be paid at the rate they were receiving at the time they entered the Operations Trainee Program until they complete sufficient time in the training program to advance to the next higher rate. Employees who enter the Operations Trainee Program whose rates are below the Operations Trainee start rate shall receive the Operations Trainee start rate.

Permanent vacancies in Operating jobs will be filled by seniority from employees assigned to the Operations Pool. To be eligible to claim a permanent vacancy, Operations Trainees must have qualified for one job prior to the date that the vacancy occurs. Permanent vacancies filled from the Operations Pool may be filled temporarily until the employee who has claimed the permanent vacancy completes his/her training program.

Employees hired after February 1, 1988, shall not have the right to disqualify themselves and may be dropped from the payroll should they fail to meet the requirements of the Training Program. Employees on the payroll as of February 1, 1988, who disqualify themselves or who are disqualified during their trial period will be returned as outlined in Article VI, Section (2)A.

Head Operator training will consist of two weeks with the Day Head Operator and two weeks with the Inside Head Operator.

# Exhibit AC

Ogletree Deakins

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
*Attorneys at Law*
One Allen Center
500 Dallas Street, Suite 3000
Houston, TX 77002
Telephone: 713-655-0855
Facsimile: 713-655-0020
www.ogletree.com

Marlene C. Williams
(713) 655-5769
marlene.williams@ogletree.com

June 16, 2023

Ms. Christina Hernandez
U.S. Equal Employment Opportunity Commission
Houston District Office
1919 Smith Street, 6th Floor
Houston, TX 77002

RE: Charge No. 460-2023-03734
Charging Party: Warren Jones
Respondent Named: Chevron Phillips Chemical

Dear Investigator Hernandez:

We represent Chevron Phillips Chemical Company LP ("Chevron Phillips Chemical") in connection with the above-referenced matter. This letter constitutes Chevron Phillips Chemical's response to the Charge and is based solely on information available to and known by Chevron Phillips Chemical at this time. Accordingly, Chevron Phillips Chemical reserves the right to amend and/or supplement this response if it discovers new or additional facts.

Chevron Phillips Chemical intends to fully cooperate with the Commission. However, Chevron Phillips Chemical also desires to take all steps necessary to protect privileged, private, and confidential information, including regarding its business operations and about its current and former employees. The information and materials submitted in this Statement of Position are considered confidential and should not be disclosed by the Commission to any third party without the express written permission of Chevron Phillips Chemical. Moreover, by producing information in response to the Charge, Chevron Phillips Chemical does not intend to waive, does not waive, and should not be considered to have waived any privileges Chevron Phillips Chemical has with respect to information related to this Charge and Charging Party's claims against Chevron Phillips Chemical, including the attorney-client privilege, the investigative privilege and/or privileges protected by the work product doctrine.

**A. <u>Background</u>**

Chevron Phillips Chemical is engaged in the production of chemical products that are essential to the manufacturing of over 70,000 consumer and industrial products. In addition to the Port Arthur

facility where Charging Party worked, the Company operates 17 production facilities in the domestic United States and others around the world.

The Company's Port Arthur facility is in Port Arthur, Texas and produces Ethylene, Propylene and Cyclohexane. The Facility operates 24 hours a day, 7 days a week and employs approximately 275 employees.

Chevron Phillips Chemical is committed to ensuring that all employment decisions are based on job-related criteria without regard to disability, protected conduct or any other criteria prohibited by law. This commitment is reiterated in multiple places, including the Company's Code of Conduct, on which all employees are trained at the time of hire and annually throughout their employment. *See* Exhibit A (Code of Conduct Excerpts). In addition, the Company maintains policies prohibiting discrimination and retaliation, which provide guidelines to ensure that employment decisions are not made based upon protected characteristics or activity. *See* Exhibit B (Company Policies 2100 Employment Compliance).

**B. <u>Jones' Employment at Chevron Phillips Chemical</u>**

Warren Jones began working for Chevron Phillips Chemical as an Operations Trainee on or about December 7, 2015. Jones became a Pool Operator on or about December 7, 2018. He worked at the Port Arthur facility for his entire employment with Chevron Phillips Chemical.

At the Port Arthur facility, Pool Operators are expected to qualify on the job to which they are assigned in the unit. Because of the safety-sensitive nature of the work involved, Operators are given adequate time to learn and qualify, but if they do not make satisfactory progress towards qualification they may be placed on a Performance Improvement Plan and subsequently terminated if they do not successfully complete training and qualify on a role. During training, employees are provided written materials that outline the training plan, including required tasks, expectations for the role, and tests for each module. Employees also work with qualified operators who guide them through the training materials and training process. Ultimately, however, employees are responsible for taking the initiative to master the material and complete the training on schedule. Jones was familiar with the training and qualification process and previously completed training for other Operator roles in March 2016, October 2017 and November 2019.

In or around mid-March 2022, Jones was the next employee in line to qualify for a Heater Board Operator role at the Port Arthur facility.[1] Although he had the option to request a bypass, Jones did not request to be bypassed and, therefore, began training on the role. Employees are generally expected to complete training and testing within four (4) months, but Jones' first test on the Heater Board was longer and took place on August 24, 2022, approximately five (5) months after he initiated training. Jones was unsuccessful on his first test in August 2022. Notably, between March 2022 and August 2022, Jones did not indicate that he had any type of impairment or disability that

[1] The Heater Board role was located in an indoor area of the facility and, like other roles, was a rotating shift position. Prior to this, Jones had been working in an outdoor area of the facility on a rotating shift.

affected his training or ability to complete the test, and he did not ask for any assistance or accommodation with any impairment or disability.

Jones retested for the Heater Board role approximately one month later in September 2022 and was again unsuccessful. Because Jones was unsuccessful on his first two tests, he was placed on a Performance Improvement Plan to address his deficiencies with the Unit Review Committee, in accordance with applicable training guidelines. During the PIP, Jones received additional classroom instruction and one-on-one training.

Around the time of Jones' second test, he presented the Company with a doctor's note indicating for the first time that he had vision difficulties, including deciphering "small numbers and letters," as well as issues with the lighting on the Heater Board console. Among other things, Jones' doctor suggested that Jones should be removed from the night shift to address his concerns. Upon receipt of this information, the Company immediately initiated an interactive process with Jones to explore possible accommodations. During a meeting with Chelse Cisneros, Human Resources Associate, Jones indicated that he wanted to make the Company aware of his vision issues, but he did not want to be removed from the night shift as suggested by his doctor's note. Jones also indicated that he was using a portable lamp at the console to help increase the lighting, which addressed the concerns he had with the Heater Board console. Cisneros asked Jones and he agreed to consult with his doctor regarding potential adaptive devices that the Company might be able to provide to assist Jones at the console.

Following this meeting, Cisneros sent Jones a summary of their discussion and reminded Jones to consult with his doctor and follow up to continue the interactive process. In response to Cisneros' summary, Jones stated "[r]eally all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine." In response to this confirmation and request, the Company submitted a work order for a replacement lighting bar to address the lighting above the console. In the meantime, Jones agreed that his portable light was sufficient and he could continue with his training and the qualification process.

Jones subsequently tested on the Heater Board for a third time on November 17, 2022 and was again unsuccessful even though he used his preferred portable light, which he indicated allowed him to see the console board with no issues.[2] Importantly, Jones did not raise any additional visibility concerns or request any additional assistance or accommodations for the November 17th test. However, in order to give Jones another opportunity in light of his vision issues, the Company allowed Jones to train again and test for a fourth time, again using the portable light he indicated allowed him to see the console with no issues. Jones tested for the fourth time on December 15, 2022 and again failed to qualify.

Under Stipulation 35 (Operator Training) in the United Steelworkers Plant Group Collective Bargaining Agreement, employees who fail to meet training program requirements may be separated from the Company. Accordingly, because Jones failed to successfully qualify on the

---

[2] The replacement lighting bar was on special order and had not arrived at this time.

Heater Board multiple times, including with his requested accommodation of additional lighting, the Company terminated his employment on or about January 2, 2023.

### C. Response to Specific Allegations

As demonstrated above, Jones was not subjected to unlawful discrimination or retaliation. Chevron Phillips Chemical had legitimate, non-discriminatory and non-retaliatory reasons for its decisions regarding Jones' employment. The Company responds below to Jones' specific allegations.

**Allegation 1**: I was born with significantly impaired eyesight (i.e., with -16.0 vision in my right eye and -14.0 in my left eye). As a result of my condition, I have always worn thick glasses, and my eyesight has continued to deteriorate over the course of my life.

**Response**: Chevron Phillips Chemical is without sufficient information to respond to this allegation, which describes Jones' alleged history of vision issues since birth.

**Allegation 2**: I began my employment with Chevron Phillips Chemical on or about December 5, 2015. At the time of my suspension and discharge, I was employed as an Outside Operator and earned approximately $155,000.00 per year ($51.00 per hour, regular time).

**Response**: Jones' employment began on or about December 7, 2015. As described above, per Company rules Jones was placed on a Performance Improvement Plan when he failed to qualify on the Heater Board two times in a row. He was later placed on a brief suspension and then terminated when he failed to qualify on the Heater Board role after four tests and additional training opportunities, including with his requested accommodation. Chevron Phillips Chemical denies that Jones was an "outside operator" and that his base compensation at the time of his termination was $155,000 annually. Jones was a pool operator and, at the time of his termination, his annual salary was approximately $105,971.00 based on his work schedule and hourly rate at the time.

**Allegation 3**: In Fall 2022, and through Chevron's seniority promotion system, I was provided an opportunity to be promoted to CDS Board Operator. In order to obtain the promotion, I had to train with a certified board operator for several weeks and pass a two-part test (written and practical). This position required me to look at numerous screens containing tiny numbers and symbols. Though none of my previous job duties had been adversely affected by my disability, I noticed very quickly that my disability significantly impaired my ability to read the tiny numbers on the screens and caused me excessive headaches. I ultimately took the Board Operator test, received an 89% on the written portion; however, after a 4-2 vote of the interview panel, I was found to have "failed" the practical portion. Several panel members argued that 1 actually passed the practical; however, my Operations Manager, Thomas Judson Wooters (hereinafter "Wooters"), refused to pass me.

**Response**: Chevron Phillips Chemical denies that Jones was offered a promotion and that his qualification on the Heater Board would reflect a promotion. Rather, as described above Jones was the next employee in line to qualify for the Heater Board and he did not request to bypassed, as he could have. Chevron Phillips Chemical admits, as described above, that Jones was required to train and successfully test in order to qualify as an Operator on the Heater Board. Chevron Phillips Chemical does not have sufficient information to confirm when Jones first noticed difficulty reading small numbers on the console. However, as explained above, Jones did not notify the Company of any alleged impairments until at or around the time of his second test, in September or October 2022. Chevron Phillips Chemical also denies that Thomas Wooters, who is the Operations Superintendent (not Operations Manager), "refused to pass" Jones for any improper reasons. Although Jones had a satisfactory score on the written portion of the exam, Jones' performance during the practical portion of the exam reflected a noticeable lack of understanding of important processes required for safe and effective operation of the Board. The Panel discussed Jones' performance and collectively agreed that Jones did not pass the practical portion of the test.

**Allegation 4**: After I began experiencing difficulties due to my eyesight, and prior to taking the Board Operator test, I had spoken with Wooters and advised him of my eye condition. I went to my Ophthalmologist in every effort to remedy the issue. I attempted tinted bi-focals, eye drops, and contacts; however, none of the options relieved my condition.

**Response**: Chevron Phillips Chemical is without sufficient information to respond to any attempts Jones made to relieve his vision issues with bifocals, eye drops and/or contacts. Similarly, Chevron Phillips Chemical is without sufficient information to respond to when Jones first began to experience vision issues while he was training on the Heater Board. However, Chevron Phillips Chemical denies that Jones notified Wooters of any vision issues prior to his first test in August 2022. Rather, Jones first notified the Company of vision issues around the time of his second test, in September or October 2022, after he had previously failed to qualify on the Heater Board.

