**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| WARREN F. JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:24-CV-350 |
| | § | |
| CHEVRON PHILLIPS CHEMICAL | § | |
| COMPANY, L.P., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Chevron Phillips Chemical Company, L.P.'s ("CPChem") Motion for Summary Judgment (#17).  Plaintiff Warren F. Jones ("Jones") filed a Response in opposition (#21) and CPChem filed a Reply (#25).  Having considered the motion, the submissions of the parties, the record, and the applicable law, the court is of the opinion that CPChem's motion should be granted in part and denied in part.

I.      Background

This lawsuit arises from CPChem's termination of Jones's employment.  Jones began his employment with CPChem as an Operations Trainee at CPChem's Port Arthur petrochemical facility in December 2015.  Operators at CPChem are responsible for overseeing and managing the chemical processes to ensure they are completed in a safe and efficient manner.  According to CPChem, Operators must train and qualify to perform six different essential job functions, including oversight of:  (1) outside heaters; (2) outside distillation; (3) outside compressors; (4) inside Heater Board; (5) inside Distillation Board; and (6) inside Compressor Board.  About three years after Jones began working for CPChem, he transitioned to an Outside/Pool Operator position

at the Port Arthur facility.   Throughout his employment, Jones was a member of the United Steelworkers of America Union ("Union"), and, as such, his employment was governed by the terms of the Collective Bargaining Agreement ("CBA") between the Union and CPChem.   Among other things, the CBA included terms governing which Operators were next in line to qualify in new areas of their units based on seniority.   Between December 2018 and March 2022, Jones successfully completed training and qualifications on the "outside" job functions, including outside heaters, outside compressors, and outside distillation.   Although Jones was born with significantly impaired eyesight, or "myopia," Jones's eye impairment had never negatively impacted or interfered with his previous, essential job functions as an Operations Trainee or an Outside/Pool Operator.

In Summer of 2022, through CPChem's seniority promotion system, Jones was offered an opportunity to be promoted to CDS/Heater Board Operator.   The position required Jones to perform various "inside" jobs such as watching and monitoring numerous screens, each of which included tiny numbers and symbols.   To qualify for the promotion, Jones had to undergo several weeks of training with a certified board operator and pass a written and practical exam.   Specifically, qualification on the Heater Board involved a two-part test:   (1) an online "final knowledge" test; and (2) an in-person evaluation by a Unit Review Committee.   According to CPChem, once Jones decided to proceed with Heater Board training, he could not change his mind, as the CBA states that employees "shall not have the right to disqualify themselves and may be dropped from the payroll should they fail to meet the requirements of the Training Program."[1]

---

[1] Jones disagrees with CPChem's characterization of the consequences of failing the training. Rather, Jones maintains that while employees may not have the unqualified "right" to disqualify themselves, *the company* could request or otherwise permit an employee to bypass training if presented with

2

Nevertheless, Jones decided to proceed with Heater Board training and was "looking forward" to qualifying for the job and advancing his career.

When Jones began his Heater Board training, he first noticed that his vision made it difficult for him to read the Heater Board in its current state. In order to operate the Heater Board, Jones sat at a desk equipped with a console consisting of six regular-sized computer monitors and one large monitor at the top. Although the room had no windows, it was illuminated by overhead lighting, some of which was adjustable. Jones's eye condition, however, substantially impaired his ability to read and monitor the various screens. Moreover, as a result of Jones's having to strain his eyes to focus on the board's tiny numbers and symbols, he suffered debilitating headaches. Jones approached his supervisor and Operations Manager, Thomas Judson Wooters ("Wooters"), and openly discussed his disabling eye condition. Prior to sitting for the Board Operator exam, Jones consulted his Ophthalmologist, William B. Hart, M.D. ("Dr. Hart"), in an effort to remedy the issues he experienced reading the Board Operator monitors. In compliance with Dr. Hart's recommendations, Jones tried tinted bi-focal glasses, specialized eye drops, and contact lenses. Unfortunately, however, none of the options alleviated Jones's difficulty reading the Board Operator monitors or the headaches caused by Jones's straining his eyes.

Jones first attempted the online written test for the Heater Board on August 22, 2022, and did not pass. Jones took the online exam a second time, however, on September 20, 2022, and passed. On August 24, 2022, Jones appeared before the Unit Review Committee for his first in-person evaluation. During the in-person evaluation, Operators must demonstrate the ability to understand how the Heater Board system works because, in an emergency situation, lives could

---

a "good reason." Further, Jones's deposition testimony indicates that he was not fully aware of this policy.

be at stake.   Jones's in-person panel committee consisted of Head Operator Jimmie Hayes ("Hayes"), Plant Shift Coordinator Nicholas Graham ("Graham"), and Training Coordinator Josh Montalvo ("Montalvo").  Montalvo selected 25 questions from a master set of 97 to assess Jones's knowledge and competency regarding the Heater Board.  Ultimately, every member of the Unit Review Committee signed and confirmed that Jones had not successfully demonstrated the knowledge required to qualify.  Although Jones admitted that he felt his performance was "shaky" during the first panel evaluation, he maintains that he was questioned more rigorously during this evaluation than other Operators.

On September 13, 2022, after failing the first set of exams, Jones asked to be reassigned to a Pool Operator role.[2]  CPChem agreed and reassigned Jones as a Pool Operator.  Jones remained subject to the same training and qualification requirements, however, and was still expected to complete the Heater Board training.  Accordingly, Jones was scheduled to re-take the panel evaluation before the Unit Review Committee on September 22, 2022.  On or around September 16, 2022, Dr. Hart issued a physician's note detailing Jones's vision condition and the difficulties he was experiencing during the Heater Board Operator training because of the requirement that he read monitors.  The note confirmed that Jones suffered from "extremely high myopia," or nearsightedness.  As a result of Jones's difficulties reading the monitors, Dr. Hart recommended that Jones be accommodated by being transitioned from night shift to day shift.[3]

---

[2] A Pool Operator role is a versatile position where the Operator may be assigned to any job function as needed, depending on his or her qualifications.  According to CPChem, however, Pool Operators are not relieved of the responsibility to train for and qualify for jobs assigned to the unit, such as the Heater Board.

[3] Jones maintains that this request stemmed from a misunderstanding between him and Dr. Hart and later clarified that he was not asking to be removed from night shifts.

Jones provided Dr. Hart's note to his Union Representative, Clay Ryan ("Ryan"), and thereafter provided a copy of the note directly to Wooters on September 19, 2022. Upon receiving Dr. Hart's note, according to CPChem, its Human Resources ("HR") team initiated the "interactive process." HR Associate Chelse Cisneros ("Cisneros") notified HR Manager April Danford ("Danford") of the letter, and they, together with Wooters, scheduled a meeting with Jones to assess whether any reasonable accommodation would enable him to perform the essential functions of his position as an Operator. Jones notes, however, that Cisneros did not contact him to set up the meeting until September 26, 2022—four days after he was subjected to another in-person exam. On September 22, 2022, Jones appeared before the Unit Review Committee for his second in-person panel evaluation. The committee included Hayes, Graham, Montalvo, Wooters, Ryan, and Operator John Watkins ("Watkins"). Once again, Jones was unsuccessful.