**Allegation 5**: On or about September 16, 2022, my Ophthalmologist issued a physician's note detailing my condition, the difficulties I was experiencing during the Board Operator training, and requesting that, as an accommodation, I be permitted to forego the seniority promotion and, instead, remain an Outdoor Operator, as I had successfully performed the functions of that job for several years. I provided the doctor's note to my Union Representative, Clay Ryan (hereinafter "Ryan"), and he provided a copy to Mr. Wooters on September 19, 2022.

**Response**: Chevron Phillips Chemical admits that the doctor's note Jones presented after he had already failed to qualify on the Heater Board was dated September 16, 2022. The doctor's note suggested that Jones be relieved of "night shift" duties, but did not recommend that he move back to an Outdoor Operator role.

**Allegation 6**: On October 3, 2022, I attended a meeting with Mr. Ryan, a Human Resources Representative, and Mr. Wooters about the doctor's note. At that time, Wooters refused to permit

me to remain an Outdoor Operator and, instead, stated that I would have to re-test the practical portion of the Board Operator exam.

**Response**: Chevron Phillips denies these allegations as stated. On October 3, 2022, Jones met with Cisneros and Wooters to discuss his doctor's note and engage in an interactive process to determine what reasonable accommodations might be available to assist him with his vision issues at the Heater Board. During that meeting, Jones specifically indicated that he was notifying the Company of his vision issues but was not asking to be relieved of his "night" duties. Immediately following the meeting, Cisneros sent Jones a summary of their discussion and requested that he follow up after further consultation with his doctor. Jones responded and notified Cisneros that he only needed "lighting over the heater board console" in order to see the console better. Indeed, he specifically told Cisneros that "[e]verything else will work out fine" with additional lighting. The Company placed a work order to address the lighting above the console and agreed to allow Jones, as he requested, to use a portable lamp in the meantime, including while he continued his already-extended training and testing on the Heater Board. Because additional lighting was the only accommodation Jones requested, and he was allowed to (and did) use his portable light pending completion of the work order for the replacement bar above the console, Jones continued with his training and testing. Importantly, Jones did not ask for any additional assistance or accommodation during this time and never indicated that he was unable to continue the qualification process.

**Allegation 7**: I re-tested and, according to Wooters, failed the practical portion of the Board Operator exam on or about December 20, 2022. As a result, Wooters suspended my employment without pay on December 20, 2022.

**Response**: Chevron Phillips Chemical admits that Jones tested for a fourth time on or about December 15, 2022 and failed to pass the practical portion of the test at that time. Chevron Phillips Chemical also admits that Jones was suspended pending the Company's review of his situation.

**Allegation 8**: I was subsequently terminated on January 3, 2023 for failing to pass the practical portion of the Board Operator exam.

**Response**: Chevron Phillips Chemical admits this allegation.

**Allegation 9**: I believe I was discriminated against on the basis of my disability in violation of the Americans with Disabilities Act of 1990, as amended, as other, non-disabled operators who failed portions of various exams were permitted to remain Outdoor Operators and were not disciplined in any way, much less terminated. I also believe I was retaliated against for requesting an accommodation in violation of the Americans with Disabilities Act of 1990, as amended.

**Response**: Chevron Phillips Chemical denies that it discriminated against Jones due to his disability and that it retaliated against him for requesting an accommodation. As described above, the Company agreed to grant (and did grant) Jones his requested accommodation, and

allowed him additional training time and testing opportunities. Moreover, Chevron Phillips Chemical denies that it has retained or otherwise failed to discipline non-disabled employees who repeatedly failed to qualify on required tests for the operator position.

**D. <u>Conclusion</u>**

For all the reasons described in this Statement of Position, Jones' allegations are simply not supported by the evidence. Given these facts, Jones, cannot meet his burden of proving that the Company's decisions were discriminatory or retaliatory in any respect. Accordingly, the Commission should dismiss Jones' Charge in its entirety.

We appreciate your attention to this matter. If you have any questions, please do not hesitate to contact me.

Sincerely,

Marlene C. Williams

Marlene C. Williams

MW:lc
Encl.

# Exhibit AD

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Wednesday, September 14, 2022, 5:36 PM
To: "Danford, Aprile A" <askewam@cpchem.com>
Subject: FW: Operator Pool

---

Both Bryan and Jud were made aware of Warren's request.
Bryan responded with his support.

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.™

---

**From:** Kubsch, Bryan G <bryan.kubsch@cpchem.com>
**Sent:** Wednesday, September 14, 2022 8:00 AM
**To:** Cisneros, Chelse <CISNEC@cpchem.com>; Wooters, Judson <wootej@cpchem.com>
**Subject:** RE: Operator Pool
10-4 I support the request.

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Wednesday, September 14, 2022 7:53 AM
**To:** Wooters, Judson <wootej@cpchem.com>; Kubsch, Bryan G <bryan.kubsch@cpchem.com>
**Subject:** FW: Operator Pool
**FYI…**
We wanted to make you both aware of his request.

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.™

---

**From:** Jones, Warren F <JONESWF@cpchem.com>
**Sent:** Tuesday, September 13, 2022 6:03 PM
**To:** Danford, Aprile A <askewam@cpchem.com>
**Cc:** Cisneros, Chelse <CISNEC@cpchem.com>
**Subject:** Operator Pool
Good evening. I want to be removed from under the bar of having a permeant schedule as a 1544 Operator and be placed back into the pool please. Thank you both.

# Exhibit AE

| | |
|---|---|
| **From:** | Danford, Aprile A |
| **To:** | Cisneros, Chelse |
| **Cc:** | Bounds, Kelsey |
| **Subject:** | Fwd: Warren Jones most recent eye exam visit [**EXTERNAL**] |
| **Date:** | Monday, September 19, 2022 8:58:27 AM |
| **Attachments:** | Scan_001.tif |

Good morning ladies. Chelsea, please work with Kelsey on the on the process for an employee that reports a medical issue. In Warren's email below from his doctor, I don't see a recommendation, a restriction, or an accommodation request; therefore, we'll need to work with Warren to figure out what he is requesting and have him produce such request from his doctor. Let me know if we need to discuss.

Thanks.
Aprile
Sent from my iPhone

Begin forwarded message:

**From:** "Jones, Warren F" <JONESWF@cpchem.com>
**Date:** September 19, 2022 at 8:12:04 AM CDT
**To:** "Wooters, Judson" <wootej@cpchem.com>
**Cc:** "Danford, Aprile A" <askewam@cpchem.com>, "Ryan, Clay S" <ryancs@cpchem.com>, "Cisneros, Chelse" <CISNEC@cpchem.com>
**Subject: FW: Warren Jones most recent eye exam visit [**EXTERNAL**]**

Good morning. This letter is from my Optometrist and my recent eye exam. Ever since I've been training on the heater board I've been in and out the eye clinic trying to get my vision where I can see the controls and reading clearly. Doing this time my Dr. found some concerns he wanted to share with you guys. Attached is a letter wrote by him on my behalf. Please look at the letter and get back with me please. Thanks.

**From:** Hart Eye Center <harteyecenterfrontdesk@gmail.com>
**Sent:** Friday, September 16, 2022 4:01 PM
**To:** Jones, Warren F <JONESWF@cpchem.com>; Ryan, Clay S <ryancs@cpchem.com>
**Subject:** Warren Jones most recent eye exam visit [**EXTERNAL**]

**This Message Is From an Untrusted Sender**

You have not previously corresponded with this sender.

Do not click on links or attachments if the sender is unknown or the content is unusual. Do not share your password with anyone. Report suspicious emails by clicking the Report Phishing button.

Report Suspicious

Please find attached notes and concerns.
Thank you, Dr. William Hart

--
Hart Eye Center
1920 W. Sale Rd
Bldg. F, Ste. 3
Lake Charles, LA 70605
(337)439-4014

Hart Eye Center
See better for the rest of your life.
William B. Hart, MD

To whom it may concern:

My name is William B. Hart, MD. I am an Ophthalmologist with 40 years of practice history. I am writing on behalf of my patient Mr. Warren Jones.

Mr. Jones has been under my care for 20 years. Mr. Jones has suffered from extremely high myopia (his initial refraction at my office was negative 20 Diopters, that is over ten times the average myope in terms of correction needed. Mr. Jones was referred to me by Dr. Rick McGuirt of 20/20 Vision clinic for the treatment of his high myopia.

After initial attempts to fit glasses and contacts, Mr. Jones and I decided to perform photorefractve keratectomy. This form of treatment was chosen because of the high degree of tissue removal necessary to correct Mr. Jones's myopia. Postoperatively, it took Mr. Jones 24 months to fully recover a normal corneal surface.

Recently, Mr. Jones came for a normal annual eye exam, and at that exam he told me his vision (when on night shift) was beginning to bother him. I performed a complete eye exam, and found two issues. Mr. Jones is beginning to have vision changes due to the elongation of his eyes (a normal eye is approximately 23 millimeters long. Mr. Jones eyes are 30 mm long. The problem this great elongation presents is stretching of the retina inside the eye. This thinning of the retina leads to a decrease in retinal, and especially macular function. It is my belief that with the drying of the eyes, and the decrease in macular function is causing Mr. Jones to have difficulty with seeing small numbers and letters, as well as to be overwhelmed by the brightness of the lights on his operator's board.

Hart Eye Center, LLC • 1920 West Sale Rd., Building F, Suite 3 • Lake Charles, LA 70605
337-439-4014 • 800-256-5513 • Fax: 337-439-0185 • www.harteyecenter.com

Because of the fact that our tear production decreases at night, and also that Mr. Jones still has some slight irregularity of his corneal surface, dry eye is another contributing factor to Mr. Jones's difficulties with his operator's board on the night shift.

I would ask you to consider relieving Mr. Jones of his night shift duties because the vision difficulties give him concern about the quality of his labors. Mr. Jones asks no extreme favor, and if you find that his concerns are not consequential, he will certainly continue to perform his duties. His concern is that of the safety of the part of the plant he operates at night.

Thank you for your kind consideration of these issues, and I am

Yours truly,

William B. Hart, MD

# Exhibit AF

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Monday, September 26, 2022, 4:49 PM
To: "Jones, Warren F" <JONESWF@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>; "Wooters, Judson" <wootej@cpchem.com>
Subject: Meeting 10/3 at 4:00pm

Good Afternoon Warren,
We would like to schedule a meeting with you in regards to the letter from your Ophthalmologist you sent us.
**Please confirm** that you would be able to attend this meeting on Monday, October 3, 2022, at 4:00pm by responding to this email.
Also, please let me know if you would like a union rep present during this meeting so I can facilitate their presence.
Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.