Because Jones had failed his first two in-person panel tests, in accordance with applicable training guidelines, he was placed on a Performance Improvement Plan ("PIP") to address his deficiencies. The PIP consisted of "outside heater classroom" training and "field walk-throughs" with Hayes and Graham. On October 3, 2022, Jones attended a meeting with Ryan, Cisneros, and Wooters regarding Dr. Hart's physician's note. During the meeting, Jones described his medical history, upbringing, and nearsightedness. He also explained that his difficulty operating the Heater Board was not caused solely by his inability to see the console; rather, the 12-hour shifts also affected his vision. Jones then requested to be placed solely on outside jobs as an alternative. In response, Wooters explained that there are no "outside" Operator roles at CPChem, as Operators must perform all six essential job functions, some of which are performed inside the

5

facility.[4]  Following the meeting, October 19, 2022, Cisneros sent Jones a summary of the discussion and reminded him to consult with his physician "to identify adaptive devices that [CPChem] could potentially provide to increases the visibility" of the Heater Board console.  In response, Jones indicated that it would be easier for him to see the keys on the Heater Board if CPChem would either place or fix the lighting over the board console.  Jones also informed CPChem that he was bringing in a portable light to help him with the lighting issue.  Wooters instructed Jones to put in a work order to get the lighting repaired.  Although Jones put in the work order, there is disagreement as to whether the issue was resolved.[5]

On November 17, 2022, Jones tested on the Heater Board for a third time before Ryan, Montalvo, Wooters, and Plant Shift Coordinator Bryan Lohr ("Lohr").  He was again unsuccessful.  Jones claims that he commented to the Unit Review Committee during the exam that he had trouble seeing the screen.  After the exam, Wooters met with Jones to discuss the results of his third evaluation and the status of his PIP.  During the meeting, Jones communicated to Wooters that he continued to have vision concerns that periodically interfered with his ability to view the text on the screens.  In consideration of these concerns, CPChem agreed to give Jones a fourth opportunity to test before the Unit Review Committee.  CPChem also arranged a visual acuity exam for Jones on December 12, 2022.  According to CPChem, the eye exam confirmed

---

[4] Jones disputes the contention that Operators must perform all six essential job functions. Specifically, he maintains that there are at least two Operators, Palmer Lee and Gerald Devlanc, who were permitted to work either solely on inside jobs or solely on outside jobs without obtaining qualifications in all six areas of the unit.  CPChem claims it has no record of either employee testing for the Heater Board job or of any such reassignment following an unsuccessful qualification attempt on any inside job.

[5] While Jones's Complaint (#1) states that the lighting issue was never resolved, Jones testified that the lighting issue was resolved about a month after he put the work order in, which was around November 2022.  CPChem's records suggest, however, that the work order was delayed and that the issue was unresolved as of December 12, 2022.

that Jones's eyesight was acceptable to be able to qualify for his job.  Jones contends, however, that acuity is not the only factor to consider when determining whether his myopia could have impacted his ability to see the board in a dark room.  Jones completed his fourth in-person evaluation on December 15, 2022, before Ryan, Lohr, Montalvo, and Wooters, but was again unsuccessful.  Following the exam, Wooters immediately suspended Jones's employment, without pay, beginning December 20, 2022.  CPChem ultimately terminated Jones's employment effective January 3, 2023.

On or around March 13, 2023, Jones filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights ("TCHR")/Texas Workforce Commission ("TWC").  Jones was issued a Notice of Right to Sue on August 13, 2024.  On August 23, 2024, Jones filed his Complaint (#1) against CPChem in this court alleging disability discrimination and retaliation under the Americans with Disabilities Act ("ADA") and the Texas Commission on Human Rights Act ("TCHRA").  CPChem filed the present Motion for Summary Judgment on December 3, 2025.  Jones filed a Response (#21) and CPChem filed a Reply (#25).

II.    Analysis

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party.  *See Union Pac. R.R. Co. v. Palestine*, 41 F.4th 696, 703 (5th Cir. 2023); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 380 (5th Cir. 2019); *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010).  Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a); *King v. King*, 117 F.4th 301, 308 (5th Cir. 2024); *Union Pac. R.R. Co.*, 41 F.4th at 703; *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020). The party seeking summary judgment bears the initial burden of informing the court of the basis for its  motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022); *Goldring v. United States*, 15 F.4th 639, 644-45 (5th Cir. 2021); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 416-17 (5th Cir. 2021). To warrant judgment in its favor, the movant "must establish beyond peradventure *all* of the essential elements of the claim or defense." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)); *accord Chapoy v. Union Pac. R.R.*, No. 22-40791, 2023 WL 6461252, at *2 (5th Cir. Oct. 4, 2023).

"A fact issue is 'material' if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)); *see MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020). "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *accord Valencia v. Davis*, 836 F. App'x 292, 296 (5th Cir. 2020); *see Dyer*, 964 F.3d

at 379. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Gerhart v. Barnes*, 724 F. App'x 316, 321 (5th Cir. 2018) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)); *accord Johnson v. City of San Antonio*, No. 22-50196, 2023 WL 3019686, at \*6 n.7 (5th Cir. Apr. 20, 2023); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). Thus, "[a] genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368 (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)); *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Dyer*, 964 F.3d at 379; *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The moving party, however, "need not negate the elements of the nonmovant's case." *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014); *see Savoy v. Kroger Co.*, 848 F. App'x 158, 160 (5th Cir. 2021).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023); *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 410 (5th Cir. 2020). The court "should review the record as a whole." *Black v. Pan Am. Lab'ys, L.L.C.*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000)); *see Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons*, 964 F.3d at 302. The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255); *Dietrich v. United Parcel Serv., Inc. (Ohio)*, No. 24-50316, 2025 WL 445050 at *3 (5th Cir. Feb. 10, 2025); *Seigler*, 30 F.4th at 476; *Batyukova*, 994 F.3d at 724; *Lyons*, 964 F.3d at 302. The evidence is construed "in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Johnson v. Cooper T. Smith Stevedoring Co., Inc.*, 74 F.4th 268, 275 (5th Cir. 2023) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *accord Lexon Ins. Co., Inc.*, 7 F.4th at 321; *Geovera Specialty Ins. Co. v. Odoms*, 836 F. App'x 197, 200 (5th Cir. 2020) (quoting *Little*, 37 F.3d at 1075).