# Exhibit AG

From: "Wooters, Judson" <wootej@cpchem.com>
Sent: Monday, October 10, 2022, 1:25 PM
To: "Danford, Aprile A" <askewam@cpchem.com>; "Cisneros, Chelse" <CISNEC@cpchem.com>
Cc: "Kubsch, Bryan G" <kubscbg@cpchem.com>
Subject: Fwd: Warren & Letty PIP - Draft
Attachments: PIP - Letty Lorenz - 202210 rev.docx; PIP - Warren Jones - 202210 rev.docx

Aprile/Chelse, for your review. I'd like to review this with them this week.— Jud

---

**From:** Wooters, Judson <wootej@cpchem.com>
**Date:** October 10, 2022 at 11:37:27 AM CDT
**To:** Kubsch, Bryan G <KUBSCBG@cpchem.com>
**Subject:** Warren & Letty PIP - Draft

Let's discuss

**T. Judson Wooters** | Olefins Superintendent | O (409) 985-0757 | C (409) 332-9309 |
wootej@cpchem.com

Information contained in this e-mail is subject to the disclaimers found by clicking on the following link:
http://www.cpchem.com/forms/disclaimer1.asp

# Exhibit AH

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Tuesday, October 11, 2022, 10:34 AM
To: "Kubsch, Bryan G" <kubscbg@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>
Subject: CONFIDENTIAL: Summary of Meet and Confer- W. Jones
Attachments: W Jones-Summary of Meet Confer.docx

Bryan,
Please review the attached letter and let me know if you have any questions or suggestions.
Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.™

Personal and Confidential

October 5, 2022

Warren Jones
Port Arthur, Operator

Re: Summary of Meet and Confer Meeting Held October 3, 2022

Dear Warren:

Thank you for participating in a meet and confer session on October 3, 2022. The following individuals attended the meeting: Jud Wooters, Olefins Superintendent, Clay Ryan, Union Representative, you, and me. This letter serves as a written summary of our discussion. After review of this letter, if there is any item you believe to be incomplete or inaccurate, please contact me as soon as possible. If we do not receive a response from you or anyone speaking on your behalf by October 28, 2022, we will assume the summary set forth in this letter is accurate.

On September 19, 2022, the Company became aware of your request for a reasonable accommodation. Based on the note you provided to the company from your Ophthalmologist William B. Hart. In accordance with the doctors note you presented to the company you are having difficulties of viewing "small numbers and letters", as well as becoming "overwhelmed by the brightness of the lights on your console.

During our meeting on October 3, 2022, we came to an agreement that you would consult with your Ophthalmologist William B. Hart, to find apparatuses that the company could potentially provide to increase the visibility of the console. The company expects for you to provide us a list of these items by November 1, 2022. We will then review this list and evaluate the equipment that you feel will provide you the best support while completing your job responsibilities. The company will review the effectiveness of these apparatus(es) provided after a period of 30 days.

We appreciate your patience and cooperation as we reviewed your request for a reasonable accommodation.

Please feel free to contact me directly should you have additional questions or concerns.

Sincerely,

Chelse Cisneros
Human Resources Associate
Chevron Phillips Chemical Company
409.985.0823

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Wednesday, October 12, 2022, 8:37 AM
To: "Johnson, Jeannie M [c]" <JOHNSJM@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>
Subject: CONFIDENTIAL: Letter of Summary
Attachments: W Jones-Summary of Meet Confer.docx

Good Morning Jeannie,
I have attached a copy of the letter.
Please treat this as **CONFIDENTIAL** and do not distribute this information to anyone other than those that are on a "need to know" basis.
Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.

Personal and Confidential

October 11, 2022

Warren Jones
Port Arthur, Pool Operator

Re: Summary of Meet and Confer Meeting Held October 3, 2022

Dear Warren:

Thank you for participating in a meet and confer session on October 3, 2022. The following individuals attended the meeting: Jud Wooters, Olefins Superintendent, Clay Ryan, Union Representative, you, and me. This letter serves as a written summary of our discussion. After review of this letter, if there is any item you believe to be incomplete or inaccurate, please contact me as soon as possible. If I do not receive a response from you or anyone speaking on your behalf by October 28, 2022, I will assume the summary set forth in this letter is accurate.

On September 19, 2022, the Company became aware of your request for a reasonable accommodation. In accordance with the doctors note you presented to the Company from your Ophthalmologist, William B. Hart, you are having difficulties viewing "small numbers and letters", as well as becoming "overwhelmed by the brightness of the lights on your console".

During our meeting on October 3, 2022, you agreed that you would consult with your Ophthalmologist, William B. Hart, to identify apparatuses that the Company could potentially provide to increase the visibility of the console. The company expects for you to provide this list as soon as possible, but no later than December 2, 2022.

Simultaneously, on September 22, 2022, you were unsuccessful in passing the heater console operator final exam which resulted in your being taken out of schedule for a period of 90 days so that you can focus on retraining. Therefore, after the Company receives your request, we will schedule a follow-up meeting within 30 days to review and evaluate.

We appreciate your patience and cooperation as we review your request for a reasonable accommodation. Please feel free to contact me directly should you have additional questions or concerns.

Sincerely,

Chelse Cisneros
Human Resources Associate
Chevron Phillips Chemical Company
409.985.0823

From: "Kubsch, Bryan G" <bryan.kubsch@cpchem.com>
Sent: Tuesday, October 11, 2022, 2:46 PM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Subject: RE: Warren Jones most recent eye exam visit [**EXTERNAL**]

During our meeting on October 3, 2022, we came to an agreement that you would consult with your Ophthalmologist, William B. Hart, to find apparatuses that the company could potentially provide to increase the visibility of the console. The company expects for you to provide us a list of these items as soon as possible, but no later than October 28, 2022. We will then review this list and evaluate the equipment that you feel will provide you the best support while completing your job responsibilities. The company will perform a review of the effectiveness of these apparatus(es) provided after a period of 30 days.

During our meeting on October 3, 2022, you agreed to consult with your Ophthalmologist, William B. Hart, to find devices that the Company could potentially provide to increase the visibility of the console. The Company expects for you to provide us a list of these items as soon as possible, but no later than October 28, 2022. We will then review this list and evaluate the equipment that you feel will provide you the best support while completing your job responsibilities. The Company requests you provide feedback on the effectiveness of any visibility improvements made within 30 days of implementation to Human Resources.

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Tuesday, October 11, 2022 11:18 AM
**To:** Kubsch, Bryan G <kubscbg@cpchem.com>
**Subject:** FW: Warren Jones most recent eye exam visit [**EXTERNAL**]

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.

---

**From:** Jones, Warren F <JONESWF@cpchem.com>
**Sent:** Monday, September 19, 2022 8:12 AM
**To:** Wooters, Judson <wootej@cpchem.com>

# Exhibit AI

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Wednesday, October 19, 2022, 3:01 PM
To: "Jones, Warren F" <JONESWF@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>
Subject: CONFIDENTIAL: Letter to Employee - Warren Jones
Attachments: W Jones-Summary of Meet Confer.docx

---

Hi Warren,

Thank you for attending the meeting this afternoon.

As stated in the letter, You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but **no later than November 11, 2022.**

**Attached: Summary of Meeting**

Should you have any questions feel free to contact me.

Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.

Personal and Confidential

October 19, 2022

Warren Jones
Port Arthur, Pool Operator

Re: Summary of Meet and Confer Meeting Held October 3, 2022

Dear Warren:

Thank you for participating in a meet and confer session on October 3, 2022. The following individuals attended the meeting: Jud Wooters, Olefins Superintendent, Clay Ryan, Union Representative, you, and me. This letter serves as a written summary of our discussion. After review of this letter, if there is any item you believe to be incomplete or inaccurate, please contact me as soon as possible. If I do not receive a response from you or anyone speaking on your behalf by October 28, 2022, I will assume the summary set forth in this letter is accurate.

On September 19, 2022, the Company became aware of your request for an accommodation. In accordance with the doctors note you presented to the Company from your Ophthalmologist, William B. Hart, you are having difficulties viewing "small numbers and letters," as well as becoming "overwhelmed by the brightness of the lights on your console."

During our meeting on October 3, 2022, you stated that you were not requesting to be removed from nights as communicated in the letter from your Ophthalmologist, but rather you were making the company aware of your vision difficulties. You further mentioned that you are currently bringing a lamp to and from work to help increase the lighting. You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but no later than November 11, 2022. The Company has also consulted with our Corporate Occupational Health Department regarding additional information and resources that could be helpful and will continue to do so as necessary.

Simultaneously, on September 22, 2022, you were unsuccessful in passing the heater console operator final exam which resulted in your being taken out of schedule for a period of 35 days so that you can focus on retraining. We will continue to engage in this interactive process with you as needed while you are retraining on the console on day shift. Upon your return to normal shift assignment and implementation of any accommodation, the Company will schedule a follow-up meeting within 30 days to review and evaluate.

We appreciate your patience and cooperation as we review this matter. Please feel free to contact me directly should you have additional questions or concerns.

Sincerely,

Chelse Cisneros
Human Resources Associate
Chevron Phillips Chemical Company
409.985.0823

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Wednesday, October 19, 2022, 3:02 PM
To: "Kubsch, Bryan G" <bryan.kubsch@cpchem.com>; "Wooters, Judson" <wootej@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>
Subject: FW: CONFIDENTIAL: Letter to Employee - Warren Jones
Attachments: W Jones-Summary of Meet Confer.docx

FYI.

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.℠

**From:** Cisneros, Chelse
**Sent:** Wednesday, October 19, 2022 3:01 PM
**To:** Jones, Warren F <joneswf@cpchem.com>
**Cc:** Danford, Aprile A <ASKEWAM@cpchem.com>
**Subject:** CONFIDENTIAL: Letter to Employee - Warren Jones

Hi Warren,

Thank you for attending the meeting this afternoon.

As stated in the letter, You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but **no later than November 11, 2022.**

**Attached: Summary of Meeting**

Should you have any questions feel free to contact me.

Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.℠

Chevron Phillips CHEMICAL

Personal and Confidential

October 19, 2022

Warren Jones
Port Arthur, Pool Operator

Re: Summary of Meet and Confer Meeting Held October 3, 2022

Dear Warren:

Thank you for participating in a meet and confer session on October 3, 2022. The following individuals attended the meeting: Jud Wooters, Olefins Superintendent, Clay Ryan, Union Representative, you, and me. This letter serves as a written summary of our discussion. After review of this letter, if there is any item you believe to be incomplete or inaccurate, please contact me as soon as possible. If I do not receive a response from you or anyone speaking on your behalf by October 28, 2022, I will assume the summary set forth in this letter is accurate.

On September 19, 2022, the Company became aware of your request for an accommodation. In accordance with the doctors note you presented to the Company from your Ophthalmologist, William B. Hart, you are having difficulties viewing "small numbers and letters," as well as becoming "overwhelmed by the brightness of the lights on your console."

During our meeting on October 3, 2022, you stated that you were not requesting to be removed from nights as communicated in the letter from your Ophthalmologist, but rather you were making the company aware of your vision difficulties. You further mentioned that you are currently bringing a lamp to and from work to help increase the lighting. You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but no later than November 11, 2022. The Company has also consulted with our Corporate Occupational Health Department regarding additional information and resources that could be helpful and will continue to do so as necessary.

Simultaneously, on September 22, 2022, you were unsuccessful in passing the heater console operator final exam which resulted in your being taken out of schedule for a period of 35 days so that you can focus on retraining. We will continue to engage in this interactive process with you as needed while you are retraining on the console on day shift. Upon your return to normal shift assignment and implementation of any accommodation, the Company will schedule a follow-up meeting within 30 days to review and evaluate.

We appreciate your patience and cooperation as we review this matter. Please feel free to contact me directly should you have additional questions or concerns.

Sincerely,

Chelse Cisneros
Human Resources Associate
Chevron Phillips Chemical Company
409.985.0823

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Thursday, October 20, 2022, 11:45 AM
To: "Danford, Aprile A" <askewam@cpchem.com>
Subject: FW: CONFIDENTIAL: Letter to Employee - Warren Jones

FYI

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips CHEMICAL | Performance by design. Caring by choice.℠

**From:** Wooters, Judson <wootej@cpchem.com>
**Sent:** Thursday, October 20, 2022 7:03 AM
**To:** Jones, Warren F <JONESWF@cpchem.com>
**Cc:** Cisneros, Chelse <CISNEC@cpchem.com>
**Subject:** Re: CONFIDENTIAL: Letter to Employee - Warren Jones
Thanks Warren, are you referring to the long, narrow lights on arms that can be moved around? Can you enter a G3 to get them fixed?

Sent from my iPhone

On Oct 20, 2022, at 6:59 AM, Jones, Warren F <JONESWF@cpchem.com> wrote:

Good morning! Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine. The only light that works properly is the one over the computer. The other two seem to be broken. Thanks.