Furthermore, the court's obligation to draw reasonable inferences "does not extend so far as to allow a wholly 'unreasonable inference' or one which amounts to 'mere speculation and conjecture.'" *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) (quoting *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 879 (5th Cir. 1977)); *accord McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 432 (5th Cir. 2020); *Batyukova*, 994 F.3d at 724 ("'Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' will not survive summary judgment." (quoting *Orr v. Copeland*, 844

10

F.3d 484, 490 (5th Cir. 2016))); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) ("If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992))); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) ("[O]nly reasonable inferences in favor of the nonmoving party can be drawn from the evidence." (citing *Eastman Kodak Co.*, 504 U.S. at 468 n.14)). "[S]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *accord Allaudin v. Perry's Rests., Ltd.*, 805 F. App'x 297, 299 (5th Cir. 2020); *Acadian Diagnostic Lab'ys, L.L.C.*, 965 F.3d at 410 (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Summary judgment is generally inappropriate, however, when inferences the parties seek to draw deal with questions of motive and intent. *Autobahn Imps., L.P. v. Jaguar Land Rover N. Am., L.L.C.*, 896 F.3d 340, 350 n.23 (5th Cir. 2018); *see Perry v. H.J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 476 (5th Cir. 2021) ("[S]ummary judgment is rarely proper when an issue of intent is involved." (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996))); *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (stating that "we hesitate to grant summary judgment when a case turns on a state of mind determination"); *Pasco v. Knoblauch*, 223 F. App'x 319, 322 (5th Cir. 2007) ("[S]ummary judgment is rarely proper when an issue of intent is involved."). Courts have applied this principle when denying

11

summary judgment to defendants in employment discrimination cases where genuine disputes of material fact exist as to whether the plaintiff was discriminated against on the basis of his or her protected class. *See, e.g.*, *Cappel v. La. Dep't of Transp. & Dev.*, No. 10-1810, 2012 WL 2990695, at *2 (E.D. La. July 20, 2012) (denying the defendant's motion for summary judgment on the plaintiff's age, race, and sex discrimination claims in part because "where the Defendant's intent is at issue, it is inappropriate '[t]o grant summary judgment because the party's state of mind is inherently a question of fact which turns on credibility'" (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991))); *see also Whatley v. Hopewell*, No. 1:21-CV-01185, 2022 WL 11385995, at *9 & n.27 (W.D. La. Oct. 19, 2022).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Lyons*, 964 F.3d at 302; *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 560 (5th Cir. 2019). "[W]here the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' no genuine issue of material fact can exist." *Goode v. Greenstream Int'l, L.L.C.*, 751 F. App'x 518, 521 (5th Cir. 2018) (quoting *Nichols v. Enterasys Networks, Inc.*, 595 F.3d 185, 188 (5th Cir. 2007)); *see Phillips v. Sanofi U.S. Servs. (In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 994 F.3d 704, 710 (5th Cir. 2021). In such a situation, "'[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (quoting *United States ex rel. Farmer v. City of Houston*, 523

F.3d 333, 337 (5th Cir. 2008)); *accord Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023); *Stingley v. Watson Quality Ford*, 836 F. App'x 286, 288 (5th Cir. 2020).

A.      Discrimination Claim

The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to individuals without a disability. *See* 42 U.S.C. §§ 12101-12113; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001); *Clark v. Dep't of Pub. Safety*, 63 F.4th 466, 470 (5th Cir. 2023); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 696 (5th Cir. 2014); 29 C.F.R. § 1630.1. Title I of the Act, which covers employment discrimination, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 179-80 (2012); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 46 (2003); *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 483 (5th Cir. 2023). "The ADA seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 801 (1999) (citing 42 U.S.C. § 12101(a)(8), (9)); *see Ariza v. Loomis Armored US, LLC*, 132 F. Supp. 3d 775, 786-87 (M.D. La. 2015). Employees asserting claims under Title I of the ADA are required to follow the procedures applicable to Title VII actions, including the timely filing of an EEOC charge. *See* 42 U.S.C. § 12117(a); *Melgar v. T.B. Butler Publ'g Co., Inc.*, 931 F.3d 375, 378 (5th Cir. 2019).

13

The plaintiff may present either direct evidence of disability discrimination or employ the indirect method of proof utilized in other types of employment discrimination cases.[6] *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 525 (5th Cir. 2022) (citing *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "In cases in which the plaintiff produces only circumstantial evidence, we proceed under the *McDonnell Douglas* burden shifting framework," which "first requires the employee to establish a *prima facie* case of discrimination." *Gosby*, 30 F.4th at 525-26 (citing *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015); *LHC Grp., Inc.*, 773 F.3d at 694); *see Clark*, 952 F.3d at 582. "Because TCHRA 'parallels the language of the [ADA],' Texas courts follow ADA law in evaluating TCHRA discrimination claims." *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 444-45 (5th Cir. 2018) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285-87 (5th Cir. 2004)); *accord Nall*, 917 F.3d at 340 n.2.

---

[6] The Fifth Circuit defines "direct evidence" as "evidence which, if believed, proves the fact without inference or presumption." *Clark*, 952 F.3d at 579 (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)). "A statement or document which shows 'on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination.'" *Id.* (quoting *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018)). In *Clark*, the Fifth Circuit held that, where the plaintiff "fail[ed] to point to any statement or document that directly and expressly link[ed] his disability to a decisionmaker's choice to terminate him," and instead relied on "generalized knowledge about his diabetes and the termination itself," his evidence required the fact-finder "to make an inference." *Id.* at 580-81; *see Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) (holding that "[f]iring [the plaintiff] for arriving to work under the influence of alcohol is not equivalent to firing [the plaintiff] because of a prejudice against alcoholics," as "[a]n inferential leap is required to arrive at the conclusion [the employer] discharged [the plaintiff] out of discriminatory animus against him as an alcoholic"); *Nall*, 917 F.3d at 341 (determining that the comment "people with Parkinson's don't get better" did not constitute direct evidence of disability discrimination because it "could simply be an observation about the disorder" and, in order "[t]o be evidence of animus, the comment requires an inference that the irreversible nature of Parkinson's disease was the reason why [the plaintiff] would not be returning to work").

To establish a *prima facie* case of employment discrimination under Title I of the ADA, the plaintiff must demonstrate that:

(1)     he has a "disability";

(2)     he was qualified for the position; and

(3)     he was subject to an adverse employment action because of his disability.

*Strife v. Aldine Indep. Sch. Dist.*, 138 F.4th 237, 248 (5th Cir. 2025); *Gosby*, 30 F.4th at 526 (citing *Nall*, 917 F.3d at 341); *Clark*, 952 F.3d at 582.

If the plaintiff succeeds in making this *prima facie* showing, a rebuttable presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Mueck*, 75 F.4th at 483; *Gosby*, 30 F.4th at 526; *Clark*, 952 F.3d at 588. While the employer need not prove that its actions were motivated by the legitimate reason, it must produce some evidence in support of its proffered rationale. *Vincent v. Coll. of the Mainland*, 703 F. App'x 233, 237 (5th Cir. 2017) (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016)); *see EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). The defendant's burden is merely one of production and not of persuasion. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 257-58 (1981); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 232 n.10 (5th Cir. 2015). To meet this burden, an employer must produce evidence which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *McDaniel v. Nat'l R.R. Passenger Corp.*, 705 F. App'x 240, 246 (5th Cir. 2017) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)); *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016).