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Wednesday, October 19, 2022 3:01 PM
**To:** Jones, Warren F <JONESWF@cpchem.com>
**Cc:** Danford, Aprile A <askewam@cpchem.com>
**Subject:** CONFIDENTIAL: Letter to Employee - Warren Jones
Hi Warren,
Thank you for attending the meeting this afternoon.
As stated in the letter, You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but **no later than November 11, 2022.**
**Attached: Summary of Meeting**

Should you have any questions feel free to contact me.
Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Thursday, October 20, 2022, 2:13 PM
To: "Kubsch, Bryan G" <bryan.kubsch@cpchem.com>
Cc: "Wooters, Judson" <wootej@cpchem.com>
Subject: FW: CONFIDENTIAL: Letter to Employee - Warren Jones

FYI.

**Bryan** - Please see the email conversation below, let me know if you have any questions.
**Jud** - We will still need to have a follow up meeting to review and evaluate if fixing the lighting over the heater board console has helped his vision. I'll send you, Clay, and Warren a meeting invite once it gets closer.

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.

**From:** Wooters, Judson <wootej@cpchem.com>
**Sent:** Thursday, October 20, 2022 7:03 AM
**To:** Jones, Warren F <JONESWF@cpchem.com>
**Cc:** Cisneros, Chelse <CISNEC@cpchem.com>
**Subject:** Re: CONFIDENTIAL: Letter to Employee - Warren Jones

Thanks Warren, are you referring to the long, narrow lights on arms that can be moved around? Can you enter a G3 to get them fixed?

Sent from my iPhone

> On Oct 20, 2022, at 6:59 AM, Jones, Warren F <JONESWF@cpchem.com> wrote:
>
> Good morning! Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine. The

only light that works properly is the one over the computer. The other two seem to be broken. Thanks.

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Wednesday, October 19, 2022 3:01 PM
**To:** Jones, Warren F <JONESWF@cpchem.com>
**Cc:** Danford, Aprile A <askewam@cpchem.com>
**Subject:** CONFIDENTIAL: Letter to Employee - Warren Jones

Hi Warren,

Thank you for attending the meeting this afternoon.
As stated in the letter, You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but **no later than November 11, 2022.**

**Attached: Summary of Meeting**

Should you have any questions feel free to contact me.

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips CHEMICAL | Performance by design. Caring by choice.

# Exhibit AJ

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Monday, December 12, 2022, 1:04 PM
To: "Stanton, James M [c]" <STANTJM@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>
Subject: FW: Visual Acuity for Employee

Dr. Stanton,
Below are the results for Warren Jones visual acuity exam.
Please let us know of your thoughts or suggestions on how we should proceed.
Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com
Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips CHEMICAL | Performance by design. Caring by choice.™

**From:** Johnson, Jeannie M [c] <JOHNSJM@cpchem.com>
**Sent:** Monday, December 12, 2022 12:09 PM
**To:** Cisneros, Chelse <CISNEC@cpchem.com>
**Subject:** Visual Acuity for Employee
Chelse-
Here is the visual acuity for Warren Jones that you requested (performed today 12.12.22):
Rt eye: 20/50
Lt eye: 20/50
Both eyes: 20/40
**This was performed with prescription glasses on.**
Sincerely,
*Jeannie Johnson, APRN, MSN, FNP-C*
Family Nurse Practitioner|Port Arthur
In Affiliation with CareOnSite
Office: 409-985-0752
Fax: 409-985-0796
Email: Johnsjm@cpchem.com

Chevron Phillips Chemical Company LP | Performance by design. Caring by choice.™

CP CHEM 000744

# Exhibit AK

From: "Rudloff, Lauren" <lauren.rudloff@cpchem.com>
Sent: Monday, January 2, 2023, 5:35 PM
To: "Danford, Aprile A" <askewam@cpchem.com>
Subject: FW: Review and Approval Requested of Termination Recommendation - Port Arthur Pool Operator - Warren Jones

Hi Aprile,

We have approval to proceed.

Thanks!

Lauren

---

**From:** McAlister, Jacob <MCALIL@cpchem.com>
**Sent:** Saturday, December 31, 2022 12:01 PM
**To:** Rudloff, Lauren <lauren.rudloff@cpchem.com>
**Cc:** Parsley, David G <parsldg@cpchem.com>
**Subject:** Fwd: Review and Approval Requested of Termination Recommendation - Port Arthur Pool Operator - Warren Jones

Lauren,
Please see both Bryan's and my support to proceed. Thanks.

L. Jacob McAlister
GM, Manufacturing

Begin forwarded message:

> **From:** "Canfield, Bryan" <CANFICB@cpchem.com>
> **Date:** December 31, 2022 at 10:54:13 AM CST
> **To:** "McAlister, Jacob" <MCALIL@cpchem.com>
> **Subject: RE: Review and Approval Requested of Termination Recommendation - Port Arthur Pool Operator - Warren Jones**
>
> I support the recommendation.
>
> I know we need personnel, but we need quality over quantity.
>
> ---
>
> **From:** McAlister, Jacob <MCALIL@cpchem.com>
> **Sent:** Thursday, December 29, 2022 4:20 PM
> **To:** Canfield, Bryan <CANFICB@cpchem.com>
> **Subject:** FW: Review and Approval Requested of Termination Recommendation - Port Arthur Pool Operator - Warren Jones
>
> Bryan,

This is the first of two termination requests coming your way regarding Operators at Port Arthur. I realize this is not ideal considering how we are working to grow this population, but in both cases, the individuals have been given ample opportunities to qualify and cannot pass even after multiple attempts.

For the first request below, I endorse the recommendation for termination of Warren Jones.

Over the past several months, Warren Jones has had 4 attempts (with one-on-one training associated with a PIP) to qualify on the Furnace board post. The fourth attempt came after determining a potential medical issue. However, he failed all 4 times. See additional information from Aprile below.

Please provide your support of this action. Let me know if you have any comments or questions. Thanks.

L. Jacob McAlister
GM, Manufacturing
Direct: 832.813.4503
Mobile: 346.224.6533
Email: mcalil@cpchem.com

Chevron Phillips Chemical Company LP
10001 Six Pines Drive, The Woodlands, TX 77380

Performance by design. Caring by choice.™

This message is subject to disclaimers.

---

**From:** Rudloff, Lauren <lauren.rudloff@cpchem.com>
**Sent:** Thursday, December 29, 2022 8:41 AM
**To:** McAlister, Jacob <MCALIL@cpchem.com>
**Subject:** Review and Approval Requested of Termination Recommendation - Port Arthur Pool Operator - Warren Jones

Jacob,

Port Arthur leadership is seeking your review and approval of termination of Warren Jones, Pool Operator, for failing to qualify on the heater board as required.

Mr. Jones was unsuccessful in qualifying on the heater board four times over the course of 8 months. As a result of the performance deficiencies despite additional resources and classroom training provided, Bryan Kubsch, Operations Manager, recommends termination of Mr. Jones' employment. Gary Parsley, Plant Manager, supports termination. Mr. Jones was suspended on December 21 pending further review.

I have reviewed and support the recommendation. Stephanie John, Senior Counsel – HR, Benefits & Privacy, has also reviewed and supports this recommendation.

With your support, I'll send to Bryan for final review and approval. Please let me know of any questions or additional information needed.

Lauren

---

**From:** Danford, Aprile A <askewam@cpchem.com>
**Sent:** Wednesday, December 28, 2022 9:05 AM
**To:** Rudloff, Lauren <lauren.rudloff@cpchem.com>
**Subject:** Review and Approval Requested of Termination Recommendation - Port Arthur Pool Operator - Warren Jones

Good morning Lauren,

We are seeking your and Bryan's review/endorsement to terminate the employment of Warren Jones, Pool Operator, for failing to qualify on the heater board as required.

**Employee:** Warren Jones
**Position:** Pool Operator
**Location:** Port Arthur
**Date of Hire:** 12/7/2015
**Performance History:** 2021 – ME; 2020 – ME; 2019 – ME

**Summary:**
Warren Jones has been unsuccessful in qualifying on the heater board four times over the course of 8 months. Jones started training to qualify for the heater board role on March 18, 2022. He was unsuccessful when he tested for the first time on August 24. Jones completed another month's training and then was unsuccessful when he retested on September 22. Per HR Training Guideline 2, Section 4.5.3, Jones was then formally placed on a Performance Improvement Plan (PIP) on October 13, 2022, to address the deficiencies identified during his test with the Unit Review Committee.

During the PIP, Jones received additional classroom and one-on-one training. Despite the additional training, Jones was again unsuccessful on his third attempt at qualifying on the heater board on November 17, 2022.

Jones indicated at this time the existence of a medical condition that may have been relevant to his qualification attempts. The Company engaged in an interactive process with Jones and, among other things, permitted Jones to make a fourth attempt to qualify. On December 15, 2022, Jones failed for a fourth time to qualify on the heater board and per Stipulation 35, Operator Training, in the United Steelworkers Plant Group Collective Bargaining Agreement, an employee who fails to meet the training program requirements may be dropped from the payroll.

**Recommendation:**

As a result of Jones's failure to qualify on the heater board after four attempts, Bryan Kubsch, Operations Manager, recommends termination of Jones's employment. Gary Parsley, Plant Manager, and Stephanie John, Senior Counsel – HR, Benefits & Privacy, support this recommendation.

**Attachments for Review:**

1. 7 Factor Test
2. Employee History Detail

Please advise if you have any questions or need additional information. Additionally, please let me know if we have your support to proceed with termination.

Thank you.

Aprile Danford
HR Manager
Direct: 409.985.0822
Cell: 979.481.3216
Email: askewam@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, Texas 77640

Performance by design. Caring by choice.™

This message is subject to disclaimers.

# Exhibit AL

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Monday, December 12, 2022, 10:39 AM
To: "Kubsch, Bryan G" <bryan.kubsch@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>
Subject: FW: Instrument Mechanic Bid
Attachments: W.Jones_Instrument bid_12122022113140.pdf

Bryan,

This is FYI that Clay has turned in Warren's application in for the Instrument Mechanic Bid.

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical

Performance by design.
Caring by choice.™

**From:** Cisneros, Chelse
**Sent:** Monday, December 12, 2022 10:39 AM
**To:** Jones, Warren F <joneswf@cpchem.com>
**Cc:** Ryan, Clay S <ryancs@cpchem.com>
**Subject:** Instrument Mechanic Bid

Hey Warren,

Here is a copy of your application for the instrument mechanic bid.

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.℠

CP CHEM 000777

Chevron Phillips Chemical Company LP

# Application for Job Vacancy

Notice Number 2022 - 1

Candidate, please fill out the application and return to Human Resources, Room 171, before 4:00 P.M. of the close date. Human Resources will sign and timestamp your application and give you a copy of your application.

**Date of Application:** 12/12/2022

**Date of Last Hire:** Dec 7, 2015

**Employee ID:** 1009756

**Employee Name** Warren Jones

**Employee Department:** 1544

**Employee Job Title:** Operator

I, Warren Jones (Name of Employee), hereby apply for the position of Instrument Tech (Vacant Position)

in the Maintenance Department (Department of Vacant Position) as posted under Notice Number ______ (Notice No.)

Warren F. Jones
Employee Signature

12/12/2022
Date

**For Human Resources Use Only:**

Chelde Ott
Human Resources Representative

12/12/22
Date

10:30 am
Time Received

# Exhibit AM

From: "Wooters, Judson" <wootej@cpchem.com>
Sent: Monday, September 26, 2022, 12:34 PM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Subject: RE: Accommodation Meeting - Warren Jones

4 PM should be good, ask him to be sure

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Monday, September 26, 2022 10:14 AM
**To:** Wooters, Judson <wootej@cpchem.com>
**Subject:** RE: Accommodation Meeting - Warren Jones

Hi Jud,

We are good to schedule the accommodation meeting on 10/3. Would you like Warren to come in at 4:00 that day to have the meeting before his shift starts or wait until 4:30-5:00?