If the employer meets its burden of production, the presumption is dissolved, and the burden shifts back to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination—the defendant's alleged nondiscriminatory reason is false and the real reason for the adverse action is disability discrimination. *Rogers*, 827 F.3d at 408 (quoting *Reeves*, 530 U.S. at 133); *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015) (quoting *Hicks*, 509 U.S. at 507). As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022) (quoting *Burdine*, 450 U.S. at 253); *see Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235 (5th Cir. 2016). To prevail on an ADA claim, the plaintiff must prove that an adverse employment decision was made "because of his disability." *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir. 2021) (citing *Neely*, 735 F.3d at 245). The ADA does not prohibit adverse action due to a consequence of a disability, such as being unable to report to work regularly or to perform essential job duties as a result of an injury or illness. *Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017); *LHC Grp., Inc.*, 773 F.3d at 697; *Hypes ex rel. Hypes v. First Com. Corp.*, 134 F.3d 721, 726-27 (5th Cir. 1998) (citing 42 U.S.C. § 12112(a)); *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195-96 (7th Cir. 1998); *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 759-60 (5th Cir. 1996). In short, an employee "can not hide behind the ADA and avoid accountability for his actions." *Hamilton*, 136 F.3d at 1052.

1.      Prima Facie Case[7]

CPChem does not dispute the first two elements of Jones's prima facie case—Jones is disabled and he was qualified for his job on the date of his termination.[8]  CPChem argues, however, that Jones cannot show that he was subject to an adverse employment decision on account of his disability.  While it is undisputed that Jones was subjected to an adverse employment action, namely, CPChem's termination of his employment, the parties dispute whether the termination was due to Jones's disability.  Here, Jones has presented summary judgment evidence that could support the inference that his claimed disability and requests for accommodations were at least motivating factors in his termination.[9]

Specifically, Jones submits evidence that CPChem's failure to provide adequate lighting in the Heater Board room caused the performance deficiencies that prevented him from passing the Heater Board exam and ultimately resulted in his termination.  On September 19, 2022—after his first exam but before his subsequent three exams—Jones officially notified Wooters and HR

---

[7] The following ADA analysis  applies equally to Jones's claims under the TCHRA.  *See Williams*, 717 F. App'x at 444-45.

[8] CPChem notes in its motion that "[a]t the prima facie stage, in determining whether an employee is 'qualified for the position,' the analysis centers on whether the employee had sufficient job experience for the position at the time of hire or promotion, and a 'later decrease in work performance [does not] render [a] plaintiff-employee unqualified when he was qualified for the same position when he was hired.' *Williams v. Entergy Services, Inc.*, 2011 WL 3555814, at *8 (E.D. Tex. July 20, 2011), *adopted by* 2011 WL 3511475 (E.D. Tex. Aug. 10, 2011)."

[9] The evidence of discrimination proffered by Jones is circumstantial.  The court therefore applies the *McDonnell Douglas* burden-shifting framework.  *See Gosby*, 30 F.4th at 525-26.  Although Jones cites *Piligian v. Icahn School of Medicine at Mount Sinai*, 490 F.Supp.3d 707, 717 (S.D.N.Y. Sept. 28, 2020) for the proposition that there is no need to determine whether the proffered reason for discharge was pretext where an employee alleges that an employer failed to accommodate a disability, and that failure to accommodate caused the conduct upon which termination was based, the court declines to follow this line of reasoning and instead relies on established Fifth Circuit precedent.  *See Mueck*, 75 F.4th at 483; *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016); *LHC Grp.*, 773 F.3d at 694.

17

in writing that he was having trouble seeing the Heater Board controls and reading the screen clearly. In his email, Jones included a letter from Dr. Hart explaining his condition and stating that his vision impairment was "causing Mr. Jones to have difficulty seeing small numbers and letters, as well as to be overwhelmed by the brightness of the lights on his operator's board." At the suggestion of Wooters, Jones submitted an official maintenance request for the light directly over the Heater Board to be fixed. CPChem's own records reveal, however, that the request was still pending around the same time that Jones took his fourth and final Heater Board exam. In addition, several Unit Review Committee members made comments about Jones's inability to physically navigate the board during the exams, which was listed as a deficiency on his evaluation. Hayes noted that Jones had "a navigation issue" and agreed that Jones's myopia problems could affect how he might navigate the console panel due to the "smaller writing." Montalvo also noticed that Jones was having trouble physically navigating the console. When asked whether a person's ability to see the board could impact his ability to navigate it, Montalvo answered, "I mean, if he can't see, yeah."

Construing the evidence in the light most favorable to Jones, a rational trier of fact could conclude that, if CPChem had granted Jones a reasonable accommodation to improve the lighting and visibility of the Heater Board, Jones would have been able to navigate the board more easily, pass the exam, and CPChem would not have terminated his employment. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015) (noting that the burden on plaintiffs at the prima facie stage of the *McDonnell Douglas* analysis is "not onerous"); *accord Ramirez v. PHI Health, LLC*, 762 F. Supp. 3d 596, 611 (S.D. Tex. 2025). Thus, the court finds that a reasonable jury could conclude that Jones has a disability, he was qualified for the job, and that he was subject to

18

an adverse employment action on account of his disability. Jones has therefore established a prima facie case of discrimination.

2.  Legitimate, Non-Discriminatory Reason

In light of Jones's prima facie showing, the burden of production now shifts to CPChem to produce a legitimate, non-discriminatory reason for Jones's termination. CPChem argues that it terminated Jones because he failed to qualify for the Heater Board role after four attempts over the course of eight months. This reasoning is well-documented in the email exchange regarding Jones's termination between HR and members of the management team. Furthermore, CPChem cites to the CBA, which states that employees "may be dropped from the payroll should they fail to meet the requirements of the Training Program." Moreover, CPChem has produced evidence showing that Jones was unsuccessful on his tests not because of any vision issues but because, after nine months of training, he did not seem to understand the material well enough to explain critical process flows that he should have known. Specifically, Ryan testified that "[he] should be able to talk about flow with [Jones] and [have Jones] explain where it's going, where it's coming from, what it's doing. And [Jones] couldn't do that." The reasons articulated by CPChem for terminating Jones are thus legitimate, nondiscriminatory reasons. *See LHC Grp.*, 773 F.3d at 701-02 ("Terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law."); *Cockrell v. United Parcel Serv., Inc.*, No. 3:08-CV-0128-K, 2009 WL 2448571, at *6 (N.D. Tex. Aug. 10, 2009) (finding a legitimate, non-discriminatory reason existed for Plaintiff's termination where Defendant fired him in accordance with the terms of the collective bargaining agreement).

### 3.    Pretext for Disability Discrimination

Because CPChem met its burden to produce evidence of a legitimate reason for Jones's termination, Jones must now offer evidence to show that reason was a pretext for discrimination. *LHC Grp.*, 773 F.3d at 702.   "To carry this burden, the plaintiff must rebut each nondiscriminatory . . . reason articulated by the employer." *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016).   "Pretext is established 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Delaval*, 824 F.3d at 480 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).   The Fifth Circuit applies "a 'motivating factor' test, which provides that 'discrimination need not be the sole reason for the adverse employment decision . . . [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome.'" *Id.* at 479-80 (quoting *LHC Grp.*, 773 F.3d at 694).