Once we figure out a good time, I will email Warren to let him know that we would like to have the accommodation meeting when he returns to work on 10/3. I will also ask if he would like a union rep present, so I can go ahead and arrange that as well.
I do not expect a response until Friday afternoon since he is off.

Let me know what works best for you.

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.™

---

**From:** Cisneros, Chelse
**Sent:** Monday, September 26, 2022 7:45 AM
**To:** Wooters, Judson <wootej@cpchem.com>
**Subject:** RE: Accommodation Meeting - Warren Jones

Hey Jud,

I am working with compliance to see if we can wait and have the meeting on 10/3. I should have an answer by the end of the day.

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips CHEMICAL | Performance by design. Caring by choice.™

---

**From:** Wooters, Judson <wootej@cpchem.com>
**Sent:** Thursday, September 22, 2022 5:50 PM
**To:** Cisneros, Chelse <CISNEC@cpchem.com>
**Subject:** RE: Accommodation Meeting - Warren Jones

Hey Chelse, Warren is on a long weekend starting tonight, he won't be back till next Friday night. We can ask him to come up here one day this next week if he's available. Or we can wait till Monday evening, Oct 3? -- Jud

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Thursday, September 22, 2022 4:45 PM
**To:** Wooters, Judson <wootej@cpchem.com>
**Subject:** Accommodation Meeting - Warren Jones

Jud,

I am looking to schedule a meeting to discuss the request made in the letter Warren Jones sent us on Monday. In this meeting, Warren, HR, yourself, and a Union Rep (if warren would like one) would need to be present.
The purpose of this meeting is to gather information in regards to the employee's request. We are trying to determine what exactly he is wanting us to accommodate and the duration of the request.

No decision will be made or communicated during this meeting.

**Please let me know a day and time next week, that works best so we can get it scheduled.**

Feel free to reach out if you have any questions.

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.™

# Exhibit AN

From: "Stanton, James M [c]" <STANTJM@cpchem.com>
Sent: Tuesday, December 6, 2022, 3:47 PM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Cc: "Roberts, Beth" <ROBERMB@cpchem.com>; "Danford, Aprile A" <askewam@cpchem.com>
Subject: RE: Warren Jones

Hi Chelse,

I had a long conversation with Mr. Jones this afternoon and I think I have a better understanding of his overall situation and what solutions may or may not be feasible.

If you want to give me a call we can discuss, or if you prefer we can do another teams meeting with Beth. Just let me know.

Regards,

**James M. Stanton, M.D.** | Medical Director |

**Chevron Phillips Chemical Co, LP | (832) 813.4989 Office | (713) 724.7766 Mobile |**
**stantjm@cpchem.com**
Disclaimer: www.cpchem.com/forms/disclaimer1.asp

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Monday, December 5, 2022 3:24 PM
**To:** Stanton, James M [c] <STANTJM@cpchem.com>
**Cc:** Roberts, Beth <ROBERMB@cpchem.com>; Danford, Aprile A <askewam@cpchem.com>
**Subject:** Warren Jones

Dr. Stanton,

Thank you for taking the time to join Beth and I in our meeting this afternoon. I have attached the letter from Warren's ophthalmologist and have provided his contact information as well.
Please let me know if you have any questions or need further information.

**Warren Jones**
Cell: (337)-764-8468
Work Email: joneswf@cpchem.com
Personal Email: warren.jones73@gmail.com

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.

# Exhibit AO

From: "Wooters, Judson" <wootej@cpchem.com>
Sent: Monday, December 12, 2022, 5:39 PM
To: "Cisneros, Chelse" <CISNEC@cpchem.com>
Subject: FW: Lighting above the heater board

Chelse, this has not gotten repaired yet.

---

**From:** Vandevender, Bubba <VANDEDA@cpchem.com>
**Sent:** Monday, December 12, 2022 5:18 PM
**To:** Richardson, Claude D <richacd@cpchem.com>; Gay, Danny <gayd@cpchem.com>; Johnson, Greg <JOHNSRG@cpchem.com>; Jones, Warren F <JONESWF@cpchem.com>
**Cc:** Wooters, Judson <wootej@cpchem.com>; Coots, Andy C <cootsac@cpchem.com>
**Subject:** RE: Lighting above the heater board

E 2 10/25/2022 12075686 4595469 Heater board lights (lamps)
PA-CCRM-ELE PAELECT APPR G3PTMREMOTE NOPR NOPT ORAS

Can we get these lights- repaired on the Heater Board area? Limited lights in the area, make it hard to see in the area.

Bubba Van

---

**From:** Wooters, Judson <wootej@cpchem.com>
**Sent:** Monday, December 12, 2022 5:08 PM
**To:** Vandevender, Bubba <VANDEDA@cpchem.com>
**Subject:** FW: Lighting above the heater board

Is this something you can check on?

---

**From:** Cisneros, Chelse <CISNEC@cpchem.com>
**Sent:** Monday, December 12, 2022 5:05 PM
**To:** Wooters, Judson <wootej@cpchem.com>
**Cc:** Danford, Aprile A <askewam@cpchem.com>
**Subject:** Lighting above the heater board

Jud,

Do you know if the lighting above the heater board has been fixed?
If you can, could you also provide the date the work order was put in for this?

Thanks,
Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Performance by design.
Caring by choice.™

# Exhibit AP

From: "Cisneros, Chelse" <CISNEC@cpchem.com>
Sent: Monday, October 24, 2022, 5:08 PM
To: "Parsley, David G" <parsldg@cpchem.com>
Cc: "Danford, Aprile A" <askewam@cpchem.com>
Subject: Summary of Meet and Confer - W Jones
Attachments: W Jones-Summary of Meet Confer.docx

Hi Gary,

Here is the accommodation letter that was given to Warren Jones on October 19, 2022.

Thanks,

Chelse Cisneros
Human Resources Associate, Port Arthur
Direct: 409-985-0823
Cell: 346-337-1822
Email: cisnec@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, TX 77640

Chevron Phillips Chemical | Performance by design. Caring by choice.™

Personal and Confidential

October 19, 2022

Warren Jones
Port Arthur, Pool Operator

Re: Summary of Meet and Confer Meeting Held October 3, 2022

Dear Warren:

Thank you for participating in a meet and confer session on October 3, 2022. The following individuals attended the meeting: Jud Wooters, Olefins Superintendent, Clay Ryan, Union Representative, you, and me. This letter serves as a written summary of our discussion. After review of this letter, if there is any item you believe to be incomplete or inaccurate, please contact me as soon as possible. If I do not receive a response from you or anyone speaking on your behalf by October 28, 2022, I will assume the summary set forth in this letter is accurate.

On September 19, 2022, the Company became aware of your request for an accommodation. In accordance with the doctors note you presented to the Company from your Ophthalmologist, William B. Hart, you are having difficulties viewing "small numbers and letters," as well as becoming "overwhelmed by the brightness of the lights on your console."

During our meeting on October 3, 2022, you stated that you were not requesting to be removed from nights as communicated in the letter from your Ophthalmologist, but rather you were making the company aware of your vision difficulties. You further mentioned that you are currently bringing a lamp to and from work to help increase the lighting. You agreed that you would consult with your Ophthalmologist to identify adaptive devices that the Company could potentially provide to increase the visibility of the console. The Company would appreciate you providing this list as soon as possible, but no later than November 11, 2022. The Company has also consulted with our Corporate Occupational Health Department regarding additional information and resources that could be helpful and will continue to do so as necessary.

Simultaneously, on September 22, 2022, you were unsuccessful in passing the heater console operator final exam which resulted in your being taken out of schedule for a period of 35 days so that you can focus on retraining. We will continue to engage in this interactive process with you as needed while you are retraining on the console on day shift. Upon your return to normal shift assignment and implementation of any accommodation, the Company will schedule a follow-up meeting within 30 days to review and evaluate.

We appreciate your patience and cooperation as we review this matter. Please feel free to contact me directly should you have additional questions or concerns.

Sincerely,

# Exhibit AQ

From: "Parsley, David G" <PARSLDG@cpchem.com>
Sent: Wednesday, November 2, 2022, 2:30 PM
To: "Jones, Warren F" <joneswf@cpchem.com>
Subject: RE: My Concerns

Sounds good. See you shortly.

**Gary Parsley**
Plant Manager
Port Arthur Plant
Chevron Phillips Chemical Company LP
Office: 409-985-0731
Cell: 979-417-1925

Chevron Phillips Chemical Company LLC | **Performance** by design. **Caring** by choice.™

**Confidential Information** - This email is for use by the intended recipient(s) and might contain privileged, confidential or copyrighted information. Unauthorized use, copying or distribution of this email, in whole or in part, is strictly prohibited. If you are not an intended recipient of this email, please notify the sender by return email and delete this email.

**No Contract Formation** - This e-mail does not constitute a contract or an offer or acceptance of an offer to enter into a contract. Further, this e-mail may not be used to modify, supplement, novate, or waive any rights with respect to an existing contract or other binding commercial terms.

---

**From:** Jones, Warren F <JONESWF@cpchem.com>
**Sent:** Wednesday, November 2, 2022 2:30 PM
**To:** Parsley, David G <parsldg@cpchem.com>
**Subject:** RE: My Concerns

Ok thanks! I'll walk up there now if that's ok?

---

**From:** Parsley, David G <parsldg@cpchem.com>
**Sent:** Wednesday, November 2, 2022 2:15 PM
**To:** Jones, Warren F <JONESWF@cpchem.com>
**Subject:** RE: My Concerns

Certainly. I would be happy to speak with you Warren. My schedule is open until 15:00 this afternoon.

**Gary Parsley**
Plant Manager
Port Arthur Plant
Chevron Phillips Chemical Company LP
Office: 409-985-0731
Cell: 979-417-1925

Chevron Phillips Chemical Company LLC | Performance by design. Caring by choice.™

**Confidential Information** - This email is for use by the intended recipient(s) and might contain privileged, confidential or copyrighted information. Unauthorized use, copying or distribution of this email, in whole or in part, is strictly prohibited. If you are not an intended recipient of this email, please notify the sender by return email and delete this email.

**No Contract Formation** - This e-mail does not constitute a contract or an offer or acceptance of an offer to enter into a contract. Further, this e-mail may not be used to modify, supplement, novate, or waive any rights with respect to an existing contract or other binding commercial terms.

---

**From:** Jones, Warren F <JONESWF@cpchem.com>
**Sent:** Wednesday, November 2, 2022 2:13 PM
**To:** Parsley, David G <parsldg@cpchem.com>
**Subject:** My Concerns

David,

Good afternoon! I hope this email finds you well.
A week ago today, I spoke with Elliott Johnson concerning an issue on a personal level and ended up talking about a few other concerns that I have here at work.
Elliott & I spoke today, and he spoke very highly of you.
If your schedule allows, I would like to come to your office and share some things with you.

Regards,
Warren Jones

# Exhibit AR

From: "McAlister, Jacob" <MCALIL@cpchem.com>
Sent: Wednesday, December 21, 2022, 3:00 PM
To: "Parsley, David G" <parsldg@cpchem.com>
Subject: Re: Update on Personnel Issues at Port Arthur

Thanks. Don't want to give them that kind of Christmas gift.

L. Jacob McAlister
GM, Manufacturing

On Dec 21, 2022, at 2:41 PM, Parsley, David G <PARSLDG@cpchem.com> wrote:

Jacob,

Yes, I don't see either happening until after Christmas.