Here, Jones contends that at least two Operators, Lee and Devlanc, were permitted to work either solely inside jobs or solely outside jobs without obtaining qualifications in all six areas of the unit.   Jones testified that Lee could not pass the exam to qualify for the distillation job, but CPChem permitted Lee to work solely in the compressor heater areas until he departed on disability leave.   Similarly, Jones testified that Devlanc, after qualifying on all three outside jobs and on the Distillation Board, had "a couple of incidents" indicating that he was not equipped to work the Distillation Board.   According to Jones, CPChem simply stopped assigning Devlanc to work that board and scheduled him to work solely outside jobs until he retired.   CPChem argues that it has no record of either Lee or Devlanc testing for the Heater Board job or of any such reassignment following an unsuccessful qualification attempt on any inside job.   Ryan testified that

20

Lee "never worked the boards" and that "past union committees and past management . . . kind of allowed him to slip under the radar." Ryan further noted that when he and the new management took over, "the expectation is that [employees] will be qualified on all six jobs." When Lee "couldn't pass his last outside job, distillation, . . . he ended up going off on disability." Ryan testified, however, that "if [Lee] didn't get disability, he was going to be terminated because he couldn't pass the test." Moreover, Hayes testified that Devlanc qualified on distillation, but he "had a couple of incidents" with other boards. Hayes explained, however, that because "[Devlanc] was due for retirement soon . . . they just stopped him at that board and let him stop in his training into retirement."

In the case at bar, Jones has not proffered sufficient summary judgment evidence to demonstrate that he was treated differently or adversely as compared to other non-disabled employees. Critically, the evidence does not show that the employment actions involving Lee and Devlanc arose under nearly identical circumstances. Although Jones testified that both employees were permitted to work in limited assignments after failing to qualify for certain positions, deposition testimony reveals that both situations occurred under markedly different circumstances. Ryan testified that Lee "slipped under the radar" under prior management and that, once new management implemented the expectation that operators qualify in all six areas, Lee was unable to pass the required examination and ultimately went out on disability. Ryan further testified that, had Lee not gone on disability, he would have been terminated for failing to qualify. Likewise, although Hayes acknowledged that Devlanc stopped training on certain boards after experiencing performance issues, Hayes explained that CPChem made that decision because Devlanc was nearing retirement and simply allowed him to remain in his existing assignment until he retired.

21

Unlike Lee and Devlanc, Jones was neither grandfathered under prior management practices nor nearing retirement or disability leave when he failed to qualify for the Heater Board.  Accordingly, the record does not support a finding that Lee and Devlanc were similarly situated comparators who received more favorable treatment under nearly identical circumstances.  *See Mueck*, 75 F.4th at 484 ("In the context of discrimination claims, 'we [have] require[d] that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken under nearly identical circumstances.'" (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)); *see also Delaval*, 824 F.3d at 480 ("In response to a motion for summary judgment, an employee must present 'substantial evidence' that the employer's legitimate, nondiscriminatory reason for termination is pretextual.").

Therefore, the summary judgment evidence does not, even when all reasonable inferences are drawn in a light most favorable to Jones, support the conclusion, or raise a genuine issue of material fact on whether, CPChem's termination of Jones constitutes discrimination under the ADA or TCHRA.

B.     Failure to Accommodate Claim

CPChem additionally maintains that summary judgment is warranted on Jones's failure to accommodate claim.  The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  Specifically, the ADA provides:

The term "reasonable accommodation" may include—

(A)  making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B)  job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9); *see Feist v. La. Dep't of Justice*, 730 F.3d 450, 453 (5th Cir. 2013).  In addition to repeating the examples set forth in the statute, the regulations define the term "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii); *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 417 (2002); *Feist*, 730 F.3d at 453; *EEOC*, 570 F.3d at 620-21.

To prevail on a failure to accommodate claim, a plaintiff must prove the following elements:  "(1) [the plaintiff] is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations."  *Jennings v. Towers Watson*, 11 F.4th 335, 343 (5th Cir. 2021) (quoting *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017)); *Feist*, 730 F.3d at 452.  The plaintiff is required to demonstrate, as part of his *prima facie* case, that an accommodation of his disability exists and that such accommodation is reasonable.  *Riel*, 99 F.3d at 683; *Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (citing *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)).  "[A] reasonable accommodation is 'a method of accommodation that is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's]

23

operations.'" *Riel*, 99 F.3d at 683 (quoting *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993) (interpreting "reasonable accommodation" under the linguistically similar Rehabilitation Act)); *see Medrano*, 179 F. App'x at 901 (citing *US Airways, Inc.*, 535 U.S. at 401**)** (noting that many lower courts have held that an accommodation must be reasonable "on its face, *i.e.*, ordinarily or in the run of cases"). The burden of production is not a heavy one and merely entails demonstrating the existence of a plausible accommodation, "the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995); *see Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir. 2001). Nevertheless, "[a] disabled employee is entitled only to a reasonable accommodation, not the employee's preferred accommodation, and has no right to a promotion or to choose a job assignment." *Stringer v. N. Bolivar Consol. Sch. Dist.*, 727 F. App'x 793, 800 (5th Cir. 2018) (citing *Griffin*, 661 F.3d at 224).

"An employee who needs an accommodation because of a disability has the responsibility of informing [his] employer." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 621(citing *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)); *accord Griffin*, 661 F.3d at 224. The United States Supreme Court has recognized that:

> the [ADA] requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, *i.e.*, preferentially.

*US Airways, Inc.*, 535 U.S. at 397 (emphasis in original). Furthermore, "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to suggest the

24

reasonable accommodations." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 621 (quoting *Taylor*, 93 F.3d at 165). However, "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *EEOC v. Agro Distrib., LLC*, 555 F.3d 462 (5th Cir. 2009) (citing *Hendrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)); *see* 29 C.F.R. § 1630.9, App.

After the plaintiff has suggested a reasonable accommodation, the burden shifts to the employer to "engage in an 'interactive process': 'a meaningful dialogue with the employee to find the best means of accommodating that disability." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 621 (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)); *see Griffin*, 661 F.3d at 224 (citing *Agro Distrib., LLC*, 555 F.3d at 471). If the employer's refusal to engage in this process "'leads to a failure to reasonably accommodate an employee, the employer violates the ADA.' [Conversely,] 'an employer cannot be found to have violated the ADA when responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer.'" *Griffin*, 661 F.3d at 224 (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)).