Thanks,

**Gary Parsley**
Plant Manager
Port Arthur Plant
Chevron Phillips Chemical Company LP
Office: 409-985-0731
Cell: 979-417-1925
<image001.png>

**Confidential Information** - This email is for use by the intended recipient(s) and might contain privileged, confidential or copyrighted information. Unauthorized use, copying or distribution of this email, in whole or in part, is strictly prohibited. If you are not an intended recipient of this email, please notify the sender by return email and delete this email.

**No Contract Formation** - This e-mail does not constitute a contract or an offer or acceptance of an offer to enter into a contract. Further, this e-mail may not be used to modify, supplement, novate, or waive any rights with respect to an existing contract or other binding commercial terms.

---

**From:** McAlister, Jacob <MCALIL@cpchem.com>
**Sent:** Wednesday, December 21, 2022 12:52 PM
**To:** Parsley, David G <parsldg@cpchem.com>
**Subject:** Re: Update on Personnel Issues at Port Arthur

Thanks, Gary. I've been thinking about these requests. In light of the holiday, do we have to progress with termination before Christmas? If we have a choice, we should err on the side of not doing this until after. What do you think?

L. Jacob McAlister
GM, Manufacturing

On Dec 21, 2022, at 10:24 AM, Parsley, David G <PARSLDG@cpchem.com> wrote:

Jacob,

I wanted to give you an update on a couple of personnel issues that are moving toward termination.

Warren Jones – Operator at 1544
We have discussed Warren a few times. He did not pass the heater board test last week for the third time. There was a potential medical concern raised by Dr. Stanton concerning his eyesight. He was tested last week, the results satisfied Dr. Stanton concern. Compliance has reviewed and endorsed termination. Legal is aware and will review further during the approval process. Our next step will be to suspend Warren pending approvals, he has been on long change since last Thursday. Warren has been training on the Heater Board job post for about a year and has been under Performance Improvement Plan (PIP) for not being able to qualify on this job post.

Leticia Lorenz – Operator at 1544
I have not discussed Leticia with you. She has been under a PIP for the Compressor Board job post. Leticia failed the qualification test yesterday. The path forward is to suspend her and move toward termination. Compliance has reviewed and endorsed termination. Legal is aware and will review further during the approval process. Some additional background. Leticia was under a PIP when training for the Heater Board position in 2020/2021. She passed the qualification test and successfully completed the PIP in 2021 for this job post.

I realize that the timing is terrible, but there is no good time for these actions. As always, we can discuss further.

Thanks,

**Gary Parsley**
Plant Manager
Port Arthur Plant
Chevron Phillips Chemical Company LP
Office: 409-985-0731
Cell: 979-417-1925
<image001.png>

**Confidential Information** - This email is for use by the intended recipient(s) and might contain privileged, confidential or copyrighted information. Unauthorized use, copying or distribution of this email, in whole

or in part, is strictly prohibited. If you are not an intended recipient of this email, please notify the sender by return email and delete this email.

**No Contract Formation** - This e-mail does not constitute a contract or an offer or acceptance of an offer to enter into a contract. Further, this e-mail may not be used to modify, supplement, novate, or waive any rights with respect to an existing contract or other binding commercial terms.

# Exhibit AS

From: "Danford, Aprile A" <askewam@cpchem.com>
Sent: Wednesday, December 28, 2022, 9:05 AM
To: "Rudloff, Lauren" <lauren.rudloff@cpchem.com>
Subject: Review and Approval Requested of Termination Recommendation - Port Arthur Pool Operator - Warren Jones
Attachments: Termination Recommendation - W Jones.docx; 7 Factor Test - W. Jones.docx; Warren Jones EHD.pdf; PIP-W.Jones.pdf; Additions to PIP.pdf; HR Training Guideline 2, Section 4.5.2-4.5.4.JPG; Stipulation 35.JPG; Unit Review Results W. Jones.pdf; Heater Board Review 1-8.24.22.pdf; Heater Board Review 2-9.22.22.pdf; Heater Board Review 3-11.17.22.pdf; Heater Board Unit Review 4-12.15.2022.pdf; Training Expectations & Responsibilities Signed.pdf

Good morning Lauren,

We are seeking your and Bryan's review/endorsement to terminate the employment of Warren Jones, Pool Operator, for failing to qualify on the heater board as required.

**Employee:** Warren Jones
**Position:** Pool Operator
**Location:** Port Arthur
**Date of Hire:** 12/7/2015
**Performance History:** 2021 – ME; 2020 – ME; 2019 – ME

**Summary:**
Warren Jones has been unsuccessful in qualifying on the heater board four times over the course of 8 months. Jones started training to qualify for the heater board role on March 18, 2022. He was unsuccessful when he tested for the first time on August 24. Jones completed another month's training and then was unsuccessful when he retested on September 22. Per HR Training Guideline 2, Section 4.5.3, Jones was then formally placed on a Performance Improvement Plan (PIP) on October 13, 2022, to address the deficiencies identified during his test with the Unit Review Committee.

During the PIP, Jones received additional classroom and one-on-one training. Despite the additional training, Jones was again unsuccessful on his third attempt at qualifying on the heater board on November 17, 2022.

Jones indicated at this time the existence of a medical condition that may have been relevant to his qualification attempts. The Company engaged in an interactive process with Jones and, among other things, permitted Jones to make a fourth attempt to qualify. On December 15, 2022, Jones failed for a fourth time to qualify on the heater board and per Stipulation 35, Operator Training, in the United Steelworkers Plant Group Collective Bargaining Agreement, an employee who fails to meet the training program requirements may be dropped from the payroll.

**Recommendation:**
As a result of Jones's failure to qualify on the heater board after four attempts, Bryan Kubsch, Operations Manager, recommends termination of Jones's employment. Gary Parsley, Plant Manager, and Stephanie John, Senior Counsel – HR, Benefits & Privacy, support this recommendation.

**Attachments for Review:**
- Termination Summary
- 7 Factor Test

- Employee History Detail
- Performance Improvement Plan
- Performance Improvement Plan additions
- HR Training Guideline 2, Section 4.5.2-4.5.4
- Stipulation 35
- Unit Review Results
- Heater Board Review 1-4
- Training Expectations and Responsibilities Signed

Please advise if you have any questions or need additional information. Additionally, please let me know if we have your support to proceed with termination.

Thank you.

Aprile Danford
HR Manager
Direct: 409.985.0822
Cell: 979.481.3216
Email: askewam@cpchem.com

Chevron Phillips Chemical Company LP
2001 S. Gulfway Drive, Port Arthur, Texas 77640

Performance by design. Caring by choice.™

This message is subject to disclaimers.

Chevron Phillips CHEMICAL

# TERMINATION RECOMMENDATION – Seven-Factor Test

**Date: December 27, 2022**

| | |
|---|---|
| **Employee Name:** Warren Jones | **Position Title:** Pool Operator |
| | |
| **Company/Division/Department:** CPChem/Port Arthur Manufacturing/Operations | **Manager:** Bryan Kubsch, Operations Manager |
| | |
| **Date of Hire:** 12/7/2015 | **Performance History:** 2021 – ME; 2020 – ME; 2019 – ME |
| | |

When considering whether to terminate an employee in a Union or non-Union facility, the line supervisor and appropriate HR Business Partner should review the questions below in making a final decision. Generally, when an allegation of a Life-Saving Rule (LSR), work rule, policy, guideline, or procedure violation is reported, or when an employee has uncorrected performance deficiencies, the line supervisor and the appropriate HR Business Partner shall determine the proper course of action. Arbitrators evaluating union grievances use a test known as the Seven Factors of Just Cause, which we have adapted below as guidance in considering whether to recommend termination. The "just cause" standard only applies to our Union-represented employees because our non-represented employees are employed on an "at will" basis. Nonetheless, considering the seven factors listed below in all cases will help ensure that termination decisions are made fairly and consistently.

1. Did the Employee have forewarning as to the possible or probable consequence of the alleged conduct? (i.e. Was the Employee aware of the LSR, work rule, policy, guideline, or procedure and the consequences of violating it? Was the employee aware of his/her performance deficiencies and the consequences of failing to correct those deficiencies?) **Yes, Jones was placed on a Performance Improvement Plan (PIP) on October 13, 2022, that detailed specified deficiencies that needed to be improved. The PIP was scheduled to be in effect for 5 weeks, October 13, 2022 – November 17, 2022. Additionally, Operator training and expectations are outlined in HR Training Guideline 2 and expectations in Stipulation 35 in the United Steelworker Collective Bargaining Agreement.**

2. Is the Employer's rule reasonably related to (a) the orderly, efficient, and safe operation of the business and (b) the performance that the Employer might properly expect of the Employee? **Yes, the employee is expected to perform the roles and responsibilities of a fully qualified operator, which includes training on various jobs and passing qualification tests. However, Jones was unable to successfully pass the heater board test resulting in not being a fully qualified operator.**

3. Have we made an effort to discover whether the Employee did in fact violate or disobey the LSR, work rule, policy, guideline, or procedure, or where appropriate, fail to correct his/her performance deficiencies? (i.e. Did we conduct a comprehensive and thorough investigation?) **Yes. Jones was given multiple attempts at training and testing to qualify for the heater board. Additionally, Jones signed a form that certified his agreement with the training expectations and responsibilities.**

4. Did we conduct a fair and impartial investigation of the incident, or where appropriate, the performance deficiencies? (i.e. Did we have an open mind to receiving the results of the investigation before determining the appropriate action? Generally, an investigation is "fair" when the employer provides the employee suspected of misconduct the opportunity to tell his/her side of the story and to provide an explanation for the challenged conduct.) **Yes. Jones was provided with additional one-on-one training and allowed for multiple attempts to pass the test in order to qualify for the heater board.**

5. Have we sufficiently proved that the alleged violation occurred? (i.e. Do the facts support our conclusion that the violation occurred?) **Yes, Jones was unsuccessful in passing his heater board qualification exam on four separate occasions.**

6. Have we applied our rules evenhandedly and without discrimination to all employees? (i.e. Have we treated others in a similar fashion, given all of the circumstances?) **Yes.**

Chevron Phillips CHEMICAL

# TERMINATION RECOMMENDATION – Seven-Factor Test

| |
|---|
| 7. Is the recommended action reasonably related to the seriousness of the proven offense and have we considered the Employee's overall work record, including company service? (i.e. Does the recommended action fit the violation?) **Yes, all were considered.** |

**Termination Recommended By/Title:** **Bryan Kubsch/Operations Manager**

**Human Resources Representative/Title:** **Chelse Cisneros/ HR Associate**

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**PIP Update:**

- 17-Nov-2022 – This was emailed to Warren Jones to document the unit review that took place on this day. The unit review team included Jud Wooters, Nick Graham, Clayton Ryan, Jimmie Hayes and Josh Montalvo.

> Warren,
>
> Thank you for meeting with me this afternoon to discuss the status of your PIP (copied). This email serves to document our discussion. Attendees in this meeting were Jud Wooters, Nick Graham, Warren Jones, Clayton Ryan, and Jimmie Hayes.
>
> As required by the PIP, you completed the heater outside classroom and have continued to review heater board material since 22-Sep-2022. Today was your scheduled "full heater board unit review" to determine if you could be qualified to work the heater board. While you showed proficiency answering questions in the quench and feed prep areas, your answers to questions in the Lummus/SWEC heater area were not acceptable. Therefore, I cannot qualify you to work alone at the heater console.
>
> In addition, during our discussion, you indicated that you continue to have vision concerns that periodically interfere with your ability to view text on the screens. To be sure we adequately address the continued vision concerns, we will be reaching out to the company doctor following the Thanksgiving holiday.
>
> In the meantime, we agreed that you would return to shift and be allowed to continue working on your heater board training. If a suitable resolution to your vision concerns is found prior to 15-Dec-2022, you will be given one final opportunity to take the full heater board unit review test to qualify for the heater board.
>
> -- Jud

- 12-Dec-2022 – Consistent with the email sent to Warren Jones on 17-Nov-2022, the company reviewed his vision concerns with company medical and council and it was determined that those concerns should be treated independing of his ability to perform the heater board job. As such, it was determined that a fourth heater board unit review test would be given.