Once the plaintiff has done so, the defendant has the burden of showing that the proposed accommodation is unreasonable, which "merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." *Borkowski*, 63 F.3d at 138; *see Riel*, 99 F.3d at 681-82. The ADA provides "that an employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'" *US*

*Airways, Inc.*, 535 U.S. at 395 (emphasis in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). In practice, the questions of whether an accommodation is reasonable and whether it creates an undue burden are almost identical. *See, e.g., id.* at 402 (noting that ordinary summary judgment principles reconcile reasonable accommodation and undue hardship); *Arline*, 480 U.S. at 287 n.17 (finding that accommodation is not reasonable if it either imposes "undue financial and administrative burdens" or requires a "fundamental alteration in the nature of [the] program"); *Bruff*, 244 F.3d at 500 (undue hardship exists if employer "incurs anything more than a *de minimis* cost"); *Riel*, 99 F.3d at 681 (the terms "reasonable accommodation" and "undue hardship" often go hand-in-hand); *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1080 (6th Cir. 1988) (an accommodation is not reasonable if it places an undue burden on the employer).

The ADA, however, "does not require an employer to relieve an employee of any essential functions of [his] job" in order to make reasonable accommodation for his disability. *Miller v. Metrocare Servs.*, 809 F.3d 827, 831 & n.3 (5th Cir. 2016); *LHC Grp., Inc.*, 773 F.3d at 698; *Crossley*, 569 F. App'x at 200 (citing *Barber v. Nabors Drilling, U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997)); *Gober*, 537 F. App'x at 522. The law is clear that "an employer's duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of [her] job with an accommodation." *Jones v. Walgreen Co.*, 679 F.3d 9, 19 (1st Cir. 2012) (quoting *DeCaro v. Hasbro, Inc.*, 580 F.3d 55, 63 (1st Cir. 2009); *accord Wilkerson v. Boomerang Tube, LLC*, No. 1:12-CV-198, 2014 WL 5282242, at *10 (E.D. Tex. Oct. 15, 2014); *see Appel v. Inspire Pharms., Inc.*, 712 F. Supp. 2d 538, 548-49 (N.D. Tex. 2010). In addition, where an employer has no part-time positions, the employer need not create such a position to accommodate a disabled employee; nor must it displace a temporary worker to

26

place a disabled worker. *Moreno v. Brownlee*, 85 F. App'x 23, 28 (5th Cir. 2004); *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 680 (7th Cir. 1998); *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 318 n.11 (5th Cir. 1997). Similarly, an employer has no obligation to create a new "light duty" position for a disabled employee. *Moreno*, 85 F. App'x at 28 ("[T]he Army, at that point, was not required to simply create a position that Moreno could perform."); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998); *Foreman*, 117 F.3d at 809. Hence, the ADA does not require an employer to reassign the employee to an occupied position, create a new position, eliminate essential functions of a job, or assign existing employees or hire new employees to perform abandoned essential functions of a position. *Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 724 (5th Cir. 2011); *Still v. Freeport-McMoran, Inc.*, 120 F.3d 50, 53 (5th Cir. 1997); *Turco*, 101 F.3d at 1094; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996); *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995); *see also* 29 C.F.R. pt. 1630, App. § 1630.2(o).

Furthermore, "the ADA does not require an employer to take action inconsistent with the contractual rights of other workers under a collective bargaining agreement." *Foreman*, 117 F.3d at 810 (citing *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995)); *see US Airways, Inc.*, 535 U.S. at 403 ("[L]ower courts have unanimously found that collectively bargained seniority trumps the need for reasonable accommodation in the context of the linguistically similar Rehabilitation Act."); *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996) ("[T]he ADA does not require disabled individuals to be accommodated by sacrificing the collectively

bargained, bona fide seniority rights of other employees."); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995).

Here, CPChem does not dispute, for the purposes of its motion, that Jones is a qualified individual with a disability or that CPChem had notice of the disability and its consequential limitations. CPChem argues, however, that Jones cannot demonstrate that CPChem failed to provide a reasonable accommodation. In particular, CPChem argues that it did not fail to accommodate Jones with respect to lighting, nor did it fail to accommodate Jones with respect to his request for an "outside" Operator role. In response, Jones argues that CPChem's motion omits discussion of a host of other potential accommodations of which it had been made aware during the interactive process. The court addresses each assertion in turn.

### 1. Lighting Accommodation

On September 19, 2022, Jones officially notified Wooters and HR of his vision problems and the impact on his Heater Board training. In the email, Jones stated, "Ever since I've been training on the heater board I've been in and out of the eye clinic trying to get my vision where I can see the controls and reading clearly." Attached to the email was a letter from Dr. Hart describing Jones's eye condition. Although there was an alleged misunderstanding between Dr. Hart and Jones as to whether Jones wanted to be removed from the night shift, the letter states that "Jones suffered from extremely high myopia," that "Jones is beginning to have vision changes due to the elongation of his eyes," and that these issues are "causing [Jones] to have difficulty with seeing small numbers and letters, as well as to be overwhelmed by the brightness of the lights on his operator's board." Despite the specific issues listed in the letter, CPChem decided to move forward with Jones's second in-person panel interview, since the testing occurred during the day.

28

It was not until October 3, 2022, that HR met with Jones to discuss possible accommodations. On October 19, 2022, Cisneros requested via email that Jones identify adaptive devices that CPChem could implement to accommodate Jones's vision concerns. The next day, Jones responded: "Really all I need from you guys is the lighting over the heater board console to work properly so I can see the keys on the board. Everything else will work out fine." Wooters then instructed Jones to submit a work order to have the lighting repaired. Moreover, Wooters testified that "it is not unreasonable to have . . . a lighting source." While Jones testified that the lighting was repaired about a month after he made the request, around November 2022, CPChem's records show that the light remained unrepaired as of December 2022, when Jones was placed on leave. Moreover, CPChem does not point to any evidence showing that it was under the impression that the lighting was fixed during the relevant time period. *See Strife*, 138 F.4th at 246 (noting that "delay in providing reasonable accommodation may show a lack of good faith in the interactive process"). In fact, the evidence indicates that Cisneros did not follow up regarding the lighting issue until December 12, 2022—three days before Jones was scheduled to take his final Heater Board exam. At that time, Wooters was made aware that the lighting was never fixed. Thus, a reasonable jury could find that CPChem was at least partially at fault for the breakdown in the interactive process. *See Loulseged*, 178 F.3d at 736 (holding that responsibility for the interactive process is shared).

CPChem points to certain comments made by Jones as well as others during deposition testimony, which it claims negate Jones's assertion that it failed to accommodate him. Specifically, when asked if at any point he requested that his training be paused to allow the lighting to be fixed, Jones responded, "I had no idea I could pause the training." Kubsch also

testified that Jones "brought his own light to work" and that he was "using his own personal light to see the board." When Kubsch asked Jones about the light, Jones "said it was working just fine." Moreover, Jones does not appear to attribute his failures on the Heater Board exams to the lighting issues. When asked if he felt like he answered the Unit Review Committee's questions such that he thought he should have passed, he replied, "I thought I did." Further, when asked if he felt like there was something CPChem could have done to assist him in passing the Heater Board, Jones replied "No."[10]

Although these statements are likely relevant to the question of whether the failure to accommodate Jones's disability caused Jones to fail the Heater Board exam and thus be terminated, a failure to accommodate claim does not require proof of an adverse employment action. *Strife*, 138 F.4th at 247. The only factors the court must consider with regard to this claim are whether Jones is a qualified individual with a disability, whether the disability and its consequential limitations were known by CPChem, and whether the CPChem failed to make reasonable accommodations for such known limitations. *See Jennings*, 11 F.4th at 343. Here, there is ample evidence to support the fact that Jones made a reasonable request that the lighting be fixed over the Heater Board and that CPChem did not fix the issue before Jones was terminated. Thus, at a minimum, there exists a fact issue regarding whether the CPChem failed to accommodate Jones with respect to the lighting over the Heater Board.