  On 15-Dec-2022 a board unit review team consisting of Jud Wooters, Clayton Ryan, Bryan Lohr and Josh Montalvo performed a heater board assessment to determine if Jones could be qualified to work the heater board alone. While Jones showed some improvement in answering the board unit review team's questions, He did not meet the teams expectations, and therefor cannot be qaulified to work alone at the heater console.

Chevron Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**Action Plan**

| C. Performance Issue | D. Required Actions to Bring Performance to Fully Successful Level | E. Action Employee Will Take to Address the Problem | F. Metric(s) | G. Results/Expectations Met or not Met | *TCD | **ACD |
|---|---|---|---|---|---|---|
| Not Meeting Training Expectations | Attend heater outside classroom to refresh on heater area flows Class:03-Oct-2022 | | • Field walk through with qualified outside operator & HO/PSC to confirm understanding of heater board system flows. | Met<br>Nick Graham<br>Jimmy Hayes<br>Clayton Ryan | 28 Oct 2022 | |
| | Retrain and qualify on the heater board.<br><br>A qualified heater board operator and/or a special assignment operator will be made available to assist in your retraining. | | Complete review of all module situations with qualified heater board operator & HO/PSC to confirm competency. Pass the full heater board unit review. The review team will assess your ability to demonstrate compentancy in situation questions and flows relevant to the heater board. Unit review will be scheduled for the week of 17-Nov-2022. | Met<br>Justin Ridgaway<br><br>Not Met<br>Jud Wooters<br>Clayton Ryan<br>Bryan Lohr<br>Josh Montalvo | 17 Nov 2022 | |

***Target Completion Date (TCD)**
****Actual Completion Date (ACD)**

#1

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

#2

EU1544 Unit Review Committee

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
    a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
    a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
    a. Comments:
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
    a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
    a. Comments:
6. Locate and explain on the DCS console how the economizer works.
    a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
    a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work.
    a. Comments:
9. What basic steps should be taken upon loss of instrument air?
    a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked?
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.
    a. Comments:

W. J. #3

EU1544 Unit Review Committee

## EU1544 Heater DCS

Dearator controls discussion . . . had trouble explaining min flow for GA703, but did alright w/ most below on BFW

Heater DCS Unit Review Committee to select 25 questions:

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:

★ (3.) Locate the Deaerator level control on the DCS console and explain how this works.

3/5 a. Comments: Was able to explain the level control, but when asked about high level, he just said we'd drop water. Forgot about jump over

★ 4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.

4/5 Did pretty good, flow questions mostly ok

   a. Comments:

5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:

(6.) Locate and explain on the DCS console how the economizer works.
   a. Comments:

7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:

★ 8. Locate and explain how 44PC 7589 and 44FC 7582 work.
   a. Comments:

(9) What basic steps should be taken upon loss of instrument air?
   a. Comments:

★ (10.) What basic steps should be taken upon loss of boiler feed water pressure?

5/5 a. Comments: check pumps
blowdown
inlet to economizer
check for UXX/TLE
Take heaters off

CP CHEM 000842

# EU1544 Unit Review Committee

Fuel gas system .. did pretty well

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.

    a. Comments:

12. Locate the natural gas pressure controller on the DCS and explain its function.

    a. Comments:

13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.

    a. Comments:

14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation?

    a. Comments:

★ 15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked? Didn't go into depth

3/5

    a. Comments:

16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.

    a. Comments:

★ 17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.

4/5

    a. Comments: · Could have been cut out of VL8 · Wyl could take it (had to be prompted)

18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.

    a. Comments:

19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point.

    a. Comments:

CP CHEM 000843

EU1544 Unit Review Committee

W.V. #4

## EU1544 Heater DCS

Heater DCS Unit Review Committee to select 25 questions:

220-750
Cont. v. dnt.
Cont on 7CE
vent 220 to flare

1. Locate the cooling water temperature TI point on the DCS console.
   a. Comments:
2. Locate the Superheater Temperature controller on the DCS console.
   a. Comments:
3. Locate the Deaerator level control on the DCS console and explain how this works.
   a. Comments: ✓
4. Locate the Superheater Minimum Flow controller on the DCS console and explain how this works.
   a. Comments:
5. Locate the FA701 level controller on the DCS console and explain its control.
   a. Comments:
6. Locate and explain on the DCS console how the economizer works.
   a. Comments:
7. Show how to tag up 44PC 7637 and explain what its function is.
   a. Comments:
8. Locate and explain how 44PC 7589 and 44FC 7582 work. Review (7)
   a. Comments:
9. What basic steps should be taken upon loss of instrument air?
   a. Comments:
10. What basic steps should be taken upon loss of boiler feed water pressure?
    a. Comments:

CP CHEM 000844

# EU1544 Unit Review Committee

11. Locate the level controller for both Drier Regeneration Knock Out drums on the DCS.
    a. Comments:
12. Locate the natural gas pressure controller on the DCS and explain its function.
    a. Comments:
13. Locate the main fuel gas trip to the heaters on the DCS and explain its function.
    a. Comments:
14. What would happen if FA 305 were to fill up with liquid and what should be done to rectify the situation? ✓
    a. Comments:
15. If we were bringing in natural gas and exporting fuel gas to 1041 boiler unit, what should be checked? review
    a. Comments:
16. Locate on the DCS where the excess flow of fuel gas is sent to Refinery Fuel and explain when this should show a flow.
    a. Comments:
17. Explain what basic moves should be made if we were flaring fuel gas on 44PC 488.
    a. Comments:
18. Locate on the DCS the pressure controller for the DMS storage drum and state what it should it be set at.
    a. Comments:
19. Locate on the DCS the Flow controllers for the DMS injection to the Cracking heaters and explain what determines the set point. ✓
    a. Comments:

#### 4.5.2 First Extension

If the trainee fails to meet the established criteria for passing Unit Review Committee #1, retraining and reevaluation are required. The Unit Review Committee will specify the allowed duration for the First Extension, which should not exceed 20% of the base timeframe for that qualification area unless approved by the Unit Superintendent. The trainee will be evaluated again through Unit Review Committee #2 by the end of that specified duration, ensuring that any deficiencies previously noted are covered and understood.

#### 4.5.3 Second Extension

If the trainee does not successfully pass Unit Review Committee #2, the Training Coordinator will facilitate a discussion with the Unit Leadership to determine the path forward which could include a Second Extension for retraining and reevaluation through Unit Review Committee #3 or placing the employee on a Performance Improvement Plan to address the deficiencies listed on the Unit Review Committee Form. (Human Recourses will be consulted as necessary). If the Unit Leadership assessment approves a Second Extension, they will specify the duration of that extension, which should not exceed 20% of the base timeframe for that qualification area unless approved by the Unit Superintendent. The trainee will be evaluated again through Unit Review Committee #3 by the end of that specified duration ensuring that any deficiencies previously noted are covered and understood.

#### 4.5.4 Unsuccessful Third Attempt

If the trainee does not successfully pass the Unit Review Committee #3, Unit Leadership will consult with Human Resources to determine appropriate action.

Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**Date:** **13-Oct-2022**

**Manager/Supervisor Name:** **Judson Wooters**

**Employee Name:** **Warren Jones**

**Position Title:** **Operator**

**Company/Division/Department:** **Port Arthur Operations**

Your performance has fallen short of the expectations of an employee of your level of experience. The purpose of this document is to record the areas needing improvement as previously discussed and develop a plan that will enable you to improve to the level expected of you. Primary reason for PIP is indicated below.

☐ Overall Annual Performance Rating "Needs Improvement" ☐ Working Relationships
☒ Specific Skill or Competency Deficiency

**A. Overall Timeline**

The PIP will be in effect from 13-October-2022 through 17-November-2022, although nothing in this PIP alters your at-will employment status or guarantees employment for any specified period of time. You are expected to make immediate and ongoing improvement while on the PIP, and a fully successful level of performance must be continually sustained once expectations are met.

**B. Summary of Performance Issues and Organizational Impact**
*(Explain the problem and its impact on the organization)*

**Performance Issue:** Not Meeting Training Expectations
**Organizational Impact:**
**Current PIP (13-Oct-2022 – 17-Nov-2022)**

- Heater Console Console Training
  - 1st attempt at training & testing (18-Mar-2022 to 24-Aug-2022) – did not perform well enough on final exam to qualify for the job
  - 2nd attempt at training & testing (25-Aug-2022 to 22-Sep-2022) – again unsuccessful in passing your final exam to qualify for the job necessitating this PIP

Phillips Chemical Company LP

# PERFORMANCE IMPROVEMENT PLAN (PIP)

**Action Plan**

| C. Performance Issue | D. Required Actions to Bring Performance to Fully Successful Level | E. Action Employee Will Take to Address the Problem | F. Metric(s) | G. Results/Expectations Met or not Met | *TCD | **ACD |
|---|---|---|---|---|---|---|
| Not Meeting Training Expectations | Attend heater outside classroom to refresh on heater area flows Class:03-Oct-2022 | | • Field walk through with qualified outside operator & HO/PSC to confirm understanding of heater board system flows. | | 28 Oct 2022 | |
| | Retrain and qualify on the heater board.<br><br>A qualified heater board operator and/or a special assignment operator will be made available to assist in your retraining. | | • Complete review of all module situations with qualified heater board operator & HO/PSC to confirm competency.<br>• Pass the full heater board unit review. The review team will assess your ability to demonstrate compentancy in situation questions and flows relevant to the heater board. Unit review will be scheduled for the week of 17-Nov-2022. | | 17 Nov 2022 | |

***Target Completion Date (TCD)**
****Actual Completion Date (ACD)**

## STIPULATION NO. 35
## OPERATOR TRAINING

The parties hereby establish a three year training program for Operating employees. Employees entering the Operator Training Program will be classified as Operations Trainees. Positions in the Operations Trainee classification will be filled by the posting of bids to eligible employees. Positions which cannot be filled by bid may be filled by appointment or by the hiring of new employees.

A step rate wage progression has been established for the Operations Trainee classification. To advance to the next step rate, employees must qualify in a minimum of one additional Operating location each year and satisfactorily complete a minimum of 20 hours of self-study courses each year as prescribed by the Company. It is recognized that long term sickness and accidents that are beyond an employee's control may occur which will warrant granting to the employee additional time to meet the requirements of the training program. In such cases the Union and Company agree to meet and discuss the circumstances of the particular situation and the length of additional time to be granted, if any, to complete the training program. Employees in the Operations Trainee classification will be assigned to the Operations Pool and may be assigned to fill temporary vacancies as outlined in Stipulation No. 22. Upon completion of the Operator Training Program, employees in the Operations Trainee classification will be reclassified as Pool Operators.

Employees entering the Operations Trainee Program, whose rates are above the minimum will be paid at the rate they were receiving at the time they entered the Operations Trainee Program until they complete sufficient time in the training program to advance to the next higher rate. Employees who enter the Operations Trainee Program whose rates are below the Operations Trainee start rate shall receive the Operations Trainee start rate.

Permanent vacancies in Operating jobs will be filled by seniority from employees assigned to the Operations Pool. To be eligible to claim a permanent vacancy, Operations Trainees must have qualified for one job prior to the date that the vacancy occurs. Permanent vacancies filled from the Operations Pool may be filled temporarily until the employee who has claimed the permanent vacancy completes his/her training program.

Employees hired after February 1, 1988, shall not have the right to disqualify themselves and may be dropped from the payroll should they fail to meet the requirements of the Training Program. Employees on the payroll as of February 1, 1988, who disqualify themselves or who are disqualified during their trial period will be returned as outlined in Article VI, Section (2)A.