---

[10] Jones subsequently stated that the only thing CPChem could have done was, with regard to his first exam, alter his training schedule so that it was not being broken up with outside work. Notably, this complaint has nothing to do with his disability.

2.      Outside Operator Role Accommodation

During the October 3, 2022, meeting, Jones maintains that he requested to return to one of the outdoor jobs on which he had previously qualified instead of completing his training and qualification on the Heater Board console.  The request, however, was never discussed as an option.  Wooters explained to Jones during the meeting that it was not possible to put him in an "outside" Operator role because no such role existed.  Indeed, CPChem maintains that Operator roles are not "inside" or "outside," but rather involve six different essential job functions, some of which are performed inside and some of which are performed outside.  Although Jones points to purported exceptions made for Lee and Devlanc, as previously discussed, Jones's situation is dissimilar to that of Lee and Devlanc because Jones was not nearing retirement or disability leave when he failed to qualify for the Heater Board nor was he subject to prior management practices at the time of his training.

Furthermore, CPChem has produced evidence demonstrating that working inside jobs such as the Heater Board role is an essential part of being an Operator and that no "outside only" job existed.  According to Kubsch, it would not have been possible to allow Jones to work outside as an accommodation due to his vision struggles on the Heating Board.  When asked whether there was any other kind of Operator jobs at CPChem that Jones could be moved to as an accommodation, Kubsch said, "Not in my organization."  Ryan also noted that because all the Operators "make the same amount of money," "the expectation is that [Operators] will be qualified on all six jobs."  Regarding why allowing Jones to bypass Heater Board qualification would not be a reasonable accommodation, Danford explained, "As an operator you have to qualify on all of the jobs.  So, by [Jones] not qualifying on the inside jobs, he would not be in that

31

rotation which is required by the union contract." Similarly, Ryan testified that allowing someone to work outside as an accommodation "would go against our CBA." *See Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) ("[T]he ADA does not require an employer to take action inconsistent with the contractual rights of other workers."); *accord Allen v. U.S. Postal Serv.*, No. 21-30699, 2022 WL 2383869, at *2 (5th Cir. July 1, 2022). While the outside Operator role may not have been thoroughly explored as an option for Jones, there is no requirement that CPChem create a previously non-existing position to accommodate a disability, particularly if that position would not require Jones to perform the essential functions of an Operator. *See Barber*, 130 F.3d at 709 ("We cannot say that he can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for [the employee] not to perform those essential functions."). Here, the evidence clearly indicates that performing inside jobs is an essential function of the Operator role. Thus, because an outside-only role would circumvent the essential functions of an Operator, this cannot be considered a reasonable accommodation. *See Weber v. BNSF Ry. Co.*, 989 F.3d 320, 327 (5th Cir. 2021) (holding that because Plaintiff failed to show that he could perform the essential functions of his train dispatcher position, with or without reasonable accommodations, summary judgment for his employer on the failure-to-accommodate claim was appropriate).

In addition, Jones claims that on December 12, 2022, prior to his final Heater Board exam, he submitted an application for a vacant instrument technician position within CPChem's maintenance department. Email correspondence confirms that Cisneros, Danford, and Kubsch were all aware of Jones's application. Although a reasonable accommodation under the ADA may be "reassignment to a vacant position," CPChem was not required to give priority to Jones when

hiring for that position. *See Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) ("[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."). Importantly, there is no evidence showing that Jones applied for this position as an accommodation for his vision problems. Indeed, at the time he applied for the technician job, he was still undergoing testing on the Heater Board to continue with his position as an Operator. Additionally, while Jones maintains that there is "no dispute" that this position remained unfilled at the time of Jones's suspension and discharge, he points to no evidence in the record to support this claim. Therefore, no genuine dispute of material fact exists regarding the failure to accommodate claim based on the outside operator role position or other vacancies within CPChem, as these are not reasonable accommodations.

### 3. Other Accommodations

After failing his third attempt to qualify on the Heater Board, Jones informed Wooters that he was having difficulty seeing the text on the screen. According to Wooters, Jones "commented during the third exam that he was having trouble seeing the text on the screen," which Wooters admitted "is different than him not having adequate lighting to see the console." On December 6, 2022, Jones met with Dr. James Stanton ("Dr. Stanton"), CPChem's medical director. Dr. Stanton testified that he and Jones discussed various possible accommodations, including changing the font size on the monitors, switching from a white background to a black background, and using a monitor screen. Dr. Stanton stated that he was "pretty sure" he suggested that he and Jones talk these options over with Jones's manager or supervisor to "see what might . . . be done."

According to Cisneros, she had a discussion with Dr. Stanton wherein they discussed utilizing "a magnifier and some other apparatuses that could help [Jones] see."

As a preliminary matter, the problems indicated by Jones in November and December of 2022 appear to constitute separate issues for which a separate accommodation would be required. Thus, even if CPChem was not obligated to fix the lighting above the Heater Board, Jones's report that he could not read the monitor presented a separate vision-related limitation requiring renewed consideration of reasonable accommodations. While CPChem is correct that "a disabled employee cannot remain silent and expect his employer to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation," this notion specifically applies "[w]hen the nature of the disability, resulting limitations, and necessary accommodations are uniquely within the knowledge of the employee and his health-care provider." *Taylor*, 93 F.3d at 165. Here, there is evidence that CPChem was aware of Jones's vision limitations and, through its own medical director, had identified several potential accommodations that could address those limitations. As CPChem points out, Jones was simply entitled to a reasonable accommodation, not his preferred one. *See Strife*, 138 F.4th at 250. Under these circumstances, CPChem cannot rely solely on Jones's failure to make a specific request for each proposed accommodation. A reasonable jury could conclude that Jones reasonably believed Dr. Stanton would communicate these proposed accommodations to management and that CPChem would continue the interactive process to determine whether they could be implemented.[11]

---

[11] The court additionally notes that Jones did not seek help from Dr. Stanton on his own. Cisneros first initiated a request that Dr. Stanton see Jones regarding his vision problems.

Furthermore, the ADA contemplates an ongoing interactive process as an employee's limitations become known. As the Fifth Circuit has noted, the interactive process "should be an ongoing, reciprocal process, not one that ends with "the first attempt at accommodation," but one that "continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Dillard v. City of Austin*, 837 F.3d 557, 562 (5th Cir. 2016) (quoting *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001)). In the case at bar, viewing the evidence in the light most favorable to Jones, the fact-finder could reasonably conclude that CPChem failed to engage meaningfully in the interactive process and therefore failed to provide a reasonable accommodation. *See Ford v. Mckesson*, 171 F.4th 332, 338 (5th Cir. 2026). Accordingly, genuine issues of material fact remain as to whether CPChem's failure to continue the interactive process deprived Jones of a reasonable accommodation that would have enabled him to qualify for the Heater Board position, precluding summary judgment on this facet of his ADA failure-to-accommodate claim.