Head Operator training will consist of two weeks with the Day Head Operator and two weeks with the Inside Head Operator.

**Termination Recommendation Memo**

**Employee:** Warren Jones
**Position:** Pool Operator
**Location:** Port Arthur
**Date of Hire:** 12/7/2015
**Performance History:** 2021 – ME; 2020 – ME; 2019 – ME

**Facts:**
Warren Jones has been unsuccessful in qualifying on the heater board four times over the course of 8 months. Jones started training to qualify for the heater board role on March 18, 2022. He was unsuccessful when he tested for the first time on August 24. Jones completed another month's training and then was unsuccessful when he retested on September 22. Per HR Training Guideline 2, Section 4.5.3, Jones was then formally placed on a Performance Improvement Plan (PIP) on October 13, 2022, to address the deficiencies identified during his test with the Unit Review Committee.

During the PIP, Jones received additional classroom and one-on-one training. Despite the additional training, Jones was again unsuccessful on his third attempt at qualifying on the heater board on November 17, 2022.

Jones indicated at this time the existence of a medical condition that may have been relevant to his qualification attempts. The Company engaged in an interactive process with Jones and, among other things, permitted Jones to make a fourth attempt to qualify. On December 15, 2022, Jones failed for a fourth time to qualify on the heater board and per Stipulation 35, Operator Training, in the United Steelworkers Plant Group Collective Bargaining Agreement, an employee who fails to meet the training program requirements may be dropped from the payroll.

**Recommendation:**
As a result of Jones's failure to qualify on the heater board after four attempts, Bryan Kubsch, Operations Manager, recommends termination of Jones's employment. Gary Parsley, Plant Manager, supports this recommendation.

Prepared by Chelse Cisneros on 12/22/2022
Reviewed and supported by Sr. Counsel Stephanie John

| CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR | |
|---|---|
| Chevron Phillips — Training Expectations and Responsibilities | |

Date: 8/24/22

Trainee Name: Warren Jones

Qualification Area: Heater DCS

Expected Training Duration 35 shifts

Anticipated Unit Review Committee Date 8/24/22

The training expectations and responsibilities agreement is an integral component of the Port Arthur Training Program. The training agreement ensures expectations and responsibilities are communicated and understood.

## SIGNATURES

**Signing below certifies agreement with the expectations and responsibilities of this document**

| | | | |
|---|---|---|---|
| Trainee: | Print: Warren Jones | Sign: Warren Jones | Date: 8/24/22 |
| Classroom Qualified Operator: | Print: N/A | Sign: N/A | Date: N/A |
| Piggyback Qualified Operator: | Print: Justin Ridgaway | Sign: [signature] | Date: 8/24/22 |
| PSC: | Print: Nick Graham | Sign: [signature] | Date: 8/24/22 |
| Training Coordinator: | Print: Vosker Martkle | Sign: [signature] | Date: 9/22/22 |

***It is the responsibility of the Trainee to retain the required Training Documentation for the duration of the training period, all documentation is due prior to the first Unit Review Committee. Qualified Operators will work directly with the Trainee to cover all materials required in the specific area of training. The PSC will monitor progress of the trainee by periodically checking status of sign-offs of the required qualification checklists.***

*The process overview for this qualification contains the following:*

1. Trainee will complete Familiarization, Classroom, and Piggyback training material as required by the qualification area.
2. A Qualified Operator will be designated to work with the Trainee for training purposes.
3. PSCs will monitor progress of Trainee throughout completion of training.
4. Successful completion of all training documentation
5. Walk-thru and Skills Demonstration with Qualified Operator, Training Coordinator, Head Operator, or PSC.
6. Final knowledge test in LMS.
7. Unit Review Committee.
8. Qualified Solo period to get behavioral feedback and gain additional experience.

***TRAINEE***

**On-the-Job Training** (Familiarization, Classroom & Piggyback) the Trainee will…

- Be Self Motivated making immediate and ongoing improvements during the Training period.
- Successfully demonstrate understanding and knowledge obtained on the process and day to day tasks associated with the qualification area.
- Address any deficiencies discovered during the Unit Review Committee according to the Action Plan.
- Be accountable and responsible for successful completion of the qualification process in the expected time period.
- Keep up with training materials and Training Documentation.
- Be required to participate in exercises and work associated with training.
- Achieve a minimum of 85% on tests.
- *Be able to draw the unit flows from memory (process units – specifics below).
- Be trained on and knowledgeable about the area SOPs.
- *Be trained on and knowledgeable about the area PFDs/P&IDs.
- Recognize the hazards of the chemicals in the area of training.
- Know and utilize the proper MPPE for handling of samples / tasks.
- Know equipment purpose, locations and what aspects are critical.
- *Understand how the mechanical equipment works.
- Be knowledgeable about instrumentation and how it controls the process.
- Gain complete understanding of routine tasks.
- Understand the procedures for proper LTT of all equipment in the area.

**CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR**

Chevron Phillips

# Unit Review Committee for Job Qualification

| | | | |
|---|---|---|---|
| Date: | 8/24/22 | ☐ Successful | |
| Trainee Name: | Warren Jones | ☒ Not Successful | #1 |
| Unit: | EU1544 | ☐ 1st Attempt | |
| Qualification Area: | Heater DCS | ☐ 2nd Attempt | |
| LMS Course Code: | PAR00006 | ☐ 3rd Attempt | |

A Successful indication above signifies that the Trainee has demonstrated the knowledge, comprehension, and ability to work the area unassisted and is now qualified in the area for which they trained.

**Extension duration and approval** (if needed):

Approved Extension Duration (shifts) ____________ ☐ 1st Extension

Next OJT Review Committee Date ____________ ☐ 2nd Extension

Unit Superintendent Approval (if >20% of base duration) ____________________

A **Qualified Solo Work Cycle** will be required for 6 weeks following this qualification.

**By signing below, I certify agreement with the Review Committee's determination.**

If Not Successful is indicated above, the Trainee accepts responsibility for addressing any deficiencies that have been identified and completing the Action Plan associated with those deficiencies prior to the next Unit Review Committee attempt.

| | Print: | Sign: | Date: |
|---|---|---|---|
| Trainee: | Warren Jones | [signature] | 8-24-2[illegible] |
| Area Qualified Operator(s) | Jimi Hayes | [signature] | 8-24-22 |
| (if applicable): | N/A | N/A | N/A |
| PSC: | Nick Graham | [signature] | 8/24/22 |
| Training Coordinator: | Joshua Mentzel | [signature] | 8/24/2[illegible] |
| Other Personnel (if applicable): | N/A | N/A | N/A |
| Unit Superintendent (if applicable): | Jay Wo[illegible] | [signature] | 22-Sep-22 |

| Dept: Training Department | Page 1 of 2 | Rev: 0 | Revision Date: 4/26/2021 | |
|---|---|---|---|---|
| The most recent revision of this document should be obtained and used. Current revisions can be printed from the Document Management system on the Web. This copy is valid for 24 hrs. from print date. | | | Print Date: 7/28/2022 | Print Time: 8:18 AM |

CP CHEM 000853

| CHEVRON PHILLIPS CHEMICAL COMPANY PORT ARTHUR | |
|---|---|
| Chevron Phillips — Unit Review Committee for Job Qualification | |

**Summary of Deficiencies and Action Plan**
*(Explain the deficiency and identify actions needed)*

| Deficiencies Identified | Required Actions to resolve deficiencies and complete a successful Unit Review Committee | Action Employee Will Take to Address the deficiencies |
|---|---|---|
| Did not pass the LMS Final Exam. 82.4 [initials] | Retest on LMS Final Exam + Situational deficiencies | Shaping knife on E/P Mix |
| Navigating Console Pages Superheater operation | in 4 sets (week of Sept 19). [initials] | Vaporizer system along with Superheater system and SWC heaters w/ [illegible] |
| EP Mix Feed operation (system) Quench Tower operation (system) Flare load shedding | | |
| Navigate heater feed, steam, fuel pages + control [initials] | | and QW system w/ navigating |
| | | |
| | | |

# Exhibit AT

From: "Jones, Warren F" <JONESWF@cpchem.com>
Sent: Friday, April 22, 2022, 5:04 AM
To: "Wooters, Judson" <wootej@cpchem.com>
Subject: RE: W. Jones

Thanks guys! I really appreciate the concerns. I will push through this training like I've done with everything else I've had to face in life. If I need anything I won't hesitate to ask for help. Thanks again.

**From:** Wooters, Judson <wootej@cpchem.com>
**Sent:** Tuesday, April 19, 2022 5:14 PM
**To:** Hayes, Jimmie <hayesj@cpchem.com>
**Cc:** Jones, Warren F <JONESWF@cpchem.com>; Lohr, Bryan R <lohrbr@cpchem.com>; Ridgaway, Justin A <RIDGAJA@cpchem.com>
**Subject:** RE: W. Jones

Thanks Jimmie!

Warren, if there's anything you think we can do to provide you the resources you need to be successful, please don't hesitate to ask. I'm confident you'll do great!

-- Jud

**From:** Hayes, Jimmie <hayesj@cpchem.com>
**Sent:** Tuesday, April 19, 2022 5:04 PM
**To:** Wooters, Judson <wootej@cpchem.com>
**Cc:** Jones, Warren F <JONESWF@cpchem.com>; Lohr, Bryan R <lohrbr@cpchem.com>; Ridgaway, Justin A <RIDGAJA@cpchem.com>
**Subject:** W. Jones

At Warren's request he would like to continue training. He has some new described glasses coming in two weeks. My crew and I will give him as much assistance as necessary to make him successful. Also we will alert you if we run into any issues along the way.

Make 3 crew great again
Devil's Advocate

# Exhibit AU

Display Order header text: Alternative Language EN

| F... | L. | Row Text | R |
|---|---|---|---|
| | | ....+....1....+....2....+....3....+....4....+....5....+....6....+....7.. | |
| * | | Heater board lights (lamps) | |
| * | | 10/25/2022 10:24:44 CST G3PTMREMOTE G3PTMREMOTE (G3PTMREMOTE) | |
| * | | Submitted By: | |
| * | | Johnson, Richard (JOHNSRG) | |
| * | | Description: | |
| * | | Heater board lamps don't all work.  Not sure who can repair/replace. | |
| | | These are the Koncept brand lamps over the console. | |
| * | | Work Description: | |
| * | | repair/replace | |
| * | | Troubleshooting: | |
| * | | n/a | |

Display UNPLANNED MAINTENANCE ORDERS 4595469: Administrative Data/Para

| | | | |
|---|---|---|---|
| Order | PM02 4595469 | Heater board lights (lamps) | |
| Sys.Status | CLSD PCNF GMPS MACM PPRT PRC SETC | SCHD MBAG | |

HeaderData | Operations | Components | Costs | Objects | Additional Data | Location | Planning | Control | Enhancement

**Administrative data**

| | |
|---|---|
| Entered by | DOYLEMP |
| Created on | 10/25/2022 |
| Changed by | PRODSAP |
| Changed on | 10/01/2023 |

**Planning indicator**

- ○ Planned order
- ○ Immediate order
- ◉ Unplanned order

**Parameters**

| | | | |
|---|---|---|---|
| Costing Sheet | | Status Profile | ZPM00002 |
| Overhead key | | PriorityType | PM |
| CstgVariantPlan | PM01 | Category | 3 |
| CstgVariantActl | PM01 | MaintProfile | 0000001 |
| RA Key | | ExternProfile | EX_LAB1 |
| Op./act. incrmt | 0010 | Mat.Profile | EX_MAT1 |

**Reservations/purchase requisitions**

| | |
|---|---|
| Res./Purc. req. | Immediately |

CP CHEM 000898

# Exhibit AV

0D10B6CE-.jpg Received on Mar 9th at 7:05 AM



EXHIBIT A