C.    Retaliation Claim

Lastly, CPChem argues that summary judgment is warranted with regard to Jones's retaliation claim. The ADA prohibits discrimination against an employee who has engaged in activity protected by the Act:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

35

42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show:

(1)    he engaged in statutorily protected activity;

(2)    an adverse employment action occurred; and

(3)    a causal connection exists between the protected activity and the adverse employment action.

*See Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001); *Seaman*, 179 F.3d at 301; *Talanda*, 140 F.3d at 1095; *Champagne v. Servistar Corp.*, 138 F.3d 7, 12 n.5 (1st Cir. 1998); *Sherrod*, 132 F.3d at 1122 n.8; *Penny*, 128 F.3d at 417; *Krouse*, 126 F.3d at 500.

Regarding the third prong, a "plaintiff alleging retaliation may satisfy the causal connection element by showing close timing between an employee's protected activity and an adverse action against him." *Way v. City of Missouri City*, 133 F.4th 509, 522 (5th Cir. 2025) (quoting *Feist*, 730 F.3d at 454). Satisfying the third prong with temporal proximity alone requires the timing to be "very close." *Id.* (quoting *Lyons*, 964 F.3d at 305). The Fifth Circuit has "ruled, for example, that a six-and-a-half-week timeframe is sufficiently close, but that a five month lapse is not close enough, without other evidence of retaliation, to establish the 'causal connection' element of a prima facie case of retaliation." *Id.* A plaintiff unable to establish a causal connection based on temporal proximity alone must point to other evidence, such as "an employment record that does not support dismissal, or an employer's departure from typical policies and procedures." *Id.* (quoting *Feist*, 730 F.3d at 454-55).

The plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. *See Seaman*, 179 F.3d at 301; *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998).

If the employee establishes a *prima facie* case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, nonretaliatory reason for its adverse employment action. *See Seaman*, 179 F.3d at 301; *Krouse*, 126 F.3d at 500. "If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation." *Seaman*, 179 F.3d at 301; *see Talanda*, 140 F.3d at 1096; *Sherrod*, 132 F.3d at 1123; *Penny*, 128 F.3d at 417. "The ultimate issue of retaliation requires the employee to prove that the adverse employment action would not have occurred 'but-for' the protected activity." *Sherrod*, 132 F.3d at 1122; *accord Seaman*, 179 F.3d at 301.

CPChem assumes for purposes of its motion that Jones engaged in protected activity when he requested an accommodation in September 2022 and recognizes that Jones's employment ended effective January 2, 2023. CPChem argues, however, that Jones cannot establish the third element of his prima facie retaliation claim, as the record contains no evidence of a causal connection between his protected activity and his termination. The question is therefore whether, under the burden-shifting framework, in the light most favorable to Jones, there is a causal connection between his protected activity and the adverse employment action.

### 1.    Prima Facie Case

CPChem argues that Jones cannot establish a prima facie case of retaliation because Jones's termination took place over three months after he requested an accommodation in September 2022. According to CPChem, Jones cannot show sufficient temporal proximity, and there is no other evidence that would establish a causal connection. While the court agrees that temporal proximity alone may not suffice to demonstrate a causal connection regarding Jones's September 2022 complaint regarding lighting, CPChem overlooks the fact that Jones did not officially request that

the lighting be repaired until October 20, 2022.  Because  making a request for a reasonable accommodation under the ADA constitutes a statutorily protected activity, temporal proximity could reasonably be calculated from the date that Jones requested the lighting accommodation. *See Way*, 133 F.4th at 522 ("[M]aking a request for a reasonable accommodation under the ADA constitutes 'participat[ing] in an activity protected under the statute.'").  Thus, because Jones was suspended on December 20, 2022, only two months elapsed between Jones's protected activity and an adverse employment action.  Moreover, if Jones's November 2022 complaint to Wooters regarding his inability to read the letters on the screen constitutes a protected activity, the temporal proximity is closer.

Even if these events are too distant from Jones's termination to satisfy the "very close" standard, Jones has nonetheless presented evidence that his requests for accommodation caused CPChem to terminate his employment.  After requesting that the light fixture be repaired, CPChem still required him to take the Heater Board test two more times under sub-optimal conditions.  Moreover, when Jones brought up his difficulty seeing the board after his third exam, CPChem still tested him a fourth time with no change in testing conditions.  A reasonable juror could find a causal connection between Jones's requests for accommodation and his termination based on the fact that CPChem subjected him to multiple Heater Board exams without having made any alterations to accommodate his disability.  This is especially true in light of the fact that the requested accommodations were relatively simple and did not constitute an undue burden on CPChem.  Thus, Jones has presented sufficient evidence to demonstrate a prima facie case of retaliation.

### 2.   Legitimate, Nonretaliatory Reason

As the court previously discussed with regard to Jones's discrimination claim, CPChem has provided sufficient evidence to show that it had a legitimate reason for terminating Jones's employment.  Namely, CPChem terminated Jones because he failed to qualify for the job in the Heater Board role after four attempts over the course of eight months.  Moreover, CPChem has produced evidence showing that Jones was unsuccessful on his tests not because of any vision issues but because, after nine months of training, he did not seem to understand the material well enough to explain critical process flows that he should have known.  According to the CBA, failure to qualify on the Heater Board may result in termination.  Thus, CPChem has produced evidence that it had a legitimate, nonretaliatory reason for its adverse employment action against Jones.

### 3.   Pretext

Although Jones has presented adequate evidence to establish a prima facie case of retaliation, he has not produced sufficient evidence from which a reasonable jury could conclude that CPChem's stated reason for terminating his employment was pretextual.  There is no evidence that retaliation was CPChem's true motive for terminating Jones.  As previously discussed, the evidence presented demonstrates that Jones was terminated for his failure to pass the Heater Board exam, and there is no evidence to suggest that this reason was a pretext for retaliation.  *See Feist*, 730 F.3d at 454 ("In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." (quoting *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996))).  Moreover, the temporal proximity between Jones's accommodation request and his

termination is insufficient, without more, to establish pretext. *See Lyons*, 964 F.3d at 306-07

(holding that "very close" temporal proximity is insufficient to demonstrate pretext). Therefore,

summary judgment is warranted on Jones's claims of retaliation under the ADA and TCHRA.

III.    Conclusion

In accordance with the foregoing analysis, CPChem's Motion for Summary Judgment (#17)

is GRANTED in part and DENIED in part. CPChem is entitled to summary judgment on Jones's

discrimination claims under the ADA and TCHRA and Jones's retaliation claims under the ADA

and TCHRA. The parties shall proceed to trial on Jones's failure to accommodate claims under

the ADA and TCHRA.

SIGNED at Beaumont, Texas, this 24th day of June, 2026.

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE